# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | Civ. No. 24-cv-1743 (JMB/DTS)<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR LEAVE TO FILE SUPPLEMENTAL CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| UNITEDHEALTH GROUP INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL ALLEGATIONS .............................................................................. 2

      A.    Summary of Relevant Allegations in the Complaint ................................. 2

      B.    Summary of Findings from New OIG Report and Information from
            New Investigative News Reports .............................................................. 4

III.  ARGUMENT ..................................................................................................... 7

IV.   CONCLUSION .................................................................................................. 9

4863-2807-6028.v1

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 15(d) ("Rule 15(d)"), Lead Plaintiff California Public Employees' Retirement System ("Plaintiff"), respectfully submits this memorandum of law in support of its Unopposed Motion for Leave to File Supplemental Consolidated Complaint for Violations of the Federal Securities Laws.  Rule 15(d) allows parties "to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented" with leave of court.  Fed. R. Civ. P. 15(d).

Plaintiff seeks leave to file a supplemental complaint adding new supporting findings and information from a report by the Office of the Inspector General for the Department of Health and Human Services ("OIG"), and two investigative news reports.  As summarized below, the OIG report and the investigative news reports were all released after the Complaint was filed on October 4, 2024.[1]  A redline version of the proposed supplemental consolidated complaint showing the supplemental information, including the new OIG and two investigative news reports as additional exhibits, is attached to the Declaration of Tim Sullivan as Ex. A.[2]

---

[1]    "Complaint" refers to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 45).  Unless otherwise noted, all "¶__" or "¶¶__" citations herein are to the Complaint, all capitalized terms not otherwise defined have the same meaning as set forth in the Complaint, citations are omitted, and emphasis is added.

[2]    *See* Declaration of Tim Sullivan in Support of Lead Plaintiff's Unopposed Motion for Leave to File Supplemental Consolidated Complaint for Violations of the Federal Securities Laws, filed concurrently herewith, Ex. A (a redline copy of the proposed supplemental consolidated complaint incorporating the new material findings and information and attaching the two new investigative news reports, and the OIG's additional report, as Exhibits 5-6 and 10, respectively).

UnitedHealth Group, Inc. ("UnitedHealth" or the "Company"), Andrew Witty, Stephen Hemsley, and Brian Thompson's (collectively, "Defendants") response to the Complaint is currently due December 3, 2024. ECF 43. Plaintiff and Defendants, through their counsel of record, have met and conferred regarding this motion, and Defendants do not oppose the motion to file a supplemental complaint.

## II.    FACTUAL ALLEGATIONS

### A.    Summary of Relevant Allegations in the Complaint

UnitedHealth is one of the largest healthcare corporations in the world, and its businesses span the breadth of the healthcare market, providing health insurance, healthcare administration, and healthcare services to hundreds of millions of people, which gives UnitedHealth immense market power. ¶¶28-30. This case arises out of Defendants' abuse of that power. The Complaint alleges that during the Class Period Defendants engaged in improper and anti-competitive practices, which they concealed from investors in violation of federal securities laws. Relevant to this motion, the Complaint alleges that Defendants implemented and oversaw an undisclosed scheme to boost revenues by fraudulently "upcoding" diagnoses of serious and chronic medical conditions across UnitedHealth's massive Medicare Advantage member population. ¶¶46-93. Medicare Advantage is a privatized version of traditional Medicare, under which the government pays a set fee to private insurers such as UnitedHealth to provide insurance plans to qualifying senior citizens. ¶¶6, 46. The government pays a higher set fee for Medicare Advantage patients with certain medical conditions. ¶¶6, 37-41. This upcoding scheme, which was carefully

orchestrated by Defendants to add unwarranted diagnoses codes, allowed UnitedHealth to extract billions of dollars in taxpayer-funded payments during the Class Period.  ¶¶92-93.

