# EXHIBIT 9

U.S. Department of Health and Human Services

# Office of Inspector General



# Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments

**Suzanne Murrin**

Deputy Inspector General for Evaluation and Inspections

September 2021, OEI-03-17-00474



U.S. Department of Health and Human Services

# Office of Inspector General

**Report in Brief**
September 2021, OEI-03-17-00474



## Why OIG Did This Review

We undertook this evaluation because of concerns that companies with contracts under Medicare Advantage (MA companies) may leverage both chart reviews and health risk assessments (HRAs) to maximize risk-adjusted payments, without beneficiaries receiving care for those diagnoses. Unsupported risk-adjusted payments have been a major driver of improper payments in the MA program.

The risk-adjustment program is an important payment mechanism for MA. It levels the playing field for MA companies that enroll beneficiaries who need a costlier level of care, which helps to ensure that these beneficiaries have continued access to MA plans. Chart reviews and HRAs can be tools for improving the MA program. However, two prior OIG evaluations found that the diagnoses that MA companies reported *only* on chart reviews or HRAs in the 2016 encounter data—i.e., on no other service records—resulted in billions in risk-adjusted payments for 2017. These prior evaluations raised concerns about the completeness of encounter data; the validity of submitted diagnoses on chart reviews or HRAs; and the quality of care provided to MA beneficiaries. The current evaluation builds on those two evaluations to identify MA companies that disproportionately drove increases in risk-adjusted payments from both chart reviews and HRAs.

# Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments

## Key Takeaway

Some Medicare Advantage companies' disproportionate use of chart reviews and health risk assessments to maximize risk-adjusted payments raises concerns and highlights the need for more targeted oversight.

The Centers for Medicare & Medicaid Services (CMS) risk-adjusts payments by using beneficiaries' diagnoses to pay higher capitated payments to MA companies for beneficiaries expected to have higher-than-average medical costs. This may create financial incentives for MA companies to make beneficiaries appear as sick as possible. For CMS to risk-adjust payments, MA companies report beneficiaries' diagnoses—based on services provided to beneficiaries—to CMS's MA encounter data system and the Risk Adjustment Processing System.

Chart reviews and HRAs are allowable sources of diagnoses for risk adjustment. A chart review is an MA company's review of a beneficiary's medical record to identify diagnoses that a provider did not submit or submitted in error. An HRA occurs when—in order to diagnose a beneficiary and identify possible gaps in care—a health care professional collects information from a beneficiary about the beneficiary's health.

## What OIG Found

Our findings raise concerns about the extent to which certain MA companies may have inappropriately leveraged both chart reviews and HRAs to maximize risk-adjusted payments. We found that 20 of the 162 MA companies drove a disproportionate share of the $9.2 billion in payments from diagnoses that were reported only on chart reviews and HRAs, and on no other service records. These companies' higher share of payments could not be explained by the size of their beneficiary enrollment. Each company generated a share of payments from these chart reviews and HRAs that was more than 25 percent higher than its share of enrolled MA beneficiaries.

Among these 20 MA companies, 1 company further stood out in its use of chart reviews and HRAs to drive risk-adjusted payments without encounter records of any other services provided to the beneficiaries for those diagnoses. This company had 40 percent of the risk-adjusted payments from both mechanisms, yet enrolled only 22 percent of MA beneficiaries. In addition, this company accounted for about a third of all payments from diagnoses reported solely on chart reviews and more than half of all

# Report in Brief continued
Report No. OEI-03-17-00474

## How OIG Did This Review
Using previously collected MA encounter data from 2016, we determined whether any MA companies' use of chart reviews and HRAs increased their risk-adjusted payments disproportionately relative to their size and their peers.

payments from diagnoses reported solely on HRAs. Further, almost all of its HRAs were conducted in beneficiaries' homes. Since in-home HRAs are often conducted by vendors hired by MA companies (and not likely conducted by beneficiaries' primary care providers), this raises particular concerns about the quality of care coordination for these beneficiaries and the validity of diagnoses that were reported on the HRAs.

## What OIG Recommends
CMS should (1) provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs; (2) take additional actions to determine the appropriateness of payments and care for the 1 MA company that substantially drove risk-adjusted payments from chart reviews and HRAs; and (3) perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs. To assist CMS with its efforts, we will provide information on which companies had a substantially disproportionate share of risk-adjusted payments from diagnoses that were reported only on chart reviews and/or HRAs. CMS neither concurred nor nonconcurred with our three recommendations and stated that it will take our recommendations under consideration as part of its ongoing process to determine policy options for future years.

# TABLE OF CONTENTS

BACKGROUND                                                                                                      1

    Methodology                                                                                        5

FINDINGS                                                                                                           8

    Twenty MA companies drove a disproportionate share of the $9.2 billion from chart reviews        8
and HRAs

    One MA company stood out from its peers in its use of chart reviews and HRAs to drive         10
risk-adjusted payments

CONCLUSION AND RECOMMENDATIONS                                                                   15

    Provide oversight of the 20 MA companies that had a disproportionate share of the             16
risk-adjusted payments from chart reviews and HRAs

    Take additional actions to determine the appropriateness of payments and care for the one     16
MA company that substantially drove risk-adjusted payments from chart reviews and HRAs

    Perform periodic monitoring to identify MA companies that had a disproportionate share of     17
risk-adjusted payments from chart reviews and HRAs

AGENCY COMMENTS AND OIG RESPONSE                                                               18

APPENDIX A                                                                                                     19

ACKNOWLEDGMENTS AND CONTACT                                                                     23

ABOUT THE OFFICE OF INSPECTOR GENERAL                                                         24

ENDNOTES                                                                                                        25

# BACKGROUND

## Objective

To determine whether any Medicare Advantage (MA) companies' use of chart reviews and health risk assessments (HRAs) disproportionately increased risk-adjusted payments relative to those of their peers.

Under MA, also known as Medicare Part C, CMS contracts with MA organizations (MAOs) to provide coverage of Parts A and B services through private health plan options.[1]  An MA company is a company that owns or has a controlling interest in one or more MAOs.[2]  Ensuring that MA companies receive accurate payments to provide appropriate care to Medicare beneficiaries is critically important.  Toward this end, the Centers for Medicare & Medicaid Services (CMS) risk-adjusts payments by using beneficiaries' diagnoses to pay higher capitated payments to MA companies for beneficiaries who are expected to have higher-than-average medical costs.  This payment policy may create financial incentives for MA companies to misrepresent beneficiaries' health statuses and make beneficiaries appear to have additional illnesses and other conditions that would command higher payment.

Unsupported risk-adjusted payments—payments that are not supported by diagnoses documented in beneficiaries' medical records—have been a major driver of improper payments in the MA program.  The Office of Inspector General (OIG), CMS, the United States Department of Justice (DOJ), the Government Accountability Office (GAO), and the Medicare Payment Advisory Commission (MedPAC) have identified vulnerabilities related to MA companies' inflating their beneficiaries' risk scores.  Two prior OIG evaluations found that diagnoses that MA companies reported only on two specific sources of diagnoses—chart reviews and HRAs—resulted in billions in risk-adjusted payments for 2017.[3]  This evaluation builds on those two evaluations to identify MA companies that disproportionately drove increases in risk-adjusted payments from both chart reviews and HRAs.

