# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CITY OF HOLLYWOOD FIREFIGHTERS' PENSION FUND, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

UNITEDHEALTH GROUP INC., et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
))
)
)

Civ. No. 24-cv-1743 (JMB/DTS)

CLASS ACTION

LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL RELIEF FROM THE PSLRA DISCOVERY STAY TO OBTAIN DOCUMENTS ALREADY PRODUCED TO THE DEPARTMENT OF JUSTICE

DATE:      February 27, 2025
TIME:      2:00 P.M. EST
CTRM:      9E

4889-8823-9602.v1

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   RELEVANT FACTUAL BACKGROUND ........................................................ 3

III.  LEGAL STANDARD ....................................................................................... 10

IV.   ARGUMENT ..................................................................................................... 11

    A.    The Fact that Plaintiff Seeks Documents or ESI Already Produced to the DOJ Constitutes an "Exceptional Circumstance" that Supports the *Partial* Lifting of the Discovery Stay .................................................... 11

    B.    Plaintiff's Request Is Sufficiently Particularized ....................................... 13

    C.    Plaintiff Will Be Subject to Undue Prejudice if It Is Not Granted Access to Materials Produced to the DOJ .................................................... 14

V.    CONCLUSION ................................................................................................. 17

4889-8823-9602.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Courter v. CytoDyn, Inc.*,
2022 WL 621535 (W.D. Wash. Mar. 3, 2022) ................................................ 13, 15, 16

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income
Sec. Act (ERISA) Litig.*,
2009 WL 4796169 (S.D.N.Y. Nov. 16, 2009) ............................................................ 12

*In re Delphi Corp.*,
2007 WL 518626 (E.D. Mich. Feb. 15, 2007) ...................................................... 10, 12

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
2002 WL 31845114 (S.D. Tex. Aug. 16, 2002) .................................................... 11, 13

*In re FirstEnergy Corp. Sec. Litig.*,
2021 WL 2414763 (S.D. Ohio June 14, 2021) ................................................ 13, 14, 17

*In re Grand Casinos, Inc. Sec. Litig.*,
988 F. Supp. 1270 (D. Minn. 1997) .............................................................................. 10

*In re LaBranche Sec. Litig.*,
333 F. Supp. 2d 178 (S.D.N.Y. 2004) ........................................................................... 15

*In re Lernout & Hauspie Sec. Litig.*,
214 F. Supp. 2d 100 (D. Mass. 2002) .......................................................................... 14

*In re Massey Energy Co. Sec. Litig.*,
2011 WL 4528509 (S.D. W. Va. Sept. 28, 2011) .................................................. 13, 15

*In re Royal Ahold N.V. Sec. & Erisa Litig.*,
220 F.R.D. 246 (D. Md. 2004) .................................................................... 13, 14, 15, 16

*In re WorldCom, Inc. Sec. Litig.*,
234 F. Supp. 2d 301 (S.D.N.Y. 2002) .................................................................... 13, 15

*Pension Tr. Fund for Operating Engr's v. Assisted Living
Concepts, Inc.*,
943 F. Supp. 2d 913 (E.D. Wis. 2013) ..................................................... 11, 12, 13, 15

*Singer v. Nicor, Inc.*,
2003 WL 22013905 (N.D. Ill. Apr. 23, 2003) ................................................ 11, 13, 16

4889-8823-9602.v1

**Page**

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
    §77z-1....................................................................................................................*passim*
    §78u-4(b)(3)(B)........................................................................................................ 10

4889-8823-9602.v1

Lead Plaintiff California Public Employees' Retirement System ("Plaintiff"), respectfully moves for ***partial*** relief from the Private Securities Litigation Reform Act of 1995 (the "PSLRA") discovery stay to seek production of a narrow set of highly relevant documents that defendant UnitedHealth Group, Inc. ("UnitedHealth" or the "Company") has already produced to the Department of Justice ("DOJ") as part of the DOJ's ongoing investigation of the Company commenced in October 2023.

