# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Civ. No. 24-cv-1743 (JMB/DTS) |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | SUPPLEMENTAL CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| UNITEDHEALTH GROUP INC., et al., | |
| Defendants. | |

4935-8985-8078.v1

## TABLE OF CONTENTS

Page

I.    OVERVIEW OF THE ACTION ....................................................................... 1

II.   JURISDICTION AND VENUE .................................................................... 10

III.  THE PARTIES .......................................................................................... 10

      A.    Plaintiff ....................................................................................... 10

      B.    Defendants ................................................................................... 11

IV.   DEFENDANTS' IMPROPER ANTI-COMPETITIVE PRACTICES AND
      WRONGFUL COURSE OF BUSINESS ....................................................... 13

      A.    Corporate Overview .................................................................... 13

            1.    UnitedHealth Became an Industry Behemoth Through
                  Strategic Acquisitions ....................................................... 14

            2.    The Balanced Budget Act Privatized Medicare ............... 14

            3.    The Affordable Care Act Sought to Limit the Profits and
                  Power of Private Insurers .................................................. 15

            4.    UnitedHealth Identifies a Loophole in the Affordable Care
                  Act and Expands Further .................................................... 16

      B.    UnitedHealth's Fraudulent Upcoding Scheme Extracted Billions of
            Dollars in Taxpayer-Funded Payments ........................................ 21

            1.    Overview of the Medicare Advantage Program ............... 21

            2.    UnitedHealth Used Health Risk Assessments from In-Home
                  Visits to Perpetrate Its Upcoding Scheme ........................ 23

                  a.    HouseCalls Nurses Were Instructed and Pressured to
                        Add Unsupported Diagnosis Codes During In-Home
                        Visits ....................................................................... 26

                  b.    HouseCalls Nurses Were Required to Use Unreliable
                        Medical Devices that Caused False Positive Diagnoses ....... 31

            3.    Additional Means by Which UnitedHealth Perpetrated the
                  Upcoding Scheme .............................................................. 35

4935-8985-8078.v1

**Page**

       4.      UnitedHealth Adamantly Denies the Office of Inspector General's September 2021 Report Showing Billions of Dollars in Questionable Payments Made to UnitedHealth as a Result of Chart Reviews and Health Risk Assessments ................. 41

   C.   UnitedHealth Acquires Change Healthcare and Misleads Investors About Data Firewalls......................................................................... 44

       1.      The Change Acquisition................................................... 44

       2.      The Change Acquisition Comes Under Immediate Government Scrutiny ........................................................ 46

       3.      UnitedHealth Defeats the DOJ Lawsuit By Insisting It Always Maintains "Strict" Data Firewall ........................ 48

       4.      There Was Not (and Is Not) a Technical Firewall Between Intra-Optum Businesses ..................................... 50

   D.   UnitedHealth's Lax Security Leads to Massive Data Breach .................... 53

   E.   Optum's Additional Anti-Competitive Practices ........................................ 56

   F.   UnitedHealth's Additional Anti-Competitive Conduct ............................. 57

   G.   UnitedHealth Receives Notice of a Nonpublic DOJ Investigation and UnitedHealth Executives Immediately Embark on a Massive Insider Selling Spree........................................................................................ 58

   H.   The Scope of the New DOJ Investigation Is Publicly Disclosed and UnitedHealth's Stock Price Drops ............................................................. 60

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS.................................................................. 61

   A.   False and Misleading Statements Concerning UnitedHealth's HouseCalls and Medicare Advantage Program ......................................... 61

       1.      Statements During 2021 ................................................... 62

       2.      Statements During 2022 ................................................... 65

       3.      Statements During 2023 ................................................... 68

**Page**

B.    Defendants' Misrepresentations About Internal Firewalls at UnitedHealth and Its Optum Subsidiary ..................................... 71

    1.    Statements During 2022 ................................... 71

    2.    Statements During 2023 ................................... 75

C.    Additional False and Misleading Statements in UnitedHealth's Code of Conduct ................................................ 76

VI.    ADDITIONAL INDICIA OF SCIENTER ............................................. 80

A.    The Individual Defendants' Frequent Discussions of Housecalls and Medicare Advantage with Analysts Confirms Their Intimate Knowledge of the Upcoding Scheme ........................................ 80

B.    The Upcoding Scheme Required Participation Throughout the Company ................................................................... 81

C.    Testimony, Internal Communications, and Internal Reports Unsealed During the Change Antitrust Trial Support a Strong Inference of Scienter ................................................................... 83

    1.    UnitedHealth Targeted Change Healthcare Specifically to "Utilize" Claims Data and Customer Sensitive Information .......... 83

    2.    UnitedHealth's and Optum's Track Record of Data Governance Failures, Including Unauthorized Database Access ................................................................... 86

D.    Defendants Engaged in Multiple Suspicious Rounds of Insider Trading ................................................................... 90

    1.    Hemsley Sold Shares as Media Outlets Began to Question UnitedHealth's Medicare Advantage Practices ............................. 90

    2.    Defendants Sold Shares Heading into the Change Antitrust Trial Concerning UnitedHealth's Purchase of Change Healthcare ................................................................... 91

    3.    Defendants Sold Shares Upon Receiving Nonpublic Information that the DOJ Was Opening a New Antitrust Investigation ................................................................... 92

**Page**

E.    Defendants' Anti-Competitive Scheme Infected the Core of
UnitedHealth's Business ................................................................ 93

1.    UnitedHealthcare's Medicare Advantage Business, Including
the HouseCalls Program, Was a Core Component of
UnitedHealth's Business ................................................... 93

2.    Optum's 2022 $13 Billion Acquisition of Change Healthcare
Garnered National Attention and Federal Scrutiny ......................... 95

F.    UnitedHealthcare's Anti-Competitive Conduct ........................................ 96

G.    The Abrupt Departure of UnitedHealth's Chief Information Security
Officer ................................................................................. 99

VII.    POST-CLASS PERIOD EVENTS .................................................... 100

A.    Secret Recording of Internal UnitedHealth Meeting Confirms
UnitedHealth's Upcoding Scheme ............................................ 100

B.    United States Lawmakers Implore the SEC to Open an Investigation
into Defendants' Suspicious Insider Trading ............................ 101

C.    Massive Data Breach Leads to Congressional Scrutiny of the
Upcoding Scheme ................................................................. 102

D.    Investigative Reports Confirm UnitedHealth Trained and Pressured
Doctors to Improperly Upcode Patients ................................... 103

E.    Investigative Reports Confirm UnitedHealth Used In-Home Visits to
Perpetrate the Upcoding Scheme and Improperly Increase Medicare
Advantage Profits ................................................................ 105

F.    OIG Report Confirms UnitedHealth's Upcoding Scheme Continued
Through 2023 and that the Company Was Paid Billions in Improper
Payments in 2023 ................................................................. 107

G.    UnitedHealth's Continued False Denials ............................................ 109

H.    UnitedHealth's Upcoding Scheme Is a Longstanding Practice and
UnitedHealthcare's Former CEO Successfully Pressured CMS ............. 111

VIII.    LOSS CAUSATION ................................................................. 112

- iv -

**Page**

IX.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE
     FRAUD-ON-THE-MARKET DOCTRINE ........................................................ 115

X.   CLASS ACTION ALLEGATIONS ................................................................ 116

XI.  CLAIMS ........................................................................................................ 118

COUNT I ........................................................................................................ 118

COUNT II ....................................................................................................... 120

COUNT III ...................................................................................................... 121

PRAYER FOR RELIEF ..................................................................................... 123

DEMAND FOR JURY TRIAL ........................................................................... 123

Lead Plaintiff California Public Employees' Retirement System ("Plaintiff" or "CalPERS"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants named herein, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters. Plaintiff's allegations are based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls, and announcements made by Defendants; U.S. Securities and Exchange Commission ("SEC") filings; releases published by and regarding UnitedHealth Group, Inc.; analyst reports and advisories about UnitedHealth Group, Inc.; media; statements by percipient witnesses; and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    OVERVIEW OF THE ACTION

1.    This securities fraud class action is brought on behalf of purchasers of UnitedHealth Group, Inc. common stock between September 22, 2021 and February 27, 2024, inclusive (the "Class" and "Class Period"), seeking to pursue remedies under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) against UnitedHealth,[1] two of the Company's senior executives, Andrew Witty Chief Executive Officer ("CEO") of

---

[1]    UnitedHealth Group, Inc. is referred to herein as "UnitedHealth," "UNH," or the "Company."

UnitedHealth and Brian Thompson CEO of UnitedHealth subsidiary UnitedHealthcare, and the Chair of the Company's Board of Directors, Stephen Hemsley (collectively, herein referred to as the "Defendants").

2.      UnitedHealth is a health insurance company that provides insurance to individuals, employers, and small businesses. Today, its insurance arm – UnitedHealthcare – is the largest insurance provider in the United States. In 2010, the Affordable Care Act (the "ACA") was enacted into law. The ACA introduced medical loss ratio ("MLR") requirements that required insurers (also called "payers") to spend a greater percentage of premiums collected from patients on actual healthcare, rather than administrative costs or insurer profits. The ACA placed downward pressure on UnitedHealth's profits and the Company immediately ramped up its vertical expansion – *i.e.*, expanding into areas outside of health insurance – to diversify its revenue streams and maintain its growth.

3.      In April 2011, UnitedHealth launched a new subsidiary, Optum. Optum does not provide insurance, but rather provides healthcare services and products through its three businesses: Optum Health (healthcare providers), Optum Rx (prescription services), and Optum Insight (healthcare technology products). After launching the new brand, UnitedHealth focused on expanding its non-insurance business in order to widen its influence in the healthcare industry. Owning both a healthcare insurer and medical providers positioned UnitedHealth to circumvent the ACA's MLR restrictions. UnitedHealthcare could collect premiums, send patients to Optum Health for treatment, and pay itself (through Optum) for the requisite level of healthcare treatment to satisfy the MLR requirements. Doing so allowed UnitedHealth to then retain profits on both sides of the ledger.

- 2 -

4.     From the enactment of the ACA to the start of the Class Period, UnitedHealth spent over $60 billion expanding into the far corners of the healthcare industry and, accordingly, establishing immense market power it could use to manipulate other participants in the industry.

5.     This case arises out of Defendants' abuse of power.  Defendants engaged in a scheme and wrongful course of business which was designed to, and did, artificially inflate the Company's revenues, earnings, and stock price.  As part of the scheme and wrongful course of business complained of herein, Defendants formulated, implemented, and oversaw an illegal, company-wide upcoding gambit.  Defendants also misrepresented the breadth, scope, and integrity of Optum's existing firewall protections while concurrently concealing Optum's ability to circumvent those very firewall protections.  Finally, Defendants used UnitedHealth's monopolistic dominance to engage in anti-competitive practices to consolidate its control over healthcare services and eliminate competition.

**Defendants' Medicare Advantage "Upcoding" Scheme**

6.     Medicare Advantage is a privatized version of traditional Medicare, under which the government pays a set fee to private insurers such as UnitedHealth to provide insurance plans to qualifying senior citizens ("members").  The government pays a higher set fee for Medicare Advantage patients with certain pre-existing conditions.  During the Class Period, Defendants publicly identified UnitedHealthcare's Medicare Advantage business as one of the Company's "key elements of [it's] growth strategy."  At the core of Defendants' scheme was their carefully orchestrated plans and procedures to inflate the fees UnitedHealth

- 3 -

collected from the government by deliberately "upcoding" – or adding unwarranted diagnosis codes – across its massive member population.

7.    Defendants' employed several different mechanisms to effectuate their wrongful course of business.  For example, UnitedHealth induced providers to find new diagnoses by paying bonuses to providers who upcoded.  UnitedHealth trained providers to use "'buddy codes,'" that is adding multiple new diagnoses based upon existing ones. UnitedHealth also purposefully leveraged its HouseCalls program, whereby the Company would dispatch nurse practitioners to members' homes to perform physical assessments. Defendants also exploited the HouseCalls program by using tools designed to find diagnoses that did not exist, including software specifically programmed to recommend lucrative diagnoses and unreliable medical devices.  Defendants used such tools even though they were aware the tools were prone to issue false positives for lucrative conditions.  Doctors and nurses who worked for UnitedHealth during the Class Period have ***admitted*** that they added codes they did not truly believe existed because UnitedHealth pressured them to do so.

8.    Defendants' upcoding scheme worked as planned.  According to an analysis of Medicare data by *The Wall Street Journal* (the "*WSJ*"), in 2021 alone, UnitedHealth received ***$8.7 billion*** in taxpayer money for diagnosis codes that no doctor treated.  The cost of Defendants' scheme was not solely financial; it also had real-life impact on America's senior citizens.  Doctors around the country have described panicked calls from UnitedHealth members who noticed alarming new diseases listed on their medical chart that their doctor never mentioned.  Former UnitedHealth physician, Dr. Susan Baumgaertel, admitted that when she got those calls, "she always tried to tell patients the truth, as uncomfortable as it

- 4 -

was: I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more."

9.    Throughout the Class Period, Defendants frequently spoke to investors about the Company's Medicare Advantage business and the HouseCalls program while concealing the upcoding scheme.  For example, on September 22, 2021, the first day of the Class Period, UnitedHealth responded to questions about its coding practices by assuring investors that "'UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care.'"  Defendants continued to issue similar false and misleading assurances throughout the Class Period.

**Optum Acquires Change Healthcare and Misleads Investors About Data Firewalls**

10.    On January 6, 2021, UnitedHealth announced its largest acquisition ever: Optum Insight would acquire Change Healthcare ("Change"), a healthcare technology company, for $13 billion.  Change operated a clearinghouse that acted as the "pipes" of the healthcare industry, processing health insurance claims and moving data from entity to entity.  According to a UnitedHealth estimate, more than half of American medical insurance claims "pass through (or touch)" Change's systems.  Internally, UnitedHealth's then-CEO, David Wichmann, lauded the acquisition because it granted UnitedHealth access to the Change data, calling that access the "'foundation'" of the deal.  Indeed, the Change acquisition gave UnitedHealth access to critical competitor information, including pricing structures, claims data, and billing practices.

- 5 -

11.     Industry groups, however, responded differently, immediately questioning the propriety of the deal, citing serious antitrust concerns.  On February 24, 2022, the Department of Justice (the "DOJ") sued to block the Change acquisition on antitrust grounds, arguing UnitedHealth would gain access to sensitive data that it could wield against its competitors.  UnitedHealth immediately refuted the DOJ's allegations and assured investors that Optum possessed "best-in-class firewalls and compliance programs that maintain the integrity of our customers' data and information."  Throughout the Class Period, Defendants repeatedly made similar assurances, insisting that UnitedHealth had "internal firewalls that prevent the sharing of competitively sensitive information across business units."  Ultimately, UnitedHealth's assurances won the day.  The U.S. District Court for the District of Columbia decided in Optum's favor, expressly crediting UnitedHealth's purported history of maintaining data firewalls.

12.     The firewalls UnitedHealth described to the court and the public were illusory – they simply did not exist.  In truth, Optum's business applications share data with other Optum business applications.  And what they did *not* do is prohibit Optum from using external customer data to benefit those Optum businesses competing with external customers.  The lack of firewalls and lax security also ultimately led to the largest security breach in the history of the United States healthcare system, which hackers achieved simply by acquiring a working username and password.

- 6 -

**UnitedHealth Receives Notice of a Nonpublic DOJ Investigation and UnitedHealth Executives Respond by Selling More than $100 Million of Their Own UnitedHealth Shares**

13.     On October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company.'"  Concealing this material information from investors and the public, UnitedHealth chairman Stephen J. Hemsley and several other senior executives immediately took action – selling more than $100 million of their own UnitedHealth stock at artificially inflated prices as the market and other investors remained unaware of the new federal antitrust investigation.

**The Relevant Truth Leaks Out**

14.     On February 27, 2024, the *WSJ* reported that the DOJ was conducting an antitrust investigation into UnitedHealth.  According to the *WSJ*, the DOJ's investigation centered around, among other things, "[m]edicare billing issues, including the Company's practices around documenting patients' illnesses," as well as issues relating to other anti-competitive practices at Optum and UnitedHealthcare.  News of the DOJ investigation was severely troubling to investors, with industry analysts subsequently expressing concern that the DOJ investigation would expose "UnitedHealth's M[edicare] A[dvantage] risk coding practices" that "'make your M[edicare] A[dvantage] beneficiaries look sicker than they really are'" in order to "'make more money,'" that UnitedHealth's "'firewall has a lot of holes in it,'" and that "ownership of physician and health-plan units affects competition."  In response to those revelations, the price of UnitedHealth stock declined over $27 per share, falling from $525.32 per share on February 26, 2024 to $498.28 on February 28, 2024.

- 7 -

**U.S. Lawmakers Take Notice and Demand Further Action**

15.     UnitedHealth's anti-competitive practices have garnered intense government

scrutiny, including Congressional hearings.  In a rare case of bipartisanship, lawmakers from

both sides of the aisle demanded intervention.  For example, Senator Elizabeth Warren (D-

Ma.) stated: "Because UnitedHealth has bought up every link in the healthcare chain, it's in a

position to jack up prices, squeeze competitors, hide revenues, and pressure doctors to put

profits ahead of patients. UnitedHealth is a monopoly on steroids," while Republican

Representative Buddy Carter (R-Ga.) bluntly agreed that UnitedHealth "'needs to be busted

up.'"

16.     Based on the highly suspicious stock sales by Hemsley and others, Senator

Warren and 16 other lawmakers sent a letter urging the SEC to open an insider trading

investigation.  The lawmakers said "these trades reveal a disturbing fact pattern," particularly

since they came during a DOJ investigation, when such trades should have been prohibited.

**An Office of Inspector General Report and Whistle-Blower Media Reports Confirm the Fraudulent Upcoding Scheme**

17.     In July, August and October 2024, UnitedHealth's fraudulent upcoding scheme

was confirmed in a series of bombshell investigative reports published by the *WSJ* and *STAT*

*News*.[2]  Over the course of six investigative reports – fortified by numerous whistleblower

---

[2]     *See* Christopher Weaver et al., *Insurers Pocketed $50 Billion From Medicare for
Diseases No Doctor Treated*, Wall St. J. (July 8, 2024); Anna Wilde Mathews et al., *The
One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare*, Wall St. J.
(Aug. 4, 2024); Bob Herman et al., *How UnitedHealth harnesses its physician empire to
squeeze profits out of patients*, STAT News (July 25, 2024); Casey Ross et al., *How
UnitedHealth turned a questionable artery-screening program into a gold mine*, STAT News
(Aug. 7, 2024); Tara Bannow et al., *Inside UnitedHealth's strategy to pressure physicians:
$10,000 bonuses and a doctor leaderboard*, STAT News (Oct. 16, 2024); Christopher

- 8 -

accounts from former UnitedHealth employees – journalists detailed how Defendants exploited the HouseCalls visits and pressured doctors and nurse practitioners to manipulate diagnosis codes, securing for themselves billions of dollars of inflated and unsupported payments.

18.     On October 24, 2024, the Office of Inspector General ("OIG") released a new report titled: "Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions."[3]  The government watchdog found that UnitedHealth reaped $3.2 billion in extra federal payments in 2023 for diagnoses from in-home health risk assessments ("HRAs") and HRA-linked chart reviews.  According to the report, UnitedHealth accepted these payments *even though the patients did not receive any additional treatment or medical services following the new diagnoses*.  "One top MA company, UnitedHealth Group, Inc., stood out from its peers, especially in its use of in-home HRAs and HRA-linked chart reviews to generate risk-adjusted payments," the OIG report noted.

19.     Throughout the Class Period, UnitedHealth leveraged its monopolistic power to crush competition, manipulate government officials, and force others in the healthcare industry to cede to its demands.  In the process, UnitedHealth unlawfully obtained billions of dollars of revenue from the federal government, healthcare providers, and its own members.

---

Weaver et al., *Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds*, Wall St. J. (Oct. 24, 2024).  The six reports are attached as Exhibits 1-6.

[3]     The October 24, 2024 OIG report is attached hereto as Exhibit 10.

When investors learned the truth, the inflation in the price of UnitedHealth's stock dissipated.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

21.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act.  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

22.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    THE PARTIES

### A.    Plaintiff

23.    Lead Plaintiff California Public Employees' Retirement System is the largest state public pension fund in the United States, with more than 2 million members and more than $500 billion in assets under management.  CalPERS purchased UnitedHealth common

- 10 -

stock during the Class Period, as set forth in the Certification attached hereto as Ex. 7, and was damaged thereby.

### B.    Defendants

24.    Defendant UnitedHealth Group, Inc. is a publicly-traded healthcare company incorporated in Delaware and headquartered at 9900 Bren Road East, Minnetonka, Minnesota 55343.  UnitedHealth owns an insurance business, UnitedHealthcare, as well as a medical services provider and technology business, Optum.  UnitedHealth is one of the largest corporations in the world, with a 2023 revenue of $371.6 billion.  During the Class Period, UnitedHealth traded on the New York Stock Exchange under the ticker UNH.

