**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITEDHEALTH GROUP INC., ANDREW WITTY, STEPHEN HEMSLEY, and BRIAN THOMPSON, <br><br> *Defendants.* | Case No. 0:24-cv-01743-JMB-DTS |

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 3

ARGUMENT ...................................................................................................... 5

I.   The Complaint Fails to State a Securities Fraud Claim (Count I) ......................... 5

   A.  The Complaint Fails to Plead Loss Causation.................................................... 6

   B.  The Complaint Fails to Plead Falsity ............................................................. 10

      1.  HouseCalls .................................................................................. 10

         a.  The Complaint Does Not Allege an Illegal Upcoding Scheme……..11

         b.  Plaintiff Has Not Pled A Companywide Improper Scheme………...12

         c.  The OIG Reports Cannot Support the Complaint's Allegations Of "Widespread" Misconduct……………………………………………..14

         d.  Statements Untethered to the Alleged Upcoding…………………...17

         e.  Puffery………………………………………………………………..18

      2.  Data Firewalls ............................................................................. 19

      3.  The Code of Conduct ................................................................... 24

   C.  The Complaint Fails to Plead Scienter ........................................................... 26

      1.  HouseCalls .................................................................................. 27

      2.  Data Firewalls ............................................................................. 29

      3.  Stock Trading .............................................................................. 31

      4.  Miscellaneous Allegations ............................................................ 35

II.   The Complaint Fails to State a Section 20A Insider Trading Claim (Count III) ... 37

    A.   No Predicate Violation ................................................................................. 37

    B.   No Contemporaneous Trades ........................................................................ 37

    C.   No Possession of Material Nonpublic Information ....................................... 39

III.  The Complaint Fails to State a Claim for Control Person Liability (Count II) ...... 40

CONCLUSION ......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 3M Co. Sec. Litig.*,
2021 WL 4482987 (D. Minn. Sept. 30, 2021)................................................. 29, 32

*In re AST Rsch. Sec. Litig.*,
887 F. Supp. 231 (C.D. Cal. 1995) ........................................................... 38

*Bajjuri v. Raytheon Tech. Corp.*,
2023 WL 3650554 (D. Ariz. May 25, 2023) ................................................. 7

*Bien v. LifeLock Inc.*,
2015 WL 12819154 (D. Ariz. July 21, 2015)................................................. 20

*Boluka Garment Co. v. Canaan Inc.*,
547 F. Supp. 3d 439 (S.D.N.Y. 2021) ....................................................... 7

*Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*,
2024 WL 4023842 (2d Cir. Sept. 3, 2024) ................................................. 25

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................. 18

*In re Buca Inc. Sec. Litig.*,
2006 WL 3030886 (D. Minn. Oct. 16, 2006) ........................................... 7, 10

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlitt
Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013)....................................................... 25

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ................................................................. 26

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004) ....................................................... 20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.,
Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................. 36

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ..................................................................... 37

*City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*,
2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024) ......................................... 25

*City of Plantation Police Officers Pension Fund v. Meredith Corp.*,
16 F.4th 553 (8th Cir. 2021) ............................................................... 19, 21

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015) ....................................................... 10

*Cornelia I. Crowell GST Trust v. Possis Med., Inc.*,
519 F.3d 778 (8th Cir. 2008) ............................................................ 26, 32

*In re Credit Suisse First Boston Corp.*,
431 F.3d 36 (1st Cir. 2005)..................................................................... 36

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
621 F.3d 800 (8th Cir. 2010) .................................................................. 19

*Diehl v. Omega Protein Corp.*,
339 F. Supp. 3d 153 (S.D.N.Y. 2018) ..................................................... 17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................ 6

*In re Eventbrite, Inc. Sec. Litig.*,
2020 WL 2042078 (N.D. Cal. Apr. 28, 2020)......................................... 18

*Ezra Charitable Tr. v. Tyco Int'l, Ltd.*,
466 F.3d 1 (1st Cir. 2006)....................................................................... 36

*In re Fed. Nat'l Mortg. Ass'n Sec. Derivative & "ERISA" Litig.*,
503 F. Supp. 2d 25 (D.D.C. 2007)........................................................... 38

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015).............................................................. 35, 36

*Fla. State Bd. of Admin v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) .................................................................. 27

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018) ..................................................... 29

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019) ................................................................ 11, 12

*Gordon v. Tencent Music Ent. Grp.*,
2021 WL 9183821 (E.D.N.Y. Mar. 31, 2021)........................................................ 10

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
2009 WL 4798148 (D.N.J. Dec. 7, 2009)........................................................ 21

*In re Hutchinson Tech., Inc. Sec. Litig.*,
536 F.3d 952 (8th Cir. 2008) ........................................................ 13, 34

*In re Hutchinson Tech. Sec. Litig.*,
502 F.Supp.2d 884 (D. Minn. 2007)........................................................ 34

*In re Intel Corp. Sec. Litig.*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ........................................................ 20

*In re K-tel Int'l, Inc., Sec. Litig.*,
107 F. Supp. 2d 994 (D. Minn. 2000)........................................................37

*In re K-tel Int'l., Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ........................................................ 26, 33, 37

*In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*,
2014 WL 585658 (S.D.N.Y. Feb. 14, 2014)........................................................35

*Kushner v. Beverly Enters., Inc.*,
317 F.3d 820 (8th Cir. 2003) ........................................................ 3, 16, 17

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................ 10

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) ........................................................ 12

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ........................................................ 9, 10

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788 (D. Minn. 2022)........................................................*passim*

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
716 F.3d 229 (1st Cir. 2013)........................................................ 9

*MathStar, Inc. v. Tiberius Cap. II, LLC*,
    712 F. Supp. 2d 870 (D. Minn. 2010)....................................................... 40

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)................................................................................. 17

*McAdams v. McCord*,
    584 F.3d 1111 (8th Cir. 2009) ............................................................ 6, 10

*In re Medtronic Inc., Sec. Litig.*,
    618 F. Supp. 2d 1016 (D. Minn. 2009)............................................... 19, 26

*Meyer v. Green*,
    710 F.3d 1189 (11th Cir. 2013) ........................................................... 7, 10

*In re Nash Finch Co. Sec. Litig.*,
    323 F. Supp. 2d 956 (D. Minn. 2004)....................................................... 28

*In re Navarre Corp. Sec. Litig.*,
    299 F.3d 735 (8th Cir. 2002) .................................................. 31, 32, 33

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) .................................................................. 38, 39

*In re NVE Corp. Securities Litigation*,
    551 F. Supp. 2d 871 (D. Minn. 2007)................................................... 33, 34

*Okla. Firefighters' Pension and Ret. Sys. v. Capella Educ. Co.*,
    873 F. Supp. 2d 1070 (D. Minn. 2012)...........................................*passim*

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) ....................................................... 8

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................. 8, 9

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*,
    2023 WL 1800963 (D. Ariz. Feb. 7, 2023) ......................................... 38, 39

*Parnes v. Gateway 2000 Inc.*,
    122 F.3d 539 (8th Cir. 1997) .................................................................. 19

*In re Patterson Cos., Inc. Sec., Deriv. & ERISA Litig.*,
    479 F. Supp. 2d 1014 (D. Minn. 2007)......................................... 26, 27, 28

*Perez v. Target Corp.*,
  2024 WL 4804656 (D. Minn. Nov. 15, 2024) ........................................................ 13

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
  11 F.4th 90 (2d Cir. 2021) ................................................................................... 16

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v.*
  *Fairfax Fin. Holdings, Ltd.*,
  886 F. Supp. 2d 328 (S.D.N.Y. 2012) ...................................................................... 7

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  2019 WL 3336119 (D. Minn. July 25, 2019) ......................................................... 24

*Rand-Heart of New York, Inc. v. Dolan*,
  812 F.3d 1172 (8th Cir. 2016) ..................................................................... 6, 7, 10

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-*
  *Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) .............................................................................. 25

*Rochester Laborers Pension Fund v. Monsanto Co.*,
  883 F. Supp. 2d 835 (E.D. Mo. 2012) ................................................................... 21

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................ 39

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000) ................................................................................. 20

*Shoemaker v. Cardiovascular Sys.*,
  300 F. Supp. 3d 1046 (D. Minn. 2018) ............................................................ 11, 12

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007) ................................................................... 22

*In re Silver Lake Grp., LLC Sec. Litig.*,
  108 F.4th 1178 (9th Cir. 2024) ....................................................................... 35, 39

*Singh v. Cigna*,
  918 F.3d 57 (2d Cir. 2019) ................................................................................... 24

*In re Skechers U.S.A., Inc. Sec. Litig.*,
  273 Fed.Appx. 626 (9th Cir. 2008)........................................................................32

*Steamfitters Local 449 Pension & Ret. Sec. Funds v. Sleep Number Corp.*,
  2023 WL 4421688 (D. Minn. July 10, 2023) ........................................................ 28

