# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED States of America,          )
                                   } Civil Action
              Plaintiff,           ) No. 22-cv-481
                                   )
vs.                                ) BENCH TRIAL
                                   )
UnitedHealth Group,                ) Washington, DC
Incorporated, et al.,              ) August 5, 2022
                                   ) Time:  2:00 p.m.
              Defendants.          )
_____

                TRANSCRIPT OF BENCH TRIAL
                      HELD BEFORE
        THE HONORABLE JUDGE CARL J. NICHOLS
            UNITED STATES DISTRICT JUDGE
_____

                 A P P E A R A N C E S

For Plaintiff:       Eric Damian Welsh
                     Jared Bond
                     U.S. Department of Justice
                     Antitrust Division
                     450 Fifth Street, N.W.
                     Washington, DC  20530
                     (202) 598-8681
                     Email:  Eric.welsh@usdoj.gov

For Defendant:
  UnitedHealth       Craig S. Primis
                     Matthew Reilly
                     Kirkland & Ellis LLP
                     1301 Pennsylvania Avenue, N.W.
                     Washington, DC  20004
                     (202) 389-5921
                     Email:  Craig.primis@kirkland.com
                     Email:  Matt.reilly@kirkland.com

                     Justin Bernick
                     Hogan Lovells US LLP
                     555 13th Street, N.W.
                     Washington, DC  20004
                     (202) 879-5140
                     Email:  Matt.reilly@kirkland.com

Change                   David Gelfand
                         Cleary Gottlieb Steen & Hamilton, LLP
                         2112 Pennsylvania Avenue, N.W.
                         Washington, DC  20037
                         (202) 974-1500
                         Email:  Dculley@cgsh.com

                         Sara Y. Razi
                         Abram J. Ellis
                         Simpson, Thacher & Bartlett, LLP
                         900 G Street, NW
                         Washington, DC  20001
                         Email:  Sara.razi@stblaw.com
                         Email:  Aellis@stblaw.com

_____

Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                         Official Court Reporter
                         United States Courthouse, Room 6523
                         333 Constitution Avenue, NW
                         Washington, DC  20001
                         202-354-3267

customer data?

A.   In the same way our antitrust policy does and other policies.  It does not allow it.

Q.   I just want to direct your attention to one provision in particular.  If you can flip to the second page.

Under Use and Disclosure of CSI, if you could just read the third bullet into the record.

A.   "The disclosure of external customer CSI to UHG business units that are competitors of such external customers is strictly prohibited."

Q.   What does that provision mean, in your view, in terms of restriction on data use within United?

A.   It, similarly, does not allow external customer CSI to be shared with other business units with UnitedHealthcare.

Q.   So just to be clear, would this policy prohibit post-merger Change from sharing external customer claims data with UnitedHealthcare?

A.   It would.

Q.   Further, what about artificial intelligence and machine learning?  Are you familiar with those terms?

A.   I am.

Q.   Is it possible under this policy for artificial intelligence or machine learning to be used to circumvent the policy?  Could you build an AI machine learning model and use that to share information with UnitedHealthcare?

A.   No.   Regardless of the method being used, whether it's AI, ML or, you know, a more traditional method of analytics, that would not be permitted.

Q.   This policy also says that, "Employees cannot disclose data received from an Optum customer to a business unit that competes with that customer."

Does that mean that employees can freely share that same information, just if they get it from another source; say, a healthcare provider?

A.   No.   No.   That would not -- also not be permitted.   It's kind of playing games with the compliance.   No.

Q.   So, just to walk that through with an example, if Optum receives data about a UnitedHealthcare competitor from a healthcare provider, could Optum share that data with UnitedHealthcare, since it's not coming from a competitor directly?

A.   It could not.   That would be against a number of our policies; this policy in particular.

Q.   Similar to the antitrust policy, are employees obligated to report violations of this policy?

A.   Yes, they are.   Violations and suspected violations.

Q.   Can employees be disciplined if they violate a policy?

A.   Yes, they can.

Q.   Have there been any violations of United's firewall policies where a UnitedHealthcare employee actually accessed

Optum external customer data?

A.    Not that I'm aware of.

Q.    And how do you know?

A.    We did a thorough review -- a forensic review of access to all the systems that contained external customer claims, and based on that review, out of 350,000 employees, there were barely a dozen that had access, and that access was revoked. And we determined that none of those employees had ever used or viewed or accessed that data.

Q.    I want to unpack what you just said.  You said that you found some UHC employees who had access.  What do you mean by that exactly?

A.    They had a role that gave them privileges to that data, access to that data.

Q.    Does that mean that they actually observed that data and logged in and looked at the data?

A.    Based on the system audit logs we had, no, they did not do that.  And based on the conversations we had with those employees, no, they did not.

Q.    And how many -- about -- approximately, how many UHC employees have you been aware of that had that type of access?

A.    I think it was roughly a dozen or so, based on this analysis.

Q.    Do you know how many total employees work at United?

A.    I think the number is around 350,000.

Q.  What did you learn, if anything, about why those individuals might have had access to those databases?

A.  We looked at that.  Typically, the situation we found was these individuals were in researcher roles -- researcher roles, meaning they were doing research for the public good, and they had moved across business units.  They started in Optum and they moved to UnitedHealthcare, the vast majority of them in that situation.  Some of them even moved back to Optum before we were able to revoke their access.

