**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. No. 24-cv-1743 (JMB/DTS) |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | FIRST AMENDED CONSOLIDATED |
| vs. | ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| UNITEDHEALTH GROUP INC., et al., | ) ) | |
| Defendants. | ) ) | |

4901-6680-9379.v3

## TABLE OF CONTENTS

**Page**

I.  OVERVIEW OF THE ACTION ............................................................... 1

II.  JURISDICTION AND VENUE ............................................................ 11

III.  THE PARTIES ........................................................................... 12

    A.  Plaintiff .............................................................................. 12

    B.  Defendants ......................................................................... 12

IV.  DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS .............................................................................. 14

    A.  Corporate Overview ........................................................... 14

        1.  UnitedHealth Became an Industry Behemoth Through Strategic Acquisitions ............................................. 15

        2.  The Balanced Budget Act Privatized Medicare .............. 15

        3.  The Affordable Care Act Sought to Limit the Profits and Power of Private Insurers .................................. 17

        4.  UnitedHealth Identifies a Loophole in the Affordable Care Act and Expands Further ................................... 17

    B.  UnitedHealth's Fraudulent Upcoding Scheme Extracted Billions of Dollars in Taxpayer-Funded Payments ........................ 25

        1.  Overview of the Medicare Advantage Program ............... 25

        2.  UnitedHealth Used Health Risk Assessments from In-Home Visits to Perpetrate Its Upcoding Scheme ............ 27

            a.  HouseCalls Nurses Were Required to Use Software Designed to Recommend Lucrative Diagnoses .............. 29

            b.  HouseCalls Nurses Were Instructed and Pressured to Add Unsupported Diagnosis Codes During In-Home Visits ................................................ 32

            c.  HouseCalls Nurses Were Required to Use Unreliable Medical Devices that Caused False Positive Diagnoses ....... 35

**Page**

3.      Additional Means by Which UnitedHealth Perpetrated the
        Upcoding Scheme ............................................................... 40

4.      The Upcoding Scheme Caused UnitedHealth to Diagnose
        Disproportionate Amounts of Lucrative Conditions ........................ 43

5.      The Office of Inspector General Investigates UnitedHealth's
        Medicare Advantage Program ............................................................. 49

        a.      The OIG's September 2021 Report Confirms Billions
                of Dollars in Questionable Payments Made to
                UnitedHealth as a Result of Chart Reviews and Health
                Risk Assessments ................................................................ 49

        b.      Additional OIG Report in October 2024 Confirms
                UnitedHealth's Upcoding Scheme Continued Through
                2023 and that UnitedHealth Was Paid Billions in
                Improper Payments in 2023 ................................................. 52

6.      Named Witness Accounts, Confidential Witness ("CW")
        Accounts, and Other Sources ........................................................... 54

        a.      CW Accounts ........................................................................ 54

        b.      Media Sources ..................................................................... 65

                (1)     *The Wall Street Journal* ............................................. 65

                (2)     *STAT News* ................................................................ 67

                (3)     *The Examiner News* .................................................. 68

C.      UnitedHealth Acquires Change Healthcare and Misleads Investors
        About Data Firewalls ............................................................................. 69

1.      The Change Acquisition ............................................................. 69

2.      The Change Acquisition Comes Under Immediate
        Government Scrutiny ..................................................................... 71

3.      UnitedHealth Defeats the DOJ Lawsuit by Insisting It Always
        Maintains "Strict" Data Firewalls ..................................................... 74

- ii -

**Page**

4.      There Was Not (and Is Not) a Technical Firewall Between All Intra-Optum Businesses ........................................................... 76

D.      UnitedHealth's Lax Security Leads to Massive Data Breach .................... 79

E.      Optum's Additional Anti-Competitive Practices ........................................ 82

F.      UnitedHealth's Additional Anti-Competitive Conduct .............................. 84

G.      UnitedHealth Receives Notice of a Nonpublic DOJ Investigation and UnitedHealth Executives Immediately Embark on a Massive Insider Selling Spree ................................................................................................. 85

H.      Investors Begin to Learn the Truth but Defendants Continue to Mislead the Market ...................................................................................... 88

        1.      The Scope of the New DOJ Antitrust Investigation Is Publicly Disclosed and UnitedHealth's Stock Price Drops ............................ 88

        2.      UnitedHealth Continued to Make False Denials About Medicare Advantage and HouseCalls ............................................... 89

        3.      The *WSJ* Discloses a New DOJ Fraud Investigation into UnitedHealth's Medicare Advantage Billing Practices and UnitedHealth's Stock Price Plummets ............................................. 92

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........................................................................ 94

A.      False and Misleading Statements and Omissions Concerning UnitedHealth's HouseCalls and Medicare Advantage Program ................. 94

        1.      Statements During 2021 .................................................................... 94

        2.      Statements During 2022 .................................................................... 98

        3.      Statements During 2023 .................................................................. 100

        4.      Statements During 2024 .................................................................. 101

        5.      Statements During 2025 .................................................................. 104

**Page**

B.    Defendants' Misrepresentations About Internal Firewalls at UnitedHealth and Its Optum Subsidiary ................................................... 107

    1.    Statements During 2022 ................................................ 107

C.    UnitedHealth's False and Misleading Statements Regarding the Company's Regulatory Compliance Standards and Fair Competition Practices................................................................................................ 110

VI.    ADDITIONAL INDICIA OF SCIENTER .......................................... 113

A.    The Individual Defendants' Frequent Discussions of HouseCalls and Medicare Advantage with Analysts Confirms Their Intimate Knowledge of the Upcoding Scheme ........................................... 113

B.    The Upcoding Scheme Required Participation Throughout the Company ...................................................................................... 115

C.    High-Level Executives Dismissed Internal Reports of Improper Upcoding and Retaliated in Response........................................... 118

D.    Sworn Testimony, Internal Communications, and Internal Reports Support a Strong Inference of Scienter ...................................... 119

    1.    UnitedHealth Targeted Change Healthcare Specifically to "Utilize" Claims Data and Customer Sensitive Information ........ 119

    2.    UnitedHealth's and Optum's Track Record of Data Governance Failures, Including Unauthorized Database Access.............................................................................................. 121

E.    Defendants Engaged in Multiple Suspicious Rounds of Insider Trading ....................................................................................... 126

    1.    Hemsley Sold Shares as Media Outlets Began to Question UnitedHealth's Medicare Advantage Practices ............................ 126

    2.    Defendants Sold Shares Heading into the Change Antitrust Trial Concerning UnitedHealth's Purchase of Change Healthcare...................................................................................... 127

**Page**

3.      Defendants Sold Shares Upon Receiving Nonpublic
Information that the DOJ Was Opening a New Antitrust
Investigation ................................................................... 128

F.    U.S. Lawmakers Urged the SEC to Investigate Defendants'
"Disturbing" Insider Sales........................................................ 129

G.    Defendants' Anti-Competitive Scheme Infected the Core of
UnitedHealth's Business .............................................................. 131

1.      UnitedHealthcare's Medicare Advantage Business, Including
the HouseCalls Program, Was a Core Component of
UnitedHealth's Business ................................................. 131

2.      Optum's 2022 $13 Billion Acquisition of Change Healthcare
Garnered National Attention and Federal Scrutiny........................ 132

H.    Additional Ongoing Investigations into UnitedHealth for Improper
Upcoding Add to the Strong Inference of Scienter ................................. 134

1.      DOJ Antitrust Division Seeks Interviews with Former
UnitedHealth Doctors Who Blew the Whistle About the
Company's Fraudulent Upcoding ...................................... 134

2.      The Chairman of the Senate Judiciary Committee Pushes for
Answers on UnitedHealth's Medicare Advantage Billing
Practices "Apparent Fraud, Waste, and Abuse"............................ 135

I.    UnitedHealth's Upcoding Scheme Is a Longstanding Practice and
UnitedHealthcare's Former CEO Successfully Pressured CMS.............. 136

VII.   LOSS CAUSATION ........................................................................ 137

VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE
FRAUD-ON-THE-MARKET DOCTRINE......................................... 143

IX.    CLASS ACTION ALLEGATIONS.................................................. 144

X.     CLAIMS ........................................................................................ 146

4901-6680-9379.v3

Lead Plaintiff California Public Employees' Retirement System ("Plaintiff" or "CalPERS") alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters. Plaintiff's allegations are based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of public documents, conference calls, and announcements made by Defendants; U.S. Securities and Exchange Commission ("SEC") filings; releases published by and regarding UnitedHealth Group, Inc.;[1] analyst reports and advisories about UnitedHealth; media; statements by percipient witnesses; and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    OVERVIEW OF THE ACTION

1.    This securities fraud class action is brought on behalf of purchasers of UnitedHealth common stock between September 22, 2021 and February 20, 2025, inclusive (the "Class" and "Class Period"), seeking to pursue remedies pursuant to §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This action is brought against UnitedHealth; its Chief Executive Officer ("CEO"), Andrew Witty; the former CEO of UnitedHealth subsidiary UnitedHealthcare, Brian Thompson; and the Chair of the

---

[1]    UnitedHealth Group, Inc. is referred to herein as "UnitedHealth," "UNH," or the "Company."

Company's Board of Directors, Stephen Hemsley (collectively, herein referred to as "Defendants").

2.      UnitedHealth is a health insurance company that provides insurance to individuals, employers, and small businesses.  Today, its insurance arm – UnitedHealthcare – is the largest insurance provider in the United States.

3.      In 2010, the Affordable Care Act (the "ACA") was enacted into law.  The ACA introduced medical loss ratio ("MLR") requirements that required insurers (also called "payers") to spend a greater percentage of premiums collected from patients on actual healthcare, as opposed to administrative costs or insurer profits.  The ACA placed downward pressure on UnitedHealth's profits and in response to the ACA becoming law, the Company immediately ramped up its vertical expansion – *i.e.*, expanding outside of health insurance to diversify its revenue streams and maintain its growth.

4.      In April 2011, UnitedHealth launched a new subsidiary, Optum.  Optum does not provide insurance, but rather provides healthcare services and products through its three businesses: Optum Health (healthcare providers), Optum Rx (prescription services), and Optum Insight (healthcare technology products).   After launching the new brand, UnitedHealth focused on expanding its non-insurance business in order to widen its influence in the healthcare industry.  Owning both a healthcare insurer and medical providers positioned UnitedHealth to circumvent the ACA's MLR restrictions.  UnitedHealthcare could collect premiums, send patients to Optum Health for treatment, and pay itself (through Optum) for the requisite level of healthcare needed to satisfy the MLR requirements.  Designing its corporate structure in this way allowed UnitedHealth to

- 2 -

circumvent the ACA's MLR restrictions and retain greater profits on both the insurance side and the provider side of the ledger.

5.      Between the enactment of the ACA and the start of the Class Period on September 22, 2021, UnitedHealth spent over $60 billion expanding into every branch of the healthcare industry and, accordingly, establishing immense market power it could use to manipulate the industry.

6.      This case arises out of Defendants' abuse of that power. Defendants engaged in a scheme and wrongful course of business which was designed to, and did, artificially inflate the Company's revenues, earnings, and stock price. As part of the misconduct alleged herein, Defendants formulated, implemented, and oversaw a fraudulent, Company-wide upcoding scheme. Defendants also misrepresented the breadth, scope, and integrity of Optum's existing firewall protections while concurrently concealing Optum's ability to circumvent those very firewall protections. Finally, Defendants used UnitedHealth's monopolistic dominance to engage in anti-competitive practices to consolidate its control over healthcare services and eliminate competition.

**Defendants' Medicare Advantage "Upcoding" Scheme**

7.      Medicare Advantage is a privatized version of traditional Medicare, under which the government pays a set fee to private insurers such as UnitedHealthcare to provide insurance plans to qualifying senior citizens ("members"). The government pays a higher set fee for Medicare Advantage patients with certain pre-existing conditions. During the Class Period, Defendants publicly identified UnitedHealthcare's Medicare Advantage business as one of the "key elements of [the Company's] growth strategy." At the core of

- 3 -

their scheme was Defendants' carefully orchestrated plans and procedures to inflate the fees UnitedHealth collected from the government by deliberately "upcoding" across its massive Medicare Advantage member population. "Upcoding" is the practice of fraudulently diagnosing Medicare Advantage plan members with various conditions, making such members appear sicker and causing Medicare to overpay UnitedHealth for their care.

8.     To effectuate their wrongful course of business, Defendants' employed several different mechanisms. For example, UnitedHealth induced providers to find new diagnoses by paying bonuses to providers who upcoded. UnitedHealth trained providers to use "'buddy codes,'" that is adding multiple new diagnoses based upon existing ones. UnitedHealth also purposefully leveraged its HouseCalls program, whereby the Company would dispatch nurse practitioners to members' homes to perform physical assessments in search of new diagnoses, even if they were not medically supported. Defendants also exploited the HouseCalls program by using tools designed to find diagnoses that did not exist, including software specifically programmed to recommend lucrative diagnoses and unreliable medical devices. Defendants used such tools even though they were aware the tools were prone to issue false positives for lucrative conditions. Doctors and nurses who worked for UnitedHealth during the Class Period have ***admitted*** that they added codes they did not truly believe existed because UnitedHealth pressured them to do so. Former UnitedHealth physician, Dr. Susan Baumgaertel described this conduct as unconscionable, observing that "'[w]e were not truly caring for patients anymore,'" but rather "'were just micromanaging their care to bring in money. It just felt so unconscionable.'"

- 4 -

9.     Defendants' upcoding scheme worked as planned.  According to an analysis of Medicare data by *The Wall Street Journal* (the "*WSJ*"), in 2021 alone, UnitedHealth reaped *$8.7 billion* in taxpayer money for diagnosis codes that no doctor treated.  The cost of Defendants' scheme was not solely financial; it also had real-life impact on America's senior citizens.   Doctors around the country have described panicked calls from UnitedHealth members who noticed alarming new diseases listed on their medical chart that their doctor never mentioned.  Dr. Susan Baumgaertel frankly admitted that when she got those calls, "she always tried to tell patients the truth, as uncomfortable as it was: I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more."

10.     Throughout the Class Period, Defendants frequently spoke to investors about revenue growth from the Company's Medicare Advantage business and the purported value of HouseCalls to the health of its members, while concealing the upcoding scheme. For example, on September 22, 2021, the first day of the Class Period, UnitedHealth responded to questions about its coding practices by assuring investors that "'UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care.'"  Defendants also repeatedly told investors that UnitedHealthcare's revenue growth came from its growing Medicare Advantage business and sicker patients (those with higher acuity needs), while hiding that it was in fact pervasive upcoding that was driving billions in revenue.  Defendants continued to issue similar false and misleading assurances throughout the Class Period.

- 5 -

**Optum Acquires Change Healthcare and Misleads Investors About Data Firewalls**

11.     On January 6, 2021, UnitedHealth announced its largest acquisition ever: Optum Insight would acquire Change Healthcare ("Change"), a healthcare technology company, for $13 billion.  Change operated a clearinghouse that acted as the "pipes" of the healthcare industry, processing health insurance claims and payments among providers, payers, and patients.  According to a UnitedHealth estimate, more than half of American medical insurance claims "pass through (or touch)" Change's systems.  Internally, UnitedHealth's then-CEO, David Wichmann, lauded the acquisition because it granted UnitedHealth access to the Change data, acknowledging that access as the "'foundation'" of the Change acquisition.  Indeed, the Change acquisition gave UnitedHealth access to critical competitor information, including pricing structures, claims data, and billing practices.

12.     Industry groups, however, responded differently, immediately questioning the propriety of the deal, and citing serious antitrust concerns.  On February 24, 2022, the Department of Justice (the "DOJ") sued to block the Change acquisition on antitrust grounds, arguing UnitedHealth would gain access to sensitive data that it could wield against its competitors.  UnitedHealth immediately refuted the DOJ's allegations and assured investors that Optum possessed "firewalls" "that maintain the integrity of our customers' data and information."  Throughout the Class Period, Defendants repeatedly made similar assurances, insisting that UnitedHealth possessed "internal firewalls that prevent the sharing of competitively sensitive information across business units."  Ultimately, UnitedHealth's assurances won the day and the U.S. District Court for the

- 6 -

District of Columbia decided in Optum's favor, expressly crediting UnitedHealth's representations that it maintained data firewalls.

13.    The firewalls UnitedHealth described to the court and the public, however, were illusory.  They simply did not exist.  In truth, Optum's business applications share data with other Optum business applications.  And what they did ***not*** do is prohibit Optum from using external customer data to benefit those Optum businesses competing with external customers.  The lack of firewalls and lax cyber security also ultimately led to the largest security breach in the history of the United States healthcare system, which hackers achieved simply by acquiring a working username and password.

**UnitedHealth Receives Notice of a Nonpublic DOJ Investigation and UnitedHealth Executives Respond by Selling More than $100 Million of Their Own UnitedHealth Shares**

14.    On October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company.'"  Concealing this material information from investors and the public, UnitedHealth chairman Stephen J. Hemsley and several other senior executives immediately took action – selling more than $100 million of their own UnitedHealth stock at artificially inflated prices while the market and other investors remained unaware of the new federal antitrust investigation into UnitedHealth.

**The Relevant Truth Begins to Leak out, but Defendants Continue to Mislead the Market**

15.    On February 27, 2024, the *WSJ* exposed the scope of the DOJ's antitrust investigation into UnitedHealth.  According to the *WSJ*, the DOJ's investigation centered around, among other things, "[m]edicare billing issues, including the Company's practices

around documenting patients' illnesses," as well as issues relating to other anti-competitive practices at Optum and UnitedHealthcare.  News of the DOJ investigation surprised investors, with industry analysts linking the *WSJ* disclosure to the Company's Medicare Advantage business and purported firewalls.  In response to those revelations, the price of UnitedHealth stock declined over $27 per share, falling from just over $525 per share on February 26, 2024 to just over $498 per share on February 28, 2024.

**An Office of Inspector General Report and Whistle-Blower Media Reports Confirm Defendants' Wrongful Course of Conduct - Defendants Repeatedly Deny the Allegations**

16.    From March 2024 through January 2025, UnitedHealth's fraudulent upcoding scheme was discussed in a series of bombshell investigative reports published by the *Examiner News*, *WSJ*, and *STAT News*.[2]  *STAT News* released a multi-part series called

---

[2]    *See* Adam Stone, *Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum*, The Examiner News (Mar. 18, 2024); Christopher Weaver & Tom McGinty, *How the Journal Analyzed Medicare Advantage Data*, Wall St. J. (July 7, 2024); Christopher Weaver et al., *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, Wall St. J. (July 8, 2024); Bob Herman et al., *How UnitedHealth harnesses its physician empire to squeeze profits out of patients*, STAT News (July 25, 2024); Anna Wilde Mathews et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare*, Wall St. J. (Aug. 4, 2024); Casey Ross et al., *How UnitedHealth turned a questionable artery-screening program into a gold mine*, STAT News (Aug. 7, 2024); Tara Bannow et al., *Inside UnitedHealth's strategy to pressure physicians: $10,000 bonuses and a doctor leaderboard*, STAT News (Oct. 16, 2024); Christopher Weaver & Anna Wilde Mathews, *Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds*, Wall St. J. (Oct. 24, 2024); Bob Herman et al., *UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits*, STAT News (Nov. 25, 2024); Casey Ross et al., *Lawmakers call for curbs on UnitedHealth's growing empire*, STAT News (Dec. 23, 2024); Christopher Weaver et al., *UnitedHealth's Army of Doctors Helped it Collect Billions More From Medicare*, Wall St. J. (Dec. 29, 2024); Tara Bannow, *DOJ seeks interviews with former UnitedHealth Group doctors*, STAT News (Jan. 12, 2025).  The 12 reports are attached hereto as Exhibits 1-12.

- 8 -

"Health Care's Colossus," which began on July 25, 2024 that expressly shows "how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence."  *STAT News* said its reports were "based on interviews with more than two dozen current and former UnitedHealth doctors and executives conducted over the past six months," conversations with "health policy experts and patients," and examination of "court records, and . . . UnitedHealth's 600-page medical coding bible," a tome UnitedHealth crafted to teach insurers and their employees how to "'capture'" more diagnoses.  In total, over the course of dozens of investigative reports – fortified by numerous whistleblower accounts from former UnitedHealth employees – journalists from *STAT News*, *WSJ*, *The Examiner News*, and other publications have detailed how Defendants exploited HouseCalls visits and pressured doctors and nurse practitioners to manipulate diagnosis codes, securing for UnitedHealth billions of dollars of inflated and unsupported payments.  The investigative reports also confirm UnitedHealth's wrongful use of its market dominance to upend and pressure Optum's competitors and how the Company pays its own provider groups considerably more than non-Optum providers, driving up consumer costs and its profits.

17.     On October 24, 2024, the Department of Health & Human Services Office of Inspector General ("OIG") released a report titled: "Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions."[3] The government watchdog found that UnitedHealth reaped $3.2 billion in extra federal

---

[3]     The October 24, 2024 OIG report is attached hereto as Exhibit 13.

payments in 2023 alone for diagnoses from in-home health risk assessments ("HRAs") and HRA-linked chart reviews. According to the OIG report, UnitedHealth accepted these payments *even though the patients did not receive any additional treatment or medical services following the new diagnoses*. "One top MA company, UnitedHealth Group, Inc., stood out from its peers, especially in its use of in-home HRAs and HRA-linked chart reviews to generate risk-adjusted payments," the OIG report noted.

18.    Defendants repeatedly responded to these investigative reports and articles by issuing statements publicly denying them. For instance, UnitedHealth issued a release in August 2024 calling the *WSJ*'s reports of upcoding "flawed," and "unsubstantiated," and asserting that "the WSJ presented no credible evidence to support this claim." Likewise, UnitedHealth publicly denied the findings of the 2024 OIG report stating they were "[a] misleading, narrow and incomplete view of risk adjustment data."

**A New DOJ "Fraud" Investigation Is Disclosed**

19.    On February 21, 2025 the *WSJ* revealed that the DOJ launched a new civil fraud investigation, separate from the DOJ investigation announced in February 2024, into UnitedHealth's Medicare Advantage billing practices. The *WSJ* report also revealed that the OIG was involved in the investigation. The *WSJ* report relied on doctors and a nurse practitioner who said that they were questioned by the DOJ about specific diagnoses that UnitedHealth encouraged them to use with patients, incentive arrangements, and pressure to add diagnoses. The *WSJ* sources said the Company trained them to document diagnoses, even if they were irrelevant to a particular patient, and used software to suggest conditions.

- 10 -

20. UnitedHealth immediately issued a release the same day adamantly denying the *WSJ* report as "misinformation."

21. The *WSJ*'s disclosure of a new DOJ civil fraud investigation into UnitedHealth caused the Company's stock price to plummet $36 per share.

22. Throughout the Class Period, UnitedHealth leveraged its monopolistic power to crush competition, manipulate government officials, and force others in the healthcare industry to cede to its demands. In the process, UnitedHealth fraudulently obtained billions of dollars of revenue from the federal government, healthcare providers, and its own members. In total, the revelations of misconduct caused severe harm to investors in UnitedHealth, as UnitedHealth's stock price declined in response thereto over the course of several corrective disclosures.

## II.   JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5(a)-(c) promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

24. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District. In addition, the Company's principal executive offices are located in this District.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.  THE PARTIES

### A.     Plaintiff

26.     Lead Plaintiff California Public Employees' Retirement System is the largest public pension fund in the United States, with more than 2 million members and more than $500 billion in assets under management.  CalPERS purchased UnitedHealth common stock during the Class Period, as set forth in the Certification attached hereto as Exhibit 14, and was damaged thereby.

### B.     Defendants

27.     Defendant UnitedHealth Group, Inc. is a publicly-traded healthcare company incorporated in Delaware and headquartered at 9900 Bren Road East, Minnetonka, Minnesota 55343.  UnitedHealth owns an insurance business, UnitedHealthcare, as well as a medical services provider and technology business, Optum.  UnitedHealth is one of the largest corporations in the world, with a 2024 revenue of over $400 billion.  During the Class Period, UnitedHealth traded on the New York Stock Exchange under the ticker UNH.

28.     Defendant Andrew Witty has been CEO of UnitedHealth and on UnitedHealth's Board of Directors (the "Board") since February 3, 2021.  Until his appointment as CEO and Director, Witty was the Executive Vice President of UnitedHealth and CEO of Optum from March 2018.  Prior to his appointment as Optum CEO in March

- 12 -

2018, Witty served as an Independent Director on the UnitedHealth Board. In these roles, Witty oversaw UnitedHealth and Optum's operations. During the Class Period, Witty spoke often about the HouseCalls program calling it "a true collaboration between Optum and UnitedHealthcare," and also confirmed UnitedHealth's commitment to maintaining a data firewall between Optum and UnitedHealthcare. He signed each of the Company's Forms 10-Q and Forms 10-K during the Class Period.

29.     Defendant Stephen Hemsley has been the Chair of UnitedHealth's Board of Directors since September 1, 2017. He has been a Director since 2000. Hemsley also served as CEO of the Company from September 2017 through November 2019. In 2021 and 2022, Hemsley sat on the Board's Health and Clinical Practice Policies Committee, which is responsible for "oversight of management's initiatives to improve health care affordability." During the Class Period, Hemsley sold more than 21% of his UnitedHealth shares for proceeds of over $211 million.

30.     Defendant Brian Thompson was the CEO of UnitedHealthcare, UnitedHealth's insurance business, from April 7, 2021 until his death on December 4, 2024. Thompson held numerous leadership positions at the Company after he started work there in April 2004, with a primary focus on the financial side of the Medicare business. From July 2019 to April 2021, Thompson was CEO of UnitedHealthcare, Government Programs. In this role, he oversaw the UnitedHealthcare Medicare & Retirement division, a business arm focused on the Company's coverage of Medicare members. From April 2017 to July 2019, he was CEO of UnitedHealthcare Medicare & Retirement. Prior to that, from December 2012 until April 2017, Thompson was the Chief Financial Officer ("CFO")

- 13 -

of UnitedHealthcare, Medicare & Retirement.  During the Class Period, Thompson spoke to investors regarding the HouseCalls program and sold over 31% of his UnitedHealth shares for proceeds of over $15 million.

31.     Defendants Witty, Hemsley, and Thompson are hereinafter referred to as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false or misleading statements that caused the price of UnitedHealth common stock to trade at artificially inflated levels and/or maintained artificial inflation in UnitedHealth's common stock during the Class Period.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company and was privy to confidential, proprietary information concerning the Company and its businesses, operations, services, competition, and present and future business prospects.

