# EXHIBIT 13

Department of Health and Human Services

# Office of Inspector General



## Office of Evaluation and Inspections

October 2024 | OEI-03-23-00380

# Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions

OIG.HHS.GOV

# REPORT HIGHLIGHTS



October 2024 | OEI-03-23-00380

# Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions

## Why OIG Did This Review

- Medicare Advantage (MA) companies receive higher risk-adjusted payments from CMS for enrollees who are sicker, which helps to ensure that plans receive sufficient payment to cover more costly care and enrollees have continued access to MA plans.  However, taxpayers fund billions of dollars in overpayments to MA companies each year based on unsupported diagnoses for MA enrollees.  Unsupported diagnoses inflate risk-adjusted payments and drive improper payments in the MA program.

- Using 2016 MA encounter data, prior OIG work identified two sources of enrollee diagnoses—health risk assessments (HRAs) and chart reviews—as vulnerable to misuse by MA companies.  This evaluation updates that work and determines whether vulnerabilities persist regarding the appropriateness of resulting risk-adjusted payments and the quality of care for enrollees with diagnoses reported only on HRAs and on no other records of services (i.e., service records) in the 2022 MA encounter data.  This evaluation also newly examines the extent to which MA companies use chart reviews of information gathered as part of HRAs to add diagnoses that increase their risk-adjusted payment (HRA-linked chart reviews).

## What OIG Found

 **Diagnoses reported only on enrollees' HRAs and HRA-linked chart reviews, and not on any other 2022 service records, resulted in an estimated $7.5 billion in MA risk-adjusted payments for 2023.**  The lack of any other followup visits, procedures, tests, or supplies for these diagnoses in the MA encounter data for 1.7 million MA enrollees raises concerns that either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews.

**In-home HRAs** and **HRA-linked chart reviews** generated almost two-thirds of the estimated $7.5 billion in risk-adjusted payments.  In-home HRAs and HRA-linked chart reviews may be more vulnerable to misuse because these tools are often administered by MA companies or their third-party vendors and not enrollees' own providers.  Diagnoses reported only on these types of records heighten concerns about the validity of the diagnoses or the coordination of care for MA enrollees.



 **Just 20 MA companies drove 80 percent of the estimated $7.5 billion in payments**.  Also, these MA companies generated a substantially greater share of payments resulting from HRAs or HRA-linked chart reviews for certain health conditions, including serious and chronic illnesses, such as diabetes and congestive heart failure.

## What OIG Recommends

In addition to implementing prior OIG recommendations, CMS should: (1) impose additional restrictions on the use of diagnoses reported only on in-home HRAs or chart reviews that are linked to in-home HRAs for risk-adjusted payments, (2) conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews, and (3) determine whether select health conditions that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.  CMS concurred with our third recommendation but not the other two.

# Primer: The Medicare Advantage Program and Health Risk Assessments



## The Medicare Advantage Program

Under Medicare Advantage (MA), also known as Medicare Part C, the Centers for Medicare & Medicaid Services (CMS) contracts with MA companies[1] to provide coverage of Parts A and B services through private health plan options.[2]  In 2023, half of Medicare enrollees—32 million—elected to enroll with MA companies rather than the Medicare fee-for-service program.  MA program costs were $448 billion of the total $1 trillion in Medicare program costs in fiscal year 2023.[3]

**MA risk-adjusted payments.**  For each enrollee, MA companies receive a capitated payment that reflects CMS's predicted cost of providing care to an MA enrollee.  CMS risk-adjusts payments to pay MA companies more for enrollees with higher expected health care costs.  To calculate these payments, MA companies submit records of services provided to enrollees to CMS's MA Encounter Data System that contain claims information or administrative data, including the diagnoses.  CMS identifies diagnoses that are eligible for risk adjustment and groups them into hierarchical condition categories (HCCs) of clinically related diagnoses.[4]  Each HCC has relative numerical values (i.e., relative factors) that represent expected costs associated with treating the medical conditions in the category.[5]  The enrollee's risk score equals the sum of the relative factors that correspond with the enrollee's HCCs and demographic characteristics.  The total risk-adjusted payment to an MA company for an enrollee equals the enrollee's risk score multiplied by the MA plan's base payment rate.[6]

The risk-adjustment payment policy creates financial incentives for MA companies to misrepresent enrollees' health statuses by submitting unsupported diagnoses to CMS for additional conditions that inappropriately inflate their risk-adjusted payments.  Unsupported risk-adjusted payments have been a major driver of improper payments in the MA program.  For fiscal year 2023, CMS identified $12.7 billion in net overpayments that resulted from plan-submitted diagnoses that were not supported by documentation in enrollees' medical records.[7]  Similarly, OIG[8] and other oversight entities[9, 10] tasked with safeguarding MA program integrity have identified vulnerabilities related to MA companies inflating their enrollees' risk scores, as shown in Appendix A.

## HRAs and HRA-Linked Chart Reviews

CMS allows MA companies to use HRAs and chart reviews as sources of diagnoses for risk adjustment.[11]  OIG and other entities have raised concerns that some MA companies may be misusing these mechanisms to report unsupported enrollee diagnoses and inflate their risk-adjusted payments.  For example, in September 2023, the Department of Justice announced a $172 million settlement with The Cigna Group and its subsidiaries, achieved in partnership with OIG.  This settlement resolved allegations that Cigna improperly increased its risk-adjusted payments from CMS by misusing chart reviews and in-home HRAs.

**HRAs.**  In Medicare, health care professionals conduct HRAs to collect information from enrollees about their health status, health risks, and daily activities.  HRAs are part of enrollees' annual wellness visits, which typically occur in physician offices or other health care facilities.  Annual wellness visits also may

occur via telehealth. HRAs also may be conducted during other visits with enrollees—including visits to enrollees' homes. Thus, Medicare enrollees may receive an in-home HRA, a telehealth HRA, or a facility-based HRA.

CMS encourages MA companies to have providers conduct initial and annual HRAs.[12] Ideally, assessing an enrollee's health risks affords the opportunity for care coordination that may include developing a plan of care, arranging services, delivering interventions, and reassessing and adjusting the plan of care as needed. CMS also encourages MA companies to adopt best practices that support care coordination when implementing in-home HRA programs, as shown in Exhibit 1.

### Exhibit 1: Examples of CMS's best practices for ensuring care coordination related to in-home HRAs

Schedule appointments with appropriate providers.

Make referrals to appropriate community resources.

Verify that needed followup care is provided.

Verify that information obtained during the assessment is provided to the appropriate providers.

Provide a summary to the enrollee that includes their diagnoses, medications, scheduled followup appointments, plan for care coordination, and contact information for community resources.

Place the enrollee in the MA company's disease management or case management program, as appropriate.

Source: CMS, "Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," p. 146. Accessed at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2016.pdf on Apr. 11, 2024.

**Concerns regarding HRAs.** Oversight entities have questioned whether MA companies use HRAs or HRA-type assessments[13] primarily as a tool to maximize risk-adjusted payments rather than to improve care provided to enrollees. Previous OIG work found that diagnoses that MA companies reported only on HRAs in the encounter data resulted in an estimated $2.6 billion in risk-adjusted payments for 2017. HRAs conducted in enrollees' homes generated $2.1 billion of the $2.6 billion in risk-adjusted payments. Most of these in-home HRAs were conducted by third-party vendors that MA companies partnered with or hired to conduct HRAs and likely were not conducted by enrollees' own primary care providers, which may have created gaps in care coordination. OIG's findings raised concerns about the appropriateness of risk-adjusted payments generated by HRAs, the quality of care coordination for enrollees, and the completeness of encounter data. The Medicare Payment Advisory Commission (MedPAC) conducted similar analyses and noted that diagnoses identified only through in-home HRAs may be less accurate because they often are based on enrollee self-reporting or may require verification by diagnostic equipment not present during the visit.[14]

CMS does not require MA companies to indicate in the Encounter Data System that a diagnosis resulted from an HRA, which also presents challenges for overseeing the appropriate use of HRAs. For this and our prior evaluations of HRAs, we had to reasonably approximate our identification of these diagnoses based on OIG analysis and discussion with CMS, as detailed in our Methodology on page 12.

**HRA-linked chart reviews.**  In CMS's Encounter Data System, MA companies may add diagnoses to service records using chart review records.  CMS allows MA companies to link these chart reviews to records of HRA visits (hereafter referred to as "HRA-linked chart reviews").  A chart review is an MA company's retrospective review of an enrollee's medical record documentation to identify diagnoses that a provider did not submit to the MA plan or submitted to the plan in error.  MA companies may conduct chart reviews to ensure that the correct diagnoses are reported for risk adjustment.  To perform these reviews, MA companies may hire third-party vendors to examine enrollees' medical records.  These vendors may employ staff with clinical or health care coding experience, or they may use artificial intelligence software.  When conducting chart reviews, vendors or other reviewers may add diagnoses based on their review of information in the enrollee's medical record, including diagnoses that they believe were missed in the original HRA documentation.

**Concerns regarding HRA-linked chart reviews.**  Previous OIG work raised concerns that chart reviews may provide MA companies with opportunities to inflate risk-adjusted payments inappropriately.  OIG found that diagnoses that MA companies reported only on chart reviews—and not on any service records in the encounter data—resulted in an estimated $6.7 billion in risk-adjusted payments for 2017.  Diagnoses collected from MA companies' chart reviews may be less likely to be supported by medical records compared to diagnoses submitted to MA companies by providers.[15]

Chart reviews that are linked to HRAs—regardless of where the HRA was performed—may be even more vulnerable to misuse than chart reviews previously identified by OIG because HRA-linked chart reviews contain both the vulnerabilities associated with chart reviews and the vulnerabilities associated with HRAs.  Thus, if MA companies submit diagnoses derived from their own chart reviews of HRAs, this heightens concerns regarding the validity of these diagnoses or the quality of care for MA enrollees.

Although all HRA-linked chart reviews raise concerns, the specific subset of chart reviews that are linked to in-home HRAs may be even more vulnerable to misuse than those linked to facility-based HRAs because in-home HRAs may: (1) be conducted by someone other than the enrollee's primary care provider and (2) occur in a setting with less diagnostic equipment than would be in a health care facility.  By adding diagnoses to an in-home HRA via a chart review without also implementing best practices for care coordination, MA companies may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care.

