# EXHIBIT B-2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> UNITEDHEALTH GROUP INC., et al., <br><br> Defendants. | Civ. No. 24-cv-1743 (JMB/DTS) <br><br> <u>CLASS ACTION</u> <br><br> [PROPOSED] SECOND SUPPLEMENTAL CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

4909-1868-2697.v1

# EXHIBIT 2

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/medicare-advantage-data-methodology-8e54a67c

### HEALTH | HEALTHCARE

# How the Journal Analyzed Medicare Advantage Data

By *Christopher Weaver* Follow *and Tom McGinty* Follow

*July 7, 2024 10:50 pm ET*



The Centers for Medicare and Medicaid Services headquarters in Maryland. PHOTO: ROSEM MORTON FOR WSJ

The Wall Street Journal set out to examine the system under which Medicare Advantage insurers can collect extra federal money for patients with certain conditions.

The Journal reviewed Medicare data under a research agreement with the federal government. The data doesn't include patients' names, but covers details of doctor visits, hospital stays, prescriptions and other care.

For years 2018 through 2021, the Journal studied Medicare Advantage patients who were enrolled in a single plan for the full year and had drug coverage through Medicare.

The analysis excluded those with advanced kidney disease, who received hospice care or who were enrolled in certain types of Medicare plans with atypical payment rules.

Those criteria yielded an average of 20 million enrollees in each year of the analysis, or about 84% of all Medicare Advantage members.

The Journal analyzed roughly two billion diagnoses that those patients received from either doctors, hospitals or their insurance companies. Next, it narrowed those diagnoses to ones listed on claims that qualify under Medicare rules to be considered for so-called risk-adjustment payments—extra payments to Medicare Advantage insurers.

Among those 1.6 billion diagnoses, the Journal determined which ones were added by insurers, either after reviewing doctors' charts or sending medical workers to do assessments in patients' homes. The Journal identified claims resulting from home assessments based on criteria used by other researchers, and counted anyone with up to two such visits.

The next steps were to figure out which diagnoses actually result in extra payments, and among those, which were due only to diagnoses added by insurers.

The Journal then matched up those diagnoses with payment categories set by Medicare, called Hierarchical Condition Categories, or HCCs. Not every diagnosis leads to a payment, and some cancel out others. Insurers, for example, can't get paid extra for a patient's depression if they already are getting paid extra for schizophrenia.

Next, for each category and patient, the Journal checked whether the related diagnoses came just from insurers or included physicians' diagnoses.

To determine how much extra money Medicare paid for the insurer-driven diagnoses, the Journal calculated payments for those HCCs using a formula published by Medicare. The formula includes a base payment amount, a geographic adjustment and some other adjustment factors.

To estimate the base payment amounts, the Journal used plan payment data that Medicare has published through 2021. The Journal estimated the geographic

adjustments using public plan enrollment data and cost data published by Medicare.

The Journal used data from the system Medicare currently uses to calculate Medicare Advantage payments. During the Journal's study period, Medicare used a now mostly retired data system for some of its payment calculations, but researchers say diagnoses were consistent between the two systems.

The Journal then sought to determine whether patients with diagnoses added just by insurers received typical treatments for those conditions at the same rates as those diagnosed by their doctors. The Journal interviewed medical experts to come up with lists of prescription drugs considered standard treatments for most patients with certain diseases.

For each disease, the Journal determined whether each patient had at least one prescription filled for a recommended drug in a calendar year when they received the diagnosis. The Journal then compared the drug-treatment rates for two groups of patients: Medicare Advantage patients with diagnoses only from their insurers, and all Medicare patients who got diagnoses from their doctors.

The Journal also studied questionable diagnoses, such as for diabetic cataracts in people who had already had cataract surgery in both eyes. In that analysis, the Journal identified people for whom insurers had been billed by eye surgeons treating both their left and right eyes, but who had a diagnosis of diabetic cataracts in a calendar year after both eyes had been repaired.

Write to Christopher Weaver at Christopher.Weaver@wsj.com and Tom McGinty at Tom.McGinty@wsj.com

---

**Further Reading**

**Dr. Oz Criticizes Some Medicare Advantage Business Practices**

Sen. Grassley Opens Inquiry Into UnitedHealth's Medicare Billing Practices

OPINION    American Health Insurance Needs a Check Up

Health Insurers Deny 850 Million Claims a Year. The Few Who Appeal Often Win.

How Health Insurers Racked Up Billions in Extra Payments From Medicare Advantage

---

**Videos**



**WSJ Opinion: Hits and Misses of the Week**

**Highlights: Dr. Oz Confirmation Hearing to Head Medicare and Medicaid**

**Musk: 'Waste' in Entitlement Spending Is 'Big One to Eliminate'**

## Buy Side from WSJ

Buy Side is independent of The Wall Street Journal newsroom.



**BANKING**

**Here Are Today's Best CD Rates**



**BANKING**

**How to Choose the Best High-Yield Savings Account**



**BANKING**

**What Is a Money Market Account (MMA)? Rates and Advice**



**PERSONAL LOANS**

**Best Debt Consolidation Loans**

# EXHIBIT 3

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d

**EXCLUSIVE**   **HEALTHCARE**

# Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated

Questionable diagnoses of HIV and other maladies triggered extra Medicare Advantage payments; 'It's anatomically impossible'

By Christopher Weaver [Follow] , Tom McGinty [Follow] , Anna Wilde Mathews [Follow]  and Mark Maremont [Follow]  |
Graphics by Andrew Mollica [Follow]

Updated July 8, 2024 12:08 am ET

Gloria Lee was perplexed when the phone calls started coming in from a representative of her Medicare insurer. Could a nurse stop by her Boston home to give her a quick checkup? It was a helpful perk. No cost. In fact, she'd get a $50 gift card.

After several such calls in 2022, Lee agreed. A nurse showed up, checked her over, asked her questions, then diagnosed her with diabetic cataracts.

The finding was good news for Lee's insurer, a unit of UnitedHealth Group UNH **0.07%** ▲ . Medicare pays insurers more for sicker patients. In the case of someone like Lee with diabetic cataracts, up to about $2,700 more a year at that time.

