# EXHIBIT B-2

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>UNITEDHEALTH GROUP INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 24-cv-1743 (JMB/JFD)<br><br><u>CLASS ACTION</u><br><br>[PROPOSED] THIRD SUPPLEMENTAL CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

4902-9194-7617.v1

# EXHIBIT 2

CASE 0:24-cv-01743-JMB-JFD Doc. 152-3 Filed 08/25/25 Page 4 of 74

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/medicare-advantage-data-methodology-8e54a67c

**HEALTH** | **HEALTHCARE**

# How the Journal Analyzed Medicare Advantage Data

By *Christopher Weaver* [ Follow ] *and Tom McGinty* [ Follow ]

*July 7, 2024 10:50 pm ET*



The Centers for Medicare and Medicaid Services headquarters in Maryland. PHOTO: ROSEM MORTON FOR WSJ

The Wall Street Journal set out to examine the system under which Medicare Advantage insurers can collect extra federal money for patients with certain conditions.

The Journal reviewed Medicare data under a research agreement with the federal government. The data doesn't include patients' names, but covers details of doctor visits, hospital stays, prescriptions and other care.

For years 2018 through 2021, the Journal studied Medicare Advantage patients who were enrolled in a single plan for the full year and had drug coverage through Medicare.

The analysis excluded those with advanced kidney disease, who received hospice care or who were enrolled in certain types of Medicare plans with atypical payment rules.

Those criteria yielded an average of 20 million enrollees in each year of the analysis, or about 84% of all Medicare Advantage members.

The Journal analyzed roughly two billion diagnoses that those patients received from either doctors, hospitals or their insurance companies. Next, it narrowed those diagnoses to ones listed on claims that qualify under Medicare rules to be considered for so-called risk-adjustment payments—extra payments to Medicare Advantage insurers.

Among those 1.6 billion diagnoses, the Journal determined which ones were added by insurers, either after reviewing doctors' charts or sending medical workers to do assessments in patients' homes. The Journal identified claims resulting from home assessments based on criteria used by other researchers, and counted anyone with up to two such visits.

The next steps were to figure out which diagnoses actually result in extra payments, and among those, which were due only to diagnoses added by insurers.

The Journal then matched up those diagnoses with payment categories set by Medicare, called Hierarchical Condition Categories, or HCCs. Not every diagnosis leads to a payment, and some cancel out others. Insurers, for example, can't get paid extra for a patient's depression if they already are getting paid extra for schizophrenia.

Next, for each category and patient, the Journal checked whether the related diagnoses came just from insurers or included physicians' diagnoses.

To determine how much extra money Medicare paid for the insurer-driven diagnoses, the Journal calculated payments for those HCCs using a formula published by Medicare. The formula includes a base payment amount, a geographic adjustment and some other adjustment factors.

To estimate the base payment amounts, the Journal used plan payment data that Medicare has published through 2021. The Journal estimated the geographic

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 6 of 74

adjustments using public plan enrollment data and cost data published by Medicare.

The Journal used data from the system Medicare currently uses to calculate Medicare Advantage payments. During the Journal's study period, Medicare used a now mostly retired data system for some of its payment calculations, but researchers say diagnoses were consistent between the two systems.

The Journal then sought to determine whether patients with diagnoses added just by insurers received typical treatments for those conditions at the same rates as those diagnosed by their doctors. The Journal interviewed medical experts to come up with lists of prescription drugs considered standard treatments for most patients with certain diseases.

For each disease, the Journal determined whether each patient had at least one prescription filled for a recommended drug in a calendar year when they received the diagnosis. The Journal then compared the drug-treatment rates for two groups of patients: Medicare Advantage patients with diagnoses only from their insurers, and all Medicare patients who got diagnoses from their doctors.

The Journal also studied questionable diagnoses, such as for diabetic cataracts in people who had already had cataract surgery in both eyes. In that analysis, the Journal identified people for whom insurers had been billed by eye surgeons treating both their left and right eyes, but who had a diagnosis of diabetic cataracts in a calendar year after both eyes had been repaired.

Write to Christopher Weaver at [Christopher.Weaver@wsj.com](mailto:Christopher.Weaver@wsj.com) and Tom McGinty at [Tom.McGinty@wsj.com](mailto:Tom.McGinty@wsj.com)

**Further Reading**

**Dr. Oz Criticizes Some Medicare Advantage Business Practices**

**Sen. Grassley Opens Inquiry Into UnitedHealth's Medicare Billing Practices**

OPINION    **American Health Insurance Needs a Check Up**

**Health Insurers Deny 850 Million Claims a Year. The Few Who Appeal Often Win.**

**How Health Insurers Racked Up Billions in Extra Payments From Medicare Advantage**

---

## Videos



### WSJ Opinion: Hits and Misses of the Week

### Highlights: Dr. Oz Confirmation Hearing to Head Medicare and Medicaid

### Musk: 'Waste' in Entitlement Spending Is 'Big One to Eliminate'

## Buy Side from WSJ

Buy Side is independent of The Wall Street Journal newsroom.



**BANKING**

### Here Are Today's Best CD Rates



**BANKING**

### How to Choose the Best High-Yield Savings Account



**BANKING**

### What Is a Money Market Account (MMA)? Rates and Advice



**PERSONAL LOANS**

### Best Debt Consolidation Loans

# EXHIBIT 3

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d

EXCLUSIVE   HEALTHCARE

# Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated

Questionable diagnoses of HIV and other maladies triggered extra Medicare Advantage payments; 'It's anatomically impossible'

*By Christopher Weaver* [Follow] *, Tom McGinty* [Follow] *, Anna Wilde Mathews* [Follow]  *and Mark Maremont* [Follow]  | *Graphics by Andrew Mollica* [Follow]

Updated July 8, 2024 12:08 am ET

Gloria Lee was perplexed when the phone calls started coming in from a representative of her Medicare insurer. Could a nurse stop by her Boston home to give her a quick checkup? It was a helpful perk. No cost. In fact, she'd get a $50 gift card.

After several such calls in 2022, Lee agreed. A nurse showed up, checked her over, asked her questions, then diagnosed her with diabetic cataracts.

The finding was good news for Lee's insurer, a unit of UnitedHealth Group  UNH **0.07%** ▲ . Medicare pays insurers more for sicker patients. In the case of someone like Lee with diabetic cataracts, up to about $2,700 more a year at that time.

But the retired accountant doesn't have diabetes, her own doctor later said, let alone the cloudy vision sometimes caused by the disease.

Private insurers involved in the government's Medicare Advantage program made hundreds of thousands of questionable diagnoses that triggered extra taxpayer-funded payments from 2018 to 2021, including outright wrong ones like Lee's, a Wall Street Journal analysis of billions of Medicare records found.

The questionable diagnoses included some for potentially deadly illnesses, such as AIDS, for which patients received no subsequent care, and for conditions people couldn't possibly have, the analysis showed. Often, neither the patients nor their doctors had any idea.

Medicare Advantage, the $450-billion-a-year system in which private insurers oversee Medicare benefits, grew out of the idea that the private sector could provide healthcare more economically. It has swelled over the last two decades to cover more than half of the 67 million seniors and disabled people on Medicare.

Instead of saving taxpayers money, Medicare Advantage has added tens of billions of dollars in costs, researchers and some government officials have said. One reason is that insurers can add diagnoses to ones that patients' own doctors submit. Medicare gave insurers that option so they could catch conditions that doctors neglected to record. The Journal's analysis, however, found many diagnoses were added for which patients received no treatment, or that contradicted their doctors' views.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 11 of 74



Insurers added diabetic cataract diagnoses to many patients treated by Goodyear, Ariz.,
ophthalmologist Dr. Howard Chen. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

The insurers make new diagnoses after reviewing medical charts, sometimes using artificial intelligence, and sending nurses to visit patients in their homes. They pay doctors for access to patient records, and reward patients who agree to home visits with gift cards and other financial benefits.

Insurers added diabetic cataract diagnoses to 148 patients treated by Dr. Howard Chen, an ophthalmologist in Goodyear, Ariz. He said he saw at most one or two such cases a year.

He said he charges insurers $40 per patient to cover his costs for providing them with medical charts.

"If they are just making stuff up, then why do they even need or want my charts?" said Chen.

In all, Medicare paid insurers about $50 billion for diagnoses added just by insurers in the three years ending in 2021, the Journal's analysis showed.

UnitedHealth and other insurers say they use the home visits and chart reviews to help coordinate patients' care and ensure accurate diagnoses.

UnitedHealth spokesman Matthew Wiggin said the Journal's analysis is "inaccurate and biased," and that Medicare Advantage "provides better health outcomes and more affordable healthcare for millions of seniors" than traditional Medicare.

He said Medicare Advantage plans record diagnoses more completely than doctors treating traditional Medicare patients, and that insurers "identify disease states earlier." He declined to comment about Lee, citing a healthcare privacy law.

The Journal consulted more than a dozen experts, including academics, actuaries and policy analysts, about its analysis of the Medicare data, who said the methodology was sound.

A spokeswoman for the Centers for Medicare and Medicaid Services, which oversees Medicare, said the agency was making changes that would continue to ensure "taxpayer dollars are appropriately spent." Medicare Advantage "offers robust and stable options" for beneficiaries, the spokeswoman said.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 12 of 74

The Journal reviewed the Medicare data under a research agreement with the federal government. The data doesn't include patients' names, but covers details of doctor visits, hospital stays, prescriptions and other care. The Journal identified the patients named in this article through their doctors.

Some diagnoses claimed by insurers were demonstrably false, the Journal found, because the conditions already had been cured. More than 66,000 Medicare Advantage patients were diagnosed with diabetic cataracts even though they already had gotten cataract surgery, which replaces the damaged lens of an eye with a plastic insert.

"It's anatomically impossible," said Dr. Hogan Knox, an eye specialist at University of Alabama at Birmingham. "Once a lens is removed, the cataract never comes back."



Dr. Chen reviewing patient charts requested by Medicare Advantage insurers. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

Another 36,000 diabetic cataract patients didn't receive any medical services or prescription drugs related to diabetes.

## No treatment

About 18,000 Medicare Advantage recipients had insurer-driven diagnoses of HIV, the virus that causes AIDS, but weren't receiving treatment for the virus from doctors, between 2018 and 2021, the data showed. Each HIV diagnosis generates about $3,000 a year in added payments to insurers.

Everyone with HIV should be on antiretroviral drugs, the only effective treatment, and nearly all Medicare patients whose doctors diagnosed the virus took the drugs. Less than 17% of patients with insurer-driven HIV diagnoses were on them, the Journal found.

"It seems like almost all of those people don't have HIV," said Jennifer Kates, HIV policy director at KFF, a health-research nonprofit. "If they did, that would be substandard care at a pretty severe level," she said.

## Treatment Gap

Patients diagnosed with various conditions by Medicare Advantage insurers received typical treatments for their conditions at lower rates than those diagnosed by doctors.



Note: Includes diagnoses from 2018-21. Patients diagnosed by doctors include both Medicare Advantage and traditional Medicare enrollees. Numbers are subject to rounding.

A spokesman for Humana, the second biggest Medicare Advantage insurer, provided a written statement that said the Journal's analysis of treatment rates for people with insurer-driven diagnoses "is flawed and misleading."

The company said that internal data showed its HIV patients who got diagnosed in one way, through home visits, were on antiretroviral treatment at a far higher rate than the Journal found. The Medicare data show about one-third of those Humana patients were on the drugs.

Wiggin, the UnitedHealth spokesman, called the Journal's analysis flawed because it correlates insurer-driven diagnoses with subsequent medical care.

He said internal company data for 2022 showed a treatment rate for patients UnitedHealth diagnosed with HIV of more than triple what the Journal found. He said the pandemic disrupted care, lowering treatment rates during the period analyzed by the Journal, and that the analysis failed to account for patients who started treatments in future years.

The Medicare data, however, show UnitedHealth's patients with insurer-driven HIV diagnoses were on the antiretrovirals at low rates even before the pandemic, and hardly any started the drugs in the years after UnitedHealth diagnosed them.

Some of the insurer-driven diagnoses startled patients. Harriet Siskin, a retired customer-service worker, was diagnosed last year with obstructed arteries in her legs by a doctor who visited her house on behalf of her insurer, Humana, which stood to make an extra roughly $2,300 a year from the diagnosis.

"He told me that I may have some sort of artery blockage," said Siskin, who tested negative a few months later after her regular doctor ordered a full work-up. "He did scare me."