The Complaint alleges that Defendants employed several different mechanisms to effectuate their upcoding scheme.  For example, UnitedHealth induced providers to find new diagnoses by paying bonuses to those who upcoded.  ¶¶7, 80.  The Complaint alleges that providers were rewarded tens of thousands of dollars for coding high-value diagnoses without a valid basis.  ¶¶80, 194, 246.  Similarly, UnitedHealth trained providers to use "'buddy codes,'" to add multiple new unwarranted diagnoses based upon existing ones. ¶79.

UnitedHealth also purposefully leveraged its in-home visit program called HouseCalls, to dispatch nurse practitioners to members' homes to perform physical assessments specifically designed to generate unsupported diagnoses of serious and chronic medical conditions, without regard for actual member care, in order to boost Medicare Advantage payments. ¶¶59-74.  HouseCalls nurses were forced to use questionnaires during HouseCalls visits that were crafted to generate high-value diagnoses, without regard to the members' actual medical conditions. ¶¶62-63, 190.  Providers and HouseCalls nurses were also required to use inaccurate and unreliable diagnostic tools to capture high-value diagnoses for certain serious medical conditions. ¶¶65-74.  Defendants used such tools even though they were aware the tools were prone to issue false positives for lucrative conditions. Doctors and nurses who worked for UnitedHealth during the Class Period have *admitted* that they added codes they did not truly believe existed because UnitedHealth pressured them to do so.  ¶¶60, 66-81.

UnitedHealth's upcoding scheme was extraordinarily profitable.  In 2021 alone, UnitedHealth obtained $8.7 billion in tax-payer payments for upcoded diagnoses that no doctor treated, which amount represented over 50% of the Company's net income.  ¶¶84, 93, 188, 252.  The cost of Defendants' scheme was not just financial; it has had a real-life adverse impact on America's senior citizens.  Doctors around the country have described panicked calls from UnitedHealth members who noticed alarming new diseases listed on their medical chart that their doctor never mentioned.  ¶¶8, 71.  Former UnitedHealth physician, Dr. Susan Baumgaertel, admitted that when she got those calls, "she always tried to tell patients the truth, as uncomfortable as it was: ***I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more***."  ¶8.

### B.    Summary of Findings from New OIG Report and Information from New Investigative News Reports

After Plaintiff's Complaint was filed on October 4, 2024, the OIG released an additional report, and two investigative news reports were published, that provide new material findings and information that support the Complaint's upcoding allegations and Defendants' misconduct.  On October 16, 2024, *STAT News* published an investigative report titled: "Inside UnitedHealth's strategy to pressure physicians: $10,000 bonuses and a doctor leaderboard."  Ex. A, ¶¶17 n.2, 87, 252; Ex. A at Ex. 5.  Based on internal UnitedHealth documents, the *STAT News* report describes the ways UnitedHealth instituted a "pressure campaign" to get its doctors to upcode, particularly through "annual wellness visits."  Ex. A, ¶252.  According to the *STAT News* report, UnitedHealth used a system of

- 4 -

bonuses, peer pressure, and competitive dashboards to push doctors to document more chronic illnesses in Medicare Advantage patients.  Ex. A, ¶87.

The *STAT News* report also confirmed that at UnitedHealth clinics, doctors diagnosed peripheral artery disease in 47% of Medicare Advantage patients: a rate three to four times higher than typical prevalence in older Americans.  *Id.*  Each diagnosis brought in about $3,000 in extra annual Medicare payments per patient.  *Id.*  According to the *STAT News* report, former UnitedHealth physicians from across the country consistently described intense pressure from the Company to increase patient risk scores and noted that doctors who did not code enough diagnoses were sent to remedial training.  The *STAT News* report quoted a former UnitedHealth doctor stating: "'They would say, "You should talk about these other high-risk disease states so that we get more compensation for it," . . .  I think that's an inherent conflict of interest.  Effectively what you're incentivizing is sicker patients, or at least sicker appearing on paper, which I think is a joke.'"  *Id.*