## The Medicare Advantage Program

In 2020, 40 percent of Medicare beneficiaries—25 million—elected to enroll with MA companies rather than the Medicare fee-for-service program.  In fiscal year 2020, MA program costs were $314 billion of the total $780 billion in Medicare program costs.[4]

**MA risk-adjusted payments.**  For each beneficiary enrolled, MA companies receive a capitated payment that reflects CMS's predicted cost of providing care to an MA

beneficiary. CMS risk-adjusts payments to pay MA companies more for beneficiaries who have higher expected health care costs.

CMS bases risk adjustments on MA beneficiaries' demographic information and diagnoses from the prior year. Exhibit 1 outlines CMS's risk-adjustment process as it relates to diagnoses that MA companies report.[5]

**Exhibit 1: MA risk-adjustment process**



Source: OIG summary of CMS's guidance on the MA risk-adjustment process.[6]

The risk-adjustment process generally begins when the beneficiary receives a service or medical item from a provider. The provider submits claims information, including diagnoses, to the MA company on the basis of the service or medical item provided to the beneficiary. The MA company submits a record of the service (hereafter referred to as a service record) to CMS's MA encounter data system. This service record contains claims information or administrative data, including the diagnoses. MA companies also submit data on beneficiaries' diagnoses to CMS through the Risk Adjustment Processing System (RAPS).[7]

CMS groups the risk-adjustment-eligible diagnoses into hierarchical condition categories (HCCs)—categories of clinically related diagnoses.[8] Each HCC has relative numerical values (i.e., relative factors) that represent the expected costs associated with treating the medical conditions in that category.[9] A beneficiary's risk score

equals the sum of the relative factors that correspond with the beneficiary's HCCs and demographic characteristics. The total risk-adjusted payment to an MA company for an enrolled beneficiary equals the risk score multiplied by the MA plan's base payment rate.[10]

# Chart Reviews and Health Risk Assessments

CMS allows chart reviews and HRAs to be used as sources of diagnoses for risk adjustment. However, the use of chart reviews and HRAs by MA companies have raised concerns as they may use them inappropriately to collect diagnoses and increase their risk-adjusted payments.

## Chart Reviews

In addition to reporting diagnoses to CMS on service records, MA companies may also perform chart reviews—retrospective reviews of beneficiaries' medical record documentation to identify diagnoses that providers did not originally submit to the MA companies.[11] To perform these reviews, MA companies may employ third-party vendors (hereafter referred to as vendors) to examine beneficiaries' medical records. These vendors may use staff with clinical or coding experience, or they may use artificial intelligence software. MA companies may report diagnoses identified by these reviews to the encounter data system in the form of chart review records. CMS allows diagnoses reported on chart reviews to support risk-adjusted payments.

In the MA encounter data, CMS does not require MA companies to link chart reviews to previously accepted records of services provided to beneficiaries. Linking a chart review to a previously accepted service record would allow CMS and other oversight entities to identify the specific item or service that is associated with a diagnosis that is eligible for risk adjustment.[12] However, CMS also permits MA companies to submit unlinked chart reviews that add diagnoses to the encounter data without identifying the specific items or services associated with the diagnoses.[13] In addition, when MA companies do not know the actual procedure codes associated with diagnoses submitted on unlinked chart reviews, CMS allows MA companies to submit any procedure codes of their choosing; CMS refers to such codes as default procedure codes.[14]

**OIG concerns about chart reviews.** A December 2019 OIG report raised concerns that chart reviews may provide MA companies with opportunities to circumvent CMS's risk-adjustment rules and inflate risk-adjusted payments inappropriately— particularly when the chart reviews are not linked to service records. Specifically, allowing MA companies to submit default procedure codes on chart reviews may create an opportunity for MA companies to circumvent the requirement for a face-to-face visit for risk adjustment.[15] OIG found that the diagnoses that MA companies reported only on chart reviews—and not on any service records in the encounter data—resulted in an estimated $6.7 billion in risk-adjusted payments for 2017.[16] Of this $6.7 billion amount, CMS based $2.7 billion in risk-adjusted payments on

diagnoses that MA companies reported only on *unlinked* chart reviews. For the unlinked chart reviews for which CMS uses procedure codes to identify diagnoses for risk adjustment, we found that 67 percent contained default procedure codes. CMS does not have safeguards in place to prevent an MA company from receiving payment for a diagnosis that is *not* eligible for risk adjustment when the MA company chooses to submit a default procedure code that *is* eligible for risk adjustment. In addition, for both chart reviews overall and unlinked chart reviews specifically, a small number of MAOs and MA companies drove a substantial portion of the resulting risk-adjusted payments.

CMS concurred with the December 2019 report's recommendations to provide oversight of certain MAOs, conduct audits of diagnoses reported on chart reviews, and reassess allowing unlinked chart reviews as sources of diagnoses for risk adjustment. In June 2020, CMS provided reports to MAOs that highlighted beneficiaries with unlinked chart reviews but no service records for 2018.[17] CMS requested that MAOs that detected errors on the basis of these reports (1) provide explanation for such errors; (2) describe any planned actions to prevent further errors; and (3) provide information about whether corrected or missing encounter records would be resubmitted. In addition, CMS has stated that it would include chart reviews in its audits of information from 2015 and 2016 that validate diagnoses for risk adjustment. As of August 2021, CMS had not yet fully implemented these recommendations.

**DOJ and GAO concerns about chart reviews.** DOJ and GAO have also raised concerns about MA companies' use of chart reviews for risk adjustment. In 2017, the United States joined a whistleblower lawsuit—filed under the False Claims Act—that included an allegation that an MA company used the results of chart reviews to submit diagnoses that the treating physician did not originally report but did not use the chart review results to delete previously submitted diagnoses that these chart reviews had found to be invalid.[18] In March 2020, the United States filed a False Claims Act lawsuit against another MA company regarding similar allegations.[19] In 2016, GAO stated its concern that diagnoses collected from MAOs' retrospective chart reviews may be less likely to be supported by medical records than diagnoses submitted to MAOs by providers.[20]

## Health Risk Assessments

Physicians or other health care professionals administer HRAs to collect information from beneficiaries about health status, health risks, and daily activities. In the Medicare fee-for-service program, HRAs are part of beneficiaries' annual wellness visits, which typically occur in physician offices or other health care facilities.[21] CMS encourages MA companies to have providers conduct initial and annual HRAs.[22] In the MA program, HRAs may also be conducted during other visits with beneficiaries—including visits to beneficiaries' homes performed by third-party vendors hired by MA companies. Care coordination that results from assessing a beneficiary's health risks

may include developing a plan of care; arranging services; delivering interventions; and reassessing and adjusting the plan of care as needed.

**OIG concerns about HRAs.**  A September 2020 OIG report found that diagnoses that MA companies reported only on HRAs in the encounter data resulted in an estimated $2.6 billion in risk-adjusted payments for 2017.[23, 24]  HRAs conducted in beneficiaries' homes generated $2.1 billion of these risk-adjusted payments.  Most of these in-home HRAs were conducted by vendors that MA companies' partner with or hire to conduct HRAs.  As with chart reviews, a small number of MAOs and MA companies drove a substantial portion of the risk-adjusted payments that resulted from HRAs overall and in-home HRAs specifically.