## I.   INTRODUCTION

On February 27, 2024, *The Wall Street Journal* ("*WSJ*") revealed that the DOJ was conducting an investigation into UnitedHealth and its subsidiaries relating to, among other things, "[m]edicare billing issues, including the Company's practices around documenting patients' illnesses," as well as issues relating to anti-competitive practices.   ¶135.[1] Defendants had concealed this new DOJ investigation from investors.[2] Even worse, several individual defendants cashed in, selling ***over $117 million*** of their personal UnitedHealth common stock at a time when insiders knew about the new DOJ probe but investors did not. ¶¶132-134.

The news of the DOJ investigation was severely troubling to investors, with industry analysts subsequently expressing concern that the DOJ investigation would expose

---

[1]   All "¶__" or "¶¶__" citations are to the Supplemental Consolidated Complaint for Violations of the Federal Securities Laws (ECF 54) (the "Complaint").  Additionally, all terms not otherwise defined herein have the same meaning as set forth in the Complaint, and unless otherwise indicated, all emphasis is added and all citations are omitted.

[2]   "Defendants" are UnitedHealth Group, Inc., Andrew Witty, and Stephen Hemsley.  This motion is not filed against defendant Brian Thompson because he is deceased and his estate has not yet been named.

- 1 -

"UnitedHealth's M[edicare] A[dvantage] risk coding practices" that "'make your M[edicare] A[dvantage] beneficiaries look sicker than they really are'" in order to "'make more money.'" ¶14.  In response to the *WSJ's* revelations, the price of UnitedHealth common stock declined over $27 per share.  ¶136.  Since then, Defendants' fortuitously timed stock sales and alleged misconduct have garnered intense government scrutiny – including United States lawmakers urging the U.S. Securities and Exchange Commission ("SEC") to open an insider trading investigation.  ¶¶16, 242-246.  Furthermore, former UnitedHealth physicians have publicly blown the whistle on the Company's Medicare billing practices detailing how UnitedHealth pressured the doctors to add codes the doctors did not believe applied so that the Company would get paid more.  ¶¶7, 47-95.  A former UnitedHealth doctor admitted: "'***It just felt so unconscionable***.'"  ECF 54-3 at 3 (exhibit 3 to the Complaint).  And, a July 2024 analysis of Medicare data showed that the Company's Medicare scheme was incredibly lucrative – in 2021 alone, UnitedHealth received $8.7 billion in taxpayer money for diagnosis codes that no doctor treated.  ¶¶8, 47-95.  This securities-fraud class action seeks to hold Defendants accountable for false and misleading statements relating to this alleged misconduct.  ¶¶137-183.

But, under the PSLRA, discovery in this case is stayed pending the Court's decision on Defendants' motion to dismiss the Complaint, which is yet to be filed.  Plaintiff requests that the discovery stay be ***partially*** lifted with respect to the documents or electronically stored information ("ESI") that Defendants have already produced to the DOJ in relation to the new DOJ investigation relating to the Company's Medicare Advantage coding practices and other anti-competitive practices, as reported by the *WSJ*.

4889-8823-9602.v1

The partial lifting of the discovery stay will impose no burden on Defendants, will cure undue prejudice to the Plaintiff, and is in compliance with the purpose and intent underlying the PSLRA discovery stay for three reasons. First, Plaintiff limits its request to documents or ESI that have already been compiled and produced to a government agency, and thus any cost associated with Plaintiff's request will be negligible. Second, Plaintiff requests only the limited, particular, and clearly defined universe of documents and ESI that Defendant has already produced to the DOJ. Third, the stay places Plaintiff at an informational disadvantage as to the DOJ, and limits Plaintiff's ability to assess its litigation strategy during the pendency of the motion to dismiss. As such, the Court should partially lift the PSLRA discovery stay.

## II.  RELEVANT FACTUAL BACKGROUND

UnitedHealth is a health insurance company that provides insurance to individuals, employers, and small businesses. ¶2. Today, its insurance arm – UnitedHealthcare – is the largest insurance provider in the United States. *Id.* In April 2011, UnitedHealth launched a new subsidiary, Optum. Optum does not provide insurance, but rather provides healthcare services and products through its three businesses: Optum Health (healthcare providers), Optum Rx (prescription services), and Optum Insight (healthcare technology products). ¶3.