25.    Defendant Andrew Witty has been CEO of UnitedHealth and on UnitedHealth's Board of Directors (the "Board") since February 3, 2021.  Until his appointment as CEO and Director, Witty was the Executive Vice President of UnitedHealth and CEO of Optum from March 2018.  Prior to his appointment as Optum CEO in March 2018, Witty served as an Independent Director on the UnitedHealth Board.  In these roles, Witty oversaw UnitedHealth and Optum's operations.  During the Class Period, Witty spoke often about the HouseCalls program calling it "a true collaboration between Optum and UnitedHealthcare," and also spoke on UnitedHealth's commitment to maintaining a data firewall between Optum and UnitedHealthcare.  He signed each of the Company's Forms 10-Q and Forms 10-K during his time as CEO.

26.    Defendant Stephen Hemsley has been the Chair of UnitedHealth's Board of Directors since September 1, 2017.  He has been a Director since 2000.  Hemsley also served as CEO of the Company from September 2017 through November 2019.  In 2021 and 2022,

- 11 -

Hemsley sat on the Board's Health and Clinical Practice Policies Committee, which is responsible for "oversight of management's initiatives to improve health care affordability." During the Class Period, Hemsley sold more than 21% of his UnitedHealth shares for proceeds of over $211 million.

27.    Defendant Brian Thompson has been the CEO of UnitedHealthcare, UnitedHealth's insurance business, since April 7, 2021.  Thompson has held numerous leadership positions at the Company since he started work in April 2004, with a primary focus on the financial side of the Medicare business.  From July 2019 to April 2021, Thompson was CEO of UnitedHealthcare, Government Programs.  In this role, he oversaw the UnitedHealthcare Medicare & Retirement division, a business arm focused on the Company's coverage of Medicare members.  From April 2017 to July 2019, he was CEO of UnitedHealthcare Medicare & Retirement.  Prior to that, from December 2012 until April 2017, Thompson was the Chief Financial Officer ("CFO") of UnitedHealthcare, Medicare & Retirement.  During the Class Period, Thompson spoke to investors regarding the HouseCalls program and sold over 31% of his UnitedHealth shares for proceeds of over $15 million.

28.    Defendants Witty, Hemsley, and Thompson are hereinafter referred to as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false or misleading statements that caused the price of UnitedHealth common stock to be artificially inflated or maintained artificial inflation in UnitedHealth's common stock during the Class Period.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company and was privy to confidential, proprietary information

- 12 -

concerning the Company and its businesses, operations, services, competition, and present and future business prospects.

## IV. DEFENDANTS' IMPROPER ANTI-COMPETITIVE PRACTICES AND WRONGFUL COURSE OF BUSINESS

### A. Corporate Overview

29.     UnitedHealth was founded in 1977 in Minneapolis, Minnesota to purchase a small health maintenance organization ("HMO") service company called Charter Med Incorporated.  UnitedHealth soon began acquiring and managing HMOs, and operating as a medical insurance company.  It has since grown to become the largest health insurer in the United States and one of the largest corporations in the world, with 2023 revenue just shy of $372 billion.

30.     UnitedHealth is comprised of two business platforms, UnitedHealthcare and Optum.  UnitedHealthcare is the insurance arm of UnitedHealth, offering employer-based and individual insurance plans and providing private health insurance to more than 35 million members in over 150 countries as of December 31, 2023.  UnitedHealthcare also provides insurance to Medicare-eligible members through its Medicare Advantage program.

31.     Optum is UnitedHealth's healthcare services arm, which provides a variety of products and services across the healthcare industry.  Optum is divided into three separate businesses.  *Optum Health* houses the healthcare provider business, delivering primary care, specialty care, urgent care, and surgery directly to patients in hospitals, in their homes, and virtually, serving more than 103 million consumers.  *Optum Rx* is a pharmacy benefit manager ("PBM"), providing pharmaceutical services to patients through a network of more than 65,000 retail pharmacies.  *Optum Insight* houses businesses with tools to service the

- 13 -

healthcare industry in the areas of data analytics, technology, and operations, largely focused on facilitating healthcare administration.

### 1. UnitedHealth Became an Industry Behemoth Through Strategic Acquisitions

32.     Shortly after its founding, UnitedHealth started making aggressive moves to increase its size and influence in the healthcare industry.  First, it expanded horizontally, purchasing over 20 other HMOs and insurance providers throughout the 1980's, 1990's, and 2000's.  In addition to this horizontal expansion in the health insurance field, UnitedHealth also expanded vertically, acquiring healthcare companies with other specialties, including financial companies, software companies, and PBMs.

### 2. The Balanced Budget Act Privatized Medicare

33.     In 1997, Congress enacted the Balanced Budget Act ("BBA"), which revamped the Medicare system and allowed many traditional government functions to transfer to the private sector. Medicare is a federally-run health insurance program administered by Centers for Medicare & Medicaid Services ("CMS") for individuals who are 65 and older or disabled.  Under the traditional Medicare program, there are two parts: Part A and Part B.  Part A covers inpatient and institutional care, while physician visits, outpatient services, and durable medical equipment are covered under Part B.  CMS reimburses hospitals and physicians' offices directly using a "fee-for-service system."  After the medical services are provided, a claim is submitted to CMS for payment.  CMS then pays the claim directly to the healthcare provider based on payment rates established by CMS.

34.     Under the BBA, Congress also created Medicare Part C, known as the Medicare Advantage program. Under this program, individuals can choose to receive their

- 14 -

Medicare-covered benefits (Parts A and B) from private insurance plans (Medicare Advantage Plans ("MA Plans"). Unlike traditional Medicare's fee-for-service model, insurers that offer MA Plans get paid a flat fee for each individual based on his or her health risks. The private insurance company then covers that patient's care according to the terms of his or her MA Plan.

35.    MA Plans were designed, at least in part, to minimize the administrative burden on the government. Congress also believed that the private sector could provide healthcare more economically, ultimately keeping members healthier and saving taxpayers money.[4]

### 3.    The Affordable Care Act Sought to Limit the Profits and Power of Private Insurers

36.    In 2010, Congress enacted the Affordable Care Act (the ACA), a healthcare reform law backed by the Obama administration and designed to provide healthcare to a larger proportion of the United States population, promote efficient use of healthcare dollars, and improve patient care. To that end, the ACA introduced significant changes designed to reduce costs and make healthcare more accessible.

37.    The ACA implemented medical loss ratio (MLR) requirements, which require insurance companies to spend a certain portion of the premiums they receive from patients on actual patient care, rather than administrative costs and profit. Large group plans have a MLR of 85%, and smaller group plans have a MLR of 80%. MA Plans are also subject to

---

[4]    *See* 42 U.S.C. §1395c *et seq.*

4935-8985-8078.v1

the ACA limits, and have a MLR of 85%. If a company spends less than the MLR on patient

care, it has to pay a rebate to the Centers for Medicare & Medicaid Services (CMS).

**4.      UnitedHealth Identifies a Loophole in the Affordable
         Care Act and Expands Further**

38.     In April 2011, UnitedHealth created Optum (and its segments Optum Health,

Optum Rx, and Optum Insight), to house its non-insurance businesses.[5]

39.     UnitedHealth soon recognized that Optum Health, the healthcare provider

segment, allowed the Company to blur the lines between payer and provider, evading the

constraints of the ACA's MLR rules.  UnitedHealth could simply hire its own affiliate – via

Optum Health – to provide medical care to members.  Thus, UnitedHealth could increase

payments to Optum Health in order to hit the minimum MLR level, and pocket outsized

profits the ACA was designed to remove.

40.     Christopher Whaley, a health-care economist at Brown University, explained

in an April 30, 2024 *Washington Post* article that Optum Health allowed UnitedHealth to

"'acquire providers and essentially pay [it]self.'"  He expressed concern that the arrangement

"'provides a disincentive to really care that much about prices and spending growth.'"

41.     Soon after the enactment of the ACA, UnitedHealth accelerated Optum

Health's expansion (and UnitedHealth's vertical expansion in the provider space).  Optum

acquired several provider groups in the years between the enactment of the ACA and the end

of the Class Period, including primary care practices, specialty clinics, and even a few

hospitals.  For example, in December 2017, UnitedHealth announced that Optum would

---

[5]     Occasionally referred to as OptumHealth, OptumRx, and OptumInsight.

acquire DaVita Medical Group (which was itself a Fortune 500 company and the nation's largest provider of kidney care) for $4.34 billion.  And in March 2022, UnitedHealth announced that Optum would acquire LHC Group for $5.4 billion.  At the time, LHC Group was a massive healthcare provider with a focus on at-home healthcare, with 960 locations in 37 states.  Earlier this year, UnitedHealth attempted to buy *another* home-health company, Amedisys, for $3.7 billion.  The DOJ is currently reviewing that transaction for antitrust violations.  Through these transactions, Optum has become the largest employer of physicians in America, boasting relationships with 90,000 physicians across the country, or 10% of all physicians in America.  The following graphic represents UnitedHealth's provider acquisitions since enactment of the ACA:

- 17 -

## Timeline of UnitedHealth's biggest physician acquisitions



42.     As Optum grew to become the predominant healthcare provider, UnitedHealth leveraged Optum's power to thwart competition.  The Company's control over a significant percentage of America's medical service providers allowed it to favor Optum-owned physician groups when creating insurance contracts, leaving its provider rivals with less desirable terms.  Conversely, Optum was positioned to disadvantage its insurer rivals by preventing Optum-affiliated providers from working with insurance companies other than UnitedHealthcare.  Indeed, Optum targeted providers in rural areas where the local population had little choice about which provider to use, and thus had to sign up for whatever insurance company the provider contracted with.

43.     UnitedHealth also spent billions on its vertical expansion, acquiring other healthcare-related businesses.  For example, in July 2015, UnitedHealth acquired Catamaran Corporation, a PBM, through Optum Rx, for $12.8 billion.  In September 2019, UnitedHealth announced that Optum Insight acquired Equian, LLC, which owns a medical billing tool, for $3.2 billion.

44.     Perhaps the most dramatic acquisition came in January 2021 when Optum Insight announced it was purchasing Change, for $13 billion.  Change was the largest provider of prescription processing services in the United States, acting as a clearinghouse for medical transactions.  Change acted as the "pipes" for the healthcare industry as a whole, handling more than 15 billion healthcare transactions worth more than $1.5 trillion each year.  By the nature of its business, Change stores highly sensitive health information from millions of patients.  It also houses valuable data from UnitedHealth's rivals at every level of the healthcare system.  After the transaction, UnitedHealth had access to critical competitor

- 19 -

information, including information that demonstrated their pricing structures, claims processing procedures, and billing practices. The acquisition of Change also positioned UnitedHealth to use this information in anticompetitive ways, such as creating insurance plans with hypercompetitive terms, and negotiating contracts with full visibility into the terms its counterparty had reached with UnitedHealth's competitors. For this reason, the DOJ sued to block the Change acquisition on antitrust grounds.

45.     UnitedHealth's massive expansion into the far corners of the healthcare industry positioned it to manipulate the system through intracompany dealings. Just over the last decade, UnitedHealth has spent $60 billion on acquisitions. Kaufman, Hall & Associates, LLC, a prominent healthcare advisor and advocacy group, reported on March 15, 2024 that Optum as a whole "earned $88B of consolidated revenue" in 2023, but captured "an additional $136B of revenue from its insurance arm [that] was redirected into its Optum businesses in the form of intercompany eliminations." The report explained that "payments from UnitedHealthcare to Optum allow UHG to retain profit-capped insurance revenue by shifting it to other divisions, driving increased profitability for the overall enterprise." It noted Optum Health's growth in particular, which "increased its earnings over eightfold since 2014, consistently earning the majority of its revenue from UHG's insurance arm."

46.     By the start of the Class Period, UnitedHealth had grown to become the largest healthcare company of all time, and the eleventh largest company overall in the world by revenue, with 2023 revenue of almost $372 billion. Operating independently of the UnitedHealth umbrella, Optum itself would be a Fortune 50 company.

- 20 -

B. **UnitedHealth's Fraudulent Upcoding Scheme Extracted Billions of Dollars in Taxpayer-Funded Payments**

1. **Overview of the Medicare Advantage Program**

47.    As detailed above, the Medicare Advantage program, or Medicare Part C, empowers UnitedHealth and other insurance companies to provide insurance to Americans through government programs using MA Plans.  CMS provides that private insurers which offer MA Plans using a capitated payment system receive a flat rate for each member.  Additionally, there is a risk adjustment feature, which adjusts payments to MA Plans based on the health status of members, thereby allowing MA Plans to receive higher payments for sicker or more complex members.

48.    Under the Medicare Advantage risk-adjustment feature, CMS adjusts the monthly capitated payments to account for various "risk" factors that impact a member's expected health expenditures.  CMS collects "risk adjustment" data (medical diagnosis codes) from the MA Plans to make these payment adjustments.  A diagnosis code must satisfy the following criteria to be eligible for risk adjustment: (1) documented in an approved medical record during the prior year; and (2) documented as a result of a face-to-face visit between the member and a healthcare provider.

49.    CMS then calculates a "risk score" for each member enrolled in a MA Plan which determines the payment for that member.  This process ensures that MA Plans are paid more for those member expected to incur higher healthcare costs and less for the healthier member expected to incur lower costs.  For example, assume that a base yearly payment for a hypothetical Medicare member is $10,000.  If a metastatic cancer and leukemia diagnosis code is added then this would increase the member's "risk score" and

- 21 -

would result in CMS paying the MA Plan $20,700 more in risk-adjusted payments for the member in that year.

50.    This payment process is prospective.  The "risk score" is calculated for each member anew for each payment year based on the diagnosis codes from the immediately preceding year.  CMS relies on the MA Plans and their contracted providers, including hospitals and physicians, to accurately document and submit the diagnosis codes to CMS. CMS requires the MA Plans to submit annual attestations to CMS about the validity of these diagnosis codes.  The submission of such attestation is a condition of payment under CMS' regulations.

51.    Under the Medicare Advantage program, MA Plans are allowed to use health risk assessments and retrospective chart reviews to collect, and submit to CMS, additional diagnoses for risk-adjusted payments that may not have been captured through standard clinical visits.  Health risk assessments can occur as part of a member's annual wellness visit or may be conducted at a member's home by the MA Plan.

52.    Chart reviews can also be used by MA Plans to identify diagnoses that lead to higher risk-adjusted payments.  In a chart review, the MA Plan examines medical records to identify any diagnoses that may not have been previously reported or coded during standard clinical visits.  This retrospective review often involves examining physician notes, test results, and other documentation to ensure that relevant health conditions are captured. Based on these chart reviews, MA Plans can submit additional diagnoses to CMS, potentially increasing the risk scores for members and, consequently, the risk-adjusted payments they receive from CMS.

53.    The members UnitedHealth has enrolled in the Medicare Advantage program grew from 4.9 million in 2018 to 7.7 million in 2023, as shown in the following chart:



### 2.    UnitedHealth Used Health Risk Assessments from In-Home Visits to Perpetrate Its Upcoding Scheme

54.    Before and during the Class Period, Defendants leveraged UnitedHealth's home-visit program, known as HouseCalls, to conduct health risk assessments as a key part of Defendants' upcoding scheme. Defendants exploited these HouseCalls visits and manipulated the Medicare Advantage program in order to inflate the risk-adjusted payments UnitedHealth obtained from CMS and thereby divert billions of dollars to UnitedHealth in improper risk-adjusted taxpayer-funded payments.

- 23 -

55.     HouseCalls is a unit of UnitedHealth's insurance business, UnitedHealthcare. HouseCalls dispatches nurse practitioners ("HouseCalls nurses" or "nurse practitioners") to members' homes for visits that are supposed to last 45 to 60 minutes, with the stated goal of identifying "gaps in care."  To increase and reward member participation, UnitedHealth encourages members to participate in the in-home visits using gift cards and other incentives.

56.     The HouseCalls visits are limited in scope.  While the HouseCalls nurses can record new diagnoses, they are prohibited from providing any direct medical treatment or care, writing prescriptions, ordering diagnostic tests, or referring members to specialists for further medical attention. Their primary task is to complete a lengthy online questionnaire, which includes a checklist of potential diagnoses for them to make.  But the HouseCalls nurses do not have the necessary equipment to diagnose serious or complex medical conditions, making the validity of these in-home visits questionable, especially for UnitedHealth members with potentially undiagnosed health issues requiring thorough clinical assessment.

57.     The in-home visits are focused on ensuring that a member's health status is documented, versus any hands on care.  UnitedHealth provides mandatory training sessions and guidelines for the nurse practitioners performing the HouseCalls visits that focus on how to conduct the in-home visits, make new diagnoses, and record any such diagnosis.  The training sessions make clear to the nurse practitioners that they need to get as many diagnoses as they can during the in-home visits.

58.     UnitedHealth sets productivity targets for the number of HouseCalls visits nurse practitioners are expected to complete each day, directly linking compensation to the

- 24 -

volume of in-home visits completed within a week.  HouseCalls nurses are evaluated on the thoroughness of these visits, creating additional pressure on them to find new diagnoses.  As detailed below, during the Class Period HouseCalls nurses were instructed to conduct unnecessary and unreliable tests during these visits, which were prone to generate false-positives that would support valuable diagnoses.  They were further pressured to identify high-value medical conditions that were not present in members' medical records and to change diagnosis codes to include more lucrative ones.

59.     By 2021, the Company's HouseCalls visits increased to 2.1 million visits per year and continued to increase throughout the Class Period, as shown in the following chart:



a.    **HouseCalls Nurses Were Instructed and Pressured to Add Unsupported Diagnosis Codes During In-Home Visits**

60.    Before and during the Class Period, UnitedHealth instructed and pressured HouseCalls nurses to inflate the number of diagnoses reported during HouseCalls visits. During HouseCalls visits, nurses practitioners were required to use a Company-issued laptop with pre-loaded software calibrated to maximize the number of diagnoses for additional payment. Rather than being a neutral tool for a thorough health risk assessment, the software suggested potential diagnoses based on members' medications and responses that pushed HouseCalls nurses toward making as many medical determinations as possible. The software was designed by UnitedHealth to ensure that nurse practitioners follow a predetermined path of diagnosis generation that inflated risk scores in order to maximize the Company's revenue from the Medicare Advantage program.

61.    A July 8, 2024 report in the *WSJ* titled: "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated," confirmed that the installed HouseCalls software suggested "what illnesses a patient might have and even adds some automatically to a 'diagnosis cart.'" On August 4, 2024, the *WSJ* published another report titled: "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," which described how the HouseCalls software prodded nurses to add diagnoses. For example, the HouseCalls software was designed to and did encourage diagnoses of secondary hyperaldosteronism (elevated levels of the hormone aldosterone), a rarely diagnosed condition. The HouseCalls software suggested the diagnosis if a member had a history of heart failure or cirrhosis ***even though the nurse practitioners were not required to confirm the diagnosis with a lab test***.

- 26 -

The August 4, 2024 *WSJ* report quoted former HouseCalls nurse practitioner as stating: "'In a million years, I wouldn't have come up with a diagnosis of secondary hyperaldosteronism.'"

62.     Based on an analysis of Medicare data, the *WSJ* found that from 2019 to 2021, UnitedHealth diagnosed secondary hyperaldosteronism 246,000 times after in-home visits, leading to $450 million in payments while **all other MA Plans *combined*** were paid less than 1/10th of that amount, or $42 million, from making the same diagnosis during this time period, as illustrated in the following chart:



63.     During the Class Period, HouseCalls nurses were also pressured to upcode during internal reviews of the online questionnaires they filled out during in-home visits. Reviewers from UnitedHealth's quality assurance team ("reviewers") examined the questionnaires to ensure that HouseCalls nurses had maximized all available high-value diagnosis codes. During this review process, reviewers pressured HouseCalls nurses to identify and add new diagnosis codes that the nurses themselves had not previously identified. Specifically, HouseCalls nurses were pressured to link reported symptoms to

previously diagnosed chronic conditions.  For instance, nurse practitioners were told that every time a member reported neuropathy at an in-home visit and had a previous diabetes diagnosis, they were required to diagnose the neuropathy as diabetic neuropathy, even though that might not be the case.  Similarly, reviewers pressured HouseCalls nurses to add new diagnoses for immune suppression disorders in cases where members were prescribed medications for chronic conditions known to potentially cause immune suppression, regardless of whether the member actually experienced immune suppression.  Nurse practitioners were terminated for not following reviewers' instructions.

64.    The July 8, 2024 *WSJ* report stated that UnitedHealth used its HouseCalls program to inflate diagnoses by also including conditions that members were not treated for, contradicted their doctors' assessments, or were simply incorrect.  For example, in 2022, Gloria Lee, a 70-year-old retired accountant and a former UnitedHealth MA Plan member, was offered a $50 gift card if she would allow a nurse practitioner to come to her home for a HouseCalls visit.  Ms. Lee stated that the visit lasted for approximately 20 minutes and the HouseCalls nurse concluded that Ms. Lee had minor cataracts caused by diabetes severe enough to cause nerve damage.  Ms. Lee's primary care physician, Dr. Nancy Keating, also a professor at Harvard Medical School, however, confirmed that Ms. Lee "never had diabetes, let alone complications like diabetic cataracts or nerve damage – a conclusion confirmed by subsequent blood tests."  Dr. Keating commented on the practice of upcoding, stating: "'It's all just so wrong.'"  Ms. Lee agreed, stating: "'If they're going to come out and diagnose people with things they don't have, they shouldn't get any more money.'"