*In re Stratasys Ltd. S'holder Sec. Litig.*,
  864 F.3d 879 (8th Cir. 2017) .............................................................................. 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................... 6, 26

*Trustees of Welfare and Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*,
  726 F. Supp. 3d 938 (D. Minn. 2024)................................................. 3, 19, 20, 32

*Tyler v. Liz Claiborne, Inc.*
  814 F. Supp. 2d 323 (S.D.N.Y. 2011) ................................................................ 29

*United States v. UnitedHealth Grp. Inc.*,
  630 F. Supp. 3d 118 (D.D.C. 2022)................................................................ 20, 23

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2022) ........................................................................... 31

*Yan v. ReWalk Robotics Ltd.*,
  973 F.3d 22 (1st Cir. 2020)........................................................................... 27, 30

*In re Williams Sec. Litig. WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ........................................................................... 7

## Federal Statutes

15 U.S.C. §78t-1(a) ................................................................................................ 37

15 U.S.C. § 78u-4(b)(2).................................................................................... 6, 26

15 U.S.C. § 78u-4(b)(4) ........................................................................................... 6

## Other Authorities

Fed R. Civ. P. 8 ...................................................................................................... 6

Fed R. Civ. P. 9(b)........................................................................................ 6, 13, 39

Joshua Fineman, *Justice Dept. Starts Monopoly Investigation Into Managed-Care Industry*, Seeking Alpha (July 26, 2023), https://seekingalpha.com/news/3991480-justice-dept-starts-monopoly-investigation-into-managed-care-industry-report ................................... 9

Rebecca Pifer, *DOJ Hits UnitedHealth, Amedisys With Second Request Over $3.3B Deal*, Healthcare Dive (Aug. 11, 2023), https://www.healthcaredive.com/news/unitedhealth-amedisys-second-request-doj/690612/ ....................................................................... 9

## INTRODUCTION[1]

In February 2024, the Wall Street Journal ("WSJ") reported that the Department of Justice ("DOJ") had opened an antitrust investigation into UnitedHealth Group ("UHG"). The article did not claim that UHG had done anything wrong and, a year later, the DOJ has taken no public action in connection with this purported investigation. Nonetheless, a modest stock price decrease followed. On that basis, Plaintiff filed its Complaint. That Complaint fails on multiple independent grounds. First, it fails to show loss causation. Plaintiff puts forward no allegations to connect what it says are UHG's alleged misstatements to the purportedly "corrective" WSJ article about an *antitrust* investigation. Plaintiff variously alleges misstatements about UHG's internal data firewalls and its HouseCalls program for Medicare Advantage ("MA") beneficiaries, but the February 2024 WSJ article did not "correct" any prior alleged misstatements about any of these topics— it did not even mention "firewalls" or "data security," and does not allege any wrongdoing involving HouseCalls. At most, the article left investors to speculate whether at some point in the future, the DOJ might allege an antitrust violation against UHG. That is not a viable theory of loss causation at all, and certainly not when untethered to any alleged misstatements. The PSLRA's heightened pleading requirements demand more, and Plaintiff does not (and cannot) meet them. The Court should follow the many courts in this Circuit dismissing securities claims on loss causation alone.

---

[1] This Motion is brought by Defendants UnitedHealth Group Incorporated, Andrew Witty, and Stephen Hemsley. Defendant Brian Thompson is deceased.

Plaintiff also fails to show falsity. Securities fraud requires a false or misleading statement. Substituting page volume for substance, the Complaint cites an array of irrelevant news articles, obvious puffery, statements that are unassailably true, and statements that are inactionable under the securities laws because they were not directed at investors. Plaintiff generally alleges "illegal" upcoding and anticompetitive conduct, but never specifies the law violated nor the conduct constituting the violation. These allegations fail to satisfy the PSLRA's heightened pleading requirements. Moreover, the Centers for Medicare & Medicaid Services ("CMS"), has consistently found that programs like the one Plaintiff complains about are legal, provide significant benefits to the health care system, and are heavily scrutinized to deter abuse, belying the suggestion that UHG's statements were false or misleading.

Nor does the Complaint satisfy the PSLRA's heightened pleading standards for scienter. Instead of presenting concrete allegations about what Defendants knew or how they were reckless (as required), the Complaint is rife with legally inadequate "must-have-known" allegations based only on status or the nature of the subject matter. Further, Plaintiff's theory that the Individual Defendants made "suspicious" stock sales misreads the record—one that, for instance, shows they *increased* their stock holdings, which is the opposite of selling to profit from alleged fraud.

Finally, Plaintiff fares no better advancing Section 20A claims against two Defendants for insider trading. The claims fail to plead either: (i) an underlying Exchange

Act violation; or (ii) "contemporaneousness," *i.e.,* the legal requirement that Plaintiff purchased stock at a higher price on the same day that a Defendant sold at a lower price.

Plaintiff's claims should be dismissed in their entirety.

**BACKGROUND**

UHG is a health and well-being company whose principal executive offices are in Minnesota. ¶24.[2]  UHG's United Healthcare ("UHC") business is the country's largest health benefits provider. ¶¶2, 29.  UHC participates in MA, a healthcare program where CMS pays insurers a flat rate for each member—adjusted for health risk factors—rather than paying per-treatment. ¶¶47–50.

### 1.      HouseCalls and Chart Reviews

CMS permits MA plans to conduct in-home health clinical visits with members, sometimes referred to as health risk assessments ("HRAs"), describing them as a "tool for early identification of health risks to improve beneficiaries' health outcomes through care coordination." P-Ex. 10 at 23.  CMS understands and acknowledges that these in-home visits may yield diagnoses that increase the adjusted flat rate paid for a particular member. *Id.; see also* ¶51.  UHC's HouseCalls program provides members with in-home clinical visits that include physical exams by Advanced Practice Clinicians ("APCs") and which

_____

[2] "¶" references are to the Supplemental Amended Complaint ("Complaint").  "P-Ex." references are Complaint exhibits.  "D-Ex." references are exhibits to the Declaration of Michael Bongiorno, submitted herewith.  Because D-Ex. exhibits are documents cited in the Complaint and/or filed with the SEC, the Court may consider them as incorporated by reference and/or judicially noticeable. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003); *Trustees of Welfare and Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*, 726 F. Supp. 3d 938, 957, n.7 (D. Minn. 2024).

allow those APCs to identify gaps in care. ¶55. Among other efforts to ensure program integrity, CMS performs Risk Adjustment Data Validation audits on MA plans that measure the accuracy of risk-adjusted diagnoses, including those identified through HouseCalls visits and chart reviews, and uses the results of those audits to identify and recover overpayments. ¶52, P-Ex. 10 at 24.

As Plaintiff admits, neither HRAs nor chart reviews are improper. UHC is "allowed to use" both in-home "[HRAs] and retrospective chart reviews to collect, and submit to CMS, additional diagnoses for risk-adjusted payments that may not have been captured through standard clinic visits." ¶51; *see* P-Ex. 10 at (i). Indeed, OIG and CMS have acknowledged that HRAs "can be used for early identification of health risks to improve enrollees' care and health outcomes," while chart reviews "can be a tool to improve the accuracy of risk-adjusted payments." P-Ex. 10 at 8, 23–24.

Plaintiff claims UHG used HouseCalls and chart reviews to "upcode." *E.g.*, ¶¶54, 79. Plaintiff does not define "upcoding" beyond implying it has something to do with "unwarranted diagnoses codes." ¶6. Nor does Plaintiff distinguish between "upcoding," and what it concedes (¶¶51–52) are permitted chart reviews and HRAs that properly yield additional diagnoses. While Plaintiff alleges, for example, that "between 2019 and 2021, UHG received $10.7 billion from in-home visit diagnoses," it does not allege what portion (if any) it believes was attributable to improper "upcoding," as opposed to permissible diagnoses. ¶65.

4

### 2.    Change Healthcare Transaction

UHG also owns Optum, a health services business.  ¶¶3, 30–31.  In January 2021, UHG announced that Optum would acquire Change Healthcare, a network that processes claims for physicians and pharmacies.  ¶¶96–97.  In February 2022, the DOJ challenged the acquisition, asserting that certain UHG business lines might use Change's data anticompetitively.  ¶¶103–05.  UHG prevailed at trial, with the court finding that the DOJ failed to prove the acquisition would substantially lessen competition because, among other reasons, UHG had policies and incentives to protect information, including with respect to internal firewalls.  ¶¶11, 112.

### 3.    The WSJ Reports a DOJ Antitrust Investigation and UHG's Stock Drop

In February 2024, the WSJ reported that the DOJ had launched an antitrust investigation of UHG in October 2023 but offered few specifics.  ¶¶14, 135.  UHG's stock price subsequently dropped.  ¶¶135–136.  Plaintiff now attributes that drop to a "correction" of alleged misstatements concerning "upcoding," data firewalls, and UHG's code of conduct, notwithstanding that none of those things was mentioned in the article.  A year later, the DOJ has not brought any action against UHG in connection with this purported investigation.