Q.  Is the policy in that situation, when employees move, to revoke access?

A.  It is.  The process we have in place is that managers would review that access.  The process we put -- and they would -- the manager would identify the misalignment of access and request that be revoked.

        The policy we've put in place since then is preventative, so much as access is wiped clean as individuals move across the company and they start new.

Q.  I want to shift your attention back to another document that was used earlier.

        Let's see if I can find it.

        PX962, I believe Mr. Welsh asked you about, in your bigger binder.

A.  Okay.

Q.  And you were asked some questions about this document.

Does this document reflect the shutting-off of access that you were just describing?

A. It did.

Q. Was there anything inappropriate about the way this was handled, in your view?

A. No. It's just normal operations based on that assessment.

Q. Okay. You can put that one to the side.

Now, post merger, could UnitedHealthcare employees access Change customer claims data consistent with these policies we've been locking at?

A. No, they could not.

Q. And are you aware of any plans to modify, change, or alter the policies we've looked at in any way?

A. If anything, we would enhance these policies.

Q. And I understand that United has these policies in place, but how, in your view, do external customers get comfort that their data is actually being protected?

A. They get comfort by the audits and assessments they've done with us over the years, and they continually have that right and they exercise that right. And some of these customers have been and will continue to be competitors to Optum and UnitedHealthcare.

Q. And are you aware that United has made commitments to Change customers in this transaction to maintain these firewall policies?

talk regularly, correct?

A.  Yes.

Q.  And they attend meetings together, too, don't they?

A.  They do.

Q.  All right.  Now, I want to get back to this subject of your policies and about competitively sensitive information and that being potentially shared.  I think I understood your testimony there.

You -- as you testified earlier today, you were involved in responding to the government's Interrogatory Number 6 about the data policies and breaches, correct?

A.  Correct.

Q.  Firewalls?  Okay.

And then you also gave a 30(b)(6) on that subject as well, right?

A.  I did.

Q.  And attested to what the level of knowledge was, right?

A.  Yes.

Q.  Okay.

MR. WELSH:  Your Honor, may I approach?

THE COURT:  You may.

A.  Thank you.

BY MR. WELSH:

Q.  Mr. Dumont, I have handed you a number of exhibits.  I'll go in order here.  If I could direct you to PX673 first, if you

have that.

A.  Okay.

MR. WELSH:  And all these exhibits, Your Honor, that I've handed to the witness are in evidence.

THE COURT:  Thank you.

BY MR. WELSH:

Q.  Now, 673 is an internal team chat from United-Optum, and in this document here -- I'm going to direct you to the entry where it says, "Hi, Karla."

Do you see that?  This is a chat from February 25, 2022, from Patrick Conahan.

A.  Yes.

Q.  It says, "Hi, Karla, I'm trying to figure out why UHC business should have access to PICTS and why."  Do you see that?

A.  I do.

Q.  PICTS refers to the Payment Integrity Case Tracking System, correct?

A.  It does.

Q.  All right.  And then Karla Petraitis responds, "Patrick, It's not a simple answer, unfortunately, so it may be best to set up some time to discuss."  Do you see that?

A.  Yes.

Q.  Patrick then responds.  "I did get a chance to speak to Sherry Johnson.  She indicates there isn't separate role based

on -- based access between UnitedHealthcare and Optum direct business."  Do you see that?

A.  Yes.

Q.  Then the comment, "Very, very concerning," correct?

A.  Right.

Q.  And then later in the exchange he writes, "We have a UHC employee able to access their competitors' data, if I understand it correctly."  Do you see that?

A.  I do.

MR. BERNICK:  Your Honor, I'm waiting to hear where this is going, but I'm not sure how this is within the scope of my examination.  So, object to the testimony.

MR. WELSH:  He was asked -- I believe he was asked questions about their compliance with policies, that information from UnitedHealthcare is not going to be shared with Optum, and I'm exploring that in terms of these documents, Your Honor.

THE COURT:  I think it's fair, so I'm going to allow it.

MR. WELSH:  Thank you, Your Honor.

THE COURT:  Obviously, the documents are in the record already.

MR. WELSH:  Right.

BY MR. WELSH:

Q.  Now, Optum direct refers to external Optum customers,

right?  Isn't that the case?

A.  It does.

Q.  And this chat communication we have here, February 25, 2022, you wrote -- do you understand that this was a day after the plaintiffs filed this lawsuit?

A.  I did not know that.

Q.  This document that we have here as PX673, though, was not referred to, cited, or noted in the Interrogatory Response Number 6; isn't that true?

A.  That's true.

Q.  Okay.  Now, I'm going to direct you to 675 -- PX675.  This is an email invite that's dated December 2, 2021, from an Eric Jackman of payment integrity risk management.  Do you see that?

A.  I do.

Q.  Mr. Jackman writes, "We need to develop a solution to ensure that UHC cannot access Optum BH FWA tips in PICTS."  Do you see that?