## IV.    DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS

### A.    Corporate Overview

32.     UnitedHealth was founded in 1977 in Minneapolis, Minnesota to purchase a small health maintenance organization ("HMO") service company called Charter Med Incorporated.  UnitedHealth soon began acquiring and managing HMOs, and operating as a medical insurance company.  It has since grown to become the largest health insurer in the United States and one of the largest corporations in the world, with 2024 revenue of over $400 billion.

33.     UnitedHealth is comprised of two business platforms, UnitedHealthcare and Optum.  UnitedHealthcare is the insurance arm of UnitedHealth, offering employer-based and individual insurance plans and providing private health insurance to more than 35

- 14 -

million members in over 150 countries as of December 31, 2023. UnitedHealthcare also provides insurance to Medicare-eligible members through its Medicare Advantage programs.

34. Optum is UnitedHealth's healthcare services arm, which provides a variety of products and services across the healthcare industry. Optum is divided into three separate businesses. **Optum Health** houses the healthcare provider business, delivering primary care, specialty care, urgent care, and surgery directly to patients in hospitals, in their homes, and virtually, serving more than 103 million consumers. **Optum Rx** is a pharmacy benefit manager ("PBM"), providing pharmaceutical services to patients through a network of more than 65,000 retail pharmacies. **Optum Insight** houses businesses with tools to service the healthcare industry in the areas of data analytics, technology, and operations, largely focused on facilitating healthcare administration.

### 1. UnitedHealth Became an Industry Behemoth Through Strategic Acquisitions

35. Shortly after its founding, UnitedHealth started making aggressive moves to increase its size and influence in the healthcare industry. First, it expanded horizontally, purchasing over 20 other HMOs and insurance providers throughout the 1980's, 1990's, and 2000's. In addition to this horizontal expansion in the health insurance field, UnitedHealth also expanded vertically, acquiring healthcare companies with other specialties, including financial companies, software companies, and PBMs.

### 2. The Balanced Budget Act Privatized Medicare

36. In 1997, Congress enacted the Balanced Budget Act ("BBA"), which revamped the Medicare system and allowed many traditional government functions to

- 15 -

transfer to the private sector. Medicare is a federally-run health insurance program administered by Centers for Medicare & Medicaid Services ("CMS") for individuals who are 65 and older or disabled. Under the traditional Medicare program, there are two parts: Part A and Part B. Part A covers inpatient and institutional care, while physician visits, outpatient services, and durable medical equipment are covered under Part B. CMS reimburses hospitals and physicians' offices directly using a "fee-for-service system." After the medical services are provided, a claim is submitted to CMS for payment. CMS then pays the claim directly to the healthcare provider based on payment rates established by CMS.

37.    Under the BBA, Congress also created Medicare Part C, known as the Medicare Advantage program. Under this program, individuals can choose to receive their Medicare-covered benefits (Parts A and B) from private insurance plans (Medicare Advantage Plans ("MA Plans")). Unlike traditional Medicare's fee-for-service model, insurers that offer MA Plans ("MA Insurers") get paid a flat fee for each individual based on his or her health risks. The private insurance company then covers that patient's care according to the terms of his or her MA Plan.

38.    MA Plans were designed, at least in part, to minimize the administrative burden on the government. Congress also believed that the private sector could provide healthcare more economically, ultimately keeping members healthier and saving taxpayers money.[4]

---

[4]    *See* 42 U.S.C. §1395c *et seq.*

### 3. The Affordable Care Act Sought to Limit the Profits and Power of Private Insurers

39.    In 2010, Congress enacted the Affordable Care Act (the ACA), a healthcare reform law backed by the Obama administration and designed to provide healthcare to a larger proportion of the United States population, promote efficient use of healthcare dollars, and improve patient care.  To that end, the ACA introduced significant changes designed to reduce costs and make healthcare more accessible.

40.    The ACA implemented medical loss ratio (MLR) requirements, which require insurance companies to spend a certain portion of the premiums they receive from patients on actual patient care, rather than administrative costs and profit.  Large group plans have a MLR of 85%, and smaller group plans have a MLR of 80%.  MA Plans are also subject to the ACA limits, and have a MLR of 85%.  If a company spends less than the MLR on patient care, it has to pay a rebate to CMS.

### 4. UnitedHealth Identifies a Loophole in the Affordable Care Act and Expands Further

41.    In April 2011, shortly after the enactment of the ACA, UnitedHealth created Optum (and its segments Optum Health, Optum Rx, and Optum Insight), to house its non-insurance businesses.[5]

42.    UnitedHealth recognized that Optum Health, the healthcare provider segment, allowed the Company to blur the lines between payer and provider, evading the constraints of the ACA's MLR rules.  UnitedHealth could simply hire its own affiliate –

---

[5]    Occasionally referred to as OptumHealth, OptumRx, and OptumInsight.

- 17 -

via Optum Health – to provide medical care to members. Thus, UnitedHealth could increase payments to Optum Health in order to hit the minimum MLR level, and pocket outsized profits the ACA was designed to eliminate.

43.    Christopher Whaley, a health-care economist at Brown University, explained in an April 30, 2024 *Washington Post* article that Optum Health allowed UnitedHealth to "'acquire providers and essentially pay [it]self.'" He expressed concern that the arrangement "'provides a disincentive to really care that much about prices and spending growth.'" As part of its "Health Care's Colossus" series, *STAT News* issued an investigative report on November 25, 2024 entitled: "UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits."[6] In the report, Ron Howrigon, a health care consultant and former executive at Blue Cross Blue Shield, Cigna Healthcare, and Kaiser Permanente, said that UnitedHealth was "'cooking the books . . . by pushing things that are really insurance company profit over to medical expenses, because you own those doctors.'" In the same report, a physician who used to work within one of Optum's New York practices noted, "'[i]t's really a game the way they switch money from their right pocket to their left.'"

44.    Soon after the enactment of the ACA, UnitedHealth accelerated Optum Health's expansion (and UnitedHealth's vertical expansion in the provider space). Optum acquired several provider groups in the years between the enactment of the ACA and the end of the Class Period, including primary care practices, specialty clinics, and even a few

---

[6]    *See* Ex. 9.

hospitals.  For example, in December 2017, UnitedHealth announced that Optum would acquire DaVita Medical Group (which was itself a Fortune 500 company and the nation's largest provider of kidney care) for $4.34 billion.  And in March 2022, UnitedHealth announced that Optum would acquire LHC Group for $5.4 billion.  At the time, LHC Group was a massive in-home healthcare provider, with 960 locations in 37 states.  Earlier this year, UnitedHealth attempted to buy ***another*** home-health company, Amedisys, for $3.7 billion.  The DOJ is currently reviewing that transaction for antitrust violations.  Through these and other transactions, Optum has become the largest employer of physicians in America, boasting relationships with 90,000 physicians across the country, or 10% of all physicians in America.  The following graphic represents UnitedHealth's provider acquisitions since 2015:

4901-6680-9379.v3



45.    As Optum grew to become the predominant U.S. healthcare provider, UnitedHealth leveraged Optum's power to thwart competition.  The Company's control over a significant percentage of America's medical service providers allowed it to favor Optum-owned physician groups when creating insurance contracts, leaving its provider rivals with less desirable terms.  Conversely, Optum was positioned to disadvantage its insurer rivals by preventing Optum-affiliated providers from working with insurance companies other than UnitedHealthcare.  Indeed, Optum targeted providers in rural areas

where the local population had little choice about which provider to use, and thus had to sign up for whatever insurance company the provider contracted with.

46.    In addition to UnitedHealth's upcoding scheme, Defendants further gamed the system by circumventing the federal MLR rules by redirecting hundreds of billions of dollars in revenue from the Company's insurance arm, UnitedHealthcare, to its wholly owned Optum businesses.  As part of Defendants' scheme to shift more dollars to Optum to avoid the profit limitations imposed by the MLR rules, UnitedHealth paid its Optum provider groups considerably more than non-Optum providers.

47.    For its November 25, 2024 report, *STAT News* partnered with Tribunus Health, a data analysis firm, to analyze public data to determine whether UnitedHealth paid Optum providers more than competing insurers.  The analysis focused on five common medical procedures that allow for flexible rates paid to providers and account for a large percentage of medical spend.  The report analyzed more than 94 million rows of data from UnitedHealthcare and compared them with similar data from Blue Cross Blue Shield ("BCBS").  *STAT News* reported that, on average, UnitedHealth paid Optum providers 22% more than BCBS paid for the same services.  *STAT News* linked this anti-competitive conduct with the DOJ antitrust investigation, disclosed in February 2024, "over how its insurance company and medical groups compete with others."

48.    The disproportionate payments from UnitedHealth to Optum relative to BCBS payments to Optum are depicted in the chart below:

- 21 -

## UnitedHealthcare's higher rates

What UnitedHealthcare pays Optum CareMount practices in N.Y. compared to what Anthem BCBS pays

| Service | Anthem BCBS | UnitedHealthcare | % difference |
|---|---|---|---|
| Dermatology office visit (99213) | $184 | $210 | 14% |
| Family medicine office visit (99214) | $275 | $302 | 10% |
| Colonoscopy (45385) | $763 | $2,268 | 197% |
| Oncology office visit (99214) | $275 | $302 | 10% |
| CT scan of abdomen and pelvis (74177) | $992 | $1,298 | 31% |

Table: J. Emory Parker/STAT • Source: Tribunus analysis for STAT

49.     In response to the November 2024 *STAT News* analysis, "[t]he company said it ran its own analyses and asserted that, 'UnitedHealthcare pays Optum Health consistent with other payers in the market.'"  The *STAT News* report stated: "The company declined to share its analyses with STAT.  However, nothing within UnitedHealth's statement directly challenges the central finding that UnitedHealthcare pays Optum providers considerably more than non-Optum providers."

50.     By funneling more dollars to Optum via above-market payments for healthcare, UnitedHealth exploited MLR rules, undermined competition, and drove up costs for consumers.  As shown in the chart below, UnitedHealth payments to Optum, which included Optum Health, almost doubled between 2021 and 2024.

- 22 -



51.    UnitedHealth also spent billions on its vertical expansion, acquiring other healthcare-related businesses.  For example, in July 2015, UnitedHealth acquired Catamaran Corporation, a PBM, through Optum Rx, for $12.8 billion.  In September 2019, UnitedHealth announced that Optum Insight acquired Equian, LLC, which owns a medical billing tool, for $3.2 billion.

52.    Perhaps the most dramatic acquisition came in January 2021 when Optum Insight announced it was purchasing Change Healthcare, at a cost of $13 billion.  Change was the largest provider of prescription processing services in the United States, acting as a clearinghouse for medical transactions.  Change acted as the "pipes" for the healthcare industry as a whole, handling more than 15 billion healthcare transactions involving more than $1.5 trillion each year.  By the nature of its business, Change stores highly sensitive health and financial information from millions of patients.  It also houses valuable data from UnitedHealth's rivals at every level of the healthcare system.  Acquiring Change gave UnitedHealth access to critical competitor information, including information that

demonstrated its competitors' pricing structures, claims processing procedures, and billing practices. The acquisition of Change also positioned UnitedHealth to use this information in anticompetitive ways, such as creating insurance plans with hypercompetitive terms, and negotiating contracts with full visibility into the terms its counterparty had reached with UnitedHealth's competitors. For this reason, the DOJ sued to block the Change acquisition on antitrust grounds.

53.     UnitedHealth's massive expansion into the far corners of the healthcare industry positioned it to manipulate the system through intracompany dealings. Over the last decade, UnitedHealth has spent $60 billion on acquisitions. Kaufman, Hall & Associates, LLC, a prominent healthcare advisor and advocacy group, reported on March 15, 2024 that Optum as a whole "earned $88B of consolidated revenue" in 2023, but captured "an additional $136B of revenue from its insurance arm [that] was redirected into its Optum businesses in the form of intercompany eliminations." The report explained that "payments from UnitedHealthcare to Optum allow UHG to retain profit-capped insurance revenue by shifting it to other divisions, driving increased profitability for the overall enterprise." It noted Optum Health's growth in particular, which "increased its earnings over eightfold since 2014, consistently earning the majority of its revenue from UHG's insurance arm."

54.     By the start of the Class Period, UnitedHealth had grown to become the largest healthcare company in history, and the eleventh largest company overall in the world by revenue, with 2021 revenue of almost $288 billion. Operating independently of the UnitedHealth umbrella, Optum itself would be a Fortune 50 company.

- 24 -

### B. UnitedHealth's Fraudulent Upcoding Scheme Extracted Billions of Dollars in Taxpayer-Funded Payments

#### 1. Overview of the Medicare Advantage Program

55.     As detailed above, the Medicare Advantage program, or Medicare Part C, empowers UnitedHealth and other insurance companies to provide insurance to Americans through government programs using MA Plans.  CMS pays private insurers that offer MA Plans using a capitated payment system, in which they receive a flat rate for each member covered by the MA Plan.  Additionally, there is a risk adjustment feature, which adjusts payments to MA Insurers based on the health status of members, thereby allowing MA Insurers to receive higher payments for sicker or more complex members.

56.     Under the Medicare Advantage risk-adjustment feature, CMS adjusts the monthly capitated payments to account for various "risk" factors that impact a member's expected health expenditures.  CMS collects "risk adjustment" data (medical diagnosis codes) from the MA Insurers to make these payment adjustments.  A diagnosis code must satisfy the following criteria to be eligible for risk adjustment: (1) documented in an approved medical record during the prior year; and (2) documented as a result of a face-to-face visit between the member and a healthcare provider.

57.     CMS then calculates a "risk score" for each member enrolled in a MA Plan which determines the payment for that member.  This process ensures that MA Insurers are paid more for those members expected to incur higher healthcare costs and less for the healthier members expected to incur lower costs.  For example, assume that a base yearly payment for a hypothetical Medicare member is $10,000.  If a metastatic cancer and leukemia diagnosis code is added then this would increase the member's "risk score" and

- 25 -

would result in CMS paying the MA Insurer $20,700 more in risk-adjusted payments for the member in that year.

58.     This payment process is prospective.  The "risk score" is calculated for each member anew for each payment year based on the diagnosis codes from the immediately preceding year.  CMS relies on the MA Insurers and their contracted providers, including hospitals and physicians, to accurately document and submit the diagnosis codes to CMS. CMS requires the MA Insurers to submit annual attestations to CMS about the validity of these diagnosis codes.  The submission of such attestation is a condition of payment under CMS's regulations.

59.     Under the Medicare Advantage program, MA Insurers are allowed to use HRAs and retrospective chart reviews to collect, and submit to CMS, additional diagnoses for risk-adjusted payments that may not have been captured through standard clinical visits. HRAs can occur as part of a member's annual wellness visit or may be conducted at a member's home by the MA Insurer.

60.     Chart reviews can also be used by MA Insurers to identify diagnoses that lead to higher risk-adjusted payments.  In a chart review, the MA Insurer examines medical records to identify any diagnoses that may not have been previously reported or coded during standard clinical visits.  This retrospective review often involves examining physician notes, test results, and other documentation to ensure that relevant health conditions are captured.  Based on these chart reviews, MA Insurers can submit additional diagnoses to CMS, potentially increasing the risk scores for members and, consequently, the risk-adjusted payments they receive from CMS.

61.    The members UnitedHealth has enrolled in the Medicare Advantage program grew from 4.9 million in 2018 to 7.8 million in 2024, as shown in the following chart:



### 2. UnitedHealth Used Health Risk Assessments from In-Home Visits to Perpetrate Its Upcoding Scheme

62.    Before and during the Class Period, Defendants leveraged UnitedHealth's home-visit program, known as HouseCalls, to inflate the risk-adjusted payments UnitedHealth obtained from CMS for Medicare Advantage patients.  HouseCalls is a unit of UnitedHealth's insurance business, UnitedHealthcare, that dispatches nurse practitioners ("HouseCalls nurses" or "nurse practitioners") to members' homes to conduct HRA (health risk assessment) visits that are supposed to last 45 to 60 minutes, with the

stated goal of identifying "gaps in care." To increase and reward member participation, UnitedHealth provides gift cards and other incentives to members who complete HouseCalls visits.

63.     UnitedHealth provides mandatory training sessions and guidelines for the nurse practitioners performing HouseCalls visits that focus on how to conduct the in-home visits, make new diagnoses, and record any such diagnoses. The training sessions make clear to the nurse practitioners that they should get as many new diagnoses as they can during the in-home visits.

64.     UnitedHealth also sets productivity targets for the number of HouseCalls visits nurse practitioners are expected to complete each day, directly linking compensation to the volume of visits completed within a week. HouseCalls nurses are evaluated on the thoroughness of these visits, including diagnoses coding, which creates additional pressure on them to find new diagnoses. HouseCalls nurses are taught and pressured to identify high-value medical conditions that were not present in members' medical records and to change diagnosis codes to include more lucrative ones.

65.     But HouseCalls visits are limited in scope. While HouseCalls nurses can record new diagnoses, they are prohibited from providing direct medical treatment. Their primary task is to complete a lengthy online questionnaire, which includes a checklist of potential diagnoses for them to make. HouseCalls nurses lack the necessary equipment to diagnose serious or complex medical conditions, making the validity of diagnoses from HouseCalls questionable, especially for UnitedHealth members with potentially undiagnosed health issues requiring thorough clinical assessment. Yet, during the Class

- 28 -

Period, HouseCalls nurses are instructed to conduct unnecessary and unreliable tests which are prone to generate false-positives because those tests supported valuable diagnoses.

66.     By 2021, the Company's HouseCalls visits increased to 2.1 million visits per year and continued to increase throughout the Class Period, as shown in the following chart:



### a.     HouseCalls Nurses Were Required to Use Software Designed to Recommend Lucrative Diagnoses

67.     Before and during the Class Period, UnitedHealth instructed and pressured HouseCalls nurses to inflate the number of diagnoses reported during HouseCalls visits. During HouseCalls visits, nurse practitioners were required to use a Company-issued

laptop with pre-loaded software calibrated to maximize the number of diagnoses for additional payment. Rather than being a neutral tool for a thorough HRA, the software suggested potential diagnoses based on members' medications and responses that pushed HouseCalls nurses toward adding as many lucrative medical conditions as possible. The software was designed by UnitedHealth to ensure that nurse practitioners follow a predetermined path of diagnosis generation that UnitedHealth designed to inflate risk scores in order to maximize the Company's revenue from the Medicare Advantage program.

68.     A July 8, 2024 report in the *WSJ* titled: "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated," confirmed that the installed HouseCalls software suggested "what illnesses a patient might have and even adds some automatically to a 'diagnosis cart.'" On August 4, 2024, the *WSJ* published another report titled: "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," which described how the HouseCalls software prodded nurses to add diagnoses. For example, the HouseCalls software was designed to and did encourage diagnoses of secondary hyperaldosteronism (elevated levels of the hormone aldosterone), a rarely diagnosed condition. The HouseCalls software suggested the diagnosis if a member had a history of heart failure or cirrhosis *even though the nurse practitioners were not required to confirm the diagnosis with a lab test*. The August 4, 2024 *WSJ* report quoted former HouseCalls nurse practitioner as stating: "'In a million years, I wouldn't have come up with a diagnosis of secondary hyperaldosteronism.'"

- 30 -

69.    Based on an analysis of Medicare data, the *WSJ* found that from 2019 to 2021, UnitedHealth diagnosed secondary hyperaldosteronism 246,000 times after in-home visits, leading to $450 million in payments while ***all other MA Insurers combined*** generated less than 10% of that amount, or $42 million, from making the same diagnosis during this time period, as illustrated in the following chart:



### b. HouseCalls Nurses Were Instructed and Pressured to Add Unsupported Diagnosis Codes During In-Home Visits

70.    Before and during the Class Period, UnitedHealth instructed and pressured HouseCalls nurses to inflate the number of diagnoses reported during HouseCalls visits.

71.    HouseCalls nurses were pressured to upcode during internal reviews of the online questionnaires they filled out during in-home visits. Reviewers from UnitedHealth's quality assurance team ("reviewers") examined the questionnaires to ensure that HouseCalls nurses had maximized all available high-value diagnosis codes. During this review process, reviewers pressured HouseCalls nurses to identify and add new diagnosis codes that the nurses themselves had not previously identified. Specifically, HouseCalls nurses were pressured to link reported symptoms to previously diagnosed chronic conditions. For instance, nurse practitioners were told that every time a member reported neuropathy at an in-home visit and had a previous diabetes diagnosis, they were required to diagnose the neuropathy as diabetic neuropathy, even though that might not be the case. Similarly, reviewers pressured HouseCalls nurses to add new diagnoses for immune suppression disorders in cases where members were prescribed medications for chronic conditions known to potentially cause immune suppression, regardless of whether the member actually experienced immune suppression. Nurse practitioners were terminated for not following reviewers' instructions.

72.    The July 8, 2024 *WSJ* report stated that UnitedHealth used its HouseCalls program to inflate diagnoses by also including conditions that members were not treated for, contradicted their doctors' assessments, or were simply incorrect. For example, in

- 32 -

2022, Gloria Lee, a retired accountant and a former UnitedHealth MA Plan member, was offered a $50 gift card if she would allow a nurse practitioner to come to her home for a HouseCalls visit. Ms. Lee stated that the visit lasted for approximately 20 minutes and the HouseCalls nurse concluded that Ms. Lee had minor cataracts caused by diabetes severe enough to cause nerve damage. Ms. Lee's primary care physician, Dr. Nancy Keating, also a professor at Harvard Medical School, however, confirmed that Ms. Lee "never had diabetes, let alone complications like diabetic cataracts or nerve damage – a conclusion confirmed by subsequent blood tests." Dr. Keating commented on the practice of upcoding, stating: "'It's all just so wrong.'" Ms. Lee agreed, succinctly stating: "'If they're going to come out and diagnose people with things they don't have, they shouldn't get any more money.'"

73. The manipulation of diagnostic codes was carefully calibrated and orchestrated by Defendants. On March 18, 2024, *The Examiner News* reported on one such example, on January 26, 2024 a meeting was convened between Optum executives and other healthcare professionals for the Optum Tri-State/Optum East Organization. The purpose of the meeting was to advise nurses on how to add additional diagnosis codes when conducting chart reviews. The following people participated in the meeting: eight or nine nurses; a trio of administrators; a physician, Dr. Kevin Baran; and a pair of higher-level executives – Optum East Director of Clinical Documentation Education Rachelle Gauvin and the Vice President of Risk Adjustment Cristy Bauer, who reports to the President of Risk Bearing Entities Alyssa Pepper. The report included inside audiotapes from the meeting evidencing how UnitedHealth management coached attendees to add unsupported

- 33 -

diagnoses during chart reviews and to confront doctors who challenged medical conditions UnitedHealth sought to add to a patient's chart. One executive instructed those at the meeting to tell resistant doctors: "'"We presented this supported medical condition to you, and you disagreed with it. Let me explain to you what the CMS definitions are around the condition, and then I'd love to hear more about why you felt it might not be appropriate for this patient."'" The executives also instructed the nurses and administrators to add diagnoses through "'buddy codes,'" where one diagnosis would automatically lead to the addition of related diagnoses. One nurse asked the UnitedHealth executives whether a resource existed explaining the paired codes, but Dr. Baran acknowledged that UnitedHealth had made them up, and that: "'No one else will know what you're talking about outside of this room.'"

74.    *The Examiner News* also described the three-step process employed by Optum to defraud CMS. First, nurses would conduct chart reviews to identify the members' prior chronic conditions (even if the prior condition was years old) and then add the diagnoses to the members' charts to "resurrect" prior medical issues into an "active problem." Second, the members would then visit their primary healthcare provider, but Optum tried to keep the members' primary healthcare provider "inoculated" from the upcoding scheme. Third, a coder, "usually offshore in India," would add a code in a "super shady" manner that related to the diagnoses previously added by the nurse in step one, but not addressed by the primary healthcare provider in step two, and then claims would be submitted to CMS without the members' primary healthcare providers' involvement.

- 34 -

75.    The August 4, 2024 *WSJ* report stated that between 2019 and 2021, UnitedHealth received $10.7 billion from in-home visit diagnoses.  The report also stated that UnitedHealth had the highest average payments among other Medicare Advantage insurers of $2,735 for in-home diagnoses per visit from 2019 to 2021.  UnitedHealth's outsized payments are illustrated in the following chart:



### c.    HouseCalls Nurses Were Required to Use Unreliable Medical Devices that Caused False Positive Diagnoses

76.    Leading up to and during the Class Period, UnitedHealth required HouseCalls nurses to use a medical device called QuantaFlo to diagnose and upcode peripheral artery disease.  HouseCalls nurses were forced to use QuantaFlo as a mechanism to generate revenue without regard to medical necessity as the device was not indicated by the Food and Drug Administration ("FDA") for use as a stand-alone diagnostic device and medical guidelines actually recommended against widespread screening for peripheral

- 35 -

artery disease. Nonetheless, the HouseCalls training manual required nurse practitioners to diagnose peripheral artery disease based on the results from QuantaFlo alone.

77.    Reports published after the Class Period confirm the Company's peripheral artery disease upcoding scheme. For instance, the August 4, 2024 *WSJ* report stated that Shelley Manke, a nurse practitioner previously employed by UnitedHealth, was required to use QuantaFlo during her in-home visits. The *WSJ* confirmed that UnitedHealth was checking for cases of peripheral artery disease because each new case would result in an additional payment of approximately $2,500 per year. After Ms. Manke tried the device on herself and received mixed results, she and other nurses raised concerns to UnitedHealth management but were told they needed to keep using the device. The report stated that Ms. Manke said it "'made me cringe'" because she did not believe they should be making such a diagnosis when they did not have an adequate test.

78.    Similarly, the August 4, 2024 *WSJ* report stated that Dr. Amy Chappell, a neurologist and UnitedHealthcare member, was surprised when UnitedHealth sent a nurse to her house and the nurse pulled out the QuantaFlo device. Dr. Chappell is an avid runner and tennis player and the nurse should not have had any reason to believe that Dr. Chappell had peripheral artery disease. The report explained that according to the device, Dr. Chappell tested positive although the nurse did not do any other exam to check for symptoms of the disease. Her primary care physician subsequently confirmed that diagnosis was inaccurate. UnitedHealth later admitted that Dr. Chappell's diagnosis was improper.