**Estimated Risk-Adjusted Payments**

## Diagnoses reported only on HRAs and HRA-linked chart reviews resulted in an estimated $7.5 billion in risk-adjusted payments for 2023

Diagnoses reported only on HRAs and HRA-linked chart reviews, and on no other service records for the entire year, resulted in an estimated $7.5 billion in risk-adjusted payments for 2023.[16]  Most MA companies (157 of 170) generated risk-adjusted payments from HRAs and HRA-linked chart reviews for 1.7 million MA enrollees with no other encounter records of visits, procedures, tests, or supplies that contained these diagnoses.

In-home HRAs and HRA-linked chart reviews generated 63 percent of the estimated $7.5 billion in risk-adjusted payments, as shown in Exhibit 2.  Diagnoses reported only on an HRA—conducted in any setting—but on no other service records raise questions about whether the diagnoses are valid and whether enrollees got needed care.  However, it is especially concerning when diagnoses result solely from in-home HRAs or from HRA-linked chart reviews conducted in any setting.  In-home HRAs and HRA-linked chart reviews conducted in any setting may be more vulnerable to misuse because these tools are often administered by MA companies or their third-party vendors and not enrollees' own providers.  Diagnoses reported *only* on these types of records heighten concerns about the validity of the diagnoses or the coordination of care for MA enrollees.

HRA-linked chart reviews generated an estimated $1.3 billion in risk-adjusted payments.  HRA-linked chart reviews are chart reviews that may retrospectively add diagnoses using the information collected by the HRA, even though the original HRA did not contain that diagnosis.  Of the total payments from HRA-linked chart reviews, 57 percent were linked to HRAs conducted in homes ($738.9 million of $1.3 billion).  In contrast, chart reviews of HRAs conducted in facilities generated 42 percent of risk-adjusted payments from HRA-linked chart reviews ($546 million of $1.3 billion).  Chart reviews that were linked to HRAs conducted via telehealth generated less than 1 percent of risk-adjusted payments from HRA-linked chart reviews ($7.4 million of $1.3 billion).

Taken together, in-home HRAs and the subset of chart reviews that relied upon in-home HRAs generated an estimated $4.2 billion of the total $7.5 billion in risk-adjustment payments.[17]  Any inaccurate diagnoses from these in-home HRAs and associated chart reviews may have resulted in overpayments to the MA companies.  For diagnoses that were accurate, enrollees may have gone without needed care.

**Exhibit 2:** In-home HRAs and HRA-linked chart reviews drove almost two-thirds of the estimated risk-adjusted payments from diagnoses reported only on HRAs and HRA-linked chart reviews



$3.5B

$2.7B

$7.5B

$92M

$1.3B

In-Home HRAs · Facility-Based HRAs · HRA-Linked Chart Reviews · Telehealth HRAs

Source: OIG analysis of 2022 MA encounter data from CMS's Integrated Data Repository Cloud (IDRC).
Note: Before rounding, the sum of payments from in-home HRAs ($3.45 billion) and HRA-linked chart reviews ($1.29 billion) totaled $4.7 billion.

1

## MA companies generated a higher payment for each in-home HRA submitted than for other types of HRAs and HRA-linked chart reviews

On average, for each in-home HRA, MA companies generated $1,869 in estimated risk adjusted payments, as shown in Exhibit 3.  On average, for each facility-based HRA, MA companies generated $365 in estimated risk-adjusted payments.

**Exhibit 3: On average, MA companies generated a higher payment for each in-home HRA submitted than for other types of HRAs and HRA-linked chart reviews**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

Overall, 46 percent of the estimated $7.5 billion in risk-adjusted payments from HRAs and HRA-linked chart reviews were generated by in-home HRAs, yet these in-home visits accounted for only 13 percent of the HRAs and HRA-linked chart review records in the 2022 MA encounter data, as shown in Exhibit 4.  While the percentage of in-home HRA records submitted was smaller than the percentage of estimated payments generated by those in-home HRAs, the percentage of facility-based HRAs and HRA-linked chart reviews had the opposite relationship.

**Exhibit 4: Although in-home HRAs generated a substantial portion of estimated payments from HRAs and HRA-linked chart reviews, these visits accounted for only 13 percent of the HRA and HRA-linked chart review records in the 2022 MA encounter data**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

2

**Top Health Conditions**

## Just 13 health conditions drove 75 percent of the estimated $7.5 billion in 2023 risk-adjusted payments from HRAs and HRA-linked chart reviews

The hierarchical condition categories (HCCs) generated by diagnoses reported only on HRAs and HRA-linked chart reviews included serious, chronic illnesses, such as diabetes and congestive heart failure.  However, there were no service records in the encounter data directly demonstrating that these enrollees received treatment for these and other serious conditions.  The top 13 health conditions generated $5.6 billion of the estimated $7.5 billion in risk-adjusted payments for 2023, as shown in Exhibit 5.  Almost half of these payments ($2.7 billion of $5.6 billion) were generated by **in-home HRAs**.  On the other end of the spectrum, 1 percent of these payments ($67.6 million of $5.6 billion) were generated by telehealth HRAs.  Appendix B provides the amount of risk-adjusted payments for each condition that resulted from diagnoses reported solely on HRAs and HRA-linked chart reviews.

**Exhibit 5: Thirteen health conditions drove three-fourths of the risk-adjusted payments from HRAs and HRA-linked chart reviews for 2023**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

3

## Diagnoses for Top Health Conditions

### Certain diagnoses associated with the top 13 health conditions were most commonly generated by in-home HRAs

MA companies relied mainly on in-home HRA visits to collect certain diagnoses associated with some of the top 13 health conditions, as shown in Exhibit 6.  For example, MA companies used in-home HRAs to report a diagnosis of "secondary hyperaldosteronism" for 74 percent of all enrollees (59,281 of 80,130) with this diagnosis on either an HRA or HRA-linked chart review that resulted in payment.  However, only 3 percent of enrollees (2,240 of 80,130) received this diagnosis during a facility-based HRA visit that resulted in payment.

**Exhibit 6: Certain diagnoses were reported more often on in-home HRAs than on other types of records**

| Diagnosis (Associated HCC) | Percentage of MA Enrollees With Diagnoses That Generated Payment From HRAs or HRA-Linked Chart Reviews | | | |
|---|---|---|---|---|
| | In-Home HRA | Facility-Based HRA | HRA-Linked Chart Review | Telehealth HRA |
| Type 2 diabetes mellitus with diabetic polyneuropathy (Diabetes with Chronic Complications) | 82% | 9% | 9% | <1% |
| Rheumatoid polyneuropathy with rheumatoid arthritis of unspecified site (Myasthenia Gravis/Myoneural Disorders and Guillain-Barré Syndrome/Inflammatory and Toxic Neuropathy; Rheumatoid Arthritis and Inflammatory Connective Tissue Disease) | 81% | <1% | 18% | <1% |
| Type 2 diabetes mellitus with diabetic cataract (Diabetes with Chronic Complications) | 74% | 8% | 16% | <1% |
| Secondary hyperaldosteronism (Other Significant Endocrine And Metabolic Disorders) | 74% | 3% | 23% | <1% |
| Type 2 diabetes mellitus with hyperglycemia (Diabetes with Chronic Complications) | 74% | 18% | 7% | <1% |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.
Note: The percentages may not sum to 100 percent due to rounding.  In addition, the diagnosis code "rheumatoid polyneuropathy with rheumatoid arthritis of unspecified site" is associated with two HCCs.

## Top MA Companies

### Twenty MA companies had a disproportionate share of the estimated $7.5 billion in risk-adjusted payments resulting solely from HRAs and HRA-linked chart reviews

Most MA companies' (137 of 157) share of these payments was proportional to or lower than their percentage of enrollees.  However, the **top 20 MA companies** each had a share of payments from HRAs and HRA-linked chart reviews that exceeded their percentage of enrollees by more than 25 percent (see Appendix C).  Taken together, these 20 MA companies generated 80 percent of the estimated $7.5 billion in 2023 risk-adjusted

4

payments while covering only half of MA enrollees, as shown in Exhibit 7.  In contrast, the other 137 MA companies generated 20 percent of payments.

Exhibit 7: Just 20 MA companies drove 80 percent of risk-adjusted payments from diagnoses reported only on HRAs and HRA-linked chart reviews while covering only half of MA enrollees



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

## The top 20 MA companies generated a substantially greater share of the payments resulting from HRAs and HRA-linked chart reviews for 7 of the top 13 health conditions

Overall, the top 20 MA companies had between 81 and 91 percent of the payments resulting from HRAs and HRA-linked chart reviews for each of 7 conditions, as shown in Exhibit 8.  For example, these 20 MA companies drove 88 percent ($476.8 million of $539 million) of the estimated risk-adjusted payments from HRAs and HRA-linked chart reviews for "Disorders of Immunity."  In contrast, the other 137 MA companies generated only 12 percent ($62.4 million of $539 million) of the estimated risk-adjusted payments from HRAs and HRA-linked chart reviews for the same health condition.

Exhibit 8: For some of the top health conditions, the top 20 MA companies had a substantially greater share of the payments resulting from HRAs and HRA-linked chart reviews, in comparison to their peers



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

5

# One top MA company drove payments from in-home HRAs and HRA-linked chart reviews

One top MA company stood out from its peers in its use of in-home HRAs and HRA-linked chart reviews to generate risk-adjusted payments.  As shown in Exhibit 9, this one top MA company drove about two-thirds of risk-adjusted payments from diagnoses reported only on in-home HRAs and HRA-linked chart reviews.  Yet, this MA company covered only 28 percent of 2022 MA enrollees.  In contrast, the other companies had a greater share of the payments from diagnoses reported solely on facility-based and telehealth HRAs.

**Exhibit 9: One top MA company had a greater share of the payments from diagnoses reported solely on in-home HRAs and HRA-linked chart reviews, whereas the other companies had more of the payments from diagnoses reported solely on facility-based and telehealth HRAs**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.
Note: Before rounding, the sum of payments from in-home HRAs ($3.45 billion) and HRA-linked chart reviews ($1.29 billion) totaled $4.74 billion.

The other top 19 MA companies accounted for almost a quarter of payments ($1.2 billion of $4.7 billion) from in-home HRAs and HRA-linked chart reviews and covered 22 percent of enrollees.  The remaining 137 companies accounted for 10 percent of payments ($495.4 million of $4.7 billion) from in-home HRAs and HRA-linked chart reviews yet covered half of enrollees.