But the retired accountant doesn't have diabetes, her own doctor later said, let alone the cloudy vision sometimes caused by the disease.

Private insurers involved in the government's Medicare Advantage program made hundreds of thousands of questionable diagnoses that triggered extra taxpayer-funded payments from 2018 to 2021, including outright wrong ones like Lee's, a Wall Street Journal analysis of billions of Medicare records found.

The questionable diagnoses included some for potentially deadly illnesses, such as AIDS, for which patients received no subsequent care, and for conditions people couldn't possibly have, the analysis showed. Often, neither the patients nor their doctors had any idea.

Medicare Advantage, the $450-billion-a-year system in which private insurers oversee Medicare benefits, grew out of the idea that the private sector could provide healthcare more economically. It has swelled over the last two decades to cover more than half of the 67 million seniors and disabled people on Medicare.

Instead of saving taxpayers money, Medicare Advantage has added tens of billions of dollars in costs, researchers and some government officials have said. One reason is that insurers can add diagnoses to ones that patients' own doctors submit. Medicare gave insurers that option so they could catch conditions that doctors neglected to record. The Journal's analysis, however, found many diagnoses were added for which patients received no treatment, or that contradicted their doctors' views.

CASE 0:24-cv-01743-JMB-JFD    Doc 120-3    Filed 06/12/25    Page 11 of 36



Insurers added diabetic cataract diagnoses to many patients treated by Goodyear, Ariz.,
ophthalmologist Dr. Howard Chen. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

The insurers make new diagnoses after reviewing medical charts, sometimes using artificial intelligence, and sending nurses to visit patients in their homes. They pay doctors for access to patient records, and reward patients who agree to home visits with gift cards and other financial benefits.

Insurers added diabetic cataract diagnoses to 148 patients treated by Dr. Howard Chen, an ophthalmologist in Goodyear, Ariz. He said he saw at most one or two such cases a year.

He said he charges insurers $40 per patient to cover his costs for providing them with medical charts.

"If they are just making stuff up, then why do they even need or want my charts?" said Chen.

In all, Medicare paid insurers about $50 billion for diagnoses added just by insurers in the three years ending in 2021, the Journal's analysis showed.

UnitedHealth and other insurers say they use the home visits and chart reviews to help coordinate patients' care and ensure accurate diagnoses.

UnitedHealth spokesman Matthew Wiggin said the Journal's analysis is "inaccurate and biased," and that Medicare Advantage "provides better health outcomes and more affordable healthcare for millions of seniors" than traditional Medicare.

He said Medicare Advantage plans record diagnoses more completely than doctors treating traditional Medicare patients, and that insurers "identify disease states earlier." He declined to comment about Lee, citing a healthcare privacy law.

The Journal consulted more than a dozen experts, including academics, actuaries and policy analysts, about its analysis of the Medicare data, who said the methodology was sound.

A spokeswoman for the Centers for Medicare and Medicaid Services, which oversees Medicare, said the agency was making changes that would continue to ensure "taxpayer dollars are appropriately spent." Medicare Advantage "offers robust and stable options" for beneficiaries, the spokeswoman said.

CASE 0:24-cv-01743-JMB-JFD    Doc. 120-3    Filed 06/12/25    Page 12 of 36

The Journal reviewed the Medicare data under a research agreement with the federal government. The data doesn't include patients' names, but covers details of doctor visits, hospital stays, prescriptions and other care. The Journal identified the patients named in this article through their doctors.

Some diagnoses claimed by insurers were demonstrably false, the Journal found, because the conditions already had been cured. More than 66,000 Medicare Advantage patients were diagnosed with diabetic cataracts even though they already had gotten cataract surgery, which replaces the damaged lens of an eye with a plastic insert.

"It's anatomically impossible," said Dr. Hogan Knox, an eye specialist at University of Alabama at Birmingham. "Once a lens is removed, the cataract never comes back."



Dr. Chen reviewing patient charts requested by Medicare Advantage insurers. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

Another 36,000 diabetic cataract patients didn't receive any medical services or prescription drugs related to diabetes.

## No treatment

About 18,000 Medicare Advantage recipients had insurer-driven diagnoses of HIV, the virus that causes AIDS, but weren't receiving treatment for the virus from doctors, between 2018 and 2021, the data showed. Each HIV diagnosis generates about $3,000 a year in added payments to insurers.

Everyone with HIV should be on antiretroviral drugs, the only effective treatment, and nearly all Medicare patients whose doctors diagnosed the virus took the drugs. Less than 17% of patients with insurer-driven HIV diagnoses were on them, the Journal found.

"It seems like almost all of those people don't have HIV," said Jennifer Kates, HIV policy director at KFF, a health-research nonprofit. "If they did, that would be substandard care at a pretty severe level," she said.

CASE 0:24-cv-01743-JMB-JFD   Doc. 120-3   Filed 06/12/25   Page 13 of 36

## Treatment Gap

Patients diagnosed with various conditions by Medicare Advantage insurers received typical treatments for their conditions at lower rates than those diagnosed by doctors.



Note: Includes diagnoses from 2018-21. Patients diagnosed by doctors include both Medicare Advantage and traditional Medicare enrollees. Numbers are subject to rounding.

A spokesman for Humana, the second biggest Medicare Advantage insurer, provided a written statement that said the Journal's analysis of treatment rates for people with insurer-driven diagnoses "is flawed and misleading."

The company said that internal data showed its HIV patients who got diagnosed in one way, through home visits, were on antiretroviral treatment at a far higher rate than the Journal found. The Medicare data show about one-third of those Humana patients were on the drugs.

Wiggin, the UnitedHealth spokesman, called the Journal's analysis flawed because it correlates insurer-driven diagnoses with subsequent medical care.

He said internal company data for 2022 showed a treatment rate for patients UnitedHealth diagnosed with HIV of more than triple what the Journal found. He said the pandemic disrupted care, lowering treatment rates during the period analyzed by the Journal, and that the analysis failed to account for patients who started treatments in future years.

The Medicare data, however, show UnitedHealth's patients with insurer-driven HIV diagnoses were on the antiretrovirals at low rates even before the pandemic, and hardly any started the drugs in the years after UnitedHealth diagnosed them.