Humana's written statement said Siskin's primary-care doctor also submitted the diagnosis when he treated her following the home visit. It said Humana learned from the Journal that Siskin had later tested negative for the disease, and was working to correct the diagnosis.

## UnitedHealth's HIV Treatment Rate

The insurer diagnosed 1,285 patients with HIV in 2018. Most stayed in Medicare Advantage through 2021, but few received recommended HIV treatments.

"[W]e strive for complete and accurate clinical information about our members, and to help them get the care they need," Humana said.

Many patients may never know they have been misdiagnosed by their insurers, and doctors often don't know when insurers have added diagnoses of their patients.

Insurer-driven diagnoses by UnitedHealth for diseases that no doctor treated generated $8.7 billion in 2021 payments to the company, the Journal's analysis showed. UnitedHealth's net income that year was about $17 billion.



### Sick Pay

Average insurer-driven diagnosis payments per member varied widely among the five biggest Medicare Advantage insurers in 2021.

Each dot is an insurer

Number of members (millions)

Kaiser Permanente $131

Elevance Health $527

Humana $573

CVS/Aetna $941

UnitedHealth $1,434

UnitedHealth added diagnoses at a far higher rate than other major insurers.

⟵ AVERAGE PAYMENT PER MEDICARE ADVANTAGE MEMBER ⟶

Note: Limited to insurers with 10,000 or more members.

UnitedHealth's Wiggin said the Journal's calculations appear accurate. He said the added payments are "not simply earnings for the company," but help pay for medical care, lower premiums and provide other benefits for Medicare Advantage members.

Humana disputed the Journal's calculation that the company had received $2.2 billion in 2021 payments from insurer-driven diagnoses, saying that total didn't reflect chart reviews that lowered payments by removing diagnoses.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 15 of 74

Sometimes, insurers didn't remove potentially outdated diagnoses. The Journal's analysis found that between 2018 and 2021, nearly 50,000 Medicare Advantage patients completed a course of high-cost drugs that almost always cures hepatitis C, a virus that can cause serious liver damage.

Insurers subsequently told Medicare that more than half of the patients who had received the drug treatment still had hepatitis C in a future year, leading to millions of dollars in extra payments. The diagnoses came from the insurers' chart reviews and assessments, and from physician claims that insurers didn't correct.

"They're totally wrong," said Douglas Dieterich, director of the Institute for Liver Medicine at Mount Sinai Health System in New York. "Real world evidence is a 99% cure rate."

## Cost concerns

When Congress conceived of the Medicare Advantage program decades ago, the hope was that insurers would make Medicare more efficient. In traditional Medicare, doctors and hospitals get paid for each service they provide, an incentive to provide more. The idea behind Medicare Advantage was to pay private insurers a lump sum to cover all services, giving them an incentive to keep patients healthier.



Harriet Siskin was diagnosed with obstructed arteries in her legs by a doctor who visited her house on behalf of her insurer. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

To protect insurers from the risk of winding up with sicker-than-average patients, the government allowed bigger payments for certain serious health conditions.

Partly because of that, Medicare Advantage has cost the government an extra $591 billion over the past 18 years, compared with what Medicare would have cost without the help of the private plans, according to a March report by the Medicare Payment Advisory Commission, or MedPAC, a nonpartisan agency that advises Congress. Adjusted for inflation, that amounts to $4,300 per U.S. tax filer.

Academic researchers and government investigators have raised questions about high rates of insurer-driven diagnoses in Medicare Advantage. In a 2021 report, the inspector general that oversees Medicare found the agency spent billions of dollars based on insurer-driven diagnoses for which patients received no care from doctors.

A 2019 whistleblower lawsuit by a Florida doctor alleged that an insurer submitted inaccurate diagnoses, including that a Medicare Advantage patient's foot had been amputated when it wasn't. The insurer, Freedom Health, denied the

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 16 of 74

allegations, and a spokeswoman for Elevance Health, which now owns Freedom, declined to comment.

In September, insurer Cigna Group agreed to pay $172 million to settle civil-fraud allegations by the Justice Department over its Medicare Advantage practices. Cigna admitted to adding diagnoses that weren't supported by patients' medical records. Cigna declined to comment.

Government contractors audit Medicare Advantage plans and eventually can recoup payouts for inaccurate diagnoses. An insurance industry trade group, AHIP, said in a written statement that such audits have found Medicare Advantage insurers to be highly accurate.

Medicare administrators are overhauling the list of diseases for which insurers earn higher payments. Some of the most heavily used diagnoses, including diabetic cataracts, will pay less or nothing extra after the changes take full effect in 2026. But new diagnoses, including asthma, were added to the list of conditions warranting extra payments.

CMS said its changes showed it is a "good steward of taxpayer dollars."

John Gorman, a former Medicare official and founder of two companies that review records and conduct home visits on behalf of Medicare insurers, doesn't think the changes will solve the problem. "Any time you base a system like this on diagnosis codes, there's going to be rampant abuse of the system," he said. Insurers "will find something else to make up the revenue."

In 2019, Medicare added dementia to the list of diseases that pay more. That same year, the reported rate of the disease among Medicare Advantage members jumped 7.8% after holding flat for years before that, University of Southern California researchers found.

## Vision problems

Cataracts are extremely common in the elderly—pretty much everyone gets them. Diabetes also is common, so it isn't unusual for old people to have both. But eye doctors say they rarely diagnose cataracts caused by diabetes in old people. It usually isn't possible to pinpoint the cause, and in any case, the treatment is the same.

For Medicare Advantage insurers, a big difference between the two forms of cataracts is that the government only pays extra for the diabetic ones.



Siskin pointing to results of test ordered by a specialist who concluded that she didn't have peripheral artery disease. PHOTO: REBECCA NOBLE FOR THE WALL STREET JOURNAL

Some insurers interpreted U.S. guidelines for recording diagnoses in the broadest possible way, labeling patients with diabetes and any kind of cataract with the more lucrative diagnosis. They did it even when doctors said the patients only had the old-age form of the disease or had no diabetic complications at all, the data show.

"If you suspected that it could be connected, they felt they would be justified in connecting it," said Shannon Decker, a former UnitedHealth employee. "It's an easy capture."

UnitedHealth didn't respond to written questions about its practices for recording diabetic cataract cases.

Over four years, insurers added diabetic-cataract diagnoses to 112 patients of Dr. Stephen McConnell, an ophthalmologist in Brunswick, Ga., the data show. "That's unbelievable," said McConnell, who said he had no idea what was happening until informed by the Journal.

Dr. Javier Pérez, an Orlando, Fla.-based eye surgeon, treated hundreds of patients who insurers claimed have diabetic cataracts, the Medicare data show. On average, they were the same age as his old-age cataract patients, about 72.

"Just because you're diabetic doesn't mean you have a diabetic cataract," he said, adding that most almost certainly have old-age cataracts, not ones caused by diabetes. "You can be diabetic and be old," he said.

Lee, the 70-year-old retired accountant from Boston, recalled that her visit with the nurse practitioner sent by UnitedHealth lasted about 20 minutes. The nurse worked for HouseCalls, a unit of UnitedHealth.

UnitedHealth said that in 2023 three million "gaps in care" were identified during such home visits, which typically last 45 to 60 minutes. It said HouseCalls workers called ambulances 624 times that year after identifying emergencies, and that the visits had a 99% customer-satisfaction rate.

Former employees said UnitedHealth also uses the visits to add diagnoses. A HouseCalls home-visit training manual, which was reviewed by the Journal, describes software used on the laptops that workers carry on home visits. According to the manual, the software offers suggestions about what illness a patient might have—and even adds some automatically to a "diagnosis cart."

The nurse visiting Lee concluded that her minor cataracts were caused by diabetes that was severe enough to have triggered nerve damage, according to a letter from HouseCalls to her primary care doctor that was reviewed by the Journal. A diabetes test done during the visit was negative, according to the letter.

Lee's doctor, Nancy Keating, also a professor at Harvard Medical School, said her patient has never had diabetes, let alone complications like diabetic cataracts or nerve damage—a conclusion confirmed by subsequent blood tests.

"It's all just so wrong," Keating said.

Lee agrees. "If they're going to come out and diagnose people with things they don't have, they shouldn't get any more money," she said.

Lee switched to another health plan this year.

Write to Christopher Weaver at Christopher.Weaver@wsj.com, Tom McGinty at Tom.McGinty@wsj.com, Anna Wilde Mathews at Anna.Mathews@wsj.com and Mark Maremont at Mark.Maremont@wsj.com

*Appeared in the July 9, 2024, print edition as 'Medicare Paid $50 Billion To Insurers for Untreated Ills'.*

# EXHIBIT 4



NATSUMI CHIKAYASU FOR STAT

A STAT **INVESTIGATION**

# Health Care's *Colossus*

**How UnitedHealth harnesses its physician empire to squeeze profits out of patients**




*By* [Bob Herman](#) *,* [Tara Bannow](#) *,* [Casey Ross](#) *, and* [Lizzy Lawrence](#)

July 25, 2024

This is the first in a periodic series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence.

CASE 0:24-cv-01743-JMB-JFD       Doc. 152-3       Filed 08/25/25

UnitedHealth Group started out as a small, Minnesota health insurance company and has since morphed into a modern-day Standard Oil, exerting unmatched dominance over health care in the United States.

It's no secret that UnitedHealth is a colossus: It's the country's largest health insurer and the fourth-largest company of any type by revenue, just behind Apple. And thanks to a series of stealthy deals, almost 1 in 10 U.S. doctors — some 90,000 clinicians — now either work for UnitedHealth or are under its influence, more than any major clinic chain or hospital system.

But behind those statistics, there's a lot UnitedHealth doesn't want you to know. A STAT investigation reveals the untold story of how the company has gobbled up multiple pieces of the health care industry and exploited its growing power to milk the system for profit. UnitedHealth's tactics have transformed medicine in communities across the country into an assembly line that treats millions of patients as products to be monetized.

Central to these tactics is UnitedHealth's unrivaled leverage over physicians, whose diagnoses help determine how much private insurers get paid for covering older adults. Dozens of former doctors and employees at UnitedHealth medical practices told STAT how they became enmeshed in UnitedHealth's strategy to make their patients seem as sick as possible. Doctors said the company had a fixation with medical coding to generate more revenue — encouraging clinicians through bonuses and performance reviews to identify more health problems in patients, even if those conditions seemed dubious.



An early 20th century editorial cartoon depicts a "Standard Oil" tank as an octopus with tentacles wrapped around the steel, copper, and shipping industries, as well as a state house, the U.S. Capitol, and the White House. *Udo J Keppler/Library of Congress*

By controlling doctors, UnitedHealth can lean on them to practice in ways that benefit the insurer, and use its insurance arm to funnel cash back to its clinicians — similar to how Standard Oil amassed power as both the buyer and seller in oil refining. Through these efforts, and by adeptly navigating the Medicare Advantage payment system, UnitedHealth has squeezed potentially tens of billions of extra dollars from taxpayers over the past decade, according to STAT estimations based on federal data. The relationship

between UnitedHealth's insurance company and physician practices is the focus of an ongoing [Department of Justice antitrust probe](#).

Doctors interviewed by STAT said they were initially seduced by the company's sales pitch that it would be hands-off and help them provide high-quality care, but they quickly became disillusioned. UnitedHealth has required some physicians to see as many as four patients per hour, a difficult task if any of those patients are new to a clinic, they said. Patients, meanwhile, are wondering why their doctors are rushing through their appointments — if they can get seen at all — and have expressed alarm when concerning diagnoses pop up in their medical records, many of which were never mentioned by their physicians.

Susan Baumgaertel experienced the shift firsthand. She is an internal medicine physician who spent 25 years — almost her entire career — at The Polyclinic, a large multispecialty group in Seattle. After UnitedHealth took over in 2018, Baumgaertel said the company pressured her and her colleagues to code patients for certain conditions, including some that the doctors didn't think applied. She quit in 2021.

"We were not truly caring for patients anymore," Baumgaertel said. "We were just micromanaging their care to bring in money. It just felt so unconscionable."

She's become an unofficial therapist for dozens of her colleagues who still work at UnitedHealth practices, dispensing advice and words of comfort over hours-long walks or coffee dates. Recently, Baumgaertel was on the phone with another physician who worked at a UnitedHealth-owned clinic at the time, and had just pulled up in front of her house.