On October 24, 2024, the OIG released a report titled: "Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions."  Ex. A, ¶¶17 n.2, 18; Ex. A at Ex. 10.  The OIG report confirmed UnitedHealth's persistent manipulation of the Medicare Advantage payment system during the Class Period.  The OIG report found that $4.8 billion in risk-adjusted payments made to Medicare Advantage plans in 2023 resulted from diagnoses reported **only** on in-home health risk assessments and health risk assessment-linked chart review, and that UnitedHealth alone generated $3.2 billion, or two-thirds, of these payments, while covering only 28% of Medicare Advantage members.  Ex. A, ¶¶18, 66, 237.  The OIG report also found that

- 5 -

UnitedHealth was responsible for generating more than half of the payments made to 77 Medicare Advantage plans in 2023 where the payments were tied solely to a single in-home health risk assessment and ***no other service or treatment record***.  Ex. A, ¶66.  Based on these findings, the OIG expressed concern that "either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on [in-home health risk assessments] or [] linked chart reviews." Ex. A, ¶67.

The OIG report also expressed concern about UnitedHealth's practice of using ***their own*** doctors to conduct in-home visits, rather than using the patients' primary care provider in a clinical setting.  The OIG report stated: "By adding diagnoses to an in-home [health risk assessment] via a chart review without also implementing best practices for care coordination, [Medicare Advantage] companies [including UnitedHealth] may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care." *Id.*  As a result of its findings, the OIG recommended for the first time that CMS restrict or even cut off payments to Medicare Advantage plans like UnitedHealth for diagnoses from in-home visits and linked chart reviews.  *See* Ex. A, ¶68.

Also on October 24, 2024, *The Wall Street Journal* ("*WSJ*") published an investigative report titled: "Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds."  Ex. A, ¶¶17 n.2, 261; Ex. A at Ex. 6.  *WSJ* reported on the OIG's findings, and included statements from OIG officials, including the inspector general, condemning the upcoding practices of UnitedHealth.  According to *WSJ*, the OIG's assistant inspector general for evaluation and inspections, stated:

"We're seeing that some Medicare Advantage companies are making billions from the health risk assessment diagnoses without providing care for the conditions that they identify" . . . .

That could mean some of the diagnoses are false . . . [o]r, if they are accurate, the insurers making them aren't connecting patients to the care they need, even as the companies are paid extra based on the supposed cost of treating the conditions. "Profiting off enrollees' medical conditions without providing treatment for those conditions is wrong" . . . .

Ex. A, ¶261. The *WSJ* report also stated that UnitedHealth and other Medicare Advantage plans made diagnoses at in-home visits without standard confirmatory testing, stating:

The diagnoses that triggered home-visit payments documented in the OIG report were often for illnesses that might be difficult to confirm without a laboratory or other equipment. Two of the top diagnoses driving the payments were a form of rheumatoid arthritis, which might require lab work and X-rays to diagnose, along with secondary hyperaldosteronism, a condition that can be confirmed with blood work.

Ex. A, ¶262. Quoting the lead author of the OIG report, the *WSJ* report stated: "There are definitely conditions where you might wonder, 'Can they really, you know, identify that by a visit to someone's home?'" *Id.*

As discussed below, Plaintiff meets the requirements to file a supplemental complaint to include the new material findings and information from each of these publications.

III.    **ARGUMENT**

Rule 15(d) allows parties "to serve a supplemental pleading setting out any transaction, occurrence, or event that happened ***after*** the date of the pleading to be supplemented" with leave of court. Fed. R. Civ. P. 15(d). Rule 15(d) provides in part: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *Id.* "The purpose of subdivision (d) is to

promote as complete an adjudication of the dispute between the parties as is possible." 6A Charles A. Wright et al., *Federal Practice & Procedure* §1504 (3d ed. 2024).