Of this September 2020 report's five recommendations, CMS concurred with two recommendations to provide targeted oversight of certain MA companies that drove payments resulting from in-home HRAs.  CMS has not yet implemented these two recommendations.  CMS stated that it did not concur with three recommendations because it did not determine that a change in policy was warranted.

**CMS and MedPAC concerns about HRAs.**  CMS and MedPAC have questioned whether MAOs use HRAs primarily as a strategy to find and submit more diagnoses to increase payments rather than a means to improve the care provided to beneficiaries. In 2015, CMS stated that it had observed an increase in in-home visits to assess MA enrollees.[25]  According to CMS, nonphysician practitioners working for vendors hired by MAOs usually performed in-home HRAs, and the resulting care coordination appeared to vary across plans.  At that time, CMS provided guidance to MA companies on best practices that promote the primary use of in-home HRAs as tools for improving care for MA enrollees, not just as a process for collecting diagnoses to increase risk-adjusted payments.[26]

In 2016, MedPAC—a nonpartisan legislative-branch agency that provides Congress with analysis and policy advice on the Medicare program—recommended that the Secretary of Health and Human Services eliminate HRAs as a source of diagnoses for MA risk adjustment.  MedPAC contended that a small number of MAOs were using HRAs to increase Medicare payment without providing followup care.[27]  In addition, MedPAC raised concerns about the reportedly aggressive tactics that some MAOs use to recruit beneficiaries for in-home HRAs, and it questioned the accuracy of diagnoses identified only through in-home HRAs.

# Methodology

## Data Sources

To determine whether any MA companies' use of chart reviews and HRAs increased risk-adjusted payments disproportionately relative to those of their peers, we used previously collected data for 162 MA companies that had payments resulting from diagnoses reported only on chart reviews and HRAs.  For prior work, we extracted

chart reviews[28] and HRAs[29] in the 2016 MA encounter data, as well as beneficiary enrollment data stored within CMS's Integrated Data Repository (IDR).[30]  For beneficiaries who had risk-adjustment-eligible diagnoses that were reported only on chart reviews or HRAs, we determined the HCCs generated from mapping the diagnoses reported only on chart reviews or HRAs.[31]  We calculated estimates of the amount of risk-adjusted payments associated with each HCC by multiplying the MA plan's monthly base payment rate by the relative factor of the HCC.[32, 33]  We then multiplied monthly amounts of payments by 12 to determine the annual estimated risk-adjusted payments from diagnoses reported only on chart reviews or HRAs and not on any other encounter records.

For this evaluation, we combined these data for the 162 MA companies with estimated payments from chart reviews and HRAs into a dataset.  To compare risk-adjusted payments by MA companies' enrollment size, we used CMS data on the number of beneficiaries enrolled with each MA company as of January 1, 2016.

## Analysis of Payment Amounts From Both Chart Reviews and HRAs

Using our combined dataset of previously collected information, we determined the number of MA companies with payments from chart reviews and HRAs.  Overall, 162 MA companies generated payments from diagnoses reported only on chart reviews and HRAs.  Of these companies, 126 had payments from both chart reviews and HRAs.  Of the 36 remaining companies, 30 had payments solely from HRAs and 6 companies had payments solely from chart reviews.  For each of the 162 MA companies, we totaled their payments from these mechanisms.  We then assessed the distribution of payments across MA companies to determine whether any MA companies had higher amounts of risk-adjusted payments from chart reviews and HRAs.  In addition, we compared MA companies' payments from chart reviews to their payments from HRAs, to determine whether any MA companies had higher amounts of risk-adjusted payments from chart reviews in comparison to their risk-adjusted payments from HRAs.

We summarized the number and type of HCCs and diagnoses that increased payments as a result of chart reviews and HRAs.  For our analysis of diagnoses, we limited the analysis to diagnoses reported for at least 5,000 beneficiaries on in-home HRAs.  We also summarized the number of beneficiaries with diagnoses from chart reviews and HRAs.  Finally, we calculated and compared the difference between each MA company's share of the payments from these mechanisms and its share of MA enrollment.  We identified companies with a share of payments that exceeded their share of enrollment by more than 25 percent.  We used this same approach to determine whether certain MA companies had higher amounts of risk-adjusted payments from unlinked chart reviews[34] and in-home HRAs.[35]  We are not including the names of MA companies in this report, but we will provide information to CMS regarding which companies had a substantially disproportionate share of risk-adjusted payments from diagnoses reported only on chart reviews and HRAs.

## Limitations

In calculating risk-adjusted payments for diagnoses reported only on chart reviews and HRAs during the previous evaluations, we estimated the potential impact of chart reviews and HRAs on the MA program for 2017 by using the encounter data submitted by MA companies for 2016.[36] We did not review CMS's final payment data to MA companies for 2017. CMS's actual monthly payments to MA companies may change each month if there are changes in certain beneficiary characteristics, such as long-term institutional status, dual eligibility status, and county of residence. For analytic efficiency, we calculated payment estimates for the entire year using 2016 encounter data and beneficiaries' characteristics as of January 2016. Finally, we did not incorporate diagnoses stored in CMS's RAPS data into our payment calculations because RAPS does not identify diagnoses collected from chart reviews or HRAs.[37] However, we checked RAPS and found that 99.5 percent of the diagnoses included in our HRA payment analysis were also reported in RAPS.

## Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# FINDINGS

## Twenty MA companies drove a disproportionate share of the $9.2 billion from chart reviews and HRAs

MA companies generated an estimated $9.2 billion in risk-adjusted payments from diagnoses that were reported only on chart reviews and HRAs in the encounter data. Most of these companies (142 of 162) had an amount of payments proportional to or lower than their size, as defined by their share of enrolled beneficiaries. However, 20 companies had a share of payments that was disproportionally higher than their size. For each of these top 20 companies, their share of payments from chart reviews and HRAs was more than 25 percent higher than their share of enrolled beneficiaries. Of the remaining 142 companies, 8 had a share of payments that was between 2 and 17 percent higher than their share of enrolled beneficiaries. The other 134 companies had a share of payments that was *lower* than their share of enrolled beneficiaries.

The top 20 companies generated $5.0 billion from chart reviews and HRAs that were the sole source of diagnoses in the encounter data. These 20 companies generated 54 percent of the $9.2 billion in payments from diagnoses submitted solely on chart reviews and HRAs, but enrolled only 31 percent of MA beneficiaries, as shown in Exhibit 2. In contrast, the other 142 companies generated 46 percent of the payments, but enrolled 69 percent of MA beneficiaries.

**Exhibit 2: Twenty MA companies drove over half of the risk-adjusted payments from diagnoses submitted solely on chart reviews and HRAs, yet they enrolled only 31 percent of MA beneficiaries.**



**20 MA companies**

generated **54%** of risk-adjusted **payments** from chart reviews and HRAs

enrolled **31%** of MA **beneficiaries**

Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

## Half of the 20 companies drove payments mainly using the types of chart reviews and HRAs that are more vulnerable to misuse

Unlinked chart reviews and in-home HRAs may be particularly vulnerable to misuse by MA companies to maximize risk-adjusted payments inappropriately. Specifically:

- Unlinked chart reviews do not identify the specific item or service associated with the diagnoses and may often contain default procedure codes, which

may provide opportunities for MA companies to circumvent CMS's face-to-face visit requirement for risk adjustment.