As alleged in the Complaint, Defendants engaged in a scheme and wrongful course of business which was designed to, and did, artificially inflate the Company's revenues, earnings, and stock price. ¶5. As part of the scheme and wrongful course of business, Defendants formulated, implemented, and oversaw an illegal, Company-wide upcoding gambit. ¶¶5, 47-95. Defendants also misrepresented the breadth, scope, and integrity of

4889-8823-9602.v1

Optum's existing firewall protections while concurrently concealing Optum's ability to circumvent those very firewall protections. ¶¶5, 96-120. Finally, Defendants used UnitedHealth's monopolistic dominance to engage in anti-competitive practices to consolidate its control over healthcare services and eliminate competition. ¶¶126-131.

Medicare Advantage is a privatized version of traditional Medicare, under which the government pays a set fee to private insurers such as UnitedHealth to provide insurance plans to qualifying senior citizens ("members"). ¶6. The government pays a higher set fee for Medicare Advantage patients with certain pre-existing conditions. *Id.* During the Class Period, Defendants publicly identified UnitedHealthcare's Medicare Advantage business as one of the Company's "key elements of [it's] growth strategy." *Id.* At the core of Defendants' Medicare Advantage scheme was their carefully orchestrated plans and procedures to inflate the fees UnitedHealth collected from the government by deliberately "upcoding" – or adding unwarranted diagnosis codes – across its massive member population. ¶¶6, 17, 47-95.

Defendants employed several different mechanisms to effectuate their wrongful course of business. For example, UnitedHealth induced providers to find new diagnoses by paying bonuses to providers who upcoded. ¶¶7, 47-95. UnitedHealth trained providers to use "'buddy codes,'" that is adding multiple new diagnoses based upon existing ones. *Id.* UnitedHealth also purposefully leveraged its HouseCalls program, whereby the Company would dispatch nurse practitioners to members' homes to perform physical assessments. *Id.* Defendants also exploited the HouseCalls program by using tools designed to find diagnoses that did not exist, including software specifically programmed to recommend lucrative

- 4 -

4889-8823-9602.v1

diagnoses and unreliable medical devices. *Id.* Defendants used such tools even though they were aware the tools were prone to issue false positives for lucrative conditions. *Id.* Doctors and nurses who worked for UnitedHealth during the Class Period have admitted that they added codes they did not truly believe existed because UnitedHealth pressured them to do so. *Id.*

For example, former UnitedHealth physician, Dr. Susan Baumgaertel, admitted the Company pressured her and her colleagues to code patients for certain conditions, including some that the doctors didn't think applied. ECF 54-3 at 3. Dr. Baumgaertel put it bluntly: "'*We were not truly caring for patients anymore. . . . We were just micromanaging their care to bring in money. It just felt so unconscionable*.'" *Id.*

Defendants' upcoding scheme worked as planned. According to an analysis of Medicare data, in 2021 alone, UnitedHealth received $8.7 billion in taxpayer money for diagnosis codes that no doctor treated. ¶¶8, 47-95. The cost of Defendants' scheme was not solely financial; it also had real-life impact on America's senior citizens. Doctors around the Country have described panicked calls from UnitedHealth members who noticed alarming new diseases listed on their medical chart that their doctor never mentioned. ¶¶8, 85. Former UnitedHealth physician, Dr. Baumgaertel, admitted that when she got those calls, "she always tried to tell patients the truth, as uncomfortable as it was: I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more." *Id.*

Throughout the Class Period, Defendants frequently spoke to investors about the Company's Medicare Advantage business and the HouseCalls program while concealing the upcoding scheme. For example, on September 22, 2021, the first day of the Class Period,

- 5 -

UnitedHealth responded to questions about its coding practices by assuring investors that "'UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care.'" ¶9. Defendants continued to issue similar false and misleading assurances throughout the Class Period. ¶¶137-163.