- 29 -

65.    The August 4, 2024 *WSJ* report stated that between 2019 and 2021, UnitedHealth received $10.7 billion from in-home visit diagnoses.  The report also stated that UnitedHealth had the highest average payments among other Medicare Advantage insurers of $2,735 for in-home diagnoses per visit from 2019 to 2021.  UnitedHealth's inflated payments are illustrated in the following chart:



66.    In October 2024, the OIG issued a new report titled "Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions," confirming UnitedHealth's persistent manipulation of the Medicare Advantage payment system during the Class Period.  The October 2024 OIG report found that $4.8 billion in risk-adjusted payments made to MA plans in 2023 resulted from diagnoses reported ***only*** on in-home health risk assessments ("HRA") and HRA-linked chart reviews, and that UnitedHealth alone generated $3.2 billion, or two-thirds, of these payments, while covering only 28% of Medicare Advantage members.  The report also found that UnitedHealth was responsible for generating more than half of the payments made to 77

- 30 -

Medicare Advantage plans in 2023 where the payments were tied solely to a single in-home HRA and *no other service or treatment record*.

67.    Based on these findings, the OIG expressed concern that "either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews." The OIG report also expressed concern about UnitedHealth's practice of using *their own* doctors to conduct in-home HRAs, rather than using the patients' primary care provider in a clinical setting.   The OIG report stated: "By adding diagnoses to an in-home [health risk assessment] via a chart review without also implementing best practices for care coordination, MA companies [including UnitedHealth] may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care."

68.    As a result of its findings, the OIG recommended for the first time that CMS restrict or even cut off payments to MA plans like UnitedHealth for diagnoses from in-home visits and linked chart reviews.

### b.    HouseCalls Nurses Were Required to Use Unreliable Medical Devices that Caused False Positive Diagnoses

69.    Before and during the Class Period, UnitedHealth required HouseCalls nurses to use a medical device called QuantaFlo to diagnose and upcode peripheral artery disease. HouseCalls nurses were forced to use QuantaFlo as a mechanism to generate revenue without regard to medical necessity as the device was not indicated by the Food and Drug Administration ("FDA") for use as a stand-alone diagnostic device and medical guidelines actually recommended against widespread screening for peripheral artery disease.

- 31 -

Nonetheless, the HouseCalls training manual required nurse practitioners to diagnose peripheral artery disease based on the results from QuantaFlo alone.

70.     Reports published after the Class Period confirm the Company's peripheral artery disease upcoding scheme. For instance, the August 4, 2024 *WSJ* report stated that Shelley Manke, a nurse practitioner previously employed by UnitedHealth, was required to use QuantaFlo during her in-home visits. The *WSJ* confirmed that UnitedHealth was checking for cases of peripheral artery disease because each new case would result in an additional payment of approximately $2,500 per year. After Ms. Manke tried the device on herself and received mixed results, she and other nurses raised concerns to UnitedHealth management but were told they needed to keep using the device. The report stated that Ms. Manke said it "'made me cringe'" because she did not believe they should be making such a diagnosis when they did not have an adequate test.

71.     Similarly, the August 4, 2024 *WSJ* report stated that Dr. Amy Chappell, a 73-year-old neurologist and UnitedHealthcare member, was surprised when UnitedHealth sent a nurse to her house and the nurse pulled out the QuantaFlo device. Dr. Chappell is an avid runner and tennis player and the nurse should not have had any reason to believe that Dr. Chappell had peripheral artery disease. The report explained that according to the device, Dr. Chappell tested positive although the nurse did not do any other exam to check for symptoms of the disease. Her primary care physician subsequently confirmed that diagnosis was inaccurate. UnitedHealth later admitted that Dr. Chappell's diagnosis was improper.

72.     As illustrated in the following chart, the August 4, 2024 *WSJ* report found that UnitedHealth diagnosed this condition 568,000 times after in-home visits between 2019 and

- 32 -

2021, yielding $1.4 billion in payments while ***all other MA Plans combined*** were paid $446 million from making the same diagnosis during this time period:



73.    On August 7, 2024, *STAT News* published an investigative report titled: "How UnitedHealth turned a questionable artery-screening program into a gold mine," which further confirmed Defendants' upcoding scheme.  The report stated that after the worst of the COVID-19 pandemic was over, UnitedHealth-owned clinics were directed by the Company to use QuantaFlo on Medicare Advantage members because "it will not only identify undiagnosed peripheral artery disease, but also increase patients' risk scores," which in turn would allow UnitedHealth to "tap into a sea of revenue."  Each diagnosis of peripheral artery disease was worth approximately $3,600 in additional payments from CMS per year.

74.    According to the report, the clinics pushed back on the practice of screening asymptomatic members, especially using only the unreliable QuantaFlo test.  Nevertheless,

- 33 -

the Company still forced the clinics to adhere to a UnitedHealth-controlled schedule to conduct the testing.  The QuantaFlo testing was delegated to HouseCalls nurses, yet they were not allowed to offer clinical advice when patients received their results.

75.    According to five doctors from UnitedHealth-owned clinics, "[s]ome of the QuantaFlo diagnoses were nearly useless."  The report stated that doctors were concerned that patients with false or exaggerated diagnoses would receive unnecessary treatments. According to Dr. Michael Good, a physician formerly employed by a UnitedHealth-owned clinic, he and fellow doctors would receive agonizing calls from their patients, Dr. Good stated: "'They'd call up and say, what does this mean that I have peripheral artery disease? What is this all about? Why didn't you ever tell me about this?'"

76.    The August 7, 2024 *STAT News* report also stated that provider offices had received anxious calls from members who received abnormal QuantaFlo test results through the HouseCalls program since 2022.  For example, the report stated that Kristine Lane, a physician's assistant at The Vascular Experts, a chain of vascular offices in Connecticut, stated that several patients were calling to ask for immediate appointments because they were worried about losing a leg without treatment.  Ms. Lane also reported to *STAT News* that The Vascular Experts "conducted an ultrasound on these patients to scan their lower extremities for signs of restricted blood flow.  She couldn't recall a single follow-up test that found evidence of the disease.  "'They'll come in with an extremely abnormal QuantaFlo number, and then on real testing – more elaborate testing – they're not abnormal at all,' she said."

77.    The *STAT News* report also stated that the "same pattern unfolded at a nearby vascular clinic at Hartford HealthCare, to the point where clinical staff stopped ordering

- 34 -

normal follow-up testing because so many QuantaFlo patients were falsely positive." Dr. Ray Antonelli, a family physician in North Carolina, saw about three or four patients a week who had been falsely diagnosed during a HouseCalls in-home visit. Dr. Foluso Fakorede, a Mississippi cardiologist and leader in peripheral artery disease treatment, stated that he has also seen an increase in QuantaFlo members to his office, and typically ignores the results when they have normal pulses and have no risk factors.

78.    In 2024, CMS finally eliminated the diagnosis code for peripheral artery disease (vascular disease) without complications. This action was supported by 19 former CMS officials, physicians, and policy experts who had sent a letter to CMS supporting this reform, stating: "It is well-known that [MA Plans] maximize the vascular disease . . . by sending staff into MA patients homes with digital diagnostic devices to try and find the slightest hint of sclerosis with little or no clinical relevance."[6]

### 3.    Additional Means by Which UnitedHealth Perpetrated the Upcoding Scheme

79.    The multi-faceted upcoding scheme also incorporated chart reviews, and provider pressure tactics. For the purpose of upcoding, UnitedHealth used risk-adjustment coders employed by Optum and third-party companies to seek out chronic conditions in the charts of Medicare Advantage members that could be linked to potential complications even

---

[6]    The targeting of financial gains from upcoding peripheral artery disease is a longstanding practice at UnitedHealth. For example, in 2007, Jerry Knutson, then-CFO for UnitedHealth's Medicare & Retirement division, emailed a Company colleague to discuss ways to increase revenue: "'You mentioned vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities. Let's turn on the gas! What can we do to make sure we are being reimbursed fairly for the members and risk we take on more than what we are currently doing.'" Mr. Knutson stated a desire to increase the following year's revenue by $100 million.

if a diagnosis code was unsupported.  The risk-adjustment coders were instructed to mine for information that would allow UnitedHealth to raise the member's risk-adjustment score.

80.    UnitedHealth also instructed risk-adjustment coders to coach providers to find the highest value diagnosis codes for Medicare Advantage member without regard to medical necessity, which was referred to as "leading" the provider.  In 2023, UnitedHealth increasingly outsourced its risk-adjustment coding responsibilities to offshore entities, primarily based in India.

81.    As with the HouseCalls nurses, the risk-adjustment coders were required to link chronic conditions, such as diabetes, to known diabetic complications ***even if the connection was not medically indicated***.  The risk-adjustment coders were evaluated on how much upcoding they performed and were expected to code the highest value diagnosis possible.  Optum's financial coding team had granted the authority to change diagnosis codes and upcode to higher-value diagnoses.

82.    On March 18, 2024, *The Examiner News* reported on a January 2024 meeting between Optum executives and other healthcare professionals for the Optum Tri-State/Optum East Organization.[7]  The purpose of the meeting was to advise nurses on how to add additional diagnosis codes when conducting chart reviews.  The following people participated in the meeting: eight or nine nurses, a trio of administrators, a physician, Dr. Kevin Baran, and a pair of higher-level executives: Optum East Director of Clinical

---

[7]    Attached hereto as Exhibit 8 is a copy of *The Examiner News* article titled: "Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum," dated March 18, 2024.

Documentation Education Rachelle Gauvin and the Vice President of Risk Adjustment Cristy Bauer, who reports to the President of Risk Bearing Entities Alyssa Pepper. *The Examiner News* described the three-step process employed by Optum to defraud CMS. First, nurses would conduct chart reviews to identify the members' prior chronic conditions (even if the prior condition was years old) and then add the diagnoses to the members' charts to "resurrect" prior medical issues into an "active problem." Second, the members would then visit their primary healthcare provider, but Optum tried to keep the members' primary healthcare provider "inoculated" from the upcoding scheme. Third, a coder, "usually offshore in India," would add a code in a "super shady" manner that related to the diagnoses previously added by the nurse in step one, but not addressed by the primary healthcare provider in step two, and then claims would be submitted to CMS without the members' primary healthcare providers' involvement.

83.    The March 18, 2024 *The Examiner News* report also included inside audiotapes, evidencing UnitedHealth management coaching nurses to add unsupported diagnoses during chart reviews. Specifically, UnitedHealth management encouraged nurses to use "'buddy codes'" to add a new diagnosis based purely on a member's separate existing diagnoses, and not because a doctor actually detected any new medical condition.

84.    UnitedHealth also used its captured Optum provider network to facilitate the upcoding scheme. On July 25, 2024, *STAT News* published a report titled: "How UnitedHealth harnesses its physician empire to squeeze profits out of patients," further documenting UnitedHealth's nationwide practice of pushing clinicians to document as many ailments as they could by offering bonuses, while concurrently admonishing clinicians who

- 37 -

did not code as much as their peers. UnitedHealth not only instructed clinicians to document conditions they did not believe applied, but reprimanded clinicians if their upcoding numbers were not sufficient. Doctors who met UnitedHealth's coding expectations were rewarded with annual bonuses upwards of $30,000.

85.    The July 25, 2024 *STAT News* report further reported that a 2022 study by UnitedHealth's own physician researchers showed that UnitedHealth's physicians coded its MA Plan members as having lung disorders, vascular conditions, and kidney disease at more than two times the rate of those in the traditional Medicare program. The July 25, 2024 *STAT News* report stated that Dr. Susan Baumgaertel (a primary care physician previously employed by UnitedHealth in Seattle, Washington) would truthfully tell members when they called that they really did not have the condition she had added to their chart, but she was instructed to add it by UnitedHealth so that she would get paid more.

86.    Additionally, the July 25, 2024 *STAT News* report stated that Dr. Nick Jones (a primary care physician previously employed by UnitedHealth in Eugene, Oregon), stated that the inaccurate code he saw most frequently was long-term management of insulin: the code was applied to members that only received insulin once to lower their blood sugar before surgery, but who never needed the drug again. Dr. Jones stated that UnitedHealth would regularly host sessions where they spent hours teaching doctors how to code, but the sessions never covered new research into specific conditions or resources available for members.

87.    On October 16, 2024, a *STAT News* report further confirmed UnitedHealth's practice of pressuring doctors to document more chronic illnesses in Medicare Advantage

- 38 -

patients to increase revenue. According to the report, UnitedHealth used a combination of techniques to exert upcoding pressure, including paying bonuses (up to $10,000), peer pressure, and utilizing competitive dashboards comparing doctors' diagnosis rates with peers. The report also confirmed that at UnitedHealth clinics, doctors diagnosed peripheral artery disease in 47% of Medicare Advantage patients – a rate three to four times higher than typical prevalence in older Americans. Each diagnosis brought in about $3,000 in extra annual Medicare payments per patient. According to the *STAT News* report, former UnitedHealth physicians from across the country consistently described intense pressure from the Company to increase patient risk scores and noted that doctors who did not code enough diagnoses were sent to remedial training. The *STAT News* report quoted a former UnitedHealth doctor, stating: "'They would say, "You should talk about these other high-risk disease states so that we get more compensation for it,". . . I think that's an inherent conflict of interest. Effectively what you're incentivizing is sicker patients, or at least sicker appearing on paper, which I think is a joke.'"

88.    During the Class Period, UnitedHealth used HIV, a high-value diagnosis code to obtain additional payments from CMS even though the condition was unsupported in many instances. For example, as shown in the chart below approximately 89% of UnitedHealthcare members diagnosed with HIV from 2018 to 2021 did not receive the recommended antiretroviral drug treatment, which was the only effective treatment for HIV. The lack of treatment demonstrates that these HIV "diagnosis" were not supported. A HIV diagnoses gave UnitedHealth an extra $3,000 a year per member.



89.    The *WSJ* reported that insurer-driven diagnoses by UnitedHealth for high-value

diagnoses that no doctor treated generated $8.7 billion in payments to UnitedHealth from

CMS in 2021 alone, representing more than 50% of the Company's 2021 net income of $17

billion.

90.    The *WSJ* also found that UnitedHealth added diagnoses at a far higher rate that

other insurers, as illustrated in the following chart:

- 40 -



### 4.    UnitedHealth Adamantly Denies the Office of Inspector General's September 2021 Report Showing Billions of Dollars in Questionable Payments Made to UnitedHealth as a Result of Chart Reviews and Health Risk Assessments

91.    In September 2021, the Office of Inspector General ("OIG") of the Department of Health and Human Services published the results from its detailed evaluation of payments made by CMS in 2017 resulting from chart reviews and health risk assessments.[8]  Two prior OIG evaluations found that MA Plans were paid $9.2 billion in 2017 for diagnosis codes only reported on chart reviews or health risk assessments.   Therefore, the OIG was concerned that MA Plans were leveraging both chart reviews and health risk assessments to

---

[8]    Attached hereto as Exhibit 9 is the OIG report titled: *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments to Disproportionately Drive Payments*, OEI-03-17-00474, dated September 2021.

inflate risk-adjusted payments.  The submission of unsupported diagnoses is a major driver of improper payments to the MA Plans.

92.    The OIG found that UnitedHealth stood out in its use of chart reviews and health risk assessments to increase its risk-adjusted payments.[9]  In 2017, UnitedHealth received 40% ($3.7 billion of $9.2 billion) of the total risk-adjusted payments made by CMS resulting from chart reviews and health risk assessments, yet UnitedHealth enrolled only 22% of the total MA Plan members.  UnitedHealth's payments from just health risk assessments was even more disproportionate compared to its peers – in 2017 the Company generated 58% ($1.5 billion of $2.6 billion) of all payments made by CMS resulting from health risk assessments.   Almost all of the health risk assessments conducted by UnitedHealth were in members' homes.

93.    UnitedHealth received 66.6% of all payments made by CMS in 2017 resulting from diagnoses reported from only in-home health risk assessments and on no other service records.  Additionally, the top three diagnoses from in-home health risk assessments that generated risk-adjusted payments for UnitedHealth were "'peripheral vascular disease, unspecified,'" "'major depressive disorder, recurrent, mild,'" and "'type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene.'"  These three diagnoses were submitted by UnitedHealth solely predicated on in-home health risk assessments and on no other service records for 125,632 members, almost 600% of the number submitted for these

---

[9]    The OIG report did not identify UnitedHealth by name.  Shortly after the OIG report was issued, the *WSJ* and other media outlets published articles about the report confirming that UnitedHealth was the company referenced in the OIG report.

three diagnosis only on in-home health risk assessments by all other 161 MA Plans (21,618 members) combined!

94.    Additionally, UnitedHealth accounted for at least 90% of members with 9 other diagnoses made only from in-home health risk assessments that generated additional risk-adjusted payments by CMS in 2017.  For example, UnitedHealth submitted the diagnosis of "'other forms of angina pectoris'" for 99% (6,719 of 6,795) of the members with this diagnosis from an in-home health risk assessment that generated payment by CMS in 2017.  All other 161 MA Plans combined submitted this diagnosis from in-home health risk assessments for just 76 members.  The OIG concluded it was "'unusual that one company accounted for such a substantially higher share of the [members] with these diagnoses.'"  Therefore, the OIG recommended that CMS perform additional oversight over UnitedHealth to determine the propriety of the billions of dollars in payments CMS made to the Company.

95.    In response to a September 2021 report from the OIG report, UnitedHealth adamantly denied any wrongdoing, stating: "'UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care.  Our Medicare Advantage risk-adjustment program is transparent and compliant with CMS rules.'"

**C.  UnitedHealth Acquires Change Healthcare and Misleads Investors About Data Firewalls**

**1.  The Change Acquisition**

96.     On January 6, 2021, UnitedHealth announced its intention to purchase Change, the largest healthcare electronic data interchange ("EDI") clearinghouse in the U.S., for $13 billion.  At the time of the acquisition, Change described itself as standing at the "'center of the health ecosystem'" in the United States.  Change's payer customers (insurers) included many of UnitedHealth's key commercial health insurance rivals.  Change described its services as an "'information highway connecting key healthcare stakeholders.'" UnitedHealth planned to integrate Change into Optum Insight, one of UnitedHealth's business segments.

97.     As an EDI clearinghouse, Change played a critical role in commercial health insurance markets.  Often called the "pipes of the healthcare industry," EDI clearinghouses enable the electronic transmission of claims, remittances, and other information among healthcare payers and providers.  Unlike paper or telephonic transmissions that have historically been used, EDI clearinghouses facilitate much faster processing and result in much less administrative waste.  Manual claim submissions cost health insurers over ten times as much as electronic submissions, according to industry estimates.  As a result, transactions using EDI clearinghouses are the industry standard.  In 2021, 97% of medical claims were submitted electronically, and 95% of providers and 99% of insurers used EDI clearinghouses.

98.     A substantial amount of data flows through EDI clearinghouses.  And these data cover the entire lifecycle of a claim – both pre- and post-adjudication.  Pre-adjudicated

- 44 -

claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts. Post-adjudicated claims data can include even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions. Both pre-adjudicated and post-adjudicated claims data have proprietary information and competitive value.

99.    As the largest EDI clearinghouse in the United States, Change maintained connections across the American healthcare landscape: connections with over 2,000 payers, 1 million physicians, and 6,000 hospitals and health systems.

100.    At the time the acquisition was announced, Change processed more than 15 billion healthcare transactions per year, together worth more than $1.5 trillion in adjudicated value. Through these transactions, Change had access to vast amounts of data, relating to about half of all commercial medical claims in the United States. It also had the legal rights to use these data through contracts with customers and intermediaries. The data to which Change has access and rights includes claims data for each of UnitedHealth's major rivals going back to 2012, and its access and rights are significantly more expansive than what UnitedHealth had prior to the acquisition.

101.    With the acquisition of Change, UnitedHealth's Optum business segments would gain access to a significant store of providers' financial and clinical data (including customer sensitive information ("CSI"), valuable information that would accelerate and support the expansion of its provider business.

- 45 -

### 2. The Change Acquisition Comes Under Immediate Government Scrutiny

102. UnitedHealth's purchase of Change immediately came under scrutiny due to its anti-competitive implications. In a March 17, 2021 letter, the American Hospital Association ("AHA") expressed serious concern that the purchase would squelch competition for the sale of healthcare IT services to other providers. The AHA was also concerned that the acquisition would put a sizable portion of the country's healthcare data into the hands of a single entity (UnitedHealth). Recognizing the fundamental importance of the issue, the AHA specifically questioned UnitedHealth's and Optum's purported "firewalls," and noted that the Company "has never demonstrated that the firewalls are sufficiently robust to prevent sensitive and strategic information sharing."[10] One Deutsche Bank analyst noted a clear and present danger that "this merger would lead to a significant consolidation of data in healthcare and would end up giving [UnitedHealth] solo access to nearly all competitive payers information."

103. On February 24, 2022, the DOJ, along with attorneys general for Minnesota and New York, sued to block the transaction. The DOJ alleged that the proposed acquisition violated antitrust laws because, among other things, the integration of Change and Optum would give UnitedHealth unparalleled access to information regarding nearly every health insurer, as well as health data on nearly every single American.

---

[10]  A firewall is a network security device that monitors incoming and outgoing network traffic and decides whether to allow or block specific traffic based on a defined set of security protocols. Firewalls have been the first line of defense in network security for over 25 years.

104.    The DOJ also claimed the transaction would give UnitedHealth a near monopoly over EDI clearinghouse services, as well as claims editing[11] – the two of the most critical processes in the commercial health insurance industry – since UnitedHealth's Optum segments already operated an EDI clearinghouse and provided a claims editing product.