## ARGUMENT

## I.    The Complaint Fails to State a Securities Fraud Claim (Count I)

To plead a claim under Section 10(b) of the Exchange Act, Plaintiff must satisfy Rules 8 and 9(b) and the heightened pleading requirements of the Private Securities

Litigation Reform Act ("PSLRA").  Plaintiff must: (i) identify the statements challenged; (ii) provide a particularized factual basis for falsity and scienter; and (iii) show that the proposed inference of scienter is both cogent and as compelling as competing benign inferences.  Fed R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322–24 (2007).  Plaintiff must also plead that the alleged fraud caused Plaintiff's loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347–48 (2005).  Here, the Complaint fails to plead loss causation, falsity, or scienter.

### A.        The Complaint Fails to Plead Loss Causation

The Complaint's starkest shortcoming is its failure to adequately plead loss causation.  Securities laws protect investors only "against those economic losses that misrepresentations actually cause"; they do not provide "broad insurance against market losses."  *Broudo*, 544 U.S. at 345; *see* 15 U.S.C. § 78u-4(b)(4).  Indeed, a stock's "loss in value can reflect a variety of factors other than [an] earlier misstatement," *McAdams v. McCord*, 584 F.3d 1111, 1114 (8th Cir. 2009), so a plaintiff must "show that the defendant's fraud—and not other events—caused the security's drop in price," *Okla. Firefighters' Pension and Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1085 (D. Minn. 2012).

Here, this requires Plaintiff to identify a "corrective disclosure" that caused a stock drop because it reveals the truth about previous misstatements that artificially inflated the value of the stock.  *See Rand-Heart of New York, Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016).  But "'not every bit of bad news that has a negative effect on the price of a

security necessarily has a *corrective* effect for purposes of loss causation.'" *Id.* at 1180 (quoting *Meyer v. Green*, 710 F.3d 1189, 1202 (11th Cir. 2013)). The corrective disclosure "'***must at least relate back to the [earlier] misrepresentation*** and not to some other negative information about the company.'" *Id.* at 1180 (quoting *In re Williams Sec. Litig. WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)) (emphasis added).

The Complaint alleges only one corrective disclosure: the February 2024 WSJ article (P-Ex. 11). ¶275. The article, however, is not *corrective*. Although it purports to reveal the existence of a DOJ antitrust investigation—and thereby may have caused speculation among some investors—it does not address the fraud Plaintiff alleges and thus could not have "corrected" a prior statement. *See Capella*, 873 F. Supp. 2d at 1085–86 (no loss causation where alleged corrective disclosures "did not mention" that defendant engaged in the alleged wrongful practices); *In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, at *7–9 (D. Minn. Oct. 16, 2006) (no loss causation where alleged collective disclosure "did not disclose the alleged fraud"); *Bajjuri v. Raytheon Tech. Corp.*, 2023 WL 3650554, at *19 (D. Ariz. May 25, 2023); *Boluka Garment Co. v. Canaan Inc.*, 547 F. Supp. 3d 439, 445–46 (S.D.N.Y. 2021); *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings, Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012).

Indeed, the article does not even mention the topics on which the Complaint is built:

- The article *never once references* firewalls, any alleged shortcoming in UHG's data security, or any supposed past misstatement about those topics.

- It does not refer to HouseCalls, much less supply new information correcting a prior misstatement. P-Ex. 11. It makes passing reference to pending inquiries about "Medicare billing issues, including the company's practices around documenting patients' illnesses" (*see* P-Ex. 11 at 3), but does not discuss purported "upcoding" (which is not implied by the generic description "billing issue") or offer any other specifics about what the DOJ was purportedly investigating.

With no connection between the article and HouseCalls or firewalls, Plaintiff cannot plausibly tie the stock drop to the correction of any prior misstatement.

Commentary published after the WSJ article (¶¶275–81; D-Ex. 26–32) confirms that the market did not interpret it as Plaintiff suggests. None of the commentaries suggest that UHG lied in the past, nor do they identify anything new from the article (beyond a reported investigation). The portions of the commentaries Plaintiff quotes *do not even mention* HouseCalls or upcoding (*see* ¶¶275–81), and firewalls are noted only generally in sentences describing a "probe" and containing no new information (¶281). The lack of commentary further evidences Plaintiff's failure to allege adequately loss causation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (relying on analyst coverage to conclude that plaintiff failed to allege corrective disclosure).

Finally, Plaintiff cannot salvage its case by insisting that, because the stock price dropped after the WSJ article, *something* must have been revealed. Of course, something

was revealed—*the purported existence of a DOJ antitrust investigation.*[3]  But that without more does not correct any prior statement about HouseCalls, data firewalls, or UHG's generic antitrust compliance (as required).  *See* ¶279 (citing WSJ headline tying stock drop to *"news that the Justice Department has launched an antitrust investigation"*) (emphasis added); ¶179.  At most, the announcement of an investigation "simply puts investors on notice of a *potential* future" issue, and "any decline in a corporation's share price following the announcement of an investigation can only be attributed to *market speculation . . . .*"  *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (emphasis added).  Such

---

[3] Plaintiff does not even attempt to rule out that the stock price drop could have been the residual effect of UHG's recent disclosure, less than a week earlier, that it suffered an external cyber attack.  ¶¶121–25.  Moreover, Plaintiff ignores multiple public accounts throughout 2023 about a purported DOJ antitrust probe of the managed care sector that highlighted UHG as a potential target, which significantly predated the WSJ article.  *See, e.g.*, Rebecca Pifer, *DOJ Hits UnitedHealth, Amedisys With Second Request Over $3.3B Deal*, Healthcare Dive (Aug. 11, 2023), https://www.healthcaredive.com/news/unitedhealth-amedisys-second-request-doj/690612/; Joshua Fineman, *Justice Dept. Starts Monopoly Investigation Into Managed-Care Industry*, Seeking Alpha (July 26, 2023), https://seekingalpha.com/news/3991480-justice-dept-starts-monopoly-investigation-into-managed-care-industry-report. Accordingly, Plaintiff has failed to "eliminat[e] other possible explanations for this price drop," as required.  *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237–38 (1st Cir. 2013).

speculation "cannot form the basis of a viable loss causation theory." *Id.*; *Meyer*, 710 F.3d at 1201–02 (same, collecting cases).[4]

In sum, Plaintiff fails to plausibly allege it was "fraud—and not other events—[that] caused the security's drop in price." *Capella*, 873 F. Supp. 2d at 1085. This means the claim cannot survive. *McAdams*, 584 F.3d at 1115 (dismissal on loss causation); *Rand-Heart*, 812 F.3d at 1180 (same); *Buca*, 2006 WL 3030886, at *7–9 (same).

### B. The Complaint Fails to Plead Falsity

The Complaint alleges misstatements concerning: (i) HouseCalls (¶¶137–63); (ii) data firewalls (¶¶164–76); and (iii) UHG's Code of Conduct (¶¶177–83). None sufficiently alleges a false statement.

#### 1. HouseCalls

The Complaint challenges Defendants' statements in news articles, on earnings calls, and in SEC filings about HouseCalls and its benefits to patients, asserting that the statements were misleading because they omitted that "upcoding" yielded unsupported diagnoses, increasing MA reimbursement. ¶¶137–63. But Plaintiff fails to distinguish between, on the one hand, lawful conduct that led to increased MA revenue—*i.e.*,

---

[4] Indeed, because an investigation, without more, does not mean that an issuer has violated the law, issuers have no "generalized duty" to disclose the existence of government investigations under SEC regulations. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1,12 (S.D.N.Y. 2016); *see also Gordon v. Tencent Music Ent. Grp.*, 2021 WL 9183821, at *7 (E.D.N.Y. Mar. 31, 2021) (disclosure of Chinese antimonopoly investigation not required because the "existence of an investigation alone does not support an inference that the company 'expected, or reasonably should have expected, that it would later incur fines or liabilities (or both) that would impact its future financial results materially'") (quoting *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 83 (S.D.N.Y. 2015).

10

additional diagnoses generated from lawful HRAs and chart reviews—and allegedly unlawful "upcoding," on the other hand. Plaintiff also challenges statements having nothing to do with "upcoding," or statements so plainly immaterial as to be inactionable "puffery." None of these allegations states a claim.

### a) The Complaint Does Not Allege an Illegal Upcoding Scheme

Plaintiff alleges that "Defendants formulated, implemented, and oversaw an illegal, company-wide upcoding gambit" that resulted in "unsupported diagnoses of serious and chronic medical conditions . . . to boost Medicare Advantage payments from CMS." ¶¶5, 163(a). According to Plaintiff, any statement made over a three-year period about HouseCalls was rendered false or misleading by failure to disclose the "illegal" scheme. ¶¶5, 163.