A.  Yes.

Q.  All right.  So, this issue on access PICTS, fair to say it wasn't resolved, then, around December 7, 2021, correct?

A.  I don't know what these issues are, if they're even related.  But I see a host of colleagues from Optum compliance, privacy, legal, data governance.  I mean, this is a great example of how these issues get escalated and dealt with.

Q.  Okay.  Let's look at PX678.

        This is another team message, this one from January 5, 2022.  Again, Mr. Patrick Conahan, he writes, "I don't want to look for problems, but I think we should gather an access list for both PICTS and CIMS and review appropriateness."  Do you see that?

A.  Yes.

Q.  This would indicate that as of that date, January 5, again, the PICTS issue had not been resolved, correct.

A.  An issue for PICTS had not been resolved, right.

Q.  All right.  Let's look at PX767 -- or, I'm sorry, 676.  Excuse me.

        This is a --

        MR. POPE:  676.

        MR. WELSH:  676, I'm sorry.

A.  Oh, okay.

BY MR. WELSH:

Q.  Now, 676 is another team's chat, correct --

A.  It is.

Q.  -- for Optum.

        And this is, on March 3, 2022, Patrick Conahan again writes, "Do you recall that there were requests processed for PICTS, including a BSL?"  Do you see that?

A.  Yes.

Q.  All right.  And a "BSL" is a business service liaison; is

that correct?

A. It is.

Q. And then it goes on to say, "Sharon and I met with her this morning. She does this for a number of applications." Do you see that?

A. Yes.

Q. And then it goes on, and he writes, "Scarey. And she's having requesters sign a confidentiality agreement that they won't look at things they shouldn't." Do you see that?

A. Yes.

Q. And then it says, "That's worthless without a technical control in place to block access. They can play dumb." Right?

A. I see that.

Q. And Patrick Conahan, he replaced you in compliance at Optum, correct?

A. He's in the data governance function. So, I think he and Ryan Cahill are probably great individuals to handle this issue.

Q. Okay. And all of the people we're looking at in these chats here, these team chats, they're Optum employees, correct?

A. They are.

Q. I'm going to direct you to PX674.

PX674 is an email from Eric Jackman to Sharon Rodgers; is that correct?

A. It is.

Q.  And both of them are with Optum, correct?

A.  Yes.

Q.  And this is on February 1, 2022, correct?

A.  Yes.

Q.  And in this email Mr. Jackman writes, "I know there has been previous discussion in recent weeks about a list of Optum BH FWA tips which were both accessed by UHC staff and, also, actually copied over into UHC's own case tracking system."  Do you see that?

A.  Yes.

Q.  He notes that, "They're looking at the extent of it, of the non-UHC member information being included," correct?

A.  Yes.

Q.  And then he notes, in the second to the last paragraph, that, "There's been some friction with our counterparts in UHC in recent discussions about validation process overall," correct?

A.  Correct.

Q.  Now, none of the exhibits that I just walked through, none of those were in the interrogatory response from United, correct?

A.  No.  But they look like they're all within the right group to address the issue and run it to ground.

Q.  And the fact that someone was having employees sign a confidentiality agreement rather then putting up barriers,

that's the way that United does things?

A.   No, that's not true at all.  We have -- we have an enterprise agreement that employees sign when they start to work here, but we have the fabric of controls.  I think I've discussed those at length today.  Technically and administratively, there are a lot of controls in place.

Q.   And here, with all the controls you just mentioned in place, you still have employees that are accessing and talking about the situation being, in this case, "scary," correct?

A.   Right.  There's some instant message sessions.

Q.   And what we're seeing here in terms of employees not knowing what's going on with the use of -- or, the access to the data and then reflecting it as being a "scary" situation, that's the real world environment, isn't it?

A.   Well, that's the process playing out in real life.  That's -- this is what these teams are passionate about.  They want to get to the bottom of these issues and solve them.

Q.   Well, in the real world, sir, folks that do the governance work like to keep their policy discussions verbal rather than written so that there's not a record of it, right?

A.   No.

Q.   In the real world, access is granted to non -- to UHC employees to look at data in non-UHC databases; isn't that true?

A.   That's not true.

Q.  In the real world, though, you don't know day-to-day whether every employee is actually adhering to the policies that are in place; isn't that true?

A.  I have a real strong sense that they are based on my experience, based on the close to two decades here.  No, we have not seen issues.

Q.  Okay.

MR. WELSH:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Welsh.

Mr. Bernick, any redirect?

MR. BERNICK:  Just very briefly, Your Honor.

THE COURT:  Of course.

RECROSS-EXAMINATION

BY MR. BERNICK:

Q.  Mr. Dumont, if you could flip back to PX674.  It's one of the emails that's put in front of you.

A.  Yes.

Q.  If you could look at -- there's two bullet points in the middle of the page.  Do you see that?

A.  I do.

Q.  Could you read the second bullet?

A.  "The total number of BH cases that were copied over into CIMS by UHC staff, how many of those have included non-UHC member PHI?"

Q.  And what does "PHI" stand for?