79.     As illustrated in the following chart, the August 4, 2024 *WSJ* report found that UnitedHealth diagnosed this condition 568,000 times after in-home visits between 2019 and 2021, yielding $1.4 billion in payments while *all other MA Insurers combined* were paid $446 million from making the same diagnosis during this time period:



80.     As part of its "Health Care's Colossus" series, on August 7, 2024, *STAT News* published a report titled: "How UnitedHealth turned a questionable artery-screening program into a gold mine," which further confirmed Defendants' upcoding scheme.  The report stated that after the worst of the COVID-19 pandemic was over, UnitedHealth-owned clinics were directed by the Company to use QuantaFlo on Medicare Advantage members because "it will not only identify undiagnosed peripheral artery disease, but also increase patients' risk scores," which in turn would allow UnitedHealth to "tap into a sea

of revenue." Each diagnosis of peripheral artery disease was worth approximately $3,600 in additional payments from CMS per year.

81.    According to the report, UnitedHealth directed providers to use QuantaFlo to screen patients for peripheral artery disease, even if they did not report any symptoms. But the device was "backed by a slim body of evidence generated by its manufacturer" and "[c]leared in 2015 through a Food and Drug Administration pathway that requires limited clinical testing" and only "cleared as a tool to aid clinicians in diagnosing [peripheral artery disease], but not as a standalone diagnostic device." Studies showed that the device gave false positives 10% of the time, and accordingly "[e]xperts said that level of imprecision, combined with the small sample size, makes it problematic for use in widespread screening because of the potential that false positives could expose high numbers of patients to unnecessary care." According to five doctors from UnitedHealth-owned clinics, "[s]ome of the QuantaFlo diagnoses were nearly useless."

82.    The report stated that doctors were concerned that patients with false or exaggerated diagnoses would receive unnecessary treatments. According to Dr. Michael Good, a physician formerly employed by a UnitedHealth-owned clinic, he and fellow doctors would receive agonizing calls from their patients, Dr. Good stated: "'They'd call up and say, what does this mean that I have peripheral artery disease? What is this all about? Why didn't you ever tell me about this?'" Kristine Lane, a physician's assistant at The Vascular Experts, a chain of vascular offices in Connecticut, stated that several patients were calling to ask for immediate appointments because they were worried about losing a leg without treatment. Ms. Lane also said that The Vascular Experts "conducted an

- 38 -

ultrasound on these patients to scan their lower extremities for signs of restricted blood flow. ***She couldn't recall a single follow-up test that found evidence of the disease.*** "'They'll come in with an extremely abnormal QuantaFlo number, and then on real testing – more elaborate testing – they're not abnormal at all,' she said."

83.     The *STAT News* report also stated that the "same pattern unfolded at a nearby vascular clinic at Hartford HealthCare, to the point where clinical staff stopped ordering normal follow-up testing because so many QuantaFlo patients were falsely positive." Dr. Ray Antonelli, a family physician in North Carolina, saw about three or four patients a week who had been falsely diagnosed during a HouseCalls in-home visit. Dr. Foluso Fakorede, a Mississippi cardiologist and leader in peripheral artery disease treatment, stated that he has also seen an increase in QuantaFlo members to his office, and typically ignores the results when they have normal pulses and have no risk factors. Despite physicians' reservations, the Company still forced the clinics to adhere to a UnitedHealth-controlled schedule to conduct the testing.

84.     When physicians resisted too much, QuantaFlo testing was delegated to HouseCalls nurses, even though HouseCalls nurses were not allowed to offer clinical advice when patients received their results. The physicians who were interviewed during the *STAT News* investigation explained "the [C]ompany began to work around the doctors skeptical of the test, hiring nurse practitioners to conduct the test at annual wellness visits."

- 39 -

85.    Like *STAT News*, the *WSJ* reported that UnitedHealth instructed nurses to diagnose peripheral artery disease based on the results of a QuantaFlo device, which the FDA has said "'is not indicated for use as a stand-alone diagnostic device.'"[7]

86.    As a result of the regimented use of the QuantaFlo device, UnitedHealth "diagnosed Medicare Advantage patients with peripheral artery disease at almost four times the rate of patients in traditional, government-run Medicare." Ultimately, heading into 2024, CMS decided to eliminate the diagnosis code for peripheral artery disease as a rate-increasing diagnosis. This action was supported by 19 former CMS officials, physicians, and policy experts who had sent a letter to CMS supporting this reform, stating: "It is well-known that [MA Insurers] maximize the vascular disease . . . by sending staff into MA patients homes with digital diagnostic devices to try and find the slightest hint of sclerosis with little or no clinical relevance." The announcement caused an immediate reversal of coding trends. The rate of testing and diagnosis in patients 50 and older more than doubled between 2018 and 2023 – from 7 per 100,000 patients to 14.7 per 100,000 – then, following the early 2024 letter, fell by more than one third to 9.6 by May 2024.

### 3.    Additional Means by Which UnitedHealth Perpetrated the Upcoding Scheme

87.    The multi-faceted upcoding scheme also incorporated chart reviews, and provider pressure tactics. For the purpose of upcoding, UnitedHealth used risk-adjustment coders employed by Optum and third-party companies to seek out chronic conditions in the charts of Medicare Advantage members that could be linked to potential complications

---

[7]    *See* Ex. 5.

even if a diagnosis code was unsupported.  The risk-adjustment coders were instructed to mine for information that would allow UnitedHealth to raise the member's risk-adjustment score.

88.    UnitedHealth also instructed risk-adjustment coders to coach providers to find the highest value diagnosis codes for Medicare Advantage member without regard to medical necessity, which was referred to as "leading" the provider.  In 2023, UnitedHealth increasingly outsourced its risk-adjustment coding responsibilities to offshore entities, primarily based in India.

89.    As with HouseCalls nurses, the risk-adjustment coders were required to link chronic conditions, such as diabetes, to known diabetic complications ***even if the connection was not medically indicated***.  The risk-adjustment coders were evaluated on how much upcoding they performed and were expected to code the highest value diagnosis possible.

90.    UnitedHealth also used its captured Optum provider network to facilitate the upcoding scheme.  On July 25, 2024, *STAT News* published a report titled: "How UnitedHealth harnesses its physician empire to squeeze profits out of patients," further documenting UnitedHealth's nationwide practice of pushing its 90,000 affiliated clinicians to document as many ailments as they could by "encouraging clinicians through bonuses and performance reviews to identify more health problems in patients, even if those conditions seemed dubious."  Doctors received hours of such training on how to document patients' illnesses and increase payments from Medicare.  In its December 29, 2024 report entitled: "UnitedHealth's Army of Doctors Helped It Collect Billions More From

- 41 -

Medicare," the *WSJ* interviewed Dr. Naysha Isom, a physician who worked for UnitedHealth in Las Vegas. Dr. Isom said the training she received from UnitedHealth lasted two days and involved UnitedHealth employees encouraging her to make diagnoses she had never made before.

91.     In addition, providers in the UnitedHealth network were required to use charting software that recommended various diagnoses for Medicare Advantage patients and would not let doctors close out of a patient's chart unless the provider selected "yes" or "no" for each recommended addition. The *WSJ* interviewed Nicholas Jones, a family physician who worked for UnitedHealth in Oregon, as part of its December 29, 2024 report. Tellingly, Dr. Jones confirmed that UnitedHealth's charting software did not have the same compulsory consideration of diagnoses for patients treated outside of Medicare Advantage, where sicker patients did not mean more money. Dr. Jones said some of the suggested diagnoses were so obscure that he had to look them up on Google before responding to the prompt. Other suggestions lacked a sufficient basis, according to Dr. Jones, such as a suggestion to diagnose a clotting disorder simply because the patient reported regularly taking aspirin. Dr. Isom said that UnitedHealth employees would follow up with her if she rejected a suggested diagnoses and press her to reconsider.

92.     In *STAT News*'s words, UnitedHealth pressured physicians "to treat patients as if they were fields of medical codes to be harvested, instead of people who have complex histories." UnitedHealth not only instructed clinicians to document conditions they did not believe applied, but reprimanded clinicians if their upcoding numbers were not sufficient.

- 42 -

Doctors who met UnitedHealth's coding expectations were rewarded with annual bonuses upwards of $30,000.

93.     Similarly, according to the *WSJ*'s December 29, 2024 report, UnitedHealth paid bonuses to independent doctors for each patient with a sickness score at least 20% above average, creating an incentive to inflate the scores.  UnitedHealth also offered to pay independent doctors $250 if they would agree to allow a nurse practitioner to examine their patient in search of additional diagnoses.  Dr. Andy Pasternak, an independent doctor the *WSJ* interviewed, said this payment was higher than the amount he would receive for actually seeing the patient himself.  Valerie O'Meara, a former UnitedHealth nurse practitioner who conducted these exams in Washington state, said her job was "'finding diagnoses, that was clear as a bell.'"  Overall, UnitedHealth's upcoding scheme created perverse incentives that led to significantly higher sickness scores for patients, on paper.  According to the December 29, 2024 *WSJ* report, sickness scores for patients who switched from traditional Medicare to UnitedHealth Medicare Advantage saw a ***55% increase in their sickness score in the very first year***.  For context, that dramatic score increase is equivalent to every patient being diagnosed with HIV ***and*** breast cancer in their first year.

### 4.     The Upcoding Scheme Caused UnitedHealth to Diagnose Disproportionate Amounts of Lucrative Conditions

94.     The July 25, 2024 *STAT News* report further reported that a 2022 study by UnitedHealth's own physician researchers showed that UnitedHealth's physicians coded its MA Plan members as having lung disorders, vascular conditions, and kidney disease at a rate 200% higher than the rate of those in the traditional Medicare program.  The July 25,

2024 *STAT News* report stated that Dr. Susan Baumgaertel (a primary care physician previously employed by UnitedHealth in Seattle, Washington) would truthfully tell members when they called that they really did not have the condition she had added to their chart, but she was instructed to add it by UnitedHealth so that she would get paid more. After *STAT News* reported its story with Dr. Baumgaertel named as source, she was contacted by the DOJ to assist with its ongoing investigation.

95.     Additionally, the July 25, 2024 *STAT News* report stated that Dr. Nicholas Jones (a primary care physician previously employed by UnitedHealth in Eugene, Oregon), stated that the inaccurate code he saw most frequently was long-term management of insulin: the code was applied to members that only received insulin once to lower their blood sugar before surgery, but who never needed the drug again.  Dr. Jones stated that UnitedHealth would regularly host sessions where they spent hours teaching doctors how to code, but the sessions never covered new research into specific conditions or resources available for members.

96.     On October 16, 2024, a *STAT News* report further confirmed UnitedHealth's practice of pressuring doctors to document more chronic illnesses in Medicare Advantage patients to increase revenue.  According to the report, UnitedHealth used a combination of techniques to exert upcoding pressure, including paying bonuses, peer pressure, and utilizing competitive dashboards comparing doctors' diagnosis rates with peers.  The report also confirmed that at UnitedHealth clinics, doctors diagnosed peripheral artery disease in 47% of Medicare Advantage patients – a rate three to four times higher than typical prevalence in older Americans.  Each diagnosis brought in about $3,000 in extra annual

- 44 -

Medicare payments per patient. According to the *STAT News* report, former UnitedHealth physicians from across the country consistently described intense pressure from the Company to increase patient risk scores and noted that doctors who did not code enough diagnoses were actually sent to remedial training. The *STAT News* report quoted a former UnitedHealth doctor, stating: "'They would say, "You should talk about these other high-risk disease states so that we get more compensation for it,". . . I think that's an inherent conflict of interest. Effectively what you're incentivizing is sicker patients, or at least sicker appearing on paper, which I think is a joke.'"

97.    According to a July 8, 2024 *WSJ* report entitled: "Insurers Pocketed $50 Billion For Medicare for Diseases No Doctor Treated," UnitedHealth also targeted AIDS and HIV diagnoses. The *WSJ* report found that most people with insurance-driven AIDS/HIV diagnoses likely did not have either disease, because they did not receive any commonplace treatment for the conditions, such as antiviral medications. Indeed, 92% of patients who received an HIV/AIDS diagnosis through normal channels took antiviral drugs, while only 17% of patients diagnosed by insurance companies took them.

98.    UnitedHealth members received treatment even less often than members of other insurance companies. As shown in the chart below, only approximately 11% of UnitedHealthcare members diagnosed with HIV from 2018 to 2021 received the recommended antiretroviral drug treatment, which was the only effective treatment for HIV. The lack of treatment demonstrates that these HIV "diagnoses" were not supported. Yet, an HIV diagnosis yielded UnitedHealth extra payments of $3,000 a year per member.

- 45 -



99.     The same trend applied to various other lucrative diagnoses.  The *WSJ* studied data from UnitedHealth doctors who diagnosed conditions for not only UnitedHealth Medicare Advantage patients but also for patients on competing MA programs and patients on traditional Medicare fee-for-service.  The December 29, 2024 *WSJ* report provided diagnoses comparisons used in the following illustrative chart, showing that UnitedHealth doctors dramatically over-diagnosed conditions for

- 46 -

UnitedHealth Medicare Advantage patients, relative to patients on competing MA programs and patients on traditional Medicare fee-for-service.



100.    These targeted diagnoses were deliberately added by UnitedHealth, which paid employees to review medical charts in search of new diagnoses and sent nurses to visit patients in their homes with an aim to tack on profitable diagnosis codes. The *WSJ* reports show that 60% of UnitedHealth in-home visits generated at least one new revenue-

producing diagnosis of a condition no doctor was treating, and generated $2,735 per visit, on average.

101.    The *WSJ* reported that insurer-driven diagnoses by UnitedHealth for high-value diagnoses that no doctor treated generated $8.7 billion in payments to UnitedHealth from CMS in 2021 alone, which amount equaled more than 50% of the Company's 2021 net income of $17 billion.

102.    The *WSJ* also found that UnitedHealth added diagnoses at a far higher rate that other insurers, as illustrated in the following chart:



**5.    The Office of Inspector General Investigates
UnitedHealth's Medicare Advantage Program**

**a.    The OIG's September 2021 Report Confirms
Billions of Dollars in Questionable Payments Made
to UnitedHealth as a Result of Chart Reviews and
Health Risk Assessments**

103.    The OIG was established by law in 1976 to fight waste, fraud and abuse and to improve the efficiency of Medicare, Medicaid and more than 100 other Department of Health & Human Services (HHS) programs.  The OIG has approximately 1,600 personnel. The majority of the agency's resources go towards the oversight of Medicare and Medicaid – programs that represent a significant part of the federal budget and that affect this country's most vulnerable citizens.

104.    As detailed in the Federal Register / Vol. 83, No. 215, in furtherance of its mission, the OIG:

- conducts and supervises audits, investigations, evaluations, and inspections relating to HHS programs and operations;

- identifies systemic weaknesses giving rise to opportunities for fraud and abuse in HHS programs and operations and makes recommendations to prevent their recurrence;

- leads and coordinates activities to prevent and detect fraud and abuse in HHS programs and operations;

- detects wrongdoers and abusers of HHS programs and beneficiaries so appropriate remedies may be brought to bear, including imposing administrative sanctions against providers of health care under Medicare and Medicaid who commit certain prohibited acts; and

- keeps the Secretary of Health and Human Services and Congress fully and currently informed about problems and deficiencies in the administration of HHS programs and operations and about the need for and progress of corrective action.

105.    In addition, the OIG works with the DOJ to operate the Health Care Fraud and Abuse Control Program.

106.    In September 2021, the OIG published the results from its detailed evaluation of payments made by CMS in 2017 resulting from chart reviews and HRAs.[8]  Two prior OIG evaluations found that MA Insurers were paid $9.2 billion in 2017 for diagnosis codes only reported on chart reviews or HRAs.  Therefore, the OIG was concerned that MA Insurers were leveraging both chart reviews and HRAs to inflate risk-adjusted payments. The submission of unsupported diagnoses is a major driver of improper payments to the MA Insurers.

107.    The OIG found that UnitedHealth "stood out from its peers in its use of chart reviews and [HRAs] to drive risk-adjusted payments."[9]  In 2017, UnitedHealth received 40% ($3.7 billion of $9.2 billion) of the total risk-adjusted payments made by CMS resulting from chart reviews and HRAs, yet UnitedHealth enrolled only 22% of the total MA Plan members.    UnitedHealth's payments from just HRAs was even more disproportionate compared to its peers – in 2017 the Company generated 58% ($1.5 billion of $2.6 billion) of all payments made by CMS resulting from HRAs.  Almost all of the HRAs conducted by UnitedHealth were in members' homes.

---

[8]    Attached hereto as Exhibit 15 is the OIG report titled: *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments to Disproportionately Drive Payments*, OEI-03-17-00474, dated September 2021.

[9]    The OIG report did not identify UnitedHealth by name.  Shortly after the OIG report was issued, the *WSJ* and other media outlets published articles and investigative reports about the OIG report confirming that UnitedHealth was the company referenced in the OIG report.

- 50 -

108.    UnitedHealth alone received 66.6% of all payments made by CMS in 2017 resulting from diagnoses reported from only in-home HRAs and on no other service records.  Additionally, the top three diagnoses from in-home HRAs that generated risk-adjusted payments for UnitedHealth were "'peripheral vascular disease, unspecified,'" "'major depressive disorder, recurrent, mild,'" and "'type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene.'"   These three diagnoses were submitted by UnitedHealth solely predicated on in-home HRAs and on no other service records for 125,632 members, almost 600% of the number submitted for these three diagnosis only on in-home HRAs by all other 161 MA Insurers (21,618 members) **combined!**

109.    Additionally, UnitedHealth accounted for at least 90% of members with 9 other diagnoses made only from in-home HRAs that generated additional risk-adjusted payments by CMS in 2017.  For example, UnitedHealth submitted the diagnosis of "'other forms of angina pectoris'" for 99% (6,719 of 6,795) of the members with this diagnosis from an in-home HRA that generated payment by CMS in 2017.  All other 161 MA Insurers combined submitted this diagnosis from in-home HRAs for just 76 members.  The OIG concluded it was "'unusual that one company accounted for such a substantially higher share of the [members] with these diagnoses.'"   Therefore, the OIG recommended that CMS perform additional oversight over UnitedHealth to determine the propriety of the billions of dollars in payments CMS made to the Company.

110.    In response to a September 2021 report from the OIG, UnitedHealth adamantly denied any wrongdoing, stating: "'UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings

- 51 -

to ensure our members continue to receive cost-effective, appropriate care.  Our Medicare

Advantage risk-adjustment program is transparent and compliant with CMS rules.'"

> **b.      Additional OIG Report in October 2024 Confirms UnitedHealth's Upcoding Scheme Continued Through 2023 and that UnitedHealth Was Paid Billions in Improper Payments in 2023**

111.    In October 2024, the OIG released a report titled: "Medicare Advantage:

Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans

by Billions," confirming UnitedHealth's persistent manipulation of the Medicare

Advantage payment system during the Class Period at the expense of vulnerable seniors

and taxpayers.  The October 2024 OIG report found that $4.8 billion in risk-adjusted

payments made to MA Insurers in 2023 resulted from diagnoses reported *only* on in-home

HRAs and HRA-linked chart reviews, and that UnitedHealth alone received $3.2 billion,

or two-thirds of these payments, while covering only 28% of Medicare Advantage

members.  The report also found that UnitedHealth was responsible for generating more

than half of the payments made to 77 Medicare Advantage plans in 2023 where the

payments were tied solely to a single in-home HRA and *no other service or treatment

record*.

112.    Based on these findings, the OIG expressed concern that "either: (1) the

diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive

needed care for serious conditions reported only on HRAs or HRA-linked chart reviews."

The OIG report also expressed concern about UnitedHealth's practice of using *their own*

providers to conduct in-home HRAs, rather than using the patients' primary care providers

- 52 -

in a clinical setting.  The OIG report stated: "By adding diagnoses to an in-home [HRA] via a chart review without also implementing best practices for care coordination, MA companies [including UnitedHealth] may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care."

113.    The OIG's findings raised concerns that UnitedHealth was using in-home visits and HRA-linked chart reviews to maximize payments instead of providing healthcare.  Based on these concerns, ***for the first time ever***, the OIG recommended that CMS restrict or even cut off payments for diagnoses obtained at in-home visits.

114.    On October 24, 2024, the *WSJ* reported on the OIG report and included additional commentary from OIG officials.  According to the *WSJ*, the OIG's assistant inspector general for evaluation and inspections, stated:

> "We're seeing that some Medicare Advantage companies are making billions from the health risk assessment diagnoses without providing care for the conditions that they identify," . . . .
>
> That could mean some of the diagnoses are false . . . .  Or, if they are accurate, the insurers making them aren't connecting patients to the care they need, even as the companies are paid extra based on the supposed cost of treating the conditions.  "Profiting off enrollees' medical conditions without providing treatment for those conditions is wrong[] . . . ."

115.    The *WSJ* report also stated that UnitedHealth and other MA Insurers made diagnoses at in-home visits without standard confirmatory testing, stating:

> The diagnoses that triggered home-visit payments documented in the OIG report were often for illnesses that might be difficult to confirm without a laboratory or other equipment.  Two of the top diagnoses driving the payments were a form of rheumatoid arthritis, which might require lab work and X-rays to diagnose, along with secondary hyperaldosteronism, a condition that can be confirmed with blood work.

- 53 -

Quoting the lead author of the OIG report, the *WSJ* report stated: "'There are definitely conditions where you might wonder, "'Can they really, you know, identify that by a visit to someone's home?'"'"

### 6. Named Witness Accounts, Confidential Witness ("CW") Accounts, and Other Sources

116. The CWs are percipient witnesses, some of whom are former UnitedHealth and/or Optum employees, and confirmed that Defendants engaged in the upcoding scheme. The CW accounts corroborate: (a) one another; (b) other sources set forth herein; and (c) the OIG's findings of fact. The CWs provided information on a confidential basis and are particularly described by job description and responsibility, and duration of employment. As set forth below, the information provided by the CWs further supports that the Defendants acted with scienter. In addition to the CW accounts, numerous media sources set forth above, and cited herein, reflect on-the-record interviews, firsthand accounts, and other information provided by current and former UnitedHealth and/or Optum employees. The accounts of the confidential sources and other information provided in the media articles, as cited herein, corroborate the accounts of the CWs, the findings of fact by the OIG, and other facts alleged herein.

### a. CW Accounts

117. **CW1**. CW1 is a medical doctor who worked at an Optum clinic in the western United States from 2019 to 2022. Upon beginning with Optum, CW1 had to attend a two-day coding boot camp led by a nurse practitioner.

118. CW1 was frequently pressured to get Medicare patients to come into the office for wellness visits. CW1 explained that the initial outreach to patients for wellness

- 54 -

exams was made by other employees.  The purpose of setting up wellness exams was to search for diagnoses codes that would increase their risk-adjustment scores.

119.    CW1 also described Optum's electronic health records ("EHR") platform and how CW1 was required to navigate a book load of diagnosis suggestions for every member CW1 saw.  CW1 called the EHR chart prompts ridiculous as the majority of the prompts on the list had nothing to do with why the patient was being seen.  CW1 said that Optum management cared more about adding diagnosis codes than addressing the real reason the patients were there.

120.    CW1 was prodded to add specific diagnoses, including diabetes, major depression, substance abuse disorder, vascular disease, and senile purpura.  There were diagnoses that appeared via the EHR prompts that CW1 had not seen before in all CW1's years of practicing medicine.  CW1 was appalled at the way CW1 was expected to practice medicine at Optum with the focus on increasing Medicare Advantage risk scores rather than patient care.

121.    Ultimately, CW1 left Optum because CW1 was disgusted by the way CW1 was expected to practice medicine there.

122.    **CW2**.  CW2 worked at Optum from 2019 to 2023 and worked as a Senior Risk Adjustment Coding Educator and later in Fraud Waste and Audit (FWA) Clinical Review.  CW2 explained that there are certain audit teams within Optum that review patient charts.  The audit teams review the patient profile notes and determine whether additional conditions could have been coded.  CW2 explained that audit teams focused on adding

- 55 -

codes that improved risk-adjustment scores, and did not review charts to search for codes that had no impact on risk-adjustment scores.

123.    CW2 was a member of the Coding Escalation Review Team (or CERT team). The CERT team was a group of employees who addressed coding questions from UnitedHealth and Optum employees across the country.  CW2 was the only registered nurse on the CERT team.  CW2 was concerned with some of the upcoding changes conducted by the financial coding team.  To address these concerns, CW2 emailed CW2's teams within Optum that CW2 managed and instructed them on how they should properly code.  CW2 stated that Optum was wrong in applying certain diagnosis codes and CW2 communicated that belief to the coding team.  After CW2 sent the email about proper coding, CW2's supervisor, a Vice President of Quality Assurance at Optum, demoted CW2, and CW2 was removed from the CERT team, leaving the CERT team without a registered nurse.  The Vice President of Quality Assurance at Optum was not happy that CW2 had sent CW2's teams the email questioning coding procedures and then dissolved the teams CW2 managed.

124.    CW2 stated that the Company had no leg to stand on with upcoding patient files and Optum was coding to the most severe level without proper documentation.

125.    CW2 further escalated CW2's concerns about improper upcoding internally via the Company's compliance hotline.  The compliance hotline is where UnitedHealth

- 56 -

and/or Optum employees can report Company fraud internally.[10]  CW2 sent an email to the compliance hotline.  CW2 believes that CW2 was demoted in retaliation for voicing CW2's concerns about the improper upcoding.

126.    CW2 also described a specific instance of upcoding relating to immunosuppression (or a weak immune system).  During CW2's time at Optum, coders were instructed to automatically add a diagnosis of immunosuppression to patients with other diagnoses, such as diabetes or rheumatoid arthritis, regardless of an independent basis for a clinical diagnosis for immunosuppression.  As another example, CW2 expressed disagreement about the way Optum was coding a neuropathic condition.  CW2 recommended that Optum send the issue to AMA to get guidance on proper coding.  The AMA instructed Optum to code the condition in a way that would not increase the risk-adjustment score, but Optum decided to ignore that advice and code in a way that did increase the risk-adjustment score.