# Among the top 20 MA companies, enrollees who were dually eligible and/or eligible for the low-income subsidy were disproportionately represented

For the top 20 MA companies, enrollees who were dually eligible for Medicare and Medicaid and/or eligible for the Part D low-income subsidy[18] represented 21 percent of all MA enrollees but accounted for 29 percent of enrollees with diagnoses reported only on HRAs or HRA-linked chart reviews that generated payment, as shown in Exhibit 10 on the next page.

6

In contrast, for the other 137 companies, 17 percent of all MA enrollees were dually eligible and/or eligible for the low-income subsidy and accounted for 16 percent of enrollees that had diagnoses from HRAs or HRA-linked chart reviews that resulted in payments.

**Exhibit 10: The top 20 MA companies had a higher percentage of enrollees who were dually eligible and/or eligible for the low-income subsidy and these enrollees were disproportionately represented among those with diagnoses that generated payment from HRAs or HRA-linked chart reviews**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

Of the top 20 MA companies, 8 companies mainly offered Special Needs Plans (SNPs), and at least 90 percent of their enrollees were dually-eligible for Medicare and Medicaid.[19]  Besides meeting the same coverage requirements as other MA plans, CMS also requires that companies offering SNPs conduct HRAs and take additional measures to address the specific health care and care coordination needs of the populations they serve.[20]  Thus, even more so than for other types of MA plans, it is concerning that enrollees in SNPs would potentially lack followup care given these additional requirements.

## MA Enrollees With No Other 2022 Service Records

### Thousands of MA enrollees had no service records in the 2022 encounter data other than a single in-home HRA

Of the 1.7 million MA enrollees who had no other service records for certain diagnoses reported only on HRAs and HRA-linked chart reviews, most had service records for other types of diagnoses.  However, 19,028 of those enrollees had no other service records *at all* in 2022, besides a single HRA.

In-home HRAs accounted for 74 percent of the total $81.9 million in estimated risk-adjusted payments generated for enrollees for whom there was not a single record of any other service in 2022, as shown in Exhibit 11.  Specifically, 77 MA companies generated $60.6 million in payments for 14,103 enrollees who did not have an encounter record of receiving any tests, supplies, or services other than an in-home HRA.  In contrast, facility-based HRAs accounted for 23 percent

**Exhibit 11: In-home HRAs generated almost three-quarters of the $81.9 million in risk-adjusted payments for enrollees without a single record of any other service in 2022**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

of the total payments ($18.5 million of $81.9 million) generated for enrollees who lacked any other service record in the 2022 encounter data.

While 77 MA companies had estimated risk-adjusted payments for enrollees who had only 1 in-home HRA and no other record in the 2022 encounter data, just 8 of the 77 MA companies drove 96 percent of the $60.6 million in payments.  Of these eight MA companies, just one MA company generated more than half—$36.9 million—of these payments.

## Why This Matters

HRAs can be used for early identification of health risks to improve enrollees' care and health outcomes.  In fact, CMS has provided guidance to MA companies on a wide range of best practices that they can use to help connect enrollees with appropriate care based on HRA results.  Additionally, chart reviews can be a tool to improve the accuracy of risk-adjusted payments.  However, HRAs and HRA-linked chart reviews raise concerns if MA companies use them to add diagnoses and maximize risk-adjusted payments without improving enrollees' care.

We found that diagnoses that MA companies reported solely on HRAs and HRA-linked chart reviews generated an estimated $7.5 billion in risk-adjusted payments for 2023.  In-home HRAs and HRA-linked chart reviews— which may be particularly vulnerable to misuse by MA companies—accounted for $4.7 billion, or 63 percent, of these payments.

These findings reinforce three types of concerns OIG identified in its prior work on HRAs and chart reviews.

 **Payment Integrity:** MA companies may have submitted diagnoses on the HRAs that were not documented in the enrollees' medical record and, therefore, may have received inappropriate payments from CMS.

 **Quality of Care:** MA companies may not have coordinated care following these enrollees' HRAs, including verifying that information was provided to the enrollees' provider(s) and verifying that appropriate followup care was provided to the enrollees.

 **Data Integrity**: MA companies may not have ensured that the encounter data contained all records of items and services provided to enrollees.

Most of the $7.5 billion in risk-adjusted payments were concentrated among 13 health conditions, including serious, chronic illnesses, such as congestive heart failure and diabetes.  The serious nature of some top health conditions raises questions about whether in-home HRA visits would include the appropriate testing supplies and equipment needed to accurately diagnose these conditions.  If the conditions were accurately diagnosed, the serious nature of some conditions heightens concerns about whether enrollees received needed care to treat these conditions.  Some MA companies may warrant further oversight and followup, especially those whose use of HRAs and HRA-linked chart reviews drove disproportionate shares of risk-adjusted payments and those with HRA-generated payments for enrollees who had no service records whatsoever.

## What OIG Recommends

The results of this latest analysis, combined with OIG's prior evaluations and enforcement work, call into question whether in-home HRAs should be allowed to drive billions of dollars in risk adjustment without: (1) tighter controls over the accuracy of the diagnoses generated by them and (2) controls to ensure that MA companies are taking meaningful actions to connect enrollees to appropriate care based on HRA results.

At the policy level, OIG recommends that CMS:

> **Impose additional restrictions on the use of diagnoses reported only on in-home HRAs or chart reviews that are linked to in-home HRAs for risk-adjusted payments.** While there are general requirements and oversight in place for the MA risk adjustment payment process, CMS should take additional steps specific to in-home HRAs or chart reviews linked to in-home HRAs. Additional restrictions are needed to mitigate the risks to payment integrity and enrollee coordination of care arising from diagnoses reported only through these sources. Such restrictions could be excluding such diagnoses from eligibility for risk-adjusted payments. Alternatively, CMS could require that the enrollee's medical record contain evidence that the MA company took meaningful actions to connect the enrollee to appropriate care based on the results of the in-home HRA as a condition for the in-home HRA to be an allowable source for risk-adjusted payment.

However, as long as CMS continues its policy of allowing diagnoses from in-home HRAs and chart reviews linked to in-home HRAs to generate risk-adjusted payments, it needs to strengthen its oversight of MA companies in several ways. To improve its oversight, OIG recommends that CMS:

> **Conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews.** CMS should incorporate risk-adjustment eligible diagnoses from in-home HRAs and HRA-linked chart reviews into its contract-level Risk Adjustment Data Validation (RADV) audits of risk-adjusted payments. In addition, CMS should ensure that audits include a representative or targeted sample of diagnoses reported on in-home HRAs and HRA-linked chart reviews. After conducting these contract-level RADV audits of in-home HRAs and HRA-linked chart reviews, CMS should take steps to mitigate any vulnerabilities identified in its audits and oversight of in-home HRAs and HRA-linked chart reviews.

> **Determine whether select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.** CMS should determine whether diagnoses for select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews are particularly subject to intentional or unintentional coding variation or inappropriate coding by health plans or providers. OIG identified 13 top health conditions that accounted for a substantial portion of MA companies' estimated payments from HRAs and HRA-linked chart reviews. We also identified five diagnoses (and associated top HCCs) that were reported more often for in-home HRAs than for other types of HRA visits. Finally, for 7 of the 13 HCCs, certain MA companies had a substantially greater share of payments driven by diagnoses reported solely on HRAs and HRA-linked chart reviews than their peers.

> OIG is aware that CMS has begun implementing a revised HCC diagnostic classification system that aims to address discretionary coding variation. These revisions impact some conditions highlighted in this report, such as diabetes and congestive heart failure.[21] This is consistent with one of the principles (Principle 10) that CMS uses to guide its HCC diagnostic classification system, which states "diagnoses

that are particularly subject to intentional or unintentional discretionary coding variation or inappropriate coding by health plans/providers" should not increase risk-adjusted payments to MA companies.[22]  If CMS determines through ongoing analysis that additional health conditions are more susceptible to coding variation, CMS should determine whether the degree of coding variation warrants changes to the use of these conditions for risk adjustment.

We note that this new evaluation provides further support for open recommendations that OIG has previously made to CMS to strengthen its oversight of HRAs and chart reviews.  These include:

(1)  require MA companies to implement best practices to ensure care coordination for HRAs,[23]

(2)  provide targeted oversight of MA companies that drove most of the payments resulting from in-home HRAs,[24]

(3)  require MA organizations to flag in their MA encounter data any HRAs they initiate,[25]

(4)  conduct audits that validate diagnoses reported on chart reviews in the MA encounter data,[26] and

(5)  perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs.[27]

## Agency Comments and OIG Response

CMS did not concur with our recommendation to restrict the use of diagnoses reported only on in-home HRAs or chart reviews linked to in-home HRAs for risk-adjusted payments.  Although CMS recognizes concerns regarding MA companies' potential misuse of HRAs, CMS noted that our analysis did not determine whether diagnoses reported only on HRAs were supported by medical record documentation.  CMS also stated that the lack of a definitive method for identifying in-home HRAs raises challenges in any effort to reconsider allowing these diagnoses for risk adjustment.  We share CMS's concerns regarding the lack of a definitive method for identifying various types of in-home HRAs.  To resolve this specific challenge, CMS should implement our prior recommendation to require MA organizations to flag in their MA encounter data any HRAs they initiate.  Ultimately, OIG continues to recommend that CMS impose additional restrictions on the use of diagnoses reported solely on in-home HRAs and chart reviews linked to in-home HRAs.

CMS did not concur or nonconcur with our recommendation for it to conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews.  Instead, CMS noted that it will use data gathered from its 2018 RADV audits and other analyses to assess whether to conduct future RADV audits of a sample of diagnoses derived from in-home HRAs and HRA-linked chart reviews.  CMS stated it will share the results of its 2018 audits with OIG.  OIG encourages CMS to implement our recommendation to conduct its own audits of diagnoses reported only on in-home HRAs and HRA-linked chart reviews.  We appreciate CMS's plan to share the results of its assessment with OIG.  OIG also is conducting RADV-like audits of diagnoses reported only on in-home HRAs.