Some of the insurer-driven diagnoses startled patients. Harriet Siskin, a retired customer-service worker, was diagnosed last year with obstructed arteries in her legs by a doctor who visited her house on behalf of her insurer, Humana, which stood to make an extra roughly $2,300 a year from the diagnosis.

"He told me that I may have some sort of artery blockage," said Siskin, who tested negative a few months later after her regular doctor ordered a full work-up. "He did scare me."

Humana's written statement said Siskin's primary-care doctor also submitted the diagnosis when he treated her following the home visit. It said Humana learned from the Journal that Siskin had later tested negative for the disease, and was working to correct the diagnosis.

Exclusive | Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated - WSJ

## UnitedHealth's HIV Treatment Rate

The insurer diagnosed 1,285 patients with HIV in 2018. Most stayed in Medicare Advantage through 2021, but few received recommended HIV treatments.

"[W]e strive for complete and accurate clinical information about our members, and to help them get the care they need," Humana said.

Many patients may never know they have been misdiagnosed by their insurers, and doctors often don't know when insurers have added diagnoses of their patients.

Insurer-driven diagnoses by UnitedHealth for diseases that no doctor treated generated $8.7 billion in 2021 payments to the company, the Journal's analysis showed. UnitedHealth's net income that year was about $17 billion.



**2018 patients still in Medicare Advantage**

| | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Total | 1,285 | 1,285 | 1,233 | 1,167 |
| 2018 patients on antiretroviral drugs | 168 | 139 | 129 | 129 |

**Sick Pay**

Average insurer-driven diagnosis payments per member varied widely among the five biggest Medicare Advantage insurers in 2021.

Number of members (millions): 2.5 / 1.0 / 0.1

*Each dot is an insurer*

- Kaiser Permanente $131
- Elevance Health $527
- Humana $573
- CVS/Aetna $941
- UnitedHealth $1,434

UnitedHealth added diagnoses at a far higher rate than other major insurers.

⟵ AVERAGE PAYMENT PER MEDICARE ADVANTAGE MEMBER ⟶

(scale: 0 — 500 — 1,000 — $1,500)

Note: Limited to insurers with 10,000 or more members.

UnitedHealth's Wiggin said the Journal's calculations appear accurate. He said the added payments are "not simply earnings for the company," but help pay for medical care, lower premiums and provide other benefits for Medicare Advantage members.

Humana disputed the Journal's calculation that the company had received $2.2 billion in 2021 payments from insurer-driven diagnoses, saying that total didn't reflect chart reviews that lowered payments by removing diagnoses.

CASE 0:24-cv-01743-JMB-JFD    Doc 120-3    Filed 06/12/25    Page 15 of 36

Sometimes, insurers didn't remove potentially outdated diagnoses. The Journal's analysis found that between 2018 and 2021, nearly 50,000 Medicare Advantage patients completed a course of high-cost drugs that almost always cures hepatitis C, a virus that can cause serious liver damage.

Insurers subsequently told Medicare that more than half of the patients who had received the drug treatment still had hepatitis C in a future year, leading to millions of dollars in extra payments. The diagnoses came from the insurers' chart reviews and assessments, and from physician claims that insurers didn't correct.

"They're totally wrong," said Douglas Dieterich, director of the Institute for Liver Medicine at Mount Sinai Health System in New York. "Real world evidence is a 99% cure rate."

## Cost concerns

When Congress conceived of the Medicare Advantage program decades ago, the hope was that insurers would make Medicare more efficient. In traditional Medicare, doctors and hospitals get paid for each service they provide, an incentive to provide more. The idea behind Medicare Advantage was to pay private insurers a lump sum to cover all services, giving them an incentive to keep patients healthier.



Harriet Siskin was diagnosed with obstructed arteries in her legs by a doctor who visited her house on behalf of her insurer. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

To protect insurers from the risk of winding up with sicker-than-average patients, the government allowed bigger payments for certain serious health conditions.

Partly because of that, Medicare Advantage has cost the government an extra $591 billion over the past 18 years, compared with what Medicare would have cost without the help of the private plans, according to a March report by the Medicare Payment Advisory Commission, or MedPAC, a nonpartisan agency that advises Congress. Adjusted for inflation, that amounts to $4,300 per U.S. tax filer.

Academic researchers and government investigators have raised questions about high rates of insurer-driven diagnoses in Medicare Advantage. In a 2021 report, the inspector general that oversees Medicare found the agency spent billions of dollars based on insurer-driven diagnoses for which patients received no care from doctors.

A 2019 whistleblower lawsuit by a Florida doctor alleged that an insurer submitted inaccurate diagnoses, including that a Medicare Advantage patient's foot had been amputated when it wasn't. The insurer, Freedom Health, denied the

CASE 0:24-cv-01743-JMB-JFD     Doc. 120-3     Filed 06/12/25     Page 16 of 36

allegations, and a spokeswoman for Elevance Health, which now owns Freedom, declined to comment.

In September, insurer Cigna Group agreed to pay $172 million to settle civil-fraud allegations by the Justice Department over its Medicare Advantage practices. Cigna admitted to adding diagnoses that weren't supported by patients' medical records. Cigna declined to comment.

Government contractors audit Medicare Advantage plans and eventually can recoup payouts for inaccurate diagnoses. An insurance industry trade group, AHIP, said in a written statement that such audits have found Medicare Advantage insurers to be highly accurate.

Medicare administrators are overhauling the list of diseases for which insurers earn higher payments. Some of the most heavily used diagnoses, including diabetic cataracts, will pay less or nothing extra after the changes take full effect in 2026. But new diagnoses, including asthma, were added to the list of conditions warranting extra payments.

CMS said its changes showed it is a "good steward of taxpayer dollars."

John Gorman, a former Medicare official and founder of two companies that review records and conduct home visits on behalf of Medicare insurers, doesn't think the changes will solve the problem. "Any time you base a system like this on diagnosis codes, there's going to be rampant abuse of the system," he said. Insurers "will find something else to make up the revenue."

In 2019, Medicare added dementia to the list of diseases that pay more. That same year, the reported rate of the disease among Medicare Advantage members jumped 7.8% after holding flat for years before that, University of Southern California researchers found.