"She was crying in her car. She said, 'Susan, I can't leave. I'm the breadwinner. I have to have insurance. My husband is a stay-at-home dad,'" Baumgaertel recalled. She could hear her friend's kids knocking on the car window. "She felt trapped. I hear this over and over again."

## UnitedHealth revenue outpaces many of the nation's largest companies

Total revenue in 2023, in billions of dollars

**UnitedHealth Group is larger than...**

| Company | Revenue |
|---|---|
| UnitedHealth Group | $371.6 |
| Berkshire Hathaway | $364.5 |
| CVS Health | $357.8 |
| Alphabet | $307.4 |
| Costco | $237.7 |
| Microsoft | $211.9 |
| Ford Motor Co. | $176 |

**On its own, Optum Health would be a Fortune 50 company**

| Company | Revenue |
|---|---|
| Optum Health | $95.3 |
| Johnson & Johnson | $95.2 |

| PepsiCo | $91.5 |
| UPS | $91 |
| FedEx | $90.2 |
| Walt Disney Co. | $88.9 |
| Boeing | $77.8 |

Optum Health includes its physician groups, surgery centers, post-acute services, telehealth, home health, and bank.
Chart: J. Emory Parker/STAT ● Source: Fortune, company filings

STAT's reporting is based on interviews with more than two dozen current and former UnitedHealth doctors and executives conducted over the past six months. STAT also spoke with health policy experts and patients, examined court records, and read UnitedHealth's 600-page medical coding bible. Many of the UnitedHealth doctors and executives, and even some patients, asked for anonymity — expressing concerns the company could take them to court, derail their careers, or alter their care.

Accounts from clinicians like Baumgaertel challenge UnitedHealth's stated rationale for its increasing control over health care. The company says owning medical groups, while also being the insurer, will allow for better preventive care that is "value-based." Why wait for people to show up in the emergency room with serious, costly issues when you can keep an eye on them in the clinic and intervene earlier?

UnitedHealth declined to make executives available for interviews and did not answer a detailed list of questions. In a statement to STAT, spokesperson Eric Hausman said the company's "providers and partners make independent clinical decisions, and we expect them to diagnose and document patient information completely and accurately in compliance with [federal] guidelines. We provide training and other practice support to providers because it leads to better care management, coordination, and patient follow-up. Regulators routinely audit this documentation."



UnitedHealth Group headquarters in Minnetonka, Minn. *Jenn Ackerman for STAT*

From the start, the takeover of physician practices by the nation's largest health care company has been carefully choreographed.

UnitedHealth's leadership team is filled with people who have stayed at the company a long time, and have enriched themselves by doing so. Those executives have leveraged a system that has put patients' medical charts at the center of how companies get paid. They have lobbied the government over policies that further entrench UnitedHealth's market power. Several executives have held powerful federal health care positions of their own. And they have capitalized on the government nudging more older adults to enroll in privatized Medicare Advantage plans. UnitedHealth's clinics and outpatient centers now provide care for about 103 million Americans, according to the company's own estimates.

In 2007, at a Wall Street conference in a posh midtown Manhattan hotel, UnitedHealth's then-CEO Stephen Hemsley telegraphed that UnitedHealth — already a rapidly expanding health care company — saw itself as much more than just an insurer. "I would ask you to begin to think about UnitedHealth Group and the construct of its business, its capabilities, its reach in the marketplace, as a health care system unto itself," he said.

That same year, UnitedHealth struck a deal for an insurance company that owned Southwest Medical Associates, a group of clinics located throughout Nevada — the company's first large medical group. This happened as the health care industry was on the cusp of its biggest transformation since the advent

of Medicare nearly five decades earlier — changes that would ultimately reinforce UnitedHealth's new direction and spur it to double down on doctors.

The Affordable Care Act, which President Barack Obama signed into law in 2010, limited the amount of profit insurers could make on health insurance. That encouraged many insurers to branch into other lines of business where profit wasn't capped — such as providing medical care. The law also sought to tweak how doctors and hospitals got paid by adding incentives for keeping patients healthy instead of just paying for every visit or procedure. That meant, of course, more collaboration between providers and insurers.

The result was consolidation across all corners of the industry: Insurers bought insurers. Hospitals bought hospitals. And doctors — many of them overwhelmed by new rules around documentation and using electronic health records — flocked to hospitals, private equity firms, and insurers that could handle the administrative burden. UnitedHealth's Optum subsidiary was one of the biggest players in the feeding frenzy, bringing tens of thousands of doctors under its umbrella. Today, less than half of the country's doctors work at physician-owned practices, according to the American Medical Association.

As for UnitedHealth, Hemsley, along with former Optum CEO Larry Renfro and several other top executives, positioned themselves as architects of the company's physician empire. Hemsley still serves as UnitedHealth's board chair and has his own investment firm. Renfro, who led Optum from its reorganization in 2011 until 2018, now works at UnitedHealth's venture capital firm.

While UnitedHealth expanded in patient care, it also grew its dominance in Medicare Advantage, the alternative to traditional Medicare that is run by private insurers and now covers more than half of all Medicare beneficiaries. UnitedHealth has had the biggest slice of enrollment in the program for more than a decade, growing from 20% of Medicare Advantage enrollees in 2010 to almost 30% in 2023.

That simultaneous growth was no accident. Medicare Advantage insurers depend on clinicians to enter diagnosis codes into patients' medical records. Those codes turn into risk scores that explain how sick the patient is and, in turn, how much money the government pays their insurer for their medical care.

Medicare Advantage insurers have gamed the system by excessively coding their members, resulting in massive overpayments to the companies. Overpayments based on coding alone are expected to total $50 billion this year, more than the Department of Justice's entire budget, according to the Medicare Payment Advisory Commission, a group of experts that advises Congress on Medicare. Since 2007, MedPAC estimates Medicare Advantage insurers have reaped $217 billion in coding overpayments from the federal government.



How insurers use doctors to profit off medical codes

As the country's biggest Medicare Advantage insurer and its biggest physician group, nobody is better positioned to extract massive sums from the program than UnitedHealth. The company is still facing a federal lawsuit alleging it continued to collect government money based on millions of patient diagnoses it knew were incorrect. UnitedHealth has disputed the allegations and continues to contest them in court.

While UnitedHealth operates in a completely different industry than did Standard Oil, they have unmistakable similarities, starting with their ambitions to stealthily expand. When Standard Oil was acquiring competing oil refineries in the 1860s and 1870s, the conglomerate did so with little trace. Under its founder John D. Rockefeller, Standard Oil scooped up nearly all the refineries in the Cleveland area, but few newspapers were aware of the growing monopoly.

"It had all been accomplished in accordance with one of Mr. Rockefeller's chief business principles — 'Silence is golden,'" journalist Ida Tarbell wrote in "The History of the Standard Oil Company."

UnitedHealth rarely announces its takeovers of physician clinics and outpatient centers. In part, that's because the acquisitions are small compared with its overall size and therefore don't have to be disclosed to financial regulators. It also has downplayed the number of physicians it controls through employment and other financial agreements.

Of UnitedHealth's 90,000 physicians, 10,000 are employed, and the others are affiliated through "value-based care arrangements," the company said. It's unclear what the financial parameters of those affiliations are, and UnitedHealth declined to clarify. In a statement, UnitedHealth's Hausman said, "The vast majority of the physicians we work with are independent and choose to work with us," reiterating CEO Andrew Witty's remarks to Congress.

But UnitedHealth has clearly targeted specific, important medical groups and outpatient surgery centers in markets where it also has the most Medicare Advantage enrollees. The company's strategy goes like this: If UnitedHealth could get more of its insurance members to go to its own physicians, the company would get to pay itself with money that previously would have gone out the door.

"Controlling the physicians is incredibly lucrative for maximizing risk-coding payments. It's hard to overstate just how lucrative this can be," said Hayden Rooke-Ley, an Oregon-based attorney and senior fellow for health care at the American Economic Liberties Project. He has written about the risks of insurers owning physician groups. "This is the singular explanation for why insurance companies are getting into the business of care delivery, particularly of primary care."



At the core of amassing its doctor empire was luring physicians. UnitedHealth quickly found the surest approach: Money, and a lot of it.

Some groups needed cash to invest in new electronic health records and other technology, or were facing financial distress. Physicians who bought into the idea of less wasteful care and more prevention opted to sell to UnitedHealth rather than to private equity or their local hospital systems. Plus, physicians nearing retirement were looking for a golden parachute, and UnitedHealth in some cases dangled huge sums of cash, according to multiple former physicians who sold practices to UnitedHealth and other employees.

"The doctors wanted the moolah, especially the older physicians," said a former employee of a UnitedHealth clinic in the western U.S.

# Timeline of UnitedHealth's biggest physician acquisitions



CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 29 of 74



Six former UnitedHealth doctors said that when UnitedHealth took over medical groups, nothing would immediately change. But as the weeks and months passed, UnitedHealth would begin to overhaul their schedules: They were expected to see more patients, perform more physicals, and conduct more annual wellness visits. Some said they were required to see three or even four patients per hour.

In 2022, UnitedHealth acquired Atrius Health, then the largest independent doctor group in Massachusetts. Eleanor Hobbs, an urgent care physician, soon began dreading her shifts because her new corporate owner required her to see patients every 20 minutes. Previously, she saw a patient every 30 minutes. Hobbs, 76, had planned to work longer, but instead retired earlier this year.

"When I retired, my feeling was: I feel just like an Amazon warehouse worker, where all I'm doing is 20 minutes, 20 minutes, 20 minutes, 20 minutes," Hobbs said. "Just do it. Don't ask how the patient feels about it. Don't ask what kind of a moral injury it feels like to me. It was awful."

The pressure to treat patients as if they were fields of medical codes to be harvested, instead of people who have complex histories, soon followed. More than a dozen former doctors and employees from seven different practices nationwide described how UnitedHealth pushed its clinicians to document as many ailments as they could by offering bonuses or reviewing the performance of those who were not coding as much as their peers.

"If your numbers aren't great, they meet with you individually. It just felt like at every avenue possible, you were reminded of it," a former Polyclinic provider said.

Nine clinicians told STAT they were instructed to document conditions they didn't believe applied. Six former UnitedHealth physicians said the shift has been most apparent since the Covid-19 pandemic, as they've been encouraged to catch up on coding after patients stayed at home instead of going in for routine checkups.

"It's very frustrating to me as a physician to see something that was really intended to be a way to pay primary care doctors to do good, preventive risk assessment," a physician formerly at UnitedHealth's New West Physicians group in Colorado said of risk scores and coding. "And it's turned into this coding vehicle where, 'How do we drop as many codes as we can?'"

Potentially improper coding routinely came up in the same categories, such as peripheral vascular disease and chronic kidney disease, former UnitedHealth doctors said. One study from 2022, crafted by UnitedHealth's own physician researchers, shows that UnitedHealth's physicians coded Medicare Advantage patients as having lung disorders, vascular conditions, and kidney disease at more than two times the rate of those in the traditional Medicare program.

A separate review of provider data suggests the trend was broader than just UnitedHealth. It shows the rate of vascular disease testing and diagnosis across providers in a national dataset more than doubled

between 2018 and 2023 among patients aged 50 and older. The analysis, based on electronic health record data and conducted by the health analytics company Truveta for STAT, also showed the rate of testing and diagnosis decreased in spring 2024, after Medicare eliminated a particularly lucrative code for patients with peripheral vascular disease without complications.

Part of the issue is the difference in the federal programs. Traditional Medicare pays doctors for each service they provide, while the government pays Medicare Advantage insurers based on how sick their members are, as determined by codes from doctors. Health policy experts say traditional Medicare undercounts older adults' ailments. Coding and documentation also can be more of an art than a science at times, especially for complex patients who have a lot of medical problems. But within Medicare Advantage, conditions that can be open for interpretation can be exploited.

"There are probably a subset of diagnostic codes that are kind of squishy. They're kind of subjective. They're kind of game-able," said Chris Pope, a senior fellow at the Manhattan Institute, a conservative think tank, who has studied Medicare Advantage coding.

Four doctors told STAT it was common to get panicked calls from patients. They wanted to know why their online medical charts said they had chronic kidney disease or vascular disease even though their doctors hadn't mentioned it during their visits. When Baumgaertel got those calls, she said she always tried to tell patients the truth, as uncomfortable as it was: I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more.



Primary care physician Susan Baumgaertel said after UnitedHealth took over The Polyclinic in Seattle, the company pressured doctors to code patients for certain conditions, including some they didn't think applied. "It just felt so unconscionable." *Courtesy Susan Baumgaertel*

"It was almost to the point of being embarrassing," she said. "These are people I've known for a long time, and they're like, 'Susan, what's going on?'"