"'Leave to file a supplemental complaint under Rule 15(d) rests with the court's discretion and should be freely granted'" barring any "'undue prejudice or delay.'" *White v. Crosby*, 2018 WL 11512339, at *2 (D.N.D. Nov. 20, 2018) (quoting *Dale v. Tjeersdma*, 2015 WL 1624854, at *2 (D.S.D. Apr. 13, 2015)).  This discretion is "subject to the same standard" as motions for leave to amend under Federal Rule of Civil Procedure 15(a) ("Rule 15(a)").  *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 2009 WL 10677527, at *14 n.7 (D. Minn. Feb. 9, 2009) (collecting cases finding that motions to amend under Rule 15(a) and motions to supplement under Rule 15(d) are subject to the same standard).  Thus, in keeping "'with the overarching flexibility of Rule 15, courts customarily have treated requests to supplement under Rule 15(d) liberally.  This liberality is reminiscent of the way in which courts have treated requests to amend under Rule 15(a).'" *Dekker v. Cenlar FSB, CitiMortgage, Inc.*, 2021 WL 2950143, at *1 (D. Minn. July 14, 2021).

Importantly, while the standard for requests for leave to supplement under Rule 15(d) is virtually identical as that for leave to amend under Rule 15(a), the content of such requests is different.  "'An ***amended*** pleading is designed to include matters occurring before the filing of the bill but either overlooked or not known at the time.  A ***supplemental*** pleading, however, is designed to cover matters subsequently occurring but pertaining to the original cause.'" *United States v. Vorachek*, 563 F.2d 884, 886 (8th Cir. 1977).  This is consistent with the plain language of the rule itself.  *See* Fed. R. Civ. P. 15(d) ("On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental

- 8 -

pleading setting out any transaction, occurrence, or event that happened *after* the date of the pleading to be supplemented.").

The proposed supplement is in compliance with this standard. The proposed supplemental complaint adds material information and findings contained in three publications that were released after the filing of the Complaint.

*First*, on October 16, 2024 *STAT News* published an investigative report titled: "Inside UnitedHealth's strategy to pressure physicians: $10,000 bonuses and a doctor leaderboard" (*see* Ex. A at Ex. 5).

*Second*, on October 24, 2024, the OIG publicly released a new report titled: "Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions" (*see* Ex. A at Ex. 10).

*Third*, also on October 24, 2024, *WSJ* published an article reporting on the OIG report released that same day, titled: "Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds" (*see* Ex. A at Ex. 6).

The three publications contain new material findings and information that further support Plaintiff's allegations concerning UnitedHealth's Medicare Advantage upcoding scheme. As such, the motion should be granted.

## IV.   **CONCLUSION**

For all these reasons, Plaintiff respectfully requests that the Court grant Plaintiff leave to file a clean version of the supplemental consolidated complaint attached as Ex. A to the Declaration of Tim Sullivan, including Exhibits 1-11 attached thereto.

Additionally, Plaintiff respectfully requests that the Court order the parties to meet and confer within seven days of ruling on this motion and submit a new proposed schedule to the Court for Defendants' response to the supplemental complaint.

DATED:  November 22, 2024          Respectfully submitted,

SOMERMEYER SULLIVAN PLLC
TIM SULLIVAN, MN 391528
JAMES PORADEK, MN 290488 (OF COUNSEL)


s/ TIM SULLIVAN
TIM SULLIVAN

225 South Sixth Street, Suite 3900
Minneapolis, MN  55402
Telephone:  612/643-3486
tsullivan@somsull.com
jporadek@somsull.com

Local Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (admitted *pro hac vice*)
SAM S. SHELDON (admitted *pro hac vice*)
LAURIE L. LARGENT (admitted *pro hac vice*)
ROBERT R. HENSSLER JR. (admitted *pro hac vice*)
JEFFREY J. STEIN (admitted *pro hac vice*)
JACK ABBEY GEPHART (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
darrenr@rgrdlaw.com
ssheldon@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
jstein@rgrdlaw.com
jgephart@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 10 -