- In-home HRAs are often conducted by vendors that partner with or are hired by MA companies to conduct these assessments (and therefore are not likely conducted by the beneficiary's own primary care provider). This may create gaps in care coordination for the beneficiary.

For half of the 20 MA companies that had a disproportionate share of payments from diagnoses that were reported solely on chart reviews and HRAs, *unlinked* chart reviews and/or *in-home* HRAs accounted for most of each company's combined payments. These 10 companies each had more than 80 percent of their payments resulting from diagnoses that were reported only on unlinked chart reviews and/or in-home HRAs. Seven of these 10 companies each generated more than 90 percent of their payments from diagnoses that were reported only on unlinked chart reviews and/or in-home HRAs.

## Compared to their peers, the top 20 companies more often had chart reviews and HRAs as the sole source of diagnoses for their beneficiaries

Among the top 20 companies, a higher percentage of their enrolled beneficiaries had risk-adjustment-eligible diagnoses that were reported only on a chart review and/or HRA, in comparison to beneficiaries enrolled with the other 142 companies, as shown in Exhibit 3. These companies reported diagnoses solely on these mechanisms for more than half (56 percent) of their enrolled beneficiaries, in contrast to only one-third (32 percent) of beneficiaries enrolled with the other 142 companies.

**Exhibit 3: The top 20 MA companies relied more heavily than their peers on diagnoses reported solely on chart reviews and HRAs.**



**Top 20 Companies**

**56%** of beneficiaries with diagnoses reported only on a chart review and/or HRA

**Other 142 Companies**

**32%** of beneficiaries with diagnoses reported only on a chart review and/or HRA

Source: OIG analysis of 2016 MA encounter data from CMS's IDR.

The top 20 companies had risk-adjusted payments for 38 percent of their beneficiaries who had diagnoses that were reported only on chart reviews and/or HRAs. The other 142 companies had risk-adjusted payments for 30 percent of their

beneficiaries who had diagnoses that were reported only on chart reviews and/or HRAs.

## Just 12 health conditions accounted for two-thirds of the $5 billion in risk-adjusted payments from chart reviews and HRAs for the top 20 companies

The HCCs generated by diagnoses reported only on chart reviews and HRAs included serious illnesses, such as diabetes and heart disease. However, there were no service records directly demonstrating that beneficiaries who had a chart review and/or HRA received treatment for these serious health diagnoses. For the 20 companies, 68 percent of their risk-adjusted payments ($3.4 billion of $5.0 billion) from diagnoses reported only on chart reviews and HRAs were concentrated among 12 of the 101 possible HCCs, as shown in Exhibit 4.[38]

**Exhibit 4: For 20 MA companies, 12 health conditions drove billions in risk-adjusted payments from chart reviews and HRAs.**



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

## One MA company stood out from its peers in its use of chart reviews and HRAs to drive risk-adjusted payments

Among the top 20 MA companies, 1 MA company generated 40 percent ($3.7 billion of $9.2 billion) of all payments from diagnoses submitted solely on chart reviews and HRAs, yet it enrolled only 22 percent of all MA beneficiaries, as shown in Exhibit 5.

The remaining top 19 companies accounted for a much smaller—yet still disproportionate—share of payments.[39]  The other 142 companies that had payments from chart reviews and/or HRAs enrolled 69 percent of all MA beneficiaries and accounted for just 46 percent of these payments.

**Exhibit 5: One top MA company generated billions in payments and a disproportionately high share of payments from diagnoses submitted solely on chart reviews and HRAs.**



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

## The MA company with the largest share of payments particularly stood out in its use of HRAs

This one top company stood out from its peers because of its disproportionally large share of the payments generated by (1) HRAs, (2) in-home HRAs, and (3) certain health conditions identified only during HRA visits.  It also stood out for its more intensive reporting of certain diagnoses on in-home HRAs.

**Although this one MA company drove payments from both chart reviews and HRAs, it had a disproportionately higher share of the payments from HRAs.**  This company generated 58 percent ($1.5 billion of $2.6 billion) of all payments from HRAs, as shown in Exhibit 6.  The other top 19 companies accounted for only 4 percent of payments from HRAs.  The remaining 142 companies generated 38 percent of the payments from HRAs.

**Exhibit 6: The one top MA company** had a greater share of the payments from diagnoses reported solely on HRAs, whereas the other companies had more of the payments from diagnoses reported solely on chart reviews.



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

**This one company differed from its peers in the share of the HRA-driven payments for certain health conditions.** For six HCCs, this company had a substantially greater share of the payments driven by diagnoses reported solely on HRAs, as shown in Exhibit 7.

**Exhibit 7: One top MA company** had a substantially greater share of the payments resulting from HRAs for certain health conditions, in comparison to its peers.



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

Overall, this 1 company had more than twice the amount of HRA-driven payments for these 6 HCCs as did the other 161 companies combined ($704.8 million versus $308.8 million).  Although this 1 company enrolled 22 percent of MA beneficiaries, it accounted for at least 60 percent of the beneficiaries identified as having each of these health conditions during HRAs.  This one company's substantially higher share of HRA-driven payments for these health conditions—and its correspondingly higher share of beneficiaries identified with these conditions only during HRAs—raise concerns about the validity of the diagnoses submitted only on HRAs and about the lack of evidence of followup care for beneficiaries with these conditions.

**This one MA company drove risk-adjusted payments from in-home HRAs.**  HRAs can be an important tool for early identification of health risks to improve beneficiaries' care and health outcomes.  However, conducting in-home HRAs that drive risk-adjusted payment but do not result in needed followup care raises concerns about the role that these assessments are playing in providing high-quality coordinated care.  The one top company accounted for two-thirds ($1.38 billion of $2.05 billion) of all risk-adjusted payments resulting from diagnoses reported only on in-home HRAs and on no other service records.  In contrast, the other 19 companies with a disproportionate share of payments from chart reviews and HRAs accounted for just 1 percent of payments from in-home HRAs.  The remaining 142 companies accounted for 31 percent of payments from in-home HRAs.

Almost all of the company's payments from HRAs resulted from diagnoses collected in beneficiaries' homes.  Diagnoses reported only on in-home HRAs resulted in 93 percent ($1.38 billion of $1.5 billion) of the company's payments from HRAs.  Eighteen other companies also generated more than 90 percent of their HRA payments from in-home HRAs.  However, these 18 other companies were much smaller and their payments from in-home HRAs totaled just $41 million.

**This one MA company used certain diagnosis codes more than its peers to generate risk-adjusted payments from in-home HRAs.**  For this one company, the top three diagnoses from in-home HRAs that generated risk-adjusted payments were "peripheral vascular disease, unspecified," "major depressive disorder, recurrent, mild," and "type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene." This company reported these 3 diagnoses only on in-home HRAs and on no other service records for 125,632 beneficiaries.  In contrast, all other 161 companies combined reported these 3 diagnoses only on in-home HRAs for just 21,618 beneficiaries.  The top 3 diagnoses that generated risk-adjusted payments resulting solely from in-home HRAs for the other 161 companies were "morbid (severe) obesity due to excess calories," "atherosclerotic heart disease of native coronary artery with unspecified angina pectoris," and "heart failure, unspecified."