The Company's alleged misconduct was not limited to the upcoding scheme. On January 6, 2021, UnitedHealth announced its largest acquisition ever: Optum Insight would acquire Change Healthcare ("Change"), a healthcare technology company, for $13 billion. ¶¶10, 96-120. Change operated a clearinghouse that acted as the "pipes" of the healthcare industry, processing health insurance claims and moving data from entity to entity. ¶¶10, 44, 97. According to a UnitedHealth estimate, more than half of American medical insurance claims "pass through (or touch)" Change's systems. *Id.* Internally, UnitedHealth's then-CEO, David Wichmann, lauded the acquisition because it granted UnitedHealth access to the Change data, calling that access the "'foundation'" of the deal. ¶10. Indeed, the Change acquisition gave UnitedHealth access to critical competitor information, including pricing structures, claims data, and billing practices. *Id.*

Industry groups, however, responded differently, immediately questioning the propriety of the deal, citing serious antitrust concerns. ¶¶11, 96-120. On February 24, 2022, the DOJ sued to block the Change acquisition on antitrust grounds, arguing UnitedHealth would gain access to sensitive data that it could wield against its competitors. *Id.* UnitedHealth immediately refuted the DOJ's allegations and assured investors that Optum possessed "best-in-class firewalls and compliance programs that maintain the integrity of our

- 6 -

4889-8823-9602.v1

customers' data and information." ¶11.  Throughout the Class Period, Defendants repeatedly made similar assurances, insisting that UnitedHealth had "internal firewalls that prevent the sharing of competitively sensitive information across business units."  ¶¶11, 164-176.  Ultimately, UnitedHealth's assurances won the day.  The U.S. District Court for the District of Columbia decided in Optum's favor, expressly crediting UnitedHealth's purported history of maintaining data firewalls.  ¶¶11, 96-120.

The firewalls UnitedHealth described to the court and the public were illusory – they simply did not exist.  ¶¶12, 96-120.  In truth, Optum's business applications share data with other Optum business applications.  *Id.*  And what they did not do is prohibit Optum from using external customer data to benefit those Optum businesses competing with external customers.  *Id.*  The lack of firewalls and lax security also ultimately led to the largest security breach in the history of the United States healthcare system, which hackers achieved simply by acquiring a working username and password.  ¶¶12, 121-125.

On October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company,'" according to an internal email distributed on October 24, 2023 by Rupert Bondy, an executive vice president and chief legal officer of UnitedHealth.  ¶¶13, 132-134.  Bondy's email, sent to at least 16 high-ranking colleagues inside the Company, included a "'document preservation notice.'"  ¶¶132-134.  While news of the antitrust investigation circulated inside the Company, UnitedHealth withheld this material information from investors.  ¶¶13, 132-134.

UnitedHealth chairman, defendant Hemsley, took immediate action – selling millions of dollars of his own UnitedHealth shares while in possession of this material nonpublic

- 7 -

information.  *Id.*  All told, individual defendants sold over $117 million worth of UnitedHealth common stock during the four-month period when insiders knew about the new DOJ investigation but the public did not.  *Id.*  Such insider-trading on material nonpublic information should not have been allowed.  According to Professor John Coffee, a corporate governance expert at Columbia Law School: "Typically a company's general counsel would declare a blackout period barring trading in light of a sensitive investigation . . . '[a]pparently, this did not happen' at UnitedHealth . . . ."  ¶134.

On February 27, 2024, the WSJ revealed that the DOJ was conducting a new investigation into UnitedHealth and its subsidiaries relating to, among other things, "[m]edicare billing issues, including the Company's practices around documenting patients' illnesses.  Payments to Medicare plans go up if patients have more health conditions, so aggressive documentation practices by doctors and other healthcare providers can be lucrative for insurers such as UnitedHealthcare." ¶135.  In response to those revelations, the price of UnitedHealth common stock declined over $27 per share.  ¶¶14, 135-136.