105.    The DOJ further alleged that the UnitedHealth and Change claims processing systems would together serve 38 of the top-40 health insurers in the country, giving UnitedHealth near-complete visibility into rivals' health plans and coverage, enabling UnitedHealth to structure its own plan with a competitive advantage.

106.    After the DOJ filed suit, Attorney General Merrick B. Garland stated:

"If America's largest health insurer is permitted to acquire a major rival for critical health care claims technologies, it will undermine competition for health insurance and stifle innovation in the employer health insurance markets.  The DOJ is committed to challenging anticompetitive mergers, particularly those at the intersection of health care and data."

107.    Principal Deputy Assistant Attorney General Doha Mekki of the DOJ's Antitrust Division likewise stated: "'The proposed transaction threatens an inflection point in the healthcare industry by giving United control of a critical data highway through which about half of all Americans' health insurance claims pass each year.'"  She added that:

"Unless the deal is blocked, United stands to see and potentially use its health insurance rivals' competitively sensitive information for its own business purposes and control these competitors' access to innovations in vital health care technology.  The department's lawsuit makes clear that we will not hesitate to challenge transactions that harm competition by placing so much control of data and innovation in the hands of a single firm."

---

[11]  Claims editing is the process of reviewing and correcting healthcare insurance claims before they are submitted for payment, ensuring they comply with industry standards, regulations, and payer-specific requirements.  This step helps prevent errors, reduce fraud, and avoid claim rejections or delays in reimbursement.

- 47 -

108.    On February 24, 2022, the AHA issued the following statement:

The American Hospital Association commends the Department of Justice for its efforts to protect patients and providers, including hospitals and health systems, from United HealthGroup's (UHG) attempt to acquire Change Healthcare. The AHA urged DOJ's Antitrust Division to conduct a thorough investigation of the proposed transaction because of its anticompetitive potential to "produce a massive consolidation of competitively sensitive health care data" under UHG's exclusive control. We warned repeatedly "the combination of the parties data sets would impact (and likely distort) decisions about patient care and claims processing and denials to the detriment of consumers and health care providers. . . ." Challenging this proposed combination was the right thing to do to prevent untold competitive harm for patients and health care providers.

(alteration in original).

109.    Numerous financial analysts noted the key points of the government's challenge. For example, a Credit Suisse analyst highlighted that "[t]he crux of the issue is that [UnitedHealth] would have access to sensitive data that could be wielded against competitors on the insurance side of the business." While acknowledging that the deal could be approved because of UnitedHealth's affirmative promised "strict firewalls keeping insurance data obtained by Optum from flowing through to the United Healthcare insurance business."

### 3.    UnitedHealth Defeats the DOJ Lawsuit By Insisting It Always Maintains "Strict" Data Firewall

110.    In response to the DOJ's allegations, Defendants emphasized UnitedHealth's best-in-class firewalls that allowed the Company to maintain the integrity of customers' data and CSI – and avoid antitrust concerns. For example, Defendants promised that UnitedHealth had "internal firewalls that prevent the sharing of competitively sensitive information across business units." Similarly, UnitedHealth emphasized that it had

- 48 -

"operationalized its firewall policy through 'robust' technological systems that prevent employees of one UnitedHealth business unit from accessing data housed within another UnitedHealth business unit."

111.    Recognizing the control the Change acquisition would give the Company in the claims' processing market, UnitedHealth proposed selling Change's claims editing business (ClaimsXten), after the acquisition to address the DOJ's antitrust concerns.  The DOJ, however, remained concerned about UnitedHealth and Optum's access to Change's network, and data rights the acquisition would still provide.[12]

112.    The case went to trial, and on September 19, 2022, United States District Court Judge Carl Nichols of the District of Columbia decided the suit in Optum and UnitedHealth's favor.  *See United States v. UnitedHealth Grp. Inc*., 630 F. Supp. 3d 118 (D.D.C. 2022).  In siding with the Company, among other things, the court specifically credited UnitedHealth's purported history of maintaining data firewalls and policies prohibiting anti-competitive behavior.

113.    Analysts at Deutsche Bank and Wells Fargo cheered the approved merger and affirmation of UnitedHealth's security systems as a sign of UnitedHealth's growth potential. Deutsche Bank called UnitedHealth's courtroom victory a "positive leading indicator" for more consolidation by UnitedHealth.  Wells Fargo analysts stated that: "Challenge to Change Healthcare Defeated, Could Help to Ease Concerns on Large-Scale M&A." Similarly, Wells Fargo further noted that "acquisitions have been a key part of Optum's

---

[12]   UnitedHealth sold ClaimsXten to a private equity group, TPG Capital, in October 2022 for $2.2 billion.

growth over the past 15-20 years, and today's announcement could somewhat ease concerns that large-scale vertical M&A could be more challenging going forward."

**4.     There Was Not (and Is Not) a Technical Firewall Between Intra-Optum Businesses**

114.    Both before and after the Change acquisition was announced, Optum business applications had an open access policy for customers' data, including CSI.  Optum, and its intracompany businesses, lacked both role-based security systems and a technical firewall.[13] Specifically, without role-based security, Optum lacked any mechanism to restrict data access based on user roles or permissions.  Consequently, once Optum approved a user's access request, there was no system in place to enforce limitations on what data, including CSI, the user could view or handle.  The lack of access controls meant that the intra-Optum businesses had access to Change's customers' data, including CSI, resulting in ongoing risks and exposure of sensitive information.  The absence of a technical firewall inside Optum also meant that any unauthorized access and/or data breaches could not be isolated, as the intruders would have access to the full gamut of Optum data.

115.    Change's external customers include competitors to intra-Optum businesses. In other words, for every product Change offers, there are businesses within Optum that compete with Change customers.  Following Change's integration into Optum Insight, this condition has not changed – Change's external customers still include competitors to intra-

---

[13]    Role-based security, also known as role-based access control (RBAC), is a mechanism that restricts system access.  It involves setting permissions and privileges to enable access to only authorized users.

- 50 -

Optum businesses.  As such, the lack of technical firewalls risked both the exposure of sensitive information and anti-competitive behavior.

116.    The following Optum business applications shared data with other business applications and did not (and do not) prohibit Optum from using external customer data to benefit Optum businesses that compete with those external customers:

- ContractHub – the contract repository for all of Optum's commercial contracts (CSI stored in ContractHub includes pricing information and contract terms and conditions), does not have in place sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business.[14]

- Safesforce Growth Office ("Salesforce GO") – the sales customer relationship manager used to track and report sales activity (CSI stored in Salesforce GO includes pricing information), does not have in place sufficient role-based security protocols to prevent users from observing all past and current sales activity for all Optum customers which will include Change customers.

- Business Intelligence Data Warehouse (BIGW) – the data warehouse that receives data from many systems including ContractHuB, Salesforce GO, Peoplesoft Enterprise Resource Planning Tool ("Peoplesoft ERP") and the Change Healthcare Enterprise Data Warehouse (EDW) (CSI stored in BIGW includes volumes of transactions and accounting status), does not have in place sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business.

- Data Governance Tracking Systems (DGTS) – the tool that extracts information from customer contracts regarding whether Optum can de-identify the customer data or use offshore resources to support the contract (CSI stored in DGTS includes contractual terms Change reached with its customers), does not have in place sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business.

- Peoplesoft ERP – the system used for managing billing and accounts receivables for Optum (CSI stored in Peoplesoft ERP includes billing

---

[14]   In January 2024, ContractHub implemented role-based security.  But from the time the Change acquisition was approved on September 19, 2022 until January 2024, ContractHub lacked a technical firewall.

information, accounts receivable, and the volumes of systems used), does not have in place sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business.[15]

- Optum ERP Data Store (OEDS) – the tool used for reporting data from the Peoplesoft ERP (CSI stored in Optum ERP Data Store includes billing information, accounts receivable, and the volumes of systems used), does not have in place sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business.

117. Thus, contrary to UnitedHealth's assurances on July 22, 2022, intra-Optum businesses did not have "internal firewalls that prevent the sharing of competitively sensitive information across business units."

118. During the integration activities that followed the October 2022 Change acquisition, the lack of technical firewalls inside Optum business systems was reported to the Integration Management Office ("IMO"). The report cited the lack of firewalls as a concern and potential risk for completion of integration activities per the established timeline. The IMO is responsible for reporting issues to executive leadership, including CEO Witty and the Board of Directors.

119. Since the Change acquisition, to address the specific concerns raised to Optum leadership about a lack of technical firewalls, Optum has added some firewalls. For example, Peoplesoft ERP (Fall 2023) and ContractHub (January 2024) business applications implemented role-based security.

120. The technical firewall shortcomings are not limited to Optum. Some UnitedHealthcare and Optum solutions share technical resources to manage and process data.

---

[15]   In Fall 2023, Peoplesoft ERP implemented role-based security. Yet, from the time the Change acquisition was approved on September 19, 2022 until Fall 2023, Peoplesoft ERP too lacked a technical firewall.

4935-8985-8078.v1

One such solution is the Consumer Database ("CDB"). CDB uses Line of Business ("LOB") tags to ensure proper data separation and to control whether Optum or UnitedHealthcare employees can access or view the data. The LOB tags for certain records across over 100 systems within the CDB were not implemented or applied in a manner which ensured, and thus failed to prevent, UnitedHealthcare employees from seeing Optum's customer data. In September 2023, a user reported this security failure issue and an investigation was conducted by the Privacy Team. The Privacy Team, an organization at UnitedHealth that reports to Rubert Bondy, the chief legal officer of UnitedHealth, is responsible for investigating potential privacy incidents. Optum has been working to fix all the incorrect LOB tags, but it is a long and tedious process that is planned to be "fixed" during October 2024.

### D. UnitedHealth's Lax Security Leads to Massive Data Breach

121.    On February 22, 2024, UnitedHealth announced that a massive data breach had occurred at Change. The breach resulted from a targeted attack by a ransomware group that identified and capitalized on weaknesses in UnitedHealth's security. It remains the largest cyber-attack on the healthcare industry in American history. One third of all patient records in the United States are touched by Change, and exposed by the breach. The hackers claiming responsibility for the attack claim they stole sensitive medical information for tens of millions of patients, which UnitedHealth admitted included medical information such as diagnoses and medications; billing information such as credit card numbers and payment history; and personal information, including social security numbers.

- 53 -

122.    When UnitedHealth acquired Change in October 2022, it claimed that Change would be fully integrated into the UnitedHealth system, and would therefore benefit from UnitedHealth's technology and security capabilities. But UnitedHealth failed to protect the sensitive data Change stored while the integration took place. The massive breach occurred because of that vulnerability as UnitedHealth declined to implement basic security measures, such as multi-factor authentication, where the user must present a code sent to a personal email or telephone number before access is granted. The Change system allowed for full access to the system with only an email and password. In this instance, the hackers simply obtained login information and had access to a massive database of the country's most sensitive information. The unauthorized access was not detected by UnitedHealth for ***nine days***, while the hackers scoured patient data.

123.    The damage spread well beyond the invasion of patients' privacy. UnitedHealth had no way to remove the threat, so it had to disconnect Change's systems so as to prevent the hackers from accessing even more data. UnitedHealth then gradually restored systems over the course of several weeks and months. By April 22, 2024 – after UnitedHealth had agreed to pay and did pay a $22 million ransom – UnitedHealth claimed that "approximately 80% of Change functionality has been restored on the major platforms and products." In the meantime, the breach paralyzed the processing capabilities of numerous pharmacies and healthcare providers across the country, which could not verify insurance, submit claims, generate bills, or process payments for weeks. As a result, many doctors were forced to either decline to provide healthcare services to their patients or to provide care to their patients without a mechanism to receive compensation. This impacted

- 54 -

providers' ability to make payroll and cover expenses, driving many toward financial ruin. Analysts estimated that providers alone were collectively losing *$1 billion* per day because of the breach. An AHA survey found that more than 90% of American hospitals were affected financially, with more than 70% reporting that the breach impacted their ability to care for patients.

124. While the cyber-attack devastated the rest of the healthcare industry, UnitedHealth took advantage of the attack. Initially, UnitedHealth agreed to provide loans to desperate providers financially frozen by the breach, but offered those loans under draconian terms and on the condition that the borrowers provide positive statements to the media about the "help" UnitedHealth agreed to provide. Even worse, as some providers were driven toward the brink of bankruptcy by the Change data breach, UnitedHealth used the opportunity to purchase providers at bargain prices and further increase its market power.

125. The breach immediately led to heightened scrutiny from regulators and the media. Lawmakers expressed grave concern that the entire healthcare industry could be brought to its knees because of security failure by a single company. Congressional hearings were held on May 1, 2024 to discuss the breach and its implications. Witty attended the hearings to answer questions from lawmakers. At the Senate Committee hearing, Sen. Elizabeth Warren called UnitedHealth "'so damn big'" and at the House of Representatives hearing, Rep. Buddy Carter (R-Ga.) agreed that the Healthcare behemoth "'needs to be busted up.'"

- 55 -

### E.    Optum's Additional Anti-Competitive Practices

126.    Before and during the Class Period, UnitedHealth used its monopoly-like dominance to engage in unfair anti-competitive practices to consolidate its control over healthcare services, eliminate competition, and boost revenues.  UnitedHealthcare, the Company's insurance business, maintains a contractual network of healthcare providers (such as hospitals, surgical care centers, and physicians specialists) for the benefits it provides to members.  Through its Optum businesses, UnitedHealth employs or is affiliated with nearly 90,000 physicians, making it the largest employer of physicians in the United States.

127.    During the Class Period, UnitedHealth, through its Optum businesses, engaged in anti-competitive conduct to exert control over the market for primary care providers in certain geographies were competition was particularly strong.  For example, Optum had contracts with hospitals who also owned primary care provider practices that directly competed with Optum.  Optum threatened these hospitals with contract cancellation unless the hospitals agreed to new, coercive, anti-competitive terms, that were designed to ensure their exit from the primary care provider market so that Optum could consolidate control over primary care providers that serviced Optum patients and UnitedHealthcare members.

128.    The terms demanded by Optum included that Optum would get first and last right of refusal if these hospitals put their primary care provider businesses up for sale, that they would not try to recruit Optum's doctors, and that Optum would pay less for certain hospital services.  When the hospitals did not agree to these terms, Optum cut ties with the hospitals.  Once the contracts were terminated, Optum steered its MA Plan members to other

- 56 -

hospital facilities despite federal and state laws requiring continuity of care for Medicare Advantage members.

129.    Optum intimidated doctors who wanted to leave Optum-owned practices to work for competitors by using unlawful restrictions on competition in the doctors' contracts and threatening the doctors, and the competing practices they were going to, with legal action if they moved.  Moreover, once doctors left Optum, Optum employees were instructed not to inform patients their doctors had moved to non-Optum practices.  Instead, Optum employees were instructed to deliberately conceal the doctor's departure, and to tell patients their doctors had retired or were on vacation.  Optum employees were disciplined if they did not follow these instructions.

**F.    UnitedHealth's Additional Anti-Competitive Conduct**

130.    UnitedHealthcare, UnitedHealth's insurance business, likewise engaged in anti-competitive conduct during the Class Period.  Like Optum, UnitedHealthcare was using its market dominance to pressure its in-network physicians and healthcare facilities to stop working with healthcare providers outside of UnitedHealthcare's network.  Specifically, UnitedHealthcare offered financial incentives to its in-network healthcare providers to refer patients to physicians inside of UnitedHealthcare's network.  UnitedHealth also penalized facilities and providers that continued to work with non-network providers.

131.    For example, during the Class Period UnitedHealthcare incentivized its in-network surgeons with lucrative contracts – offering up to 50% additional compensation – if they steered patients away from out-of-network anesthesiologist groups that competed with Optum and to UnitedHealthcare approved, or Optum owned, practice groups.  This strategy

was designed to and did effectively exclude competitors from the market. Also, by forcing the surgeons to use in-network providers, particularly those tied to Optum, UnitedHealthcare not only reduced its costs by relying on lower-priced providers but also strengthened its control over healthcare pricing. This allowed UnitedHealth to further consolidate its market power, unlawfully increasing its revenue while reducing competition.

### G.  UnitedHealth Receives Notice of a Nonpublic DOJ Investigation and UnitedHealth Executives Immediately Embark on a Massive Insider Selling Spree

132.  On October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company,'" according to an internal email distributed on October 24, 2023 by Rupert Bondy, an executive vice president and chief legal officer of UnitedHealth. Bondy's email, sent to at least 16 high-ranking colleagues inside the Company, included a "'document preservation notice.'" While news of the antitrust investigation circulated inside the Company, UnitedHealth withheld this material information from investors.

133.  UnitedHealth chairman, defendant Hemsley, and defendant Thompson took immediate action – selling millions of dollars of their own UnitedHealth shares while in possession of this material nonpublic information. All told, these insiders sold over $117 million worth of UnitedHealth common stock during the four-month period when insiders knew about the federal antitrust investigation but the public did not. Hemsley's largest sale during this time was particularly well-timed. On October 17, 2023 – ***just one week after UnitedHealth was notified of the DOJ antitrust investigation*** – Hemsley unloaded 121,515 shares of UnitedHealth common stock for over $65 million in proceeds. Hemsley continued

- 58 -

his insider trading on December 5, 2023, for another $36 million in proceeds. Defendant Thompson also dumped his shares, taking $15.1 million in proceeds on February 16, 2024. The below chart shows Hemsley's and Thompson's stock sales during this time:



134.    There's no indication that any of the stock sales by Defendants was executed according to scheduled trading plans. Professor John Coffee, a corporate governance expert at Columbia Law School and one of the leading and renowned defense experts in the securities-fraud area told Bloomberg News: "***Typically a company's general counsel would declare a blackout period barring trading in light of a sensitive investigation*** . . . 'Apparently, this did not happen' at UnitedHealth . . . ." Charles Elson, founding director of the Weinberg Center for Corporate Governance at the University of Delaware, told

Bloomberg News that the fact that the price of UnitedHealth shares fell after the scope of the

DOJ antitrust investigation was reported by the *WSJ* "'would suggest some materiality to

investors.'"

### H.    The Scope of the New DOJ Investigation Is Publicly Disclosed and UnitedHealth's Stock Price Drops

135.    During the trading day on Tuesday, February 27, 2024, the *WSJ* revealed new

information and new analysis about the scope of the new DOJ antitrust investigation into

UnitedHealth.[16]  For example, the *WSJ* reported:

> The Justice Department has launched an antitrust investigation into UnitedHealth, owner of the biggest U.S. health insurer, a leading manager of drug benefits and a sprawling network of doctor groups.
>
> The investigators have in recent weeks been interviewing healthcare-industry representatives in sectors where UnitedHealth competes, including doctor groups, according to people with knowledge of the meetings.
>
> During their interviews, investigators have asked about issues including certain relationships between the company's UnitedHealthcare insurance unit and its Optum health-services arm, which owns physician groups, among other assets.
>
> Investigators have asked about the possible effects of the company's doctor-group acquisitions on rivals and consumers, the people said.
>
> \*    \*    \*
>
> The new Justice Department inquiry, reported earlier by the Examiner News, a news organization based in New York's Hudson Valley, is partly examining Optum's acquisitions of doctor groups and how the ownership of physician and health-plan units affects competition, according to the people with knowledge of the matter.

---

[16]   The February 27, 2024 *WSJ* article titled: "U.S. Opens UnitedHealth Antitrust Probe, Investigators question industry officials who compete with the healthcare giant," is attached hereto as Exhibit 11.

Investigators have asked whether UnitedHealthcare favored Optum-owned groups in its contracting practices, potentially squeezing rival physicians out of certain types of attractive payment arrangements.

Investigators have also explored whether Optum's ownership of healthcare providers could present challenges to health insurers that are rivals to UnitedHealthcare.

In addition, the Justice Department officials are investigating Medicare billing issues, including the company's practices around documenting patients' illnesses.

Payments to Medicare plans go up if patients have more health conditions, so aggressive documentation practices by doctors and other healthcare providers can be lucrative for insurers such as UnitedHealthcare.

And investigators have asked whether and how the tie-up between UnitedHealthcare and Optum medical groups might affect its compliance with federal rules that cap how much a health-insurance company retains from the premiums it collects from customers.

Under those rules, insurance plans are supposed to absorb no more than 15% or 20% of the premium for their administrative costs and profits, with the percentage varying depending on the type of plan. The rest is supposed to be spent on patient care, or rebated back to customers.

When the same company owns both the health insurer and the physicians and other healthcare providers who take care of patients, the combined firm may absorb far more than the capped amount, however.

136.    Upon this news, the price of UnitedHealth common stock immediately declined in a statistically significant manner, falling over $27 per share, from $525.32 on February 26, 2024 to $498.28 on February 28, 2024.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    False and Misleading Statements Concerning UnitedHealth's HouseCalls and Medicare Advantage Program

137.    Throughout the Class Period, Defendants misrepresented the purpose of UnitedHealth's HouseCalls in-home visit program and concealed the Company's scheme to

- 61 -

target certain diagnoses of serious and chronic conditions in order to boost payments from CMS. In truth, the Company was using in-home health risk assessments conducted by HouseCalls nurses, retroactive chart reviews, and provider pressure tactics, to generate diagnosis codes for conditions that were not based on medical necessity or that no doctor ever treated to increase CMS payments to UnitedHealth.