These allegations are fundamentally defective because the Complaint does not allege with particularity the existence of a companywide "illegal" upcoding scheme. ¶¶47–95. Where, as here, "a § 10(b) claim is predicated on illegal conduct, then the complaint must allege conduct that if true would be illegal." *Shoemaker v. Cardiovascular Sys.*, 300 F. Supp. 3d 1046, 1053 (D. Minn. 2018); *see also Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019) ("[W]hen a complaint claims that statements were rendered false or misleading through the nondisclosure of illegal activity, the facts of those underlying illegal acts must also be pleaded with particularity.").

Thus, Plaintiff was required to (1) identify the underlying statutory violation and (2) allege, with particularity, facts satisfying its elements. *Shoemaker*, 300 F. Supp. 3d at 1053

(requiring plaintiff to allege elements of anti-kickback violation where violations were basis for fraud claim); *Gamm*, 944 F.3d at 465 (requiring plaintiff to plead the "basic elements of an underlying antitrust conspiracy"). Plaintiff does not attempt to do either.

### b) Plaintiff Has Not Pled A Companywide Improper Scheme

Plaintiff also fails to plead a *company-wide* scheme as would be necessary to render the challenged statements—which concern HRAs or HouseCalls generally—false or misleading. *Shoemaker*, 300 F. Supp. 3d at 1053–55. It largely cites news reports containing anecdotes about a few patient visits and criticizing certain diagnostic devices.[5] Many of those accounts are unsourced or anonymous. ¶¶17, 69, 72, 80–82, 247, 249. Although securities plaintiffs need not name their sources, to pass muster under the PSLRA and Rule 9(b), they must be corroborated by "independent factual allegations," or their "'positions and/or job responsibilities … described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations.'" *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 804 (D. Minn. 2022) (quoting *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798 (S.D.N.Y. 2020)); *see, e.g.*, P-Ex. 3 (claims from unidentified "former doctors and employees at [UHG] medical practices"); P-Ex. 4 (interviews with unidentified UHG-affiliated clinicians and patients). That these sources are reported in news articles does not make them reliable.

---

[5] There is no indication in the Complaint that Plaintiff communicated with any of the sources cited in the publicly available articles or made any other attempt to independently investigate and verify its claims. For example, it does not cite a single confidential witness or internal document.

12

Moreover, those accounts fail to demonstrate the "widespread misconduct" Plaintiff alleges. ¶240. At most, they describe isolated instances of alleged inaccuracies, pressure to find diagnoses, or qualms with specific procedures and applications. They make no effort to quantify how often such alleged incidents occurred or demonstrate any illegality. *See, e.g.*, ¶¶61 (criticism that software offers suggestions of diagnoses without any analysis about rate at which suggestions were used or corresponding accuracy), 63 (unsourced anecdote that quality assurance reviewers pushed nurses to maximize diagnoses), 64 (anecdote of purportedly inaccurate diagnosis of one patient), 69–74 (criticism of diagnostic test for peripheral artery disease and anecdotes of inaccurate diagnoses without broader assessment of accuracy), 82–83 (anecdotal account of meeting in which nurses were allegedly "coached" to add diagnoses).

Plaintiff cannot use a handful of isolated incidents to establish a company-wide scheme, as this Court has held. *See In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 959–60 (8th Cir. 2008) ("anecdotal" accounts about specific customer transactions "with no historical context" insufficient to support allegation that earnings were overstated); *Perez v. Target Corp.*, 2024 WL 4804656, at *11 (D. Minn. Nov. 15, 2024) (anonymous recounts of instances of markdowns of overstocked products that "say nothing of magnitude or degree" insufficient to support inference that markdowns would materially harm defendant's operations). Nor is it even clear which conduct described in each article is supposedly improper. For example, Plaintiff references a March 2024 article that purports to describe a January 2024 meeting between Optum executives and other

13

healthcare professionals for the Optum Tri-State/Optum East Organization. ¶82; P-Ex. 8. According to the article, the "purpose of the meeting was to counsel nurses on how to incorporate additional medical conditions…from existing data on patient charts." *Id.* Far from demonstrating a widespread improper scheme, taking its reporting at face value, this article (1) relates only to the Optum Tri-State/Optum East Organization; and (2) admits that the purpose of the meeting was lawful—as Plaintiff concedes, diagnosis codes may lawfully be added through chart reviews. ¶51.[6]

### c) The OIG Reports Cannot Support the Complaint's Allegations Of "Widespread" Misconduct

The Complaint relies heavily on a (publicly available) 2021 OIG report about risk adjustment in MA (the "2021 OIG Report") to suggest that UHG engaged in misconduct relating to its use of chart review and HRAs. *See, e.g.,* ¶¶91–94, 138, 143, 212. But this report does nothing to support Plaintiff's claims. First, the 2021 OIG Report is based on ***data from 2016***—five years before the putative class period. P-Ex. 9. Data from 2016 says nothing about conduct occurring in 2021 and cannot have rendered statements beginning in 2021 misleading. *Capella*, 873 F. Supp. 2d at 1082 (misconduct prior to class period irrelevant to allegations during class period). Second, beyond the temporal disconnect, the 2021 OIG Report fails to demonstrate the purportedly "widespread" misconduct alleged in the Complaint. Rather, the 2021 OIG Report reaches two

---

[6] Certain of these anecdotal sources also pre-date the class period and therefore do not demonstrate what occurred *during* the class period. *See, e.g.*, ¶¶267–71 (describing August 6, 2014 whistleblower case), 253–56 (recounting anonymous accounts and criticism regarding certain AIDS and HIV diagnoses pre-dating class period).

unremarkable and innocuous conclusions: (1) some companies received payments from diagnoses reported only on chart reviews and HRAs and not other service records—which is lawful—and (2) those payments were concentrated among the top 20 MA companies analyzed, of which UHG was one. *See* P-Ex. 9; ¶¶212, 138. The report does ***not*** conclude that any diagnoses were inaccurate, much less that UHG was systematically and intentionally submitting inaccurate diagnoses. Indeed, in response to this report, CMS— the regulator responsible for oversight of the MA program—defended the very practices the OIG suggests were at issue:

> HRAs are a tool for early identification of health risks to improve beneficiaries' health outcomes through care coordination. Physicians or other health care professionals conduct HRAs to collect information from beneficiaries about their health status, health risks, and daily activities. In the MA program, HRAs are either a part of annual wellness visits or conducted during other visits in non-clinical settings. MAOs [Medicare Advantage Organizations] may submit diagnoses documented in HRAs for risk adjustment.
>
> * * *
>
> Chart review records are a type of Medicare Advantage encounter data. They allow MAOs to submit diagnosis codes for risk adjustment that were not reported on the record that was submitted to report the encounter. That typically occurs because the data used to report the encounter was taken from a claim that a provider submitted to the MAO. Such a claim would not necessarily include all the diagnoses documented in the medical record during the respective encounter. While MAOs are required to submit all encounters to CMS, chart review records are intended for the submission of additional diagnosis codes submitted for risk adjustment.

P-Ex. 9 at 19–21 ("HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program."). CMS also noted that it has numerous measures already in place to ensure that HRAs and chart review are used appropriately, including

15

audits, documentation requirements, issuance of guidance and FAQs, and consistent monitoring. *Id.* at 20–22.

Plaintiff further alleges that a 2024 OIG report "confirms [UHG]'s upcoding scheme continued through 2023 and that [UHG] was paid billions in improper payments in 2023." ¶¶257–62. The 2024 OIG Report suffers from the same infirmities as the 2021 OIG Report. Moreover, while the OIG recommended in 2024 that CMS "restrict the use of diagnoses reported only on in-home HRAs or chart reviews linked to in-home HRAs for risk-adjusted payments," *CMS rejected that recommendation*, pointedly noting that it "conducted medical record reviews of the diagnoses that came from visits that may have contained an HRA," and therefore "ha[d] not concluded that these diagnoses are not accurate." P-Ex. 10 at 10, 25. In other words, *CMS rejected the very inference Plaintiff asks this Court to make*—*i.e.*, that all diagnoses that are the product of HRAs are improper.

Finally, given that CMS has not taken any action against UHG notwithstanding the two reports, UHG's denials of wrongdoing or assertions that its program is "transparent and compliant with CMS rules" are not misleading by omission and, in fact, consistent with statements made by CMS. ¶¶95, 139. In any event, an issuer does not have a duty to accuse itself of unadjudicated, uncharged misconduct. *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 11 F.4th 90, 98 (2d Cir. 2021). In *Kushner v. Beverly Enterprises, Inc.*, 317 F. 3d 820, 831 (8th Cir. 2003), the court reasoned that such "soft" information must be disclosed only if "virtually as certain as hard facts." Because "the

16

hard fact is that no regulatory action was initiated during the Class Period," there was no duty to disclose any underlying conduct. *Id.*

In sum, the Court should dismiss all allegations regarding "upcoding" for failure to allege any widespread misconduct that would render the challenged statements false or misleading.