127.    CW2 further explained that Optum physicians were prodded to diagnose and code for certain conditions every time a patient had another diagnosis that Optum had automatically linked to that condition.  If any Optum physician failed to include a recommended diagnosis where Optum had decided it was automatically linked, the coders would send a query to the Optum physician prodding the physician to add the code.  The query would come to the Optum physician by email and would prod the Optum physician

---

[10]  According to the Company's website, you can report fraud "concerns to UnitedHealthcare online at uhc.com/fraud, or to Optum by completing a submission form or by calling 844-359-7736."

to open the patient's medical chart and add the code.  If the Optum physician failed to respond to the email the Optum physician would be emailed again and again.  Doctors could not ignore these emails without recourse, and their responsiveness to the emails was tracked.  Doctors were reprimanded if their response rates were too low.

128.  **CW3**.  CW3 is a primary care physician and was a shareholder in a clinic in the western United States.  On December 31, 2018, Optum became a majority shareholder of the clinic.  CW3 continued to be a shareholder and work at the clinic until 2021, when CW3 resigned.  After Optum became the major shareholder, CW3 confirmed that the focus on patient treatment, including MA members, changed.  The clinic became hyper focused on converting non-MA members to being members of UnitedHealth's MA program, which was communicated through weekly emails, meetings, and outreach from clinic's managed care department.  Due to pressure from management, CW3 and CW3's staff began prioritizing CW3's UnitedHealth MA members over CW3's other patients.

129.  CW3 also described a widespread campaign at the clinic to maximize the diagnoses codes for each of the clinic's UnitedHealth MA members in order to increase risk-adjustment scores.  CW3 confirmed that the clinic's doctors were pushed to schedule wellness visits for MA patients for this purpose and that doctors' bonuses were tied to the number of wellness visits they completed.  CW3 was expected to find medical diagnosis codes with the highest possible risk-adjustment scores, and received harassing alerts via staff messaging, emails, and voicemails before, during, and after each appointment to consider specific diagnoses for that MA member.  If a doctor did not address a diagnosis as the alert suggested for consideration, there was a reminder for the next appointment.

CW3 reported that the clinic tracked and distributed weekly reports that compared each doctor's performance with regard to coding certain diagnoses for MA patients and the number of MA wellness visits completed.

130.    CW3 shared a story of a patient whose breast cancer had been successfully treated and was taking tamoxifen.  The clinic required that the patient be coded as having active breast cancer, rather than having a history of breast cancer, in order to get the maximum risk-adjustment score increase out of the diagnosis.  CW3 said there were other such cases and it was upsetting to the patients to see an active cancer diagnosis, while they were celebrating being cancer free.

131.    CW3 confirmed that the clinic required every MA member to have a peripheral artery disease test using the QuantaFlo device.  CW3 was required to check a box signifying that CW3 had used the QuantaFlo device with each MA patient.  CW3 described the QuantaFlo device as bogus because it wrongly diagnosed people as having peripheral artery disease.  If the test came back positive, CW3's patients would often get angry or nervous that they were at risk of having a heart attack, which would lead to more tests to rule out more serious conditions.  CW3 explained that this was often difficult for more elderly patients.

132.    **CW4**.  CW4 was a Nurse Practitioner for the HouseCalls program in the mid-western United States from 2015 to 2023.  During CW4's tenure, CW4 performed HRAs of UnitedHealth's MA members at in-home visits.  HouseCalls nurses conducted the HRAs using a UnitedHealth issued laptop, pre-loaded with the Company's proprietary software called E-HouseCalls.  E-HouseCalls had a questionnaire that nurses were required to fill

- 59 -

out for each in-home HRA.  After completing the questionnaire, E-HouseCalls suggested bundled diagnoses that nurses would have to manually unselect if the they did not apply. Based on CW4's physical exams and clinical judgment, CW4 believed 90% of the E-HouseCalls suggested diagnoses were not accurate.  CW4 felt the Company wanted HouseCalls nurses to focus on connecting certain diagnoses codes for the purpose of increasing payments from the government.  For example, if a member had diabetes and neuropathy, E-HouseCalls would suggest linking the two conditions as related diagnoses, which made the diagnosis more severe.

133.    After CW4 completed the HRAs, the assessments were uploaded through E-HouseCalls for internal review.  If CW4 chose not to accept recommended diagnoses or connect diagnoses suggested by E-HouseCalls, Company reviewers sent follow-up messages through E-HouseCalls questioning CW4's decision to not accept or connect them.  This became frustrating for CW4, as CW4 had to respond to these inquiries outside of CW4's regular work hours.  After speaking with other nurses about receiving these follow-up messages, CW4 learned that most of CW4's colleagues did not get as many messages as CW4 did, which lead CW4 to believe that they were following the E-HouseCalls diagnoses suggestions.

134.    CW4 confirmed that HouseCalls nurses were required to use QuantaFlo testing devices during in-home HRAs, which tested for peripheral artery disease (PAD). E-HouseCalls determined which MA members nurses were required to administer a QuantaFlo test to.  CW4 could not ascertain the Company's basis for this selection process. CW4 stated that in some cases CW4 was required to perform the test even if there were no

- 60 -

risk factors for PAD identified in CW4's examination of the member. CW4 stated that QuantaFlo training was limited and the test results were less than 50% accurate. As an example, CW4 explained that after conducting a physical exam and determining, based on CW4's clinical judgement, that a MA member had good circulation, the QuantaFlo test would often indicate otherwise. According to CW4, the QuantaFlo device was connected to E-HouseCalls so that the test result would automatically be coded in the MA member's chart. CW4 stated that E-HouseCalls made it was very difficult to change a PAD diagnosis if the results conflicted with the physical exam and CW4's clinical judgement. CW4 believed the Company focused on PAD diagnoses because it was a money maker.

135.    CW4 stated that the nurse practitioners' annual evaluations were based in part on reaching mandated targets for administering QuantaFlo testing to the MA members identified by E-HouseCalls. They were required to complete 85% of the tests assigned by E-HouseCalls. Nurse practitioners could be disciplined if they did not meet this target.

136.    According to CW4, nurse practitioners had to complete a certain number of HRAs per day. In the first several years, this target was seven HRAs in a 10-hour day. This workload did not include the additional time needed to respond to repeated messages from reviewers questioning CW4's diagnoses determinations based on CW4's exam and clinical judgement.

137.    During CW4's tenure as a HouseCall's Nurse Practitioner, CW4 attended Optum team building conferences and at least one meeting in Las Vegas in 2018 was attended by David Wichmann, the former CEO of UnitedHealth. At the end of CW4's

tenure, Optum was hiring more nurse practitioners who had less clinical experience. CW4 believed Optum was doing this because they were easier to train on Optum's protocol.

138. CW4 stated that to incentivize patients to agree to and complete an HRA, Optum provided gift cards. The incentive increased as the year went on to entice more members to agree. The gift card would start at $25. If a member refused a HouseCalls visit after several calls, the value of the offered gift card went up. Sometimes it went as high as $50 or $75. The incentives were effective – so much so that HouseCalls patient numbers increased.

139. **CW5**. CW5 worked at UnitedHealth and Optum for approximately 19 years mostly in data analysis and informatics. CW5 was employed from 2005 until the Spring of 2024, when CW5 was terminated due to downsizing. For the last 13 years, CW5 was the Director of Optum's Medicare Advantage Risk Adjustment Informatics group.

140. CW5 stated Optum conducted chart reviews for retrospective risk adjustments for several healthcare insurance companies including UnitedHealthcare. CW5 explained that CW5's team targeted patient charts in search of evidence of undocumented conditions so they could be resubmitted for additional coding. The targeted information included self-reported data from health assessments, all previous years' data from encounter submissions, laboratory results, and any other available documentation. Later in CW5's tenure, Optum began using AI to identify patient charts for potential re-coding.

141. UnitedHealthcare was Optum's biggest chart review client. According to CW5, UnitedHealthcare provided Optum with a specific set of guidelines for Optum's coding of UnitedHealthcare's charts. UnitedHealthcare had the most lenient coding

- 62 -

guidelines of any Optum client.  For example, CW5 observed that when comparing the results of similar chart reviews, UnitedHealthcare got double the value from the reviews compared to any other Optum client because UnitedHealthcare allowed more combined diagnoses (such as diabetes with complications).  CW5 commented that UnitedHealthcare, more than other clients, wanted as many patient charts reviewed as possible for potential risk adjustment.  According to CW5, UnitedHealthcare wanted to review more charts every year.

142.   CW5 believed it was completely obvious that UnitedHeath was upcoding because how else could UnitedHealth get double value for similar charts.

143.   CW5 stated that UnitedHealthcare and Optum used to follow a process called claims verification in which a code that related to a new and unique condition in a patient's chart was subject to further review.  Under this process, before a new code could be added, the claim detail had to first be reviewed to confirm that the information in the patient's chart supported it; if it did not, the code had to be deleted.  The process was designed to protect UnitedHealthcare in the event of a Risk Adjustment Data Verification (RADV) audit by CMS.  CW5 explained that this process had a negative impact to the value clients were getting out of chart reviews, because it made it more difficult to add diagnoses that increase risk-adjustment scores.  Many years ago, UnitedHealthcare and Optum stopped the claims verification practice and decided to take the risk of negative findings in a future RADV audit.

144.   **CW6**.  CW6 worked as a risk adjustment coder on contract with Optum in 2022.  CW6 worked from home in the mid-western United States.  CW6 voluntarily quit

- 63 -

because CW6 was expected to improperly upcode. CW6 confirmed that the improper upcoding was done in order to get a higher reimbursement.

145. In CW6's experience, the typical upcoding occurred by indicating a patient with a chronic condition also had complications from the condition even though this was not the case. For example, a Medicare Advantage member who had been diagnosed with basic diabetes would also be coded with diabetes with complications even if the documentation to support the complications did not exist. The risk-adjustment score for diabetes with complications is higher than the score for basic diabetes.

146. According to CW6, UnitedHealth guidelines explicitly directed coders to upcode. The coders were scored on how much upcoding they performed. Productivity was measured not just in the number of charts that were reviewed but also by the number of coding changes the coders made.

147. CW6 stated that CW6 now works at a different company in the same field and at the new company CW6 is not allowed to upcode.

148. **CW7**. CW7 was a Primary Care Physician with Optum in the western United States for three years, from 2019 to 2022. CW7 left due to concerns CW7 had with the use of Optum's EHR platform that contributed to upcoding and was not in the best interest of patients or physicians.

149. CW7 stated that CW7 observed that irrelevant codes were frequently added to patients' charts during HouseCalls visits, sometimes multiple times per year.

150. CW7 further stated that CW7 had to use the EHR platform, which, according to CW7, was a waste of time as a doctor and suggested diagnoses without much clinical

- 64 -

relevance in order to increase risk scores and revenue. CW7 understood that Optum or UnitedHealth had designed the platform to pre-populate patient charts with additional diagnoses, and CW7 had to address each individual diagnosis on the chart during a patient visit before CW7 could end the visit. At first, Optum incentivized CW7 and the other doctors at the clinic to address all the diagnoses in a chart through the use of bonuses, but it later became mandatory. If CW7 felt that a recommended diagnosis on the chart was not appropriate, CW7 had to spend time explaining the reasoning. It was clear to CW7 that the reason for this was to increase the value of the patient to Optum.

### b. Media Sources

#### (1) *The Wall Street Journal*

151.   Beginning in July 2024, the *WSJ* published numerous investigative reports about UnitedHealth's fraudulent Medicare Advantage upcoding scheme. The *WSJ* reporting includes the reports titled: "Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated," "The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare," "Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds," and "UnitedHealth's Army of Doctors Helped it Collect Billions More From Medicare."[11] The *WSJ*'s investigative reports are based, in substantial part, on interviews with current and former UnitedHealth physicians and nurse practitioners across the United States. Specifically, the *WSJ* provided on-the-record statements from Dr. Nicholas Jones, a family physician from Eugene, Oregon; Dr. Emilie

---

[11]   *See* Exs. 3, 5, 8, 11.

Scott, a doctor from California; Dr. Naysha Isom, who worked for a UnitedHealth medical group in Las Vegas, Nevada; Dr. Tom Lin, a former UnitedHealth physician from Oregon; Dr. Andy Pasternak, an independent physician from Reno, Nevada whose MA patients are covered through his contract with UnitedHealth; Dr. Coleen Madigan, who worked for a UnitedHealth practice in Texas; and Valerie O'Meara, a former UnitedHealth nurse practitioner.  In addition, the reports cited numerous independent doctors and medical researchers, as well as at least two former UnitedHealth employees who opted not to provide their names to the *WSJ*.

152.    The *WSJ* also conducted a detailed review and analysis of the actual Medicare data under a research agreement with the federal government.  The Medicare data does not include patients' names, but covers details of doctor visits, hospital stays, prescriptions, and other care.  The *WSJ* reviewed data for millions of Medicare Advantage enrollees and analyzed roughly ***two billion*** diagnoses that those patients received from either doctors, hospitals, or their insurance companies.[12]

153.    The accounts of the confidential sources, including former UnitedHealth and/or Optum employees, executives and other insiders, and other information provided in the *WSJ* reports, as cited herein, corroborate the accounts of the CWs, OIG findings, and other facts alleged herein.

---

[12]    *See* Ex. 2.

4901-6680-9379.v3

(2)    *STAT News*

154.    From July 2024 through January 2025, *STAT News* released a series of bombshell investigative reports that exposed and documented UnitedHealth's abuse of Medicare Advantage.  The reporting by *STAT News* included the reports titled: "How UnitedHealth Harnesses its Physician Empire to Squeeze Profits out of Patients," "How UnitedHealth Turned a Questionable Artery-screening Program into a Gold Mine," "Inside UnitedHealth's Strategy to Pressure Physicians: $10,000 Bonuses and a Doctor Leaderboard," "Lawmakers Call for Curbs on UnitedHealth's Growing Empire," and "DOJ Seeks Interviews with Former UnitedHealth Group Doctors."[13]  As with the *WSJ*, these investigative reports by *STAT News* relied heavily on interviews with multiple former UnitedHealth medical personnel.  Specifically, *STAT News* interviewed Dr. Susan Baumgaertel, a physician who's Seattle practice was purchased by UnitedHealth in 2018; Dr. Eleanor Hobbs, an urgent care physician in Massachusetts; Dr. Nicholas Jones, who was also interviewed by the *WSJ*; Dr. Michael Good, a former UnitedHealth physician from Connecticut; Dr. Rubin Hirsch, a retired UnitedHealth doctor from Connecticut; and Dr. Reza Alavi, the former medical director at an Optum-owned practice, in addition to numerous individuals who opted not to have their names published along with their statements.

155.    *STAT News* said the reports were "based on interviews with more than two dozen current and former UnitedHealth doctors and executives conducted over the past six

---

[13]  *See* Exs. 4, 6-7, 10, 12.

months," conversations with "health policy experts and patients," and examination of "court records, and . . . UnitedHealth's 600-page medical coding bible," a 592-page book UnitedHealth created to teach insurers and their employees how to "'capture'" more diagnoses.

156.    The accounts of the confidential sources, including current and former UnitedHealth and/or Optum employees, executives and other insiders, and other information provided in the *STAT News* reports, as cited herein, corroborate the accounts of the CWs, OIG findings, and other facts alleged herein.

### (3)    *The Examiner News*

157.    The *Examiner News* also reported on UnitedHealth's fraudulent activity on March 18, 2024, in an article entitled: "Whistleblower Releases Audio, Files Complaint: Cites Medical Billing Plot at Optum."[14]    The article by *Examiner News* was based on extensive interviews with an insider whistleblower, a secret audio-recording of a Company meeting involving at least 14 executives and other employees, as well as at least one unnamed former Optum executive.

158.    The accounts of the confidential sources, including current and former UnitedHealth and/or Optum employees, executives and other insiders, and other information provided in the *Examiner News* articles, as cited herein, corroborate the accounts of the CWs, OIG findings, and other facts alleged herein.

---

14    *See* Ex. 1.

- 68 -

C.    **UnitedHealth Acquires Change Healthcare and Misleads Investors About Data Firewalls**

1.    **The Change Acquisition**

159.    On January 6, 2021, UnitedHealth announced its intention to purchase Change, the largest healthcare electronic data interchange ("EDI") clearinghouse in the U.S., for $13 billion. At the time of the acquisition, Change described itself as standing at the "'center of the health ecosystem'" in the United States. Change's payer customers (insurers) included many of UnitedHealth's key commercial health insurance rivals. Change described its services as an "'information highway connecting key healthcare stakeholders.'" UnitedHealth planned to integrate Change into Optum Insight, one of UnitedHealth's business segments.

160.    As an EDI clearinghouse, Change played a critical role in commercial health insurance markets. Often called the "pipes of the healthcare industry," EDI clearinghouses enable the electronic transmission of claims, remittances, and other information among healthcare payers and providers. Unlike paper or telephonic transmissions that have historically been used, EDI clearinghouses facilitate much faster processing and result in much less administrative waste. Manual claim submissions cost health insurers over ten times as much as electronic submissions, according to industry estimates. As a result, transactions using EDI clearinghouses are the industry standard. In 2021, 97% of medical claims were submitted electronically, and 95% of providers and 99% of insurers used EDI clearinghouses.

161.    A substantial amount of data flows through EDI clearinghouses. And these data cover the entire lifecycle of a claim – both pre- and post-adjudication. Pre-adjudicated

- 69 -

claims data include details about the provider, the patient, the employer group, the location of care, the diagnosis, the services and procedures rendered, and the billed amounts. Post-adjudicated claims data can include even more information, such as details about the provider-payer contract, the payer's claims edits, the medical policy and benefit design, the final paid amount, and adjudication decisions. Both pre-adjudicated and post-adjudicated claims data have proprietary information and competitive value.

162.    As the largest EDI clearinghouse in the United States, Change maintained connections across the American healthcare landscape: connections with over 2,000 payers, 1 million physicians, and 6,000 hospitals and health systems.

163.    At the time the acquisition was announced, Change processed more than 15 billion healthcare transactions per year, together worth more than $1.5 trillion in adjudicated value. Through these transactions, Change had access to vast amounts of data, relating to about half of all commercial medical claims in the United States. It also had the legal rights to use these data through contracts with customers and intermediaries. The data to which Change has access and rights includes claims data for each of UnitedHealth's major rivals going back to 2012, and its access and rights are significantly more expansive than what UnitedHealth had prior to the acquisition.

164.    With the acquisition of Change, UnitedHealth's Optum business segments would gain access to a significant store of providers' financial and clinical data (including customer sensitive information ("CSI")), valuable information that would accelerate and support the expansion of its provider business.

- 70 -

### 2. The Change Acquisition Comes Under Immediate Government Scrutiny

165. UnitedHealth's purchase of Change immediately came under scrutiny due to its anti-competitive implications. In a March 17, 2021 letter, the American Hospital Association ("AHA") expressed serious concern that the purchase would squelch competition for the sale of healthcare information technology services to other providers. The AHA was also concerned that the acquisition would put a sizable portion of the country's healthcare data into the hands of a single entity (UnitedHealth). Recognizing the fundamental importance of the issue, the AHA specifically questioned UnitedHealth's and Optum's purported "firewalls," and noted that the Company "has never demonstrated that the firewalls are sufficiently robust to prevent sensitive and strategic information sharing."[15] One Deutsche Bank analyst noted a clear and present danger that "this merger would lead to a significant consolidation of data in healthcare and would end up giving [UnitedHealth] solo access to nearly all competitive payers information."

166. On February 24, 2022, the DOJ, along with attorneys general for Minnesota and New York, sued to block the transaction. The DOJ alleged that the proposed acquisition violated antitrust laws because, among other things, the integration of Change and Optum would give UnitedHealth unparalleled access to information regarding nearly every health insurer, as well as health data on nearly every single American.

---

[15] A firewall is a network security device that monitors incoming and outgoing network traffic and decides whether to allow or block specific traffic based on a defined set of security protocols. Firewalls have been the first line of defense in network security for over 25 years.

167.    The DOJ also claimed the transaction would give UnitedHealth a near monopoly over EDI clearinghouse services, as well as claims editing[16] – two of the most critical processes in the commercial health insurance industry – since UnitedHealth's Optum segments already operated an EDI clearinghouse and provided a claims editing product.

168.    The DOJ further alleged that the UnitedHealth and Change claims processing systems would together serve 38 of the top-40 health insurers in the country, giving UnitedHealth near-complete visibility into rivals' health plans and coverage, enabling UnitedHealth to structure its own plan with a competitive advantage.

169.    The DOJ's case against UnitedHealth was closely followed and reported on (including litigation filings) by market commentators, financial press, and financial analysts.[17]

---

[16]  Claims editing is the process of reviewing and correcting healthcare insurance claims before they are submitted for payment, ensuring they comply with industry standards, regulations, and payer-specific requirements.  This step helps prevent errors, reduce fraud, and avoid claim rejections or delays in reimbursement.

[17]  *See*, *e.g.*, John Tozzi, *Health Data Antitrust Concerns Overshadow UnitedHealth Deal*, Bloomberg (Jul. 28, 2022), https://www.bloomberg.com/news/articles/2022-07-28/health-data-antitrust-concerns-overshadow-unitedhealth-deal ("UnitedHealth and Change say that UnitedHealth has a clear history of protecting rivals' data in its existing businesses."); Paige Minemyer, *UnitedHealth – Change Healthcare deal trial has begun.  Here are 3 things to know*, Fierce Healthcare (Aug. 1, 2022), https://www.fiercehealthcare.com/payers/unitedhealth-change-healthcare-deals-trial-has-begun-here-are-3-things-know (relaying arguments made by both parties, and noting that UnitedHealth/Optum claimed that its "years of firewall policies" were sufficient to defeat the government's antitrust challenge); Leah Nylen & John Tozzi, *UnitedHealth Internal Audit Shows data Misuse Risks,  DOJ Says*, Bloomberg (Aug. 10, 2022), https://www.bloomberg.com/news/articles/2022-08-10/unitedhealth-internal-audit-shows-data-misuse-risks-doj-says (Andrew Witty "repeatedly said the company wouldn't use Change's data to give

4901-6680-9379.v3

170.    After the DOJ filed suit, the United States Attorney General stated:

"If America's largest health insurer is permitted to acquire a major rival for critical health care claims technologies, it will undermine competition for health insurance and stifle innovation in the employer health insurance markets. The DOJ is committed to challenging anticompetitive mergers, particularly those at the intersection of health care and data."

171.    Principal Deputy Assistant Attorney General Doha Mekki of the DOJ's

Antitrust Division likewise stated: "'The proposed transaction threatens an inflection point

in the healthcare industry by giving United control of a critical data highway through which

about half of all Americans' health insurance claims pass each year.'" She added that:

"Unless the deal is blocked, United stands to see and potentially use its health insurance rivals' competitively sensitive information for its own business purposes and control these competitors' access to innovations in vital health care technology. The department's lawsuit makes clear that we will not hesitate to challenge transactions that harm competition by placing so much control of data and innovation in the hands of a single firm."

172.    On February 24, 2022, the AHA issued the following statement:

The American Hospital Association commends the Department of Justice for its efforts to protect patients and providers, including hospitals

---

advantages to UnitedHealth's insurance arm."); Susan Morse, *Briefs sealed in UnitedHealth and Change antitrust trial*, HealthCare Finance (Sep. 1, 2022), https://www.healthcarefinancenews.com/news/briefs-sealed-unitedhealth-and-change-antitrust-trial (citing UnitedHealth's arguments that "'[i]t is not sufficient for plaintiffs to speculate that UHG might misuse customer data'" while noting that the proposed merger could "distort decisions about patient care"); Anna Wilde Mathews & Brent Kendall, *Judge Rejects Antitrust Challenge to UnitedHealth Acquisition*, Wall St. J. (Sep. 19, 2022), https://www.wsj.com/articles/judge-rejects-antitrust-challenge-to-unitedhealth-acquisition-11663627930 (noting that, during the trial, "UnitedHealth had argued that its combination with Change could help improve care by getting better information to doctors, and reduce waste").

All told, there were more than 250 analyst reports and articles relating to the Change litigation from when it was announced on February 24, 2022, to September 21, 2022, two days after the court approved the merger.

and health systems, from United HealthGroup's (UHG) attempt to acquire Change Healthcare. The AHA urged DOJ's Antitrust Division to conduct a thorough investigation of the proposed transaction because of its anticompetitive potential to "produce a massive consolidation of competitively sensitive health care data" under UHG's exclusive control. We warned repeatedly "the combination of the parties data sets would impact (and likely distort) decisions about patient care and claims processing and denials to the detriment of consumers and health care providers. . . ." Challenging this proposed combination was the right thing to do to prevent untold competitive harm for patients and health care providers.

(alteration in original).

173.    Numerous financial analysts noted the key points of the government's challenge. For example, a Credit Suisse analyst highlighted that "[t]he crux of the issue is that [UnitedHealth] would have access to sensitive data that could be wielded against competitors on the insurance side of the business." The analyst acknowledged that the deal could nevertheless be approved because UnitedHealth affirmatively promised "strict firewalls keeping insurance data obtained by Optum from flowing through to the United Healthcare insurance business."

### 3.    UnitedHealth Defeats the DOJ Lawsuit by Insisting It Always Maintains "Strict" Data Firewalls

174.    In response to the DOJ's allegations, Defendants emphasized UnitedHealth's firewalls that allowed the Company to maintain the integrity of customers' data and CSI – and avoid antitrust concerns. For example, Defendants promised that UnitedHealth had "internal firewalls that prevent the sharing of competitively sensitive information across business units." Similarly, UnitedHealth emphasized that it had "operationalized its firewall policy through 'robust' technological systems that prevent employees of one

- 74 -

UnitedHealth business unit from accessing data housed within another UnitedHealth business unit."

175.    Recognizing the control the Change acquisition would give the Company in the claims' processing market, UnitedHealth proposed selling Change's claims editing business (ClaimsXten) after the acquisition to address the DOJ's antitrust concerns. The DOJ, however, remained concerned about UnitedHealth and Optum's access to Change's network, and the data rights the acquisition would still provide.[18]

176.    The case went to trial, and on September 19, 2022, United States District Court Judge Carl Nichols of the District of Columbia decided the suit in Optum and UnitedHealth's favor. *See United States v. UnitedHealth Grp. Inc*., 630 F. Supp. 3d 118 (D.D.C. 2022). In siding with the Company, among other things, the court specifically credited UnitedHealth's purported history of maintaining data firewalls and policies prohibiting anti-competitive behavior.