CMS concurred with our recommendation to determine whether select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.  CMS states that it has implemented this recommendation and has begun taking steps to exclude or constrain certain

10

HCCs that CMS determined were more susceptible to coding variation by MA companies—including HCCs highlighted by OIG as driving payments from HRAs and HRA-linked chart reviews.  OIG appreciates the actions CMS has taken to revise its HCC classification system.  Going forward, we encourage CMS to continue to analyze any changes in coding variation for health conditions generated solely by HRAs and HRA-linked chart reviews, and reassess the use of such conditions for risk adjustment.

We ask that, in its Final Management Decision, CMS reconsider its position on our first recommendation, clarify its position on our second recommendation, and provide updates on its plans and actions related to each of these recommendations.

The full text of CMS's comments can be found in Appendix E.

11

## Methodology

We reviewed HRAs and HRA-linked chart reviews from the 2022 MA encounter data stored in CMS's Integrated Data Repository Cloud (IDRC) to determine the amount of 2023 MA risk-adjusted payments that would have resulted from diagnoses reported only on HRAs or HRA-linked chart reviews.[28]  For our analysis, we included only enrollees in the same MA contract for all 12 months of 2022.  In addition, we excluded enrollees who were diagnosed with end-stage renal disease, were receiving hospice care, or did not reside in a U.S. State or Washington D.C.  We excluded cost plans, demonstration plans, programs of all-inclusive care for the elderly organizations, and Medicare medical savings account plans.

**Identifying HRAs.**  Because CMS does not require MA companies to flag diagnoses that resulted from HRAs, we used a two-step process to identify 2022 service records that met our criteria for an HRA.  First, we identified service records containing distinct procedure codes for annual wellness visits, initial preventive physical exams, and evaluation and management home visits.[29]  We then excluded from our analysis all service records for enrollees who had more than one HRA record with a procedure code identified in step one.  We identified the place of service codes and procedure code modifiers reported on HRA records to determine whether the HRA visits were conducted in enrollees' homes, via telehealth, or in health care facilities.

**Identifying HRA-linked chart reviews.**  We identified HRA-linked chart reviews as chart review records[30] that contained an original control number and had a four-part effective key that matched the four-part key of an HRA.

**Calculating risk-adjusted payments.**  We analyzed diagnoses reported on 9.3 million HRAs and 4.9 million HRA-linked chart reviews submitted by MA companies to calculate the impact of HRAs and HRA-linked chart reviews on risk-adjusted payments for 2023.  We identified enrollees with HCCs generated only by diagnoses reported on risk-adjustment-eligible HRAs and HRA-linked chart reviews that were not reported on any other 2022 record submitted to CMS's Encounter Data System.[31]  We extracted enrollment and payment information for these enrollees, including information from the Medicare Advantage and Prescription Drug data, to calculate estimated risk-adjusted payments for diagnoses reported only on HRAs and HRA-linked chart reviews.

**Conducting summary analyses.**  For payment year 2023, we conducted summary analyses on the MA companies with payments from diagnoses reported only on HRAs and HRA-linked chart reviews.  We analyzed variation across MA companies to determine whether certain companies had a disproportionately higher share of risk-adjusted payments due to diagnoses reported only on HRAs and HRA-linked chart reviews.  We summarized the percentage of HRAs that were administered in enrollees' homes, via telehealth, or in health care facilities.  We also summarized the number and type of HCCs and diagnoses that resulted in payments.  For our analysis of diagnoses that were most commonly generated by in-home HRAs, we limited the analysis to diagnoses reported for at least 5,000 enrollees on in-home HRAs.  To determine whether certain enrollees may have been disproportionately represented among enrollees with diagnoses that resulted in payments, we compared the percentage of all MA enrollees with certain demographic characteristics to the percentage of enrollees with these characteristics who also had diagnoses reported only on HRAs or HRA-linked chart reviews that resulted in payments, as shown in Appendix D.

## Limitations

We did not determine whether diagnoses reported only on HRAs or HRA-linked chart reviews were supported by documentation in enrollees' medical records.  For enrollees with diagnoses reported only on HRAs or

12

HRA-linked chart reviews, we did not determine whether their MA companies had submitted all required service records to CMS's Encounter Data System.  In addition, our review did not include records of services provided to MA enrollees but not covered or paid under Medicare Part C by an MA company, such as services provided through the Veterans Health Administration.

Because CMS does not require MA companies to flag in the encounter data that a diagnosis resulted from an HRA, we had to reasonably approximate our identification of these diagnoses based on OIG analysis and discussion with CMS.  Our approximation may have included diagnoses reported during visits in which medical care was provided and an HRA was not administered.  Alternatively, our approximation may have missed diagnoses that resulted from HRAs that MA companies reported on types of records that we did not include.

For this analysis we used MA enrollees' race and ethnicity data contained in the IDRC, which is based on data collected from the Social Security Administration and an algorithm developed by the Research Triangle Institute.  CMS and OIG have identified inaccuracies in Medicare enrollees' race and ethnicity data that CMS has been working to improve.  The race and ethnicity data are less accurate for certain racial and ethnic communities.[32]

## Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# Appendix A: Recent HHS-OIG Work Related to MA Risk Adjustment

Information on OIG's work on managed care can be found on our Managed Care web page.  Below is a list of recent OIG work on risk adjustment in MA.

## Exhibit A-1: HHS-OIG's recent work on risk adjustment in MA

| Recent HHS-OIG Evaluations Related to Risk Adjustment in MA | Report Number | Date Issued |
|---|---|---|
| *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments* | OEI-03-17-00474 | September 2021 |
| *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* | OEI-03-17-00471 | September 2020 |
| *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns* | OEI-03-17-00470 | December 2019 |
| **Recent HHS-OIG Audits Related to Risk Adjustment in MA** | **Report Number** | **Date Issued** |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That MediGold (Contract H3668) Submitted to CMS* | A-07-20-01198 | February 2024 |
| *Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes* | A-07-23-01213 | December 2023 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That SelectCare of Texas, Inc. (Contract H4506) Submitted to CMS* | A-06-19-05002 | November 2023 |
| *Medicare Advantage Compliance Audit of Diagnosis Codes That CarePlus Health Plans, Inc. (Contract H1019) Submitted to CMS* | A-04-19-07082 | October 2023 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Aetna, Inc. (Contract H5521) Submitted to CMS* | A-01-18-00504 | October 2023 |
| **Recent Fraud Enforcement Actions Related to Risk Adjustment in MA** | | **Date Released** |
| *Former Executive at Medicare Advantage Organization Charged for Multimillion-Dollar Medicare Fraud Scheme* | | October 2023 |
| *Cigna Group to Pay $172 Million to Resolve False Claims Act Allegations* | | September 2023 |
| *Martin's Point Health Care Inc. to Pay $22,485,000 to Resolve False Claims Act Allegations* | | July 2023 |
| *Sutter Health and Affiliates to Pay $90 Million to Settle False Claims Act Allegations of Mischarging the Medicare Advantage Program* | | August 2021 |
| *Medicare Advantage Provider and Physician to Pay $5 Million to Settle False Claims Act Allegations* | | August 2019 |

Source: OIG, *Managed Care,* 2024.  Accessed at https://oig.hhs.gov/reports-and-publications/featured-topics/managed-care/ on May 1, 2024.

14

# Appendix B: Estimated Risk-Adjusted Payments, by Health Condition

For enrollees who had diagnoses reported only on HRAs or HRA-linked chart reviews in the 2022 encounter data, we identified HCCs generated by these diagnoses.[33] The estimated 2023 risk-adjusted payments for each HCC added by HRAs and HRA-linked chart reviews ranged from $4,102 to $966.9 million.

**Exhibit B-1: Estimated 2023 risk-adjusted payments resulting from diagnoses reported on HRAs and HRA-linked chart reviews, by HCC**

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews[1] |
| **Disease Coefficients** | | | | | | |
| HCC108 | Vascular Disease | $449,445,460 | $378,998,488 | $126,270,515 | $12,150,099 | $966,864,562 |
| HCC59 | Major Depressive, Bipolar, and Paranoid Disorders | $347,823,621 | $357,037,555 | $151,455,752 | $11,785,322 | $868,102,250 |
| HCC47 | Disorders of Immunity | $269,452,102 | $154,895,605 | $109,045,565 | $5,799,045 | $539,192,317 |
| HCC22 | Morbid Obesity | $214,358,309 | $191,247,145 | $68,182,478 | $4,816,980 | $478,604,914 |
| HCC111 | Chronic Obstructive Pulmonary Disease | $179,166,596 | $150,563,075 | $74,344,490 | $5,159,893 | $409,234,055 |
| HCC75 | Myasthenia Gravis/Myoneural Disorders and Guillain-Barré Syndrome/ Inflammatory and Toxic Neuropathy | $234,607,699 | $76,686,141 | $84,797,282 | $3,171,926 | $399,263,048 |
| HCC48 | Coagulation Defects and Other Specified Hematological Disorders | $188,787,739 | $132,521,844 | $55,920,502 | $5,312,063 | $382,542,148 |
| HCC18 | Diabetes with Chronic Complications | $218,972,306 | $78,372,669 | $50,262,469 | $3,847,087 | $351,454,531 |
| HCC85 | Congestive Heart Failure | $150,144,292 | $95,259,585 | $56,650,960 | $3,058,638 | $305,113,476 |
| HCC55 | Substance Use Disorder, Moderate/Severe, or Substance Use with Complications | $124,770,917 | $112,706,642 | $49,461,675 | $6,584,704 | $293,523,938 |
| HCC40 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | $88,936,971 | $97,563,627 | $50,322,381 | $2,605,476 | $239,428,455 |
| HCC23 | Other Significant Endocrine and Metabolic Disorders | $120,995,551 | $46,639,219 | $47,980,544 | $1,535,638 | $217,150,953 |
| HCC96 | Specified Heart Arrhythmias | $75,115,883 | $61,642,913 | $25,388,402 | $1,739,813 | $163,887,011 |
| HCC52 | Dementia Without Complications | $55,730,562 | $60,950,598 | $27,236,614 | $1,677,754 | $145,595,528 |

[1] Note: Due to rounding, amounts presented may not add up precisely to the totals provided.