## Vision problems

Cataracts are extremely common in the elderly—pretty much everyone gets them. Diabetes also is common, so it isn't unusual for old people to have both. But eye doctors say they rarely diagnose cataracts caused by diabetes in old people. It usually isn't possible to pinpoint the cause, and in any case, the treatment is the same.

For Medicare Advantage insurers, a big difference between the two forms of cataracts is that the government only pays extra for the diabetic ones.

CASE 0:24-cv-01743-JMB-JFD Doc 120-3 Filed 06/12/25 Page 17 of 36



Siskin pointing to results of test ordered by a specialist who concluded that she didn't have peripheral artery disease. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

Some insurers interpreted U.S. guidelines for recording diagnoses in the broadest possible way, labeling patients with diabetes and any kind of cataract with the more lucrative diagnosis. They did it even when doctors said the patients only had the old-age form of the disease or had no diabetic complications at all, the data show.

"If you suspected that it could be connected, they felt they would be justified in connecting it," said Shannon Decker, a former UnitedHealth employee. "It's an easy capture."

UnitedHealth didn't respond to written questions about its practices for recording diabetic cataract cases.

Over four years, insurers added diabetic-cataract diagnoses to 112 patients of Dr. Stephen McConnell, an ophthalmologist in Brunswick, Ga., the data show. "That's unbelievable," said McConnell, who said he had no idea what was happening until informed by the Journal.

Dr. Javier Pérez, an Orlando, Fla.-based eye surgeon, treated hundreds of patients who insurers claimed have diabetic cataracts, the Medicare data show. On average, they were the same age as his old-age cataract patients, about 72.

"Just because you're diabetic doesn't mean you have a diabetic cataract," he said, adding that most almost certainly have old-age cataracts, not ones caused by diabetes. "You can be diabetic and be old," he said.

Lee, the 70-year-old retired accountant from Boston, recalled that her visit with the nurse practitioner sent by UnitedHealth lasted about 20 minutes. The nurse worked for HouseCalls, a unit of UnitedHealth.

UnitedHealth said that in 2023 three million "gaps in care" were identified during such home visits, which typically last 45 to 60 minutes. It said HouseCalls workers called ambulances 624 times that year after identifying emergencies, and that the visits had a 99% customer-satisfaction rate.

Former employees said UnitedHealth also uses the visits to add diagnoses. A HouseCalls home-visit training manual, which was reviewed by the Journal, describes software used on the laptops that workers carry on home visits. According to the manual, the software offers suggestions about what illness a patient might have—and even adds some automatically to a "diagnosis cart."

CASE 0:24-cv-01743-JMB-JFD   Doc. 120-3   Filed 06/12/25   Page 18 of 36

The nurse visiting Lee concluded that her minor cataracts were caused by diabetes that was severe enough to have triggered nerve damage, according to a letter from HouseCalls to her primary care doctor that was reviewed by the Journal. A diabetes test done during the visit was negative, according to the letter.

Lee's doctor, Nancy Keating, also a professor at Harvard Medical School, said her patient has never had diabetes, let alone complications like diabetic cataracts or nerve damage—a conclusion confirmed by subsequent blood tests.

"It's all just so wrong," Keating said.

Lee agrees. "If they're going to come out and diagnose people with things they don't have, they shouldn't get any more money," she said.

Lee switched to another health plan this year.

Write to Christopher Weaver at Christopher.Weaver@wsj.com, Tom McGinty at Tom.McGinty@wsj.com, Anna Wilde Mathews at Anna.Mathews@wsj.com and Mark Maremont at Mark.Maremont@wsj.com

*Appeared in the July 9, 2024, print edition as 'Medicare Paid $50 Billion To Insurers for Untreated Ills'.*

# EXHIBIT 4



NATSUMI CHIKAYASU FOR STAT

## A STAT INVESTIGATION

# Health Care's *Colossus*

---

**How UnitedHealth harnesses its physician empire to squeeze profits out of patients**

*By* Bob Herman , Tara Bannow , Casey Ross , *and* Lizzy Lawrence

July 25, 2024

This is the first in a periodic series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence.

UnitedHealth Group started out as a small, Minnesota health insurance company and has since morphed into a modern-day Standard Oil, exerting unmatched dominance over health care in the United States.

It's no secret that UnitedHealth is a colossus: It's the country's largest health insurer and the fourth-largest company of any type by revenue, just behind Apple. And thanks to a series of stealthy deals, almost 1 in 10 U.S. doctors — some 90,000 clinicians — now either work for UnitedHealth or are under its influence, more than any major clinic chain or hospital system.

But behind those statistics, there's a lot UnitedHealth doesn't want you to know. A STAT investigation reveals the untold story of how the company has gobbled up multiple pieces of the health care industry and exploited its growing power to milk the system for profit. UnitedHealth's tactics have transformed medicine in communities across the country into an assembly line that treats millions of patients as products to be monetized.

Central to these tactics is UnitedHealth's unrivaled leverage over physicians, whose diagnoses help determine how much private insurers get paid for covering older adults. Dozens of former doctors and employees at UnitedHealth medical practices told STAT how they became enmeshed in UnitedHealth's strategy to make their patients seem as sick as possible. Doctors said the company had a fixation with medical coding to generate more revenue — encouraging clinicians through bonuses and performance reviews to identify more health problems in patients, even if those conditions seemed dubious.



An early 20th century editorial cartoon depicts a "Standard Oil" tank as an octopus with tentacles wrapped around the steel, copper, and shipping industries, as well as a state house, the U.S. Capitol, and the White House. *Udo J Keppler/Library of Congress*

By controlling doctors, UnitedHealth can lean on them to practice in ways that benefit the insurer, and use its insurance arm to funnel cash back to its clinicians — similar to how Standard Oil amassed power as both the buyer and seller in oil refining. Through these efforts, and by adeptly navigating the Medicare Advantage payment system, UnitedHealth has squeezed potentially tens of billions of extra dollars from taxpayers over the past decade, according to STAT estimations based on federal data. The relationship

9/30/24, 10:29 AM
CASE 0:24-cv-01743-JMB-JFD    Doc. 120-3    Filed 06/12/25    Page 22 of 36
Inside UnitedHealth's doctor empire | STAT

between UnitedHealth's insurance company and physician practices is the focus of an ongoing [Department of Justice antitrust probe](#).