Doctors said that UnitedHealth medical directors and administrators pressured them to increase codes for a variety of different ailments, even if they thought those codes didn't fit patients' conditions. As one example, more than a half dozen clinicians said UnitedHealth used an unreliable device to screen nearly

all of its Medicare Advantage patients for peripheral arterial disease as a way to boost vascular disease diagnoses.

Another example is chronic kidney disease. It's normal for people's kidney function to decline as they age, but five doctors said UnitedHealth pushed them to code for that condition even if they felt the patients' diminished kidney function was appropriate for their age and unlikely to cause harm.

"The number of elderly patients I had who had legit panic episodes when they went to their chart and found out they had chronic kidney disease," a former Polyclinic doctor said. "I'd have to have this whole conversation with them about like, 'No, your kidney function is actually not that abnormal for your age, but because of this coding thing, blah blah blah.' That was awful."

Daniel Weiner, a nephrologist at Tufts Medical Center, said many older adults meet the technical definition of having chronic kidney disease based on tests that examine their kidney function. The problem is there's a limited number of codes for chronic kidney disease that cover a large group of people.

"There are clearly financial reasons to code people with chronic kidney disease, as some of these patients have extremely complex medical issues, but others, with the same code, are far healthier," he said.

Nick Jones, a primary care physician who joined Oregon Medical Group in Eugene just before UnitedHealth bought the practice, said the inaccurate code he saw most frequently in patients' records was long-term management of insulin. In some cases, he said, this code was applied to patients who received insulin once to lower their blood sugar before a surgery, but who never needed the drug again.

Jones said he finally got fed up when the Oregon Medical Group's electronic health record started making it mandatory that doctors attest to whether patients' Medicare Advantage codes had been checked off before they could close out a visit. The system gave the option to deny the codes, but that was more labor-intensive because it required an explanation for why the codes were wrong, he said.

UnitedHealth would regularly host educational sessions where company representatives spent hours teaching Oregon Medical Group doctors how to code Medicare Advantage patients, Jones said. He found it frustrating because the sessions never covered new research into specific conditions or resources available for patients, like nutritionists or case managers.

"I don't give a damn about what reimburses for what," said Jones, who now runs a practice called Clear Health Direct Primary Care. "I'm just going to code what I addressed during that visit."

Even surgeons were roped in, according to one who used to work at The Polyclinic.

"It just didn't make a lot of sense for a surgeon to talk to patients about chronic illnesses that didn't necessarily have a lot to do with their presenting complaint," he said. "We're not frankly specialized or qualified to do it."

Nine doctors reported being rewarded with bonuses if they met UnitedHealth's coding expectations. One former Polyclinic surgeon said it could be upwards of $30,000 per year. But if doctors didn't comply, it

affected their entire department, that surgeon said. UnitedHealth declined to respond to questions about whether it encouraged coding through bonuses and performance reviews, and whether it encouraged doctors to use specific codes that exaggerated patients' conditions.

"So are you going to be the turd — sorry — are you going to be the doctor, who is not compliant and causing your partners to lose thousands of dollars? No. And ultimately, that's what got me to be compliant," the former Polyclinic surgeon said. Eventually, he and his colleagues left for a different medical group.



Top UnitedHealth executives have gushed to investors over the past 15 years that thoroughly documenting patients' conditions is an untapped line of recurring revenue. UnitedHealth has become such an expert on the topic that it sells a coding bible to the medical community for $165.95. The 592-page book explains how the government's payment system works and provides advice on how to "capture" more conditions.

The tips give a sense for how the company views coding and documentation: as a way to distill patients to a series of numbers and decimals that translate into big dollar figures. Coders are taught that every 0.1 in coding equates to $1,000, more or less, from the government per year.

Does a patient have diabetes? That adds 0.166 to the risk score, according to the government's 2024 risk adjustment system, equating to $1,700 in annual Medicare payments. Congestive heart failure? That's another 0.36 to the patient's score, or $3,600. Severe obesity, cocaine use, Medicaid eligibility — all descriptors that lead to more money.

Some may assume Medicare Advantage insurers push for more documentation of these diagnoses because of a "desire to make a profit," UnitedHealth's 2024 coding guide reads. "This is a half-correct assumption," the guide concedes, before saying coding also ensures companies get enough money from the government to cover care.

UnitedHealth's guide emphasizes how coders should scour physicians' notes to see if there are other illnesses that aren't being captured. For example, it says doctors should mark down a patient's cancer diagnosis when they come in for an unrelated issue like a high cholesterol reading if that patient's records show they are actively seeing an oncologist and on cancer medication.

Richard Lieberman, a medical coding expert who helped develop the government's risk adjustment system, said there is "far too much gaming of risk coding, but also of documentation." Big companies like UnitedHealth have insulated themselves from more sweeping government investigations by justifying everything in medical charts, even if the diagnoses are wrong or based on flawed diagnostic tools, he said.

"It becomes sort of like a 'Catch Me If You Can' kind of scenario," Lieberman said. "Only when you get audacious is your number often up."

One doctor who used to work at UnitedHealth's WellMed practice in Florida told STAT that managers set a troublesome expectation that risk scores could only go up, not down. UnitedHealth's guide also explains how doctors and coders can "recapture" as many prior health conditions as possible. Things like fractures that have healed will fall off, but chronic conditions are expected to carry over. The assumption is that as people get older, they will have more diseases.

"There are a lot of targets that are just set to meet some obvious financial endpoint. They were unrealistic," the former WellMed physician said. "People like me didn't feel comfortable that these targets are the ones that we are getting our bonus based on, or people will even chase you and get you out of the company if you're not producing like other physicians."

UnitedHealth's coding book attempts to help people determine if conditions are appropriately documented. All they have to do is remember this mnemonic device: treatment, assessment, monitor, plan, evaluation, and referral — or TAMPER.



Sharon Maloney holds a photograph of her husband, Bill Sullo, who died in February 2023. *Tim Tai for STAT*

Hundreds of people across the country have taken to Yelp and Google to gripe about longer waits for appointments and doctors quitting after UnitedHealth assumed control of their clinics. It became tough to

get a real person on the phone, even after waiting for hours on hold. Billing mistakes became more common and difficult to resolve. Appointments felt rushed.

At the Polyclinic in Seattle, patient Todd Anderson said that after UnitedHealth took over, it became clear the company was trying to cut costs in every way possible. Check-in became centralized in a way that created a lot of confusion. Then came easily avoidable mistakes. The clinic sent the Seattle retiree's bill to the wrong health insurer, so it was rejected. Despite Polyclinic's repeated promises to fix the problem, Anderson was sent to collections. Then he was told if he wanted to stay on as a patient, he'd have to switch from his Aetna Medicare Advantage plan to a UnitedHealthcare one.

"Things changed rather dramatically, and it was pretty visible," Anderson said.

For some patients, waiting longer to be seen had serious consequences. Connecticut resident Sharon Maloney believes her husband might still be alive if he'd been able to see his doctor right away, as he'd been able to before UnitedHealth took over ProHealth Physicians in 2015. In the past, she said, ProHealth had reserved time for sick patients to be seen the same day.

Maloney's husband had several health issues, and he was taking medications for ulcerative colitis, chronic inflammation of the large intestine or rectum, that made him more susceptible to infections. In October of 2022, Maloney's husband had all the telltale signs of a UTI, but ProHealth couldn't get him in for three days. The day after he called ProHealth, his symptoms got so bad, Maloney took him to the hospital. By then, the infection had spread into his kidneys, leading to sepsis, antibiotics, a hospital-acquired infection, and, ultimately, his death last year.

"If he had been able to get a visit that day, if they had been able to identify the culture, and if they had gotten him on the antibiotic in the first couple of days, this slope would not have even started," Maloney said.

UnitedHealth didn't respond to questions about the care of Maloney's husband.

Former longtime Polyclinic patient Mary Woodbery said things that used to be simple now require a maze of specialist referrals and seemingly unnecessary tests. One time, her teenage son had a tiny cyst on his neck that she suspected was an ingrown hair. Instead of letting him see a dermatologist straight away, The Polyclinic first made him see a radiologist who performed an ultrasound and then a neck specialist. Finally, a dermatologist confirmed it was an ingrown hair. Woodbery was exasperated.

"They have answers. They just don't want to give them to you because they want to drag you through this endless chain of referrals so they can make sure all their departments are utilized," said Woodbery, a speechwriter living in Seattle who had seen the same Polyclinic doctor for over two decades before that doctor left.

UnitedHealth continues to absorb medical groups, including a contentious battle over The Corvallis Clinic in Oregon. Regret is starting to set in for some physicians who took UnitedHealth's offer. The coding dictates became too much for many to handle. For one former ProHealth physician in

CASE 0:24-cv-01743-JMB-JFD     Doc. 152-3    Filed 08/25/25

Connecticut, remorse builds even more after hearing from longtime patients who are wondering why they can't get an appointment or why they have been mistakenly billed.

"Everybody thinks it was a catastrophe," the former ProHealth physician said. "They destroyed our practice."

**STORY CREDITS**

**Writing:** Bob Herman and Tara Bannow
**Reporting:** Bob Herman, Tara Bannow, Casey Ross, Lizzy Lawrence
**Editing:** Zachary Tracer
**Graphics:** Emory Parker and Alex Hogan
**Illustrations:** Natsumi Chikayasu
**Video:** Hyacinth Empinado
**Art and Photo Direction:** Alissa Ambrose
**Additional photo editing:** Crystal Milner
**Copy editing:** Karen Pennar, Sarah Todd
**Additional editing:** Gideon Gil, Rick Berke
**Design and development:** Jennifer Keefe, Julia Bujalski, Ben Lokshin

## About the Authors



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the [Health Care Inc. newsletter](#).

bob.herman@statnews.com
@bobjherman



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers.

tara.bannow@statnews.com
@TaraBannow



**Casey Ross**

National Technology Correspondent

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter.

lizzy.lawrence@statnews.com
@LizzyLaw_

To submit a correction request, please visit our Contact Us page.

# EXHIBIT 5

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b

EXCLUSIVE   HEALTHCARE

# The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare

Information gathered from Medicare Advantage patients in their homes triggered extra payments; 'It made me cringe'

By *Anna Wilde Mathews* [Follow] , *Christopher Weaver* [Follow] , *Tom McGinty* [Follow] and *Mark Maremont* [Follow]

Aug. 4, 2024 9:00 pm ET

Millions of times each year, insurers send nurses into the homes of Medicare recipients to look them over, run tests and ask dozens of questions.

The nurses aren't there to treat anyone. They are gathering new diagnoses that entitle private Medicare Advantage insurers to collect extra money from the federal government.

A Wall Street Journal investigation of insurer home visits found the companies pushed nurses to run screening tests and add unusual diagnoses, turning the roughly hourlong stops in patients' homes into an extra $1,818 per visit, on average, from 2019 to 2021. Those payments added up to about $15 billion during that period, according to a Journal analysis of Medicare data.



**Average payments for home-visit diagnoses, per visit, 2019–21**

Note: Limited to insurers with 5,000 or more home visits.
Andrew Mollica/WSJ

Nurse practitioner Shelley Manke, who used to work for the HouseCalls unit of UnitedHealth Group, was part of that small army making home visits. She made a half-dozen or so visits a day, she said in a recent interview.

Part of her routine, she said, was to warm up the big toes of her patients and use a portable testing device to measure how well blood was flowing to their extremities. The insurers were checking for cases of peripheral artery disease, a narrowing of blood vessels. Each new case entitled them to collect an extra $2,500 or so a year at that time.

But Manke didn't trust the device. She had tried it on herself and had gotten an array of results. When she and other nurses raised concerns with managers, she said, they were told the company believed that data supported the tests and that they needed to keep using the device.

CASE 0:24-cv-01743-JMB-JFD   Doc. 152-3   Filed 08/25/25   Page 40 of 74



Shelley Manke, a nurse practitioner who once worked for UnitedHealth, visited many Medicare Advantage recipients in their homes. PHOTO: TAYLOR GLASCOCK FOR WSJ

"It made me cringe," said Manke, who stopped working for HouseCalls in 2022. "I didn't think the diagnosis should come from us, period, because I didn't feel we had an adequate test."

Other nurses interviewed by the Journal said many of the diagnoses that home-visit companies encouraged them to make wouldn't otherwise have occurred to them, and in many cases were unwarranted.