In addition, the top MA company accounted for almost all of the beneficiaries with certain diagnoses.  For nine other diagnoses that generated payments from in-home HRAs, this one company had at least 90 percent of the beneficiaries who had these diagnoses reported only on an in-home HRA, as shown in Exhibit 8.  For example, the

company reported a diagnosis of "other forms of angina pectoris" for 99 percent (6,719 of 6,795) of the beneficiaries with this diagnosis on an in-home HRA that generated payment.  All other 161 companies combined had payments generated by this diagnosis from in-home HRAs for just 76 beneficiaries.  It seems unusual that one company accounted for such a substantially higher share of the beneficiaries with these diagnoses.

**Exhibit 8: The one top MA company had almost all of the beneficiaries with certain diagnoses from in-home HRAs that generated payments.**

| Diagnosis Code | Description of Diagnosis Code | Top Company's Percentage of All Beneficiaries With the Diagnosis on an In-Home HRA That Generated Payment |
|---|---|---|
| I208 | Other forms of angina pectoris | 99% |
| F3342 | Major depressive disorder, recurrent, in full remission | 99% |
| F3341 | Major depressive disorder, recurrent, in partial remission | 98% |
| E1139 | Type 2 diabetes mellitus with other diabetic ophthalmic complication | 97% |
| E1136 | Type 2 diabetes mellitus with diabetic cataract | 96% |
| G63 | Polyneuropathy in diseases classified elsewhere | 96% |
| E1169 | Type 2 diabetes mellitus with other specified complication | 95% |
| F330 | Major depressive disorder, recurrent, mild | 90% |
| E46 | Unspecified protein-calorie malnutrition | 90% |

Source: OIG analysis of 2016 MA encounter data from CMS's IDR.

# CONCLUSION AND RECOMMENDATIONS

The risk-adjustment program is an important payment mechanism for MA.  It levels the playing field for MA companies that enroll beneficiaries who need a costlier level of care, which helps to ensure these beneficiaries have continued access to MA plans.  Chart reviews can be a tool to improve the accuracy of risk-adjusted payments, and HRAs can be used for early identification of health risks to improve beneficiaries' care and health outcomes.  However, these mechanisms raise concerns if MA companies use them to add diagnoses and maximize risk-adjusted payments without any other encounter records indicating that they provided care for conditions reported by these mechanisms.

Of the 162 MA companies with estimated risk-adjusted payments from diagnoses reported only on chart reviews and/or HRAs, 20 companies had a disproportionate share of the $9.2 billion in risk-adjusted payments from both mechanisms.  This disproportion could not be explained by their enrollment size.  Overall, these 20 companies generated $5 billion in payments for beneficiaries who may not have received any other services for the medical conditions indicated by the diagnoses.  For half of these 20 companies, unlinked chart reviews and in-home HRAs—which may be particularly vulnerable to misuse by MA companies—accounted for most of their estimated payments generated by chart reviews and HRAs.  Among these top 20 MA companies, 1 large company further stood out for its large share of risk-adjusted payments from chart reviews and HRAs.  This company enrolled 22 percent of MA beneficiaries, yet it generated 40 percent of all risk-adjusted payments from these mechanisms.  In addition, it accounted for half of all payments from HRAs.  Finally, almost all its payments from HRAs resulted from diagnoses reported only on in-home HRAs.

These findings, along with prior OIG work, raise concerns that certain MA companies may be using both chart reviews and HRAs more than their peers to maximize risk-adjusted payments inappropriately.  These findings also reinforce the three types of potential concerns identified during prior work on chart reviews and HRAs: (1) a data integrity concern that MA companies are not submitting all service records as required; (2) a quality-of-care concern that beneficiaries are not receiving needed services to address diagnoses identified on these mechanisms; and (3) a payment integrity concern that if diagnoses are inaccurate or unsupported, the associated risk-adjusted payments would then be inappropriate.

MA companies should receive appropriate compensation for providing care to beneficiaries with serious and chronic health conditions.  However, mechanisms such as chart reviews and HRAs should not be misused to collect diagnoses that inappropriately increase payments to MA companies and do not result in improved care for MA beneficiaries.

# We recommend that CMS:

# Provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs

CMS should perform oversight of the 20 MA companies that each had a share of payments from chart reviews and HRAs that was more than 25 percent higher than its share of enrolled MA beneficiaries.  When OIG issues this report, we will provide CMS with a list of the 20 MA companies, including the estimated risk-adjusted payments from chart reviews and HRAs.  CMS should assess the following:

- whether there are quality-of-care issues regarding the beneficiaries for whom there were diagnoses reported only on chart reviews or HRAs (i.e., whether the lack of additional MA service records for some of the serious conditions being represented by these diagnoses raises concerns about the adequacy of care provided to these beneficiaries);

- whether MA companies are submitting records of all services for beneficiaries with diagnoses reported only on chart reviews or HRAs; and

- whether the diagnoses reported solely on chart reviews or HRAs submitted by these 20 MA companies are accurate.

CMS may need to work across different Centers (e.g., the Center for Clinical Standards and Quality and the Center for Program Integrity) to conduct these assessments.

# Take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs

CMS should perform additional oversight of the MA company that had a high and disproportionate share of the payments from *both* chart reviews and HRAs for beneficiaries who may not have received any other services for the diagnoses reported only on these mechanisms.  OIG identified six health conditions that accounted for a substantial portion of the company's payments from HRAs.  We also identified nine diagnoses from in-home HRAs that generated payments and were reported for many more of the company's beneficiaries than for those of its peers.  CMS should work across its different Centers to examine the appropriateness of payments and care specifically for these conditions and diagnoses.  In addition, CMS should assess the company's requirements for care coordination after in-home HRAs and determine whether the company effectively implements these requirements.

CMS should take action(s) to remedy any problems identified and improve the integrity of this company's chart review and/or HRA programs.  Specifically, if the company does not ensure that beneficiaries receive appropriate care for diagnoses reported on these mechanisms, CMS should require the company to implement practices that ensure care coordination for beneficiaries.  In addition, if the company submitted a chart review or HRA to CMS with unsupported diagnoses, CMS should recover risk-adjusted overpayments as appropriate.

## Perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs

CMS should conduct periodic reviews to identify MA companies that generate shares of payments from chart reviews and HRAs that are disproportionately higher than their respective shares of enrolled MA beneficiaries.  These periodic reviews should determine whether the 20 MA companies, or other MA companies, generate a disproportionately higher share of the payments from these mechanisms in a given payment year.  CMS should use this information to provide targeted oversight of companies that consistently generate a share of payments that cannot be explained by their enrollment size.  These reviews should include (1) assessing whether these companies are providing quality care for their beneficiaries, and/or (2) determining the accuracy of diagnoses reported only on chart reviews or HRAs submitted by these companies.