In the months since, UnitedHealth's anti-competitive practices have garnered intense government scrutiny, including Congressional hearings and findings by the Office of Inspector General ("OIG").  ¶¶15, 247, 257-262.  For example, Senator Elizabeth Warren specifically called out UnitedHealth's manipulation of the Medicare Advantage system and the Company's effort to "rake in more taxpayer money by using a practice called upcoding to make enrollees look sicker."  ¶247.  In addition, based on the highly suspicious stock sales by Hemsley and others, noted above, Senator Warren and 16 other U.S. lawmakers sent a letter urging the SEC to open an insider trading investigation.  ¶¶16, 242-246.  The

- 8 -

lawmakers said "these trades reveal a disturbing fact pattern," particularly since they came during a DOJ investigation, when such trades should have been prohibited. *Id.* And, on October 24, 2024, the OIG released a new report that found that UnitedHealth reaped billions in extra federal payments in 2023 for diagnoses from in-home health risk assessments ("HRAs") and HRA-linked chart reviews. ¶¶18, 66-68, 237, 257-262. According to the OIG report, UnitedHealth accepted these payments even though the patients did not receive any additional treatment or medical services following the new diagnoses. *Id.*

Finally, in a recent investigative report, *STAT News* revealed that "[t]he Justice Department is interviewing former UnitedHealth Group physicians about their experiences working at practices owned by the health care giant." *See* Tara Bannow, *DOJ seeks interviews with former UnitedHealth Group Doctors*, STAT News (Jan. 12, 2025) (attached as Exhibit A to the concurrently filed Declaration of Robert R. Henssler Jr.). According to the *STAT News* report, the DOJ recently spoke with former Company doctors who had "described how the quality of patient care deteriorated at their practices after they were acquired by UnitedHealth's Optum subsidiary." *Id.* One of the doctors recently contacted by the DOJ was Dr. Baumgaertel who said she planned to meet virtually with four government attorneys. *Id.* Notably, Dr. Baumgaertel is one of the former Company doctors who has admitted that "***UnitedHealth pressured her and her colleagues to apply codes to Medicare Advantage patients for conditions they didn't think were appropriate***." *Id.*; *see also* ECF 54-3 at 3.

Thus, with the DOJ investigation proceeding apace – and with the benefit of documents produced by UnitedHealth – Plaintiff brings this motion to ***partially*** lift the stay.

- 9 -

4889-8823-9602.v1

## III.    LEGAL STANDARD

As a general matter, the PSLRA provides that discovery in private securities actions is to be stayed during the "pendency of any motion to dismiss." 15 U.S.C. §78u-4(b)(3)(B). However, the stay imposed by the PSLRA where a defendant files a motion to dismiss is not absolute, as courts in this District have noted – Congress has explicitly allowed for the stay to be lifted upon a showing that "particularized discovery is necessary to preserve evidence or to prevent undue prejudice." *Id. See also In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1270, 1272 (D. Minn. 1997) (lifting the stay and noting that "[i]f . . . Congress had intended an absolute stay on discovery, then Congress would not have authorized a judicial reprieve from such a stay, when a reprieve is needed"); *In re Delphi Corp.*, 2007 WL 518626, at *4 (E.D. Mich. Feb. 15, 2007) (lifting the stay and noting "Congress, however, did not impose an absolute stay on discovery"). In so doing, Congress has recognized that there are situations in which the purpose of the discovery stay – to "minimize the incentives for plaintiffs to file frivolous securities class actions in the hope either that . . . defendants will settle those actions rather than bear the high costs of discovery" – either does not apply or is outweighed by other considerations. *Id.*

Courts have devised a three element standard that movants must satisfy in order to have the stay on discovery lifted:

> [I]t is necessary to show that (1) "exceptional circumstances exist," such that allowing discovery would not violate the ethos of the PSLRA discovery stay and further that (2) "particularized discovery" is (3) necessary to either (a) "preserve evidence" or (b) "prevent undue prejudice" to a party.