### 1.     Statements During 2021

138.     The Class Period starts on September 22, 2021, the day the *WSJ* published an article titled: "Most of $9.2 Billion in Questionable Medicare Payments Went to 20 Insurers, Investigators Say." The article reported on the September 2021 OIG report, that found 20 Medicare insurers received about half of a $9.2 billion pool of suspicious Medicare payments from CMS. The article further stated that:

> Among the 20 companies flagged in the report, the investigators found that one received approximately 40% of the questionable payments, or $3.7 billion, while enrolling only 22% of Medicare Advantage customers. The [OIG] report didn't name the company. Federal data compiled by analysts at BMO Capital Markets shows that enrollment share closely matched that of industry giant UnitedHealth Group Inc.'s UnitedHealthcare during the period covered in the report.

139.     In the *WSJ* article, UnitedHealth adamantly denied any wrongdoing stating:

"'***UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care. Our Medicare Advantage risk-adjustment program is transparent and compliant with CMS rules***.'"

140.     On October 14, 2021 Defendants held an earnings call to discuss UnitedHealth's Q3 2021 performance. During the question and answer session with analysts

- 62 -

on an October 14, 2021 earnings call with investors, analysts inquired about the financial impact of COVID-19 on Medicare Advantage risk-adjustments and how the Company was performing in terms of completing in-home wellness visits compared to the previous year. In response defendant Thompson answered: "*[W]e are encouraged by the encounters with the physicians, the primary care visits and annual wellness visits as well as in-home clinical visits. So those have been encouraging. So I certainly expect less of a headwind in 2022 due to those encounters, certainly getting traction certainly compared to 2021*."

141.    During the question and answer session, an analyst from Barclay's questioned Defendants about the September 22, 2021 *WSJ* article which highlighted questionable Medicare Advantage risk-adjusted payments to insurers, including UnitedHealth, asking:

> So you touched on the topic of Medicare risk adjuster payments earlier. This was also a little bit more topical about a month ago with *The Wall Street Journal* putting a spotlight on it. So I guess I'm just curious if you have any updated high-level thoughts on [Medicare risk-adjustment] payments conceptually for the managed care industry overall. And do you see any potential reform of [Medicare risk-adjustment] near term? Or do you expect status quo going forward?

142.    In response McMahon stated:

> And when we think about the risk adjustment model in the payment system. The model has been critical to providing broad and equitable access to [Medicare Advantage]. *Risk adjustment levels of playing field and ensures that there's no disincentive to care for the most vulnerable. So we really feel that it's an essential part of encouraging the right incentives in the program*, and think that it's something to build on and broadly support that we need to think about how to build on these positive elements and aspects of the program for which this is one of them.

143.    On October 19, 2021, the *Minnesota Star Tribune* published an article titled:

"Report says UnitedHealth Group was top recipient of questionable Medicare payments."

Similar to the September 22, 2021 *WSJ* article, the *Minnesota Star Tribune* reported on the

- 63 -

September 2021 OIG report, confirming that, based on government documents it received, UnitedHealth was the company identified in the OIG report as the stand out Company that "covered 22% of all [members] enrolled in the health plans [reviewed by the OIG] at the time, yet received a disproportionately high $3.7 billion, or 40% of the total payments" in 2017.  The *Minnesota Star Tribune* article stated that the OIG "report found UnitedHealth Group received 58% of all payments" based on in-home health risk assessments.  The article further stated that "UnitedHealth Group accounted for two-thirds of all risk-adjusted payments resulting from diagnoses reported only on in-home [assessments] and no other service record."

144.   UnitedHealth again denied any wrongdoing, claiming that the OIG report was "'*based on old data and is inaccurate and misleading – a disservice to seniors and an attack on the [federal government's] payment system*,'" and "'*[i]n-home clinical care programs and chart reviews are needed for appropriate senior care and payment, . . . UnitedHealthcare's status as an early clinical home provider is not only appropriate, it's best practice*.'"

145.   Beginning with UnitedHealth's November 3, 2021 Form 10-Q filed with the SEC for the quarter ended September 30, 2021, which was signed by defendant Witty, Defendants repeatedly stated that: "*UnitedHealthcare's revenue increased due to growth in the number of individuals served through Medicare Advantage and Medicaid, including a greater mix of people with higher acuity needs* . . . ."[17]

---

[17]   This false and misleading statement was repeated in the following UnitedHealth SEC filings: (i) May 4, 2022 Q1 2022 Form 10-Q (signed by Witty); (ii) August 3, 2022 Q2 2022

146.    On November 30, 2021, UnitedHealth held its annual investor conference. During the conference Witty discussed HouseCalls, and its purported focus on delivering and improving healthcare for Medicare Advantage enrollees, stating:

> *Another is through [HouseCalls], a true collaboration between Optum and UnitedHealthcare, where our clinicians help seniors in Medicare Advantage programs manage their chronic disease, close gaps in care and stay healthy and out of the hospital.  Our teams not only look after our members' medical needs, they help with any number of life challenges like keeping healthy food in the fridge or find an assistance with a utility bill*.

### 2.    Statements During 2022

147.    On January 19, 2022, Defendants held an earnings call with investors to discuss the Company's Q4 2021 and FY 2021 financial results.  During the call Witty spoke about the Company's in-home visits program and its focus on patient care, stating:

> [O]ne of the things that I think we really are pleased about is the way in which OptumCare has developed a whole set of capabilities to deliver really enhanced focus on [Medicare Advantage] patients.  Obviously, these patients have a high medical need very often.  They need high touch.  I've been super impressed with the development, not just in the clinic, ***but also through the at-home programs, where we're able to continue to make sure folks are looked after properly***.

148.    On February 15, 2022, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2021, which was signed by defendant Witty.  Under the heading "UnitedHealthcare Medicare & Retirement," the Form 10-K for FY 2021, stated:

> *Medicare Advantage*. . . .  Under the Medicare Advantage program, UnitedHealthcare Medicare & Retirement provides health insurance coverage

---

Form 10-Q (signed by Witty); (iii) November 2, 2022 Q3 2022 Form 10-Q (signed by Witty); (iv) May 3, 2023 Q1 2023 Form 10-Q (signed by Witty); (v) August 2, 2023 Q2 2023 Form 10-Q (signed by Witty);and (vi) November 6, 2023 Q3 2023 Form 10-Q (signed by Witty).

in exchange for a fixed monthly premium per member from CMS plus, in some cases, monthly consumer premiums. ***Premium amounts received from CMS vary based on the geographic areas in which individuals reside; demographic factors such as age, gender and institutionalized status; and the health status of the individual***.[18]

149.    Under the same heading, the Form 10-K also reported on HouseCalls, stating:

UnitedHealthcare Medicare & Retirement's senior-focused care management model operates at a medical cost level below traditional Medicare, while helping seniors live healthier lives. We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care. ***For example, through our HouseCalls program, nurse practitioners performed more than 2.1 million clinical preventive home care visits in 2021 to address unmet care opportunities and close gaps in care***.

150.    The Form 10-K reported on premium revenues from CMS, stating: "***Premium revenues from CMS represented 36% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2021, most of which were generated by UnitedHealthcare Medicare & Retirement***."

151.    On April 14, 2022, Defendants held an earnings call with investors to discuss the Company's Q1 2022 results. During the call Tim Noel, the CEO of UnitedHealthcare's Medicare & Retirement division, stated:

***In-home testing is certainly a huge area of focus for us. . . . [M]ore recently, we've really been focused on reaching out to people that we know to be underdiagnosed for conditions like hep C and diabetes. And in doing this, we've reached out over the last year to about 1 million members who we suspect to be underdiagnosed and offering in-home testing solutions that are then delivered by our HouseCalls partners over at Optum. These completion rates have been really promising, 35% last year, and we'll continue to evaluate expanding this program. That will do a really nice job of helping***

---

[18]   This statement was repeated in UnitedHealth's February 24, 2023 FY 2022 Form 10-K, which was signed by Witty.

*us understand where conditions are underdiagnosed and can be better treated*.

152. On May 10, 2022, executives from UnitedHealth attended a healthcare industry conference call hosted by Bank of America. During the call the CEO of Optum Rx, Inc. discussed the HouseCalls program's value to the Company's business model, stating:

> *So another great example is even go back beyond and you think about the beginnings of our home and community base, think about HouseCalls, which we've talked about for years. I remember when HouseCalls was doing a couple of hundred thousand annual visits a year. Today, it is really the backbone of a home and community-based program that brings more value to the system, helps consumers, service people in their home, puts together capabilities that will keep driving value, and we'll continue to grow and drive value to all of our payers and clients*.

153. On July 15, 2022, Defendants held an earnings call with investors to discuss the Company's Q2 2022 financial results. During the call Witty discussed the healthcare benefits of HouseCalls to Medicare patients, stating: "*And as you know, we've got a long history in this in areas like house calls, which have delivered amazing health assessment and preventive direction to millions of people, and this is another big step for us to extend*."

154. UnitedHealth CFO John Rex added that the HouseCalls annual wellness assessments for the Company's Medicare patients was "*very important for us in getting them the care they need*" and "*[w]e got to make sure people are getting the care that they need. We've seen the greatest response really in our senior populations. I think some of that is our ability to get into their homes to influence that care and to get them into that*."

155. On November 29, 2022, UnitedHealth held its annual investor conference. During the conference Robert Hunter, the Senior Vice President of UnitedHealthcare's

- 67 -

Medicare Advantage Product & Experience division, stated: "House[Calls] has been the

centerpiece of our home care model for government programs for years."  Hunter added:

>*We expect to complete 2.2 million house calls this year, bringing personalized care into the home to address both immediate and preventive medical care needs in addition to social needs, including access to healthy food, safe housing, transportation and medical appointments and more.  We have been testing people for underdiagnosed conditions such as diabetes, prediabetes, hep C and colon cancer.  And what we found is nearly 1 out of every 4 people we screened had a condition, they didn't realize they had and the hep C positivity rates for dual special needs members are nearly double the national average.*

### 3.     Statements During 2023

156.     On January 13, 2023 Defendants held an earnings call with investors to discuss

the Company's Q4 2022 and FY 2022 financial results.  During the call UnitedHealth Chief

Operating Officer ("COO") Dirk McMahon stated:

>*[W]e continue to expand the range of clinical services we provide via our HouseCalls initiative.  In 2023, we will increase the types of vaccinations offered, expand testing services and deploy even more real-time resources to address social determinants of health.  Seniors place high value on being able to get care in their home.*

157.     On February 24, 2023, the Company filed its Form 10-K with the SEC for the

fiscal year ended December 31, 2022, which was signed by defendant Witty.

158.     Under the heading "UnitedHealthcare Medicare & Retirement" the FY 2022

Form 10-K reported on HouseCalls, stating:

>We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care.  *For example, through our HouseCalls program, nurse practitioners performed nearly 2.3 million clinical preventive home care visits in 2022 to address unmet care opportunities and close gaps in care.*

- 68 -

159.    The Form 10-K reported premium revenues from CMS, stating: "***Premium revenues from CMS represented 38% of UnitedHealth Group's total consolidated revenues for the year ended December 31, 2022, most of which were generated by UnitedHealthcare Medicare & Retirement***."

160.    On April 14, 2023, Defendants held an earnings call with investors to discuss the Company's Q1 2023 financial results.  During the call McMahon stated: "***First, patient assessments, in-home clinical visits designed to identify care needs and help patients with other physical and social needs.  This year, we expect to make more than 2.5 million visits to patients' homes and we continue to expand the scope of the clinical services offered in that setting***."

161.    On July 14, 2023, Defendants held and earning call with investors to discuss the Company's Q2 2023 results.  During the call, Witty spoke about the Company's in-home "***wellness assessments***" offered by HouseCalls, stating:

> Last month, researchers at Yale Medicine, working in collaboration with Optum, published a peer-reviewed study about in-home visits, an important element in our value-based care approach.  ***The study found patients who received our in-home preventative wellness assessments compared with those who hadn't made fewer emergency department visits and spent fewer nights in hospitals across 4 common conditions: depression, hypertension, coronary artery disease and type 2 diabetes.***  They also experienced reduced wait times for follow-up primary care.

162.    On November 29, 2023, UnitedHealth held its annual investor conference.  During the conference Robert Hunter, the Senior Vice President of UnitedHealthcare's Medicare Advantage Product & Experience division, spoke about HouseCalls, stating: "***This year, we will conduct more than 2.5 million in-home visits through our house calls***

- 69 -

**program, completing approximately 200,000 tests for diabetes and hep C, which are consistently underdiagnosed conditions**," and "**[t]his year, we will screen nearly 3.8 million people, helping connect them to necessary resources with over 40% of those screenings occurring during a house calls visit**."

163.    Defendants' statements, as alleged in ¶¶139-162, were false and misleading when made.  The true facts, which Defendants knew or recklessly disregarded, were that:

(a)    UnitedHealth's HouseCalls program was specifically designed to conduct health risk assessments in members' homes to generate unsupported diagnoses of serious and chronic medical conditions in order to boost Medicare Advantage payments from CMS.  The HouseCalls program was being used to maximize UnitedHealth's revenue, without regard for actual member care, and in furtherance thereof:

(i)    HouseCalls nurses were forced to use questionnaires during HouseCalls visits that were crafted to generate high-value diagnoses, without regard to the members' actual medical conditions (¶¶63-64, 192);

(ii)    "Quality assurance" teams pressured HouseCalls nurses to link symptoms to pre-existing chronic conditions without regard to medical necessity (*id.*);

(iii)    UnitedHealth induced members to participate in HouseCalls in-home visits by paying them and offering other financial incentives (¶¶55, 64);

(iv)    Providers were rewarded with substantial bonuses – tens of thousands of dollars – for coding high-value diagnoses without a valid basis (¶¶84, 196, 249); and

- 70 -

(v)    Providers and HouseCalls nurses were required to use inaccurate and unreliable diagnostic tools to capture high-value diagnoses for certain serious medical conditions (¶¶69-78).

(b)    UnitedHealth's upcoding scheme was so effective that it had the highest average payments among other Medicare Advantage insurers of $2,735 for in-home diagnosis per visit from 2019 to 2021 (¶¶65, 255).  In 2021 alone, UnitedHealth obtained $8.7 billion in payments from CMS for high-value diagnoses that no doctor treated, which amount represented over 50% of the Company's net income (¶¶89, 190, 256).  In 2023, UnitedHealth reaped $3.2 billion in Medicare Advantage payments from diagnoses reported only on in-home health risk assessments and health risk assessment-linked chart reviews, which was two-thirds of the total risk adjusted payments CMS made to insurers that same year based on these diagnosing methods.  (¶¶18, 66, 237).

## B.    Defendants' Misrepresentations About Internal Firewalls at UnitedHealth and Its Optum Subsidiary

164.    Defendants misrepresented UnitedHealth's purportedly best-in-class firewalls and their ability to maintain the integrity of customers' data and CSI.  As explained above in ¶¶114-120, for example, although no technical firewall existed for many intra-Optum businesses, Defendants falsely assured the markets that UnitedHealth had "internal firewalls that prevent the sharing of competitively sensitive information across business units."

### 1.    Statements During 2022

165.    On February 24, 2022, Optum published a "fact sheet," defending the Change acquisition.  In the so-called "fact sheet" Optum asserted that the ***"theories at the core of the [DOJ's] case are completely without merit."***  Optum also boasted about its purported best-

- 71 -

in-class firewalls: *"Our track record of safeguarding our customers' proprietary information speaks for itself. We have best-in-class firewalls and compliance programs that maintain the integrity of our customers' data and information, and prevent unauthorized access and misuse. Combining with Change Healthcare alters none of those fundamentals."*

166. On March 11, 2022, in its Answer to the DOJ complaint, UnitedHealth *"agreed to make binding commitments to its customers and the Government"* to *"maintain its robust firewall processes – and extend them to Change's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes."* UnitedHealth further claimed that *"OptumInsight imposes strict limitations on the use or disclosure of external customer data . . . ."*

167. On March 17, 2022, UnitedHealth posted a document on its website titled: "Benefits of Combination with Change Healthcare" addressing the DOJ's lawsuit, asserting that *"Optum will maintain robust firewall processes and extend them to Change Healthcare's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes."* Underscoring its commitment to data protection, UnitedHealth stated that Optum *"invests extraordinary time, money, and resources into safeguarding [customer sensitive] information and keeping it walled off from UnitedHealthcare"* and that *"UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer [information]."*

- 72 -

168.   In May 2022, UnitedHealth adopted a new firewall policy relating to the proposed acquisition of Change.  The policy explicitly addressed the sharing of customers' CSI and stated:

- *"The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited";*

- *"The use of External Customer CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited";*

- *"UHG employees may not access External Customer CSI unless such access is necessary to perform their job responsibilities";* and

- *"External Customer CSI shall be logically separated from other UHG business unit data within Electronic Data Sites.  No employees of other UHG business units that are competitors of an External Customer shall have access to the location where External Customer CSI is stored within such Electronic Data Sites."*

169.   On June 14, 2022, UnitedHealth published its 2021 Sustainability Report.  In the report, the Company declared that it was "*focused*" on "*maintaining data privacy and cybersecurity*," expressly recognizing its "*obligation*" to "*protect the information of all those we serve*."   UnitedHealth continued to assert that it was "*required to safeguard personal information reasonably and appropriately*" and that the "*[p]rimary tools used to fulfill these obligations are cybersecurity and data privacy programs*."   Further, the Sustainability Report explained that UnitedHealth "*manages a robust Information Security Risk Management and Privacy Program that improves its ability to make risk-informed decisions by conducting systematic and structured reviews of information security risks*."   The results of these internal audits are then "communicated to executive leadership and presented to the Audit and Finance Committee of the Board of Directors quarterly."

- 73 -

170.    The June 14, 2022 Sustainability Report also addressed the Company's data protection policies and explained that its "***data protection policy applies to all lines of business and subsidiaries***" and that its "***Code of Conduct outlines our commitment to protecting the information entrusted to us.  Supported by a comprehensive set of principles, our policies and programs describe appropriate uses of data and the safeguards that protect the confidentiality and integrity of our systems***."  These policies include "[e]nterprise information security policies," "[p]rivacy and data protection policies," and "[a]n incident management program that encompasses cybersecurity, privacy and compliance obligations."

171.    On July 22, 2022, as part of its effort to convince the court and prevail at trial, UnitedHealth filed its Amended Pretrial Brief and stated that "***UHG has an 'advanced and sophisticated technology architecture and infrastructure' of internal firewalls that prevent the sharing of competitively sensitive information across business units***."

172.    On September 7, 2022, UnitedHealth filed its Post-Trial Brief and again assured the court of how UnitedHealth had "***operationalized its firewall policy through 'robust' technological systems that prevent employees of one UHG business unit from accessing data housed within another UHG business unit***."

173.    Also on September 7, 2022, UnitedHealth filed its Proposed Findings of Fact and stated:

> ***For years, UHG has maintained robust firewall and data security policies specifically designed to make sure customers' potentially sensitive information is protected and not misused in any way.  UHG commits to apply these same firewall and data security policies to customer data held by Change on behalf of Change's EDI customers, and to uphold all contractual***

- 74 -

*rights of Change's customers to audit the protection and security of their data*.

174.    On November 29, 2022, UnitedHealth held its annual Investor Conference, materials for which were publicly released on November 28, 2022.  The Conference Book highlighted the Company's "*long-established firewalls and strong legal, reputational, ethical and financial incentives to protect patient and customer information*."

### 2.    Statements During 2023

175.    On June 1, 2023, Witty represented UnitedHealth at the Bernstein Strategic Decisions Conference.  During the conference Witty acknowledged the Company's firewall requirements, noting that UnitedHealth was focused on improving performance by "*exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements [that] are needed there*."

176.    Defendant statements, as alleged in ¶¶165-175, were false and misleading when made.  The true facts that were then known to Defendants were that: (i) Optum, and its intracompany businesses, lacked both role-based security systems and a technical firewall (¶¶114-120); (ii) numerous Optum business applications, including Salesforce GO, Business Intelligence Data Warehouse, Data Governance Tracking Systems, and Optum ERP Data Store, lacked sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business (¶116); and (iii) Line of Business (LOB)  tags across over 100 systems within UnitedHealthcare and Optum's shared Consumer Database (CDB) were wrong or improperly applied and did not prevent UnitedHealthcare employees from seeing Optum's customer data (¶120).

- 75 -

**C.    Additional False and Misleading Statements in UnitedHealth's Code of Conduct**

177.    Throughout the Class Period, UnitedHealth maintained and published its code of ethics, entitled: "Code of Conduct: Our Principles of Ethics and Integrity."  The Code of Conduct was applicable to each of the Defendants as principal executive officers, and senior financial officers of the Company.  UnitedHealth's Code of Conduct was published on its website every day of the Class Period.

178.    As discussed above, ¶¶47-131, throughout the Class Period Defendants engaged in a wrongful course of conduct that included: (i) implementing an illegal upcoding scheme (¶¶47-95); (2) failing to implement a technical firewall across Optum's businesses, allowing UnitedHealth to exploit competitor data (¶¶96-120); and (3) leveraging UnitedHealth's monopoly-like dominance to engage in unfair anti-competitive practices to consolidate its control over healthcare services, and eliminate competition  (¶¶126-131). Each of these wrongful practices violated UnitedHealth's Code of Conduct and made the statements therein false and misleading.

179.    Specifically, under the section "Fair Competition and Fair Dealing: UnitedHealth Group's success is founded on honest competition," the Code of Conduct stated: "***We seek competitive advantages only through legal and ethical business practices. We succeed by outperforming our competitors honestly and fairly***."