### d)  Statements Untethered to the Alleged Upcoding

Many challenged statements are also inactionable under the securities laws because they have nothing to do with allegedly improper "upcoding."  Section 10(b) does not create a generalized duty to disclose all material information; rather, a duty arises only when there is a sufficient nexus between a statement and omitted matter, such that without the latter, the former misleads investors.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (disclosure only required to make statements, in "light of the circumstances under which they were made, not misleading"); *Capella*, 873 F. Supp. 2d at 1080 (recruitment practices "too tenuous a connection to render [] statements regarding [] financial success misleading"); *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 166 (S.D.N.Y. 2018) (no duty to disclose given no "nexus between [] statements" about financial results "and the omission of [] illegal conduct").

Plaintiff challenges numerous statements that have no connection to (and imply nothing about) any improper "upcoding," including: statements about revenue, ¶¶145, 150, 159; a series of generic true statements about MA, CMS, and HouseCalls, ¶¶148 (premiums from CMS vary based on geography, demography, and health), 156 ("we continue to

17

expand the range of clinical services we provide via our HouseCalls initiative"); and statistics regarding HouseCalls visits, ¶¶149, 155, 158, 160, 161, 162.

Plaintiff does not challenge the veracity of any of these statements. And the alleged omission—that some unspecified number of HouseCalls visits yielded allegedly improper "upcoding"— "bear[s] no connection to the substance of the statement[s]." *See In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at \*13 (N.D. Cal. Apr. 28, 2020); *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statements inactionable because they did not "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]").

### e) Puffery

Finally, Plaintiff challenges statements concerning HouseCalls that are vague, positive characterizations such as: "provide significant benefits to seniors," "valuable offerings," "best practice," "help seniors in Medicare Advantage programs," "help seniors … stay healthy," "super impressed," "encouraged," "pleased," "impressed," "drive value," "amazing health assessment and preventative direction," "helping seniors live healthier lives," "nice job," and "the backbone of a home and community-based program that brings more value to the system." ¶¶139–40, 144, 146–47, 149, 151–53, 185–88; *see also* ¶¶142 ("essential part of encouraging the right incentives"), 154 (HouseCalls is "very important for us in getting them the care they need"), 155 ("House[Calls] has been the centerpiece of our home care model for government programs for years."), 158 ("continued to enhance our offerings, focusing on more digital and physical care resources in the home").

18

Not only does Plaintiff fail to explain with any specificity why these statements are false, they are also inactionable puffery, *i.e.,* vague statements upon which "no reasonable investor" would rely.  *Parnes v. Gateway 2000 Inc.*, 122 F.3d 539, 547 (8th Cir. 1997). They are "no more than [] 'promotional phrase[s] used to champion the company…devoid of any substantive information.'"  *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009), *aff'd sub nom. Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010); *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) (descriptions of strategies being "proven" and company occupying an "industry-leading position" inactionable); *Trustees of Local 464A*, 726 F. Supp. 3d at 969 (statements that business was "a priority," defendants were "excited about" "most important product" and "important catalyst" were all inactionable puffery).  Because "[n]o reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market," any claims with respect to them should be dismissed.  *Parnes*, 122 F.3d at 547.

### 2.    Data Firewalls

Plaintiff next challenges statements related to UHG's internal data firewalls, alleging they were misleading because UHG took insufficient measures to prevent employees from accessing competitively sensitive data.  ¶¶164–76.

Plaintiff's allegations here have not only been rejected by a federal court when raised by the DOJ, but they are also inactionable under the securities laws because the statements were not directed at investors.  Section 10(b) incorporates an "in-connection-

19

with" requirement that limits claims to statements "disseminated to the public in a medium upon which a reasonable investor would rely." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 176 (3d Cir. 2000); *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *11, n.14 (N.D. Cal. Mar. 29, 2019) (advertising not "directly targeted to investors or the investment community"); *Bien v. LifeLock Inc.*, 2015 WL 12819154, at *9 (D. Ariz. July 21, 2015) (advertising not reasonably calculated to influence investing public). This rule disposes of several challenged statements:

- Plaintiff challenges sentences from UHG's *internal* firewall policy. ¶168. There is no allegation this policy was publicly disseminated. Plaintiff apparently lifted the challenged language from the court opinion in the DOJ litigation. *United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 146 (D.D.C. 2022) (quoting policy). Thus, the policy is not a statement directed at investors.[7]

- Several challenged statements are from *litigation filings* in the DOJ lawsuit. ¶¶166 (UHG Answer); 171 (pretrial brief); 172 (post-trial brief); 173 (proposed findings). Litigation filings are statements to the court, not to investors.

---

[7] In any case, a firewall policy cannot reasonably be understood as a guarantee against every risk. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376–77 (S.D.N.Y. 2004) (risk-management policies not misleading because they "did not purport to guarantee that Citigroup would not expose itself to risks").

The remaining challenged statements appear in a "fact sheet" related to the DOJ litigation (¶165), web postings (¶167), Sustainability Reports (¶¶169–70) or investor conference materials (¶174). The challenged language largely contains inactionable, generic descriptions of data security measures that communicate no specific information, such as statements using vague superlatives like "best-in-class," "robust," "advanced and sophisticated," "long-established," "exploiting the core synergy…as much as we possibly can appropriately," and "invests extraordinary time, money, and resources." ¶¶164–67, 169, 171–75, 214. These are puffery. *See, e.g., Meredith*, 16 F.4th at 557; *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (descriptions of product as offering "unmatched speed, reliability, quality, and connectivity" inactionable).

Plaintiff also challenges general statements that UHG was "focused" on and "committ[ed] to" maintaining data privacy. ¶¶169–70. Again, Plaintiff fails to show that that these statements were untrue, but they are also inactionable puffery. *See Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 882 (E.D. Mo. 2012) (statement that issuer was "committed" to reaching profitability goals was puffery); *In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *5 (D.N.J. Dec. 7, 2009) (statement that company "place[d] significant emphasis on maintaining a high level of security" not rendered misleading by data breach).[8]

---

[8] Plaintiff also appears to challenge statements that UHG was "required" or had an "obligation" to maintain firewalls. ¶169. But Plaintiff fails to articulate how such statements were false or misleading, particularly insofar as the Complaint itself acknowledges the existence of such requirements. ¶175 (asserting that Witty "acknowledged the Company's firewall requirements").

Moreover, Defendants' statements about data firewalls were not false. The Complaint acknowledges that UHG had both a firewall policy (¶168) and software-based security measures in place. *See, e.g.,* ¶119 (describing additional security measures taken). The Complaint criticizes "technical" areas where various software allegedly was not "sufficient" to prevent employees in competing business lines from accessing data (¶176). But there is no allegation that employees misused data. Plaintiff's claim thus collapses into the proposition that Defendants needed to disparage the sufficiency of their security measures, even in the absence of any actual misuse. But the "securities laws neither require corporate officers to adopt a crabbed, defeatist view of the company's business prospects nor permit dissatisfied shareholders to assert serious allegations of fraud based on the perfect hindsight afforded by the passage of time." *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007).

Finally, Plaintiff tries unsuccessfully to bolster the firewalls claim by citing evidence that Plaintiff claims reflect inadequate data security. ¶¶204–10. The assertions are based on misleading partial quotations and distortions of materials from the DOJ antitrust trial (which UHG won). For example, the Complaint selectively quotes testimony of Peter Dumont, UHG Chief Data Governance Officer, to suggest he "admitted" data security was inadequate. ¶¶204, 208. But, in the portion Plaintiff strategically omits, Dumont explained that "barely a dozen" employees out of approximately 350,000 even had access to the data in question, and that UHC determined through review of access logs and interviews that *none* accessed the data. D-Ex. 12 at 42:24–44:9. The Complaint also

22

falsely asserts that Dumont testified that "in a 'very, very concerning' prior incident" UHC employees "'access[ed] their competitors['] data.'" ¶208. Plaintiff is quoting *questions* posed to Dumont. D-Ex. 12 at 64:7–70:25.

Indeed, after that two-week trial, which focused intently on the existence and enforcement of firewalls at UHG (and the very evidence Plaintiff cites), the court found that UHG had robust policies and incentives for maintaining proper firewalls, and "has developed a corporate culture consistent with upholding [the] trust" of payers and providers that their data will be protected. *United HealthGroup*, 630 F. Supp. 3d at 145. It held "the evidence does not reflect a single instance in which these firewalls have been breached." *Id.* at 146.