177.    Analysts at Deutsche Bank and Wells Fargo cheered the approved merger and affirmation of UnitedHealth's security systems as a sign of UnitedHealth's growth potential. Deutsche Bank called UnitedHealth's courtroom victory a "positive leading indicator" for more consolidation by UnitedHealth. Wells Fargo analysts stated that: "Challenge to Change Healthcare Defeated, Could Help to Ease Concerns on Large-Scale M&A." Similarly, Wells Fargo further noted that "acquisitions have been a key part of

---

[18]   UnitedHealth sold ClaimsXten to a private equity group, TPG Capital, in October 2022 for $2.2 billion.

Optum's growth over the past 15-20 years, and today's announcement could somewhat ease concerns that large-scale vertical M&A could be more challenging going forward."

### 4. There Was Not (and Is Not) a Technical Firewall Between All Intra-Optum Businesses

178.    Both before and after the Change acquisition was announced, Optum business applications had an open access policy for customers' data, including CSI.[19] Optum and its intracompany businesses lacked both role-based security systems and a technical firewall.[20]    Specifically, without role-based security, Optum lacked any mechanism to restrict data access based on user roles or permissions.  Consequently, once Optum approved a user's access request, there was no system in place to enforce limitations on what data, including CSI, the user could view or handle.  The lack of access controls meant that the intra-Optum businesses had access to Change's customers' data, including CSI, resulting in ongoing risks and exposure of sensitive information.  The absence of a technical firewall inside Optum also meant that any unauthorized access and/or data breaches could not be isolated, as the intruders would have access to the full gamut of Optum data.  These facts, and those detailed below in ¶¶179-184, were not presented to the court during the DOJ's challenge to the Change acquisition.

179.    Change's external customers include competitors to intra-Optum businesses. In other words, for every product Change offers, there are businesses within Optum that

---

[19]   This remains true today for most Optum business applications.

[20]   Role-based security, also known as role-based access control (RBAC), is a mechanism that restricts system access.  It involves setting permissions and privileges to enable access to only authorized users.

compete with Change customers. Following Change's integration into Optum Insight, this condition has not changed – Change's external customers still include competitors to intra-Optum businesses. As such, the lack of technical firewalls risked both the exposure of sensitive information and anti-competitive behavior.

180. The following Optum business applications shared data with other business applications and did not prohibit Optum from using external customer data to benefit Optum businesses that compete with those external customers:

- ContractHub – the contract repository for all of Optum's commercial contracts (CSI stored in ContractHub includes pricing information and contract terms and conditions), lacked role-based security protocols that prevent users from one Optum business accessing data from another Optum business.[21]

- Safesforce Growth Office ("Salesforce GO") – the sales customer relationship manager used to track and report sales activity (CSI stored in Salesforce GO includes pricing information), does not have in place role-based security protocols that prevent users from observing all past and current sales activity for all Optum customers which will include Change customers.

- Business Intelligence Data Warehouse (BIGW) – the data warehouse that receives data from many systems including ContractHuB, Salesforce GO, Peoplesoft Enterprise Resource Planning Tool ("Peoplesoft ERP") and the Change Healthcare Enterprise Data Warehouse (EDW) (CSI stored in BIGW includes volumes of transactions and accounting status), does not have in place role-based security protocols that prevent users from one Optum business accessing data from another Optum business.

- Data Governance Tracking Systems (DGTS) – the tool that extracts information from customer contracts regarding whether Optum can de-identify the customer data or use offshore resources to support the contract (CSI stored in DGTS includes contractual terms Change reached with its

---

[21] In January 2024, ContractHub did implement role-based security. But from the time the Change acquisition was approved on September 19, 2022 until January 2024, ContractHub lacked a technical firewall.

customers), does not have in place role-based security protocols that prevent users from one Optum business accessing data from another Optum business.

- Peoplesoft ERP – the system used for managing billing and accounts receivables for Optum (CSI stored in Peoplesoft ERP includes billing information, accounts receivable, and the volumes of systems used), does not have in place role-based security protocols that prevent users from one Optum business accessing data from another Optum business.[22]

- Optum ERP Data Store (OEDS) – the tool used for reporting data from the Peoplesoft ERP (CSI stored in Optum ERP Data Store includes billing information, accounts receivable, and the volumes of systems used), does not have in place role-based security protocols that prevent users from one Optum business accessing data from another Optum business.

181.    Thus, contrary to UnitedHealth's assurances on July 22, 2022, intra-Optum businesses lacked "internal firewalls that prevent the sharing of competitively sensitive information across business units."

182.    During the integration activities that followed the October 2022 Change acquisition, the lack of technical firewalls inside Optum business systems was reported to the Integration Management Office ("IMO").  The report cited the lack of firewalls as a concern and potential risk for completion of integration activities per the established timeline.  The IMO is responsible for reporting issues to executive leadership, including CEO Witty and the Board of Directors.  During the Class Period defendant Witty was on the Board of Directors and defendant Hemsley was Chairman of the Board of Directors.

183.    Since the Change acquisition, to address the specific concerns raised to Optum leadership about a lack of technical firewalls, Optum added *some* firewalls.  For

---

[22]   In Fall 2023, Peoplesoft ERP implemented role-based security.  Yet, from the time the Change acquisition was approved on September 19, 2022 until Fall 2023, Peoplesoft ERP too lacked a technical firewall.

example, Peoplesoft ERP (Fall 2023) and ContractHub (January 2024) business applications implemented role-based security.

184.    The technical firewall shortcomings are not limited to Optum.  Some UnitedHealthcare and Optum solutions share technical resources to manage and process data.  One such solution is the Consumer Database ("CDB").  CDB uses Line of Business ("LOB") tags to ensure proper data separation and to control whether Optum or UnitedHealthcare employees can access or view the data.  The LOB tags for certain records across over 100 systems within the CDB were not implemented or applied in a manner which ensured, and thus failed to prevent, UnitedHealthcare employees from seeing Optum's customer data.  In September 2023, a user reported this security failure issue and an investigation was conducted by the Privacy Team.  The Privacy Team, an organization at UnitedHealth that reports to Rupert Bondy, the senior counsel and executive vice president of governance, compliance, and security of UnitedHealth, is responsible for investigating potential privacy incidents.  Optum subsequently fixed the incorrect LOB tags, and the solution was implemented in October 2024.

### D.    UnitedHealth's Lax Security Leads to Massive Data Breach

185.    When UnitedHealth acquired Change in October 2022, it claimed that Change would be fully integrated into the UnitedHealth system, and would therefore benefit from UnitedHealth's technology and security capabilities.  But UnitedHealth failed to protect the sensitive data Change stored while the integration took place.  On February 22, 2024, UnitedHealth announced that as a result of a cyberattack, Change had suffered the largest data breach in American history.  The breach resulted from a targeted attack by

- 79 -

a ransomware group that identified and capitalized on UnitedHealth's security weaknesses. One third of all patient records in the United States are touched by Change, and 190 million people had sensitive information exposed by the breach. The hackers taking responsibility for the attack claim they stole medical information for tens of millions of patients, which UnitedHealth admitted included medical information such as diagnoses and medications; billing information such as credit card numbers and payment history; and personal information, including social security numbers.

186.   The massive breach occurred because UnitedHealth declined to implement basic security measures, such as multi-factor authentication, where the user must present a code sent to a personal email or telephone number before access is granted. The Change security deficiencies allowed for full access to the UnitedHealth system with only an email and password. In this instance, the hackers simply obtained login information and gained access to a massive database of the United States' most sensitive information. The unauthorized access was not detected by UnitedHealth for ***nine days***, while the hackers scoured patient data.

187.   The damage spread well beyond the invasion of patients' privacy. UnitedHealth had no way to remove the threat, so it had to disconnect Change's systems so as to prevent the hackers from accessing even more data. UnitedHealth then gradually restored systems over the course of several weeks and months. By April 22, 2024 – after UnitedHealth had agreed to pay and did pay a $22 million ransom to the hackers – UnitedHealth claimed that "approximately 80% of Change functionality has been restored on the major platforms and products." In the meantime, the breach paralyzed the

- 80 -

processing capabilities of numerous pharmacies and healthcare providers across the country, which could not verify insurance, submit claims, generate bills, or process payments for weeks. As a result, many doctors were forced to either decline to provide healthcare services to their patients or to provide care to their patients without a mechanism to receive compensation. This impacted providers' ability to make payroll and cover expenses, driving many toward financial ruin. Analysts estimated that providers alone were collectively losing **$1 billion** per day because of the breach. An AHA survey found that more than 90% of American hospitals were affected financially, with more than 70% reporting that the breach impacted their ability to care for patients.

188.    While the cyber-attack devastated the rest of the healthcare industry, UnitedHealth took advantage of the attack. Initially, UnitedHealth agreed to provide loans to desperate providers financially frozen by the breach, but offered those loans under draconian terms and on the condition that the borrowers provide positive statements to the media about the "help" UnitedHealth agreed to provide. Even worse, as some providers were driven toward the brink of bankruptcy by the Change data breach, UnitedHealth opportunistically utilized the breach to purchase providers at bargain prices and further increase its market power.

189.    The breach immediately led to heightened scrutiny from regulators and the media. Lawmakers expressed grave concern that the entire healthcare industry could be brought to its knees because of security failure by a single company. Witty was called to testify before the House Energy and Commerce Committee and the Senate Finance Committee on May 1, 2024. At both committee hearings, lawmakers asked questions

- 81 -

beyond the focus of the data breach and openly questioned UnitedHealth's business practices. For example, at the Senate hearing, Senator Elizabeth Warren (D-Ma.) called UnitedHealth a "monopoly on steroids" that "will stop at nothing to get bigger, bigger, and bigger." Warren explained how UnitedHealth "bought up every link in the healthcare chain" and was therefore "in a position to jack up prices, squeeze competitors, hide revenues, and pressure doctors to put profits ahead of patients." Warren specifically called out UnitedHealth's manipulation of the Medicare Advantage system and the Company's effort to "rake in more taxpayer money by using a practice called upcoding to make enrollees look sicker." Warren explained that upcoding meant "adding a diagnosis . . . even if there's no clinical basis for the diagnosis and no treatment planned," and stated that UnitedHealth had extracted $3.7 billion from the practice. At the House of Representatives hearing, Rep. Buddy Carter (R-Ga.) agreed that the Healthcare behemoth "'needs to be busted up.'"

### E. Optum's Additional Anti-Competitive Practices

190. Before and during the Class Period, UnitedHealth used its monopolistic dominance to engage in unfair anti-competitive practices to consolidate its control over healthcare services, eliminate competition, and boost revenues. UnitedHealthcare, the Company's insurance business, maintains a contractual network of healthcare providers (such as hospitals, surgical care centers, and physicians specialists) for the healthcare services it provides to members. Through its Optum businesses, UnitedHealth employs or is affiliated with nearly 90,000 physicians, making it the largest employer of physicians in the United States.

191.    During the Class Period, UnitedHealth, through its Optum businesses, engaged in anti-competitive conduct to exert control over the market for primary care providers in certain geographies where competition was particularly strong.  For example, Optum had contracts with hospitals that also owned primary care provider practices that directly competed with Optum.   Optum threatened these hospitals with contract cancellation unless the hospitals agreed to new, coercive, anti-competitive terms, that were designed to ensure their exit from the primary care provider market so that Optum could consolidate control over primary care providers that serviced Optum patients and UnitedHealthcare members.

192.    The terms demanded by Optum included that Optum would get first and last right of refusal if these hospitals put their primary care provider businesses up for sale, that they would not try to recruit Optum's doctors, and that Optum would pay less for certain hospital services.  When the hospitals did not agree to these terms, Optum cut ties with the hospitals.  Once the contracts were terminated, Optum steered its MA Plan members to other hospital facilities despite federal and state laws requiring continuity of care for Medicare Advantage members.

193.    Optum intimidated doctors who wanted to leave Optum-owned practices to work for competitors by using unlawful restrictions on competition in the doctors' contracts and threatening the doctors – and the competing practices they were going to – with legal action if they moved.  Moreover, once doctors left Optum, Optum employees were instructed not to inform patients their doctors had moved to non-Optum practices. Instead, Optum employees were instructed to deliberately conceal the doctor's departure,

and to tell patients their doctors had retired or were on vacation. Optum employees were disciplined if they did not follow these instructions.

### F. UnitedHealth's Additional Anti-Competitive Conduct

194. UnitedHealthcare, UnitedHealth's insurance business, likewise engaged in anti-competitive conduct during the Class Period. Like Optum, UnitedHealthcare was using its market dominance to pressure its in-network physicians and healthcare facilities to stop working with healthcare providers outside of UnitedHealthcare's network. Specifically, UnitedHealthcare offered financial incentives to its in-network healthcare providers to refer patients to physicians inside of UnitedHealthcare's network. UnitedHealth also penalized facilities and providers that continued to work with non-network providers.

195. For example, during the Class Period UnitedHealthcare incentivized its in-network surgeons with lucrative contracts – offering up to 50% additional compensation – if they steered patients away from out-of-network anesthesiologist groups that competed with Optum and to UnitedHealthcare approved, or Optum owned, practice groups. This strategy was designed to and did effectively exclude competitors from the market. Also, by forcing the surgeons to use in-network providers, particularly those tied to Optum, UnitedHealthcare not only reduced its costs by relying on lower-priced providers but also strengthened its control over healthcare pricing. This allowed UnitedHealth to further consolidate its market power, fraudulently increasing its revenue while reducing competition.

- 84 -

196.    UnitedHealthcare also engaged in anti-competitive conduct during the Class Period by favoring Optum providers over non-Optum providers in the same markets with higher payment rates for lucrative services, freezing out rival providers and undermining competition.  For instance, UnitedHealthcare's commercial plans were paying Optum practices in New York as much as double the average market rate for colonoscopies, upper endoscopies, and breast imaging.  Similarly, in Texas, UnitedHealthcare paid Optum providers more than twice the average market rate for MRIs, colonoscopies, Mohs skin cancer removal procedures, and routine primary care visits.  In Oregon, Optum providers were paid double the market rate for CT scans, MRIs, and mammograms.  In some cases, UnitedHealthcare was paying Optum practices up to 111% above market rates while simultaneously restricting non-Optum providers to significantly lower reimbursements.

197.    UnitedHealthcare's predatory payment practices undermined competition by making it difficult, if not impossible, for independent practices to compete, recruit providers, and remain financially viable, further consolidating UnitedHealth's market power.

## G.    UnitedHealth Receives Notice of a Nonpublic DOJ Investigation and UnitedHealth Executives Immediately Embark on a Massive Insider Selling Spree

198.    On October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company,'" according to an internal email distributed on October 24, 2023 by Rupert Bondy, senior counsel and executive vice president of governance, compliance and security of UnitedHealth.  Bondy's email, sent to at least 16 high-ranking colleagues inside the Company, included a "'document

- 85 -

preservation notice.'"  While news of the antitrust investigation circulated inside the Company, UnitedHealth withheld this material information from investors.

199.  Defendant Hemsley and defendant Thompson took immediate action – selling millions of dollars of their own UnitedHealth shares while in possession of this material nonpublic information.  All told, these insiders sold over $117 million worth of UnitedHealth common stock during the four-month period when insiders knew about the federal antitrust investigation but the public did not.  Hemsley's largest sale during this time was particularly well-timed.  On October 17, 2023 – *just one week after UnitedHealth was notified of the DOJ antitrust investigation* – Hemsley unloaded 121,515 shares of UnitedHealth common stock for over $65 million in proceeds.  Hemsley continued his insider trading on December 5, 2023, for another $36 million in proceeds.  Defendant Thompson also dumped his shares, taking $15.1 million in proceeds on February 16, 2024.  The below chart shows Hemsley's and Thompson's stock sales during this time:



200.    There's no indication that any of the stock sales by Defendants was executed according to scheduled trading plans.  Professor John Coffee, a corporate governance expert at Columbia Law School and one of the leading and renowned defense experts in the securities-fraud area told Bloomberg News: "***Typically a company's general counsel would declare a blackout period barring trading in light of a sensitive investigation*** . . . 'Apparently, this did not happen' at UnitedHealth . . . ."  Charles Elson, founding director of the Weinberg Center for Corporate Governance at the University of Delaware, told Bloomberg News that the fact that the price of UnitedHealth shares fell after the scope of the DOJ antitrust investigation was reported by the *WSJ* "'would suggest some materiality to investors.'"

**H.    Investors Begin to Learn the Truth but Defendants Continue to Mislead the Market**

**1.    The Scope of the New DOJ Antitrust Investigation Is Publicly Disclosed and UnitedHealth's Stock Price Drops**

201.    During the trading day on Tuesday, February 27, 2024, the *WSJ* revealed new information and new analysis about the scope of the new DOJ antitrust investigation into UnitedHealth.[23]  For example, the *WSJ* reported:

The Justice Department has launched an antitrust investigation into UnitedHealth, owner of the biggest U.S. health insurer, a leading manager of drug benefits and a sprawling network of doctor groups.

The investigators have in recent weeks been interviewing healthcare-industry representatives in sectors where UnitedHealth competes, including doctor groups, according to people with knowledge of the meetings.

During their interviews, investigators have asked about issues including certain relationships between the company's UnitedHealthcare insurance unit and its Optum health-services arm, which owns physician groups, among other assets.

Investigators have asked about the possible effects of the company's doctor-group acquisitions on rivals and consumers, the people said.

*    *    *

The new Justice Department inquiry, reported earlier by the Examiner News, a news organization based in New York's Hudson Valley, is partly examining Optum's acquisitions of doctor groups and how the ownership of physician and health-plan units affects competition, according to the people with knowledge of the matter.

Investigators have asked whether UnitedHealthcare favored Optum-owned groups in its contracting practices, potentially squeezing rival physicians out of certain types of attractive payment arrangements.

---

[23]   The February 27, 2024 *WSJ* report titled: "U.S. Opens UnitedHealth Antitrust Probe," is attached hereto as Exhibit 16.

- 88 -

Investigators have also explored whether Optum's ownership of healthcare providers could present challenges to health insurers that are rivals to UnitedHealthcare.

In addition, the Justice Department officials are investigating Medicare billing issues, including the company's practices around documenting patients' illnesses.

Payments to Medicare plans go up if patients have more health conditions, so aggressive documentation practices by doctors and other healthcare providers can be lucrative for insurers such as UnitedHealthcare.

And investigators have asked whether and how the tie-up between UnitedHealthcare and Optum medical groups might affect its compliance with federal rules that cap how much a health-insurance company retains from the premiums it collects from customers.

Under those rules, insurance plans are supposed to absorb no more than 15% or 20% of the premium for their administrative costs and profits, with the percentage varying depending on the type of plan. The rest is supposed to be spent on patient care, or rebated back to customers.

When the same company owns both the health insurer and the physicians and other healthcare providers who take care of patients, the combined firm may absorb far more than the capped amount, however.

202.    Upon this news, the price of UnitedHealth common stock immediately declined, falling over $27 per share, from just over $525 per share on February 26, 2024 to just over $498 per share on February 28, 2024.  *See* ¶¶320-328, *infra*.

### 2.    UnitedHealth Continued to Make False Denials About Medicare Advantage and HouseCalls

203.    After the announcement of the DOJ investigation, and amidst increasing scrutiny from journalists and lawmakers, UnitedHealth continued to deny wrongdoing and reiterate their false and misleading statements.  Specifically, they continued to tout the "value" of the HouseCalls program.  On July 16, 2024, Witty falsely told investors during the Company's Q2 2024 earnings call that "***our home visit programs help patients live***

- 89 -

*healthier lives and save taxpayers' money*." On January 16, 2025, UnitedHealth CFO John Rex told investors during the Q4 2024 earnings call that UnitedHealth in-home visit programs "sav[es] the health system billions."

204. On August 8, 2024, in response to the public scrutiny arising from the *WSJ* reports, UnitedHealth released a public statement entitled: "UnitedHealth Group's Response to the Wall Street Journal." In its response, UnitedHealth claimed to "[s]et[] the record straight on HouseCalls, Medicare Advantage and the demonstrably superior health outcomes and cost savings to more than 33 million American seniors each year." Despite these promises, UnitedHealth's response relied exclusively on its own biased analyses and failed to address many of the most concerning accusations from the *WSJ* and other sources.

205. For example, although UnitedHealth promised "[a] look at the real numbers," it actually exclusively relied on numbers from a report UnitedHealth itself authored and paid for. Using these biased numbers alone, UnitedHealth concluded:

- 67.4% of patients with insurer-driven HIV/AIDS diagnoses were on antiviral therapies (still significantly less than the 92% of patients with diagnoses from providers); and

- "[T]he government's cost to fund Medicare Advantage is approximately 96% of the cost to fund [fee-for-service] and provides $60 billion annually in additional value through lower out-of-pocket costs and additional services."

206. Importantly, UnitedHealth did not deny that in-home visits were designed to, and did, add diagnoses and inflate UnitedHealth's reported profits. Instead, and without providing a percentage, UnitedHealth claimed: "The majority of diagnoses made during a home visit do not result in increased Medicare Advantage (MA) risk adjustment payments." The Company also did not deny that insurer-led diagnoses triggered more

- 90 -

taxpayer-funded payments, instead saying only "CMS has systems and processes in place to help ensure that data submitted meets the established program rules" and citing "CMS audits" as the only example. But UnitedHealth did not explain how CMS is years behind on the auditing process, and therefore none of the issues identified by the *WSJ* had yet been audited by CMS. UnitedHealth also did not deny that it encouraged physicians to use QuantaFlo alone to diagnose peripheral artery disease, resulting in false positives. Instead, it obfuscated further asserting only that "QuantaFlo is an FDA-approved device" and "[p]eripheral artery disease is underdiagnosed."

207. On October 24, 2024 – in response to the 2024 OIG report, which criticized UnitedHealth for making a disproportionate amount of diagnoses through in-home assessments and for providing no treatment after such diagnoses – UnitedHealth denied wrongdoing to the *WSJ*. A UnitedHealth spokesperson defended the "'value of in-home care'" the Company provides, saying it helps "'identify and drive needed follow-on care for the vast majority of the patients with whom we engage.'" The spokesperson claimed the OIG findings presented a "'misleading, narrow and incomplete view of risk adjustment data,'" but the report did not mention any specific criticisms from UnitedHealth about the OIG's data usage. Specifically, the Spokesperson ostensibly did not dispute that UnitedHealth received $3.2 billion from in-home assessments and related chart reviews in 2023, or that UnitedHealth was responsible for over half of the highly suspicious scenarios where a patient received a diagnosis from in-home care, and then received no further treatment of that condition.

208.    On December 29, 2024, the *WSJ* published an investigative report titled: "UnitedHealth's Army of Doctors Helped it Collect Billions More From Medicare." Based on the accounts of several former UnitedHealth providers, the article reported how UnitedHealth implemented practices that led to billions in extra Medicare Advantage payments, including forcing its providers to use pre-prepared checklists and software designed to increase the sickness scores of Medicare Advantage patients with questionable diagnoses, and promising financial incentives to providers for documenting lucrative diagnoses. The report included a written statement from UnitedHealth defending the Company's practices, stating that they lead to "'more accurate diagnoses, greater availability of care and better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management,'" and help "to avert more serious health problems later, and to achieve Medicare Advantage's goals of improving quality and reducing costs."

### 3.    The *WSJ* Discloses a New DOJ Fraud Investigation into UnitedHealth's Medicare Advantage Billing Practices and UnitedHealth's Stock Price Plummets

209.    During the trading day on February 21, 2025, the *WSJ* publicly revealed new information about a "new civil fraud investigation . . . examining the company's practices for recording diagnoses that trigger extra payments to its Medicare Advantage plans, including at physician groups the insurance giant owns."[24]

---

[24]    The February 21, 2025 *WSJ* report titled: "*DOJ Investigates Medicare Billing Practices at UnitedHealth*," is attached hereto as Exhibit 17.

210. The *WSJ* reported that the DOJ civil fraud investigation "is separate from a longer-running Justice Department antitrust probe that the journal reported last February." The *WSJ* report further stated that the DOJ civil fraud investigation "adds to the scrutiny on UnitedHealth, the $400 billion company that owns the largest U.S. health insurer and a sprawling network of other health-industry assets including its doctor practices, a large pharmacy benefit manager and data and technology operations."

211. The *WSJ* report also gave detail on the scope of the civil fraud investigation, stating:

> Last month, Justice Department lawyers from the offices of the U.S. Attorney for Minnesota and the Washington, D.C.-based Civil Division contacted at least three doctors and a nurse practitioner who were named in the Journal's story on UnitedHealth-owned clinics. One of the people was told the health department's Office of Inspector General was involved as well.
>
> Three said they were questioned about specific diagnoses UnitedHealth promoted for employees to use with patients, incentive arrangements and pressure to add the diagnoses. At least two provided documents, including a contract with a UnitedHealth unit, to the Justice Department.
>
> Valerie O'Meara, a nurse practitioner who worked for UnitedHealth in Washington state, said she was interviewed on Jan. 31 by Justice Department attorneys who were interested in the company software that suggested diagnoses and the role of a UnitedHealth manager who she said urged her to make new diagnoses beyond what doctors had treated.
>
> The attorneys zeroed in on certain diagnoses the company often suggested, such as an obscure hormonal condition called secondary hyperaldosteronism, she said. The Journal's analysis found the condition was rarely diagnosed by Medicare doctors not working for UnitedHealth.
>
> O'Meara said the attorneys focused on her account of how she was told she could add the hyperaldosteronism diagnosis to patients' records without a lab test.

More broadly, she said, "they were looking at, 'Is this abuse?'"

212. As a result of the February 21, 2025 disclosure, UnitedHealth's stock price declined, falling $36 per share, from a close of just over $502 per share on February 20, 2025 to a close of just over $466 per share on February 21, 2025, on an unusually high trading volume of 19.9 million shares. *See* ¶¶329-331, *infra*.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    False and Misleading Statements and Omissions Concerning UnitedHealth's HouseCalls and Medicare Advantage Program

213. Throughout the Class Period, Defendants misrepresented the purpose of UnitedHealth's HouseCalls in-home visit program and concealed the Company's fraudulent scheme to target certain diagnoses of serious and chronic conditions in order to boost payments from CMS. In truth, the Company was using in-home HRAs conducted by HouseCalls nurses, retroactive chart reviews, and provider pressure tactics, to generate diagnosis codes for conditions that were not based on medical necessity or that no doctor ever treated to increase CMS payments to UnitedHealth. In addition, Defendants repeatedly misrepresented the Company's revenue drivers by concealing the fraudulent upcoding scheme while misleadingly claiming that revenue growth was driven by the number of individuals served and people with higher acuity needs.