continued on next page

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC21 | Protein-Calorie Malnutrition | $69,535,306 | $44,916,938 | $20,185,127 | $1,318,266 | $135,955,636 |
| HCC103 | Hemiplegia/Hemiparesis | $43,008,840 | $20,615,381 | $16,391,746 | $1,057,499 | $81,073,466 |
| HCC8 | Metastatic Cancer and Acute Leukemia | $30,849,236 | $31,459,605 | $14,864,583 | $822,276 | $77,995,700 |
| HCC88 | Angina Pectoris | $42,730,576 | $22,062,311 | $11,764,412 | $743,885 | $77,301,185 |
| HCC84 | Cardio-Respiratory Failure and Shock | $26,039,031 | $10,382,052 | $12,089,081 | $444,861 | $48,955,024 |
| HCC138 | Chronic Kidney Disease, Moderate (Stage 3) | $4,565,138 | $33,965,578 | $8,597,005 | $640,425 | $47,768,146 |
| HCC189 | Amputation Status, Lower Limb/Amputation Complications | $25,041,287 | $9,126,151 | $10,080,453 | $331,622 | $44,579,513 |
| HCC12 | Breast, Prostate, and Other Cancers and Tumors | $5,434,885 | $33,228,434 | $4,168,367 | $511,457 | $43,343,144 |
| HCC10 | Lymphoma and Other Cancers | $14,582,936 | $17,716,797 | $6,939,581 | $422,761 | $39,662,075 |
| HCC72 | Spinal Cord Disorders/Injuries | $9,325,152 | $20,789,183 | $7,653,223 | $608,081 | $38,375,640 |
| HCC57 | Schizophrenia | $24,172,735 | $6,254,262 | $5,914,660 | $410,202 | $36,751,859 |
| HCC46 | Severe Hematological Disorders | $13,898,957 | $11,764,644 | $8,131,866 | $822,106 | $34,617,573 |
| HCC112 | Fibrosis of Lung and Other Chronic Lung Disorders | $4,446,102 | $23,205,703 | $5,327,014 | $511,708 | $33,490,527 |
| HCC78 | Parkinson's and Huntington's Diseases | $16,567,993 | $9,433,569 | $5,657,828 | $346,911 | $32,006,301 |
| HCC107 | Vascular Disease with Complications | $5,586,614 | $19,863,773 | $3,439,267 | $497,723 | $29,387,377 |
| HCC79 | Seizure Disorders and Convulsions | $12,280,655 | $10,995,392 | $5,682,999 | $401,591 | $29,360,638 |
| HCC161 | Chronic Ulcer of Skin, Except Pressure | $10,077,326 | $11,944,823 | $6,086,542 | $303,618 | $28,412,310 |
| HCC35 | Inflammatory Bowel Disease | $9,154,339 | $11,625,435 | $6,543,364 | $331,993 | $27,655,131 |
| HCC9 | Lung and Other Severe Cancers | $7,913,969 | $12,189,251 | $4,312,014 | $246,020 | $24,661,253 |
| HCC124 | Exudative Macular Degeneration | $8,784,872 | $10,069,888 | $4,105,846 | $297,634 | $23,258,240 |
| HCC51 | Dementia With Complications | $8,987,095 | $8,766,680 | $3,835,742 | $326,870 | $21,916,386 |
| HCC27 | End-Stage Liver Disease | $6,783,347 | $9,357,954 | $5,208,657 | $422,065 | $21,772,022 |

continued on next page

16

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC11 | Colorectal, Bladder, and Other Cancers | $1,798,133 | $16,541,206 | $1,554,916 | $264,206 | $20,158,462 |
| HCC56 | Substance Use Disorder, Mild, Except Alcohol and Cannabis | $8,228,357 | $6,754,944 | $4,091,264 | $338,908 | $19,413,474 |
| HCC106 | Atherosclerosis of the Extremities with Ulceration or Gangrene | $6,634,418 | $6,892,507 | $5,177,434 | $358,672 | $19,063,030 |
| HCC19 | Diabetes without Complication | $5,542,196 | $6,722,041 | $4,151,003 | $246,374 | $16,661,614 |
| HCC71 | Paraplegia | $10,253,894 | $3,607,313 | $2,334,208 | $265,958 | $16,461,374 |
| HCC28 | Cirrhosis of Liver | $5,278,788 | $5,811,443 | $3,991,972 | $164,030 | $15,246,233 |
| HCC39 | Bone/Joint/Muscle Infections/Necrosis | $5,801,586 | $6,715,789 | $2,464,231 | $210,658 | $15,192,264 |
| HCC104 | Monoplegia, Other Paralytic Syndromes | $8,250,466 | $3,172,363 | $2,372,446 | $182,750 | $13,978,025 |
| HCC29 | Chronic Hepatitis | $5,997,403 | $4,813,030 | $2,377,450 | $193,571 | $13,381,454 |
| HCC188 | Artificial Openings for Feeding or Elimination | $5,730,662 | $3,875,265 | $2,767,342 | $196,704 | $12,569,973 |
| HCC100 | Ischemic or Unspecified Stroke | $252,125 | $11,453,815 | $402,001 | $292,516 | $12,400,457 |
| HCC137 | Chronic Kidney Disease, Severe (Stage 4) | $3,551,613 | $5,359,449 | $2,635,282 | $194,164 | $11,740,508 |
| HCC77 | Multiple Sclerosis | $3,633,122 | $4,620,005 | $2,051,661 | $170,216 | $10,475,005 |
| HCC70 | Quadriplegia | $5,208,069 | $2,290,742 | $1,733,836 | $284,130 | $9,516,777 |
| HCC186 | Major Organ Transplant or Replacement Status | $3,211,750 | $2,602,633 | $3,137,020 | $34,750 | $8,986,153 |
| HCC34 | Chronic Pancreatitis | $3,517,619 | $3,138,792 | $2,068,456 | $145,882 | $8,870,749 |
| HCC169 | Vertebral Fractures without Spinal Cord Injury | $63,603 | $7,334,976 | $680,578 | $173,357 | $8,252,515 |
| HCC158 | Pressure Ulcer of Skin with Full Thickness Skin Loss | $2,723,756 | $1,543,644 | $1,948,712 | $53,430 | $6,269,542 |
| HCC135 | Acute Renal Failure | $121,752 | $5,320,618 | $456,137 | $181,649 | $6,080,156 |
| HCC122 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | $1,701,407 | $2,788,255 | $1,143,594 | $146,027 | $5,779,282 |
| HCC82 | Respirator Dependence/ Tracheostomy Status | $1,857,610 | $1,984,754 | $1,146,274 | $107,192 | $5,095,830 |
| HCC87 | Unstable Angina and Other Acute Ischemic Heart Disease | $155,402 | $3,483,505 | $1,348,893 | $95,356 | $5,083,155 |

continued on next page

17

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC176 | Complications of Specified Implanted Device or Graft | $267,909 | $3,806,856 | $604,122 | $93,433 | $4,772,320 |
| HCC86 | Acute Myocardial Infarction | $120,083 | $4,031,632 | $210,514 | $74,109 | $4,436,338 |
| HCC33 | Intestinal Obstruction/Perforation | $167,118 | $3,191,104 | $432,375 | $96,332 | $3,886,929 |
| HCC159 | Pressure Ulcer of Skin with Partial Thickness Skin Loss | $1,099,883 | $1,653,041 | $791,404 | $47,677 | $3,592,004 |
| HCC58 | Reactive and Unspecified Psychosis | $929,255 | $892,100 | $841,204 | $96,994 | $2,759,553 |
| HCC136 | Chronic Kidney Disease, Stage 5 | $663,267 | $1,217,781 | $781,087 | $50,228 | $2,712,363 |
| HCC1 | HIV/AIDS | $1,145,080 | $946,633 | $490,726 | $24,803 | $2,607,242 |
| HCC73 | Amyotrophic Lateral Sclerosis and Other Motor Neuron Disease | $1,071,846 | $809,811 | $645,100 | $62,687 | $2,589,444 |
| HCC54 | Substance Use with Psychotic Complications | $1,090,572 | $836,473 | $479,552 | $42,120 | $2,448,718 |
| HCC80 | Coma, Brain Compression/Anoxic Damage | $543,296 | $1,325,695 | $508,698 | $49,996 | $2,427,685 |
| HCC6 | Opportunistic Infections | $129,005 | $1,759,255 | $315,022 | $29,036 | $2,232,318 |
| HCC17 | Diabetes with Acute Complications | $48,283 | $1,770,721 | $298,093 | $37,925 | $2,155,022 |
| HCC99 | Intracranial Hemorrhage | $54,077 | $1,844,277 | $219,984 | $25,294 | $2,143,631 |
| HCC76 | Muscular Dystrophy | $869,981 | $829,620 | $369,355 | $35,024 | $2,103,980 |
| HCC134 | Dialysis Status | $872,599 | $294,034 | $579,117 | $20,142 | $1,765,891 |
| HCC74 | Cerebral Palsy | $486,615 | $788,724 | $253,763 | $21,490 | $1,550,593 |
| HCC170 | Hip Fracture/Dislocation | $54,336 | $1,143,504 | $101,942 | $49,442 | $1,349,225 |
| HCC157 | Pressure Ulcer of Skin with Necrosis Through to Muscle, Tendon, or Bone | $463,230 | $350,727 | $398,941 | $111,868 | $1,324,765 |
| HCC110 | Cystic Fibrosis | $574,372 | $249,539 | $372,000 | $53,498 | $1,249,409 |
| HCC167 | Major Head Injury | $134,861 | $838,304 | $150,002 | $27,908 | $1,151,075 |
| HCC173 | Traumatic Amputations and Complications | $26,792 | $949,978 | $70,776 | $26,633 | $1,074,179 |
| HCC60 | Personality Disorders | $176,692 | $632,655 | $187,713 | $17,249 | $1,014,309 |