Doctors interviewed by STAT said they were initially seduced by the company's sales pitch that it would be hands-off and help them provide high-quality care, but they quickly became disillusioned. UnitedHealth has required some physicians to see as many as four patients per hour, a difficult task if any of those patients are new to a clinic, they said. Patients, meanwhile, are wondering why their doctors are rushing through their appointments — if they can get seen at all — and have expressed alarm when concerning diagnoses pop up in their medical records, many of which were never mentioned by their physicians.

Susan Baumgaertel experienced the shift firsthand. She is an internal medicine physician who spent 25 years — almost her entire career — at The Polyclinic, a large multispecialty group in Seattle. After UnitedHealth took over in 2018, Baumgaertel said the company pressured her and her colleagues to code patients for certain conditions, including some that the doctors didn't think applied. She quit in 2021.

"We were not truly caring for patients anymore," Baumgaertel said. "We were just micromanaging their care to bring in money. It just felt so unconscionable."

She's become an unofficial therapist for dozens of her colleagues who still work at UnitedHealth practices, dispensing advice and words of comfort over hours-long walks or coffee dates. Recently, Baumgaertel was on the phone with another physician who worked at a UnitedHealth-owned clinic at the time, and had just pulled up in front of her house.

"She was crying in her car. She said, 'Susan, I can't leave. I'm the breadwinner. I have to have insurance. My husband is a stay-at-home dad,'" Baumgaertel recalled. She could hear her friend's kids knocking on the car window. "She felt trapped. I hear this over and over again."



**UnitedHealth revenue outpaces many of the nation's largest companies**

Total revenue in 2023, in billions of dollars

**UnitedHealth Group is larger than...**

| | $0 | $50 | $100 | $150 | $200 | $250 | $300 | $350 | |
|---|---|---|---|---|---|---|---|---|---|
| UnitedHealth Group | | | | | | | | | $371.6 |
| Berkshire Hathaway | | | | | | | | | $364.5 |
| CVS Health | | | | | | | | | $357.8 |
| Alphabet | | | | | | | | $307.4 | |
| Costco | | | | | | | $237.7 | | |
| Microsoft | | | | | | $211.9 | | | |
| Ford Motor Co. | | | | | $176 | | | | |

**On its own, Optum Health would be a Fortune 50 company**

| | $0 | $50 | $100 | $150 | $200 | $250 | $300 | $350 | |
|---|---|---|---|---|---|---|---|---|---|
| Optum Health | | | $95.3 | | | | | | |
| Johnson & Johnson | | | $95.2 | | | | | | |

| | |
|---|---|
| PepsiCo | $91.5 |
| UPS | $91 |
| FedEx | $90.2 |
| Walt Disney Co. | $88.9 |
| Boeing | $77.8 |

Optum Health includes its physician groups, surgery centers, post-acute services, telehealth, home health, and bank.

Chart: J. Emory Parker/STAT ● Source: Fortune, company filings

STAT's reporting is based on interviews with more than two dozen current and former UnitedHealth doctors and executives conducted over the past six months. STAT also spoke with health policy experts and patients, examined court records, and read UnitedHealth's 600-page medical coding bible. Many of the UnitedHealth doctors and executives, and even some patients, asked for anonymity — expressing concerns the company could take them to court, derail their careers, or alter their care.

Accounts from clinicians like Baumgaertel challenge UnitedHealth's stated rationale for its increasing control over health care. The company says owning medical groups, while also being the insurer, will allow for better preventive care that is "value-based." Why wait for people to show up in the emergency room with serious, costly issues when you can keep an eye on them in the clinic and intervene earlier?

UnitedHealth declined to make executives available for interviews and did not answer a detailed list of questions. In a statement to STAT, spokesperson Eric Hausman said the company's "providers and partners make independent clinical decisions, and we expect them to diagnose and document patient information completely and accurately in compliance with [federal] guidelines. We provide training and other practice support to providers because it leads to better care management, coordination, and patient follow-up. Regulators routinely audit this documentation."



UnitedHealth Group headquarters in Minnetonka, Minn. *Jenn Ackerman for STAT*

From the start, the takeover of physician practices by the nation's largest health care company has been carefully choreographed.

UnitedHealth's leadership team is filled with people who have stayed at the company a long time, and have enriched themselves by doing so. Those executives have leveraged a system that has put patients' medical charts at the center of how companies get paid. They have lobbied the government over policies that further entrench UnitedHealth's market power. Several executives have held powerful federal health care positions of their own. And they have capitalized on the government nudging more older adults to enroll in privatized Medicare Advantage plans. UnitedHealth's clinics and outpatient centers now provide care for about 103 million Americans, according to the company's own estimates.

In 2007, at a Wall Street conference in a posh midtown Manhattan hotel, UnitedHealth's then-CEO Stephen Hemsley telegraphed that UnitedHealth — already a rapidly expanding health care company — saw itself as much more than just an insurer. "I would ask you to begin to think about UnitedHealth Group and the construct of its business, its capabilities, its reach in the marketplace, as a health care system unto itself," he said.

That same year, UnitedHealth struck a deal for an insurance company that owned Southwest Medical Associates, a group of clinics located throughout Nevada — the company's first large medical group. This happened as the health care industry was on the cusp of its biggest transformation since the advent

of Medicare nearly five decades earlier — changes that would ultimately reinforce UnitedHealth's new direction and spur it to double down on doctors.

The Affordable Care Act, which President Barack Obama signed into law in 2010, limited the amount of profit insurers could make on health insurance. That encouraged many insurers to branch into other lines of business where profit wasn't capped — such as providing medical care. The law also sought to tweak how doctors and hospitals got paid by adding incentives for keeping patients healthy instead of just paying for every visit or procedure. That meant, of course, more collaboration between providers and insurers.

The result was consolidation across all corners of the industry: Insurers bought insurers. Hospitals bought hospitals. And doctors — many of them overwhelmed by new rules around documentation and using electronic health records — flocked to hospitals, private equity firms, and insurers that could handle the administrative burden. UnitedHealth's Optum subsidiary was one of the biggest players in the feeding frenzy, bringing tens of thousands of doctors under its umbrella. Today, less than half of the country's doctors work at physician-owned practices, according to the American Medical Association.