Last month, the Journal reported that insurers received nearly $50 billion in payments from 2019 to 2021 due to diagnoses they added themselves for conditions that no doctor or hospital treated. Many of the insurer-driven diagnoses were outright wrong or highly questionable, the Journal found.

The diagnoses added after home visits accounted for about 30% of that total. More than 700,000 peripheral artery disease cases diagnosed only during home visits added $1.8 billion in payments during that period.

In the Medicare Advantage system—conceived as a lower-cost alternative to traditional Medicare—private insurers get paid a lump sum to provide health benefits to about half of the 67 million seniors and disabled people in the federal program. The payments go up when people have certain diseases, giving insurers an incentive to diagnose those conditions.

To find out how insurers use home visits to add diagnoses, the Journal interviewed nurses, patients, home-visit managers and industry executives and reviewed hundreds of pages of internal documents from home-visit companies. They described a system that used nurses, software and audits to generate diagnoses.

CASE 0:24-cv-01743-JMB-JFD   Doc. 152-3   Filed 08/25/25   Page 41 of 74

**INVESTIGATING MEDICARE**



# Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated

"They do the job with a purpose, and it pays off for the Medicare Advantage plans," said Francois de Brantes, a former executive at Signify Health, a company that does home visits for insurers. "Identifying the diagnoses, that's the job."

Insurers, including UnitedHealth and CVS Health, owner of both Signify and Aetna, said the house calls help patients by, among other things, catching diseases early and making sure people are taking their medicine properly. The insurers said they relay home-visit findings to primary-care doctors.

Nurses who made visits said they felt they were helping some patients with advice about medications, performing needed tests and sometimes reporting health emergencies.

For UnitedHealth, the parent company of the largest Medicare insurer, each home visit was worth about $2,735 in extra Medicare payments during the three years covered by the data, the Journal analysis found. That's nearly three times the average for all other Medicare Advantage insurers.

UnitedHealth's chief physician, Dr. Wyatt Decker, attributed the disparity to what he said was UnitedHealth's sicker patient population and its nurse practitioners being so effective at their jobs.

Sixty percent of UnitedHealth home visits generated at least one new revenue-producing diagnosis of a condition no doctor was treating, the analysis showed. Home visits by Humana, the No. 2 Medicare insurer, did so 39% of the time.

The Journal reviewed Medicare data covering the home visits under a research agreement with the federal government. The data doesn't include patients' names, but covers details of doctor visits, hospital stays, prescriptions and other care.

The home-visit industry has grown in recent years. UnitedHealth's HouseCalls sent nurse practitioners to the homes of more than 2.7 million people last year. CVS's Signify performed about 2.6 million home visits in 2023.

**Total payment from home-visit diagnoses, in billions**



**UnitedHealth**
$10.7 billion

**All other insurers**
$4.6 billion

Note: Numbers are subject to rounding.



PHOTO: GABBY JONES/BLOOMBERG NEWS

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 43 of 74



Signify Health and a subsidiary of UnitedHealth made more than five million home visits combined in 2023. PHOTO: SHELBY TAUBER/BLOOMBERG NEWS

Step one is getting Medicare Advantage recipients to agree to a visit, especially patients whom insurers deem most likely to have undiagnosed conditions that would garner extra payments.

Two former managers who oversaw home visits for Humana, and a third who worked for both Humana and Signify, said insurers used an internal scoring system to identify prospects. Under the Medicare Advantage system, diagnoses have to be documented every year to trigger the extra payments, so people who had an earlier home visit that produced extra payments were particularly valued, the managers said.

Insurers also considered other factors, including how likely patients were to agree to a visit, some home-visit executives said.

Call centers bombard Medicare recipients with offers of home visits—in the case of Humana, autodialing them as many as 10 times, according to the former managers. Agents sometimes offered the Medicare recipients incentives such as Walmart gift cards.

A Humana spokesman said the company is committed to accurately identifying patients' health conditions, and that its home-visit vendors don't use software to suggest diagnoses for its patients.

Dave Sherwood, a 68-year-old retired accounting executive in Williamsburg, Va., joined a UnitedHealth Medicare Advantage plan last year. Earlier this year, he got a flurry of calls from representatives of the insurer. When he finally answered one, he told them he didn't want a home visit.

Months later, he started getting the calls again. Finally, he said, he picked one up and told the agent to stop calling.

When patients agree to a visit, home-visit companies send nurse practitioners or, less frequently, doctors or physician assistants. Some are full-time employees, others contractors who get paid around $100 or more per visit.

At each home, the nurses run through a series of questions covering medical history and medications, as well as doing a physical assessment and some basic testing.

In the HouseCalls system, nurses feed the information into a laptop or tablet, and the software suggests diagnoses. They automatically appear in a "diagnosis cart" on the side of the screen, according to training documents from last year that were viewed by the Journal.

Kristen Bell, a nurse practitioner who left HouseCalls in May after doing home visits for seven years, said the prompts were one way to prod nurses to add diagnoses. They also got regular training about conditions they could record, she said. She characterized the message from management as: "I'm not going to beat you up about this, but I want you to go in this direction."

Secondary hyperaldosteronism, a condition in which levels of the hormone aldosterone rise, is rarely diagnosed in traditional Medicare patients. HouseCalls documents show that its software would suggest the diagnosis if a patient had a history of heart failure or cirrhosis, and either took certain drugs, such as diuretics, or had swelling due to fluid retention. Nurses weren't required to confirm the diagnosis with a lab test.

"In a million years, I wouldn't have come up with a diagnosis of secondary hyperaldosteronism," said Bell, the former HouseCalls nurse.

UnitedHealth diagnosed it 246,000 times after home visits, leading to $450 million in payments over the three years of the Journal's analysis. All other Medicare insurers combined collected $42 million from making that diagnosis after home visits.

"It is a vastly underdiagnosed condition that is super valuable to call out," said UnitedHealth's Decker.

To find more cases of peripheral artery disease, both HouseCalls and Signify used the testing device that nurse Manke said she distrusted, company manuals show.

**Secondary hyperaldosteronism**
Payments from home-visit diagnoses,
2019-21



The Food & Drug Administration said the device, called the QuantaFlo, "is not indicated for use as a stand-alone diagnostic device but as an adjunct to the diagnostic process." Medical guidelines recommend against widespread screening for the condition.

A HouseCalls training manual advised nurses to diagnose peripheral artery disease based on results from the device. Managers at Signify told nurses they were required to use the device to test the patients of most insurers, a 2020 email shows.

Nurses diagnosed the condition after 568,000 home visits to UnitedHealth patients in the period analyzed by the Journal, adding up to nearly $1.4 billion in additional payments.

**Peripheral artery disease**
Payments from home-visit diagnoses, 2019-21



UnitedHealth's Decker said the company expected clinicians to use their judgment in making peripheral artery disease diagnoses. A spokesman for Signify-owner CVS said medical providers decide when the test is appropriate on a case-by-case basis, and that the 2020 email was "not clearly worded" and didn't reflect company policy.

Renae Cormier, chief financial officer of QuantaFlo maker Semler Scientific, said the device assesses risk for the disease.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 46 of 74

Dr. Amy Chappell, a 73-year-old neurologist in Naples, Fla., was surprised when a nurse sent to her house earlier this year by UnitedHealth pulled out a QuantaFlo device. "She had no reason to think I had peripheral artery disease," said Chappell, who says she has had no symptoms of the condition and is an avid runner and tennis player.

Chappell tested positive, although the nurse didn't do any other standard exam to check for symptoms of the disease, Chappell said. Her primary-care doctor, Dr. Rebekah Bernard, said in an email that the diagnosis was inaccurate.

"From what I do know of the case, it's an example of where we could have done better, and we need to own that," said UnitedHealth's Decker. The company later confirmed the diagnosis was a mistake and said it corrects such errors.



Manke said UnitedHealth's peripheral artery disease testing practices made her uncomfortable.

PHOTO: TAYLOR GLASCOCK FOR WSJ

The Medicare Payment Advisory Commission, a nonpartisan agency that advises Congress, has recommended that diagnoses from home visits shouldn't count toward extra payments to Medicare insurers. The inspector general that oversees the Medicare agency has said it should reconsider the use of such diagnoses.

A spokeswoman for the Centers for Medicare and Medicaid Services, said the agency recently ramped up audits to verify diagnoses. The agency also is eliminating some diagnoses from those that qualify for extra payments, including peripheral artery disease.

Nathanael Lacaria, a nurse practitioner who did home visits in Colorado for CVS's Signify unit in 2019 and 2020, said he didn't feel it was appropriate to make definitive diagnoses based on one visit.

CASE 0:24-cv-01743-JMB-JFD   Doc. 152-3   Filed 08/25/25   Page 47 of 74

He said he didn't realize insurers were submitting some of his tentative diagnoses to Medicare for billing purposes until a woman he had visited called the company to complain. "What's this depression diagnosis in my chart?" she asked, according to Lacaria.

When he visited the woman, whose husband had died, Lacaria said, he recorded her answers to a standard depression screening tool, but he hadn't actually diagnosed depression. "These visits were definitely used to jump to conclusions I wouldn't have arrived at," he said.

The CVS spokesman said Signify's clinicians independently determine which conditions a patient has.

Write to Anna Wilde Mathews at Anna.Mathews@wsj.com, Christopher Weaver at Christopher.Weaver@wsj.com, Tom McGinty at Tom.McGinty@wsj.com and Mark Maremont at Mark.Maremont@wsj.com

*Appeared in the August 6, 2024, print edition as 'Nurse Visits Made Insurers $15 Billion'.*

# EXHIBIT 6



NATSUMI CHIKAYASU FOR STAT

A STAT **INVESTIGATION**

# Health Care's *Colossus*

---

## How UnitedHealth turned a questionable artery-screening program into a gold mine

*By* [Casey Ross](#) , [Lizzy Lawrence](#) , [Bob Herman](#) , *and* [Tara Bannow](#)

Aug. 7, 2024

This is the second in a periodic series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence. [Read Part 1.](#)

9/30/24, 10:27 AM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-3   Filed 08/25/25   Page 51 of 74
UnitedHealth artery disease screening program boosted profits | STAT

The nation's largest health care company pressed thousands of its clinicians to use a thinly tested medical device to screen people for artery disease, dramatically boosting payments from the federal government for years even though many of the patients were not sick, a STAT investigation found.

The result was a torrent of sometimes questionable diagnoses of peripheral artery disease. Each one allowed the company, UnitedHealth Group, to claim thousands of dollars of extra payments tied to patients covered under Medicare Advantage, the increasingly popular version of Medicare run by private insurers. In many cases, those diagnoses were not medically useful, either because they were false positives or because they flagged early-stage disease, which isn't typically treated, according to nine clinicians.

UnitedHealth was perfectly positioned to invent a national screening program and profit from it. Over the last two decades it has assembled an unrivaled collection of physicians — some 90,000 doctors in all — and used this empire to pad its bottom line, as [STAT previously reported](#). At the same time, it has cemented its lead as the largest Medicare Advantage insurer. The full story of the company's sweeping vascular disease screening program, detailed here for the first time, reveals how UnitedHealth has used its growing dominance across the health care system to its own benefit — and to the detriment of doctors, patients, and taxpayers.

"The corporation views patients as entities that have money attached to their bodies," said Michael Good, a retired physician who worked at a Connecticut practice where UnitedHealth tested older patients with the device, called QuantaFlo. "They want to use the clinicians to mine the money that lies within the bodies of the patient."

The Centers for Medicare and Medicaid Services began cracking down on the aggressive diagnosis of peripheral artery disease in 2024, removing a diagnostic code from its payment formula that allowed UnitedHealth and other insurers to get extra reimbursement for diagnosing patients even if they weren't experiencing symptoms. In the following months, diagnoses of the condition began to decline.

In a statement, UnitedHealth defended its screening program.

"Screening patients with an increased risk for PAD aligns with guidance provided by the American Heart Association and the American College of Cardiology, and helps to identify and treat an under-diagnosed condition that, if left unmonitored and untreated, can lead to serious health consequences," UnitedHealth's statement said. "QuantaFlo is one FDA cleared tool providers may use, based on their independent clinical judgment, to assist in diagnosing patients with an increased risk for PAD and help ensure they receive appropriate follow-up care."

STAT's investigation is based on interviews with patients, vascular disease experts, and more than a dozen current and former clinicians at practices acquired by UnitedHealth across the country. It also included a review of internal communications, court records, scientific studies, and corporate documents that describe UnitedHealth's diagnostic coding practices and interactions with front-line caregivers. Some of the clinicians asked for anonymity out of concern for professional or legal repercussions from UnitedHealth.