# AGENCY COMMENTS AND OIG RESPONSE

In response to our draft report, CMS stated that it is committed to ensuring that diagnoses that MA companies submit for risk adjustment are accurate.  However, CMS neither concurred nor nonconcurred with our three recommendations.  Instead, CMS stated that it will take our recommendations under consideration as part of its ongoing process to determine policy options for future years.  CMS acknowledged concerns that in-home HRAs could be used by some MA companies primarily for the gathering of diagnoses for payment rather than to provide treatment and/or followup care to beneficiaries.  CMS noted that it has issued guidance in recent years to ensure MA companies are using HRAs and chart reviews appropriately.  CMS stated that it also uses Risk Adjustment Data Validation (RADV) audits to verify the accuracy of diagnoses reported by MA companies for risk adjustment and to recoup overpayments.

OIG recognizes the actions that CMS has taken to provide oversight of MA companies' use of HRAs and chart reviews.  However, some companies' disproportionate use of these mechanisms to maximize risk-adjusted payments raises concerns and highlights the need for more targeted oversight.  We continue to recommend that CMS:

- provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs;

- take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs; and

- perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs.

OIG requests that CMS include in its Final Management Decision details on any plans or progress it has made toward implementing our recommendations.

The full text of CMS's comments can be found in Appendix A.

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC  20201

**DATE:**      August 20, 2021

**TO:**        Christi Grimm
               Principal Deputy Inspector General
               Office of Inspector General

**FROM:**      Chiquita Brooks-LaSure
               Administrator
               Centers for Medicare & Medicaid Services

**SUBJECT:**   Office of Inspector General (OIG) Draft Report: Some Medicare Advantage
               Companies Leveraged Chart Reviews and Health Risk Assessments to
               Disproportionately Drive Payments (OEI-03-17-00474)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to review and comment on the OIG's draft report regarding the role of chart reviews and Health Risk Assessments (HRAs) in identifying diagnoses that Medicare Advantage Organizations (MAOs) submit to CMS for risk adjusted payments.

CMS pays each MAO a monthly per-person amount for each beneficiary enrolled in its plan. The per-person amount is adjusted for the risk of the beneficiary, which takes into account differences in health status between enrolled beneficiaries. Plans that disproportionately enroll healthy beneficiaries are paid less than they would be if they enrolled beneficiaries with the average risk profile, while plans that disproportionately enrolled the sickest patients are paid more than if they enrolled beneficiaries with the average risk profile.

Beneficiary risk scores are calculated with diagnoses that MAOs report to CMS. Diagnosis codes used for risk adjustment must meet specific criteria, including that the diagnosis is documented in the medical record. Historically, MAOs have reported diagnosis codes to CMS in two ways: (1) to a legacy system called the Risk Adjustment Payment System (RAPS) using an abbreviated data set, including diagnosis codes; and (2) to the Encounter Data System, where MAOs submit a larger set of information on each service provided, including diagnosis codes. CMS allows MAOs to use HRAs and chart reviews, both described in more detail below, as a source of diagnoses for Medicare Advantage (MA) beneficiaries used in the calculation of risk-adjusted payments. It is also important to note that risk adjustment requirements do not require that a service be provided for every diagnosis. For example, MAOs may report diagnoses for which there might not be a service directly linked to a condition status, but could be for associated comorbidities (e.g., morbid obesity).

HRAs are a tool for early identification of health risks to improve beneficiaries' health outcomes through care coordination. Physicians or other health care professionals conduct HRAs to collect information from beneficiaries about their health status, health risks, and daily activities. In the MA program, HRAs are either a part of annual wellness visits or conducted during other visits in

Appendix A:  Agency Comments

non-clinical settings. MAOs may submit diagnoses documented in HRAs for risk adjustment. All diagnoses submitted for risk adjustment are subject to Risk Adjustment Data Validation (RADV) audits to ensure they meet program rules. MAOs review conditions listed on HRAs to evaluate for chronicity and support in the full medical record, such as history, medications, and final assessment. Results of HRA screening portions are not considered confirmed diagnoses by MAOs unless supported by the final assessment documentation.[1] In addition, CMS has created an indicator in RAPS data that requires MAOs to identify diagnoses that result from a non-clinical setting visit during which an annual wellness visit was completed.

CMS has issued guidance in recent years to ensure MAOs are utilizing HRAs appropriately. In 2015, CMS provided guidance to MAOs on best practices that promote the primary use of in-home HRAs as tools for improving care for MA enrollees.[2] These practices included making referrals to appropriate community resources, verifying that needed follow-up care is provided, and verifying that information obtained during the assessment was provided to the appropriate providers. CMS released additional guidance in 2016 related to coordination of care for services provided to MA beneficiaries.[3] This guidance states that MAOs must ensure continuity of services, including implementing procedures to make a best effort to conduct HRAs annually and to ensure an appropriate and timely exchange of clinical information among providers. This will help ensure that diagnoses collected from HRAs are substantiated through appropriate follow up care.

Chart review records are a type of Medicare Advantage encounter data. They allow MAOs to submit diagnosis codes for risk adjustment that were not reported on the record that was submitted to report the encounter. That typically occurs because the data used to report the encounter was taken from a claim that a provider submitted to the MAO. Such a claim would not necessarily include all the diagnoses documented in the medical record during the respective encounter. While MAOs are required to submit all encounters to CMS, chart review records are intended for the submission of additional diagnosis codes submitted for risk adjustment. Based on their reviews of medical records, MAOs may also use chart review records to delete previously submitted diagnosis codes that are not supported by those medical records.

CMS has also issued guidance in recent years to ensure MAOs are utilizing chart reviews appropriately. In January 2020, CMS released a Frequently Asked Questions document to MAOs that included information on adding or deleting diagnoses codes through chart reviews, the use of default procedure codes for unlinked chart reviews, and how MAOs can avoid duplicate errors when submitting diagnoses.[4]

---

[1] Contract-level Risk Adjustment Data Validation: Medical Record Reviewer Guidance
https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf

[2] Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter
https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf

[3] Medicare Managed Care Manual
https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c04.pdf

[4] FAQs about MAOs Encounter Data Submission and Processing
https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2012232368-lw-faqsmaosencounterdatasubmissionandprocessing.pdf

# Appendix A:  Agency Comments

CMS is committed to ensuring that diagnoses that MAOs submit for risk adjustment are accurate, and we have already taken action to target plans at higher risk for improper payment. For example, CMS uses contract-level RADV audits to validate that diagnoses used for risk adjustment meet program rules. RADV audits measure the accuracy of the plan-submitted diagnostic information through medical record and coding reviews, and uses the results of these audits to identify and recover overpayments for individual MA plans. CMS audits approximately 200 plans per payment year, using advanced statistical modeling and known areas of improper payment to focus audits on higher risk areas when drawing enrollee samples. To assess potential risk of overpayments, CMS takes into consideration various factors, including results of past RADV audits. Because the plan selection methodology for RADV audits already focuses on high-risk plans, our current methodology would already capture plans at high risk for improper payment.

## OIG Recommendation
Provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs.

## CMS Response
While CMS continues to support the use of enrollee risk assessments for wellness, care coordination, and disease prevention, we recognize that concerns remain that home visits could be used by some MA organizations primarily for the gathering of diagnoses for payment rather than to provide treatment and/or follow-up care to beneficiaries. CMS is consistently monitoring the operations of the program to determine appropriate policy options for consideration in future years, but presently, HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program. RADV audits are CMS's primary corrective action to recoup overpayments. RADV uses medical record review to verify the accuracy of enrollee diagnoses submitted by MA organizations for risk adjusted payment. CMS' RADV audits are designed to develop audit and sampling methodologies that target a combination of plans, enrollees, and diagnoses that are most at risk for improper payments. Because of this, MA companies that are at higher risk for overpayments already have an increased likelihood of being included in RADV audits. However, CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years.