4889-8823-9602.v1

*Pension Tr. Fund for Operating Engr's v. Assisted Living Concepts, Inc.*, 943 F. Supp. 2d 913, 915 (E.D. Wis. 2013) (lifting the stay). As discussed herein, Plaintiff has satisfied each of these three elements.

## IV.   ARGUMENT

### A.   The Fact that Plaintiff Seeks Documents or ESI Already Produced to the DOJ Constitutes an "Exceptional Circumstance" that Supports the *Partial* Lifting of the Discovery Stay

The "'exceptional circumstances'" element is met when documents have already been gathered and produced to other entities, including government agencies. *Id.* at 915. This is because the burdens of duplicating this discovery are far less substantial. *Id.* ("given the less burdensome prospect of discovery, defendants in such circumstances may be much less likely to feel the pressure to engage in a settlement"); *see also id.* (lifting the discovery as to "documents disclosed by the defendants to the SEC pursuant to a subpoena"); *Singer v. Nicor, Inc.*, 2003 WL 22013905, at \*2 (N.D. Ill. Apr. 23, 2003) (lifting the discovery stay, in part, upon the finding that "defendants would not be unduly burdened by producing" documents already produced to various nonprofit organizations and governmental agencies); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2002 WL 31845114, at \*1 (S.D. Tex. Aug. 16, 2002) (granting discovery of "materials produced . . . [in relation to] any inquiry or investigation by any legislative branch committee, the executive branch, including the Department of Justice and the Securities and Exchange Commission, and all transcripts of witness interviews or depositions related to those inquiries").

Here, too, Plaintiff seeks a limited and well-defined set of discovery materials already gathered and produced by UnitedHealth to the DOJ during the course of the investigation

- 11 -

that commenced in October 2023. Thus, because Defendants have already gathered, reviewed, and produced these highly relevant materials, reproducing them to Plaintiff creates little burden. *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act* (*ERISA*) *Litig.*, 2009 WL 4796169, at *2 (S.D.N.Y. Nov. 16, 2009) ("The burden on the defendants 'is slight when a defendant "has already found, reviewed and organized the documents."'").

The documents and ESI UnitedHealth has produced to the DOJ are highly relevant to this action. Plaintiff's claims directly align with the DOJ's investigation into UnitedHealth, alleging UnitedHealth has deployed an improper upcoding scheme in its Medicare Advantage business, lacks sufficient data protection protocols and capabilities to comply with federal antitrust laws, and engages in anti-competitive practices designed to consolidate control and eliminate competition in the healthcare industry. Courts have lifted the PSLRA stay and ordered production of materials in highly analogous situations. *See Delphi*, 2007 WL 518626, at *8 ("The fact that the SEC brought an action predicated upon the very same accounting irregularities alleged in the [class action complaint] . . . demonstrates that this is not a 'frivolous securities class action' brought against innocent parties."); *Assisted Living*, 943 F. Supp. 2d at 915 (lifting the discovery stay as to "documents disclosed by the defendants to the SEC pursuant to a subpoena"). Here, Plaintiff seeks access to information already produced to the government addressing the same subject matter during the relevant time period at issue in this suit. This is plainly sufficient to establish the "exceptional circumstances" element.

4889-8823-9602.v1

### B.      Plaintiff's Request Is Sufficiently Particularized

Requests for relief from the PSLRA stay are sufficiently particularized when they refer to a "'clearly defined universe of documents.'"  *In re Royal Ahold N.V. Sec. & Erisa Litig.*, 220 F.R.D. 246, 250 (D. Md. 2004); *see also In re Massey Energy Co. Sec. Litig.*, 2011 WL 4528509, at \*5 (S.D. W. Va. Sept. 28, 2011) (permitting discovery where "the production of documents . . . provided to the referenced government agencies and other parties are specific and fully consistent with the allegations and claims set forth in [plaintiffs' complaint]"); *Assisted Living*, 943 F. Supp. 2d at 915 (holding that discovery request was particularized because it was "limited solely to relevant materials that [had] already been produced in other proceedings").