180.    UnitedHealth's Code of Conduct more fully explained that:

> Many laws and regulations define and promote fair business practices to protect the competitive environment.  For example, competition laws, known in the U.S. as antitrust laws, protect against practices that interfere with free competition.  They are designed to promote a competitive economy in

- 76 -

which each business enterprise has an opportunity to compete fairly on the basis of price, quality, and service, and in the employment marketplace. ***To comply with these laws, each employee, director, and contractor must deal fairly with the Company's customers, service providers, suppliers, competitors, and employees. No employee or director should take advantage of anyone through unfair-dealing practices***.

181. UnitedHealth's Fair Competition and Fair Dealing Code of Conduct also stated that Optum's "***provider businesses contract with competitors of UnitedHealthcare and may receive competitively-sensitive information, which must be protected, and sharing the data requested without review and approval by legal counsel could be a form of unfair competition***."

182. Under the section "Government Interactions," the Code of Conduct recognized:

All levels of government have enacted laws that define interactions with government officials and prohibit improper influence by private business in the government arena. ***Our compliance with these laws and regulations is crucial to upholding UnitedHealth Group's core values, advancing our mission, maintaining UnitedHealth Group's relationships in the public sector, and demonstrating that we are worthy of the public's trust***.

183. The statements in UnitedHealth's Code of Conduct, as detailed in ¶¶179-182, were each false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were that:

(a) UnitedHealth's HouseCalls program was specifically designed to conduct health risk assessments in members' homes to generate unsupported diagnoses of serious and chronic medical conditions in order to boost Medicare Advantage payments from CMS. The HouseCalls program was being used to maximize UnitedHealth's revenue, without regard for actual member care, and in furtherance thereof:

- 77 -

(i)    HouseCalls nurses were forced to use questionnaires during HouseCalls visits that were crafted to generate high-value diagnoses, without regard to the beneficiaries' actual medical conditions (¶¶63-64, 192);

(ii)    "Quality assurance" teams pressured HouseCalls nurses to link symptoms to pre-existing chronic conditions without regard to medical necessity (*id.*);

(iii)    UnitedHealth induced members to participate in HouseCalls in-home visits by paying them and offering other financial incentives (¶¶55, 64);

(iv)    Providers were rewarded with substantial bonuses –tens of thousands of dollars – for coding high-value diagnoses without a valid basis (¶¶84,196, 249); and

(v)    Providers and HouseCalls nurses were required to use inaccurate and unreliable diagnostic tools to capture high-value diagnoses for certain serious medical conditions (¶¶69-78).

(b)    UnitedHealth's upcoding scheme was so effective that it had the highest average payments among other Medicare Advantage insurers of $2,735 for in-home diagnoses per visit from 2019 to 2021 (¶¶65, 255).  In 2021 alone, UnitedHealth received $8.7 billion in payments from CMS for high-value diagnoses that no doctor treated, representing more than 50% of the Company's FY 2021 net income (¶¶89, 190, 256).  In 2023, UnitedHealth reaped $3.2 billion in Medicare Advantage payments from diagnoses reported only on in-home health risk assessments and health risk assessment-linked chart reviews, which was two-thirds of the total risk adjusted payments CMS made to insurers that same year based on these diagnosing methods.  (¶¶18, 66, 237);

- 78 -

(c)      (i) Optum, and its intracompany businesses, lacked both role-based security systems and a technical firewall (¶¶114-120); (ii) numerous UnitedHealth business applications, including Salesforce GO, Business Intelligence Data Warehouse, Data Governance Tracking Systems, and Optum ERP Data Store, lacked sufficient role-based security protocols to prevent users from one Optum business from accessing data from another Optum business (¶116); and (iii) Line of Business (LOB) tags across over 100 systems within UnitedHealthcare and Optum's shared Consumer Database (CDB) were wrong or improperly applied and failed to prevent UnitedHealthcare employees from seeing Optum's customer data (¶120); and

(d)      Defendants were using Optum's dominance in the provider market to engage in anti-competitive practices designed to monopolize local primary care provider markets (¶¶42, 127).  Defendants were also pressuring doctors to remain within Optum's network through restrictive contracts and non-compete clauses and engaging in misleading practices to retain patients from going to competitors (¶¶127-129).  UnitedHealthcare was also using its market dominance to pressure its in-network doctors and healthcare facilities to stop working with healthcare providers outside of UnitedHealthcare's network, and incentivizing its in-network doctors to steer patients away from out-of-network providers and Optum's competitors (*id.*).

## VI.    ADDITIONAL INDICIA OF SCIENTER

### A.    The Individual Defendants' Frequent Discussions of Housecalls and Medicare Advantage with Analysts Confirms Their Intimate Knowledge of the Upcoding Scheme

184.    Individual Defendants Witty and Thompson were particularly focused on the potential for the Medicare Advantage businesses – and HouseCalls in particular – to increase the Company's revenue.  They often spoke about the programs to analysts, demonstrating actual, intimate knowledge of this aspect of UnitedHealth's business.

185.    For example, during the October 14, 2021 Q3 2021 earnings call with investors, Thompson confirmed his awareness of and focus on the daily operations of the HouseCalls program when he responded to a question about the status of the program in light of the COVID-19 pandemic, noting "we are encouraged by the encounters with the physicians, the primary care visits and annual wellness visits *as well as in-home clinical visits*."

186.    Witty also expressed his keen focus on the HouseCalls and Medicare Advantage programs.  During the Company's annual investor conference on November 30, 2021, Witty praised the HouseCalls program as a "true collaboration between Optum and UnitedHealthcare, where our clinicians help seniors in Medicare Advantage programs" and noted that "[o]ur [HouseCalls] clinicians will make about 2 million home clinical visits in 2021, leading to hundreds of thousands of referrals for much needed care."

187.    Then, during the Company's January 19, 2022 Q4 2021 earnings call, Witty again demonstrated his knowledge of the day-to-day operations of the HouseCalls program:

> OptumCare has developed a whole set of capabilities to deliver really enhanced focus on [Medicare Advantage] patients.  Obviously, these patients

- 80 -

have a high medical need very often.  They need high touch.  I've been super impressed with the development, not just in the clinic, but also through the at-home programs, where we're able to continue to make sure folks are looked after properly.

188.    During the Company's Q2 2022 earnings call held on July 15, 2022, Witty extolled the virtues and importance of HouseCalls, saying the program had "delivered amazing health assessment and preventive direction to millions of people."  And on the Company's July 14, 2023 Q2 2023 earnings call, Witty discussed a study that was done by Optum, in conjunction with Yale Medical School, which looked at the potential health benefits of the HouseCalls program.

189.    In short, throughout the Class Period, defendants Witty and Thompson each spoke in detail about the HouseCalls program, addressing the questions of analysts and demonstrating their focus and in-depth knowledge of that aspect of UnitedHealth's business.

## B.    The Upcoding Scheme Required Participation Throughout the Company

190.    UnitedHealth's upcoding scheme represents a central part of UnitedHealth's business and was a primary source of UnitedHealth's revenue.  Indeed, in 2021 alone, UnitedHealth added *$8.7 billion* in revenue from diagnoses that did not result in any treatment.  The Company depended on coordinated efforts and policies across multiple working groups in order to achieve this shocking result.

191.    For example, UnitedHealth actively trained its providers to add unwarranted diagnosis codes to patient charts during in-home visits.  As evidenced by audiotapes leaked to the media, UnitedHealth executives convened meetings whose purpose was to coach

- 81 -

nurses and administrators to use "'buddy codes'" to add unwarranted diagnoses to charts for patients with related conditions.

192.    Also, UnitedHealth systematically pressured providers who performed HouseCalls to add as many new diagnoses as possible.  On the HouseCalls, providers (usually nurse practitioners) completed questionnaires about each patient's health and had the opportunity to add diagnoses based on the answers.  UnitedHealth employed a so-called "quality assurance" team that then reviewed these questionnaires, checking them to make sure that the provider had maximized all available high-value diagnosis codes.  If any codes were missed, reviewers from the quality assurance team pressured the provider to add them.

193.    The Company also issued laptops to HouseCalls providers with pre-loaded software designed to guide their evaluations and add diagnoses.  UnitedHealth calibrated the software specifically to maximize the number of diagnoses based on patients' medications and responses, and then present those potential diagnoses into a "diagnosis cart" for the provider to quickly approve.

194.    UnitedHealth also purchased and distributed equipment to providers specifically for the purpose of adding unwarranted diagnoses, the use of which was designed to generate revenue for UnitedHealth without regard to the medical needs of its members.  Specifically, UnitedHealth bought and required the use of the QuantaFlo device in search of a relatively rare but lucrative diagnosis called peripheral artery disease.  Notoriously unreliable and prone to returning false positive results, the device purported to measure blood circulation.  UnitedHealth required providers to use the unreliable device – and nothing else – to make the diagnoses of peripheral artery disease, and paid additional

- 82 -

compensation to providers who used it regularly. In 2019 to 2021 alone, UnitedHealth diagnosed this condition 568,000 times after in-home visits, leading to $1.4 billion in payments.

195. The Company also employed a team of risk-adjustment coders in India, who it trained to find the highest value diagnosis codes, and then coach providers to add them. UnitedHealth evaluated the job performance of risk-adjustment coders based on how much upcoding they performed.

196. UnitedHealth also modified its growth strategy to target provider groups that could assist with the Medicare Advantage fraud. Since 2010, UnitedHealth acquired hospitals, doctors' offices, and clinics at an aggressive rate, until it controlled 10% of the physicians in America. Then, it implemented a nationwide practice of pushing its clinicians to document as many ailments as they could by offering bonuses to "high" performers and reprimanding doctors who were not coding as much as their peers. As a result, UnitedHealth's physicians diagnosed lung disorders, vascular conditions, and kidney disease at more than two times the rate of those in the traditional Medicare program.

**C.    Testimony, Internal Communications, and Internal Reports Unsealed During the Change Antitrust Trial Support a Strong Inference of Scienter**

**1.    UnitedHealth Targeted Change Healthcare Specifically to "Utilize" Claims Data and Customer Sensitive Information**

197. Leading up to the Change deal, UnitedHealth and Optum hired the consulting giant McKinsey & Company to assess the value of Change. In particular, according to testimony from Optum senior executives Robert Musslewhite and Chris Hasslinger,

- 83 -

UnitedHealth tasked McKinsey & Company with assessing the value of the data Change had access and rights to.[19]

198.    McKinsey prepared a January 2020 presentation analyzing the value to UnitedHealth of obtaining Change's data, which concluded that Change:

- "enjoys [the] broadest and deepest datasets in several categories," with "unrestricted access under HIPAA guidelines";

- had a high depth and breadth of data assets for commercial claims;

- "manages the highest volume of claims compared to any other EDI competitor as well as a large percentage of longitudinal data sets that are more valued"; and

- "connects to >70% of all payers, providers, pharmacy and physician orgs."

199.    According to the January 2020 presentation, McKinsey & Company concluded that UnitedHealth could "'utilize transactions intelligence'" from Change's claims data to "'optimize benefit design'" for UnitedHealthcare, UnitedHealth's insurance business. That is, acquiring Change could help UnitedHealthcare, already the biggest health insurer in the country, gain a further edge over its rivals by giving it access to some of the most crucial information in that business: claims data from rival insurers.

200.    UnitedHealth's deal team cited this type of data use when it presented the potential acquisition to the Company's then-CEO in April 2020. Change's data could yield what was euphemistically referred to as "'improved medical policy and benefit design'" for UnitedHealthcare, the deal team wrote in a subsequent memo. The data could also help

---

[19]   Musslewhite has been the CEO of Optum Insight since August 2019. Hasslinger was Senior Vice President at Optum, responsible for acquisitions and partnerships at Optum Insight, until August 2021.

UnitedHealthcare track the pricing of medical procedures and expand insurance underwriting. The deal team also recognized a glaring concern: using Change's data in some of these ways could raise "'antitrust concerns.'"

201.    Even though Defendants repeatedly emphasized the existence and integrity of their "data firewalls" in defense of the Change acquisition, a February 21, 2021 internal memorandum instead emphasized that Optum and UnitedHealthcare needed to focus on "Enterprise thinking," noting:

> Where to start . . .
>
> We have SO much opportunity to put the breadth of our capabilities on full display and achieve true synergy and scale gains from our extensive capabilities. *We need to stop thinking that just because we need to have financial and data firewalls between Optum and UHC means we can't show up together and harness the capabilities of both organizations together. We need to take a deep look at how success is defined for each operating unit and how performance is rewarded and stop any compensation / reward plans that unintentionally inhibit Enterprise thinking or worse create moral hazards or incongruency with our strategic growth objectives.* We need to improve our CRM systems and stop operating with many different instances of sales force that don't talk to another at some level. We need to continue the Enterprise Growth work aimed at building a total comprehensive view of our top existing and prospective accounts.

202.    A March 3, 2021 email from Daniel Schumacher, UnitedHealth's Chief Strategy & Growth Officer, to CEO Witty was more direct: "Be explicit about what information we are going to *share between companies . . . not just grant permission, but require it* . . . ."[20]

---

[20]  Schumacher is responsible for driving the Company's long-term strategy including enterprise growth, marketing, and consumer organizations as well as strategic client relationships, enterprise partnerships, and the financial services business.

4935-8985-8078.v1

203.    David Wichmann, UnitedHealth CEO from September 2017 through March 2021, testified that UnitedHealth's access to Change's data acted as "'the foundation by which the business case was made'" for the acquisition.  Wichmann also testified that Change's data was part of the strategic asset justifying the acquisition, stating that "'a network with no data isn't worth very much.'"

### 2.    UnitedHealth's and Optum's Track Record of Data Governance Failures, Including Unauthorized Database Access

204.    UnitedHealth has repeatedly granted UnitedHealth employees or Optum employees assigned to UnitedHealth projects access to sensitive data of external competitors.  Despite assurances that its antitrust compliance policy prohibited sharing external payers' data with UnitedHealth, Peter Dumont, the current Chief Data Governance Officer at UnitedHealth, admitted during the Change antitrust trial that UnitedHealth classified many competitively sensitive fields of the external payer data as "standard" fields available to employees across a broad array of UnitedHealth business units.[21]  For example, the "covered amount" – *i.e.*, the portion of a claim covered by the payer's plan – was classified as "standard" information and available across databases.

205.    UnitedHealthcare and Optum also kept permission logs, which document when employees access information outside their business unit.  These permission logs confirm that employees regularly accessed information outside their business unit.  UnitedHealth's

---

[21]  Previously, from April 2011-March 2021, Dumont was Vice President, Privacy at Optum, and from April 2021-October 2023 was Chief Privacy Officer at Optum Labs, UnitedHealth.

- 86 -

permission logs confirm that the employees granted access to external customer data have

included:

- A Director of Healthcare Economics for UnitedHealth's commercial health insurance business.

- A Healthcare Economics Consultant for UnitedHealthcare Networks.

- A Director of Data Science for UnitedHealthcare's Government Benefit Operations Segment.

- A Director of Data Analytics for UnitedHealthcare's Clinical Services Segment.

- A Business Analyst Consultant for UnitedHealthcare's Medicare & Retirement segment.

- A Senior Manager of Data Science for UnitedHealthcare's Clinical Services Segment.

- An Associate Director of Business Analysis for UnitedHealthcare's Payment Integrity Strategic Performance Division.

- A Senior Director of Actuarial Services for UnitedHealthcare's Medicare & Retirement Underwriting and Healthcare Economics Division.

- An Optum Insight employee who received access for "'a contract with United Healthcare Employer & Individual to provide de-identify [sic] benchmarking data.'"

- An Optum Insight employee who received access for "'a funded agreement with [UnitedHealthcare] to do cost predictions for various groups from E&I,'" which is UnitedHealth's commercial health insurance business.

- An Optum Insight employee who indicated that "'currently access is required to fulfill my role to pull and analyse [sic] data for a [UnitedHealthcare] group pricing project.'"

206. UnitedHealth's recordkeeping practices obscure the full extent and frequency

of improper access. UnitedHealth has no access logs for its dNHI database – an Optum

database containing de-identified claims data – before May 2021, approximately three

- 87 -

months after the government's investigation began.[22]  Prior to that time, according to Dumont, UnitedHealth determined who improperly accessed data, only by informally asking employees orally whether they accessed any non-UnitedHealth data, without confirming anything in writing.  Dumont also testified that UnitedHealth did not notify any of the other payers that UnitedHealthcare-affiliated employees had access to their data.

207.   UnitedHealth frequently authorizes access to payer data even when squarely prohibited by contract.   Under Optum Rx's contracts with its external customers, "'[UnitedHealthcare] employees are not allowed to see or use the non-[UnitedHealthcare] book of business.'"  Contrary to these agreements, UnitedHealth admits it granted "'a handful'" of UnitedHealthcare-affiliated employees access to the Optum Rx external customer data in dNHI.  A manager responsible for maintaining dNHI, Timothy Josephson, informed Dumont about improper access in January 2021, adding he "'was not aware of the restrictions on access to the non-[UnitedHealthcare] OptumRx claims.'"  In response, Dumont responded: "'I'm [sic] don't have serious concerns'" about the improper access because the "'data is de-identified in compliance with HIPAA,'" disregarding the severe antitrust implications.  Again, UnitedHealth and Optum never notified its external customers about the access, even though it was regularly breaching its contractual commitments to these customers by sharing their information with UnitedHealthcare.

---

[22]   For the period from May through October 2021, UnitedHealth provided the government only a partial access log that omitted employee numbers, making the data impossible to match for a large share of employees.  Thus, the only access log that the government could effectively use begins in November 2021.  Even the data on employees' access rights lack information on a substantial share of employees' email domains and roles within UnitedHealth.

- 88 -

208.    UnitedHealth employees also engaged in mass downloads of external customer data, with one such download occurring as recently as March 2022. Dumont testified that in a "'very, very concerning'" prior incident, UnitedHealthcare employees "'access[ed] their competitors['] data,'" and "'actually copied [such data] over into [UnitedHealthcare's] own case tracking system.'" This security breach again reflects the lack of reliable safeguards implemented by Optum and the regularized breaching of contracts. Dumont confirmed that despite learning of that lapse no later than December 2021, UnitedHealth's data governance employees failed to take affirmative action until at least March 2022. In the interim, in January 2022, Optum data security employees internally discussed "'a more aggressive timeline,'" but determined they "'d[idn't] want to look for problems,'" so they were not "'mak[ing] much headway,'" but in fact "'going backwards from our last discussion'" (alterations in original).

209.    Defendants have been given clear notice of UnitedHealth and Optum's data governance failures, but declined to remediate them. Witty testified that in December 2021, UnitedHealth's Internal Audit and Advisory Services conducted an audit of UnitedHealth's data management practices, stating: "'Given the potential pervasiveness and severity of the observations noted during the assessment,'" the auditors "'assigned a rating of ***Needs Improvement to the Data Governance Internal audit*.'"** In particular, UnitedHealth's internal auditors concluded that there was:

- a "'heightened risk of data being mismanaged'" at Optum;

- "'no effective means of enforcement if or when data misuse is discovered or reported'" leading to a "risk that the [Enterprise Data Management Office]

will be unable to effectively intervene and reinforce data management practices" (alteration in original).

210.    Mr. Witty forwarded the report to his COO, writing: "'A lot to do here.'" But Witty testified that in June 2022 – six months later – he still did not know whether any changes had been made to strengthen UnitedHealth's data governance.

### D.    Defendants Engaged in Multiple Suspicious Rounds of Insider Trading

211.    Defendants made a series of unusual insider trades during the Class Period. Importantly, none of the sales were executed according to scheduled trading plans.

#### 1.    Hemsley Sold Shares as Media Outlets Began to Question UnitedHealth's Medicare Advantage Practices

212.    In September 2021, the OIG published a report demonstrating that insurance companies with MA Plans were leveraging chart reviews and in-home visits to maximize risk-adjusted payments from CMS.  The OIG report grabbed media attention, with the *WSJ* and the *Minnesota Star Tribune* publishing articles referring to the report on September 22, 2021 and October 19, 2021, respectively.

213.    Not coincidentally, Hemsley then dumped UnitedHealth shares.  In a period of just 2 days, October 25 and October 26, 2021, Hemsley unloaded 125,000 shares of UnitedHealth common stock for sales proceeds of over ***$56 million***.  Collectively, these sales represent Hemsley's second-largest sale during the Class Period.[23]  This two-day sale is also

---

[23]    The largest sale, on October 17, 2023, is also highly suspicious.  *See* §VI.D.3, *infra*.

larger than any sale Hemsley made during the two-and-a-half year period from April 17, 2019 through September 21, 2021 (the "Control Period"), except one.[24]

### 2. Defendants Sold Shares Heading into the Change Antitrust Trial Concerning UnitedHealth's Purchase of Change Healthcare

214. The trial to determine whether UnitedHealth and Optum would be permitted, under the antitrust laws, to proceed with their purchase of Change began on August 1, 2022. Up to that point, Defendants had insisted that the transaction should go through because UnitedHealth would maintain robust firewall processes and extend them to Change's business. UnitedHealth also assured the public that Optum "invests extraordinary time, money, and resources into safeguarding [customer sensitive] information and keeping it walled off from UnitedHealthcare" and that "UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer [information]."