Plaintiff also posits that a 2021 internal audit provided "clear notice of … data governance failures." ¶ 209. Plaintiff uses bold italics to quote a "Needs Improvement" finding (*id.*) while choosing to avoid quoting the full finding: "[N]eeds a moderate level of improvement. The combination of severity of observations and impact to UHG enterprise ***are not significant***." D-Ex. 13 at 7 (emphasis added). Moreover, Witty did not merely respond to the audit with "a lot to do here" as suggested by the Complaint (¶ 210); he directed, "when you are ready would appreciate a review with you and the right team." D-Ex. 14.

In ¶ 207, Plaintiff selectively quotes an internal email (without making clear what is being quoted) and asserts it shows that "UnitedHealth frequently authorizes access to payer data." In fact, far from evidencing "frequent" access, the email (D-Ex. 11) states

23

that although "a few" users within UHC had access to Optum Rx data, it had *not* been determined that the access was inappropriate. *See* D-Ex. 11.[9]

Last, the Complaint resorts to pejoratively describing an irrelevant *external* cyber-attack, of which Change Healthcare was the *victim*, which Plaintiff suggests in some generic way shows inadequate security. ¶¶121–25. The Complaint draws no connection— there is none—between this *external* hack and the *internal* data firewalls Plaintiff puts at issue in this case.

Thus, the Court should find that the challenged statements concerning data firewalls are inactionable as a matter of law.

### 3. The Code of Conduct

Plaintiff also claims that sentences from UHG's Code of Conduct (D-Ex. 25) are false. ¶¶177–83. A code of conduct that "simply tout[s] compliance with 'all laws and regulations'" or "merely aspires to be 'open, honest, and direct in all our dealing,' or something similarly fuzzy," is inherently aspirational and inactionable because a reasonable stockholder would not rely on it. *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2019 WL 3336119, at \*15–16 (D. Minn. July 25, 2019); *Singh v. Cigna*, 918 F.3d 57, 61–63 (2d Cir. 2019) (code of ethics that stated "it's so important for every employee…to

---

[9] The materials discussed in ¶¶204–10 in addition to being distortions are irrelevant because they are all from the period *prior to* the Change acquisition and *prior to* the class period. Moreover, to the extent they were publicly used in the trial, their contents could not have been "revealed" by the 2024 WSJ article.

handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations" was inactionable).[10]

UHG's Code of Conduct is inactionable under the securities laws. Plaintiff cites passages stating that UHG seeks competitive advantages "only through legal and ethical business practices" (¶179), requires employees to "deal fairly" with various constituencies (¶180), requires the protection of sensitive information (¶181), and articulates legal compliance as one of its "core values" (¶182). Courts routinely find these aspirational generalities inactionable. Treating them as actionable would "render every code of ethics materially misleading whenever an executive commits an ethical violation following a scandal." *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlitt Packard Co.*, 964 F. Supp. 2d 1128, 1140 (N.D. Cal. 2013). That is not the law. *See Retail Wholesale*, 845 F.3d at 1276; *Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2024 WL 4023842, at *3 (2d Cir. Sept. 3, 2024).

Further, the Code of Conduct cannot possibly support a claim alleging that any code provision was rendered false because UHG was allegedly "using Optum's dominance in the provider market to engage in anti-competitive practices designed to monopolize local primary care provider markets." ¶183(d). Plaintiff cannot generally make speculative

---

[10] *See also Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (code of conduct contained "no objectively verifiable statements" and was therefore "inherently aspirational" and inactionable); *City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, 2024 WL 4349289, at *5 (S.D.N.Y. Sept. 30, 2024) (code of conduct with "generic" statements that do not invite "reasonable reliance" inactionable).

antitrust accusations as a predicate for securities fraud.  Rather, Plaintiff is required to allege each element of a specific antitrust claim, with particularity.  *See supra* Part I.

### C.        The Complaint Fails to Plead Scienter

Next, the Complaint fails the heightened requirement in the PSLRA—among the highest in American civil law—that Plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 243 (8th Cir. 2008) (quoting 15 U.S.C. § 78u–4(b)(2)).  It is "not sufficient for the facts alleged to give rise to a weak or plausible or even reasonable inference of scienter"; the inference "must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Id.* at 244 (quoting *Tellabs*, 551 U.S. at 314 (2007)).  A strong inference of scienter must be alleged as to each individual defendant. *In re Patterson Cos., Inc. Sec., Deriv. & ERISA Litig.*, 479 F. Supp. 2d 1014, 1028 (D. Minn. 2007).  A failure to plead a strong inference of scienter as to the Individual Defendants forecloses corporate scienter. *See Medtronic*, 618 F. Supp. 2d at 1035.

A Complaint pleads scienter through particularized "facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud." *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).  Defendants act with scienter if their statements present "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *In re K-tel Int'l., Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002) (internal citations omitted).  As for motive, "when the complaint does not show motive and opportunity of any sort—either

26

the … heightened motive … or even an everyday motive … then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard." *Fla. State Bd. of Admin v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir. 2001).   Because the Complaint cites no particulars regarding Individual Defendants' knowledge or state of mind, and fails to demonstrate motive, it falls woefully short of meeting this standard.

### 1.   HouseCalls

Notwithstanding 123 pages of allegations and 11 exhibits, the Complaint contains *no* particularized allegation that any Individual Defendant had any knowledge concerning an "upcoding scheme."   There is not a single email, witness statement, or anything else implicating any Individual Defendant.  *See Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 40 (1st Cir. 2020) (noting that complaints satisfying the PSLRA "often contain[] clear allegations of admissions, internal records or witnessed discussions" demonstrating scienter).  That is dispositive, and none of Plaintiff's allegations can fill the void.

*First*, the Complaint alleges that Witty and Thompson "must have known" about upcoding because they commented generally about HouseCalls on several occasions. ¶¶184–89.  But Witty and Thompson's quoted comments about HouseCalls are generic and say nothing remotely related to "upcoding" or the specifics of patient diagnoses.  ¶¶185–88; *see Patterson*, 479 F. Supp. at 1025-26, 1032–34 (no scienter where plaintiff pleaded only "generalized allegations that defendants communicated with each other and

27

[management] about the company's status" in addition to limited information provided by confidential informants).[11]

*Second,* Plaintiff alleges that "the upcoding scheme required participation throughout the company." ¶¶190–96. But this is just another "must have known" allegation, and critically, the Complaint does not allege any Individual Defendant's "participation" as required. *See Patterson*, 479 F. Supp. 2d at 1032–33 ("generalized allegations" or "blanket assertions of knowledge" do not establish "an inference that any defendant acted with an intent to defraud the market"); *see also In re Nash Finch Co. Sec. Litig.*, 323 F. Supp. 2d 956, 962 (D. Minn. 2004). Plaintiff's generalized allegations based solely on media reporting cannot fill this gap. They are vague at best as to timing, based on purported comments by low-ranking and often anonymous employees, many layers removed from top management, and unsupported by any suggestion that the sources had any insight into what the Individual Defendants knew. *See, e.g., Steamfitters Local 449 Pension & Ret. Sec. Funds v. Sleep Number Corp.*, 2023 WL 4421688, at *11–12 (D. Minn. July 10, 2023) (dismissing with prejudice for failure to plead facts giving rise to strong inference of scienter).

*Finally*, Plaintiff alleges that Defendants must have known about an upcoding scheme because upcoding supposedly "represents a central part of UnitedHealth's business" and $8.7 billion in revenue came from diagnoses without treatment. ¶190; *see*

---

[11] Plaintiff's flawed logic would eliminate scienter as a distinct element of Section 10(b). If the fact of a statement permits an inference of scienter, then scienter would always be present.

*also* ¶¶191–96.  This appears to be Plaintiff's attempt to invoke the so-called "core operations" doctrine.  But the Eighth Circuit has not adopted this doctrine. *See In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *21 (D. Minn. Sept. 30, 2021).  Moreover, the alleged upcoding cannot be considered a "core operation" because those alleged payments (none of which has been shown to be improper) comprised just 3% of UHG's overall 2021 revenue of $287.6 billion.  *See* ¶ 163 ($8.7B in CMS payments); D-Ex. 1 at 41 (2021 revenue of $287.6 billion).[12]  Jurisdictions that have adopted the core operations doctrine "have required that the operation in question constitute nearly all of a company's business before finding scienter." *Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (quoting *Tyler v. Liz Claiborne, Inc.* 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011)); *Tyler*, 814 F. Supp. 2d at 343–44 (16% not enough).  That is not the case here.

Thus, nothing in the Complaint comes close to establishing that the Individual Defendants knew of any improper "upcoding scheme."

### 2.    Data Firewalls

The Complaint's scienter allegations with respect to data firewalls likewise fall short of PSLRA pleading standards.