#### 1.    Statements During 2021

214. The Class Period starts on September 22, 2021, the day the *WSJ* published a report titled: "Most of $9.2 Billion in Questionable Medicare Payments Went to 20 Insurers, Investigators Say." The article reported on the September 2021 OIG report, that

- 94 -

found 20 Medicare insurers received about half of a $9.2 billion pool of suspicious

Medicare payments from CMS.  The article further stated that:

> Among the 20 companies flagged in the report, the investigators found
> that one received approximately 40% of the questionable payments, or $3.7
> billion, while enrolling only 22% of Medicare Advantage customers.  The
> [OIG] report didn't name the company.  Federal data compiled by analysts
> at BMO Capital Markets shows that enrollment share closely matched that
> of industry giant UnitedHealth Group Inc.'s UnitedHealthcare during the
> period covered in the report.

215.    In the *WSJ* report, UnitedHealth adamantly denied any wrongdoing stating:

"'***UnitedHealthcare's in-home clinical care programs provide significant benefits to***

***seniors and for years have been valuable offerings to ensure our members continue to***

***receive cost-effective, appropriate care.  Our Medicare Advantage risk-adjustment***

***program is transparent and compliant with CMS rules***.'"

216.    On October 14, 2021 Defendants held an earnings call to discuss

UnitedHealth's Q3 2021 financial results.[25]  During the question and answer session of the

call, analysts inquired about the financial impact of COVID-19 on Medicare Advantage

risk-adjustments and how the Company was performing in terms of completing in-home

wellness visits compared to the previous year.  In response defendant Thompson answered:

"[W]e are encouraged by the encounters with the physicians, the primary care visits and

annual wellness visits as well as in-home clinical visits.  So those have been encouraging.

***So I certainly expect less of a headwind in 2022 due to those encounters, certainly getting***

***traction certainly compared to 2021***."

---

[25]  As used herein, the letter "Q" stands for quarter, thus Q3 2021 means the third fiscal
quarter for fiscal year ("FY") 2021.

217.    During the call, an analyst from Barclay's also questioned Defendants about the September 22, 2021 *WSJ* report which highlighted questionable Medicare Advantage risk-adjusted payments to insurers, including UnitedHealth, asking:

> So you touched on the topic of Medicare risk adjuster payments earlier. This was also a little bit more topical about a month ago with *The Wall Street Journal* putting a spotlight on it. So I guess I'm just curious if you have any updated high-level thoughts on [Medicare risk-adjustment] payments conceptually for the managed care industry overall. And do you see any potential reform of [Medicare risk-adjustment] near term? Or do you expect status quo going forward?

218.    In response UnitedHealth COO Dirk McMahon stated:

> And when we think about the risk adjustment model in the payment system. The model has been critical to providing broad and equitable access to [Medicare Advantage]. ***Risk adjustment levels of playing field and ensures that there's no disincentive to care for the most vulnerable***. So we really feel that it's an essential part of encouraging the right incentives in the program, and think that it's something to build on and broadly support that we need to think about how to build on these positive elements and aspects of the program for which this is one of them.

219.    On October 19, 2021, the *Minnesota Star Tribune* published an article titled: "Report says UnitedHealth Group was top recipient of questionable Medicare payments." Similar to the September 22, 2021 *WSJ* report, the *Minnesota Star Tribune* reported on the September 2021 OIG report, confirming that, based on government documents it received, UnitedHealth was the company identified in the OIG report as the stand out Company that "covered 22% of all [members] enrolled in the health plans [reviewed by the OIG] at the time, yet received a disproportionately high $3.7 billion, or 40% of the total payments" in 2017. The *Minnesota Star Tribune* article stated that the OIG "report found UnitedHealth Group received 58% of all payments" based on in-home HRAs. The article further stated

that "UnitedHealth Group accounted for two-thirds of all risk-adjusted payments resulting from diagnoses reported only on in-home [assessments] and no other service record."

220.    UnitedHealth again denied any wrongdoing, claiming that the OIG report was "'*based on old data and is inaccurate and misleading – a disservice to seniors and an attack on the [federal government's] payment system*,'" and "'*[i]n-home clinical care programs and chart reviews are needed for appropriate senior care and payment, . . . UnitedHealthcare's status as an early clinical home provider is not only appropriate, it's best practice*.'"

221.    Beginning with UnitedHealth's November 3, 2021 SEC Form 10-Q filed with the SEC for the quarter ended September 30, 2021, which was signed by defendant Witty, Defendants repeatedly stated that: "*UnitedHealthcare's revenue increased due to growth in the number of individuals served through Medicare Advantage and Medicaid, including a greater mix of people with higher acuity needs . . . .*"[26]

222.    On November 30, 2021, UnitedHealth held its annual investor conference. During the conference Witty discussed HouseCalls, and its purported focus on delivering and improving healthcare for Medicare Advantage enrollees, stating:

> *Another is through [HouseCalls], a true collaboration between Optum and UnitedHealthcare, where our clinicians help seniors in Medicare Advantage programs manage their chronic disease, close gaps in*

---

[26]    Substantially similar false and misleading statements were repeated in the following UnitedHealth SEC filings signed by Witty: (i) May 4, 2022 Q1 2022 Form 10-Q; (ii) August 3, 2022 Q2 2022 Form 10-Q; (iii) November 2, 2022 Q3 2022 Form 10-Q; (iv) May 3, 2023 Q1 2023 Form 10-Q; (v) August 2, 2023 Q2 2023 Form 10-Q and (vi) November 6, 2023 Q3 2023 Form 10-Q; (vii) May 9, 2024 Q1 2024 Form 10-Q; (viii) August 9, 2024 Q2 2024 Form 10-Q; and (ix) November 4, 2024 Q3 2024 Form 10-Q.

- 97 -

*care and stay healthy and out of the hospital.  Our teams not only look after our members' medical needs, they help with any number of life challenges like keeping healthy food in the fridge or find an assistance with a utility bill*.

### 2.   Statements During 2022

223.    On January 19, 2022, Defendants held an earnings call with investors to discuss the Company's Q4 2021 and FY 2021 financial results.  During the call Witty spoke about the Company's in-home visits program and its focus on patient care, stating:

> [O]ne of the things that I think we really are pleased about is the way in which OptumCare has developed a whole set of capabilities to deliver really enhanced focus on [Medicare Advantage] patients.  Obviously, these patients have a high medical need very often.  They need high touch.  I've been super impressed with the development, not just in the clinic, ***but also through the at-home programs, where we're able to continue to make sure folks are looked after properly***.

224.    On February 15, 2022, Defendants filed UnitedHealth's SEC Form 10-K for the year fiscal ended December 31, 2021.  The Form 10-K was signed by defendants Witty and Hemsley.  The Form 10-K also reported on HouseCalls, stating:

> UnitedHealthcare Medicare & Retirement's senior-focused care management model operates at a medical cost level below traditional Medicare, while helping seniors live healthier lives.  We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care.  ***For example, through our HouseCalls program, nurse practitioners performed more than 2.1 million clinical preventive home care visits in 2021 to address unmet care opportunities and close gaps in care***.

225.    On April 14, 2022, Defendants held an earnings call with investors to discuss the Company's Q1 2022 financial results.  During the call Tim Noel, the CEO of UnitedHealthcare's Medicare & Retirement division, stated:

- 98 -

In-home testing is certainly a huge area of focus for us. . . . *[M]ore recently, we've really been focused on reaching out to people that we know to be underdiagnosed for conditions like hep C and diabetes. And in doing this, we've reached out over the last year to about 1 million members who we suspect to be underdiagnosed and offering in-home testing solutions that are then delivered by our HouseCalls partners over at Optum.* These completion rates have been really promising, 35% last year, and we'll continue to evaluate expanding this program. That will do a really nice job of helping us understand where conditions are underdiagnosed and can be better treated.

226.    On May 10, 2022, executives from UnitedHealth attended a healthcare industry conference call hosted by Bank of America. During the call the Optum Rx, Inc. CEO discussed the HouseCalls program's value to the Company's business model, stating:

So another great example is even go back beyond and you think about the beginnings of our home and community base, think about HouseCalls, which we've talked about for years. I remember when HouseCalls was doing a couple of hundred thousand annual visits a year. Today, it is really the backbone of a home and community-based program *that brings more value to the system, helps consumers, service people in their home, puts together capabilities that will keep driving value, and we'll continue to grow and drive value to all of our payers and clients*.

227.    On July 15, 2022, Defendants held an earnings call with investors to discuss the Company's Q2 2022 financial results. During the call Witty discussed the healthcare benefits of HouseCalls to Medicare patients, stating: "*And as you know, we've got a long history in this in areas like house calls, which have delivered amazing health assessment and preventive direction to millions of people, and this is another big step for us to extend*."

228.    On November 29, 2022, UnitedHealth held its annual investor conference. During the conference Robert Hunter, the Senior Vice President of UnitedHealthcare's

- 99 -

Medicare Advantage Product & Experience division, stated: "House[Calls] has been the centerpiece of our home care model for government programs for years."  Hunter added:

> *We expect to complete 2.2 million house calls this year, bringing personalized care into the home to address both immediate and preventive medical care needs in addition to social needs, including access to healthy food, safe housing, transportation and medical appointments and more.  We have been testing people for underdiagnosed conditions such as diabetes, prediabetes, hep C and colon cancer.  And what we found is nearly 1 out of every 4 people we screened had a condition, they didn't realize they had and the hep C positivity rates for dual special needs members are nearly double the national average*.

### 3.    Statements During 2023

229.    On February 24, 2023, the Company filed its SEC Form 10-K for the fiscal year ended December 31, 2022, which was signed by defendants Witty and Hemsley.

230.    The Form 10-K reported on HouseCalls, stating:

> We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care.  *For example, through our HouseCalls program, nurse practitioners performed nearly 2.3 million clinical preventive home care visits in 2022 to address unmet care opportunities and close gaps in care*.

231.    On April 14, 2023, Defendants held an earnings call with investors to discuss the Company's Q1 2023 financial results.  During the call UnitedHealth COO Dirk McMahon stated: "*First, patient assessments, in-home clinical visits designed to identify care needs and help patients with other physical and social needs.  This year, we expect to make more than 2.5 million visits to patients' homes* and we continue to expand the scope of the clinical services offered in that setting."

232.    On November 29, 2023, UnitedHealth held its annual investor conference.  During the conference Robert Hunter, the Senior Vice President of UnitedHealthcare's

Medicare Advantage Product & Experience division, spoke about HouseCalls, stating:

"*This year, we will conduct more than 2.5 million in-home visits through our house calls program, completing approximately 200,000 tests for diabetes and hep C, which are consistently underdiagnosed conditions*," and "*[t]his year, we will screen nearly 3.8 million people, helping connect them to necessary resources with over 40% of those screenings occurring during a house calls visit*."

### 4.    Statements During 2024

233.    On February 28, 2024, the Company filed its SEC Form 10-K for the fiscal year ended December 31, 2023, which was signed by defendants Witty and Hemsley.  The Form 10-K reported on HouseCalls, stating:

> We have continued to enhance our offerings, focusing on more digital and physical care resources in the home, expanding our concierge navigation services and enabling the home as a safe and effective setting of care.  *For example, through our HouseCalls program, nurse practitioners performed more than 2.7 million clinical preventive home care visits in 2023 to address unmet care opportunities and close gaps in care*.

234.    On July 16, 2024, Defendants held an earnings call with investors to discuss the Company's Q2 2024 financial results.  During the conference call Witty discussed the value of UnitedHealth's HouseCalls program to both Medicare Advantage consumers and taxpayers, stating:

> The home visits we offer seniors further illustrate the value of MA. Last year, our medical professionals made more than 2.5 million home visits. *As a direct result, our clinicians identified 300,000 seniors with emerging health needs that may otherwise have gone undiagnosed.  They connected more than 500,000 seniors to essential resources to help them with unaddressed needs such as food and security, medication affordability, transportation, and financial support.  They also identified and helped close more than three million gaps in care that made a real difference in*

- 101 -

*people's lives.  Within 90 days of one of our home visits, 75% of patients received follow-up in a clinical setting*.

*Additionally, Medicare Advantage patients with chronic conditions who receive these home visits end up with better managed and more stable health outcomes, as evidenced by spending measurably less time than fee-for-service patients in emergency room and other hospital settings.  The bottom line, our home visit programs help patients live healthier lives and save taxpayers' money*.  It is only Medicare Advantage that makes programs and results like this possible.

235.    On July 25, 2024, *STAT News* published a report titled: "How UnitedHealth harnesses its physician empire to squeeze profits out of patients."  The report described how the Company uses its 90,000 employed or contracted providers to inflate risk scores and make patients appear sicker than they are in order to get larger payments from CMS, including pressure tactics and financial incentives.  The report quoted a UnitedHealth spokesperson, who essentially denied any wrongdoing, stating:

> [T]he company's "***providers and partners make independent clinical decisions, and we expect them to diagnose and document patient information completely and accurately in compliance with [federal] guidelines.  We provide training and other practice support to providers because it leads to better care management, coordination, and patient follow-up. Regulators routinely audit this documentation***."

236.    On August 8, 2024, in response to the *WSJ*'s investigative reports published on July 8 and August 4, 2024, UnitedHealth issued a press release titled: "UnitedHealth Group's Response to the Wall Street Journal."  Based on an in-depth Medicare Advantage data analysis, the *WSJ* reports concluded that UnitedHealth and other insurers used upcoding to boost their Medicare Advantage profits.  In UnitedHealth's release, UnitedHealth denied the *WSJ* reports' findings stating "***[t]he WSJ's core thesis, methodology and conclusions are flawed***" and its assertions are "***unsubstantiated, and***

*the WSJ presented no credible evidence to support this claim*." The release affirmed that HouseCalls "*provides in-home clinical assessments at no cost to millions of seniors each year*" claiming that it is "*to better understand their current health status, identify conditions, and connect patients to necessary specialists and high-quality medical care. It's a critical touchpoint in the care continuum, supplementing annual physician visits – not replacing them – and ensuring people have access to needed services, including housing, food and social support*."

237.   On October 24, 2024, the *WSJ* published a report titled: "Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds." The report discussed the OIG report released in October 2024 that showed how UnitedHealth manipulates the Medicare Advantage system by utilizing in-home HRAs and chart reviews at the expense of vulnerable seniors and taxpayers. The *WSJ* report quoted a UnitedHealth spokesman as denying the 2024 OIG findings, stating they were "'*[a] misleading, narrow, and incomplete view of risk adjustment data is being used to draw inaccurate conclusions about the value of in-home care for America's most vulnerable seniors in Medicare Advantage*.'" The *WSJ* report further quoted the spokesman as saying the in-home visits "are comprehensive assessments by highly-trained clinicians that take 45 to 60 minutes and help '*identify and drive needed follow-on care for the vast majority of the patients with whom we engage*.'"

238.   On December 29, 2024, the *WSJ* published an investigative report titled: "UnitedHealth's Army of Doctors Helped it Collect Billions More From Medicare." Based on the accounts of several former UnitedHealth providers, the article reported how

- 103 -

Resetting

UnitedHealth implemented practices that led to billions in extra Medicare Advantage payments, including forcing its providers to use pre-prepared checklists and software designed to increase the sickness scores of Medicare Advantage patients with questionable diagnoses, and promising financial incentives to providers for documenting lucrative diagnoses. The report included a written statement from UnitedHealth defending the Company's practices, stating that they lead to "'*more accurate diagnoses, greater availability of care and better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management*,'" and help "*to avert more serious health problems later, and to achieve Medicare Advantage's goals of improving quality and reducing costs*."

### 5.    Statements During 2025

239.    On January 16, 2025, Defendants held an earnings call with investors to discuss the Company's Q4 and FY 2024 financial results. During the conference call UnitedHealth CFO John Rex discussed the value of UnitedHealth's in-home patient visit program, claiming UnitedHealth was "*saving the health system billions*" while stating:

> As we move into '25, we will continue to enhance access and care integration through the home, a much-needed area to help people with their health. More than three-quarters of our in-home patient visits result in a primary care visit within 90 days. Medicare Advantage patients with chronic conditions who receive a home care visit have a lower rate of ER visits, fewer inpatient stays, stronger health outcomes, and a better experience, all while saving the health system billions.

240.    Defendants' statements, as alleged in ¶¶214-239, were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were that:

(a)    UnitedHealth's HouseCalls program was specifically designed to conduct HRAs in members' homes to generate unsupported diagnoses of serious and chronic medical conditions in order to boost Medicare Advantage payments from CMS. The HouseCalls program was being used to maximize UnitedHealth's revenue, without regard for actual member care, and in furtherance thereof:

(i)    HouseCalls nurses were forced to use questionnaires during HouseCalls visits that were crafted to generate high-value diagnoses, without regard to the members' actual medical conditions (¶¶70-75);

(ii)    HouseCalls nurses were required to use UnitedHealth software that recommended certain high-value diagnoses, which were chosen by the software without regard to the HouseCalls nurses' medical opinions (¶¶67-69);

(iii)    "Quality assurance" teams pressured HouseCalls nurses to link symptoms to pre-existing chronic conditions without regard to medical necessity (¶¶70-75);

(iv)    UnitedHealth induced members to participate in HouseCalls in-home visits by paying them and offering other financial incentives (¶¶62, 72, 138); and

(v)    HouseCalls nurses were required to use inaccurate and unreliable diagnostic tools to capture high-value diagnoses for certain serious medical conditions (¶¶76-86, 134-135).

(b)    UnitedHealth further maximized revenue by deliberately inflating its members' risk-adjustment scores using tactics outside the HouseCalls program, and in furtherance thereof:

- 105 -

(i)    UnitedHealth hired risk-adjustment coders employed by Optum and third-party companies to mine the charts of UnitedHealth's Medicare Advantage members in search of potential grounds for adding high-value diagnosis codes, without regard to the members' actual medical conditions (¶¶87-89);

(ii)    UnitedHealth provided physicians with hours of training about how to document patients' illnesses so as to increase payments from Medicare (¶¶90, 96);

(iii)    Physicians were required to use UnitedHealth software that forced physicians to consider adding certain high-value diagnoses, which were chosen by the software without regard to the physicians' medical opinions (¶¶91-92);

(iv)    Physicians received substantial monetary bonuses as a reward for coding high-value diagnoses without a valid basis (¶¶90-93, 129, 150); and

(v)    Physicians were required to use inaccurate and unreliable diagnostic tools to capture high-value diagnoses for certain serious medical conditions (¶¶80-86, 131).

(c)    UnitedHealth's upcoding scheme was so effective that it had the highest average payments among other Medicare Advantage insurers of $2,735 for in-home diagnosis per visit from 2019 to 2021 (¶¶75, 100). Sickness scores for patients who switched from traditional Medicare to UnitedHealth Medicare Advantage saw a 55% increase in their sickness score in the very first year, an increase equivalent to every patient being diagnosed with HIV and breast cancer (¶93). In 2021 alone, UnitedHealth obtained $8.7 billion in payments from CMS for high-value diagnoses that no doctor treated, which amount was equal to more than 50% of the Company's net income (¶101). In 2023,

- 106 -

UnitedHealth reaped $3.2 billion in Medicare Advantage payments from diagnoses reported only on in-home HRAs and HRA-linked chart reviews, which amount was equal to two-thirds of the total risk adjusted payments CMS made to all insurers that same year based on these diagnosing methods (¶111).

### B. Defendants' Misrepresentations About Internal Firewalls at UnitedHealth and Its Optum Subsidiary

241. Defendants misrepresented UnitedHealth's data firewalls and their ability to maintain the integrity of customers' data and CSI. As explained above in §§IV.C.3-4, for example, although no technical firewall existed for many intra-Optum businesses, Defendants falsely assured the markets that UnitedHealth had "internal firewalls that prevent the sharing of competitively sensitive information across business units."

### 1. Statements During 2022

242. On February 24, 2022, Optum published a "fact sheet," defending the Change acquisition. In the so-called "fact sheet" Optum asserted that the "*theories at the core of the [DOJ's] case are completely without merit*." Optum also boasted about its data firewalls: "*Our track record of safeguarding our customers' proprietary information speaks for itself. We have best-in-class firewalls and compliance programs that maintain the integrity of our customers' data and information, and prevent unauthorized access and misuse. Combining with Change Healthcare alters none of those fundamentals.*"

243. On March 11, 2022, in its Answer to the DOJ's complaint, which UnitedHealth promptly published on its website,[27] UnitedHealth "*agreed to make binding*

---

[27] *See* UnitedHealth Group Incorporated's Answer to the Complaint, *United States v. UnitedHealth Grp. Inc., et al.*, No. 1:22-cv-0481 (CJN), ECF 37 (D. D.C. Mar. 11, 2023),

*commitments to its customers and the Government*" to "*maintain its robust firewall processes – and extend them to Change's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes.*" UnitedHealth further claimed that "*OptumInsight imposes strict limitations on the use or disclosure of external customer data . . . .*"

244.    On March 17, 2022, UnitedHealth posted a document on its website titled: "Benefits of Combination with Change Healthcare" addressing the DOJ's lawsuit, asserting that "*Optum will maintain robust firewall processes and extend them to Change Healthcare's business – to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes.*" Underscoring its commitment to data protection, UnitedHealth stated that Optum "*invests extraordinary time, money, and resources into safeguarding [customer sensitive] information and keeping it walled off from UnitedHealthcare*" and that "*UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer [information].*"

245.    On June 14, 2022, UnitedHealth published its 2021 Sustainability Report.  In the report, the Company continued to assert that it was "*required to safeguard personal information reasonably and appropriately*" and that the "*[p]rimary tools used to fulfill these obligations are cybersecurity and data privacy programs*."    Further, the

---

available at https://www.unitedhealthgroup.com/content/dam/UHG/PDF/2022/2022.03.11 -answer-of-UnitedHealth-Group-Incorporated.pdf.

Sustainability Report explained that UnitedHealth "*manages a robust Information Security Risk Management and Privacy Program that improves its ability to make risk-informed decisions by conducting systematic and structured reviews of information security risks*." The results of these internal audits are then "communicated to executive leadership and presented to the Audit and Finance Committee of the Board of Directors quarterly."

246.    On July 22, 2022, as part of its effort to convince the court and prevail at trial, UnitedHealth filed its Amended Pretrial Brief and stated that "*UHG has an 'advanced and sophisticated technology architecture and infrastructure' of internal firewalls that prevent the sharing of competitively sensitive information across business units*."

247.    On September 7, 2022, UnitedHealth filed its Post-Trial Brief and again assured the court of how UnitedHealth had "*operationalized its firewall policy through 'robust' technological systems that prevent employees of one UHG business unit from accessing data housed within another UHG business unit*."

248.    Also on September 7, 2022, UnitedHealth filed its Proposed Findings of Fact and stated:

> *For years, UHG has maintained robust firewall and data security policies specifically designed to make sure customers' potentially sensitive information is protected and not misused in any way. UHG commits to apply these same firewall and data security policies to customer data held by Change on behalf of Change's EDI customers, and to uphold all contractual rights of Change's customers to audit the protection and security of their data.*

249.    On November 29, 2022, UnitedHealth held its annual Investor Conference, materials for which were publicly released on November 28, 2022.  The Conference Book highlighted the Company's "*long-established firewall*."

250.    Defendants' statements, as alleged in ¶¶242-249, were false and misleading when made.  The true facts that were then known to Defendants were that: (i) Optum, and its intracompany businesses, lacked both role-based security systems and a technical firewall (¶¶178-184); (ii) numerous Optum business applications, including Salesforce GO, Business Intelligence Data Warehouse, Data Governance Tracking Systems, and Optum ERP Data Store, lacked role-based security protocols to prevent users from one Optum business from accessing data from another Optum business (¶180); and (iii) Line of Business (LOB)  tags across over 100 systems within UnitedHealthcare and Optum's shared Consumer Database (CDB) were wrong or improperly applied and did not prevent UnitedHealthcare employees from seeing Optum's customer data (¶184).

### C.    UnitedHealth's False and Misleading Statements Regarding the Company's Regulatory Compliance Standards and Fair Competition Practices

251.    On June 1, 2023, Witty attended an investor conference call hosted by Sanford C. Bernstein.  During the conference call, Witty highlighted to investors the Company's strategic focus on "exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can," while simultaneously assuring them that these insurance and provider businesses maintained appropriate separation with "firewall

requirements that are needed there" to ensure compliance with regulatory standards.[28]
Witty stated:

> Three things we've been focused on over the last 2 years to really improve our performance: ***making sure that we're exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements that are needed there*** . . . .

252.    Witty's statement in ¶251 was false and misleading when made. Despite his public assurances to investors about maintaining "***firewall requirements***" between UnitedHealthCare and Optum, Defendants were favoring Optum provider groups over non-Optum competitor groups with higher payments for lucrative healthcare services, which undermined competition and circumvented MLR requirements (¶¶46-54, 141-142, 194-197). UnitedHealth, as the corporate parent of both a dominant insurance company and health care provider organization, was capturing larger profits by paying itself higher prices for basic checkups, surgeries, and procedures. In some cases, UnitedHealthcare's payments to Optum providers were double the amount paid to non-Optum competitors for identical services in the same market (*id.*). Defendants' practices made it difficult, if not impossible, for independent practices to compete, recruit providers, and remain financially viable, further consolidating UnitedHealth's market power.

253.    UnitedHealth maintained a code of conduct that was published on its website every day of the Class Period, which contained specific assurances and guidelines that

---

[28]    In this context, the "'firewall' refers to UnitedHealth executives' assertion that UnitedHealthcare and Optum negotiate with each other at arm's length." Ex. 9 at 7.

UnitedHealth employees, including Defendants, were required to follow to comply with U.S. anti-trust laws.

254.    UnitedHealth's code of ethics was entitled: "Code of Conduct: Our Principles of Ethics and Integrity."  Under the section "Fair Competition and Fair Dealing: UnitedHealth Group's success is founded on honest competition," the Code of Conduct mandated that Defendants "***Comply with Fair Competition Laws and Company Policies***," stating:

> ***Many laws and regulations define and promote fair business practices to protect the competitive environment.  For example, competition laws, known in the U.S. as antitrust laws, protect against practices that interfere with free competition.  They are designed to promote a competitive economy in which each business enterprise has an opportunity to compete fairly on the basis of price, quality, and service, and in the employment marketplace.  To comply with these laws, each employee, director, and contractor must deal fairly with the Company's customers, service providers, suppliers, competitors, and employees.  No employee or director should take advantage of anyone through unfair-dealing practices***.