continued on next page

18

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|-----|-----------------|------------|------------|------------|------------|------------|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC2 | Septicemia, Sepsis, Systemic Inflammatory Response Syndrome/Shock | $97,508 | $547,065 | $138,218 | $69,503 | $852,294 |
| HCC114 | Aspiration and Specified Bacterial Pneumonias | $83,545 | $577,722 | $135,202 | $43,464 | $839,933 |
| HCC115 | Pneumococcal Pneumonia, Empyema, Lung Abscess | $38,923 | $269,613 | $56,147 | $8,761 | $373,444 |
| HCC162 | Severe Skin Burn or Condition | $11,730 | $67,040 | $10,985 | $0 | $89,755 |
| HCC166 | Severe Head Injury | $6,430 | $34,466 | $0 | $0 | $40,896 |
| HCC83 | Respiratory Arrest | $3,256 | $23,649 | $0 | $2,987 | $29,893 |
| **Disease Interactions** | | | | | | |
| HCC47_gCancer | Immune Disorders*Cancer | $76,083,887 | $41,101,759 | $26,867,505 | $1,272,171 | $145,325,321 |
| CHF_gCopdCF | Congestive Heart Failure*Chronic Obstructive Pulmonary Disease | $39,523,130 | $25,726,629 | $13,094,293 | $865,053 | $79,209,105 |
| HCC85_gRenal_v24 | Congestive Heart Failure*Renal | $26,167,774 | $26,918,623 | $11,273,423 | $867,561 | $65,227,381 |
| Diabetes_CHF | Congestive Heart Failure* Diabetes | $35,469,501 | $15,731,310 | $9,115,017 | $615,038 | $60,930,865 |
| HCC85_HCC96 | Congestive Heart Failure*Specified Heart Arrythmias | $23,622,218 | $10,144,555 | $6,445,076 | $362,823 | $40,574,672 |
| gSubstanceUseDisorder_gPsych | Substance Abuse Group*Psychiatric | $23,216,867 | $9,417,621 | $6,987,511 | $943,865 | $40,565,863 |
| gCopdCF_CARD_RESP_FAIL | Cardiorespiratory Failure*Chronic Obstructive Pulmonary Disease | $12,187,187 | $6,551,516 | $4,701,072 | $299,523 | $23,739,298 |
| SCHIZO-PHRENIA_gCopdCF | Schizophrenia*Chronic Obstructive Pulmonary Disease | $44,676 | $38,020 | $20,434 | $7,726 | $110,856 |
| SCHIZO-PHRENIA_SEIZURES | Schizophrenia*Seizure Disorders and Convulsions | $21,967 | $11,378 | $14,036 | $5,569 | $52,951 |
| gCopdCF_ASP_SPEC_BACT_PNEUM | Chronic Obstructive Pulmonary Disease*Aspiration and Specified Bacterial Pneumonias | $15,267 | $9,751 | $4,376 | $0 | $29,394 |

continued on next page

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| SCHIZO-PHRENIA_CHF | Schizophrenia*Congestive Heart Failure | $13,685 | $9,838 | $3,899 | $1,333 | $28,755 |
| ART_OPENINGS_PRESSURE_ULCER | Artificial Openings for Feeding or Elimination*Pressure Ulcer | $3,180 | $3,507 | $6,136 | $0 | $12,824 |
| SEPSIS_ARTIF_OPENINGS | Sepsis*Artificial Openings for Feeding or Elimination | $0 | $5,323 | $1,559 | $0 | $6,883 |
| **Disabled/Disease Interactions** | | | | | | |
| DISABLED_HCC85 | Disabled, Congestive Heart Failure | $19,350 | $9,426 | $5,396 | $0 | $34,172 |
| DISABLED_HCC161 | Disabled, Chronic Ulcer of the Skin, Except Pressure Ulcer | $10,048 | $2,852 | $0 | $0 | $12,901 |
| DISABLED_PRESSURE_ULCER | Disabled, Pressure Ulcer | $10,422 | $0 | $0 | $0 | $10,422 |
| DISABLED_HCC39 | Disabled, Bone/Joint Muscle Infections/Necrosis | $5,161 | $0 | $0 | $0 | $5,161 |
| DISABLED_HCC77 | Disabled, Opportunistic Infections | $0 | $0 | $4,102 | $0 | $4,102 |
| | **Total** | $3,455,232,997 | $2,669,010,125 | $1,292,319,589 | $91,823,780 | $7,508,386,491 |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.
Note: For 4 of the 108 HCCs from the 2020 CMS-HCC model, there were no risk-adjusted payments that resulted from diagnoses reported only on HRAs or HRA-linked chart reviews.

# Appendix C: Top MA Companies

Twenty MA companies each had a share of payments from HRAs and HRA-linked chart reviews that exceeded their percentage of enrollees by more than 25 percent.  Taken together, these 20 MA companies generated 80 percent ($6 billion of $7.5 billion) of the estimated 2023 risk-adjusted payments from HRAs and HRA-linked chart reviews while covering only half of MA enrollees.  One top MA company, UnitedHealth Group, Inc., stood out from its peers, especially in its use of in-home HRAs and HRA-linked chart reviews to generate risk-adjusted payments.

**Exhibit C-1: The top 20 MA companies with a disproportionate share of estimated 2023 risk-adjusted payments from HRAs and HRA-linked chart reviews**

| MA Company | Estimated Risk-Adjusted Payments From HRAs and HRA-Linked Chart Reviews |
|---|---|
| AIDS Healthcare Foundation | $2,373,994 |
| Alignment Healthcare USA, LLC | $59,960,609 |
| Associated Care Ventures, Inc. | $1,703,317 |
| Community Care, Inc. | $193,985 |
| First Sacramento Capital Funding LLC | $187,090 |
| HealthPartners, Inc. | $15,857,479 |
| Humana Inc. | $1,709,202,266 |
| Independent Health Association, Inc. | $38,729,065 |
| Intermountain Health Care, Inc. | $18,538,874 |
| ISNP Holdings, LLC | $160,789 |
| Marquis Companies I, Inc. | $236,123 |
| Missouri Healthcare Advisors, LLC | $272,233 |
| Orange County Health Authority | $770,131 |
| Renown Health | $7,171,111 |
| Scan Group | $127,644,675 |
| The Cigna Group | $236,951,359 |
| Triton Health Systems, L.L.C. | $23,711,322 |
| UnitedHealth Group, Inc. | $3,726,358,748 |
| Visiting Nurse Service Of New York | $1,822,637 |
| Zing Health Consolidator, Inc | $1,356,993 |
| **TOTAL** | **$5,973,202,800** |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

21

# Appendix D: MA Enrollees' Demographic Characteristics

For MA enrollees included in our review, we compared the percentage of 2022 MA enrollees with certain demographic characteristics to the percentage of enrollees with these characteristics who also had diagnoses reported only on HRAs or HRA-linked chart reviews that resulted in 2023 risk-adjusted payments.

**Exhibit D-1: Comparison of 2022 MA enrollees with diagnoses reported only on HRAs or HRA-linked chart reviews that generated payment, by demographic characteristic**

| Eligibility for Coverage | Percent of 2022 MA Enrollees | Percent of 2022 MA Enrollees With Diagnoses Reported Only on HRAs or HRA-Linked Chart Reviews That Generated Payment |
|---|---|---|
| Eligible for Medicare due to disability | 22% | 28% |
| Eligible for Medicare and Medicaid | 19% | 26% |
| Eligible for the Part D low-income subsidy | 19% | 26% |

| Geographic Location | Percent of 2022 MA Enrollees | Percent of 2022 MA Enrollees With Diagnoses Reported Only on HRAs or HRA-Linked Chart Reviews That Generated Payment |
|---|---|---|
| Rural | 14% | 15% |
| Urban | 86% | 85% |

| Race and Ethnicity[1] | Percent of 2022 MA Enrollees[2] | Percent of 2022 MA Enrollees With Diagnoses Reported Only on HRAs or HRA-Linked Chart Reviews That Generated Payment |
|---|---|---|
| American Indian/Alaska Native | <1% | <1% |
| Asian/Pacific Islander | 4% | 3% |
| Black (or African American) | 12% | 16% |
| Hispanic | 10% | 10% |
| Non-Hispanic White | 71% | 68% |
| Other | <1% | <1% |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

[1] These percentages may not sum to 100 percent due to rounding and unknown or missing values.

[2] For 2 percent of 2022 MA enrollees reviewed, the Research Triangle Institute Race Code value in the IDRC was "unknown" or missing.

22

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Centers for Medicare & Medicaid Services

_Administrator_
Washington, DC  20201

**DATE:**        September 5, 2024

**TO:**          Juliet T. Hodgkins
                 Principal Deputy Inspector General

**FROM:**        Chiquita Brooks-LaSure
                 Administrator

**SUBJECT:**     Office of Inspector General (OIG) Draft Data Brief: _Medicare Advantage:_
                 _Questionable Use of Health Risk Assessments Continues To Drive Up Payments_
                 _to Plans by Billions_, (OEI-03-23-00380)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to review and comment on the Office of Inspector General's (OIG) draft report regarding the accuracy of diagnoses that Medicare Advantage (MA) organizations submit to CMS for risk-adjusted payments and the role of Health Risk Assessments (HRAs) in this process. CMS is committed to ensuring that diagnoses used in risk adjustment are accurate and HRAs are used appropriately to improve care.

CMS pays each MA organization a monthly per-person amount for each beneficiary enrolled in its plan (or plans). The per-person amount reflects an adjustment for the risk of the beneficiary (referred to as a "beneficiary risk score"), which takes into account differences in health status and demographic characteristics between enrolled beneficiaries.

In addition to demographic factors, to account for health status, the beneficiary risk score is calculated with diagnoses that the MA organizations report to CMS. These risk-adjusted payments ensure that a plan is paid more for a sicker enrollee than a healthier enrollee, which helps to ensure that MA organizations are paid appropriately to provide the services that their enrollees need.

Diagnosis codes used for risk adjustment must meet specific criteria, including that the diagnosis is documented in the medical record. Diagnosis codes reported by MA organizations are reported to the Encounter Data System, where MA organizations submit a larger set of information on each service provided. CMS allows MA organizations to use activities described as "health risk assessments" (HRAs), described in more detail below, as a source of diagnoses for MA beneficiaries used in the calculation of risk-adjusted payments.

HRAs, used in both MA and traditional Medicare (i.e., Medicare Parts A and B), are intended to be a tool for early identification of health risks to improve beneficiaries' health outcomes through care coordination. Physicians or other health care professionals conduct HRAs to collect information from beneficiaries about their health status, health risks, and daily activities. In the MA program, HRAs are generally part of annual wellness visits and are often conducted during other visits in non-clinical settings. In recent years, HRA-type assessments, or visits that do not

23

incorporate the use of a formal HRA but may have the same purpose of identifying diagnoses that may not be used for follow up care, have been conducted in the home. Diagnoses associated with these assessments submitted by MA organizations are eligible for use in risk adjustment when they are documented in the medical record and are associated with a risk-adjustment allowable procedure code.