As for UnitedHealth, Hemsley, along with former Optum CEO Larry Renfro and several other top executives, positioned themselves as architects of the company's physician empire. Hemsley still serves as UnitedHealth's board chair and has his own investment firm. Renfro, who led Optum from its reorganization in 2011 until 2018, now works at UnitedHealth's venture capital firm.

While UnitedHealth expanded in patient care, it also grew its dominance in Medicare Advantage, the alternative to traditional Medicare that is run by private insurers and now covers more than half of all Medicare beneficiaries. UnitedHealth has had the biggest slice of enrollment in the program for more than a decade, growing from 20% of Medicare Advantage enrollees in 2010 to almost 30% in 2023.

That simultaneous growth was no accident. Medicare Advantage insurers depend on clinicians to enter diagnosis codes into patients' medical records. Those codes turn into risk scores that explain how sick the patient is and, in turn, how much money the government pays their insurer for their medical care.

Medicare Advantage insurers have gamed the system by excessively coding their members, resulting in massive overpayments to the companies. Overpayments based on coding alone are expected to total $50 billion this year, more than the Department of Justice's entire budget, according to the Medicare Payment Advisory Commission, a group of experts that advises Congress on Medicare. Since 2007, MedPAC estimates Medicare Advantage insurers have reaped $217 billion in coding overpayments from the federal government.



How insurers use doctors to profit off medical codes

As the country's biggest Medicare Advantage insurer and its biggest physician group, nobody is better positioned to extract massive sums from the program than UnitedHealth. The company is still facing a federal lawsuit alleging it continued to collect government money based on millions of patient diagnoses it knew were incorrect. UnitedHealth has disputed the allegations and continues to contest them in court.

While UnitedHealth operates in a completely different industry than did Standard Oil, they have unmistakable similarities, starting with their ambitions to stealthily expand. When Standard Oil was acquiring competing oil refineries in the 1860s and 1870s, the conglomerate did so with little trace. Under its founder John D. Rockefeller, Standard Oil scooped up nearly all the refineries in the Cleveland area, but few newspapers were aware of the growing monopoly.

"It had all been accomplished in accordance with one of Mr. Rockefeller's chief business principles — 'Silence is golden,'" journalist Ida Tarbell wrote in "The History of the Standard Oil Company."

UnitedHealth rarely announces its takeovers of physician clinics and outpatient centers. In part, that's because the acquisitions are small compared with its overall size and therefore don't have to be disclosed to financial regulators. It also has downplayed the number of physicians it controls through employment and other financial agreements.

Of UnitedHealth's 90,000 physicians, 10,000 are employed, and the others are affiliated through "value-based care arrangements," the company said. It's unclear what the financial parameters of those affiliations are, and UnitedHealth declined to clarify. In a statement, UnitedHealth's Hausman said, "The vast majority of the physicians we work with are independent and choose to work with us," reiterating CEO Andrew Witty's remarks to Congress.

But UnitedHealth has clearly targeted specific, important medical groups and outpatient surgery centers in markets where it also has the most Medicare Advantage enrollees. The company's strategy goes like this: If UnitedHealth could get more of its insurance members to go to its own physicians, the company would get to pay itself with money that previously would have gone out the door.

"Controlling the physicians is incredibly lucrative for maximizing risk-coding payments. It's hard to overstate just how lucrative this can be," said Hayden Rooke-Ley, an Oregon-based attorney and senior fellow for health care at the American Economic Liberties Project. He has written about the risks of insurers owning physician groups. "This is the singular explanation for why insurance companies are getting into the business of care delivery, particularly of primary care."



At the core of amassing its doctor empire was luring physicians. UnitedHealth quickly found the surest approach: Money, and a lot of it.

Some groups needed cash to invest in new electronic health records and other technology, or were facing financial distress. Physicians who bought into the idea of less wasteful care and more prevention opted to sell to UnitedHealth rather than to private equity or their local hospital systems. Plus, physicians nearing retirement were looking for a golden parachute, and UnitedHealth in some cases dangled huge sums of cash, according to multiple former physicians who sold practices to UnitedHealth and other employees.

"The doctors wanted the moolah, especially the older physicians," said a former employee of a UnitedHealth clinic in the western U.S.

# Timeline of UnitedHealth's biggest physician acquisitions



Six former UnitedHealth doctors said that when UnitedHealth took over medical groups, nothing would immediately change. But as the weeks and months passed, UnitedHealth would begin to overhaul their schedules: They were expected to see more patients, perform more physicals, and conduct more annual wellness visits. Some said they were required to see three or even four patients per hour.

In 2022, UnitedHealth acquired Atrius Health, then the largest independent doctor group in Massachusetts. Eleanor Hobbs, an urgent care physician, soon began dreading her shifts because her new corporate owner required her to see patients every 20 minutes. Previously, she saw a patient every 30 minutes. Hobbs, 76, had planned to work longer, but instead retired earlier this year.

"When I retired, my feeling was: I feel just like an Amazon warehouse worker, where all I'm doing is 20 minutes, 20 minutes, 20 minutes, 20 minutes," Hobbs said. "Just do it. Don't ask how the patient feels about it. Don't ask what kind of a moral injury it feels like to me. It was awful."

The pressure to treat patients as if they were fields of medical codes to be harvested, instead of people who have complex histories, soon followed. More than a dozen former doctors and employees from seven different practices nationwide described how UnitedHealth pushed its clinicians to document as many ailments as they could by offering bonuses or reviewing the performance of those who were not coding as much as their peers.

"If your numbers aren't great, they meet with you individually. It just felt like at every avenue possible, you were reminded of it," a former Polyclinic provider said.

Nine clinicians told STAT they were instructed to document conditions they didn't believe applied. Six former UnitedHealth physicians said the shift has been most apparent since the Covid-19 pandemic, as they've been encouraged to catch up on coding after patients stayed at home instead of going in for routine checkups.