## More on UnitedHealth

- **Part one of this series** looked at how UnitedHealth leveraged its physician empire to squeeze profits out of patients. Here's a video explainer on how it works.
- **The country's biggest** private health insurer, UnitedHealthcare, is in a contract dispute with its biggest hospital chain, HCA Healthcare.
- **Our 2023 "Denied by AI" UnitedHealth series** began with how Medicare Advantage plans use algorithms to cut off care for seniors. The series continued with a story on internal dissent at UnitedHealth, and pressure to follow the algorithm on discharge decisions. The final installment looked at the use of secret rules to restrict rehab care.

Doctors whose practices were acquired by the company's Optum subsidiary said they received hours of training on how to document patients' illnesses and increase payments from Medicare. Some clinicians previously told STAT they were pushed to document conditions they didn't believe applied to their patients. Part of their compensation was tied to the number of diagnoses they submitted for chronic conditions, including peripheral artery disease.

At the same time, they said they received no additional instruction or resources to improve care for patients with the condition. In some cases, the patients themselves only learned of the diagnosis in reviewing their own medical charts, triggering panicked calls to their doctors about the appearance of an ominous-sounding illness.

Peripheral artery disease affects between 8 million and 12 million patients a year in the U.S. and is particularly prevalent among those over age 65. It results from the gradual buildup of plaque in the arteries, typically reducing blood flow to a patient's legs and causing cramping or pain in the calf during exercise. Specialists in treating the condition said it is underdiagnosed, particularly in low-income communities and among Black people. If left untreated, it can eventually lead to amputations and even become life-threatening.

Still, the value of screening large numbers of patients is unclear. The U.S. Preventive Services Task Force, an independent panel that advises primary care physicians, does not recommend screening in patients without symptoms, due to a lack of evidence that early detection and treatment leads to better outcomes. The American Heart Association and the American College of Cardiology call for performing a thorough medical history and workup to detect signs of peripheral artery disease among patients over age 65, as well as younger patients with risk factors such as a history of diabetes, smoking, high cholesterol, or high blood pressure.

UnitedHealth does not apply those recommendations consistently. In a guidance document for clinicians who conduct visits with patients in their homes — a program called HouseCalls — the company cites the cardiology guidelines to support screening for peripheral artery disease in patients without symptoms.

But guidance to medical reviewers who decide whether UnitedHealth insurance plans should pay for services, advises against screening for peripheral artery disease in patients without symptoms. The guidance to medical reviewers states that patients with abnormal pulses may receive a standard test known as the ankle brachial index, a well-established method of identifying artery disease that relies on blood pressure measurements taken at the ankle and arms.

UnitedHealth's screening in patients' homes and primary care clinics doesn't use that technology. Instead the company relies on QuantaFlo, a relatively new device. Cleared in 2015 through a Food and Drug Administration pathway that requires limited clinical testing, QuantaFlo calculates artery blood volume

by measuring reflected infrared light through sensors placed on a patients' fingers and toes. It was cleared as a tool to aid clinicians in diagnosing PAD, but not as a standalone diagnostic device. QuantaFlo is backed by a slim body of evidence generated by its manufacturer, California-based Semler Scientific, and customers.



Cleared in 2015 through an FDA pathway that requires limited testing, the lime-green QuantaFlo device calculates artery blood volume by measuring reflected infrared light through sensors placed on a patients' fingers and toes. *STAT*

One study sponsored by Semler that describes the development of QuantaFlo found that the device is comparable in its accuracy to the ankle brachial index. The study showed that about 1 in 10 people who don't have peripheral artery disease will be incorrectly told that they do when tested with the device. Those figures come from an evaluation of the device in just 15 patients.

Experts said that level of imprecision, combined with the small sample size, makes it problematic for use in widespread screening because of the potential that false positives could expose high numbers of patients to unnecessary care.

"If you have something that's very sensitive, but not perfectly specific, you're going to pick up a lot of people, and you're going to be able to upcode a lot of people," said Steven Nissen, a cardiologist at the Cleveland Clinic. "Before I would want this to be used widely, I would want better studies suggesting that it is accurate, that it's better than ankle brachial index, that it's cost-effective."

A UnitedHealth physician leader, whom the company made available only on the condition that he not be identified, said a study is underway to compare QuantaFlo to the ankle brachial index.

UnitedHealth artery disease screening program boosted profits : STAT

Doctors with expertise in managing artery disease said they would not diagnose a patient with peripheral artery disease based on a positive result from QuantaFlo alone, and would seek to confirm the finding with an ankle brachial test. Semler asserts that no such confirmatory testing is necessary.

"QuantaFlo PAD is a stand-alone test that supports clinicians in the early diagnosis of PAD and does NOT require confirmation by cuff-based ABI," the company says on its website.

A Semler executive declined to respond to a detailed list of questions provided by STAT.

While QuantaFlo is used in some vascular clinics, its biggest customers are private insurers. Those companies were an early target for Semler, which focused on Medicare Advantage insurers because of the potential to boost use of the product nationwide.

Signify Health, a company owned by CVS Health that conducts home visits for Medicare Advantage insurers, also used the test on behalf of several large clients. A Signify spokesperson said the company uses QuantaFlo on patients with clinical risk factors for peripheral artery disease.

UnitedHealth began to expand testing nationwide through its HouseCalls program in 2017. The physician leader said the company's providers take into account the patient's medical history and findings from a physical examination, in addition to the results derived from QuantaFlo. An example scenario in guidelines for the program presents an 80-year-old woman with hypertension, no symptoms of peripheral vascular disease, and a positive QuantaFlo result. She would be coded with "peripheral vascular disease, unspecified."

UnitedHealth emphasizes in its marketing materials that early identification of chronic illnesses creates an opportunity to deliver more proactive and effective care. But years earlier, the company's executives focused on peripheral artery disease to seize a different kind of opportunity — one that directly benefited its bottom line.



UnitedHealth's HouseCalls program sends clinicians to millions of Medicare Advantage patients' homes nationwide to run tests. *STAT*

### 'Huge $ opportunities'

UnitedHealth's leaders set their sights on the financial opportunity tied to peripheral artery disease in 2007, after regulators revised Medicare Advantage's payment formula to account for patients' health status.

The change was based on a bedrock principle of the insurance business: Companies should be paid more for taking on more risk.

In November of that year, Jerry Knutson, then chief financial officer of UnitedHealthcare's Medicare and retirement division, flagged the money-making potential of vascular disease in an email to Jeffrey Dumcum, a senior vice president at Optum who worked in risk adjustment and now manages clinical performance and compliance. In his message, Knutson asked for a meeting with Dumcum to discuss ways to increase revenue from "risk-scoring" opportunities the two executives had discussed in prior conversations.

"You mentioned vasculatory disease opportunities, screening opportunities, etc with huge $ opportunities," Knutson wrote to Dumcum. "Lets turn on the gas! What can we do to make sure we are being reimbursed fairly for the members and risk we take on more than what we are currently doing."

The message, in which Knutson stated a desire to increase 2008 revenue by $100 million, was included in a federal whistleblower lawsuit filed by a former UnitedHealth financial manager, Benjamin Poehling, who had been copied on the email. Knutson is now chief financial officer of a chain of pediatric clinics in South Florida.

Poehling accused UnitedHealth's executives of bilking Medicare by failing to ensure the diagnosis codes it submitted to the agency were accurate. UnitedHealth has disputed the allegations and continues to fight them in court.

The case, scheduled for trial next year, was initially filed in 2011. After a five-year investigation, the Department of Justice joined the lawsuit in 2017, just as UnitedHealth began to expand its screening within its HouseCalls program to states across the country.

## The divergent testing rates of artery disease within Medicare

Rate of non-invasive PAD testing per 10,000 people, by enrollment type



Chart: J. Emory Parker/STAT • Source: Lown Institute

As it ramped up testing with QuantaFlo, the company sought to generate evidence to support widespread screening.

Two separate studies, one on [patients at a UnitedHealth-owned practice in Nevada](), and another on a [larger data sample]() drawn from its HouseCalls program, found that screening Medicare Advantage beneficiaries with QuantaFlo would find the condition in between 28% and 32% of patients. They also found that those who tested positive were more likely to die or experience heart attacks, strokes, and amputations in the ensuing years. But the studies were hardly independent — both were written by UnitedHealth employees.

Semler seized on the findings of the larger study in marketing materials. "We believe this study supports the use of QuantaFlo for PAD by customers who conduct in-home testing, which may drive further adoption by existing and new customers," Doug Murphy-Chutorian, a physician and CEO of Semler Scientific, said in a [December 2022 press release]().

But authors of the studies disclosed important limitations: QuantaFlo's accuracy in different populations was unknown, and it needed further validation as a relatively new and untested technology. To use it in widespread screening at that point was not a simple or obvious next step, said Carlos Mena-Hurtado, a Yale cardiologist who co-authored both of the studies.

"It's kind of a big jump," Mena-Hurtado said.

By the time the studies were published in 2022, UnitedHealth had already made that leap. At that point, the company also had a much larger network of physicians, having acquired large primary care practices nationwide, including in New York, Connecticut, Texas, Oregon, Florida, and Massachusetts. That created more opportunities for expanded testing.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page



UnitedHealth Group headquarters in Edina, Minn. *Tim Gruber for STAT*

## The fallout

A plethora of devices have become staples of the annual physical — the arm cuff to measure blood pressure, the stethoscope to listen to hearts and lungs. But within UnitedHealth, a little lime-green clip started popping up in primary care clinics across the U.S.

The company introduced the green QuantaFlo clip to primary care doctors at ProHealth, a UnitedHealth-owned network of clinics in Connecticut, after the worst of the Covid-19 pandemic. The pitch was simple: If you use this test on Medicare Advantage patients, it will not only identify undiagnosed peripheral artery disease, but also increase patients' risk scores, allowing the organization to tap into a sea of revenue.

Each diagnosis was worth about $3,600 in extra payments from Medicare, depending on the age and sex of the patient, according to a STAT analysis of Medicare data reviewed by an outside expert.

The directive to test all Medicare Advantage patients fell in line with the screening-heavy playbook UnitedHealth subsidiary Optum had championed at ProHealth since buying the network in 2015. Still, the doctors at the primary care network were baffled, several of them later recalled in interviews with STAT. Where was the evidence to support the test, and why would they screen asymptomatic patients when the U.S. Preventive Services Task Force had recommended against it?

"We were clamoring for information," said Good, a former ProHealth primary care doctor. "They didn't have this in medical school or in residency. We've never heard of this test. What's its basis, what's its validity?"

The UnitedHealth physician leader told STAT the company has shared clinical research with physicians who have raised questions about QuantaFlo, and noted that skepticism comes with any new technology.

But five former ProHealth doctors said they never received a satisfying justification for using QuantaFlo from UnitedHealth. All told STAT they were concerned that patients with false or exaggerated PAD diagnoses would receive unnecessary treatments, like statins or blood pressure medications, and struggle to buy life or disability insurance policies.

"It requires a discussion," Good said. "It's not just, 'Oh, you're a human being who's over the age of 65, let's order a test for you.' Everyone has a different situation, and every test has the possibility of negative consequences."

Good, Rubin Hirsch, Craig Czarsty, and two other experienced doctors who worked at ProHealth said they resolved to ignore UnitedHealth's demands to use the QuantaFlo test. But it wasn't going to be that easy.

UnitedHealth controlled the physicians' schedules and which patients would be seen by which doctors. Five clinicians said the company began to work around the doctors skeptical of the test, hiring nurse practitioners to conduct the test at annual wellness visits. One former ProHealth doctor said UnitedHealth started removing patients from their schedule and routing them to these nurses instead.

The result was chaos, the five doctors said. The nurse practitioners ordered QuantaFlo and other tests that racked up diagnostic codes, but were not allowed to offer clinical advice based on those results. The ProHealth doctors would then get calls from patients agonizing over the results.

"They'd call up and say, what does this mean that I have peripheral artery disease?" Good said. "What is this all about? Why didn't you ever tell me about this?"