## OIG Recommendation
Take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs.

## CMS Response
While CMS continues to support the use of enrollee risk assessments for wellness, care coordination, and disease prevention, we recognize that concerns remain that home visits could be used by some MA organizations primarily for the gathering of diagnoses for payment rather than to provide treatment and/or follow-up care to beneficiaries. CMS is consistently monitoring the operations of the program to determine appropriate policy options for consideration in future years, but presently, HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program. CMS' RADV audits are designed to develop audit and sampling methodologies that target a combination of plans, enrollees, and diagnoses that are most at risk

Appendix A:  Agency Comments

for improper payments. Because of this, MA companies that are at higher risk for overpayments already have an increased likelihood of being included in RADV audits. However, CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years.

## OIG Recommendation

Perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs.

## CMS Response

While CMS continues to support the use of enrollee risk assessments for wellness, care coordination, and disease prevention, we recognize that concerns remain that home visits could be used by some MA organizations primarily for the gathering of diagnoses for payment rather than to provide treatment and/or follow-up care to beneficiaries. CMS is consistently monitoring the operations of the program to determine appropriate policy options for consideration in future years, but presently, HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program. RADV audits are CMS's primary corrective action to recoup overpayments. CMS' RADV audits are designed to develop audit and sampling methodologies that target a combination of plans, enrollees, and diagnoses that are most at risk for improper payments. Because of this, MA companies that are at higher risk for overpayments already have an increased likelihood of being included in RADV audits. However, CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years.

# ACKNOWLEDGMENTS AND CONTACT

## Acknowledgments

Jacqualine Reid served as the team leader for this study. Others in the Office of Evaluation and Inspections who conducted the study include San Le. Office of Evaluation and Inspections staff who provided support include Joe Chiarenzelli, Kevin Farber, and Christine Moritz.

This report was prepared under the direction of Linda Ragone, Regional Inspector General for Evaluation and Inspections in the Philadelphia regional office, and Joanna Bisgaier, Deputy Regional Inspector General.

## Contact

To obtain additional information concerning this report, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov. OIG reports and other information can be found on the OIG website at oig.hhs.gov.

Office of Inspector General
U.S. Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC 20201

# ABOUT THE OFFICE OF INSPECTOR GENERAL

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

**The Office of Audit Services (OAS)** provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These audits help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

**The Office of Evaluation and Inspections (OEI)** conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

**The Office of Investigations (OI)** conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

**The Office of Counsel to the Inspector General (OCIG)** provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

# ENDNOTES

[1] MAOs may also offer prescription drug coverage under Medicare Part D.

[2] An MA company can also be referred to as a parent organization or parent company.  We use the term "MA companies" to encompass MAOs.

[3] OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019; OIG, *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns*, OEI-03-17-00471, September 2020.

[4] CMS, *CMS Financial Report Fiscal Year 2020*, November 2020, p. 53.  Accessed at https://www.cms.gov/files/document/cms-financial-report-fiscal-year-2020.pdf on January 5, 2021.

[5] Although MAOs may receive service information from providers, submit diagnoses for risk adjustment, and receive payments from CMS, this report uses the term "MA companies" (i.e., companies that own or have a controlling interest in one or more MAOs) to encompass MAOs.

[6] CMS, *Encounter Data Submission and Processing Guide, Medicare Advantage Program*, October 2020.  Accessed at https://www.csscoperations.com/internet/csscw3_files.nsf/F/CSSCED_Submission_Processing_Guide_20201009.pdf/$FILE/ED_Submission_Processing_Guide_20201009.pdf on June 17, 2021.  CMS, *Medicare Managed Care Manual, Risk Adjustment*, Pub. No. 100-16 (Rev. 118, September 19, 2014), ch. 7.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf on May 4, 2021.  CMS, *Final Encounter Data Diagnosis Filtering Logic*, December 2015. Accessed at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/final%20industry%20memo%20medicare%20filtering%20logic%2012%2022%2015_2.pdf on December 27, 2018.

[7] The RAPS data include only select information for services provided by a limited set of provider types.  CMS began collecting the more comprehensive encounter data from MA companies in 2012 as part of an effort to improve MA payment accuracy and better perform MA quality reviews.

[8] To be eligible for risk adjustment, a diagnosis must be (1) documented in a medical record from a hospital inpatient stay, hospital outpatient visit, or visit with a physician or other eligible health care professional during the prior year, (2) documented as a result of a face-to-face visit between the beneficiary and the provider, and (3) submitted on an encounter record by the final risk adjustment data submission deadline.  To identify which diagnoses meet these eligibility criteria, CMS extracts—or filters—diagnoses in the encounter data on the basis of whether the service record contains an acceptable procedure code (i.e., Current Procedural Terminology (CPT) or Healthcare Common Procedure Coding System (HCPCS) code) and/or type of bill code.

[9] Specifically, the relative factors represent the marginal expected cost of an HCC relative to the average expected cost in the Medicare fee-for-service program.

[10] CMS adjusts risk scores by normalization factors and coding adjustment factors prior to calculating payments.  An MA plan's base payment rate is the plan's standardized bid adjusted by the county Intra-Service Area Rate factor for the beneficiary's county of residence.

[11] MA companies may also perform chart reviews to delete diagnoses that providers submitted in error, but prior OIG work found that the use of chart reviews for this purpose was rare.  OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019.

[12] On a linked chart review, MA companies identify the previously accepted service record by reporting that service record's unique internal control number.

[13] CMS permits MA companies to submit unlinked chart reviews because of CMS's concerns regarding the burden on some MA companies of linking chart reviews.

[14] In August 2018, CMS issued a clarification to MA companies that "diagnoses that are disallowed for risk adjustment should not be submitted with default [procedure] codes that would cause the diagnoses to be allowed for risk-adjusted payment." CMS, *Additional Guidance for Chart Review Record (CRR) Submissions*, August 2018.  Accessed at https://www.hhs.gov/guidance /sites/default/files/hhs-guidance-documents/hpms%2520memo%2520chart_review_final_08-28-2018_4.pdf on February 19, 2021.

[15] To be eligible for risk adjustment, a diagnosis must be documented as a result of a face-to-face visit between the beneficiary and the provider.  To identify which diagnoses meet eligibility criteria, CMS extracts—or filters—diagnoses in the encounter data on the basis of whether the service record contains an acceptable procedure code (i.e., Current Procedural Terminology (CPT) or Healthcare Common Procedure Coding System (HCPCS) code) and/or type of bill code.

[16] OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019.

[17] CMS, *Medicare Advantage Encounter Data—Data Exchange Reports—June 2020*, June 2020.  Accessed at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/ma%20encounter%20data_data%20exchange _6.25.2020_8.pdf on February 22, 2021.

[18] DOJ, *U.S. Intervenes in Second "Whistleblower" Lawsuit Alleging UnitedHealth Mischarged the Medicare Advantage and Prescription Drug Programs*, May 2017.  Accessed at https://www.justice.gov/usao-cdca/pr/us-intervenes-second-whistleblower-lawsuit-alleging-unitedhealth-mischarged-medicare on April 14, 2021; United States ex rel. Poehling v. UnitedHealth Group, Inc. et al., No. CV 16-8697-MWF (SSX), (C.D. Cal. filed May 16, 2017).