In particular, "[c]ourts have regularly held that requests seeking documents produced to regulatory agencies or produced in other proceedings were particularized."  *Courter v. CytoDyn, Inc.*, 2022 WL 621535, at \*2 (W.D. Wash. Mar. 3, 2022); s*ee also In re WorldCom, Inc. Sec. Litig.*, 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002) (documents already produced to the SEC and U.S. Attorney constituted a "clearly defined universe"); *Singer*, 2003 WL 22013905, at \*2 (finding requests for documents produced to, among others, the SEC, the Illinois Attorney General, and the Cook County State's Attorney's Office "sufficiently particularized"); *Enron*, 2002 WL 31845114, at \*1-\*2 (same); *In re FirstEnergy Corp. Sec. Litig.*, 2021 WL 2414763, at \*4 (S.D. Ohio June 14, 2021) (same).

Here, the scope of Plaintiff's discovery request is limited to materials ***already produced*** by UnitedHealth to the DOJ in relation to the DOJ's investigation of the Company commenced in October 2023.  Thus Plaintiff's request constitutes a "clearly defined

- 13 -

universe." Moreover, these materials are unquestionably relevant because they go to the heart of Plaintiff's claims about the Company's Medicare Advantage business (including the upcoding scheme), its lack of data protection, and its anti-competitive conduct.

Clearly defined document sets can be produced even when the production is large. Plaintiffs in *Royal Ahold* sought to lift the PSLRA discovery stay to permit the production of documents that the defendant corporation had produced to government agencies including the DOJ and the SEC. 220 F.R.D. at 249-50. In response, defendants argued that it was insufficient for a request to be merely "'identifiable,'" arguing that the sheer volume of the universe of documents rendered the request insufficiently particularized. *Id.* at 250. The court disagreed, recognizing that "'particularized'" did not "necessarily mean 'small.'" *Id.* The court further held that the securities plaintiffs' request "describe[d] a 'clearly defined universe of documents,' and the burden of producing the materials [would] be slight, considering that the defendants [had] previously produced them to other entities." *Id.*; *see also FirstEnergy*, 2021 WL 2414763, at *4 ("particularized discovery requests are warranted, even when they are voluminous").

### C. Plaintiff Will Be Subject to Undue Prejudice if It Is Not Granted Access to Materials Produced to the DOJ

"Under the undue prejudice exception . . . sufficiently particularized discovery is permitted where the party seeking to lift the . . . automatic discovery stay makes 'a showing of improper or unfair detriment that need not reach the level of irreparable harm.'" *Ameriprise Fin. Servs., Inc. & Univision Commc'ns Inc.*, 2009 WL 10710599, at *2 (D. Minn. Jan. 9, 2009) (quoting *In re Lernout & Hauspie Sec. Litig.*, 214 F. Supp. 2d 100, 107

- 14 -

4889-8823-9602.v1

(D. Mass. 2002)).  Undue prejudice to securities plaintiffs occurs when they are deprived of "access to key documents that have already been produced."  *Royal Ahold*, 220 F.R.D. at 252.  This creates an informational disparity which places plaintiffs at a tangible disadvantage where "a defendant in a securities action . . . is also involved in criminal, civil and administrative investigations and actions which are proceeding unabated with the possibility that settlements might occur and/or fines and penalties might be imposed." *Massey Energy*, 2011 WL 4528509, at *6.[3]

Numerous courts are in accord.  *See*, *e.g.*, *In re LaBranche Sec. Litig.*, 333 F. Supp. 2d 178, 182 (S.D.N.Y. 2004) ("undue prejudice has been found in situations where plaintiffs are 'prejudiced by [their] inability to make informed decisions about [their] litigation strategy in a rapidly shifting landscape' and when they are effectively 'the only major interested party in the criminal and civil proceedings . . . without access to documents that currently form the core of those proceedings'") (alterations in original); *Assisted Living*, 943 F. Supp. 2d at 916 (where securities plaintiff "is fighting this lawsuit in a rapidly shifting landscape, at an informational disadvantage when compared to the many other interested parties . . . the Court believes that [plaintiff] would face undue prejudice if the Court were not to lift the stay"); *WorldCom*, 234 F. Supp. 2d at 305 ("[w]ithout access to documents already made available to the [the government]," plaintiff "would be prejudiced by its inability to make informed decisions about its litigation strategy").