215. But, as explained above, Optum, and its intracompany businesses, lacked both role-based security systems and a technical firewall. *See* §IV.C.4, *supra*. On July 18, 2022, Witty made his largest sale of the Class Period, dumping more than 11,000 shares of UnitedHealth common stock for proceeds of more than $6 million. This sale is also twice as large as the only transaction Witty made during the Control Period.

---

[24] The Control Period is a time period equivalent in length to the Class Period that immediately precedes the Class Period. During the Control Period, Hemsley made a series of large sales in May, July, and October of 2020. The largest collective sale occurred during a 2-day span on July 16 and July 17, 2020, when Hemsley sold 59,012 UnitedHealth shares for proceeds of $18.1 million and 170,000 UnitedHealth shares for proceeds of $52.3 million, respectively. Media outlets noticed these outsized sales and attributed them to the financial market's "epic rebound" following the COVID outbreak in March 2020.

- 91 -

216.    Shortly thereafter, on July 26, 2022, Hemsley sold off another 99,000 shares of UnitedHealth common stock for proceeds of an additional ***$53 million***.  This was Hemsley's third-largest sale during the Class Period.[25]  It was larger than any single-day sales he made during the Control Period, in terms of proceeds.

### 3.    Defendants Sold Shares Upon Receiving Nonpublic Information that the DOJ Was Opening a New Antitrust Investigation

217.    As detailed above, on October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company.'"  *See* §IV.G, *supra*.  While news of the new antitrust investigation circulated inside the Company, Defendants decided to unload their UnitedHealth shares.

218.    On October 17, 2023, ***one week after UnitedHealth was notified of the DOJ antitrust investigation***, Hemsley again dumped another 121,515 shares of UnitedHealth stock for proceeds of over $65 million.  This represents, by far, Hemsley's largest single-day transaction at any time during the Class Period or the Control Period.

219.     Hemsley continued his sell-off on December 5, 2023, selling over 66,081 UnitedHealth shares for additional proceeds of more than $36 million.

220.    In total, over the course of the Class Period, Hemsley made 7 suspicious sales, dumping over 400,000 UnitedHealth shares – ***21.4% of his holdings*** – for proceeds of $212 million.

---

[25] Hemsley's other two sales during the Class Period were also highly unusual.  *See* §§VI.D.1-2, *infra*.

4935-8985-8078.v1

221.    On February 16, 2024, Thompson engaged in his only transaction during either the Class Period or the Control Period, unloading nearly 29,000 shares of UnitedHealth common stock – ***31.4% of his holdings*** – for proceeds of over $15 million.

222.    Hemsley's and Thompson's sales were so suspicious they caught the attention of Congress.  They prompted United States Senators Elizabeth Warren and Edward Markey, along with 15 members of the United States House of Representatives, to write a joint letter to the SEC on April 29, 2024, urging it to conduct an investigation into the nature of the sales (the "Letter").  The Letter noted that the "timing of these trades . . . raises numerous questions" about whether Hemsley and Thompson had violated federal laws that prohibit trading while in possession of material, nonpublic information.

223.    Industry experts also flagged the sales as suspicious.  Professor John Coffee, a corporate governance expert at Columbia Law School and one of the leading experts on securities-fraud, told Bloomberg News: "Typically a company's general counsel would declare a blackout period barring trading in light of a sensitive investigation . . . . 'Apparently, this did not happen' at UnitedHealth . . . ."

### E.    Defendants' Anti-Competitive Scheme Infected the Core of UnitedHealth's Business

#### 1.    UnitedHealthcare's Medicare Advantage Business, Including the HouseCalls Program, Was a Core Component of UnitedHealth's Business

224.    During the Class Period, UnitedHealthcare's Medicare & Retirement division represented a substantial percentage of the Company's total revenue.  According to the Company's own SEC filings, for the years 2021 to 2023, UnitedHealthcare represented, by

far, the largest of UnitedHealth's four reportable segments,[26] and was bigger than all of the

Optum businesses combined:

The following table presents a summary of the reportable segment financial information:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
| | 2023 | 2022 | 2021 | 2023 vs. 2022 | |
| **Revenues** | | | | | |
| UnitedHealthcare | $ 281,360 | $ 249,741 | $ 222,899 | $ 31,619 | 13% |
| Optum Health | 95,319 | 71,174 | 54,065 | 24,145 | 34 |
| Optum Insight | 18,932 | 14,581 | 12,199 | 4,351 | 30 |
| Optum Rx | 116,087 | 99,773 | 91,314 | 16,314 | 16 |
| Optum eliminations | (3,703) | (2,760) | (2,013) | (943) | 34 |
| Optum | 226,635 | 182,768 | 155,565 | 43,867 | 24 |
| Eliminations | (136,373) | (108,347) | (90,867) | (28,026) | 26 |
| Consolidated revenues | $ 371,622 | $ 324,162 | $ 287,597 | $ 47,460 | 15% |

225.    Moreover, the Medicare & Retirement branch of UnitedHealthcare represented

nearly half of UnitedHealthcare's revenue, itself larger than any of the other reportable

segments of UnitedHealth's business:

*UnitedHealthcare*

The following table summarizes UnitedHealthcare revenues by business:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
| | 2023 | 2022 | 2021 | 2023 vs. 2022 | |
| UnitedHealthcare Employer & Individual - Domestic | $ 67,187 | $ 63,599 | $ 60,023 | $ 3,588 | 6% |
| UnitedHealthcare Employer & Individual - Global (a) | 9,307 | 8,668 | 8,345 | 639 | 7 |
| UnitedHealthcare Employer & Individual - Total (a) | 76,494 | 72,267 | 68,368 | 4,227 | 6 |
| UnitedHealthcare Medicare & Retirement | 129,862 | 113,671 | 100,552 | 16,191 | 14 |
| UnitedHealthcare Community & State | 75,004 | 63,803 | 53,979 | 11,201 | 18 |
| Total UnitedHealthcare revenues | $ 281,360 | $ 249,741 | $ 222,899 | $ 31,619 | 13% |

226.    For each of 2021, 2022, and 2023, UnitedHealthcare's Medicare & Retirement

business represented approximately 35% of UnitedHealth's total revenues across all

reporting segments.

---

[26]   UnitedHealthcare, Optum Health, Optum Insight, and Optum Rx.

2. **Optum's 2022 $13 Billion Acquisition of Change Healthcare Garnered National Attention and Federal Scrutiny**

227.    In October 2022, UnitedHealth and Optum finalized the purchase of Change, a healthcare technology company and data clearinghouse that facilitates transactions and communications between insurers and healthcare providers.  With a price tag of $13 billion, UnitedHealth's acquisition of Change represented its largest transaction ever.  When the deal was announced, in January 2021, it was hailed by UnitedHealth as a union that would "effectively connect and simplify core clinical, administrative and payment processes – resulting in better health outcomes and experiences for everyone, at lower cost."

228.    The deal was of national significance.  In February 2022, the DOJ filed a lawsuit seeking to enjoin the acquisition on antitrust grounds.  In their announcement of the suit, the DOJ warned that the "proposed transaction would give United, a massive company that owns the largest health insurer in the United States, access to a vast amount of its rival health insurers' competitively sensitive information" that would enable the Company to "gain an unfair advantage and harm competition in health insurance markets."  In response, UnitedHealth publicly and repeatedly pledged to utilize "firewalls" within its systems to prevent other business unites from using any potentially anti-competitive information held by Change.  Rather than give them an illegal advantage over their competitors, UnitedHealth insisted that the merger was "aimed at addressing the more than $100 billion in administrative waste in the United States healthcare system due to inaccuracies in the claims payment system."

- 95 -

229.   During the trial to determine whether the acquisition would be allowed to move forward, numerous high-level current and former senior executives gave testimony including defendant Witty, UnitedHealth COO Dirk McMahon, former UnitedHealth CEO David Wichmann, UnitedHealth Chief Growth Strategy Officer Daniel Schumacher, former Change CEO/Current Optum Insight CEO Neil de Crescenzo, Optum Insight CEO for Administrative Solutions Steve Yurjevich, Optum Insight CEO Robert Musslewhite, and former UnitedHealthcare CEO, Employer and Individual William Golden, among others.

### F.   UnitedHealthcare's Anti-Competitive Conduct

230.   UnitedHealth and its subsidiaries have a long history of unlawful conduct, including fraud, manipulation, and anti-competitive conduct in order to unlawfully extract more money from the government and UnitedHealth consumers.  UnitedHealth has been embroiled in public and private lawsuits concerning its anti-competitive conduct, and paid out hundreds of millions of dollars in settlements to resolve them.

231.   ***Ingenix Data Fraud.***  In 2008, the New York Attorney General investigated and ultimately filed suit against the predecessor to Optum Insight, Ingenix, Inc.  The healthcare information company collects, sorts, and analyzes a large array of healthcare-related data, including therapeutic outcomes and billing information, and then sells its datasets and analyses to healthcare insurers.  The New York Attorney General accused Ingenix, and by extension UnitedHealth, of operating a "defective and manipulated database" that distorted data in order to reach desired conclusions.  For example, Ingenix would manipulate data or outcomes to artificially decrease a region's calculated customary reimbursement rates.  Insurers could then refuse to cover charges above the artificial custom

rates, and thereby "force patients to absorb a higher share of the costs" for medical services. The New York Attorney General provided a "clear example" of how this manipulation of the "reasonable and customary" cost of healthcare in the Ingenix database benefited insurers like UnitedHealth:

> United insurers knew most simple doctor visits cost $200, but claimed to their members the typical rate was only $77. The insurers then applied the contractual reimbursement rate of 80%, covering only $62 for a $200 bill, and leaving the patient to cover the $138 balance.

232. Consumers questioned UnitedHealth's low reimbursement rates but the Company hid their secret connection to Ingenix. Instead, it told consumers the reimbursement rates were the product of "'independent research,'" as opposed to the self-serving manipulations of its sister company.

233. The United States Senate launched its own investigation, holding two hearings regarding the use of the Ingenix database in March of 2009. On June 24, 2009, the Committee on Commerce, Science, and Transportation published a staff report that quantified the impact of the manipulation of the Ingenix database on healthcare consumers. That report concluded that "American consumers have paid **billions of dollars** for health care services that their insurance companies should have paid."

234. On October 27, 2009, the New York Attorney General announced that it had settled with UnitedHealth and the other insurers accused of utilizing the manipulated Ingenix database. As part of the settlement, UnitedHealth agreed to shut down the Ingenix database and contribute $50 million to the creation of a new, independent, nonprofit database that insurers would use to calculate reimbursement rates going forward. In December 2009,

UnitedHealth settled a related private case with the American Medical Association for $350 million.

235.    ***Medicare Fraud.*** In 2017, the DOJ joined a whistleblower lawsuit originally filed in 2011. The suit, filed in California, alleges that UnitedHealth exaggerated the medical needs of patients in order to collect higher payments from Medicare in violation of the False Claims Act of 1863 ("False Claims Act"). The suit remains ongoing and the parties' motions for summary judgment are currently pending before the court.

236.    In September 2021, a report from the U.S. Department of Health and Human Services', Office of the Inspector General accused UnitedHealth of the same conduct alleged here (the OIG report). According to the OIG report, UnitedHealth manipulated health risk assessments and chart reviews of its members using Medicare Advantage. The OIG report found that many insurers engaged in the fraudulent practice, but that UnitedHealth "stood out" as it had "40 percent of the risk-adjusted payments" even though it enrolled "only 22 percent of [Medicare Advantage] beneficiaries."[27] The scheme was extremely fruitful – Defendants' scheme allowed UnitedHealth to pocket $3.7 billion in additional, unnecessary risk-adjusted payments in 2017 alone.[28]

237.    In October 2024, the OIG released another report again accusing UnitedHealth of the same conduct alleged here in 2022. According to the report, in 2023, based on submissions of 2022 data, UnitedHealth received $3.2 billion in Medicare Advantage

---

[27]  *See* Exhibit 7.

[28]  The OIG report did not list UnitedHealth by name, but later media reports revealed that the top perpetrator was UnitedHealth.

payments based solely on diagnoses derived from in-home health risk assessments and health risk assessment-linked chart reviews.  The $3.2 received by UnitedHealth accounted for two-thirds of the total risk-adjusted payments CMS made to insurers in 2023 using of these diagnosing methods, even though UnitedHealth covered only 28% of 2022 Medicare Advantage members.

238.    ***Reimbursement Rate Fraud.***  In November 2019, the Ohio State Attorney General sued Optum Rx for overcharging Ohio State Bureau of Workers Compensation for prescription drugs.  Optum Rx is a PBM under the UnitedHealth umbrella, meaning that it manages prescription drug costs and negotiates with pharmacies on behalf of state agencies. The Ohio lawsuit alleged that, as the PBM contracted to manage drug prices for the Bureau of Workers Compensation, Optum Rx "breached its contract by applying an incorrect reimbursement rate to certain claims for generic drugs and by failing to achieve a target reimbursement rate for certain pharmacy claims."  In October 2022, Optum Rx reached a $15 million settlement.

### G.    The Abrupt Departure of UnitedHealth's Chief Information Security Officer

239.    On December 11, 2023, just months prior to the breach, UnitedHealth terminated its employment relationship with UnitedHealth's Chief Information Security Officer, Aimee Cardwell.  Ms. Cardwell served as Executive Vice President and Chief Information Security Officer at UnitedHealth from 2020 until 2023, where she was responsible for overseeing the Company's cyber-risk efforts.  Prior to that, she was the Chief Information Officer at Optum Financial.   The data breach that exposed Change to

- 99 -

ransomware occurred on February 21, 2024. Tellingly, UnitedHealth kept the departure of such a high-profile and vital cyber-security executive under wraps.

## VII.   POST-CLASS PERIOD EVENTS

240.   After announcement of the DOJ investigation stoked investors' fears about UnitedHealth's widespread misconduct, post-Class Period articles, events, and government findings provided more evidence and detail surrounding the Company's malfeasance.

### A.   Secret Recording of Internal UnitedHealth Meeting Confirms UnitedHealth's Upcoding Scheme

241.   On March 18, 2024, *The Examiner News* published a recording from a January 26, 2024 UnitedHealth meeting, where executives coached nurses how to upcode and drive UnitedHealth profits. The call included Dr. Kevin Baran, a physician who worked in a management capacity at UnitedHealth, Optum East Director of Clinical Documentation Education Rachelle Gauvin, and Vice President of Risk Adjustment Christy Bauer. The audio files further evidence the manner in which UnitedHealth coached nurses and administrators to confront doctors who challenged medical conditions UnitedHealth sought to add to a patient's chart. One executive instructed UnitedHealth employees to tell resistant doctors: ""We presented this supported medical condition to you, and you disagreed with it. Let me explain to you what the CMS definitions are around the condition, and then I'd love to hear more about why you felt it might not be appropriate for this patient."" The executives also instructed the nurses and administrators to add diagnoses through "'buddy codes,'" where one diagnosis would automatically lead to the addition of related diagnoses. On the audio files, one nurse asked the UnitedHealth executives whether a resource existed

explaining the paired codes, but Dr. Baran acknowledged that UnitedHealth had made them up, and that: "'No one else will know what you're talking about outside of this room.'"

**B.    United States Lawmakers Implore the SEC to Open an Investigation into Defendants' Suspicious Insider Trading**

242.    As detailed above, several UnitedHealth executives sold their shares of UnitedHealth common stock while in possession of highly relevant, nonpublic information – the DOJ opening a new antitrust investigation. *See* §IV.G, *supra*. Defendants Hemsley and Thompson were among the sellers, and collectively sold roughly 216,000 shares of UnitedHealth stock for combined proceeds of over $117 million.

243.    The unusual timing of these trades and the fact they were out of line with prior trading practices, was sufficient to move 17 United States lawmakers, including Senators Elizabeth Warren and Edward Markey of Massachusetts along with 15 members of the House of Representatives, to send the joint Letter to the SEC urging the opening of an investigation into these trades. Specifically, the Letter requested that the SEC determine whether any of the individual executives who sold UnitedHealth shares (including Thompson and Hemsley) or the Company itself had violated federal laws or regulations.

244.    Senators Warren and Markey, along with their colleagues from the House of Representatives, did not mince words. The conduct of UnitedHealth and its executives, they felt, exhibited a "disturbing fact pattern" – even more so because the executives had made their sales outside of the context of a scheduled trading plan. The Letter also pointed out that it would have been typical, under such circumstances, for UnitedHealth's general counsel to

have declared a blackout period which would have barred trading by executives until such time as the DOJ investigation was made public.

245.   The Letter admonished that "[t]he timing of these trades . . . raises numerous questions," and called attention to the fact that, in selling when they did, the UnitedHealth executives, including Hemsley and Thompson, managed to shield their personal holdings from the 5.2% drop in the price of UnitedHealth stock that occurred when the news of the investigation became public.  That benefit, of course, was denied to the Plaintiff and the rest of the putative Class in this matter.  The Letter emphasized the gravity of the potential wrongdoing – in addition to civil fines which could measure in the hundreds of millions, Hemsley and Thompson, along with their colleagues, could face criminal penalties of up to $5 million and up to 20 years imprisonment.

246.   In addition to the potential insider trading, the Letter requested that the SEC launch an investigation into the Company itself, citing "concerns about whether the [C]ompany has met the requirements of SEC's" disclosure rules and whether the Company's "fail[ure]" to inform investors of the DOJ's investigation in its Form 10-K for FY 2023 was a violation of that duty.

**C.   Massive Data Breach Leads to Congressional Scrutiny of the Upcoding Scheme**

247.   Following the massive security breach at Change that UnitedHealth announced on February 22, 2024, the Company experienced heightened scrutiny from lawmakers. Witty was called to testify before the House Energy and Commerce Committee and the Senate Finance Committee on May 1, 2024.  At both committee hearings, lawmakers asked

questions beyond the focus of the data breach and openly questioned UnitedHealth's ruthless business practices. For example, at the Senate hearing, Senator Elizabeth Warren (D-Ma.) called UnitedHealth a "monopoly on steroids" that "will stop at nothing to get bigger, bigger, and bigger." Warren explained how UnitedHealth "bought up every link in the healthcare chain" and was therefore "in a position to jack up prices, squeeze competitors, hide revenues, and pressure doctors to put profits ahead of patients." Warren specifically called out UnitedHealth's manipulation of the Medicare Advantage system and the Company's effort to "rake in more taxpayer money by using a practice called upcoding to make enrollees look sicker." She explained that upcoding meant "adding a diagnosis . . . even if there's no clinical basis for the diagnosis and no treatment planned," and stated that UnitedHealth had extracted $3.7 billion from the practice.

### D. Investigative Reports Confirm UnitedHealth Trained and Pressured Doctors to Improperly Upcode Patients

248. *STAT News* released a two-part series called "Health Care's Colossus," on July 25, 2024 and August 7, 2024, that expressly showed "how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence." *STAT News* said the reports were "based on interviews with more than two dozen current and former UnitedHealth doctors and executives conducted over the past six months," conversations with "health policy experts and patients," and examination of "court records, and . . . UnitedHealth's 600-page medical coding bible," a 592-page book UnitedHealth authored that taught insurers and their employees how to "'capture'" more diagnoses.

- 103 -

249.    The *STAT News* reports detailed how UnitedHealth encouraged its 90,000 affiliated physicians to add medical coding to generate more revenue, by "encouraging clinicians through bonuses and performance reviews to identify more health problems in patients, even if those conditions seemed dubious." Doctors received hours of training on how to document patients' illnesses and increase payments from Medicare. One doctor interviewed for the piece revealed that UnitedHealth managers made clear that "risk scores could only go up, not down." In *STAT News*'s words, UnitedHealth pressured physicians "to treat patients as if they were fields of medical codes to be harvested, instead of people who have complex histories."

250.    Additionally, the *STAT News* reports detail how UnitedHealth encouraged providers to use QuantaFlo, a relatively new device, to screen patients for peripheral artery disease, even if they did not report any symptoms. But the device was "backed by a slim body of evidence generated by its manufacturer" and "[c]leared in 2015 through a Food and Drug Administration pathway that requires limited clinical testing" and only "cleared as a tool to aid clinicians in diagnosing [peripheral artery disease], but not as a standalone diagnostic device." Studies showed that the device gave false positives 10% of the time, and accordingly "[e]xperts said that level of imprecision, combined with the small sample size, makes it problematic for use in widespread screening because of the potential that false positives could expose high numbers of patients to unnecessary care."

251.    Despite these limitations, UnitedHealth insisted that providers use the device. Five separate physicians who were interviewed during the investigation explained "the [C]ompany began to work around the doctors skeptical of the test, hiring nurse practitioners

- 104 -

to conduct the test at annual wellness visits." As a result, UnitedHealth "diagnosed Medicare Advantage patients with peripheral artery disease at almost four times the rate of patients in traditional, government-run Medicare." Ultimately, heading into 2024, CMS decided to eliminate the diagnosis code for peripheral artery disease as a rate-increasing diagnosis. The announcement caused an immediate reversal of coding trends. The rate of testing and diagnosis in patients 50 and older more than doubled between 2018 and 2023 – from 7 per 100,000 patients to 14.7 per 100,000 – then fell to 9.6 in May 2024.