First, the Complaint lacks particularized allegations that any Individual Defendant had any relevant knowledge—not a single document, email, or witness statement connects

---

[12] Plaintiff repeatedly and disingenuously suggests that this $8.7 billion represents 50% of the Company's net income for 2021 (*see* ¶¶ 89, 163, 183, and 256).  But that $8.7 billion is alleged to be *revenue*, not income.

any fraudulent scheme with respect to firewalls to any Individual Defendant. *See Yan*, 973 F.3d at 40. Indeed, there is no allegation that any Individual Defendant had *any* involvement with firewalls, or any explanation why high-level executives would focus on the particulars of day-to-day IT security issues.

The absence of particularized allegations speaks volumes because Plaintiff tries mightily to find wrongdoing by mining the record of the Change Healthcare trial. ¶¶197–210. If there were fraud concerning firewalls, the trial record would be a treasure trove. Yet, Hemsley and Thompson *are not even mentioned* in anything Plaintiff cites. *See* ¶¶197–210. Witty is cited only as receiving a single audit report concerning data firewalls and as the recipient of an email that did not even mention firewalls. ¶¶202, 209–210; D-Ex. 13, D-Ex. 14, D-Ex. 23. Neither supports scienter. Plaintiff selectively quotes (¶209) from the audit report to avoid apprising the Court of the overall finding that the "combination of severity of observations and impact to UHG enterprise **are not significant**." D-Ex. 13 at 7 (emphasis added); *see also supra* Part I.B.2 (discussing audit report). This is hardly evidence of Defendants' participation in fraud.

Second, the "memorandum" discussing "Enterprise thinking" that Plaintiff quotes from the DOJ antitrust trial cannot support scienter regarding firewalls because it does not implicate any Individual Defendant. ¶201. This document is a compilation of anonymous survey responses, and the quoted material is a response by someone who is only identified by their SLT "grade level." D-Ex. 24 at 58. There is no indication that Individual Defendants even *saw* the survey response.

30

Further, an inference of scienter makes no sense as applied to firewalls. The Complaint quibbles with "technical" (Plaintiff's term, *e.g.,* ¶114) aspects of whether various software was "sufficient[ly]" configured to restrict potential unauthorized access among employees. *See, e.g.,* ¶116 (alleging that software was not configured with "sufficient" "role-based security protocols"). But the Complaint supplies no basis to infer that the CEO or Board Chair of one of the world's largest companies was mired in the details of software "protocols." And, if a software deficiency became known to an Individual Defendant (of which there is no particularized allegation), why commit fraud for no benefit whatsoever? Why not just fix it? The far more cogent inference is that UHG had security protocols in place; that, as the court in the antitrust trial found, UHG leadership had established a corporate culture consistent with adhering to those protocols; and that the technical adequacy of those protocols was outside the purview of the Individual Defendants.

### 3.    Stock Trading

Plaintiff next attempts to allege scienter by asserting that each Individual Defendant made "suspicious" stock sales. ¶¶211–23. However, "insider stock sales are not inherently suspicious; they become so only when the level of trading is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002) (quoting *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1092 (9th Cir. 2022)). Here, the record confirms that the trading was not suspicious.

31

***First,*** the Individual Defendants each *increased* their overall UHG stock holdings over the class period, which "weakens the allegation of suspicious insider trading." *3M*, 2021 WL 4482987, at \*18; *Possis Med.*, 519 F.3d at 783.[13]  If the objective was to dump stock to avoid losses, the last thing they would do is *increase* holdings.

***Second***, the trades at issue were not in quantities sufficient to be suspicious.  Witty sold 13% of his holdings.  D-Ex. 19, D-Ex. 20.   Thompson sold 31.4% of his holdings.  ¶221.  Hemsley sold 21.4% of his holdings.  ¶220.  Courts hold that these percentages are too low to be suspicious.  *3M*, 2021 WL 4482987, at \*18 (citing *Navarre*, 299 F.3d at 747 (sale of 32% of an insider's holdings insufficient)); *see*, *e.g.*, *In re Skechers U.S.A., Inc. Sec. Litig.*, 273 Fed.Appx. 626 (9th Cir. 2008) ("This court has not generally inferred scienter from sales [of up to 42%.]").

***Third***, the sales were submitted for preclearance by UHG legal, hardly the action of fraudsters trying to profit from improper insider trades.  *See* D-Ex. 32 ("[UHG] said officers and directors must get clearance to trade shares, and that trading is limited to certain windows that often open after earnings reports. The trades in question were approved, a spokesperson said.").

***Fourth***, Plaintiff cannot show that the sales deviated from historical trading patterns.  *See Trustees of Local 464A*, 726 F. Supp. 3d at 990 (citing *Navarre*, 299 F.3d at

---

[13] Hemsley increased his holdings from 621,952 shares, D-Ex. 15, to 635,812 shares, D-Ex. 16; Thompson increased his holdings from 17,388 shares, D-Ex. 17, to 32,810 shares, D-Ex. 18; and Witty increased his holdings from 70,936 shares, D-Ex. 21, to 96,819 shares, D-Ex. 22.

747); *K-tel Int'l*, 300 F.3d at 896 ("The Class failed to allege the prior history of sales for the defendants or even the number of shares held by each.... Therefore, the Class *failed to allege facts to show the trading activity was unusual or how it was unusual*.") (emphasis added).

In a misleading attempt to cast the class period trading as unusual, the Complaint purports to compare it with trading during an artificial "Control Period" prior to the class period. ¶¶215, 213, n.24. No authority compels this analysis, and no factual allegations show why comparing those periods is apt. Even this invented "Control Period" comparison backfires. For example, Hemsley's benign "Control Period" sales (373,228 shares from May 11, 2020 through October 23, 2020, D-Ex. 2, D-Ex. 3, D-Ex. 4) nearly equal his "suspicious" class period sales—a problem Plaintiff is forced to handwave away by speculating the "Control Period" selling was due to the "financial market's 'epic rebound'" following the COVID outbreak in March 2020. ¶213, n.24. The reality is that there was no deviation from historical trading patterns, which *undermines* scienter.

***Finally***, none of the trades was suspicious in timing. *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 889–90 (D. Minn. 2007) (trades early in class period and months before stock peak not suspicious). Indeed, the majority of trades Plaintiff cites took place months, if not *years*, before the WSJ article, undercutting scienter:

- *October 2021 Trades (Hemsley)*: Hemsley sold 125,000 shares on October 25 and 26, 2021. ¶213; D-Ex. 33. The Complaint criticizes him for doing this *after* the publication of an allegedly negative OIG report. ¶¶212–13. But trading *after* news comes out is the

opposite of insider trading. *See In re Hutchinson Tech. Sec. Litig.*, 502 F.Supp.2d 884, 900 (D. Minn. 2007), *aff'd,* 536 F.3d 562 (8th Cir. 2008). Moreover, if the goal was to use non-public information to profit, Hemsley's trading was irrational—the stock price rose approximately $100 after his sales, "a fact which undercuts any inference of scienter." *Hutchinson Tech*, 536 F.3d at 901; *NVE Corp.*, 551 F. Supp. 2d at 889–90.

- *July 2022 Trades (Hemsley and Witty):* On July 18, 2022, Witty sold 11,000 shares. ¶¶215; D-Ex. 20. Hemsley sold 99,000 shares on July 26, 2022. ¶216; D-Ex. 5. These trades were supposedly "suspicious" because the DOJ antitrust trial was slated to begin on August 1, 2022. ¶214. Putting aside that UHG *won* that trial, Plaintiff fails to explain why they would have anticipated a loss, much less that in the overall context of UHG's operations, a loss would result in a significant stock price drop. This is a contrived, post-hoc explanation for two innocuous sales.

- *October 17, 2023 & December 5, 2023 Trades (Hemsley)*: Hemsley sold 121,515 shares on October 17, 2023, and 66,081 shares on December 5, 2023, which Plaintiff asserts is after the DOJ began its antitrust investigation. ¶¶218-19; D-Ex. 6, D-Ex. 7. Plaintiff fails to allege, however, that Hemsley had any reason to believe reporting on the purported investigation could have a dramatic stock price effect at some unspecified future date. UHG is a very large company that regularly discloses that it is subject to government investigation (including by the DOJ). *See, e.g.*, D-Ex. 9 at 12 ("The Company has been involved or is currently involved in various governmental investigations…. These include routine, regular and special investigations . . . by . . . the U.S. Department of Justice

34

(DOJ)."); D-Ex. 10 (same); *see In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1193–94 (9th Cir. 2024) (dismissing because fact of company's meeting with regulator was not material).

- *February 16, 2024 Trade (Thompson)*:  Thompson sold 29,000 shares on February 16, 2024, before the WSJ article regarding the purported DOJ investigation was published. ¶221.  But there is no allegation that Thompson knew the article was coming.  The sale was also small and obviously benign:  he was simultaneously exercising stock options (*i.e., increasing* holdings) and most of the sale was to cover exercise costs or taxes.  D-Ex. 8 (exercising options for a total of 82,348 shares, including sales of 59,490 shares for taxes or exercise costs); *see In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *13 (S.D.N.Y. Feb. 14, 2014) (sales to cover tax obligations not indicative of fraud).