255.    The statements in ¶254 were each false and misleading when made.  The true facts, which Defendants knew or recklessly disregarded, were that:

(a)    Instead of dealing fairly with the Company's competitors as specified in UnitedHealth's Code of Conduct, Defendants were using Optum's dominance in the provider market to engage in anti-competitive practices designed to monopolize local primary care provider markets (¶¶190-197).  Defendants were also pressuring doctors to remain within Optum's network through restrictive contracts and non-compete clauses and engaging in misleading practices to retain patients from going to competitors (¶193).  UnitedHealthcare was also using its market dominance to

- 112 -

pressure its in-network doctors and healthcare facilities to stop working with healthcare providers outside of UnitedHealthcare's network, and incentivizing its in-network doctors to steer patients away from out-of-network providers and Optum's competitors (¶¶194-197).

(b)    Defendants were also artificially inflating payments to Optum providers, which gave UnitedHealth both a regulatory and financial advantage over its competitors. In some cases UnitedHealthcare's payments to Optum providers were double the amount paid to non-Optum competitors for identical services in the same market (¶¶46-54, 141-142, 194-197). Defendants' practices made it difficult, if not impossible, for independent practices to compete, recruit providers, and remain financially viable, further consolidating UnitedHealth's market power.

## VI.    ADDITIONAL INDICIA OF SCIENTER

### A.    The Individual Defendants' Frequent Discussions of HouseCalls and Medicare Advantage with Analysts Confirms Their Intimate Knowledge of the Upcoding Scheme

256.    Individual Defendants Witty and Thompson were particularly focused on the potential for the Medicare Advantage businesses – and HouseCalls in particular – to increase the Company's revenue. They often spoke about the programs to analysts, demonstrating actual, intimate knowledge of this aspect of UnitedHealth's business.

257.    For example, during the Company's Q3 2021 earnings call with investors on October 14, 2021, Thompson confirmed his awareness of and focus on the daily operations of the HouseCalls program when he responded to a question about the status of the program in light of the COVID-19 pandemic, noting "we are encouraged by the encounters with the

physicians, the primary care visits and annual wellness visits *as well as in-home clinical visits*."

258. Witty also expressed his keen focus on the HouseCalls and Medicare Advantage programs. During the Company's annual investor conference on November 30, 2021, Witty praised the HouseCalls program as a "true collaboration between Optum and UnitedHealthcare, where our clinicians help seniors in Medicare Advantage programs" and noted that "[o]ur [HouseCalls] clinicians will make about 2 million home clinical visits in 2021, leading to hundreds of thousands of referrals for much needed care."

259. Then, during the Company's Q4 2021 earnings call on January 19, 2022, Witty again demonstrated his knowledge of the day-to-day operations of the HouseCalls program:

> OptumCare has developed a whole set of capabilities to deliver really enhanced focus on [Medicare Advantage] patients. Obviously, these patients have a high medical need very often. They need high touch. I've been super impressed with the development, not just in the clinic, but also through the at-home programs, where we're able to continue to make sure folks are looked after properly.

260. During the Company's Q2 2022 earnings call held on July 15, 2022, Witty extolled the virtues and importance of HouseCalls, saying the program had "delivered amazing health assessment and preventive direction to millions of people." And on the Company's Q2 2023 earnings call on July 14, 2023, Witty discussed a study that was done by Optum, in conjunction with Yale Medical School, which looked at the potential health benefits of the HouseCalls program.

- 114 -

261.    During the Company's Q2 2024 earnings call on July 16, 2024, Witty again spoke in great detail about the HouseCalls program and Medicare Advantage, noting that, in 2023, UnitedHealth personnel conducted "2.5 million home visits" and relaying precise statistical and logistical information about the day-to-day workings of HouseCalls and the supposed benefits of the program to Medicare Advantage members:

> As a direct result, our clinicians identified 300,000 seniors with emerging health needs that may otherwise have gone undiagnosed.  They connected more than 500,000 seniors to essential resources to help them with unaddressed needs such as food and security, medication affordability, transportation, and financial support.  They also identified and helped close more than three million gaps in care that made a real difference in people's lives.  Within 90 days of one of our home visits, 75% of patients received follow-up in a clinical setting.

> Additionally, Medicare Advantage patients with chronic conditions who receive these home visits end up with better managed and more stable health outcomes, as evidenced by spending measurably less time than fee-for-service patients in emergency room and other hospital settings.  The bottom line, our home visit programs help patients live healthier lives and save taxpayers' money.  It is only Medicare Advantage that makes programs and results like this possible.

262.    In short, throughout the Class Period, defendants Witty and Thompson each spoke in detail about the HouseCalls program, addressing the questions of analysts and demonstrating their focus and in-depth knowledge of that aspect of UnitedHealth's business.

### B.    The Upcoding Scheme Required Participation Throughout the Company

263.    UnitedHealth's upcoding scheme represents a central part of UnitedHealth's business and was a primary source of UnitedHealth's revenue.  Indeed, in 2021 alone, UnitedHealth added *$8.7 billion* in revenue from diagnoses that did not result in any

- 115 -

treatment.  The Company depended on coordinated efforts and policies across multiple working groups in order to achieve this shocking result.

264.  For example, UnitedHealth actively trained its providers to add unwarranted diagnosis codes to patient charts during in-home visits.  As evidenced by audiotapes leaked to the media, UnitedHealth executives convened meetings whose purpose was to coach nurses and administrators to use "'buddy codes'" to add unwarranted diagnoses to charts for patients with related conditions.

265.  Also, UnitedHealth systematically pressured providers who performed HouseCalls to add as many new diagnoses as possible.  On HouseCalls, providers (usually nurse practitioners) completed questionnaires about each patient's health and had the opportunity to add diagnoses based on the answers.  UnitedHealth employed a so-called "quality assurance" team that then reviewed these questionnaires, checking them to make sure that the provider had maximized all available high-value diagnosis codes.  If any codes were missed, reviewers from the quality assurance team pressured the provider to add them.

266.  The Company also issued laptops to HouseCalls providers with pre-loaded software designed to guide their evaluations and add diagnoses.  UnitedHealth calibrated the software specifically to maximize the number of diagnoses based on patients' medications and responses, and then present those potential diagnoses into a "diagnosis cart" for the provider to quickly approve.

267.  UnitedHealth also purchased and distributed equipment to providers specifically for the purpose of adding unwarranted diagnoses, the use of which was designed to generate revenue for UnitedHealth without regard to the medical needs of its

- 116 -

members.  Specifically, UnitedHealth bought and required the use of the QuantaFlo device in search of a relatively rare but lucrative diagnosis called peripheral artery disease. Notoriously unreliable and prone to returning false positive results, the device purported to measure blood circulation.  UnitedHealth required providers to use the unreliable device – and nothing else – to make the diagnoses of peripheral artery disease, and paid additional compensation to providers who used it regularly.  In 2019 to 2021 alone, UnitedHealth diagnosed this condition 568,000 times after in-home visits, leading to $1.4 billion in payments.

268.    The Company also employed a team of risk-adjustment coders in India, who it trained to find the highest value diagnosis codes, and then coach providers to add them. UnitedHealth evaluated the job performance of risk-adjustment coders based on how much upcoding they performed.

269.    UnitedHealth also modified its growth strategy to target provider groups that could assist with the Medicare Advantage fraud.  Since 2010, UnitedHealth acquired hospitals, doctors' offices, and clinics at an aggressive rate, until it controlled 10% of the physicians in America.  Then, it implemented a nationwide practice of pushing its clinicians to document as many ailments as they could by offering bonuses to "high" performers and reprimanding doctors who were not coding as much as their peers.  As a result, UnitedHealth's physicians diagnosed lung disorders, vascular conditions, and kidney disease at more than two times the rate of those in the traditional Medicare program.

## C.    High-Level Executives Dismissed Internal Reports of Improper Upcoding and Retaliated in Response

270.    CW2, a Senior Risk Adjustment Coding Educator and member of the Coding Escalation Review Team (or CERT team),[29] who worked at the Company from 2019 to 2023, described the way UnitedHealth executives responded to CW2's concerns regarding upcoding.  CW2 became frustrated after observing numerous coding abuses in which the Company was coding to the most severe level without proper documentation.  *See* ¶¶122-127, *supra*.  In order to address these concerns, CW2 sent emails to the teams under CW2's purview instructing them how to code properly, in contradiction with Company-mandated coding procedures.  CW2 was chastised by CW2's manager – a Vice President of Quality Assurance at Optum – for sending this email; CW2 was removed from the CERT team, and the teams that CW2 managed were dissolved.

271.    CW2 then escalated these coding-related concerns by reporting them internally to the Company's compliance hotline.[30]  CW2 believes that CW2 was demoted because CW2 raised concerns about improper coding to the Vice President of Quality Assurance at Optum and then to the Company's compliance hotline.  *See* ¶¶122-127, *supra*.

---

[29]  The CERT team was a group of employees who addressed coding questions from UnitedHealth and Optum employees across the country.

[30]  On the UnitedHealth website, the Company maintains a compliance hotline where UnitedHealth and/or Optum employees can internally report instances of fraud or abuse, either by sending an email to a designated email address or by calling the designated telephone number.  *See* ¶¶122-127, *supra*.

4901-6680-9379.v3

D.    **Sworn Testimony, Internal Communications, and Internal Reports Support a Strong Inference of Scienter**

1.    **UnitedHealth Targeted Change Healthcare Specifically to "Utilize" Claims Data and Customer Sensitive Information**

272.    Leading up to the Change deal, UnitedHealth and Optum hired the consulting giant McKinsey & Company to assess the value of Change.  In particular, according to Optum senior executives Robert Musslewhite and Chris Hasslinger, UnitedHealth tasked McKinsey & Company with assessing the value of the data Change had access and rights to.[31]

273.    McKinsey prepared a January 2020 presentation analyzing the value to UnitedHealth of obtaining Change's data, which concluded that Change:

- "enjoys [the] broadest and deepest datasets in several categories," with "unrestricted access under HIPAA guidelines";

- had a high depth and breadth of data assets for commercial claims;

- "manages the highest volume of claims compared to any other EDI competitor as well as a large percentage of longitudinal data sets that are more valued"; and

- "connects to >70% of all payers, providers, pharmacy and physician orgs."

274.    According to the January 2020 presentation, McKinsey & Company concluded that UnitedHealth could "'utilize transactions intelligence'" from Change's claims data to "'optimize benefit design'" for UnitedHealthcare, UnitedHealth's insurance

---

[31]  Musslewhite has been the CEO of Optum Insight since August 2019.  Hasslinger was Senior Vice President at Optum, responsible for acquisitions and partnerships at Optum Insight, until August 2021.

business.  That is, acquiring Change could help UnitedHealthcare, already the biggest health insurer in the country, gain a further edge over its rivals by giving it access to some of the most crucial information in that business: claims data from rival insurers.

275.    UnitedHealth's deal team cited this type of data use when it presented the potential acquisition to the Company's then-CEO in April 2020.  Change's data could yield what was euphemistically referred to as "'improved medical policy and benefit design'" for UnitedHealthcare, the deal team wrote in a subsequent memo.  The data could also help UnitedHealthcare track the pricing of medical procedures and expand insurance underwriting.  The deal team also recognized a glaring concern: using Change's data in some of these ways could raise "'antitrust concerns.'"

276.    Even though Defendants repeatedly emphasized the existence and integrity of their "data firewalls" in defense of the Change acquisition, a February 21, 2021 internal memorandum instead emphasized that Optum and UnitedHealthcare needed to focus on "Enterprise thinking," noting:

> Where to start . . .
>
> We have SO much opportunity to put the breadth of our capabilities on full display and achieve true synergy and scale gains from our extensive capabilities.  ***We need to stop thinking that just because we need to have financial and data firewalls between Optum and UHC means we can't show up together and harness the capabilities of both organizations together.  We need to take a deep look at how success is defined for each operating unit and how performance is rewarded and stop any compensation / reward plans that unintentionally inhibit Enterprise thinking or worse create moral hazards or incongruency with our strategic growth objectives***.  We need to improve our CRM systems and stop operating with many different instances of sales force that don't talk to another at some level.  We need to continue the Enterprise Growth work aimed at building a total comprehensive view of our top existing and prospective accounts.

- 120 -

277.    A March 3, 2021 email from Daniel Schumacher, UnitedHealth's Chief Strategy & Growth Officer, to CEO Witty was more direct: "Be explicit about what information we are going to **share between companies . . . not just grant permission, but require it** . . . ."[32]

278.    David Wichmann, UnitedHealth CEO from September 2017 through March 2021, admitted that UnitedHealth's access to Change's data acted as "'the foundation by which the business case was made'" for the acquisition.  Wichmann also admitted that Change's data was part of the strategic asset justifying the acquisition, stating that "'a network with no data isn't worth very much.'"

## 2.    UnitedHealth's and Optum's Track Record of Data Governance Failures, Including Unauthorized Database Access

279.    UnitedHealth has repeatedly granted UnitedHealth employees or Optum employees assigned to UnitedHealth projects access to sensitive data of external competitors.  Despite assurances that its antitrust compliance policy prohibited sharing external payers' data with UnitedHealth, Peter Dumont, the current Chief Data Governance Officer at UnitedHealth, admitted that UnitedHealth classified many competitively sensitive fields of the external payer data as "standard" fields available to employees across

---

[32]  Schumacher is responsible for driving the Company's long-term strategy including enterprise growth, marketing, and consumer organizations as well as strategic client relationships, enterprise partnerships, and the financial services business.

a broad array of UnitedHealth business units.[33]  For example, the "covered amount" – *i.e.*, the portion of a claim covered by the payer's plan – was classified as "standard" information and available across databases.

280.    UnitedHealthcare and Optum also kept permission logs, which document when employees access information outside their business unit.  These permission logs confirm that employees regularly accessed information outside their business unit.  UnitedHealth's permission logs confirm that the employees granted access to external customer data include:

- A Director of Healthcare Economics for UnitedHealth's commercial health insurance business.

- A Healthcare Economics Consultant for UnitedHealthcare Networks.

- A Director of Data Science for UnitedHealthcare's Government Benefit Operations Segment.

- A Director of Data Analytics for UnitedHealthcare's Clinical Services Segment.

- A Business Analyst Consultant for UnitedHealthcare's Medicare & Retirement segment.

- A Senior Manager of Data Science for UnitedHealthcare's Clinical Services Segment.

- An Associate Director of Business Analysis for UnitedHealthcare's Payment Integrity Strategic Performance Division.

- A Senior Director of Actuarial Services for UnitedHealthcare's Medicare & Retirement Underwriting and Healthcare Economics Division.

---

[33]  Previously, from April 2011-March 2021, Dumont was Vice President, Privacy at Optum, and from April 2021-October 2023 was Chief Privacy Officer at Optum Labs, UnitedHealth.

4901-6680-9379.v3

- An Optum Insight employee who received access for "'a contract with United Healthcare Employer & Individual to provide de-identify [sic] benchmarking data.'"

- An Optum Insight employee who received access for "'a funded agreement with [UnitedHealthcare] to do cost predictions for various groups from E&I,'" which is UnitedHealth's commercial health insurance business.

- An Optum Insight employee who indicated that "'currently access is required to fulfill my role to pull and analyse [sic] data for a [UnitedHealthcare] group pricing project.'"

281. UnitedHealth's recordkeeping practices obscure the full extent and frequency of improper access. UnitedHealth has no access logs for its dNHI database – an Optum database containing de-identified claims data – before May 2021, approximately three months after the government's investigation into the Change acquisition began.[34] Prior to that time, according to Dumont, UnitedHealth determined who improperly accessed data, only by informally asking employees orally whether they accessed any non-UnitedHealth data, without confirming anything in writing. Dumont also admitted that UnitedHealth did not notify any of the other payers that UnitedHealthcare-affiliated employees had access to their data.

282. UnitedHealth's own internal emails confirm that the Company's history of authorizing access to payer data even when squarely prohibited by contract. Under Optum Rx's contracts with its external customers, "'[UnitedHealthcare] employees are not

---

[34] For the period from May through October 2021, UnitedHealth provided the government only a partial access log that omitted employee numbers, making the data impossible to match for a large share of employees. Thus, the only access log that the government could effectively use begins in November 2021. Even the data on employees' access rights lack information on a substantial share of employees' email domains and roles within UnitedHealth.

allowed to see or use the non-[UnitedHealthcare] book of business.'"  Contrary to these agreements, internal emails document UnitedHealthcare-affiliated employees gaining access to the Optum Rx external customer data in dNHI.  A manager responsible for maintaining dNHI, Timothy Josephson, informed Dumont about improper access in January 2021, adding he "'was not aware of the restrictions on access to the non-[UnitedHealthcare] OptumRx claims.'"  In response, Dumont responded: "'I'm [sic] don't have serious concerns'" about the improper access because the "'data is de-identified in compliance with HIPAA,'" disregarding the severe antitrust implications.  Again, UnitedHealth and Optum never notified its external customers about the access, even though it was regularly breaching its contractual commitments to these customers by sharing their information with UnitedHealthcare.

283.  UnitedHealth employees also engaged in mass downloads of external customer data, as evidenced by internal communications between UnitedHealth employees dated January-March 2022.  During internal Company chats, dated February 25, 2022, UnitedHealth employees discussed a "'very, very concerning'" prior incident, whereby UnitedHealthcare employees "'access[ed] their competitors['] data,'" and "'actually copied [such data] over into [UnitedHealthcare's] own case tracking system.'"  This security breach again reflects the lack of reliable safeguards implemented by Optum and the regularized breaching of contracts.  Indeed, according to one chat, dated March 3, 2022, a UnitedHealth employee called its security protocols "'[s]carey'" [sic] and "'worthless'" because they relied on "'having requesters sign a confidentiality agreement that they won't look at things they shouldn't'" rather than any "'technical control in place to block

- 124 -

access.'"  Dumont confirmed that despite learning of that lapse no later than December 2021, UnitedHealth's data governance employees failed to take affirmative action until at least March 2022.  In the interim, in January 2022, Optum data security employees internally discussed "'a more aggressive timeline,'" but determined they "'d[idn't] want to look for problems,'" so they were not "'mak[ing] much headway,'" but in fact "'going backwards from our last discussion'" (alterations in original).

284.    Defendants have been given clear notice of UnitedHealth and Optum's data governance failures, but declined to remediate them.  Witty testified that in December 2021, UnitedHealth's Internal Audit and Advisory Services conducted an audit of UnitedHealth's data management practices, stating: "'Given the potential pervasiveness and severity of the observations noted during the assessment,'" the auditors "'assigned a rating of ***Needs Improvement to the Data Governance Internal audit*.'"  In particular, UnitedHealth's internal auditors concluded that there was:

- a "'heightened risk of data being mismanaged'" at Optum; and

- "'no effective means of enforcement if or when data misuse is discovered or reported'" leading to a "risk that the [Enterprise Data Management Office] will be unable to effectively intervene and reinforce data management practices" (alteration in original).

285.    Mr. Witty forwarded the report to his COO, writing: "'A lot to do here.'"  But Witty testified that in June 2022 – six months later – he still did not know whether any changes had been made to strengthen UnitedHealth's data governance.

E.    **Defendants Engaged in Multiple Suspicious Rounds of Insider Trading**

286.    Defendants made a series of unusual insider trades during the Class Period. Importantly, none of the sales were executed according to scheduled trading plans.

1.    **Hemsley Sold Shares as Media Outlets Began to Question UnitedHealth's Medicare Advantage Practices**

287.    In September 2021, the OIG published a report demonstrating that insurance companies with MA Plans were leveraging chart reviews and in-home visits to maximize risk-adjusted payments from CMS.  The OIG report grabbed media attention, with the *WSJ* and the *Minnesota Star Tribune* publishing articles referring to the report on September 22, 2021 and October 19, 2021, respectively.

288.    Not coincidentally, Hemsley then dumped UnitedHealth shares.  In a period of just 2 days, October 25 and October 26, 2021, Hemsley unloaded 125,000 shares of UnitedHealth common stock for sales proceeds of more than ***$56 million***.  Collectively, these sales represent Hemsley's second-largest sale during the Class Period.[35]  This two-day sale is also larger than any sale Hemsley made during the three-and-a-half year period from April 23, 2018 through September 21, 2021 (the "Control Period"), except one.[36]

---

[35]    The largest sale, on October 17, 2023, is also highly suspicious.  *See* §VI.E.3, *infra*.

[36]    The Control Period is a time period equivalent in length to the Class Period that immediately precedes the Class Period.  During the Control Period, Hemsley made a series of large sales in May, July, and October of 2020.  The largest collective sale occurred during a 2-day span on July 16 and July 17, 2020, when Hemsley sold 59,012 UnitedHealth shares for proceeds of $18.1 million and 170,000 UnitedHealth shares for proceeds of $52.3 million, respectively.  Media outlets noticed these outsized sales and attributed them to the financial market's "epic rebound" following the COVID outbreak in March 2020.

- 126 -

**2.      Defendants Sold Shares Heading into the Change Antitrust Trial Concerning UnitedHealth's Purchase of Change Healthcare**

289.    The trial to determine whether UnitedHealth and Optum would be permitted, under the antitrust laws, to proceed with their purchase of Change began on August 1, 2022.  Up to that point, Defendants had insisted that the transaction should go through because UnitedHealth would maintain robust firewall processes and extend them to Change's business.   UnitedHealth also assured the public that Optum "invests extraordinary time, money, and resources into safeguarding [customer sensitive] information and keeping it walled off from UnitedHealthcare" and that "UnitedHealth Group's existing firewalls and data-security policies prohibit employees from improperly sharing external-customer [information]."

290.    But, as explained above, Optum, and its intracompany businesses, lacked both role-based security systems and a technical firewall.  *See* §IV.C.4, *supra*.  Defendants knew that the DOJ had uncovered evidence demonstrating that their assurances of "existing firewalls" had been false and misleading, which would be presented publicly at trial.  The evidence included "permission logs" showing that UnitedHealth employees accessed information outside their business unit, and internal emails from UnitedHealth employees referring to the Company's safety protocols as "'[s]carey'" [sic] and "'worthless.'" Defendants also knew that they had no intention of maintaining firewalls between Change and the rest of UnitedHealth.  At the time of the Change acquisition, then-CEO of UnitedHealth David Wichmann internally described UnitedHealth's access to the Change data as "'the foundation by which the business case was made'" for the deal.

- 127 -

291.    Thus, just before the Change trial began, on July 18, 2022, Witty made his largest sale of the Class Period, dumping more than 11,000 shares of UnitedHealth common stock for proceeds of more than $6 million.  This sale is also twice as large as the only transaction Witty made during the Control Period.

292.    Days later and still before trial, on July 26, 2022, Hemsley sold off another 99,000 shares of UnitedHealth common stock for proceeds of an additional *$53 million*. This was Hemsley's third-largest sale during the Class Period.[37]  It was larger than any single-day sales he made during the Control Period, in terms of proceeds.

### 3. Defendants Sold Shares Upon Receiving Nonpublic Information that the DOJ Was Opening a New Antitrust Investigation

293.    As detailed above, on October 10, 2023, UnitedHealth received notice that the DOJ had launched a "'non-public antitrust investigation into the company.'"  *See* §IV.G, *supra*.  While news of the new antitrust investigation circulated inside the Company, Defendants decided to unload their UnitedHealth shares.

294.    On October 17, 2023, *one week after UnitedHealth was notified of the DOJ antitrust investigation but before it was publicly disclosed*, Hemsley dumped another 121,515 shares of UnitedHealth stock for proceeds of over $65 million.  This represents, by far, Hemsley's largest single-day transaction at any time during the Class Period or the Control Period.

---

[37] Hemsley's other two sales during the Class Period were also highly unusual.  *See* §§VI.E.1-2, *infra*.

295. Hemsley continued his sell-off on December 5, 2023 while the investigation remained secret, selling over 66,081 UnitedHealth shares for additional proceeds of more than $36 million.

296. In total, over the course of the Class Period, Hemsley dumped over 400,000 UnitedHealth shares – *21.4% of his holdings* – for proceeds of $212 million.

297. On February 16, 2024, Thompson engaged in his only transaction during either the Class Period or the Control Period, unloading nearly 29,000 shares of UnitedHealth common stock – *31.4% of his holdings* – for proceeds of over $15 million.

### F.  U.S. Lawmakers Urged the SEC to Investigate Defendants' "Disturbing" Insider Sales

298. The unusual timing and suspicious nature of Defendants' trades leading up to the disclosure of the investigation caught the attention of Congress.  On April 29, 2024, 17 United States lawmakers, including Senators Elizabeth Warren and Edward Markey of Massachusetts, along with 15 members of the House of Representatives, sent a joint Letter to the SEC urging the opening of an investigation into these trades.  Specifically, the Letter requested that the SEC determine whether any of the individual executives who sold UnitedHealth shares (including Thompson and Hemsley) or the Company itself had violated federal laws or regulations.

299. Senators Warren and Markey, along with their colleagues from the House of Representatives, did not mince words.  The conduct of UnitedHealth and its executives, they felt, exhibited a "disturbing fact pattern" – even more so because the executives had made their sales outside of the context of a scheduled trading plan.  The Letter also pointed

out that it would have been typical, under such circumstances, for UnitedHealth's general counsel to have declared a blackout period which would have barred trading by executives until such time as the DOJ investigation was made public.

300.    The Letter admonished that "[t]he timing of these trades . . . raises numerous questions," and called attention to the fact that, in selling when they did, the UnitedHealth executives, including Hemsley and Thompson, managed to shield their personal holdings from the $27 drop in the price of UnitedHealth stock that occurred when the news of the investigation became public.  That benefit, of course, was denied to the Plaintiff and the rest of the putative Class in this matter.  The Letter emphasized the gravity of the potential wrongdoing – in addition to civil fines which could measure in the hundreds of millions, Hemsley and Thompson, along with their colleagues, could face criminal penalties of up to $5 million and up to 20 years imprisonment.

301.    In addition to the potential insider trading, the Letter requested that the SEC launch an investigation into the Company itself, citing "concerns about whether the [C]ompany has met the requirements of SEC's" disclosure rules and whether the Company's "fail[ure]" to inform investors of the DOJ's investigation in its SEC Form 10-K for FY 2023 was a violation of that duty.

302.    Industry experts also flagged the sales as suspicious.  Professor John Coffee, a corporate governance expert at Columbia Law School and one of the leading experts on securities-fraud, told Bloomberg News: "Typically a company's general counsel would declare a blackout period barring trading in light of a sensitive investigation . . . . 'Apparently, this did not happen' at UnitedHealth . . . ."