All diagnoses used for risk adjustment may be subject to Risk Adjustment Data Validation (RADV) audits to ensure they meet program rules. CMS is committed to ensuring that diagnoses that MA organizations submit for risk adjustment, including those associated with HRAs conducted in the home, are accurate, and can be validated through medical record reviews. CMS has already taken action to target plans at higher risk for improper payment. For example, CMS uses contract-specific RADV audits to validate that diagnoses used for risk adjustment meet program rules. RADV audits measure the accuracy of the plan-submitted diagnostic information through medical record and coding abstraction and uses the results of these audits to identify and recover overpayments from individual MA plans. For purposes of RADV, results of HRA screening portions are not considered confirmed diagnoses by MA organizations unless supported by the final assessment documentation according to ICD-10-CM coding guidelines and AHA coding clinics.[1] To assess potential risk of overpayments, CMS takes into consideration various factors, including results of past RADV audits. Because RADV contract selection focuses on the top decile of high-risk enrollees according to MA improper payment prediction models, our current methodology already captures plans at high risk for improper payment. The results of these audits are used to identify and recover overpayments for individual MA organizations.

CMS has also issued guidance to ensure MA organizations are utilizing HRAs appropriately. In the CY 2016 Rate Announcement, CMS established guidance encouraging plans to adopt, as a best practice, a core set of components for the in-home HRAs they perform, including administration in accordance with the Center for Disease Control and Prevention's (CDC) model HRA framework. CMS noted that plans' adoption of comprehensive in-home HRAs should provide additional information to support care planning and care coordination and could lead to improved enrollee health outcomes.

In addition to these efforts, CMS continues to consider the role HRAs play in the MA program, both to improve the care provided, as well as how MA organizations use these activities to identify enrollees' diagnoses. MA organizations often use these assessments to capture diagnoses that were recorded in a prior year, and to identify new diagnoses. We recognize that there is increasing concern that these types of assessments, especially those conducted in the home, could lead to increased MA coding growth. We also recognize that this practice is not used uniformly throughout the industry, leading to potential anti-competitive concerns.

CMS will continue to consider the relationship of HRAs to the care provided to beneficiaries. While home visits may be valuable in meeting beneficiaries' care and social needs and

---

[1] CMS abstracts diagnosis codes in accordance with International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM) Guidelines for Coding and Reporting: https://www.cdc.gov/nchs/icd/icd-10-cm/index.html, and *Coding Clinic for ICD-10-CM and ICD-10-PCS* quarterly newsletters published by American Hospital Association's Central Office on ICD-10-CM and ICD-10-PCS.

24

identifying early interventions, CMS recognizes the concern that these visits may often be primarily for assessments that lead to diagnoses that never result in early intervention, follow-up care, or care coordination, in the home or otherwise. Any evaluation of concerns and exploration of policy solutions around HRAs needs to address the complexities of whether it is possible to identify diagnoses from home visits that are primarily used for coding assessments versus home visits where the primary purpose is treatment, and if so, how these differences can be identified. As there is no single procedure code for HRAs that is uniformly used, any evaluation of HRAs would entail looking at procedure codes for other types of visits, as was the case in the OIG's report. For example, the OIG looked at all procedure codes for annual wellness visits, initial preventive physical exams, and evaluation and management (E&M) home visits. Further, there might be ongoing changes in how these procedure codes are used over time, and it might be challenging to distinguish whether visits are primarily for coding purposes versus services that are intended as assessment for further treatment, or for treatment itself. OIG also excluded individuals from the analysis who had more than one of the identified procedure codes, which given the need to assess visit purposes, might be omitting certain HRA-like visits. As we further consider this important issue, CMS will need to carefully explore the purpose of the different types of visits made in the home as well as the extent to which these home visits generate diagnoses for risk adjustment without leading to necessary follow up care or care coordination.

OIG's recommendations and CMS' responses are below.

**OIG Recommendation**
CMS should restrict the use of diagnoses reported only on in-home HRAs or chart reviews that are linked to in-home HRAs for risk-adjusted payments.

**CMS Response**
CMS does not concur with this recommendation. CMS requires MA organizations to submit all diagnoses codes through encounter data, and CMS allows MA organizations to use HRAs as a source of diagnoses used for the calculation of risk adjusted payments, as long as those diagnoses meet CMS's criteria for risk adjustment eligibility. Although OIG has expressed concern that these diagnoses may be inaccurate, they have not conducted medical record reviews of the diagnoses that came from visits that may have contained an HRA and have not concluded that these diagnoses are not accurate.

Additionally, CMS believes the recommendation does not adequately address the complexities of identifying home visits where the primary purpose is for coding assessment or whether the primary purpose is for treatment. As such, the recommendation does not address how to classify different types of home visits, whether they include an in-home "health risk assessment" or not. CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years. CMS will continue its efforts to conduct RADV audits to inform our understanding of the accuracy of these diagnoses. If CMS determines that diagnosis codes from such visits should be excluded from risk adjusted payments or that other requirements need to be met for them to be a source of diagnoses towards payment, we note that there are many important issues to address, such as whether to exclude some, and not all, in-home services as a source of diagnoses for risk adjustment. CMS believes that Medicare beneficiaries should have access to care

25

that is appropriately provided in the home setting and we would want to take into account this consideration if we were to contemplate a policy of not using diagnoses from home visits. Since the E&M codes identified by OIG as potential HRAs can cover a wide variety of services, we would need to assess the extent to which the result may disincentivize the provision of home-based services, for example, a scenario where an enrollee is receiving treatment in the home and the provider identifies an emerging condition that should be treated. Another issue is how to identify visits that do not incorporate the use of a formal HRA, but may have the same purpose of identifying diagnoses that may not be used for follow up care, such that excluding only HRAs may not achieve what is intended.

**OIG Recommendation**
CMS should conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews.

**CMS Response**
In the PY 2018 RADV audits, CMS will flag medical records that include HRAs during the medical record review process to gather preliminary data on whether such records are less likely to validate an audited hierarchical condition category (HCC). Using this assessment and other relevant analyses, CMS will then determine if a representative or targeted sample of diagnoses derived from in-home HRAs, and HRA-linked chart reviews is appropriate for future RADV audits. As part of CMS's longstanding collaboration with HHS-OIG, which also conducts its own RADV-like audits of MAOs, we will also share these findings so that the OIG sampling methodologies can be similarly adjusted to account for areas of risk.

**OIG Recommendation**
CMS should determine whether select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.

**CMS Response**
CMS concurs with the recommendation, has implemented this recommendation, and considers it closed. In its description of its recommendation, OIG states that CMS should determine whether diagnoses for select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews are particularly subject to intentional or unintentional coding variation or inappropriate coding by health plans or providers, consistent with one of the principles (Principle 10) that CMS uses to guide its HCC diagnostic classification system. The OIG report provides findings based on the 2020 CMS-HCC risk adjustment model, which was the risk adjustment model used to determine payments for MA organizations from CY 2020 through CY 2023. As finalized in the CY 2024 Rate Announcement, CMS is phasing out the 2020 CMS-HCC risk adjustment model and phasing in the updated 2024 CMS-HCC risk adjustment model, which addresses this recommendation. As part of this update, CMS rebuilt the CMS-HCC condition categories using the *International Classification of Diseases, Tenth Revision* (ICD-10) codes. This clinical reclassification involved evaluating all HCCs, including those mentioned in the OIG's recommendation, and adjustments were made so that diagnoses that are not consistently accurate predictors of costs, such as diagnosis codes that are duplicative or discretionary, were excluded from the model or grouped into more meaningful condition categories.

CMS additionally conducted a focused assessment on conditions more subject to coding variation, consistent with Principle 10 of the longstanding model principles. Secondary to this assessment, CMS made model updates, such as no longer including certain HCCs in the model and the application of HCC constraints, to limit the sensitivity of the model to coding variation, thereby maintaining the integrity of the condition categories in the model and their ability to accurately predict costs. Through this reclassification and assessment, and in consultation with clinical experts, all HCCs were evaluated in alignment with the risk adjustment principles (including Principle 10), resulting in HCCs (along with underlying diagnoses) being removed, restructured, or added. Because CMS began implementing this new model in CY 2024 and laid out a schedule to finish implementing in CY 2026, we consider this recommendation closed.

CMS thanks OIG for their efforts on this issue and looks forward to working with OIG on this and other issues in the future.

27

## Acknowledgements and Contact

Jacqualine Reid served as the team leader for this study.  Sadie Ellington in the Office of Evaluation and Inspections also conducted the study.  Office of Evaluation and Inspections headquarters staff who provided support include Kristen Calille, Robert Gibbons, Lyndsay Hopper, and Althea Hosein.

We would also like to acknowledge the contributions of other OIG staff, including Tanaz Dutia and Logan Kingma.

This report was prepared under the direction of Joanna Bisgaier, Regional Inspector General for Evaluation and Inspections in the Philadelphia Regional Office; Edward Burley, Deputy Regional Inspector General; and Amy Sernyak, Assistant Regional Inspector General.

**Contact**

To obtain additional information concerning this report, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov.  OIG reports and other information can be found on the OIG website at oig.hhs.gov.

Office of Inspector General
Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC 20201

# Endnotes

[1] An MA company owns or has controlling interest in one or more MA organizations (MAOs) that contract with CMS to provide coverage to Medicare enrollees.  We use the term "MA company" to summarize the activities of MAOs.

[2] MA companies may also offer prescription drug coverage under Medicare Part D.

[3] CMS, *Financial Report FY 2023*, November 2023, p. 49.  Accessed at https://www.cms.gov/files/document/cms-financial-report-fiscal-year-2023.pdf on Feb. 9, 2024. CMS, *Monthly Contract and Enrollment Summary Report: December 2023*.  Accessed at https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/mcradvpartdenroldata/monthly/contract-summary-2023-12 on Feb. 9, 2024.

[4] To be eligible for risk adjustment, a diagnosis must be: (1) documented in a medical record from a hospital inpatient stay, hospital outpatient visit, or visit with a physician or other eligible health care professional during the prior year; (2) documented as a result of a face-to-face visit between the enrollee and the provider; and (3) submitted to CMS on an encounter record by the final risk-adjustment data submission deadline.  To identify diagnoses that meet these eligibility criteria, CMS extracts, or filters, diagnoses in the encounter data based on whether the encounter record contains an acceptable procedure code (i.e., Current Procedural Terminology or Healthcare Common Procedure Coding System code) and/or type of bill code.