"It's very frustrating to me as a physician to see something that was really intended to be a way to pay primary care doctors to do good, preventive risk assessment," a physician formerly at UnitedHealth's New West Physicians group in Colorado said of risk scores and coding. "And it's turned into this coding vehicle where, 'How do we drop as many codes as we can?'"

Potentially improper coding routinely came up in the same categories, such as peripheral vascular disease and chronic kidney disease, former UnitedHealth doctors said. One study from 2022, crafted by UnitedHealth's own physician researchers, shows that UnitedHealth's physicians coded Medicare Advantage patients as having lung disorders, vascular conditions, and kidney disease at more than two times the rate of those in the traditional Medicare program.

A separate review of provider data suggests the trend was broader than just UnitedHealth. It shows the rate of vascular disease testing and diagnosis across providers in a national dataset more than doubled

between 2018 and 2023 among patients aged 50 and older. The analysis, based on electronic health record data and conducted by the health analytics company Truveta for STAT, also showed the rate of testing and diagnosis decreased in spring 2024, after Medicare eliminated a particularly lucrative code for patients with peripheral vascular disease without complications.

Part of the issue is the difference in the federal programs. Traditional Medicare pays doctors for each service they provide, while the government pays Medicare Advantage insurers based on how sick their members are, as determined by codes from doctors. Health policy experts say traditional Medicare undercounts older adults' ailments. Coding and documentation also can be more of an art than a science at times, especially for complex patients who have a lot of medical problems. But within Medicare Advantage, conditions that can be open for interpretation can be exploited.

"There are probably a subset of diagnostic codes that are kind of squishy. They're kind of subjective. They're kind of game-able," said Chris Pope, a senior fellow at the Manhattan Institute, a conservative think tank, who has studied Medicare Advantage coding.

Four doctors told STAT it was common to get panicked calls from patients. They wanted to know why their online medical charts said they had chronic kidney disease or vascular disease even though their doctors hadn't mentioned it during their visits. When Baumgaertel got those calls, she said she always tried to tell patients the truth, as uncomfortable as it was: I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more.



Primary care physician Susan Baumgaertel said after UnitedHealth took over The Polyclinic in Seattle, the company pressured doctors to code patients for certain conditions, including some they didn't think applied. "It just felt so unconscionable." *Courtesy Susan Baumgaertel*

"It was almost to the point of being embarrassing," she said. "These are people I've known for a long time, and they're like, 'Susan, what's going on?'"

Doctors said that UnitedHealth medical directors and administrators pressured them to increase codes for a variety of different ailments, even if they thought those codes didn't fit patients' conditions. As one example, more than a half dozen clinicians said UnitedHealth used an unreliable device to screen nearly

all of its Medicare Advantage patients for peripheral arterial disease as a way to boost vascular disease diagnoses.

Another example is chronic kidney disease. It's normal for people's kidney function to decline as they age, but five doctors said UnitedHealth pushed them to code for that condition even if they felt the patients' diminished kidney function was appropriate for their age and unlikely to cause harm.

"The number of elderly patients I had who had legit panic episodes when they went to their chart and found out they had chronic kidney disease," a former Polyclinic doctor said. "I'd have to have this whole conversation with them about like, 'No, your kidney function is actually not that abnormal for your age, but because of this coding thing, blah blah blah.' That was awful."

Daniel Weiner, a nephrologist at Tufts Medical Center, said many older adults meet the technical definition of having chronic kidney disease based on tests that examine their kidney function. The problem is there's a limited number of codes for chronic kidney disease that cover a large group of people.

"There are clearly financial reasons to code people with chronic kidney disease, as some of these patients have extremely complex medical issues, but others, with the same code, are far healthier," he said.

Nick Jones, a primary care physician who joined Oregon Medical Group in Eugene just before UnitedHealth bought the practice, said the inaccurate code he saw most frequently in patients' records was long-term management of insulin. In some cases, he said, this code was applied to patients who received insulin once to lower their blood sugar before a surgery, but who never needed the drug again.

Jones said he finally got fed up when the Oregon Medical Group's electronic health record started making it mandatory that doctors attest to whether patients' Medicare Advantage codes had been checked off before they could close out a visit. The system gave the option to deny the codes, but that was more labor-intensive because it required an explanation for why the codes were wrong, he said.

UnitedHealth would regularly host educational sessions where company representatives spent hours teaching Oregon Medical Group doctors how to code Medicare Advantage patients, Jones said. He found it frustrating because the sessions never covered new research into specific conditions or resources available for patients, like nutritionists or case managers.

"I don't give a damn about what reimburses for what," said Jones, who now runs a practice called Clear Health Direct Primary Care. "I'm just going to code what I addressed during that visit."

Even surgeons were roped in, according to one who used to work at The Polyclinic.

"It just didn't make a lot of sense for a surgeon to talk to patients about chronic illnesses that didn't necessarily have a lot to do with their presenting complaint," he said. "We're not frankly specialized or qualified to do it."

Nine doctors reported being rewarded with bonuses if they met UnitedHealth's coding expectations. One former Polyclinic surgeon said it could be upwards of $30,000 per year. But if doctors didn't comply, it

affected their entire department, that surgeon said. UnitedHealth declined to respond to questions about whether it encouraged coding through bonuses and performance reviews, and whether it encouraged doctors to use specific codes that exaggerated patients' conditions.

"So are you going to be the turd — sorry — are you going to be the doctor, who is not compliant and causing your partners to lose thousands of dollars? No. And ultimately, that's what got me to be compliant," the former Polyclinic surgeon said. Eventually, he and his colleagues left for a different medical group.



Top UnitedHealth executives have gushed to investors over the past 15 years that thoroughly documenting patients' conditions is an untapped line of recurring revenue. UnitedHealth has become such an expert on the topic that it sells a coding bible to the medical community for $165.95. The 592-page book explains how the government's payment system works and provides advice on how to "capture" more conditions.

The tips give a sense for how the company views coding and documentation: as a way to distill patients to a series of numbers and decimals that translate into big dollar figures. Coders are taught that every 0.1 in coding equates to $1,000, more or less, from the government per year.

Does a patient have diabetes? That adds 0.166 to the risk score, according to the government's 2024 risk adjustment system, equating to $1,700 in annual Medicare payments. Congestive heart failure? That's another 0.36 to the patient's score, or $3,600. Severe obesity, cocaine use, Medicaid eligibility — all descriptors that lead to more money.