9/30/24, 10:27 AM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-3   Filed 08/25/25   Page 59 of 74
UnitedHealth artery disease screening program boosted profits | STAT



Michael Good, a former family medicine physician, with a doctor's bag he once used for house calls, at his home in Durham, Conn. Good retired from practicing at ProHealth Physicians in 2023. *Tim Tai for STAT*

Some of the QuantaFlo diagnoses were nearly useless, five ProHealth doctors told STAT. A cardiologist patient who regularly exercised, had no symptoms, and was on a statin received a positive test. He brushed it off, his doctor recalled. Another QuantaFlo diagnosis hit close to home when the father of one former ProHealth doctor received a positive test.

"For him, it had no effect whatsoever because I was able to explain it to him on the back end," the former ProHealth doctor said. "He's already on cholesterol medication, he's not having symptoms. And frankly, it was probably a false positive."

But not every patient is so well-informed or has a physician in the family. In the absence of sound primary care advice, patients started calling into local vascular clinics.

Over the past two years, vascular offices in central Connecticut started fielding phone calls from anxious patients who had received abnormal QuantaFlo results. Kristine Lane, a physician's assistant at The Vascular Experts, a vascular care chain with offices across Connecticut, said several patients called asking to be seen immediately, worried that they might eventually lose a leg without treatment. Some had been referred by ProHealth and from insurance company programs that sent clinicians to visit patients in their homes, including HouseCalls.

She said the clinic conducted an ultrasound on these patients to scan their lower extremities for signs of restricted blood flow. She couldn't recall a single follow-up test that found evidence of disease. "They'll come in with an extremely abnormal QuantaFlo number, and then on real testing — more elaborate testing — they're not abnormal at all," she said.

The same pattern unfolded at a nearby vascular clinic at Hartford HealthCare, to the point where clinical staff stopped ordering normal follow-up testing because so many QuantaFlo patients were falsely positive. They would often come in with strong pulses in their feet, an employee said.

The test is tying up vascular and primary care clinics not only in Connecticut, but also across the country. UnitedHealth's HouseCalls program is nationwide, with millions of Medicare Advantage patients allowing the insurer's clinicians into their homes to run tests.

In Littleton, North Carolina, family physician Ray Antonelli sees about three or four patients a week who are reeling with anxiety after receiving a positive QuantaFlo test during a UnitedHealth wellness visit. He recalled seeing a patient who was convinced she had peripheral artery disease because the results said "Normal/Borderline," even though she wasn't experiencing any symptoms. The misunderstanding ate into precious time needed for discussing more pressing health issues.

"I usually use some kind of analogy like, we try not to dredge up problems if it's not going to be helpful to you," Antonelli said.

Foluso Fakorede, a Mississippi cardiologist and leader in peripheral artery disease treatment, said he's noticed a major uptick in QuantaFlo patients referred to his office. Like the vascular doctors in Connecticut, he typically ignores the test result if patients' pulses feel normal and they have no risk factors. "A couple of times, I have not charged a patient for a visit because I just feel bad," Fakorede said.

Fakorede is on the frontlines of the fight against an amputation epidemic that primarily affects Black Americans, whose PAD often goes undiagnosed until it's too late. He and other vascular doctors have been ringing the alarm on this issue for years, calling for more accessible and affordable screening. He acknowledged that QuantaFlo isn't perfect — but his concern lies less with the test, and more with the way UnitedHealth is deploying it.

Watching Medicare Advantage patients flood into his clinic, he's skeptical that insurers like UnitedHealth are committed to taking care of the patients whose risk score money they eagerly collect. Securing reimbursement for a procedure on a sick PAD patient is still extraordinarily difficult, he pointed out.

"Is it that we want to increase the pool of the patients in the Advantage plans that have chronic disease states, but we do not want anything coming out of the pool to really treat these patients?" Fakorede asked.

## UnitedHealth's nationwide focus on coding artery disease

When Optum began in-home visits with peripheral artery disease screening, by state

| April 2017 | May 2017 | August 2017 | November 2017 | January 2019 | February 2019 |



Note: Among Medicare Advantage beneficiaries
Map: J. Emory Parker/STAT • Source: Smolderen et al., AJPM Focus (2022)

## A dramatic rise in coding for PAD

Testing for peripheral artery disease began to skyrocket within Medicare Advantage in 2018, the first full year after UnitedHealth instituted QuantaFlo screening in its HouseCalls program in 26 states, from Connecticut to Colorado.

An analysis of Medicare data conducted for STAT by the Lown Institute, a nonpartisan health research organization, found that the rate of non-invasive PAD testing using QuantaFlo and other products climbed among Medicare Advantage patients from about 250 tests per 10,000 beneficiaries in 2018 to 650 per 10,000 by 2021. Meanwhile, the rate of testing within traditional Medicare dropped slightly, to just over 200 tests per 10,000, according to the analysis. Because of different reporting requirements, the Medicare Advantage data are incomplete and likely undercount the rate of testing.

From 2018 to 2021, UnitedHealth tallied more than 1.3 million unspecified artery disease diagnoses, according to Lown's analysis. The code for that diagnosis is worth roughly $3,000 annually on average, according to federal Medicare experts, meaning UnitedHealth took in approximately $4 billion in taxpayer money from both valid and questionable PAD diagnoses during that four-year stretch.

UnitedHealth's own data, published in late 2022, showed the company's clinicians diagnosed Medicare Advantage patients with peripheral artery disease at almost four times the rate of patients in traditional, government-run Medicare, which does not provide the same financial incentives.

UnitedHealth researchers argued in their study that more careful management of patients led to lower costs and better outcomes, including lower odds of hospitalization and fewer emergency department visits and admissions for heart attacks and strokes. In an interview with STAT, the UnitedHealth physician executive also said that Medicare Advantage's payment system rewards insurers for catching and managing chronic conditions early.

But former Medicare officials argued there was no direct evidence that the increased rate of diagnosis of peripheral artery disease was leading to better care — and it was causing costs to skyrocket. "[Medicare's] risk adjustment system has allowed plans to in effect set their own premium by incessantly creating, hunting for, and submitting more diagnosis codes to CMS," stated a March 2023 letter signed by 19 former Medicare officials, physicians, and policy experts.

The flood of codes for the illness and other chronic conditions, such as kidney disease and substance use disorder, dramatically boosted reimbursements to Medicare Advantage insurers, resulting in excessive payments expected to cost taxpayers $50 billion this year alone, according to the Medicare Payment Advisory Commission.

The letter supported reforms CMS ultimately enacted to eliminate the diagnostic code for peripheral artery disease without complications, among other changes. A CMS spokesperson told STAT the agency made those changes after it "carefully reviewed what we use in the model to predict costs and took a close look at where coding of diagnoses is likely not consistent across the industry."

Practices in the industry appeared to shift when CMS announced its coding changes. Testing and diagnosis for the condition began to drop, according to an analysis of provider records conducted for STAT by Truveta, a health data company. The rate of testing and diagnosis in patients 50 and older more than doubled between 2018 and 2023 — from 7 per 100,000 patients to 14.7 per 100,000, then fell to 9.6 in May 2024.

After Medicare revealed its plan to change coding, Semler announced its intent to use QuantaFlo to diagnose "heart dysfunction." In a recent earnings call, Semler's Chief Financial Officer Renae Cormier said the company hopes to achieve FDA clearance in the second half of 2024. Meanwhile, Semler is pouring its QuantaFlo profits toward a completely different endeavor — buying up $63 million worth of bitcoin since May.

QuantaFlo screenings seem to be on the way out at ProHealth. In March 2024, management told providers that the test would not be a covered benefit under a Medicare Advantage provider network in Connecticut, according to a copy of the email obtained by STAT.

"Please do not leave patients with the expectation that they will receive QuantaFlo screening as part of their Embedded Nurse Practitioner visit," the email reads.

But the effects are still rippling through the community. Several ProHealth doctors who STAT spoke with retired at least five years earlier than they planned, dismayed by the decisions UnitedHealth made to escalate profits at the expense of patients — the use of QuantaFlo among them.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 63 of 74

"Patients were told these were things their doctors recommended," Good said. "It was a betrayal of our patients' trust."

**STORY CREDITS**

**Writing:** Casey Ross and Lizzy Lawrence
**Reporting:** Casey Ross, Lizzy Lawrence, Bob Herman, Tara Bannow
**Editing:** Zachary Tracer
**Graphics:** Emory Parker and Alex Hogan
**Illustrations:** Natsumi Chikayasu
**Art and Photo Direction:** Alissa Ambrose
**Additional photo editing:** Crystal Milner
**Copy editing:** Karen Pennar, Sarah Todd
**Additional editing:** Gideon Gil, Rick Berke
**Design and development:** Jennifer Keefe, Julia Bujalski, Ben Lokshin

### Health Care's Colossus: Share your experience

*Required

### About the Authors



**Casey Ross**

National Technology Correspondent

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter.

lizzy.lawrence@statnews.com
@LizzyLaw_



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the [Health Care Inc. newsletter](#).

bob.herman@statnews.com
@bobjherman



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers.

tara.bannow@statnews.com
@TaraBannow

To submit a correction request, please visit our [Contact Us page](#).

# EXHIBIT 7



NATSUMI CHIKAYASU FOR STAT

A STAT **INVESTIGATION**

# Health Care's *Colossus*

---

## Inside UnitedHealth's strategy to pressure physicians: $10,000 bonuses and a doctor leaderboard






*By* Tara Bannow , Bob Herman , Casey Ross , *and* Lizzy Lawrence

Oct. 16, 2024

**This is part 4 in Health Care's Colossus**, a series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence.

10/18/24, 1:08 PM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-3   Filed 08/25/25   Page 67 of 74
UnitedHealth gave doctors bonuses, pushed for Medicare Advantage visits

The emails from UnitedHealth Group managers were filled with exclamation marks and pleasantries about the weather. But the underlying message to doctors in late 2020 was persistent and urgent: Hit your targets to see more patients. We need to bring in more money.

At the time, deaths from Covid-19 were surging, and no vaccine was available. But inside a UnitedHealth practice, the "#1 PRIORITY" became documenting older patients' chronic illnesses to generate more revenue from the federal government, the emails show.

One email trumpeted "ADDITIONAL BONUSES!!" for doctors who scheduled more appointments, encouraging them to meet with older patients on weekends. "We need to complete ALL our Medicare Advantage Visits," one manager declared. The company even started a program where it enticed Medicare Advantage patients with $75 gift cards if they completed a checkup.

UnitedHealth shared with doctors in the practice a dashboard comparing the percentage of chronic diseases they found among their Medicare Advantage patients to other practices within the company. Those who completed the most appointments with older patients got a "SHOUT OUT!!" in the messages and were eligible for up to $10,000 in bonuses. "We can do this!!" another email said, encouraging doctors who were falling behind.

These and other internal documents obtained by STAT expose the inner workings of UnitedHealth's corporate strategy to enlist its doctors to pile moneymaking diagnoses onto patients covered by Medicare Advantage, the federal health care program for older adults that's run by private insurers. Since the government pays insurers more for sicker patients — a system known as risk adjustment — the company uses its unrivaled control over its doctors to make those patients look as sick as possible on paper. UnitedHealth relies on a variety of tactics: money, peer pressure, and guilt.

The documents are tied to one specific practice owned by UnitedHealth, which brands its physician groups under the Optum name, and they are from 2020 and 2021. STAT is not naming the practice or the source who provided the documents because they said they feared professional and legal repercussions. However, nine physicians who previously worked at five other Optum clinics across the U.S. described similar practices at their former groups. The points of emphasis, and specific tactics, sometimes varied, but UnitedHealth's overarching message was the same: Conduct more visits with older patients, and document their illnesses to drive up revenue.

Rubin Hirsch, a retired UnitedHealth doctor in Connecticut, said leaders heavily pushed this message during mandatory seminars, though he did not receive a formal dashboard comparing his rates of diagnoses to others.

"The spiel was, we want to identify these people so we can take care of them better, but really they spent very little time, that I can recall, teaching you how to do better medicine," Hirsch said.

10/18/24, 1:08 PM
CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 68 of 74
United Health gave doctors bonuses, praise for Medicare Advantage diagnosis



Rubin Hirsch, a former family medicine physician, at his home in Durham, Conn. *Tim Tai for STAT*

UnitedHealth declined to answer questions for this story without reviewing the documents cited in the article. STAT declined to provide them in order to protect our sources.

At the clinic whose documents STAT reviewed, many of the patients were insured by a UnitedHealth Medicare Advantage plan. Some managers even asked doctors to connect patients with insurance brokers who set up shop inside the clinics and sold UnitedHealth Medicare Advantage plans. Medicare Advantage was the "best" or a "great" option for patients, managers cheered. UnitedHealth is the biggest seller of the private Medicare plans and covers about 9.5 million people.