[19] DOJ, *Manhattan U.S. Attorney Files Civil Fraud Suit Against Anthem, Inc., For Falsely Certifying The Accuracy Of Its Diagnosis Data*, March 2020.  Accessed at https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-files-civil-fraud-suit-against-anthem-inc-falsely-certifying on October 16, 2020.  United States v. Anthem, Inc., No. 20-cv-2593 (U.S. District Court for the Southern District of New York, filed March 26, 2020).

[20] GAO, *Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments*, GAO-16-76, April 2016, p.13.  Accessed at https://www.gao.gov/assets/680/676441.pdf on August 12, 2020.

[21] An annual wellness visit should incorporate reviews of a beneficiary's health risks, medical history, and current providers, along with routine measurements and personalized health advice.  CMS, *Medicare Wellness Visits*, October 2020.  Accessed at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/preventive-services/medicare-wellness-visits.html on April 15, 2021.

[22] MA companies must make a "best-effort" attempt to conduct an initial and annual HRA to assess each enrollee's health care needs.  42 CFR § 422.112(b)(4)(i); CMS, *Medicare Managed Care Manual, Benefits and Beneficiary Protections*, Pub. No. 100-16 (Rev. 121, April 22, 2016), ch. 4, § 110.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c04.pdf on June 16, 2021.  MA companies offering Special Needs Plans (SNPs) must conduct initial and annual HRAs of individuals' physical, psychosocial, and functional needs, using a comprehensive risk assessment tool that CMS may review during oversight activities.  Social Security Act, § 1859(f)(5)(A)(ii)(I); 42 CFR § 422.101(f)(1)(i).

[23] OIG, *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns*, OEI-03-17-00471, September 2020.

[24] We identified diagnoses reported on HRAs using a twofold process.  First, we aggregated records from CMS's Integrated Data Repository (IDR) that identify potential HRAs, including annual wellness visits; initial preventive physical exams; and

evaluation and management home visits. Second, among these types of records, we excluded from our analysis any beneficiaries who had more than one procedure code in 2016 that met our criteria for a potential HRA.

[25] CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2015. Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf on August 12, 2020.

[26] CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2015. Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf on August 12, 2020.

[27] As part of this recommendation, MedPAC recommended that the Secretary develop a risk adjustment model that uses 2 years of Medicare fee-for-service and MA diagnostic data. MedPAC, *Report to the Congress: Medicare Payment Policy*, March 2016, p. 352. Accessed at http://www.medpac.gov/docs/default-source/reports/march-2016-report-to-the-congress-medicare-payment-policy.pdf on August 12, 2020.

[28] For encounter records with dates of service in 2016, we identified chart reviews as records with (1) a claim type code between 4000 and 4800; (2) a chart review switch value of "Y"; and (3) a chart review effective switch of "Y."

[29] We identified HRAs in the 2016 MA encounter data using a twofold process. First, we aggregated records from the Integrated Data Repository (IDR) containing a procedure code that identifies a potential HRA, including a procedure code for an annual wellness visit (G0438 or G0439), an initial preventive physical exam (G0402), or an evaluation and management home visit (99341–99345 or 99347–99350). For evaluation and management home visits, we also ensured that the place of service was at home—i.e., that the code for the place of service was home (12), temporary lodging (16), custodial care facility (33), group home (14), or homeless shelter (04). Second, among these types of records, we excluded from our analysis any beneficiaries who had more than one procedure code in 2016 that met our criteria for a potential HRA.

[30] We excluded beneficiaries who—according to information contained in the IDR's MA prescription drug (MARx) data—had end stage renal disease, were receiving hospice care, or did not reside in a U.S. State. To ensure data accuracy, we also excluded beneficiaries with inconsistencies between their MA encounter data, Medicare beneficiary data, and MARx data contained in the Integrated Data Repository. In addition, we included only beneficiaries who were enrolled with the same MA plan for all 12 months of 2016.

[31] We used the 2017 CMS-HCC model and CMS's CMS-HCC mapping software to identify the HCCs generated by the diagnoses that were reported only on chart reviews or HRAs. CMS, *Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter, Table VI-1. 2017 CMS-HCC Model Relative Factors for Community and Institutional Beneficiaries*, April 2016, pp. 78-84. Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2017.pdf on December 19, 2018. CMS, *2017 Model Software/ICD-10 Mappings, V2217.79.O1.* Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors.html on May 9, 2018.

[32] Prior to calculating payment estimates, we adjusted each HCC's relative factor by CMS's normalization factors and coding adjustment factors for 2017.

[33] For MA plans that submit bids to CMS, we identified base payment rates for December 2017 in the Approved Bid Pricing Tool Extract from CMS's Health Plan Management System. For Employer Group Waiver Plans (EGWPs), which do not submit bids to CMS, we identified base payment rates using CMS's EGWP county-level ratebooks for regional and local EGWPs and information on each EGWP's star rating. We identified EGWPs' 2017 star ratings by using the Approved Bid Pricing Tool Extract and the MA Quality Bonus Payment Rating files from CMS's Health Plan Management System. The 2017 MA plan information that we used in our analysis included information from the Approved Bid Pricing Tool Extract and the Plan Benefit Package Extract in CMS's Health Plan Management System, as well as CMS's EGWP county-level ratebooks. CMS, *2017 Medicare*

*Advantage Ratebook and Prescription Drug Rate Information*, 2017.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Ratebooks-and-Supporting-Data.html on January 5, 2018.

[34] We identified linked chart reviews as chart reviews that contained an original control number and had a four-part effective key that matched the four-part effective key of an accepted service record with a date of service in 2016.  We considered all other chart reviews to be unlinked.

[35] We identified in-home HRAs as records containing a place of service code of "home" (12), "temporary lodging" (16), "custodial care facility" (33), "group home" (14), or "homeless shelter" (04).  We considered records containing all other place of service codes—including codes for physician offices, clinics, and hospitals—to be facility-based HRAs.

[36] These evaluations included only beneficiaries enrolled in the same MA plan for all 12 months of 2016.  We excluded beneficiaries who had end-stage renal disease, were receiving hospice care, or did not reside in a U.S. State.  We also excluded cost plans, demonstration plans, programs of all-inclusive care for the elderly (PACE) organizations, and Medicare medical savings account plans.

[37] For 2017, CMS calculated a blended risk score for each beneficiary by combining 25 percent of the risk score calculated from diagnoses in the encounter data and 75 percent of the risk score calculated from diagnoses in the RAPS data.  Ultimately, CMS plans to rely exclusively on encounter data to calculate risk scores.

[38] Prior OIG reports provide the amount of risk-adjusted payments for all 101 HCCs that resulted from diagnoses reported only on each of these mechanisms.  OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019, Appendix B, pp. 29–33; OIG, *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns*, OEI-03-17-00471, September 2020, Appendix B, pp. 33-36.

[39] Only 4 of these 19 companies had a more disproportionate share of payments than the large company.  However, those 4 companies were small, each enrolling less than 1 percent of all MA beneficiaries.