---

[3]    While courts must weigh any burden to the defendant against potential prejudice to the plaintiff, such an inquiry is focused on "'production costs'" that defendants may incur. *CytoDyn*, 2022 WL 621535, at *2.  Here, Plaintiff agrees to bear reasonable production costs and to also agree to a protective order maintaining confidentiality.

- 15 -

The exact circumstances contemplated and analyzed in these cases are also present here, and they warrant relief. Plaintiff and the putative class are unduly prejudiced by their inability to access the same information that the DOJ has already acquired in its new investigation of Defendants. Indeed, it appears that the DOJ's investigation is proceeding apace – including conducting interviews of former UnitedHealth doctors who have admitted that the Company pressured them to "apply codes to Medicare Advantage patients for conditions they didn't think were appropriate." Ex. A at 2. As a result, the DOJ now has significant, nonpublic information related to UnitedHealth and its Medicare Advantage upcoding scheme and other anticompetitive business practices while Plaintiff and the putative class remain at an informational disadvantage while they are subject to an indefinite stay. *See Singer*, 2003 WL 22013905, at *2 (noting plaintiffs are "unfairly disadvantaged if they do not have access to the documents that the governmental and other agencies already have, during the pendency of the motion to dismiss"). This informational disadvantage prevents Plaintiff from making informed decisions about its litigation strategy in a rapidly shifting landscape. *Royal Ahold*, 220 F.R.D. at 252.[4]

---

[4]   Although the court in *Ameriprise Fin. Servs.*, 2009 WL 10710599, at *1-*2, found that the specific facts of that case did not demonstrate undue prejudice, the circumstances here justify a different conclusion. In *Ameriprise* plaintiffs sought documents relating to the defendants' use of assets, but the court had already appointed a Special Master to monitor defendants' use of assets. Thus, the court logically found that the presence of the court-appointed Special Master protected plaintiffs' goal of guarding assets and therefore no undue prejudice existed. *Id.* Unlike *Ameriprise*, here, the DOJ investigation is proceeding apace (including recent interviews of UnitedHealth doctors) and documents have already been produced to the DOJ. Plaintiff is therefore at an informational disadvantage and prevented from making informed decisions about its litigation strategy.

- 16 -

## V.    CONCLUSION

It is well settled that "'maintaining [a] discovery stay as to materials already provided to government entities does not further the policies behind the PSLRA.'" *FirstEnergy*, 2021 WL 2414763, at \*5 (alteration in original). And, here, Plaintiff has established each of the elements necessary for the Court to lift the PSLRA discovery stay. As such, the Court should grant Plaintiff's motion for ***partial*** limited relief from the PSLRA discovery stay. Within two weeks of any Order by the Court, Defendants should be required to produce all documents and ESI produced to the DOJ relating to the DOJ investigation that began in October 2023.

DATED: February 10, 2025    Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (admitted *pro hac vice*)
SAM S. SHELDON (admitted *pro hac vice*)
LAURIE L. LARGENT (admitted *pro hac vice*)
ROBERT R. HENSSLER JR. (admitted *pro hac vice*)
JEFFREY J. STEIN (admitted *pro hac vice*)
JACK ABBEY GEPHART (admitted *pro hac vice*)


s/ Robert R. Henssler Jr.
ROBERT R. HENSSLER JR.

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
darrenr@rgrdlaw.com
ssheldon@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
jstein@rgrdlaw.com
jgephart@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 17 -

4889-8823-9602.v1

SOMERMEYER SULLIVAN PLLC
TIM SULLIVAN, MN 391528
JAMES PORADEK, MN 290488 (OF COUNSEL)
225 South Sixth Street, Suite 3900
Minneapolis, MN  55402
Telephone:  612/643-3486
tsullivan@somsull.com
jporadek@somsull.com

Local Counsel

- 18 -

4889-8823-9602.v1