252.  On October 16, 2024, *STAT News* published another investigative report about UnitedHealth's upcoding scheme, which it supported with internal Company documents and emails, and more interviews with UnitedHealth doctors. *STAT News* described the "pressure campaign" applied to doctors to generate additional diagnoses, particularly through "annual wellness visits." According to the report, UnitedHealth required remedial training for doctors who failed to upcode as frequently as UnitedHealth expected. As one doctor put it, the system created an "'inherent conflict of interest'" because "'you're incentivizing [doctors to want] sicker patients, or at least sicker appearing on paper.'" The report described that even during the height of the COVID-19 pandemic in late 2020, when deaths were surging and no vaccine was available, UnitedHealth made Medicare Advantage home visits its number one priority.

**E.  Investigative Reports Confirm UnitedHealth Used In-Home Visits to Perpetrate the Upcoding Scheme and Improperly Increase Medicare Advantage Profits**

253.  The *WSJ* issued two separate investigative reports providing the results of an in-depth analysis on Medicare Advantage data from 2019-2021, concluding that

UnitedHealth and other insurers used upcoding to boost their Medicare Advantage profits. The *WSJ* reports were entitled: "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated," dated July 8, 2024 and "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," dated August 4, 2024. The *WSJ* reviewed the Medicare data under a research agreement with the federal government. The data demonstrates that insurers, including UnitedHealth, targeted particular diagnoses they knew would increase payments from Medicare Advantage, and identified UnitedHealth as the biggest abuser of the system. Like *STAT News*, the *WSJ* reported that UnitedHealth instructed nurses to diagnose peripheral artery disease based on the results of a QuantaFlo devise, which the FDA has said "'is not indicated for use as a stand-alone diagnostic device.'"

254.    UnitedHealth also targeted AIDS and HIV diagnoses, according to the *WSJ* report. The *WSJ* report found that most people with insurance-driven AIDS/HIV diagnoses likely did not have either disease, because they did not receive any commonplace treatment for the conditions, such as antiviral medications. Indeed, 92% of patients who received an HIV/AIDS diagnosis through normal channels took antiviral drugs, while only 17% of patients diagnosed by insurance companies took them.

255.    These targeted diagnoses were deliberately added by UnitedHealth, which paid employees to review medical charts in search of new diagnoses and sent nurses to visit patients in their homes with an aim to tack on profitable diagnosis codes. The *WSJ* reports show that UnitedHealth sent nurses to visit homes on behalf of the Company, and were required to use software that automatically added diagnoses to a "'diagnosis cart.'" According to the reports, 60% of UnitedHealth in-home visits generated at least one new

revenue-producing diagnosis of a condition no doctor was treating, and generated $2,735 per visit, on average.

256.    The *WSJ* reports also described the tens of billions of dollars UnitedHealth extracted from CMS, and taxpayers, as a result of its malfeasance, including *$8.7 billion* in payments from insurer-driven diagnoses in 2021 alone, or more than *half* of the $17 billion in profit UnitedHealth generated that year.

### F.    OIG Report Confirms UnitedHealth's Upcoding Scheme Continued Through 2023 and that the Company Was Paid Billions in Improper Payments in 2023

257.    The OIG was established by law in 1976 to fight waste, fraud and abuse and to improve the efficiency of Medicare, Medicaid and more than 100 other Department of Health & Human Services (HHS) programs.  The OIG has approximately 1,600 personnel. The majority of the agency's resources go towards the oversight of Medicare and Medicaid - programs that represent a significant part of the Federal budget and that affect this country's most vulnerable citizens.

258.    As detailed in the Federal Register / Vol. 83, No. 215, in furtherance of its mission, the OIG:

- conducts and supervises audits, investigations, evaluations, and inspections relating to HHS programs and operations;

- identifies systemic weaknesses giving rise to opportunities for fraud and abuse in HHS programs and operations and makes recommendations to prevent their recurrence;

- leads and coordinates activities to prevent and detect fraud and abuse in HHS programs and operations;

- detects wrongdoers and abusers of HHS programs and beneficiaries so appropriate remedies may be brought to bear, including imposing

administrative sanctions against providers of health care under Medicare and Medicaid who commit certain prohibited acts; and

- keeps the Secretary of Health and Human Services and Congress fully and currently informed about problems and deficiencies in the administration of HHS programs and operations and about the need for and progress of corrective action.

259.   In addition, OIG works with the Department of Justice (DOJ) to operate the Health Care Fraud and Abuse Control Program.

260.   As noted above, *supra __*, the OIG released a report in October 2024 that shows how UnitedHealth manipulates the Medicare Advantage system at the expense of vulnerable seniors and taxpayers.  The report shows how UnitedHealth continued to utilize in-home health risk assessments, and chart reviews based on those assessments, as a mechanism to obtain billions in risk-adjusted payments in 2023 by diagnosing serious health conditions that never received follow-up care.  The OIG found that UnitedHealth received two-thirds of these suspicious payments in 2023, even though it covered only 28% of Medicare Advantage members.  The OIG's findings raised concerns that UnitedHealth was putting profits over patients by using in-home visits and HRA-linked chart reviews to maximize payments instead of providing healthcare.  Based on these concerns, ***for the first time ever***, the OIG recommended that CMS restrict or even cut off payments for diagnoses obtained at in-home visits.

261.   On October 24, 2024, the *WSJ* reported on the OIG report and included additional commentary from OIG officials.  According to the *WSJ*, the OIG's assistant inspector general for evaluation and inspections, stated: "'We're seeing that some Medicare Advantage companies are making billions from the health risk assessment diagnoses without

- 108 -

providing care for the conditions that they identify' . . . .  That could mean some of the diagnoses are false . . . .  Or, if they are accurate, the insurers making them aren't connecting patients to the care they need, even as the companies are paid extra based on the supposed cost of treating the conditions.  'Profiting off enrollees' medical conditions without providing treatment for those conditions is wrong[] . . . .'"

262.    The *WSJ* report also stated that UnitedHealth and other MA plans made diagnoses at in-home visits without standard confirmatory testing, stating:

> The diagnoses that triggered home-visit payments documented in the OIG report were often for illnesses that might be difficult to confirm without a laboratory or other equipment.  Two of the top diagnoses driving the payments were a form of rheumatoid arthritis, which might require lab work and X-rays to diagnose, along with secondary hyperaldosteronism, a condition that can be confirmed with blood work.

Quoting the lead author of the OIG report, the *WSJ* report stated: "'There are definitely conditions where you might wonder, "'Can they really, you know, identify that by a visit to someone's home?"'"

### G.    UnitedHealth's Continued False Denials

263.    On August 8, 2024, in response to the public scrutiny arising from the *WSJ* reports, UnitedHealth released a public statement entitled: "UnitedHealth Group's Response to the Wall Street Journal."  In its response, UnitedHealth claimed to "[s]et[] the record straight on HouseCalls, Medicare Advantage and the demonstrably superior health outcomes and cost savings to more than 33 million American seniors each year."  Despite these promises, UnitedHealth's response relies exclusively on its own biased analyses and fails to address many of the most concerning accusations from the *WSJ* and other sources.

264.    For example, although UnitedHealth promises "[a] look at the real numbers," it actually exclusively relies on numbers from a report UnitedHealth itself authored and paid for.  Using these biased numbers alone, UnitedHealth concludes:

- 67.4% of patients with insurer-driven HIV/AIDS diagnoses were on antiviral therapies (still significantly less than the 92% of patients with diagnoses from providers); and

- "[T]he government's cost to fund Medicare Advantage is approximately 96% of the cost to fund [fee-for-service] and provides $60 billion annually in additional value through lower out-of-pocket costs and additional services."

265.    Importantly, UnitedHealth does not deny that in-home visits were designed to add diagnoses and inflate UnitedHealth's reported profits.  Instead, without providing a percentage, UnitedHealth claims: "The majority of diagnoses made during a home visit do not result in increased Medicare Advantage (MA) risk adjustment payments."  The Company also does not deny that insurer-led diagnoses triggered more taxpayer-funded payments, instead saying only "CMS has systems and processes in place to help ensure that data submitted meets the established program rules" and citing "CMS audits" as the only example.  But UnitedHealth did not explain CMS is years behind on the auditing process, and therefore none of the issues identified by the *WSJ* had yet been audited by CMS.  UnitedHealth also did not deny that it encouraged physicians to use QuantaFlo alone to diagnose peripheral artery disease, resulting in false positives.  Instead, it obfuscated further asserting only that "QuantaFlo is an FDA-approved device" and "[p]eripheral artery disease is underdiagnosed."

- 110 -

266. Tellingly, UnitedHealth entirely ignored the specific allegations of wrongdoing relating to improper upcoding detailed by various UnitedHealth doctors, as reported by *STAT News*.

### H. UnitedHealth's Upcoding Scheme Is a Longstanding Practice and UnitedHealthcare's Former CEO Successfully Pressured CMS

267. In January 2014, CMS proposed a draft regulation designed to address insurers' practice of upcoding Medicare Advantage patients to get higher payments from CMS. The plan mandated that chart reviews "'cannot be designed only to identify diagnoses that would trigger additional payments'" and would have required health plans, when examining patients' medical records, to identify overpayments by CMS and refund them to the government.

268. On August 6, 2024, the court in *United States of America v. UnitedHealth Group, Inc. et al.*, a whistleblower case joined by the DOJ covering the Medicare Advantage fraud, released previously withheld testimony and emails. The records demonstrate that the proposed regulation caused an "'uproar'" at UnitedHealth when CMS proposed it.

269. Following the proposal of the regulation, UnitedHealth asked for and received a meeting with CMS, which took place on April 29, 2014. The newly released records show that Cheri Rice, then director of the CMS MA Plan payment group, testified at her deposition in relation to the whistleblower suit that she was "'very uncomfortable'" at the meeting, and had to remind UnitedHealth that, even without the chart review rule, the Company was obligated to make a good-faith effort to bill only for verified codes – or face possible penalties under the False Claims Act.

- 111 -

270.    The newly released records further show that UnitedHealthcare's then-CEO Steven Nelson personally emailed Rice on April 30, 2014, to confirm several points that had been discussed during the April 29, 2014 meeting.  Rice responded to Nelson's email on May 2, 2014, again reminding him that "'regardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS.'"  During her deposition, Rice testified that she was "very concerned" and "alarmed" by Nelson's email.

271.    Rice further testified that CMS officials ultimately backed down and abandoned the proposed regulation in May 2014 because of "'stakeholder concern and pushback.'"  In other words, UnitedHealth's pressure campaign worked.

## VIII.  LOSS CAUSATION

272.    Defendants, as alleged herein, directly and proximately caused Plaintiff's and Class members' economic loss.  During the Class Period, Defendants made false and misleading statements and omissions of material facts necessary to render those statements not false or misleading.  UnitedHealth's common stock traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about UnitedHealth and Defendants' fraudulent scheme.  Plaintiff and other Class members purchased UnitedHealth's common stock at artificially inflated prices and suffered damages when UnitedHealth' stock price declined as the relevant truth entered the market.

- 112 -

273.   The artificial inflation in UnitedHealth's common stock price was dissipated by the February 27, 2024 *WSJ* article's disclosure of the relevant truth concerning the scope of the new DOJ antitrust investigation into UnitedHealth. *See* §IV.H, *supra*. The resulting stock price decline upon release of this new truthful information, and related increased risks, were due to Company-specific, fraud-related disclosures, and not a result of market or industry. The February 27, 2024 disclosure may not be exhaustive because fact and expert discovery have yet to commence.

274.   As a result of the February 27, 2024 disclosure, UnitedHealth's stock price significantly declined, falling over $27 per share, from a close of $525.32 on February 26, 2024 to a close of $498.28 on February 28, 2024. *See* §IV.H, *supra*.

275.   Financial analysts and market commentators recognized that the February 27, 2024 *WSJ* report revealed new information and caused the stock price decline. According to a *Bloomberg* report titled: "UnitedHealth (UNH) Executives Sold Stock Before US Probe Became Public," "[s]hares of UnitedHealth fell 5.2% in two trading sessions on Feb. 27-28, after the probe was widely reported in financial media."

276.   Similarly, *Barron's* reported that "UnitedHealth Group stock fell Wednesday [February 28, 2024], after a Wall Street Journal report said the Justice Department has launched an antitrust investigation into the health insurer. UnitedHealth stock was the worst performer in the S&P 500 and the Dow Jones Industrial Average on Wednesday."

277.   Additional reports by financial analysts confirmed that the February 27, 2024 *WSJ* report revealed new information and caused the stock price decline. For example, on February 27, 2024, after market close, Jefferies published a report: "UNH's VBC Scale in

- 113 -

Certain Markets a Possible Target of Anti-Trust Probe." Jefferies noted that: "Tuesday afternoon [February 27, 2024], multiple news outlets reported the DOJ has launched an anti-trust investigation into the relationship between UHC and Optum, including how acquisitions affect competition."

278.   Also on February 27, 2024, after market close, financial analysts at RBC Capital Markets published a report: "WSJ reports UNH is the target of DOJ anti-trust investigation." RBC Capital Markets noted that the *WSJ* reported "that DOJ is launching an anti-trust investigation into UNH."

279.   On February 28, 2024, the *WSJ* published another article reporting that UnitedHealth was down due to the DOJ probe revelations: "Shares of UnitedHealth fell Wednesday morning [February 28, 2024], extending a retreat sparked late yesterday by news that the Justice Department has launched an antitrust investigation into the company." On February 28, 2024, at 2:40 ET, Cantor Fitzgerald attributed the stock drop to the *WSJ*: "***The stock traded down 7.6% vs SP500 (0.0%) since the [WSJ] article broke***."

280.   Also on February 28, 2024, financial analysts at UBS published a report: "Report of DOJ Antitrust Investigation into UNH Leads to Share Weakness." The report confirmed that: "UNH fell at the end of the trading day on February 27 following reports that the U.S. Department of Justice has launched an antitrust investigation into UnitedHealth Group (WSJ article). According to the article, investigators have been interviewing doctor groups and asking about the relationship between UNH's insurance business and Optum. The inquiry is around how ownership of physician and health-plan units affects competition, as well as Medicare billing issues." UBS also connected the antitrust probe to Optum and

Medicare Advantage noting: "We believe Optum is a critical player in driving a successful MA offering."

281.    On March 1, 2024, industry analyst *AIS Health* issued a report titled: "DOJ to Test UnitedHealth's 'Firewall' With Antitrust Probe," that discussed the February 27, 2024 *WSJ* report and the scope of the DOJ's new antitrust investigation into UnitedHealth.  The *AIS Health* report stated that federal regulators believe UnitedHealth's firewall between its payer and provider businesses "'has a lot of holes.'"  The report also pointed out that the DOJ is examining UnitedHealth's Medicare Advantage coding practices, suggesting that owning both payer and provider assets may allow UnitedHealth to make members appear sicker to increase profits.

282.    In sum, as detailed above, the decline described herein served to remove artificial inflation from the price of UnitedHealth common stock, and was the direct and foreseeable consequences of the revelation of the relevant truth concealed by Defendants.

## IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

283.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- Defendants engaged in a scheme and made misrepresentations or failed to disclose material facts during the Class Period;

- Defendants' scheme, misrepresentations, and omissions were material;

- UnitedHealth common stock traded in an efficient market;

- the Company's common stock shares were liquid and traded with substantial volume during the Class Period;

- the Company's common stock was traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased UnitedHealth common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

284.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

285.   Plaintiff and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.   CLASS ACTION ALLEGATIONS

286.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased UnitedHealth common stock during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein and the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

287.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time

and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by UnitedHealth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

288.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

289.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

290.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants engaged in a scheme or course of business that operated as a fraud or deceit on investors;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of UnitedHealth;

- whether Defendants caused UnitedHealth to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

4935-8985-8078.v1

- whether the prices of UnitedHealth common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

291.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   CLAIMS

### COUNT I

### Violations of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

292.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

293.   This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder by the SEC.  During the Class Period, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that: (a) Defendants employed devices, schemes, and artifices to defraud; (b) Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) Defendants engaged in acts, practices, and a course of business that operated as a fraud or

- 118 -

deceit upon Plaintiff and the Class in connection with their purchase of UnitedHealth common stock during the Class Period.

294.    In furtherance of their scheme and wrongful course of business, Defendants, and each of them, took the actions set forth herein.

295.    During the Class Period, defendants UnitedHealth, Witty, Hemsley and Thompson engaged in a scheme and wrongful course of business and disseminated or approved the statements specified above, which they knew were false and misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants' misconduct was intended to, and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of UnitedHealth securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire UnitedHealth common stock at artificially inflated prices.

296.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period in that, in reliance on the integrity of the market, they paid artificially inflated prices for UnitedHealth common stock. Plaintiff and the Class would not have purchased UnitedHealth stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements. Upon the disclosure that the Company had

been disseminating false and misleading statements to the investing public, Plaintiff and the other members of the Class suffered financial harm.

## COUNT II

### Violations of §20(a) of the Exchange Act Against All Defendants

297.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

298.    During the Class Period, Defendants participated in and oversaw the operation and management of UnitedHealth, and conducted and participated, directly and indirectly, in the conduct of UnitedHealth's business affairs.  The Individual Defendants were able to, and did, control the contents of the various reports, press releases, codes of conduct, and public filings which UnitedHealth disseminated in the marketplace during the Class Period concerning its business and results of operations.  Because of their senior positions, they knew the adverse nonpublic information about UnitedHealth's business as alleged herein.

299.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to UnitedHealth's financial condition and results of operations, and to correct promptly any public statements issued by UnitedHealth which had become materially false or misleading.

300.    Each of the Individual Defendants acted as a controlling person of UnitedHealth.  By reason of their senior management positions and/or being a director of UnitedHealth, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, UnitedHealth to engage in the unlawful acts and conduct complained of herein.  Each of the Defendants exercised control over UnitedHealth's general

operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause UnitedHealth to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of UnitedHealth within the meaning of §20(a) of the Exchange Act.

301.   UnitedHealth had the power to control and influence Company officers and other executives – including defendants Witty and Thompson – through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, UnitedHealth had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of defendants Witty and Thompson, including the content of their public statements. UnitedHealth, therefore, was a "controlling person" of defendants Witty and Thompson within the meaning of §20(a) of the Exchange Act.

302.   By reason of the above conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## COUNT III

### For Violations of §20A of the Exchange Act Against
### Hemsley and Witty

303.   Count III is brought pursuant to §20A of the Exchange Act against Hemsley and Witty, on behalf of Plaintiffs and members of the Class who were damaged by Hemsley's and Witty's insider trading. Plaintiff repeats and realleges every allegation above as if fully set forth herein.

- 121 -

4935-8985-8078.v1

304.    As detailed above, Hemsley possessed material, nonpublic information when he sold his stock, and he took advantage of his possession of material, nonpublic information regarding UnitedHealth to obtain over $211 million of insider trading proceeds during the Class Period.

305.    As detailed above, Witty possessed material, nonpublic information when he sold his stock, and he took advantage of his possession of material, nonpublic information regarding UnitedHealth to obtain over $11 million of insider trading proceeds during the Class Period.

306.    Plaintiff made the following purchases contemporaneously with Hemsley's and Witty's sales:

| Defendant Sales While in Possession of Material, Nonpublic Information | | | | | Contemporaneous Purchases by CalPERS | | |
|---|---|---|---|---|---|---|---|
| Defendant Seller | Date of Sale | # Shares Sold | Sale Price | | Date of Purchase | # Shares Purchased | Purchase Price |
| Andrew Witty | July 18, 2022 | 11,376 | $527.90 | → | July 19, 2022 | 36,001 | $533.45 |
| Stephen Hemsley | July 26, 2022 | 99,312 | $534.27 | → | July 28, 2022 | 49,782 | $541.49 |
| Andrew Witty | July 19, 2023 | 4,000 | $506.19 | → | July 26, 2023 | 9,840 | $508.00 |
| Stephen Hemsley | October 17, 2023 | 121,515 | $540.58 | → | October 17, 2023 | 180 | $536.65 |
| | | | | | | 1,787 | $536.65 |
| | | | | | | 3,809 | $536.65 |
| | | | | | | 9,986 | $536.65 |
| Stephen Hemsley | December 5, 2023 | 66,081 | $550.39 | → | December 11, 2023 | 182,000 | $543.68 |

307.    As UnitedHealth's top executives, Hemsley and Witty each owed a duty to UnitedHealth and its shareholders to maintain the material, nonpublic information in confidence and not trade on the basis of it.

308.    By reason of the above conduct, Hemsley and Witty are liable pursuant to §20A of the Exchange Act.

- 122 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper class action, and certify Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appoint Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

D.      Awarding such other equitable relief, including disgorgement and/or injunctive relief, that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED:  February 21, 2025        Respectfully submitted,

SOMERMEYER SULLIVAN PLLC
TIM SULLIVAN, MN 391528
JAMES PORADEK, MN 290488 (OF COUNSEL)


                                    s/ TIM SULLIVAN
                                    TIM SULLIVAN

- 123 -

4935-8985-8078.v1

225 South Sixth Street, Suite 3900
Minneapolis, MN  55402
Telephone:  612/643-3486
tsullivan@somsull.com
jporadek@somsull.com

Local Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (admitted *pro hac vice*)
SAM S. SHELDON (admitted *pro hac vice*)
LAURIE L. LARGENT (admitted *pro hac vice*)
ROBERT R. HENSSLER JR. (admitted *pro hac vice*)
JEFFREY J. STEIN (admitted *pro hac vice*)
JACK ABBEY GEPHART (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
darrenr@rgrdlaw.com
ssheldon@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
jstein@rgrdlaw.com
jgephart@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4935-8985-8078.v1