### 4.    Miscellaneous Allegations

Unable to plead any Individual Defendant's knowledge of alleged fraud, the Complaint raises two additional topics, neither of which adds to any inference of scienter.

*First*, the Complaint cites various UHG regulatory matters going back nearly 20 years (¶¶230–38), apparently to suggest UHG is a bad actor.  However, the cited matters—in addition to being factually irrelevant—did not involve accusations or findings of fraud, nor did they involve the Individual Defendants.  Further, generic "propensity" allegations do not support scienter.  *See Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 245 (1st Cir. 2015) (CW allegations that company acted improperly failed to demonstrate that statements about company policy and regulator inquiries were made

35

with scienter); *Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1, 10 (1st Cir. 2006) ("It is ordinarily not sufficient to conclusorily allege 'an overarching fraudulent scheme or corrupt environment.'") (quoting *In re Credit Suisse First Boston Corp.*, 431 F.3d 36 (1st Cir. 2005)).

*Second,* Plaintiff speculates that the December 2023 departure of Chief Information Security Officer, Aimee Cardwell somehow supports scienter.  ¶239.  However, an employee departure is "inadequate to show scienter as there may be many plausible reasons for earlier than expected resignations."  *Mart*, 595 F. Supp. 3d at 820, n.25; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (similar).  By any reasonable measure, Cardwell is irrelevant: she made no challenged statements and is not alleged to have participated in any fraudulent scheme nor interacted with Individual Defendants.

Further grasping at straws, Plaintiff adds that "[UHG] kept the departure of [Cardwell] under wraps."  ¶239.  It is unclear what this means—absent a disclosure obligation relating to Section 16 officers (not present here), companies do not customarily publicly proclaim employee departures.  Plaintiff closes by insinuating that Cardwell's departure was suspicious because "[t]he data breach that exposed Change to ransomware occurred on February 21, 2024."  ¶239.  Given that she departed months *before* the breach, there is no connection at all.

## II.    The Complaint Fails to State a Section 20A Insider Trading Claim (Count III)

Section 20A provides that those who (i) violate the Exchange Act and (ii) sell a security "while in possession of material, nonpublic information" are liable (iii) to persons who "contemporaneously" purchased the security. 15 U.S.C. §78t-1(a); *Mart*, 595 F. Supp. 3d at 825. In practice, courts have interpreted this to mean same-day trades. *See infra*. Plaintiff alleges that it purchased stock "contemporaneously" with five stock sales by Hemsley and Witty. ¶¶303–08.

| Defendant Seller | Date of Sale | # Shares Sold | Sale Price | | Date of Purchase | # Shares Purchased | Purchase Price |
|---|---|---|---|---|---|---|---|
| Andrew Witty | July 18, 2022 | 11,376 | $527.90 | → | July 19, 2022 | 36,001 | $533.45 |
| Stephen Hemsley | July 26, 2022 | 99,312 | $534.27 | → | July 28, 2022 | 49,782 | $541.49 |
| Andrew Witty | July 19, 2023 | 4,000 | $506.19 | → | July 26, 2023 | 9,840 | $508.00 |
| Stephen Hemsley | October 17, 2023 | 121,515 | $540.58 | → | October 17, 2023 | 180 | $536.65 |
| | | | | | | 1,787 | $536.65 |
| | | | | | | 3,809 | $536.65 |
| | | | | | | 9,986 | $536.65 |
| Stephen Hemsley | December 5, 2023 | 66,081 | $550.39 | → | December 11, 2023 | 182,000 | $543.68 |

These allegations fail for numerous independent reasons.

### A.    No Predicate Violation

The claim fails because the Complaint does not establish a predicate Section 10(b) violation as required. *See supra* Part I; *Mart*, 595 F. Supp. 3d. at 827-28 (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 175 (3d Cir. 2014)); *see also In re K-tel Int'l, Inc., Sec. Litig.*, 107 F. Supp. 2d 994, 1005 (D. Minn. 2000), *aff'd*, 300 F.3d 881 (8th Cir. 2002).

### B.    No Contemporaneous Trades

The claim also fails because Plaintiff's trades were not "contemporaneous" with stock sales by Hemsley and Witty. The Eighth Circuit has not defined "contemporaneous"

under Section 20A, but courts have held that *same-day* transactions are required. *See In re Fed. Nat'l Mortg. Ass'n Sec. Derivative & "ERISA" Litig.*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007) (same day); *In re AST Rsch. Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) (same day). Thus, a court in this district dismissed a Section 20A claim as to every trade except for one made on the same day as an insider's sale. *Mart*, 595 F. Supp. 3d. at 826–27. Judge Brasel rejected the argument that "contemporaneously" could encompass the "entire period of nondisclosure," as the plaintiff urged. *Id.*

Requiring that Plaintiff and Defendants transact on the same day makes sense because the contemporaneousness requirement "substitute[s] for the normal privity between buyer and seller" given that "identifying the party in actual privity with the insider is virtually impossible in trades occurring on an anonymous public market." *Fed. Nat'l Mortg. Ass'n*, 503 F. Supp. 2d at 46 (citing *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993)) (citation omitted). Large volumes of UHG stock trade constantly throughout each business day (¶283), such that even within a single day it is overwhelmingly unlikely that Plaintiff bought the shares Defendants sold. Allowing trades days or weeks apart further erodes any analogue to a privity requirement and guarantees Plaintiff did not purchase securities from Defendants. The same-day requirement disposes of all trades except for Hemsley's October 17, 2023 sale. ¶¶303–08; D-Ex. 6.

The October 17 trade is inactionable for a related reason: a plaintiff must buy *at the same or higher* price than the defendant's sale. *See Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.,* 2023 WL 1800963, at *20 (D. Ariz. Feb. 7, 2023) (plaintiffs must buy

38

company stock "after, but still contemporaneously with," the insider's sales, and "at higher prices than the prices at which [the insider] sold them"); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020) ("courts have consistently held that shares purchased below the defendant's sale price cannot satisfy the contemporaneity requirement, because it is impossible that those trades occurred with defendant at an unfair advantage").  On October 17, Hemsley sold at $540.58 while Plaintiff bought shares for nearly $4 less per share ($536.65).  ¶306; D-Ex. 6.

## C.      No Possession of Material Nonpublic Information

Plaintiff's Section 20A claims also fail because Plaintiff does not allege with particularity that Hemsley and Witty possessed material non-public information at the time of any of the five trades.  *Silver Lake Grp.*, 108 F.4th at 1191; s*ee also Neubronner*, 6 F.3d at 672; *Mart*, 595 F. Supp. 3d at 825 (courts "apply the heightened PSLRA and Rule 9(b) standards to Section 20A claims").  The two July 2022 trades occurred *before* the DOJ trial (¶¶215–16), and there is no allegation Hemsley and Witty somehow had foreknowledge of the outcome (a UHG victory).  For Witty's July 19, 2023, trade, the Complaint contains no allegations concerning his knowledge.  For Hemsley's October 17, 2023 and December 5, 2023 trades, Plaintiff alleges only that UHG had been notified of the DOJ antitrust investigation, but not any basis to infer Hemsley knew it was material.  ¶217; ¶¶132–33; *see supra* Part I.C.3.

**III.     The Complaint Fails to State a Claim for Control Person Liability (Count II)**

The Section 20(a) claim fails as a matter of law because the Section 10(b) claim

fails.  *See MathStar, Inc. v. Tiberius Cap. II, LLC*, 712 F. Supp. 2d 870, 882 (D. Minn.

2010).

**CONCLUSION**

The Court should dismiss the Complaint with prejudice.

Date:  February 28, 2025                                    Respectfully submitted,

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno

**WILMER CUTLER PICKERING
HALE AND DORR LLP**

Michael G. Bongiorno*
7 World Trade Center
250 Greenwich Street
New York, NY 10007
michael.bongiorno@wilmerhale.com
Telephone: 212-230-8800
Facsimile: 212-230-8888

Timothy J. Perla*
Sonia Sujanani*
Dan Willey*
60 State Street
Boston, MA 02109
timothy.perla@wilmerhale.com
sonia.sujanani@wilmerhale.com
dan.willey@wilmerhale.com
Telephone: 617-526-6000
Facsimile: 617-526-5000

40

**Faegre Drinker Biddle & Reath LLP**

Peter C. Magnuson
Matthew Kilby
Jeffrey P. Justman
Anderson C. Tuggle
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
peter.magnuson@faegredrinker.com
matthew.kilby@faegredrinker.com
jeff.justman@faegredrinker.com
anderson.tuggle@faegredrinker.com
Telephone: 612-766-7000
Facsimile: 612-766-1600


*Counsel for Defendants*
*\* Admitted Pro Hac Vice*