- 130 -

### G.    Defendants' Anti-Competitive Scheme Infected the Core of UnitedHealth's Business

#### 1.    UnitedHealthcare's Medicare Advantage Business, Including the HouseCalls Program, Was a Core Component of UnitedHealth's Business

303.    During the Class Period, UnitedHealthcare's Medicare & Retirement division represented a substantial percentage of the Company's total revenue. According to the Company's own SEC filings, for the years 2021 to 2024, UnitedHealthcare represented, by far, the largest of UnitedHealth's four reportable segments,[38] and was bigger than all of the Optum businesses combined:

The following table presents a summary of the reportable segment financial information:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
|---|---|---|---|---|---|
| | 2023 | 2022 | 2021 | 2023 vs. 2022 | |
| **Revenues** | | | | | |
| UnitedHealthcare | $ 281,360 | $ 249,741 | $ 222,899 | $ 31,619 | 13% |
| Optum Health | 95,319 | 71,174 | 54,065 | 24,145 | 34 |
| Optum Insight | 18,932 | 14,581 | 12,199 | 4,351 | 30 |
| Optum Rx | 116,087 | 99,773 | 91,314 | 16,314 | 16 |
| Optum eliminations | (3,703) | (2,760) | (2,013) | (943) | 34 |
| Optum | 226,635 | 182,768 | 155,565 | 43,867 | 24 |
| Eliminations | (136,373) | (108,347) | (90,867) | (28,026) | 26 |
| Consolidated revenues | $ 371,622 | $ 324,162 | $ 287,597 | $ 47,460 | 15% |

The following table presents a summary of the reportable segment financial information:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
|---|---|---|---|---|---|
| | 2024 | 2023 | 2022 | 2024 vs. 2023 | |
| **Revenues** | | | | | |
| UnitedHealthcare | $ 298,208 | $ 281,360 | $ 249,741 | $ 16,848 | 6% |
| Optum Health | 105,358 | 95,319 | 71,174 | 10,039 | 11 |
| Optum Insight | 18,757 | 18,932 | 14,581 | (175) | (1) |
| Optum Rx | 133,231 | 116,087 | 99,773 | 17,144 | 15 |
| Optum eliminations | (4,389) | (3,703) | (2,760) | (686) | 19 |
| Optum | 252,957 | 226,635 | 182,768 | 26,322 | 12 |
| Eliminations | (150,887) | (136,373) | (108,347) | (14,514) | 11 |
| Consolidated revenues | $ 400,278 | $ 371,622 | $ 324,162 | $ 28,656 | 8% |

---

[38]    UnitedHealthcare, Optum Health, Optum Insight, and Optum Rx.

- 131 -

304. Moreover, the Medicare & Retirement branch of UnitedHealthcare represented nearly half of UnitedHealthcare's revenue, itself larger than any of the other reportable segments of UnitedHealth's business:

**UnitedHealthcare**

The following table summarizes UnitedHealthcare revenues by business:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
| --- | --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2021 | 2023 vs. 2022 | |
| UnitedHealthcare Employer & Individual - Domestic | $ 67,187 | $ 63,599 | $ 60,023 | $ 3,588 | 6% |
| UnitedHealthcare Employer & Individual - Global (a) | 9,307 | 8,668 | 8,345 | 639 | 7 |
| UnitedHealthcare Employer & Individual - Total (a) | 76,494 | 72,267 | 68,368 | 4,227 | 6 |
| UnitedHealthcare Medicare & Retirement | 129,862 | 113,671 | 100,552 | 16,191 | 14 |
| UnitedHealthcare Community & State | 75,004 | 63,803 | 53,979 | 11,201 | 18 |
| Total UnitedHealthcare revenues | $ 281,360 | $ 249,741 | $ 222,899 | $ 31,619 | 13% |

The following table summarizes UnitedHealthcare revenues by business:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
| --- | --- | --- | --- | --- | --- |
| | 2024 | 2023 | 2022 | 2024 vs. 2023 | |
| UnitedHealthcare Employer & Individual - Domestic | $ 74,489 | $ 67,187 | $ 63,599 | $ 7,302 | 11 % |
| UnitedHealthcare Employer & Individual - Global | 3,667 | 9,307 | 8,668 | (5,640) | (61) |
| UnitedHealthcare Employer & Individual - Total | 78,156 | 76,494 | 72,267 | 1,662 | 2 |
| UnitedHealthcare Medicare & Retirement | 139,482 | 129,862 | 113,671 | 9,620 | 7 |
| UnitedHealthcare Community & State | 80,570 | 75,004 | 63,803 | 5,566 | 7 |
| Total UnitedHealthcare revenues | $ 298,208 | $ 281,360 | $ 249,741 | $ 16,848 | 6 % |

305. For each of 2021, 2022, 2023, and 2024, UnitedHealthcare's Medicare & Retirement business represented approximately 35% of UnitedHealth's total revenues across all reporting segments.

## 2. Optum's 2022 $13 Billion Acquisition of Change Healthcare Garnered National Attention and Federal Scrutiny

306. In October 2022, UnitedHealth and Optum finalized the purchase of Change, a healthcare technology company and data clearinghouse that facilitates transactions and communications between insurers and healthcare providers. With a price tag of $13 billion, UnitedHealth's acquisition of Change represented its largest transaction ever. When the

- 132 -

deal was announced, in January 2021, it was hailed by UnitedHealth as a union that would "effectively connect and simplify core clinical, administrative and payment processes – resulting in better health outcomes and experiences for everyone, at lower cost."

307.    The deal was of national significance.  In February 2022, the DOJ filed a lawsuit seeking to enjoin the acquisition on antitrust grounds.  In their announcement of the suit, the DOJ warned that the "proposed transaction would give United, a massive company that owns the largest health insurer in the United States, access to a vast amount of its rival health insurers' competitively sensitive information" that would enable the Company to "gain an unfair advantage and harm competition in health insurance markets." In response, UnitedHealth publicly and repeatedly pledged to utilize "firewalls" within its systems to prevent other business unites from using any potentially anti-competitive information held by Change.  Rather than give them an improper advantage over their competitors, UnitedHealth insisted that the merger was "aimed at addressing the more than $100 billion in administrative waste in the United States healthcare system due to inaccuracies in the claims payment system."

308.    During the trial to determine whether the acquisition would be allowed to move forward, numerous high-level current and former senior executives gave testimony including defendant Witty; UnitedHealth COO Dirk McMahon; former UnitedHealth CEO David Wichmann; UnitedHealth Chief Growth Strategy Officer Daniel Schumacher; former Change CEO/Current Optum Insight CEO Neil de Crescenzo; Optum Insight CEO for Administrative Solutions Steve Yurjevich; Optum Insight CEO Robert Musslewhite;

and former CEO of UnitedHealthcare Employer & Individual Business William Golden, among others.

### H. Additional Ongoing Investigations into UnitedHealth for Improper Upcoding Add to the Strong Inference of Scienter

#### 1. DOJ Antitrust Division Seeks Interviews with Former UnitedHealth Doctors Who Blew the Whistle About the Company's Fraudulent Upcoding

309. On January 12, 2025, *STAT News* reported that the DOJ reached out to at least two former Company doctors who had "described how the quality of patient care deteriorated at their practices after they were acquired by UnitedHealth's Optum subsidiary."[39]  One of the doctors contacted by the DOJ Antitrust Division was Dr. Baumgaertel who said she planned to meet virtually with four government attorneys. Notably, Dr. Baumgaertel is one of the former Company doctors who has admitted that "UnitedHealth pressured her and her colleagues to apply codes to Medicare Advantage patients for conditions they didn't think were appropriate."  A representative from the California Attorney General's office also contacted one of the former UnitedHealth Group physicians as well, according to the *STAT News* report.  The report further added that it is unclear if the new interviews confirmed by *STAT News* are part of the DOJ Antitrust investigation previously reported by the *WSJ*, or a separate inquiry.

---

[39]  *See* Ex. 12.

4901-6680-9379.v3

### 2. The Chairman of the Senate Judiciary Committee Pushes for Answers on UnitedHealth's Medicare Advantage Billing Practices "Apparent Fraud, Waste, and Abuse"

310. On February 24, 2025, Senator Chuck Grassley (R-Iowa), Chairman of the Senate Judiciary Committee and a former Chairman of the Senate Finance Committee, sent a letter to UnitedHealth CEO Witty demanding detailed information on the company's Medicare billing practices.[40]  Senator Grassley's letter cited the October 24, 2024 OIG report's findings that UnitedHealth received more money from CMS for diagnoses only made during in-home HRAs and chart reviews than any other Medicare Advantage Organization ("MAO").  In particular, the Senator highlighted the OIG's finding that:

> "[T]he lack of any other follow-up visits, procedures, tests, or supplies for these diagnoses . . . raises concerns that either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews."

The letter also noted the analysis by the *WSJ* showing that UnitedHealth "used in-home health risk assessments . . . and chart reviews to diagnose enrollees with obscure revenue-generating diagnoses that were irrelevant or inaccurate [and] the inappropriate diagnoses resulted in extra payments of $8.7 billion in just 2021."

311. Thus, according to Senator Grassley, "[i]n this context, UnitedHealth Group benefited financially more than any other MAO, which raises serious questions about its practices.  ***The apparent fraud, waste, and abuse at issue is simply unacceptable and harms not only Medicare beneficiaries, but also the American taxpayer***."

---

[40]  Senator Grassley's letter to UnitedHealth is attached hereto as Exhibit 18.

312.     Senator Grassley requested UnitedHealth provide its training manuals, guidance documents, compliance program details, audit results, and other documents relating to its Medicare Advantage billing practices by March 10, 2025.

## I.     UnitedHealth's Upcoding Scheme Is a Longstanding Practice and UnitedHealthcare's Former CEO Successfully Pressured CMS

313.     Defendants knew about UnitedHealth's scheme to make financial gains from fraudulent upcoding, as it is a longstanding practice at the Company.  For example, in 2007, Jerry Knutson, then-CFO for UnitedHealth's Medicare & Retirement division, emailed a Company colleague to discuss ways to increase revenue: "'You mentioned vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities.  Let's turn on the gas!  What can we do to make sure we are being reimbursed fairly for the members and risk we take on more than what we are currently doing.'"  Mr. Knutson stated a desire to increase the following year's revenue by $100 million.

314.     In January 2014, CMS proposed a draft regulation designed to address insurers' practice of upcoding Medicare Advantage patients to get higher payments from CMS.  The plan mandated that chart reviews "'cannot be designed only to identify diagnoses that would trigger additional payments'" and would have required health plans, when examining patients' medical records, to identify overpayments by CMS and refund them to the government.

315.     Following the proposal of the regulation, UnitedHealth asked for and received a meeting between high-level UnitedHealth executives and CMS officials, which took place on April 29, 2014.  Cheri Rice, then director of the CMS MA Plan payment

- 136 -

group, attended the meeting and said she was "'very uncomfortable'" there, and had to remind UnitedHealth that, even without the chart review rule, the Company was obligated to make a good-faith effort to bill only for verified codes – or face possible penalties under the False Claims Act.

316.    UnitedHealthcare's then-CEO Steven Nelson personally emailed Rice the day after the meeting, April 30, 2014, to confirm several points that had been discussed. Rice reported that she was "very concerned" and "alarmed" by Nelson's email.  She responded to Nelson's email on May 2, 2014, again reminding him that "'regardless of the effective date of the proposed requirement related to medical record reviews, there are other laws that do impose standards, requirements and responsibilities on MA plans in connection with the federal payments they receive from CMS.'"

317.    According to Rice, CMS officials ultimately backed down and abandoned the proposed regulation in May 2014 because of "'stakeholder concern and pushback.'"  In other words, the c-suite at UnitedHealth successfully implemented a pressure campaign to convince CMS to abandon a regulation designed to temper the Company's upcoding practice.

## VII.    LOSS CAUSATION

318.    Defendants, as alleged herein, directly and proximately caused Plaintiff's and Class members' economic loss.  During the Class Period, Defendants engaged in scheme and wrongful course of business conduct that was designed to, and did, inflate the Company's financial performance through fraudulent Medicare Advantage upcoding practices.  Defendants also publicly misrepresented Optum's firewall protections while

- 137 -

internally bypassing them and leveraged UnitedHealth's market dominance to suppress competition. In connection with this scheme and wrongful course of conduct, Defendants made false and misleading statements and omissions of material facts necessary to render those statements not false or misleading. UnitedHealth's common stock traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about UnitedHealth and Defendants' fraudulent scheme. Plaintiff and other Class members purchased UnitedHealth's common stock at artificially inflated prices and suffered damages when UnitedHealth's stock price declined as the relevant truth entered the market.

319. As discussed below, the artificial inflation in UnitedHealth's common stock price was dissipated by partial corrective disclosures on February 27, 2024 and February 21, 2025 of new Company-specific material information. The resulting statistically significant stock price declines upon release of this new material information, and related increased risks, were due to Company-specific, fraud-related disclosures, and not a result of macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

**February 27, 2024 Disclosure**

320. As detailed above in §IV.H.1, on February 27, 2024 during market trading hours, the *WSJ* reported the DOJ was conducting an antitrust investigation into UnitedHealth. According to the *WSJ*, the DOJ's investigation centered around, among other things, "[m]edicare billing issues, including the Company's practices around

- 138 -

documenting patients' illnesses," as well as issues relating to other anti-competitive practices at Optum and UnitedHealthcare.

321.    The market reacted negatively to this new Company-specific disclosure. For instance, according to a *Bloomberg* report titled: "UnitedHealth (UNH) Executives Sold Stock Before US Probe Became Public," "[s]hares of UnitedHealth fell 5.2% in two trading sessions on Feb. 27-28, after the probe was widely reported in financial media." Similarly, *Barron's* reported that "UnitedHealth Group stock fell Wednesday [February 28, 2024], after a Wall Street Journal report said the Justice Department has launched an antitrust investigation into the health insurer. UnitedHealth stock was the worst performer in the S&P 500 and the Dow Jones Industrial Average on Wednesday."

322.    Additional reports by financial analysts confirmed that the February 27, 2024 *WSJ* report revealed new information and caused the stock price decline. For example, on February 27, 2024, after market close, Jefferies published a report: "UNH's VBC Scale in Certain Markets a Possible Target of Anti-Trust Probe." Jefferies noted that: "Tuesday afternoon [February 27, 2024], multiple news outlets reported the DOJ has launched an anti-trust investigation into the relationship between UHC and Optum, including how acquisitions affect competition."

323.    Also on February 27, 2024, after market close, financial analysts at RBC Capital Markets published a report: "WSJ reports UNH is the target of DOJ anti-trust investigation." RBC Capital Markets noted that the *WSJ* reported "that DOJ is launching an anti-trust investigation into UNH."

- 139 -

324.   On February 28, 2024, the *WSJ* published another article reporting that UnitedHealth was down due to the DOJ probe revelations: "Shares of UnitedHealth fell Wednesday morning [February 28, 2024], extending a retreat sparked late yesterday by news that the Justice Department has launched an antitrust investigation into the company." On February 28, 2024, at 2:40 ET, Cantor Fitzgerald attributed the stock drop to the *WSJ*: "***The stock traded down 7.6% vs SP500 (0.0%) since the [WSJ] article broke***."

325.   Also on February 28, 2024, financial analysts at UBS published a report: "Report of DOJ Antitrust Investigation into UNH Leads to Share Weakness."  The report confirmed that: "UNH fell at the end of the trading day on February 27 following reports that the U.S. Department of Justice has launched an antitrust investigation into UnitedHealth Group (WSJ article).  According to the article, investigators have been interviewing doctor groups and asking about the relationship between UNH's insurance business and Optum.  The inquiry is around how ownership of physician and health-plan units affects competition, as well as Medicare billing issues."  UBS also connected the antitrust probe to Optum and Medicare Advantage noting: "We believe Optum is a critical player in driving a successful MA offering."

326.   On March 1, 2024, industry analyst *AIS Health* issued a report titled: "DOJ to Test UnitedHealth's 'Firewall' With Antitrust Probe," that discussed the February 27, 2024 *WSJ* report and the scope of the DOJ's new antitrust investigation into UnitedHealth. The *AIS Health* report stated that federal regulators believe UnitedHealth's firewall between its payer and provider businesses "'has a lot of holes.'"  The report also pointed out that the DOJ is examining UnitedHealth's Medicare Advantage coding practices,

- 140 -

suggesting that owning both payer and provider assets may allow UnitedHealth to make members appear sicker to increase profits.

327.    As a direct result of the February 27, 2024 disclosure, UnitedHealth's stock price significantly declined, falling over $27 per share, from a close of $525.32 on February 26, 2024 to a close of $498.28 on February 28, 2024.  An event study has determined that this decline was statistically significant.[41]

328.    The new, Company-specific, material information released on February 27, 2024, was directly related to the false and/or misleading statements previously made by the Defendants.    However, UnitedHealth's stock price remained inflated as Defendants continued to conceal the full impact of their fraudulent misconduct from investors.

**February 21, 2025 Disclosure**

329.    As detailed above in §IV.H.3, on February 21, 2025, the *WSJ* reported that the DOJ launched a "new" fraud investigation of UnitedHealth's Medicare Advantage risk coding practices.  The report revealed that the new DOJ fraud investigation focused on the Company's methods for recording diagnoses that generate additional Medicare Advantage payments, including those used by physician groups owned by UnitedHealth.  The report detailed the scope of the investigation, stating that DOJ lawyers were contacting and

---

[41]    An event study isolates the stock price movement attributable to a company (as opposed to market-wide or industry-wide movements) and then examines whether the price movement on a given date is outside the range of typical random stock price fluctuations observed for that stock.  If the isolated stock price movement falls outside the range of typical random stock price fluctuations, it is statistically significant.  If the stock price movement is deemed statistically significant, it indicates that the stock price movement cannot be attributed to market and sector factors, or to random volatility, but rather was caused by new company-specific information.

- 141 -

questioning UnitedHealth providers about specific diagnoses UnitedHealth encouraged employees to assign to patients, as well as related incentive arrangements and pressure to add the diagnoses.

330.    The market responded negatively to this new Company-specific disclosure about a new DOJ fraud investigation of UnitedHealth.  For example, on February 21, 2025, *yahoo!finance* reported that "UnitedHealth Group stock plummets on DOJ investigation report," by the *WSJ*.  Similarly, following the *WSJ* report, the *Associated Press* issued an article titled: "UnitedHealth shares dive after report of US investigation into Medicare billing."  In an article titled: "US justice department opens civil fraud investigation into UnitedHealthcare," *The Guardian* also reported that UnitedHealth's stock price significantly declined on this news.  *CNBC* issued an article reporting that the price of UnitedHealth shares "tumbled" following the *WSJ*'s disclosure of a DOJ civil fraud investigation into the Company's Medicare Advantage payment practices.   Also on February 21, 2025, the business publication *Fast Company* issued a report titled: "UnitedHealth Group stock price takes another tumble on report of alleged DOJ Medicare billing probe," noting that the Company's stock price "plummeted" after the *WSJ* published its report and explaining that "the DOJ may be concerned that UHG is trying to pad its bottom line by assigning unneeded diagnoses to patients in order to increase their taxpayer-fueled payments from the federal government."

331.    As a direct result of the February 21, 2025 disclosure, UnitedHealth's stock price significantly declined, falling $36 per share, from a close of $502.42 on February 20,

2025 to a close of $466.42 on February 21, 2025.  An event study has determined that this decline was statistically significant.

332.    In sum, as detailed above, UnitedHealth's statistically significant stock price declines described herein removed the artificial inflation from the price of UnitedHealth common stock, and was the direct and foreseeable consequences of the revelations of the relevant truth concealed by Defendants.  The declines in the price of UnitedHealth common stock described herein were a direct result of the nature, extent, and impact of Defendants' prior false and misleading statements and omissions being revealed to investors and the market.  The timing and magnitude of the price declines of UnitedHealth common stock negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

## VIII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

333.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

- Defendants engaged in a scheme and made misrepresentations or failed to disclose material facts during the Class Period;

- Defendants' scheme, misrepresentations, and omissions were material;

- UnitedHealth common stock traded in an efficient market;

- the Company's common stock shares were liquid and traded with substantial volume during the Class Period;

- the Company's common stock was traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased UnitedHealth common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

334.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

335.    Plaintiff and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    CLASS ACTION ALLEGATIONS

336.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased UnitedHealth common stock during the Class Period (the "Class") and were damaged thereby.  Excluded from the Class are Defendants herein and the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

337.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of

- 144 -

the Class may be identified from records maintained by UnitedHealth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

338.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

339.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

340.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether Defendants engaged in a scheme or course of business that operated as a fraud or deceit on investors;

- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations, and management of UnitedHealth;

- whether Defendants caused UnitedHealth to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of UnitedHealth common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- 145 -

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

341.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    CLAIMS

### COUNT I

### Violations of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

342.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

343.    This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder by the SEC.  During the Class Period, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that: (a) Defendants employed devices, schemes, and artifices to defraud; (b) Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) Defendants engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and the Class in connection with their purchase of UnitedHealth common stock during the Class Period.

344.   In furtherance of their scheme and wrongful course of business, Defendants, and each of them, took the actions set forth herein.

345.   During the Class Period, defendants UnitedHealth, Witty, Hemsley and Thompson engaged in a scheme and wrongful course of business and disseminated or approved the statements specified above, which they knew were false and misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants' misconduct was intended to, and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of UnitedHealth common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire UnitedHealth common stock at artificially inflated prices.

346.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period in that, in reliance on the integrity of the market, they paid artificially inflated prices for UnitedHealth common stock.  Plaintiff and the Class would not have purchased UnitedHealth stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  Upon the disclosure that the Company had been disseminating false and misleading statements to the investing public, Plaintiff and the other members of the Class suffered financial harm.

- 147 -

## COUNT II

**Violations of §20(a) of the Exchange Act Against All Defendants**

347.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

348.    During the Class Period, Defendants participated in and oversaw the operation and management of UnitedHealth, and conducted and participated, directly and indirectly, in the conduct of UnitedHealth's business affairs.  The Individual Defendants were able to, and did, control the contents of the various reports, press releases, codes of conduct, and public filings which UnitedHealth disseminated in the marketplace during the Class Period concerning its business and results of operations.  Because of their senior positions, they knew the adverse nonpublic information about UnitedHealth's business as alleged herein.

349.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to UnitedHealth's financial condition and results of operations, and to correct promptly any public statements issued by UnitedHealth which had become materially false or misleading.

350.    Each of the Individual Defendants acted as a controlling person of UnitedHealth.  By reason of their senior management positions and/or being a director of UnitedHealth, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, UnitedHealth to engage in the unlawful acts and conduct complained of herein.  Each of the Defendants exercised control over UnitedHealth's

- 148 -

general operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause UnitedHealth to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of UnitedHealth within the meaning of §20(a) of the Exchange Act.

351. UnitedHealth had the power to control and influence Company officers and other executives – including defendants Witty and Thompson – through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, UnitedHealth had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of defendants Witty and Thompson, including the content of their public statements. UnitedHealth, therefore, was a "controlling person" of defendants Witty and Thompson within the meaning of §20(a) of the Exchange Act.

352. By reason of the above conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**COUNT III**

**For Violations of §20A of the Exchange Act Against
Hemsley and Witty**

353. Count III is brought pursuant to §20A of the Exchange Act against Hemsley and Witty, on behalf of Plaintiffs and members of the Class who were damaged by

Hemsley's and Witty's insider trading. Plaintiff repeats and realleges every allegation above as if fully set forth herein.

354.    As detailed above, Hemsley possessed material, nonpublic information when he sold his stock, and he took advantage of his possession of material, nonpublic information regarding UnitedHealth to obtain over $211 million of insider trading proceeds during the Class Period.

355.    As detailed above, Witty possessed material, nonpublic information when he sold his stock, and he took advantage of his possession of material, nonpublic information regarding UnitedHealth to obtain over $11 million of insider trading proceeds during the Class Period.

356.    Plaintiff made the following purchases contemporaneously with Hemsley's and Witty's sales:

| Defendant Sales While in Possession of Material Nonpublic Information | | | Contemporaneous Purchases by CalPERS | |
|---|---|---|---|---|
| Defendant Seller | Date of Sale | # Shares Sold | Date of Purchase | # Shares Purchased |
| Andrew Witty | July 18, 2022 | 11,376 | July 19, 2022 | 36,001 |
| Stephen Hemsley | July 26, 2022 | 99,312 | July 28, 2022 | 49,782 |
| Andrew Witty | July 19, 2023 | 4,000 | July 26, 2023 | 9,840 |
| Stephen Hemsley | October 17, 2023 | 121,515 | October 17, 2023 | 180 |
| | | | | 1,787 |
| | | | | 3,809 |
| | | | | 9,986 |
| Stephen Hemsley | December 5, 2023 | 66,081 | December 11, 2023 | 182,000 |

357.    As UnitedHealth's top executives, Hemsley and Witty each owed a duty to UnitedHealth and its shareholders to maintain the material, nonpublic information in confidence and not trade on the basis of it.

- 150 -

358.    By reason of the above conduct, Hemsley and Witty are liable pursuant to §20A of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that this action is a proper class action, and certify Plaintiff as a Class Representative under Rule 23 of the Federal Rules of Civil Procedure and appoint Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

D.    Awarding such other equitable relief, including disgorgement and/or injunctive relief, that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED:  March 21, 2025        TM SULLIVAN PLLC
                              TIM SULLIVAN, MN 391528
                              JAMES PORADEK, MN 290488 (OF COUNSEL)


                                      s/ TIM SULLIVAN
                              _____
                                      TIM SULLIVAN

- 151 -

4901-6680-9379.v3

225 South Sixth Street, Suite 3900
Minneapolis, MN 55402
Telephone: 773/919-8667
tim@tmsull.com
jporadek@tmsull.com

Local Counsel for Lead Plaintiff

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (admitted *pro hac vice*)
SAM S. SHELDON (admitted *pro hac vice*)
LAURIE L. LARGENT (admitted *pro hac vice*)
ROBERT R. HENSSLER JR. (admitted *pro hac vice*)
JEFFREY J. STEIN (admitted *pro hac vice*)
JACK ABBEY GEPHART (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
darrenr@rgrdlaw.com
ssheldon@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
jstein@rgrdlaw.com
jgephart@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 152 -