[5] Specifically, the relative factors represent the marginal expected cost of an HCC relative to the average expected cost in the Medicare fee-for-service program.

[6] CMS adjusts risk scores by normalization factors and coding adjustment factors prior to calculating payments.  An MA plan's base payment rate is the plan's standardized bid adjusted by the county Intra-Service Area Rate factor for the enrollee's county of residence.

[7] CMS, *Part C Improper Payment Measure (Part C IPM) Fiscal Year 2023 (FY 2023) Payment Error Rate Results*, p. 1.  Accessed at https://www.cms.gov/files/document/fy-2023-medicare-part-c-error-rate-findings-and-results.pdf-0 on Apr. 11, 2024.

[8] *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns* (OEI-03-17-00470) December 2019.  *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.  *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments* (OEI-03-17-00474) September 2021.  *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That SelectCare of Texas, Inc. (Contract H4506) Submitted to CMS* (A-06-19-05002) November 2023.  *Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes* (A-07-23-01213) December 2023.

[9] CMS, "Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Apr. 6, 2015, pp. 144-146.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf on Apr. 11, 2024.  Government Accountability Office (GAO), *Medicare Advantage: Limited Progress Made to Validate Encounter Data Used to Ensure Proper Payments*, January 2017, p. 18.  Accessed at https://www.gao.gov/assets/gao-17-223.pdf on Feb. 9, 2024.  Medicare Payment Advisory Commission (MedPAC), *Report to the Congress: Medicare Payment Policy,* March 2023, p. 325.  Accessed at https://www.medpac.gov/wp-content/uploads/2023/03/Mar23_MedPAC_Report_To_Congress_v2_SEC.pdf on Apr. 11, 2024.

[10] United States Department of Justice (DOJ), *Cigna Group to Pay $172 Million to Resolve False Claims Act Allegations*, Sept. 30, 2023.  Accessed at https://www.justice.gov/opa/pr/cigna-group-pay-172-million-resolve-false-claims-act-allegations on Feb. 13, 2024.  DOJ, *Martin's Point Health Care Inc. to Pay $22,485,000 to Resolve False Claims Act Allegations*, July 31, 2023.  Accessed at https://www.justice.gov/opa/pr/martins-point-health-care-inc-pay-22485000-resolve-false-claims-act-allegations on Feb. 13, 2024.

[11] CMS does not require MA companies to flag diagnosis codes submitted to the Encounter Data System that result from HRAs.  However, CMS requires MA companies to flag chart review submissions.

[12] MA companies must make a "best-effort" attempt to conduct an initial and annual HRA to assess each enrollee's health care needs.  42 CFR § 422.112(b)(4)(i).  CMS, *Medicare Managed Care Manual, Chapter 4 – Benefits and Beneficiary Protections*, Pub. No. 100-16 (Rev. 121, Apr. 22, 2016), ch. 4, § 110.  Accessed at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/mc86c04.pdf on April 3, 2024.  MA companies offering Special Needs Plans (SNPs) must conduct initial and annual HRAs of individuals' physical, psychosocial, and functional needs using a comprehensive risk assessment tool that CMS may review during oversight activities.  Social Security Act, § 1859(f)(5)(A)(ii)(I).  42 CFR § 422.101(f)(1)(i).

[13] According to CMS, HRA-type assessments, or visits that do not incorporate the use of a formal HRA but may have the same purpose of identifying diagnoses, have been conducted in MA enrollees' homes in recent years.  For this evaluation, we use the term HRA to refer to formal HRAs and HRA-type assessments.

[14] MedPAC, *Report to the Congress: Medicare Payment Policy*, March 2016, p. 350.  Accessed at https://www.medpac.gov/wp-content/uploads/2021/10/march-2016-report-to-the-congress-medicare-payment-policy.pdf on Apr. 11, 2024.

[15] GAO, *Medicare Advantage: Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments*, April 2016, p. 13.  Accessed at https://www.gao.gov/assets/d1676.pdf on Apr. 3, 2024.

[16] CMS bases risk-adjusted payments for a given year on diagnoses from specified face-to-face visits provided to the enrollee in the previous year.  Thus, we estimated the financial impact of HRAs and HRA-linked chart reviews on 2023 MA payments by using the encounter data submitted by MA companies for services provided to enrollees in 2022.

[17] The amounts of estimated risk-adjusted payments generated by diagnoses reported only on chart reviews that were linked to in-home HRAs, facility-based HRAs, or telehealth HRAs were $738.9 million, $546 million, and $7.4 million, respectively.

[18] The Part D low-income subsidy provides Federal assistance with prescription drug costs to eligible Medicare enrollees whose income and resources are limited.  CMS, *Guidance to States on the Low-Income Subsidy*, February 2009.  Accessed at https://www.cms.gov/medicare/eligibility-and-enrollment/lowincsubmedicareprescov/downloads/statelisguidance021009.pdf on Mar. 21, 2024.

[19] Of these eight companies, five companies only offered SNPs for 2022.  One of the other eight companies also offered a non-SNP plan.  Two of the remaining eight companies also offered programs of all-inclusive care for the elderly (PACE) plans or a demonstration plan.  The PACE and demonstration plans were not included in our review.

[20] MA companies offering SNPs must conduct initial and annual HRAs of individuals' physical, psychosocial, and functional needs using a comprehensive risk assessment tool that CMS may review during oversight activities.  Social Security Act, § 1859(f)(5)(A)(ii)(I).  42 CFR § 422.101(f)(1)(i).  CMS, *Medicare Managed Care Manual, Chapter 16-B – Special Needs Plans*, Pub. No. 100-16 (Rev. 130, Jan. 12, 2024), ch.16-b, § 70.2.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c16b.pdf on Mar. 27, 2024.  CMS, *Medicare Managed Care Manual, Chapter 5 – Quality Assessment*, Pub. No. 100-16 (Rev, 117, Aug. 8, 2014), ch.5, § 20.2.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c05.pdf on Mar. 27, 2024.

[21] CMS, "Announcement of Calendar Year (CY) 2024 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," Mar. 31, 2023, pp. 90-92.  Accessed at https://www.cms.gov/files/document/2024-announcement-pdf.pdf on Apr. 6, 2024.

[22] CMS, *Report to Congress: Risk Adjustment in Medicare Advantage*, December 2021, pp. 14-16.  Accessed at https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf on Apr. 30, 2024.  Gregory C. Pope et al., *Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment: Final Report*, December 2000, pp. 42-46.  Accessed at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Reports/downloads/pope_2000_2.pdf on Apr. 30, 2024.

[23] *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.

[24] *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.

[25] *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.

[26] *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns* (OEI-03-17-00470) December 2019.

[27] *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments* (OEI-03-17-00474) September 2021.

[28] CMS's deadline for submission of 2022 risk-adjustment data was Jan. 31, 2024.  We extracted MA encounter data in February 2024.

[29] We identified annual wellness visits using procedure codes G0438 and G0439, initial preventive physical exams using procedure code G0402, and evaluation and management home visits using procedure codes 99341-99345 and 99347-99350.  For evaluation and management home visits, we also ensured that the place of service was the enrollee's home.

[30] We identified chart reviews as records with: (1) a claim type code of 4700 or 4800, (2) a chart review switch value of "Y," and (3) a chart review effective switch of "Y."

[31] For enrollees with diagnoses reported on HRAs and HRA-linked chart reviews with a claim through date between Oct. 1, 2022, and December 31, 2022, we also identified all encounter records that had a claim through date between Jan. 1, 2023, and Mar. 31, 2023.

[32] CMS, *Report to Congress: Improving Medicare Post-Acute Care Transformation (IMPACT) Act of 2014 Strategic Plan for Accessing Race and Ethnicity Data*, Jan. 5, 2017.  Accessed at https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Research-Reports-2017-Report-to-Congress-IMPACT-ACT-of-2014.pdf on Mar. 21, 2024.  *Inaccuracies in Medicare's Race and Ethnicity Data Hinder the Ability To Assess Health Disparities* (OEI-02-21-00100) June 2022.

[33] We used CMS's 2020 CMS-HCC Model to identify HCCs generated by diagnoses reported only on HRAs and HRA-linked chart reviews.  CMS, "Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Apr. 1, 2019, p. 75-80.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2020.pdf on July 8, 2022.

# Report Fraud, Waste, and Abuse

OIG Hotline Operations accepts tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement in HHS programs.  Hotline tips are incredibly valuable, and we appreciate your efforts to help us stamp out fraud, waste, and abuse.



### TIPS.HHS.GOV

### Phone: 1-800-447-8477

### TTY: 1-800-377-4950

## Who Can Report?

Anyone who suspects fraud, waste, and abuse should report their concerns to the OIG Hotline.  OIG addresses complaints about misconduct and mismanagement in HHS programs, fraudulent claims submitted to Federal health care programs such as Medicare, abuse or neglect in nursing homes, and many more.  Learn more about complaints OIG investigates.

## How Does it Help?

Every complaint helps OIG carry out its mission of overseeing HHS programs and protecting the individuals they serve.  By reporting your concerns to the OIG Hotline, you help us safeguard taxpayer dollars and ensure the success of our oversight efforts.

## Who Is Protected?

Anyone may request confidentiality.  The Privacy Act, the Inspector General Act of 1978, and other applicable laws protect complainants.  The Inspector General Act states that the Inspector General shall not disclose the identity of an HHS employee who reports an allegation or provides information without the employee's consent, unless the Inspector General determines that disclosure is unavoidable during the investigation.  By law, Federal employees may not take or threaten to take a personnel action because of whistleblowing or the exercise of a lawful appeal, complaint, or grievance right.  Non-HHS employees who report allegations may also specifically request confidentiality.



# Stay In Touch

Follow HHS-OIG for up to date news and publications.

    OIGatHHS

 HHS Office of Inspector General

Subscribe To Our Newsletter

OIG.HHS.GOV

# Contact Us

For specific contact information, please visit us online.

U.S. Department of Health and Human Services
Office of Inspector General
Public Affairs
330 Independence Ave., SW
Washington, DC 20201

Email: Public.Affairs@oig.hhs.gov