Some may assume Medicare Advantage insurers push for more documentation of these diagnoses because of a "desire to make a profit," UnitedHealth's 2024 coding guide reads. "This is a half-correct assumption," the guide concedes, before saying coding also ensures companies get enough money from the government to cover care.

UnitedHealth's guide emphasizes how coders should scour physicians' notes to see if there are other illnesses that aren't being captured. For example, it says doctors should mark down a patient's cancer diagnosis when they come in for an unrelated issue like a high cholesterol reading if that patient's records show they are actively seeing an oncologist and on cancer medication.

Richard Lieberman, a medical coding expert who helped develop the government's risk adjustment system, said there is "far too much gaming of risk coding, but also of documentation." Big companies like UnitedHealth have insulated themselves from more sweeping government investigations by justifying everything in medical charts, even if the diagnoses are wrong or based on flawed diagnostic tools, he said.

"It becomes sort of like a 'Catch Me If You Can' kind of scenario," Lieberman said. "Only when you get audacious is your number often up."

One doctor who used to work at UnitedHealth's WellMed practice in Florida told STAT that managers set a troublesome expectation that risk scores could only go up, not down. UnitedHealth's guide also explains how doctors and coders can "recapture" as many prior health conditions as possible. Things like fractures that have healed will fall off, but chronic conditions are expected to carry over. The assumption is that as people get older, they will have more diseases.

"There are a lot of targets that are just set to meet some obvious financial endpoint. They were unrealistic," the former WellMed physician said. "People like me didn't feel comfortable that these targets are the ones that we are getting our bonus based on, or people will even chase you and get you out of the company if you're not producing like other physicians."

UnitedHealth's coding book attempts to help people determine if conditions are appropriately documented. All they have to do is remember this mnemonic device: treatment, assessment, monitor, plan, evaluation, and referral — or TAMPER.



Sharon Maloney holds a photograph of her husband, Bill Sullo, who died in February 2023. *Tim Tai for STAT*

Hundreds of people [across the country](#) [have taken to Yelp](#) [and Google to gripe](#) [about longer](#) [waits for](#) [appointments](#) [and doctors](#) [quitting after UnitedHealth](#) assumed control of their clinics. It became tough to

get a real person on the phone, even after waiting for hours on hold. Billing mistakes became more common and difficult to resolve. Appointments felt rushed.

At the Polyclinic in Seattle, patient Todd Anderson said that after UnitedHealth took over, it became clear the company was trying to cut costs in every way possible. Check-in became centralized in a way that created a lot of confusion. Then came easily avoidable mistakes. The clinic sent the Seattle retiree's bill to the wrong health insurer, so it was rejected. Despite Polyclinic's repeated promises to fix the problem, Anderson was sent to collections. Then he was told if he wanted to stay on as a patient, he'd have to switch from his Aetna Medicare Advantage plan to a UnitedHealthcare one.

"Things changed rather dramatically, and it was pretty visible," Anderson said.

For some patients, waiting longer to be seen had serious consequences. Connecticut resident Sharon Maloney believes her husband might still be alive if he'd been able to see his doctor right away, as he'd been able to before UnitedHealth took over ProHealth Physicians in 2015. In the past, she said, ProHealth had reserved time for sick patients to be seen the same day.

Maloney's husband had several health issues, and he was taking medications for ulcerative colitis, chronic inflammation of the large intestine or rectum, that made him more susceptible to infections. In October of 2022, Maloney's husband had all the telltale signs of a UTI, but ProHealth couldn't get him in for three days. The day after he called ProHealth, his symptoms got so bad, Maloney took him to the hospital. By then, the infection had spread into his kidneys, leading to sepsis, antibiotics, a hospital-acquired infection, and, ultimately, his death last year.

"If he had been able to get a visit that day, if they had been able to identify the culture, and if they had gotten him on the antibiotic in the first couple of days, this slope would not have even started," Maloney said.

UnitedHealth didn't respond to questions about the care of Maloney's husband.

Former longtime Polyclinic patient Mary Woodbery said things that used to be simple now require a maze of specialist referrals and seemingly unnecessary tests. One time, her teenage son had a tiny cyst on his neck that she suspected was an ingrown hair. Instead of letting him see a dermatologist straight away, The Polyclinic first made him see a radiologist who performed an ultrasound and then a neck specialist. Finally, a dermatologist confirmed it was an ingrown hair. Woodbery was exasperated.

"They have answers. They just don't want to give them to you because they want to drag you through this endless chain of referrals so they can make sure all their departments are utilized," said Woodbery, a speechwriter living in Seattle who had seen the same Polyclinic doctor for over two decades before that doctor left.

UnitedHealth continues to absorb medical groups, including a contentious battle over The Corvallis Clinic in Oregon. Regret is starting to set in for some physicians who took UnitedHealth's offer. The coding dictates became too much for many to handle. For one former ProHealth physician in

Connecticut, remorse builds even more after hearing from longtime patients who are wondering why they can't get an appointment or why they have been mistakenly billed.

"Everybody thinks it was a catastrophe," the former ProHealth physician said. "They destroyed our practice."

**STORY CREDITS**

**Writing:** Bob Herman and Tara Bannow
**Reporting:** Bob Herman, Tara Bannow, Casey Ross, Lizzy Lawrence
**Editing:** Zachary Tracer
**Graphics:** Emory Parker and Alex Hogan
**Illustrations:** Natsumi Chikayasu
**Video:** Hyacinth Empinado
**Art and Photo Direction:** Alissa Ambrose
**Additional photo editing:** Crystal Milner
**Copy editing:** Karen Pennar, Sarah Todd
**Additional editing:** Gideon Gil, Rick Berke
**Design and development:** Jennifer Keefe, Julia Bujalski, Ben Lokshin

## About the Authors



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the Health Care Inc. newsletter.

bob.herman@statnews.com
@bobjherman



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers.

tara.bannow@statnews.com
@TaraBannow



**Casey Ross**

National Technology Correspondent

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter.

lizzy.lawrence@statnews.com
@LizzyLaw_

To submit a correction request, please visit our Contact Us page.