The coding strategy has paid off for the company. UnitedHealth's physicians produced a blizzard of diagnoses that allowed the company to reap billions of dollars from Medicare, sometimes for illnesses that doctors told STAT were either clinically insignificant, marginally treatable, or not present in the patient at all.

One aspect of the pressure campaign was the dashboard that compared doctors with peers in their region, and nationally, by the percentage of their Medicare Advantage patients they'd diagnosed with certain chronic diseases. Doctors in two other UnitedHealth-owned clinics confirmed they received a dashboard regularly by email. It set up a kind of leaderboard, a way of fueling competition to detect illnesses.

Among the assertions peppered throughout the emails was that doctors ought to give back to UnitedHealth for all of the company's support during a challenging pandemic. "They expect us to do our best to perform as well as possible," an administrator wrote in one email.

One document shared with STAT was a handout that offered doctors tips on how to code patients for various illnesses. "Think Chronic Conditions," it urged. Several doctors who reviewed the guidelines for STAT said they seemed reasonable, although Ishani Ganguli, an associate professor of medicine at

10/18/24, 1:08 PM
CASE 0:24-cv-01743-JMB-JFD Doc. 152-3 Filed 08/25/25 Page 69 of 74
UnitedHealth gave doctors bonuses, pressed for Medicare Advantage diagnosis

Harvard Medical School, said she could understand the frustration doctors might feel being asked to focus on coding during their limited time with patients.

At some practices, like the Oregon Medical Group in Eugene, the bonuses were attached to checking off diagnoses in patients' charts. Eventually, doctors couldn't close out visits in the computer system until they responded to whether or not patients had certain conditions, said Nick Jones, a primary care physician who used to work at the practice and now runs his own. Doctors also had to attend education sessions where UnitedHealth managers taught them how to code patients' conditions during visits.

"They would say, 'You should talk about these other high-risk disease states so that we get more compensation for it,'" Jones said. "I think that's an inherent conflict of interest. Effectively what you're incentivizing is sicker patients, or at least sicker appearing on paper, which I think is a joke."

One former UnitedHealth primary care doctor said it was a constant struggle to push back against the company's exhortations to increase revenue. Clinicians would strategize about how to talk corporate managers off overly ambitious goals for diagnosing more chronic conditions and increasing patients' risk scores to fetch more money from Medicare, the doctor said. There was an expectation those scores would go up every year, the physician said. And while doctors weren't penalized if they weren't coding enough diagnoses, those who were at the bottom were offered remedial training.

"There is only so much pathology in a given population of people," the former primary care doctor said. But UnitedHealth's managers compared the doctor's clinic with practices in other states that generated more diagnoses and higher patient risk scores. The implication, the doctor said, was that their clinic was behind and needed to catch up. They were leaving money on the table.

## How UnitedHealth compared its doctors

UnitedHealth Group sent doctors at one of its practices a dashboard comparing the prevalence of chronic conditions among their Medicare Advantage patients to the averages at their practice, and among UnitedHealth's providers regionally and nationwide. One example is recreated in part below.

Doctor    Practice    Regional    National

COPD

Depression/Bipolar

Diabetes

0%                          25%                          50%

**Vascular disease**

**Arrhythmias**

This is a reproduction of a portion of the dashboard provided to STAT. Exact values have been rounded to protect the identity of the source.

Chart: J. Emory Parker/STAT

In clinics nationwide, UnitedHealth has capitalized on a simple tactic for capturing more of those dollars: It pays doctors to spend time with Medicare Advantage patients in a formal sit-down known as the annual wellness visit.

The Affordable Care Act created Medicare's annual wellness visit in 2011 as a way for doctors to take stock of their patients' chronic health conditions. The visits require primary care doctors to screen for problems that are common in older adults, like dementia and depression, but they don't include a physical exam beyond checking vital signs like blood pressure. The federal government pays doctors more for these visits than other types of appointments.

"I like the concept because it is an opportunity for the provider and the patient, and sometimes their family, to sit down and talk about what they can do to remain healthy going forward," said Patrick Coll, chief of geriatrics and medical director for senior health at UConn Health. "I think, in principle, it's a good thing."

But eventually, Medicare Advantage plans started using them as a way "to improve or optimize the revenue stream" by updating coding, said Jeffrey Millstein, an internal medicine physician at Penn Medicine.

In 2022, Medicare Advantage plans received nearly $8 billion in taxpayer funds based on the medical codes that were jotted down during annual wellness visits, according to the Medicare Payment Advisory Commission, known as MedPAC. Insurers got another $5 billion that year from codes that were part of a health assessment in someone's home.

"It does not surprise me at all that United would use the annual wellness visit to generate codes," said Mark Miller, who leads health care policy at Arnold Ventures and who studied how Medicare Advantage plans used wellness visits when he was the executive director of MedPAC. "This seems to be a play that they have been involved in for years."

Research into annual wellness visits has found they don't increase preventive screenings enough to actually lower the prevalence of chronic conditions among older patients. The government designed the visit to strengthen relationships between patients and their primary care doctors, but it's also a "natural time" for doctors to take inventory of their patients' conditions and code for them, Ganguli said.

"It is annoying as a physician, I would say, because it doesn't feel closely connected to our desire to take care of patients," she said. "It feels like an administrative task. I empathize with doctors who feel like this

10/18/24, 1:08 PM
UnitedHealth gave doctors bonuses, pushed for Medicare Advantage visits
CASE 0:24-cv-01743-JMB-JFD    Doc. 152-3    Filed 08/25/25    Page 71 of 74

isn't the reason I went into medicine."

Annual wellness visits aren't the only type of visit where clinicians enter diagnoses into patients' records — they just happen to be a convenient time to do so. There's also a cottage industry of consultants and coding specialists who collect diagnoses during assessments they perform in patients' homes, typically on behalf of Medicare Advantage insurers.

Many primary care doctors say while this process is flawed, it's the main way to get more money so they can provide good preventive care. UnitedHealth also isn't the only company that prioritizes patients' medical codes. Humana, CVS Health's Aetna, Blue Cross Blue Shield insurers, and even hospital systems that participate in Medicare "accountable care" programs use technology and various vendors to maximize Medicare Advantage patients' conditions.

Those organizations, some contend, are simply responding to the incentives and systems created by Congress and the Centers for Medicare and Medicaid Services, the federal agency that regulates all Medicare programs.

"Did the rules that CMS set up make the corporate entity focus on risk adjustment more than certain things? Of course," said Reza Alavi, who used to be a medical director within one of UnitedHealth's Optum practices. "I don't think that is good or bad or sideways. It just is a fact."

But UnitedHealth's size and control over physicians makes it uniquely capable of financially benefiting. The company operates its own business unit that specializes in home visits called HouseCalls, and employs thousands of clinicians through that service.

The documents obtained by STAT, along with interviews with former UnitedHealth primary care doctors, show that HouseCalls was another piece of the strategy to maximize patients' risk scores.

An email from a manager at a UnitedHealth clinic details a layered strategy. Physicians were offered bonuses to conduct annual wellness visits. Clinics added appointment times on Saturdays to squeeze in more visits, and the company deployed clinicians from both within the practice and HouseCalls to visit patients in their homes. "Our patients love them!!" one email said of the weekend openings.

If there was ever any question about why UnitedHealth was fixated on wellness visits, the emails made it clear: risk adjustment. One manager's email listed the reasons for performing the visits. The first bullet point was increasing risk coding, followed by supporting patients, receiving bonuses and, finally, "Show our appreciation for the support we have received from Optum!"

Another practice leader's email from late 2020 listed the top three priorities going into 2021. The first: "Risk adjustment." But even as the emails did this, they used careful language that emphasized the coding must be done "accurately."

One document ranked clinicians based on how many annual wellness visits they had completed with Medicare Advantage patients, and cheered those in the lead. "TOP 10 IN AWVs TOTAL!! SHOUT OUT!!," the email blared, listing the doctors with the most visits. The message also listed bonuses for conducting more visits and explained the weekend clinics were a "win" for patients and providers

10/18/24, 1:08 PM
CASE 0:24-cv-01743-JMB-JFD Doc. 152-3 Filed 08/25/25 Page 72 of 74
UnitedHealth gave doctors bonuses, praise for Medicare Advantage visits

because they helped increase coding of chronic conditions such as peripheral artery disease, or PAD, a narrowing of the arteries that bring blood to the arms and legs.

As managers urged doctors to document positive PAD results as quickly as possible, one primary care physician complained the results were sometimes inaccurate. The doctor flagged multiple false positives and called for a halt to testing with a thinly validated device called QuantaFlo. It is unclear what, if any, follow up action was taken.

But the documents show that UnitedHealth's doctors diagnosed PAD in 47% of their Medicare Advantage patients — three to four times the estimated prevalence of the condition in older Americans. Each diagnosis generates about $3,000 a year in extra payments from Medicare.

In November 2020, a time when Covid-19 deaths were rapidly climbing toward the deadliest weeks of the pandemic, UnitedHealth was focused on logging chronic illnesses and getting older adults back into its clinics for annual wellness visits, both in-person and virtually. A practice leader's email at the time urged doctors to use "creative solutions" like expanded hours, an app for scheduling, and rapid Covid-19 testing and masks. Annual wellness visits, it declared, are "good for patients, and good for our business."

For its part, Jones said the Oregon Medical Group did not push annual wellness visits at that time, given the risks.

"To hear that other organizations are incentivizing annual wellness visits during a pandemic and getting people in for routine care, meanwhile, the number of patients dying across the country is skyrocketing, that makes me sick," Jones said.



How insurers use doctors to profit off medical codes

10/18/24, 1:08 PM
CASE 0:24-cv-01743-JMB-JFD Doc. 152-3 Filed 08/25/25 Page 73 of 74
UnitedHealth gave doctors bonuses, praise for Medicare Advantage results

Doctors in the practice were also enlisted to help enroll more patients in Medicare Advantage. UnitedHealth owned a Medicare Advantage plan that covered many of its patients, and one manager reminded doctors in a memo that the annual open enrollment period was an "opportunity for us to attract new patients while doing what's right for those we serve."

The doctors didn't have to be "Medicare experts," the memo stated, but they could "connect patients to our licensed insurance agent partners so that patients could make informed decisions," adding that "Medicare Advantage is a great option."

An email from a different manager derided traditional Medicare as "reactive, costly, and unsustainable." By contrast, the email stated, "Medicare Advantage has benefits for both our patients and our health care system." Another Optum clinic had informational booths advertising Medicare Advantage plans as recently as this year, according to photos obtained by STAT.

Tricia Neuman, a senior vice president at the health policy organization KFF who has studied Medicare for three decades, thought the language describing traditional Medicare was troublesome. "It surprises me that this type of communication is allowable under [Medicare's] marketing guidelines," she said.

She said doctors are experts in clinical matters, and not necessarily in the tradeoffs and details of health insurance. "Patients trust their doctors, and they rely on their doctors to provide advice," Neuman said. "It's not clear that doctors understand the nuances of various Medicare Advantage plans in their area."

UnitedHealth's promotion of Medicare Advantage over traditional Medicare stands in stark contrast to recent remarks made by a group of Connecticut lawmakers, including Democratic Sen. Richard Blumenthal, who held a press conference earlier this month to discourage patients from selecting Medicare Advantage plans.

"There is no advantage to Medicare Advantage," said Blumenthal, the chair of a Senate Subcommittee on Investigations that will soon release a report on the program. "There is a distinct disadvantage."

**STORY CREDITS**

**Writing:** Casey Ross, Lizzy Lawrence, Bob Herman, Tara Bannow
**Reporting:** Casey Ross, Lizzy Lawrence, Bob Herman, Tara Bannow
**Editing:** Zachary Tracer
**Graphics:** Emory Parker
**Illustrations:** Natsumi Chikayasu
**Art and Photo Direction:** Alissa Ambrose
**Additional photo editing:** Crystal Milner
**Copy editing:** Karen Pennar
**Additional editing:** Gideon Gil, Rick Berke
**Design and development:** Jennifer Keefe, Julia Bujalski, Ben Lokshin

## About the Authors



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers.

tara.bannow@statnews.com
@TaraBannow



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the [Health Care Inc. newsletter](#).

bob.herman@statnews.com
@bobjherman



**Casey Ross**

Chief Investigative Reporter, Data & Technology

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter.

lizzy.lawrence@statnews.com
@LizzyLaw_

To submit a correction request, please visit our [Contact Us page](#).