# EXHIBIT B-3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> UNITEDHEALTH GROUP INC., et al., <br><br> Defendants. | Civ. No. 24-cv-1743 (JMB/JFD) <br><br> <u>CLASS ACTION</u> <br><br> [PROPOSED] THIRD SUPPLEMENTAL CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

4902-9194-7617.v1

# EXHIBIT 8

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 09/25/25 Page 4 of 179

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/medicare-insurers-extra-payments-72d09393

**EXCLUSIVE**   **HEALTHCARE**

# Medicare Paid Insurers Billions for Questionable Home Diagnoses, Watchdog Finds

Nurse visits said to be worth $1,869 each for Medicare Advantage companies

By *Christopher Weaver* [Follow] and *Anna Wilde Mathews* [Follow]
*Updated Oct. 24, 2024 11:58 am ET*



Erin Bliss, assistant inspector general for evaluation and inspections, testifying on Capitol Hill last year.
PHOTO: JACQUELYN MARTIN/ASSOCIATED PRESS

Private Medicare insurers got about $4.2 billion in extra federal payments in 2023 for diagnoses from home visits the companies initiated, even though they led to no treatment, a new inspector general's report says.

The extra payments were triggered by diagnoses documented based on the visits, including potentially inaccurate ones, for which patients received no other medical services, the report says. Insurers offering private plans under

Medicare, known as Medicare Advantage, are paid more when patients have costly conditions.

Each visit was worth $1,869 on average to the insurers, according to the Office of Inspector General for the Department of Health and Human Services. The findings are similar to those of a Wall Street Journal investigation published in August. It showed that insurers between 2019 and 2021 pocketed an average of $1,818 for each visit based on diagnoses for which people received no other treatment.

The OIG recommended in Thursday's report for the first time that Medicare restrict or even cut off payments for diagnoses from these visits.

The Medicare agency disagreed with the recommendation to restrict home visit payments, citing limitations of the study, according to the report. In a statement to the Journal, the Medicare agency said it is committed to ensuring that diagnoses, including those from home visits, are accurate.

Medicare Advantage was conceived as a way to lower costs and improve care in the program for seniors and disabled people. But researchers and the Medicare Payment Advisory Commission, a nonpartisan watchdog agency known as MedPAC, have found that it has wound up costing more than traditional Medicare, in part because insurers have found ways to draw ever-greater payments from the pay-for-diagnoses system.



UnitedHealth has said that three million 'gaps in care' were identified through home visits in 2023.
PHOTO: TIFFANY HAGLER-GEARD/BLOOMBERG NEWS

The home visits, also called health risk assessments, are an important part of that effort. During visits, nurse practitioners, or sometimes doctors, take medical histories, review medications and run simple diagnostic tests, sometimes coming up with novel diagnoses that the patients' regular doctors had never documented.

"We're seeing that some Medicare Advantage companies are making billions from the health risk assessment diagnoses without providing care for the conditions that they identify," said Erin Bliss, assistant inspector general for evaluation and inspections.

That could mean some of the diagnoses are false, she said. Or, if they are accurate, the insurers making them aren't connecting patients to the care they need, even as the companies are paid extra based on the supposed cost of treating the conditions. "Profiting off enrollees' medical conditions without providing treatment for those conditions is wrong," she said.

Bliss said the OIG's latest findings and the conclusions of the Journal investigation are "highly consistent and pointing in the same direction."

The diagnoses that triggered home-visit payments documented in the OIG report were often for illnesses that might be difficult to confirm without a laboratory or other equipment. Two of the top diagnoses driving the payments were a form of rheumatoid arthritis, which might require lab work and X-rays to diagnose, along with secondary hyperaldosteronism, a condition that can be confirmed with blood work.

"There are definitely conditions where you might wonder, 'Can they really, you know, identify that by a visit to someone's home?' " said Jacqualine Reid, an OIG analyst and the lead author of the report.

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 09/25/25    Page 7 of 179



Humana says health risk assessments help improve patient outcomes. PHOTO: JON CHERRY/BLOOMBERG NEWS

Another Journal article, from July, found that insurers received about $50 billion in payments from diagnoses they themselves added to patients' records, including many that were demonstrably false, such as diabetic cataract cases that had already been cured.

The OIG analysis also examined health risk assessments at doctors' offices, worth about $365 a visit to insurers, as well as those done through telehealth. The report also included diagnoses insurers added following so-called chart reviews of home, telehealth or office assessments. In total, Medicare paid insurers $7.5 billion in 2023 for diagnoses recorded just through those practices.

One major Medicare Advantage insurer received about two-thirds of the total payments stemming from home visits and chart reviews, despite accounting for only 28% of the program's enrollment, the report said, without naming the company. An OIG official confirmed to the Journal that the company was UnitedHealth Group, the Medicare Advantage market leader.

"A misleading, narrow, and incomplete view of risk adjustment data is being used to draw inaccurate conclusions about the value of in-home care for America's most vulnerable seniors in Medicare Advantage," a UnitedHealth spokesman said of the OIG findings after this article was published. He said the home visits are comprehensive assessments by highly-trained clinicians that take 45 to 60 minutes and help "identify and drive needed follow-on care for the vast majority of the patients with whom we engage."

The Journal's recent analysis showed that UnitedHealth extracted far higher payments for diagnoses tied to home visits than other large insurers—$2,735 on average over the three years ending in 2021—and accounted for most of the payments.

In a statement on its corporate website following the Journal's reports, UnitedHealth said that its home visits are valuable for patients, and that the finding that diagnoses are questionable or wrong "is unsubstantiated, and the WSJ presented no credible evidence to support this claim."

In all, UnitedHealth received $3.7 billion from all types of health risk assessments activities in 2023, the OIG report said. Humana, the No. 2 Medicare Advantage insurer, generated $1.7 billion from health risk assessments and associated chart reviews.

A Humana spokesman said that health risk assessments help improve patient outcomes and that findings are always referred back to patients' own physicians for follow-up. He said Humana would continue to work with Medicare to improve the assessments' transparency and accuracy.

The Justice Department has pursued a number of cases that accused Medicare insurers of inflating payments based on diagnoses. Last year Cigna Group agreed to pay $172 million to settle such allegations. The company admitted to adding diagnoses that weren't supported by patients' medical records. An OIG official declined to comment on any ongoing investigations.

The report is the latest in a series by OIG pointing to the potential for Medicare Advantage overpayments due to insurer-driven diagnoses, such as those from home visits.

The newest findings propelled the oversight agency's strongest recommendations to rein in the tactics yet. In addition to restricting or cutting off payments based solely on home visit diagnoses, the inspector general recommended targeted audits of such diagnoses to determine whether they are accurate.

MedPAC has previously called for the Medicare agency, the Centers for Medicare and Medicaid Services, to stop allowing diagnoses drawn from health risk

assessments to affect insurers' payments.

The Medicare agency disagreed with that recommendation. It argued that OIG's report hadn't fully proved problems with the home visit diagnoses because the investigators didn't have access to patients' medical records, and that data made it difficult to identify the home visits definitively. The Medicare agency said it would consider targeted audits after further analysis.

The agency said it believed recent changes to which diagnoses trigger payments —now being phased in—had already addressed a third recommendation to study diagnoses detected at high rates through health risk assessments.

Write to Christopher Weaver at Christopher.Weaver@wsj.com and Anna Wilde Mathews at Anna.Mathews@wsj.com

## We Want to Hear From You

Have you had a Medicare Advantage plan? Share your experience with us.

Name*

Email*

City, State*

SUBMIT

By submitting your response to this questionnaire, you consent to Dow Jones processing your special categories of personal information and are indicating that your answers may be investigated and published by The Wall Street Journal and you are willing to be contacted by a Journal reporter to discuss your answers further. In an article on this subject, the Journal will not attribute your answers to you by name unless a reporter contacts you and you provide that consent.

*Appeared in the October 24, 2024, print edition as 'Medicare Watchdog Faults Home-Visit Pay'.*

## Videos

CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 11 of 179

# EXHIBIT 9

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 13 of 179



NATSUMI CHIKAYASU FOR STAT

A STAT INVESTIGATION

# Health Care's *Colossus*

---

## UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits

*By* [Bob Herman](#), [Casey Ross](#), [Lizzy Lawrence](#), *and* [Tara Bannow](#)

Nov. 25, 2024

**This is part 5 of [Health Care's Colossus](#),** a series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence.

UnitedHealth Group is paying many of its own physician practices significantly more than it pays other doctor groups in the same markets for similar services, undermining competition and driving up costs for consumers and businesses, a STAT investigation reveals.

The findings, drawn from a sample of practices across the country, expose the effects of a deepening conflict of interest: Rather than use its size and market power to drive down the cost of care, UnitedHealth, as the corporate parent of both a dominant insurance company and health care provider, can capture larger profits by paying itself higher prices for basic checkups, surgeries, and procedures.

STAT uncovered the above-market payments in a first-of-its-kind analysis conducted in partnership with health analytics company Tribunus Health. The analysis examined UnitedHealth's own data, which must be reported to the federal government, showing what its commercial insurance unit pays 16 of its Optum-branded doctor groups for common or expensive services that account for the most spending.

The higher prices reward UnitedHealth at the expense of almost everyone else. Patients end up paying more when they see their doctors and struggle to afford recommended follow-up care. Employers counting on the insurance giant to control ever-rising costs get little or no relief. And doctors trying to compete with UnitedHealth's practices find themselves frozen out of the higher rates the company is paying its own providers, making it more difficult to remain independent and keep their doors open.

STAT previously reported how UnitedHealth has used an [unparalleled empire of clinicians](#) to make older patients [appear sicker and extract higher government payments](#) for its Medicare Advantage business. The new investigation highlights the consequences of UnitedHealth's growing control of physicians on the broader commercial insurance marketplace, funded by employers and their workers.

The analysis found that UnitedHealthcare, the company's insurance subsidiary, paid 13 of the 16 Optum practices more on average for common services than the market price, which refers to the average UnitedHealthcare pays in-network providers, including Optum and non-Optum practices, within the same specialty in a given county or service area.

There's variability within that finding — UnitedHealthcare paid Optum practices anywhere from 3% to 111% above the market average. The analysis has limitations and isn't comprehensive. For example, UnitedHealth's own data files are imperfect and do not include certain information, like how common certain services are at individual practices, or the type of facility where care was provided. And the analysis included only a subset of common services and procedures ([read the methodology below](#)).

## How UnitedHealth payments to its provider groups compare to the market average

Rate at which UnitedHealth compensates its own practices compared to the average market rate



| | |
|---|---|
| Kelsey Seybold (TX) | 111% |
| CareMount (NY) | 91% |
| Healthcare Partners (CA) | 47% |
| Applecare Medical Group (CA) | 42% |
| Crystal Run (NY) | 41% |

–20%   0%   20%   40%   60%   80%   100%

3/20/25, 8:31 AM
UnitedHealthcare pays its Optum providers above-market rates | STAT
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 15 of 179

| | | |
|---|---|---|
| Oregon Medical Group (OR) | | 35% |
| Polyclinic (WA) | | 15% |
| ProHealth Physicians (CT) | | 15% |
| Everett Clinic (WA) | | 13% |
| Atrius Health (MA) | | 12% |
| Reliant Medical Group (MA) | 10% | |
| Beaver Medical Group (CA) | 8% | |
| New West Physicians (CO) | 3% | |
| WellMed (TX) | −10% | |
| Davita Medical Group (CO) | | −30% |
| Astra Medical Clinic (AZ) | | −37% |

Chart: J. Emory Parker/STAT • Source: Tribunus analysis for STAT

Even so, STAT found that for some types of care, UnitedHealthcare is doling out approximately two times the average market price at its own practices.

In New York's Westchester County north of New York City, UnitedHealthcare's commercial plans pay Optum's practices as much as double the average market rate for colonoscopies, upper endoscopies, and breast imaging. In Houston, the insurer pays Optum practices more than twice the average market rate for MRIs, colonoscopies, Mohs skin cancer removal procedures, and routine primary care visits. And in Oregon, an Optum group gets double the market rate for CT scans, MRIs for legs and knees, and 3D mammograms.

The federal government has attempted to limit insurers' profits by requiring them to spend most of the premiums they collect on medical care. UnitedHealth and other health services conglomerates have found a way around that restriction: By acquiring physician practices, they can shift more of those dollars to parts of their businesses where profits are unregulated. UnitedHealth's financial reports highlight how these payments across all of its practices amount to tens of billions of dollars going from one side of the company to the other.

In a recent speech, Jonathan Kanter, the top antitrust enforcer at the U.S. Department of Justice, referred to this practice as "regulatory gamesmanship" that has arisen from unchecked consolidation by companies like UnitedHealth.

"America's largest health care companies are no longer just health insurers or pharmacy benefit managers, and they are no longer just medical groups or hospitals. They are all of the above at once," Kanter said, adding: "Instead of increasing efficiency, health care platform integration and annexation has created perverse incentives, conflicts of interest, and opportunities for self-preferencing, steering, and self-dealing." UnitedHealth has faced a DOJ antitrust investigation over how its insurance company and medical groups compete with others.

UnitedHealth argues in marketing materials that its control of medical providers delivers greater efficiency, better care coordination, and lower costs. Health economists say, however, that consolidation has not delivered on those promises. Most research, in fact, shows there is no evidence of lower insurance premiums and prices when companies own businesses in adjacent markets. Instead, premiums for job-based coverage have jumped 7% in each of the past two years, which UnitedHealth and other insurers attribute to increasing prices and use of medical services.

STAT shared the data analysis and a list of questions with UnitedHealth before publication. The company declined to make anyone available for an on-the-record interview. Spokesperson Eric Hausman provided a statement that called the analysis "flawed." The company said it ran its own analyses and asserted that, "UnitedHealthcare pays Optum Health consistent with other payers in the market." The company declined to share its analyses with STAT. However, nothing within UnitedHealth's statement directly challenges the central finding that UnitedHealthcare pays Optum providers considerably more than non-Optum providers.

In addition to the data analysis, STAT reviewed provider payment documents and interviewed UnitedHealth physicians, health economists, insurance and policy experts, and physicians who compete with UnitedHealth's medical groups.

Chris Whaley, a health economist at Brown University, said multiple scenarios may explain the big transfers of money between UnitedHealth's insurance company and providers: One is that UnitedHealth acquires a physician group and then increases the amounts its insurance company pays that group. But the more likely strategy, he said, is that UnitedHealth takes over dominant practices its insurance arm already pays more, and then drives more patients to those practices by making them preferred options in its insurance networks.

The data STAT and Tribunus analyzed represent a snapshot of UnitedHealth's payment rates this year, so they do not show whether the company increased rates over time, or whether acquired practices were already getting higher amounts. Either way, UnitedHealth's high rates undermine the economic theory that consolidation and scale among large insurers will lead to better deals for consumers — especially when the providers on the other side of the table have the same owner.

It leads to what Whaley called a "surprising" dynamic in local health care markets. "The largest insurer in the country either doesn't have or is not using its negotiation clout to put downward pressure on prices," said Whaley, who is studying UnitedHealth's payments to its own surgery centers.

In some markets with limited competition, UnitedHealth benefits from driving up those prices, STAT's reporting shows.

UnitedHealthcare pays its Optum providers above-market rates | STAT



UnitedHealth Group headquarters in Minnetonka, Minn. *Jenn Ackerman for STAT*

The New York City region exemplifies this strategy. UnitedHealth has aggressively targeted physician groups in New York and New Jersey, and it has had a compelling reason to do so: It dominates the region's insurance markets. During the past few years, Optum has taken over the management of CareMount Medical, ProHEALTH Physicians, Riverside, and Crystal Run.

CareMount, in particular, stands out for the rates it gets from its sister company. UnitedHealthcare paid CareMount practices 91% above the market average across all the medical specialties and services studied — the second-highest of any practice in the data analysis.

A physician who used to work within one of Optum's New York practices said that since leaving for a different practice, UnitedHealth's various insurance subsidiaries have paid the same physician anywhere from one-quarter to one-half of the amount paid for the same services they provided while the physician worked for Optum. The physician, who asked to remain anonymous because they still have relationships with UnitedHealthcare, shared billing remittances with STAT that showed the payment amounts.

"It's really a game the way they switch money from their right pocket to their left," the physician said.

UnitedHealth did not respond to specific questions about its Optum practices in New York. The statement said broadly that "UnitedHealthcare's payments to Optum are consistent with the rates paid by other health plans and its payment practices are unchanged by Optum's provider group acquisitions."

Doctors who compete with Optum said the power imbalance in their markets is obvious. Thomas Lee is a neurosurgeon who practiced in Westchester County, N.Y., where CareMount practices are located, for 24 years before becoming executive vice president of the Medical Society of the State of New York, an advocacy group for doctors, earlier this year. He said it's become difficult to compete with UnitedHealth's market power as an insurer and a provider.

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 18 of 179

"They have almost a near monopoly in the downstate area in terms of insured lives," Lee said. "When any provider group is speaking to UnitedHealthcare, obviously, it's take it or leave it, if they even speak to you."

A similar dynamic has played out with the smaller medical groups neighboring Optum's Crystal Run in Orange County, N.Y. UnitedHealthcare's commercial plans paid Crystal Run doctors 41% above market rates on average across all services, the data analysis shows.

"If they have their own doctors, they're not going to give me the same rate," said Ray Basri, a longtime internal medicine doctor who practices in Middletown, N.Y., where he said Crystal Run is far and away the largest provider. "They're going to pay their own people significantly more. We know they're just paying themselves."

Several of the medical groups UnitedHealth bought, CareMount and Crystal Run included, loomed large in their markets well before the deals closed. At least some of the higher payments from UnitedHealthcare are because those practices command higher payments from all insurers. But that doesn't fully explain the higher amounts paid by UnitedHealthcare nationally, according to the data analysis. Tribunus compared the rates UnitedHealthcare paid Optum practices for the subset of services included in the analysis with the rates paid by major Blue Cross Blue Shield insurers in their markets, using BCBS data. The firm found that UnitedHealthcare's contracted rates for Optum providers were 22% higher on average than those providers' rates with BCBS plans.

In its statement, UnitedHealth said the rates its insurance subsidiary "pays most Optum providers are within a few percentage points of the rates paid by other health plans."

Cheryl Damberg, a senior economist and chair of health care payment policy at RAND Corp., said the analysis "is just one more piece of evidence that state and federal regulators should be really concerned about what is going on in the marketplace and working to take action sooner than later." She added, "It's very difficult to break up entities after they've been acquired."

## UnitedHealthcare's higher rates

What UnitedHealthcare pays Optum CareMount practices in N.Y. compared to what Anthem BCBS pays

| Service | Anthem BCBS | UnitedHealthcare | % difference | |
|---|---|---|---|---|
| Dermatology office visit (99213) | $184 | $210 | 14% | |
| Family medicine office visit (99214) | $275 | $302 | 10% | |
| Colonoscopy (45385) | $763 | $2,268 | | 197% |
| Oncology office visit (99214) | $275 | $302 | 10% | |
| CT scan of abdomen and pelvis (74177) | $992 | $1,298 | 31% | |

Table: J. Emory Parker/STAT • Source: Tribunus analysis for STAT

UnitedHealth's consolidation strategy took shape following passage of the Affordable Care Act. That law created a regulation with a seemingly straightforward goal: to make sure health insurance companies were spending premiums mostly on people's care instead of hoarding profit. Thus began the era of the medical loss ratio.

The regulation requires that at least 80% to 85% of premiums go toward care, depending on the type of insurance. But UnitedHealth's leadership team, led by current board chair and former CEO Stephen Hemsley, saw a way around it and began preaching the virtues of being on both sides of a transaction. Rather than letting those dollars leak out to other providers, UnitedHealth would pay its own.

In 2014, Larry Renfro, who led Optum at the time, told investors the company was doing everything to "support UnitedHealthcare as Optum's largest client and partner."

The following year, Wall Street analysts wanted to know how UnitedHealthcare fit within the growth plans of Optum's medical groups. Dan Schumacher, UnitedHealth's current chief strategy and growth officer who was a top executive within UnitedHealthcare at the time, made it clear the company wanted to steer more insurance members to those provider groups.

"Where we are partnered with Optum, we really like the outcomes," Schumacher said. "And so we are endeavoring, as they look to grow that business, to grow right alongside them … we are trying to orient a greater share through our Optum delivery partners over time."

Those comments came right as UnitedHealth took over ProHealth Physicians and MedExpress, and then continued its buying spree with Surgical Care Affiliates and several other large medical groups.

Last year, at an investment bank conference, current UnitedHealth CEO Andrew Witty reinforced how important its insurance company and providers were to each other. He said the company is "making sure that we're exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements are needed there," according to an event transcript from financial database firm AlphaSense. The "firewall" refers to UnitedHealth executives' assertion that UnitedHealthcare and Optum negotiate with each other at arm's length.

The strategy has played out in the company's financial results. UnitedHealth tallies the money its Optum physicians and other providers take in from all UnitedHealthcare plans through an accounting measure known as "intercompany eliminations." The company is on pace to register $153 billion worth of intercompany eliminations this year, almost quadruple what it recorded a decade ago and roughly the size of Morocco's entire economy. Optum's physicians and other providers have made up 43% of UnitedHealth's total "eliminations" so far in 2024. They accounted for just 20% a decade ago.

All of those eliminations count when it comes to reporting its expenses under the medical loss ratio rules. Amounts that insurers pay to their own physician groups can be treated as medical costs "even if some of that spending represents profits for the parent company," according to a Brookings Institution analysis that looked at vertically integrated Medicare Advantage plans.

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 20 of 179

"You're cooking the books here by pushing things that are really insurance company profit over to medical expenses, because you own those doctors," said Ron Howrigon, a health care consultant who used to be an executive at large health insurers.



The building that houses the ProHealth Physicians office in Middletown, Conn., one of the Optum practices that UnitedHealthcare paid more than the average market rate. *Tim Tai for STAT*

In 2022, the government required health insurers to start publishing the negotiated rates they pay to hospitals, doctors, and other providers, making it possible to see how much UnitedHealthcare is paying Optum's medical groups. The data files — so big they're typically measured in terabytes — are unwieldy, so STAT worked with Tribunus, which uses sophisticated techniques to mine insurers' payment files in the course of its business. Tribunus uses the data to help providers negotiate higher payment rates from insurers.

STAT identified the five medical services that accounted for the most spending in each of eight outpatient specialties, based on data produced by FAIR Health, a nonprofit organization that houses national health insurance data. Tribunus then analyzed [UnitedHealthcare's payments](#) for each of those services across 16 Optum physician practices that were highlighted in previous STAT reporting, and compared them with the insurer's payments to providers it doesn't own in the same counties.

UnitedHealth said in its statement that STAT "is knowingly using a flawed analysis to push a predetermined narrative and has ignored our attempts to point out the problems," which it said included "cherry-picking data" and "simple math mistakes." However, after the company provided feedback on the initial analysis, STAT and Tribunus incorporated UnitedHealth's suggestions — such as cleaning up payment rates and excluding certain providers that could not definitively be tied to particular markets — to the extent possible. The company also said the services analyzed "capture less than 20% of total spend" and criticized the analysis for not incorporating bundled rates or weighting for the number of visits and procedures; however, that information is not included in the data files.

STAT and Tribunus shared the updated analysis with UnitedHealth, which responded with its statement. The company provided no level of detail about its own analysis and would not share any further data.

Overall, the data analysis found UnitedHealthcare paid most of the Optum practices more than it paid others, on average, across all the markets studied. Ben Handel, a health economist at the University of California, Berkeley, said higher costs would inevitably be paid by people who have UnitedHealthcare insurance. "They're raising the costs of providers in markets where they have market power," he said, adding that the higher payment rates put upward pressure on premiums.

There is variation across medical groups, however. UnitedHealth is not paying itself higher commercial rates across the board, and in some places, it pays its practices less than the market average.

For example, UnitedHealthcare paid Optum's WellMed clinics in Texas roughly 10% below the market average across all the medical services examined by STAT and Tribunus. However, WellMed is [entirely focused on treating older adults](#) who are enrolled in Medicare Advantage or traditional Medicare, so the prices WellMed gets paid by commercial insurers mean almost nothing since they are such a small part of its clinics' business.

Medicare Advantage payment rates are not included in the datasets but are a vital source of business. UnitedHealth has acquired medical groups and outpatient centers where it has the [dominant share of Medicare Advantage enrollment](#). Because Medicare Advantage payment rates are [lower than commercial ones](#), experts say that makes volume just as important as prices — and that UnitedHealth is focusing on routing as many Medicare Advantage members as possible to its own clinics to catch those payments.

"I think this is sort of purely an MLR game," said Matt Fiedler, a health economist and senior fellow at the Brookings Institution. "It allows United to take a higher profit margin than its competitors."

STAT's findings trigger concerns beyond the medical loss ratio. They raise the question of whether UnitedHealth is causing employers to overpay for health care, said Howrigon, the consultant and former insurance executive. Most employers that offer health insurance assume the financial risk of insuring their workers and outsource plan administration to insurers like UnitedHealthcare. These employer plans, called "self-funded," are not subject to medical loss ratio rules.

But under [federal law](#), self-funded employers that offer health coverage are obligated as fiduciaries to act "prudently" and pay "only reasonable plan expenses." Several employers recently sued the insurers that administer their plans, arguing they are also fiduciaries that should be held responsible for overpaying for medical care. The [Department of Labor supported](#) one such case that ultimately lost. Howrigon sees those fiduciary standards applying in cases where UnitedHealthcare pays its own providers more, which runs up costs for the employers that hired it.

"An employer could argue, 'You violated that responsibility,'" Howrigon said. "'You have an obligation to be good stewards of my money and to try to save me money. And you were intentionally overcharging me for these services, where that money then goes into your pocket.' That's a conflict."

UnitedHealth's increasing reliance on shifting money between subsidiaries isn't just fattening its earnings. It is threatening the future of some doctors' practices.

David Podwall, a neurologist in Nassau County, N.Y., who is surrounded by Optum's ProHEALTH providers, said UnitedHealthcare's Oxford insurance plan pays his private practice significantly less than other commercial insurers. UnitedHealthcare pays Optum practices in the county 16% more for an office visit by an established patient than Podwall receives, according to the Tribunus analysis.

"What that means is that smaller practices like us either discontinue those plans, or you limit the number of patients you see in those plans," Podwall said. "Then those patients are more likely to funnel back to [Optum]."

Irina Koreen is an ophthalmologist in New York's Orange County near Optum's Crystal Run practices, which dominate the area. Koreen was one of just five doctors in her practice going into this year, but three have either retired or are on their way out. The practice has tried unsuccessfully to bring in new eye doctors for the past two years. Koreen said they can't match Optum's high pay.

When asked if she would join Optum, Koreen said no. She said Optum's practices have a reputation of seeing more patients per hour than she's comfortable with. For the time being, Koreen will continue to try and recruit new doctors and live with her payment rates from UnitedHealthcare, which she said are "slightly below" Medicare and don't fully cover her costs. UnitedHealthcare pays Crystal Run practices at least 80% more than what it pays Koreen for routine office visits and ophthalmological exams, according to the data analysis. She doesn't think her practice can survive much longer.

"We're going to have to close the practice eventually. You can't find doctors to replace the ones who are retiring," she said. "I don't want to think about it."

## Methodology

The goal of this project was to determine how much UnitedHealth Group's insurance company, UnitedHealthcare, is paying its own physician groups. UnitedHealth benefits when its UnitedHealthcare insurance members seek care at practices it owns or controls, which are branded as Optum. When UnitedHealthcare members go to Optum practices, UnitedHealth essentially gets to pay itself for their care, instead of making payments to outside providers. Until now, no analysis has been able to quantify how much UnitedHealthcare pays its Optum providers, or how those rates compare to what it pays unaffiliated practices.

Starting July 1, 2022, federal law required health insurers to publish machine-readable files with the negotiated prices paid to in-network hospitals and doctors. These are commonly called "Transparency in Coverage" files. Because of the files' large sizes and complexity, STAT partnered with Tribunus Health, a firm that examines these datasets and helps providers in their contract negotiations with insurance companies. Tribunus analyzed more than 94 million rows of data from the UnitedHealthcare files and specifically looked at how much the company paid 16 different Optum physician practices across nine states for various health care services.

Those 16 practices are Applecare (California), Astra Medical Clinic (Arizona), Atrius Health (Massachusetts), Beaver Medical Group (California), CareMount (New York), Crystal Run (New York), DaVita Medical Group (Colorado), Everett Clinic (Washington), Healthcare Partners (California), Kelsey Seybold (Texas), New West Physicians (Colorado), Oregon Medical Group, The Polyclinic (Washington), ProHealth Physicians (Connecticut), Reliant Medical Group (Massachusetts), and WellMed (Texas).

To determine which services to examine, STAT worked with FAIR Health, a nonprofit organization that houses national health insurance data. FAIR produced data showing the five services, or medical codes, that account for the most "allowed" spending within eight outpatient specialties: cardiology, cardiovascular surgery, dermatology, family medicine, gastroenterology, internal medicine, oncology, and radiology. UnitedHealthcare's data do not include claims volume. This served as a workaround so that the analysis would focus on the services that physicians frequently perform and bring in the most revenue for most practices. "Allowed" in FAIR's data refers to the negotiated amount a health plan pays.

Tribunus then analyzed UnitedHealthcare's data files to see how the company's payments to Optum practices for each code compared with its payments to relevant non-Optum practices in the same counties or service areas. The payment rates were connected to physicians' national provider identifiers (NPIs). Some markets included physicians or practices that may be located out of state but had received rates from UnitedHealthcare in that market at some point. Those providers were included if Tribunus confirmed their NPI was still in the state even if the practice was out of state. The analysis excluded providers from a market if providers were only tied to an out-of-state practice.

Some California providers were not listed as part of an Optum group in the data files but were listed on the group's website, and STAT and Tribunus included them as Optum doctors in the analysis.

The payment rates are only reflective of UnitedHealthcare's commercial plans. They also do not include capitated contracts that pay providers bundled amounts because the files do not have to include that type of data. The payments in the files are "allowable amounts," which includes what the insurance company paid as well as any cost-sharing owed by the patient. Not all specialties were represented at each Optum practice. Some Optum practices had only one relevant physician for a given specialty or code, or had contracted rates for only a small number of the codes studied.

Tribunus looked at the maximum rates that UnitedHealthcare paid to providers. This was done in part to reduce noise in the data. For example, the data did not clearly show whether a service was provided in a doctor's office or a hospital outpatient clinic, which are usually paid more. Choosing the maximum rate reduces the chances that different sites of services were compared with each other.

Here's an example of what the analysis revealed: In Westchester County in New York, the average rate that UnitedHealthcare pays in-network internal medicine physician practices for medical code 99213, which is a routine visit with an established patient, is $134. Again, this average covers what UnitedHealthcare says it paid both Optum and non-Optum providers. Optum's CareMount practice in that county is paid $209.50 by UnitedHealthcare, or 56% more than the average for the entire market.

3/20/25, 8:31 AM
CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 24 of 179
UnitedHealthcare pays its Optum providers above-market rates - STAT

Tribunus also collected relevant payment data from Blue Cross Blue Shield insurers in each county to use as a basis of comparison for how much Optum practices are paid by UnitedHealthcare.

### STORY CREDITS

**Writing and Reporting:** Bob Herman, Casey Ross, Lizzy Lawrence, Tara Bannow
**Editing:** Gideon Gil
**Graphics:** Emory Parker
**Illustrations:** Natsumi Chikayasu
**Art and Photo Direction:** Alissa Ambrose
**Additional photo editing:** Crystal Milner
**Copy editing:** Karen Pennar
**Additional editing:** Zachary Tracer
**Design and development:** Jennifer Keefe, Julia Bujalski, Ben Lokshin

## About the Authors



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the [Health Care Inc. newsletter](#). You can reach Bob on Signal at bobjherman.09.

bob.herman@statnews.com
@bobjherman



**Casey Ross**

Chief Investigative Reporter, Data & Technology

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter. You can reach Lizzy on Signal at lizzylaw.53.

lizzy.lawrence@statnews.com
@LizzyLaw_
@lizzylawrence.bsky.social
linkedin.com/in/lizzy-lawrence1/



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers. You can reach Tara on Signal at tarabannow.70.

tara.bannow@statnews.com
@TaraBannow

To submit a correction request, please visit our Contact Us page.

# EXHIBIT 10

CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 27 of 179

UnitedHealth Group headquarters in Minnetonka, Minn.
JENN ACKERMAN FOR STAT

## A STAT INVESTIGATION

# Health Care's *Colossus*

---

## Lawmakers call for curbs on UnitedHealth's growing empire



*By* [Casey Ross](#), [Bob Herman](#), [Tara Bannow](#), *and* [Lizzy Lawrence](#)

Dec. 23, 2024

**This is part 6 of [Health Care's Colossus](#)**, a series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence.

Democratic lawmakers are calling for aggressive action to curb the increasing market power of UnitedHealth Group, including a possible breakup of a business empire they say is undermining competition, corrupting Medicare, and hurting vulnerable patients.

The lawmakers, including several U.S. senators, argue the problems created by the company's size and reach demand immediate steps to restore public confidence in the health care system. They condemned the targeted killing of Brian Thompson, the CEO of UnitedHealth's insurance business. But they said the display of resentment and rage that followed was neither new nor surprising at a time when people feel powerless to defend themselves against a company that controls their doctors, their data, and their insurance policies.

"By buying up every part of our health care system — from the largest insurer in the nation, largest network of physicians, and everything in between — UnitedHealth Group has successfully bypassed competition and funneled billions of dollars to its own subsidiaries," Sen. Elizabeth Warren (D-Mass.) told STAT in a statement. "For the sake of patients, taxpayers, and independent practices, policymakers should act to prohibit joint ownership of health insurers and their provider subsidiaries, including physicians and pharmacies."

Rep. Pat Ryan (D-N.Y.) also said regulators and lawmakers must consider breaking up the company, whose conflicts of interest were exposed in a [STAT investigation](#) that found UnitedHealth's business practices have upended competition among local medical groups, especially in places where it is also a dominant insurer. Since UnitedHealth took over two large medical groups in Ryan's district, his office has fielded numerous complaints from constituents about impaired access to care and poor customer service.

"It's just absolutely punishing our community so this big corporation can make even more profits," Ryan said. "It's fucking outrageous."



3/20/25, 8:35 AM
CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 08/25/25    Page 29 of 179
UnitedHealth Group: Is it time to break up health care's colossus? | STAT

U.S. Rep. Pat Ryan, speaking at the Democratic National Convention in August. *Andrew Harnik/Getty Images*

The demands for urgent action set up a potential collision in Washington, where President-elect Trump and congressional Republicans are returning to power. Though Republicans have supported legislation to address the ills of market concentration, most notably by large pharmacy benefit managers, the party's leaders are unlikely to favor such sweeping antitrust action against a major American corporation. Republicans also have unconditionally supported Medicare Advantage, the private alternative to traditional Medicare that is a lynchpin within UnitedHealth's integrated businesses.

Still, Democrats expressed hope of bipartisan support for reform, adding that without swift and decisive action, frustration and anger will only continue to rise.

"Insurers need to respect that they have a public trust," said Sen. Richard Blumenthal (D-Conn.), who has spotlighted coverage denials for seriously ill older Americans with Medicare Advantage insurance from UnitedHealth and other companies. "What I have found over the years is that anger has been building and I would assume it will continue to rise — both anger and fear — because more and more people are feeling the effects of denials and delays in care that they need."

STAT requested comments from several Republican lawmakers active on health policy issues, including those who co-sponsored new bipartisan legislation that would break up corporate control over pharmacies and drug benefits, but did not receive responses.

UnitedHealth did not respond to a list of questions prior to publication of this story. It instead issued a brief statement through a spokesperson: "We've provided information on this topic previously and STAT hasn't accurately reflected the facts. We won't be providing more."

The Minnesota-based conglomerate, the nation's fourth largest company by revenue, is under intense scrutiny in multiple legal and regulatory venues.

It is facing a federal antitrust investigation and a Justice Department lawsuit seeking to block its proposed acquisition of the home health provider Amedisys. Lawmakers and regulators have sharply criticized the company for excessive profiteering within its Medicare Advantage business. It is being sued for allegedly using an error-prone algorithm to systematically deny care to older Americans. Earlier this year, the company's failure to secure its computer systems led to a debilitating cyberattack that shut down much of the nation's health payments infrastructure. And among numerous other legal disputes, its top executives were accused in a civil lawsuit of insider trading.

STAT's investigation of the company exposed deeply embedded conflicts within its sprawling network of businesses. As the nation's largest insurer and provider, with more than 90,000 physicians under its control, the company stands on both sides of countless transactions whose terms it can bend to serve its own financial interests, often at the expense of doctors and patients. In recent years, UnitedHealth has stealthily gobbled up a range of different medical groups, surgery centers, and urgent care clinics in places where it was a dominant insurer, leading to concerns from consumer advocacy groups and researchers about whether the company was manipulating prices and forcing patients to use its own providers.

In communities around Eugene, Ore., for example, state and federal officials were flooded with complaints after the company acquired Oregon Medical Group, a large multispeciality physician practice in the region. Several doctors left, causing confusion and disruptions in care.

"Instead of helping patients, consolidations in our nation's health care system are exploiting sick people to turn healthy profits," Sen. Jeff Merkley (D-Ore.) said in a statement. "This unchecked corporate greed is driving up prices and leading to worse outcomes for hardworking families." Merkley added that he is weighing new legislation "to rein in these out-of-control consolidations."

Merkley's counterpart from Oregon, Ron Wyden, who currently chairs the Senate Finance Committee, said "everyday Americans lose" when "one corporation monopolizes the entire supply chain."

"I'm going to keep spotlighting the consequences of an increasingly consolidated health care system on American families' costs and access to care," Wyden said in a statement.



U.S. Assistant Attorney General Jonathan Kanter of the Justice Department's Antitrust Division *Anna Moneymaker/Getty Images*

## Backlash over anticompetitive practices

A recent fiery speech by the Justice Department's outgoing top antitrust enforcer, Jonathan Kanter, made it clear that regulators are uneasy about the consequences of increasingly large companies controlling multiple parts of the health care system. That agency has so far focused most of its energy on blocking mergers within the same sector, such as insurers combining with each other. But Kanter, who did not name specific companies, seemed to encourage a future emphasis on conglomerates that encompass not just health insurance, but medical groups, pharmacy benefit managers, and other businesses.

Medicare officials are similarly turning their attention to consolidation. In particular, the agency's proposed tweaks for Medicare Advantage in 2026 would require plans to share detailed information with the government on their provider payment arrangements "to address concerns surrounding vertical

integration," which is when insurers, doctors, and other health care services are combined in the same company.

The latest installment of STAT's series on UnitedHealth found that the company pays some of the physician practices it owns significantly more than it pays other physician groups in the same market for similar services. Experts STAT spoke with said this allows the company to sidestep a federal rule that caps the percentage of premium dollars insurers can retain as profit on government and commercial policies. By moving money to a provider business without such caps, UnitedHealth and other insurers can keep more of the money.

In local health care markets, the discrepancies in payments to medical practices may also undermine competition. Ryan, the congressman from New York, said the higher payments to UnitedHealth providers in the Hudson Valley amounts to "blatant corruption" that is making it harder for independent doctor groups to keep their doors open and offer affordable services. He emphasized that UnitedHealth is among several health care conglomerates whose ownership of businesses in multiple sectors of the industry allows them to influence clinical practices and coverage decisions in ways that benefit their bottom lines.

"This just should be unlawful," Ryan said, adding that Republicans and Democrats should come together to pursue reforms to root out anticompetitive behavior. "I just think this goes against our values as Americans and as a country where this is putting all the power in corporations instead of having a health care system that serves the people."

Meanwhile, state lawmakers are trying to understand what an insurer like UnitedHealth owning primary care clinics means for their constituents' care. STAT found that in Connecticut, UnitedHealth's management of ProHealth Physicians, a network of primary care practices, created turmoil with patients and physicians. Company managers pressured doctors to conduct more wellness visits and document as many conditions as possible, often leading to questionable diagnoses that allowed the company to extract higher payments from Medicare, which pays insurers more to cover sicker patients. Meanwhile, acutely ill patients struggled to schedule appointments.

STAT's investigation found similar practices in communities around the country. Following publication of those findings, the Office of Inspector General for the U.S. Department of Health and Human Services released a report that singled out UnitedHealth for collecting billions of dollars of payments based on dubious diagnoses. The report found that UnitedHealth accounted for $3.7 billion of those payments, or almost half the total collected by all insurers. The payments were based on conditions documented through home and office visits, and reviews of patients' medical charts. But federal inspectors could not find evidence in the data they reviewed that patients received follow-up care for those illnesses.

Connecticut State Sen. Matt Lesser, a Democrat, said he's frustrated as both a lawmaker and a ProHealth patient. He's experienced firsthand the benefits of high quality primary care, which Lesser said is now diminished after UnitedHealth's acquisition. Rubin Hirsch, one of ProHealth's founding doctors who retired early after UnitedHealth took over the practice, saved Lesser's life 14 years ago by ordering a scan after Lesser came into the office with chest tenderness. It turned out Lesser had testicular cancer that had just begun spreading.

3/20/25, 8:35 AM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 32 of 179
UnitedHealth Group: Is it time to break up health care's colossus? | STAT

"If he'd had less ability to think about it creatively and wasn't able to listen to me as a patient, I'm sure he would not have ordered those tests," Lesser said.

The backlash against UnitedHealth's management of ProHealth may be leading to modest, yet helpful changes. Lesser and another ProHealth patient, Sharon Maloney, both said they were able to schedule same-day appointments after STAT published its article in August. But lawmakers want to make broader changes as well. Lesser and Connecticut Attorney General William Tong both said they are more closely examining consolidation by health services companies and how it affects access to care in the state.

"We're taking a new look at our laws around corporate practice of medicine and whether there might be a need to strengthen our laws in light of these types of transactions," Tong said.

Both state and federal officials are also [trying to ban](#) noncompete agreements, which preclude workers from going to competitors. UnitedHealth's use of noncompetes became a problem when dozens of doctors quit the Eugene multispecialty group Oregon Medical Group out of frustration with its new owner, said state Rep. Nancy Nathanson. Suddenly, doctors were forced to leave the community if they wanted to keep seeing patients. Nathanson, a Democrat, said she talked to doctors who drove more than two hours each day to keep working. Meanwhile, local patients couldn't get crucial medications refilled.

Nathanson requested, and got, a face-to-face meeting with executives from UnitedHealth, who promised to drop the noncompetes. They also agreed to continue processing most medication refills. She thinks the company viewed doing so as "necessary to regain some goodwill in the community."

Nathanson is introducing two bills in the upcoming legislative session that are designed to strengthen Oregon laws protecting patients and providers from corporate interests in health care. Oregon law already requires that doctors hold majority stakes in medical groups, but companies have found workarounds. Nathanson's measure would require those physicians to live in Oregon at least three-quarters of the year and be involved in active patient care. "In other words, you really are a physician here," she said. "Not just a straw physician."

Her other bill would ban companies from forcing health care workers to sign noncompete, non-disclosure, non-disparagement, and non-solicitation agreements.

3/20/25, 8:35 AM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 33 of 179
UnitedHealth Group: Is it time to break up health care's colossus? | STAT



The building in Oakville, Conn., that formerly housed the ProHealth Physicians Oakville Family Medicine office, which was closed by UnitedHealth. *Tim Tai for STAT*

## Reckoning or reprieve?

In Washington, the incoming Republican trifecta — control of the White House and both chambers of Congress — is a potential bright spot on the horizon for UnitedHealth, which is the largest Medicare Advantage insurer in the country with almost 10 million enrollees.

"Medicare is really the golden goose here," said Sherry Glied, a health economist and dean at New York University's Wagner Graduate School of Public Service and a former official in the Obama administration. UnitedHealth stands to benefit because Medicare Advantage "has been the pet project of Republicans for a long time," she said. Trump's pick to head the Centers for Medicare & Medicaid Services, the TV star and heart surgeon Mehmet Oz, has even used his platform to promote the program.

The next four years could mark a turning point from the Medicare Advantage reforms the Biden administration has made. Most notably, the administration has gotten rid of diagnosis codes that insurers commonly misuse to extract higher payments from Medicare, such as peripheral artery disease without complications. STAT interviewed doctors who said UnitedHealth pressured them to add lucrative codes to patients' medical records they didn't feel were appropriate or necessary for their care.

UnitedHealth CEO Andrew Witty has been particularly vocal on earnings calls about his opposition to the Biden administration's changes, calling them "the biggest incoming dynamic" affecting the company's insurance arm earlier this year.

UnitedHealth is likely more negatively affected by the risk adjustment changes than other Medicare Advantage insurers based on the inspector general's report that found the company to be particularly aggressive when it comes to risk coding, said Rick Gilfillan, a consultant and former deputy administrator of CMS during the Obama administration.

If UnitedHealth and other insurers apply pressure, Trump's CMS could relatively easily undo the Biden administration's risk adjustment changes, said Gilfillan, who also was CEO of the hospital system Trinity Health. The agency could opt not to proceed with year three of the phase-in set for 2026. Or the agency could void the new system entirely and revert back to the previous one, he said.

That said, Gilfillan noted that many Republicans, like the conservative think tank the Paragon Health Institute, support risk adjustment changes that decrease Medicare Advantage overpayments.



A demonstrator protesting against the health care industry stands outside Federal Criminal Court in New York City as Luigi Mangione, the suspect in the killing of UnitedHealthcare CEO Brian Thompson, is arraigned on December 19. *John Lamparski/Getty Images*

## Rising anger over denials

It's yet to be seen whether the anger directed at insurance companies after Thompson's killing will translate into meaningful changes at UnitedHealth, or in the health care industry more broadly. What is clear is that the shocking event unleashed a tidal wave of emotion over the problem of care denials, with many people sharing personal experiences on social media.

A recent Senate subcommittee report, led by Blumenthal, found UnitedHealth dramatically increased denials for seriously ill Medicare Advantage patients seeking rehabilitative care, an inquiry that followed STAT reporting that uncovered UnitedHealth's reliance on an algorithm to cut off payment for patients recovering from debilitating illnesses and injuries.

Blumenthal called for a "drastic overhaul" of the Medicare Advantage program to prevent use of prior authorization to deny or delay care at "such really appalling rates." Prior authorization is a process insurers use to control costs by requiring that doctors get their approval before delivering a health care service. Blumenthal said he was "disgusted" to learn that many insurers were using unregulated predictive algorithms to help automate those decisions.

"Medicare Advantage insurers' use of prior authorization is opaque and exploitative, so the program needs to be overhauled to make it more responsive and transparent," he told STAT, adding that he is considering legislation to reform the program and will also press for more immediate regulatory changes to protect older Americans from abuses.

He said he is more broadly concerned about the potential conflicts that arise from UnitedHealth controlling businesses that stand on both sides of health care transactions. Not only does that undermine competition, he said, it constrains medical care for Americans who find themselves the captives of a system that spends more money than any industrialized nation, and yet produces mediocre outcomes. "Something's wrong with this picture," Blumenthal said. "Whether it's conflicts of interest or other defects and flaws, we need to rethink this."

Ryan said the events of the past few years, with UnitedHealth buying practices in his district and the access problems that followed, have clarified the pressing need for antitrust enforcement and other policy changes to address common grievances and economic harm.

"The broadly experienced pain and frustration of so many Americans in our health care system for decades continues to get worse," he said. "It's on us in government to actually do the work to solve the problem, rather than letting that angst and frustration build in the way that it has."

## About the Authors



**Casey Ross**

Chief Investigative Reporter, Data & Technology

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the Health Care Inc. newsletter. You can reach Bob on Signal at bobjherman.09.

bob.herman@statnews.com
@bobjherman

3/20/25, 8:35 AM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 36 of 179
UnitedHealth Group: Is it time to break up health care's colossus? | STAT



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers. You can reach Tara on Signal at tarabannow.70.

tara.bannow@statnews.com
@TaraBannow



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter. You can reach Lizzy on Signal at lizzylaw.53.

lizzy.lawrence@statnews.com
@LizzyLaw_
@lizzylawrence.bsky.social
linkedin.com/in/lizzy-lawrence1/

To submit a correction request, please visit our Contact Us page.

# EXHIBIT 11

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 38 of 179

UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/unitedhealth-medicare-payments-doctors-c2a343db

# UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare

The biggest Medicare Advantage insurer presented physicians with checklists of potential diagnoses; 'I didn't think I was obese'

By *Christopher Weaver* [Follow] , *Anna Wilde Mathews* [Follow] and *Tom McGinty* [Follow]

Dec. 29, 2024 9:00 pm ET

Like most doctors, Nicholas Jones prefers to diagnose patients after examining them. When he worked for [UnitedHealth] UNH **0.92%** ▲ Group, though, the company frequently prepared him a checklist of potential diagnoses before he ever laid eyes on them.

UnitedHealth only did that with the Eugene, Ore., family physician's Medicare Advantage recipients, he said, and its software wouldn't let him move on to his next patient until he weighed in on each diagnosis.

The diagnoses were often irrelevant or wrong, Jones said. UnitedHealth sometimes suggested a hormonal condition, secondary hyperaldosteronism, that was so obscure Jones had to turn to Google for help. "I needed to look it up," he said.

The government's Medicare Advantage system, which uses private insurers to provide health benefits to seniors and disabled people, pays the companies based on how sick patients are, to cover the higher costs of sicker patients. Medicare calculates sickness scores from information supplied by doctors and submitted by the insurers. In the case of UnitedHealth, many of those doctors work directly for UnitedHealth.

More diagnoses make for higher scores—and larger payments. A Wall Street Journal analysis found sickness scores increased when patients moved from traditional Medicare to Medicare Advantage, leading to billions of dollars in extra government payments to insurers.

Patients examined by doctors working for UnitedHealth, an industry pioneer in directly employing large numbers of physicians, had some of the biggest increases in sickness scores after moving from traditional Medicare to the company's plans, according to the Journal's analysis of Medicare data between 2019 and 2022.

3/19/25, 4:23 PM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 39 of 179
UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare - WSJ

Sickness scores for those UnitedHealth patients increased 55%, on average, in their first year in the plans, the analysis showed. That increase was roughly equivalent to every patient getting newly diagnosed with HIV, the virus that causes AIDS, and breast cancer, the analysis showed.

That far outpaced the 7% year-over-year rise in the sickness scores of patients who stayed in traditional Medicare, according to the analysis. Across Medicare Advantage plans run by all insurers, including UnitedHealth, scores for all newly enrolled patients rose by 30% in the first year.

A spokesman for UnitedHealth said in a written statement that the company's practices lead to "more accurate diagnoses, greater availability of care and better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management." The company's approach, he said, helped to avert more serious health problems later, and to achieve Medicare Advantage's goals of improving quality and reducing costs.

In a series of articles this year, the Journal has examined the practices of Medicare Advantage companies, including UnitedHealth, the largest. Among other things, the articles showed how diagnoses added by insurers increased payments from the government.

The killing earlier this month of Brian Thompson, chief executive of UnitedHealth's insurance division, triggered widespread public venting about some of the practices of health insurers. Police said the suspect left a note saying he was taking action against the healthcare industry. UnitedHealth has said that neither the suspected gunman nor his parents were covered by the company.



Flags flew at half-mast at the headquarters of UnitedHealth's insurance division in Minnetonka, Minn., after the killing of CEO Brian Thompson. PHOTO: JERRY HOLT/STAR TRIBUNE/ASSOCIATED PRESS

In its written statement, UnitedHealth said Medicare's system of paying for diagnoses was developed by the government, not any one insurer, "to help ensure fair and accurate payments."

UnitedHealth and other Medicare Advantage insurers have said higher sickness scores among their patients reflect a sicker population with greater medical needs. UnitedHealth has said the diagnoses it submits are accurate, and that it detects diseases sooner, benefiting patients.

Jones, the Oregon doctor, said UnitedHealth didn't suggest diagnoses for patients he treated outside Medicare Advantage, where it doesn't pay.

Traditional Medicare patients treated by UnitedHealth doctors had much lower sickness scores, the Journal's analysis showed.

A case of hyperaldosteronism—the obscure hormonal condition that sometimes appeared on Jones's checklists—could trigger about $2,000 a year in Medicare Advantage payments during the period the Journal studied. The Journal's analysis showed that doctors who didn't work for UnitedHealth seldom diagnosed that condition, which involves elevated levels of a hormone linked to high blood pressure.

Jones said he quit UnitedHealth in 2023 to start his own practice.

UnitedHealth has acquired dozens of medical groups over the past decade-and-a half. Its Optum unit now employs about 10,000 physicians, its top executive has said, making it one of the nation's largest employers of doctors. It contracts with tens of thousands more. No other national insurer has acquired and hired doctors on that scale.

Other insurers have made more limited investments. Humana runs a network of primary-care centers under the CenterWell brand, and last year Aetna parent CVS Health purchased Oak Street Health, a clinic operator that specializes in treating seniors.

Patients of the medical groups operated by UnitedHealth have unusually high sickness scores compared with those of other doctors' practices, the Journal's analysis found.

UnitedHealth's doctors, in addition to treating those in the company's Medicare Advantage plans, treat people covered by other insurers and traditional Medicare.

Patients who both saw UnitedHealth doctors and were enrolled in UnitedHealth plans had the highest average sickness scores in the Journal's analysis of claims from 2019 to 2022. Those higher sickness scores triggered about $4.6 billion more in Medicare payments than

UnitedHealth would have received if those patients' scores had been in line with the average for the company's other Medicare Advantage patients.

"The system is not primarily about taking care of the patient," said Dr. Emilie Scott, who worked for a UnitedHealth-owned practice in California before leaving in 2016. "It's, how do you get the money to flow?"

The Journal analysis is based on billions of Medicare records obtained under a research agreement with the federal government. The Journal also examined internal documents from medical practices owned by or under contract with UnitedHealth.

UnitedHealth said its sickness scores trend higher partly because its plans "serve some of the sickest and most vulnerable populations," and that research showed under-diagnosing in traditional Medicare led to some of the differences in sickness scores between the two parts of the program. The company said it had performed well in Medicare's audits of the accuracy of diagnoses it submits for payment.

The company said revenue accrued from additional diagnoses "are not simply earnings for the company but are instead used to invest in medical benefits" and reduce out-of-pocket costs for members, among other things. It has said that its insurance unit, UnitedHealthcare, operates separately from its Optum health-services arm.

A spokeswoman for the Centers for Medicare and Medicaid Services declined to comment on the Journal's analysis, but said the agency is studying relationships between Medicare Advantage insurers and medical providers. She said Medicare Advantage insurers are required to ensure the accuracy of diagnoses they submit, and that the agency had overhauled the list of diagnoses that trigger extra payments.

The Journal reported in July that Medicare Advantage insurers added diagnoses to patients' health records that no doctor treated. The insurers collected $50 billion in payments from 2019 through 2021 for those diagnoses, the Journal reported.

## Recording diagnoses

When Dr. Naysha Isom started working at a UnitedHealth medical group in the Las Vegas area in 2019, she said, she got two days of training on how to record diagnoses. At the training, a UnitedHealth employee suggested that Isom, who had practiced for more than a decade, should consider diagnoses she had never made before.

Isom said she was told that signs of bruising could be recorded as senile purpura, a condition that generated payments in Medicare Advantage but generally didn't require treatment. Isom saw no point, since the finding didn't change patients' care: "OK, wear some sunscreen. Maybe stop bumping the wall."

After she decided not to diagnose peripheral artery disease, a narrowing of blood vessels, based on a screening test she distrusted, she said, a supervisor pressed her to reconsider. UnitedHealth didn't require her to make diagnoses, she said.

"You're just encouraged to, because obviously, if you don't, they come bothering you," said Isom, who left UnitedHealth to start her own practice in 2022.

UnitedHealth's doctors in the Journal's analysis diagnosed the bruising condition, which triggered extra payments of about $1,900 a year at the time, 28 times more often with patients in UnitedHealth Medicare Advantage plans than those in traditional Medicare.

The bruising condition, senile purpura, "is a completely benign condition" for patients, said G. Michael Harper, a geriatrician at the University of California, San Francisco. "There's nothing you have to do for them."

An internal presentation to doctors at a UnitedHealth-owned medical group in Southern California, reviewed by the Journal, listed doctors and the average Medicare sickness score for their patients. Doctors with the highest averages were highlighted in green, and those with the lowest, in red. The presentation showed that as of July 2022, the average sickness score among those practices' patients was 55% higher than the average among traditional Medicare recipients.

Under Medicare rules, each condition that triggers extra payments has to be diagnosed annually. UnitedHealth doctors said patients whose records showed past diagnoses that hadn't been re-documented were frequently called in for office visits, and the company's software would spool out lists of potential diagnoses.

The list UnitedHealth sent one doctor included a potential diagnosis of a lower-leg amputation, citing prior records, even though the patient wasn't missing a limb. The company told another doctor it suspected a patient had heart failure "based on prevalence of this condition in our patient population."

Jones, the former UnitedHealth doctor in Oregon, said the suggestions included diagnoses based on scant evidence, such as long-term insulin use for patients who had received the drug

CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 43 of 179

## Diagnosis Gap

UnitedHealth doctors diagnosed some diseases that trigger extra payments at higher rates for Medicare Advantage patients than for recipients of traditional Medicare.

**Diagnoses per 10,000 patients**

■ UnitedHealth plan
■ Other Medicare Advantage plan
■ Traditional Medicare



Senile purpura
732
397
26

Obstructed leg arteries
403
194
5

Secondary hyperaldosteronism
318
183
8

Alcohol dependence
205
166
6

Malnutrition
165
81
8

only once during a long-ago hospital stay. For patients regularly taking aspirin, he said, the technology would propose a clotting disorder.

To finish a visit, he had to check a box to confirm or rule out each possible diagnosis—or defer it for later. At first, he said, the checklists were optional, but then they became mandatory. He usually rejected the hyperaldosteronism diagnoses, he said, if he didn't see any testing or treatment for the condition.

The design of the system, he said, could lead to good-faith errors as doctors clicked through all the boxes. "The system is made to have these happy little accidents that end up resulting in a lot of money from taxpayers," he said.

## Bonus pay

A December 2023 compensation plan for one UnitedHealth-owned practice offered doctors bonuses of up to $37.50 a year for each of their Medicare Advantage patients if they confirmed or ruled out more than 90% of the suggested diagnoses.

That means a doctor seeing 800 Medicare Advantage patients in a year could see a bonus of as much as $30,000 a year.

Tom Lin, a former UnitedHealth physician in Oregon, said it was easier to say yes than no, particularly with diagnoses that another doctor had previously confirmed and placed in the patient record.

"You didn't have time to rule it out," he said, given the volume of patients each day. He said he did his best to remove from patients' charts diagnoses that he questioned such as secondary hyperaldosteronism, which UnitedHealth often suggested for heart-failure patients, "because I had no idea what the hell they were talking about."

Shweta Bansal, a nephrologist at UT Health San Antonio who studies that disease, said "the treatment of heart failure is the same" regardless of whether secondary hyperaldosteronism is

3/19/25, 4:23 PM
UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare - WSJ
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 44 of 179

diagnosed.

## High Scores

Patients of medical groups owned by UnitedHealth had higher sickness scores than those receiving treatment from many other medical groups.

**Average 2021 sickness score of Medicare Advantage recipients, by medical group**

■ UnitedHealth-owned medical group  ■ Other medical group



Average sickness score of recipient of traditional Medicare

Each dot is a medical group

Number of members
100,000
10,000

← SICKNESS SCORE →

Note: Comparison group includes large primary-care focused practices identified in the Medicare Data on Provider Practice and Specialty database; limited to practices with 1,000 Medicare Advantage recipients in the analysis.

UnitedHealth said a company study found that patients of medical providers under its Optum umbrella had better outcomes than patients in traditional Medicare, including an 18% lower risk of inpatient hospital admissions and an 11% lower risk of emergency department visits. The company said its model improved management of chronic diseases, including diabetes.

Like other Medicare Advantage companies, UnitedHealth also contracts with outside doctors in ways that can increase their payments when they diagnose more conditions. That includes arrangements where doctors receive a portion of the Medicare payments insurers get for their patients. Other Medicare Advantage insurers also suggest diagnoses to independent doctors examining their patients.

In some contracts with independent doctors reviewed by the Journal, UnitedHealth linked bonuses to sickness scores and quality ratings derived partly from patient surveys. For patients with sickness scores 20% higher than average and good quality ratings, doctors could get an

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 45 of 179

extra $40 per patient each month, one contract shows. Scores 50% above average and top quality ratings could yield $65 per patient a month. For a doctor with 100 patients covered by the contract, that would amount to a $78,000 annual bonus.

Andy Pasternak, an independent family doctor in Reno, Nev., has lower-than-average sickness scores across his practice, records show. He said he gets a per-patient bonus of $2 a month, or $2,256 annually, for the 94 Medicare Advantage patients covered by his contract with UnitedHealth.



Dr. Andy Pasternak, an independent family doctor in Reno, Nev., treats Medicare Advantage patients under a contract with UnitedHealth.  PHOTO: ALEJANDRA RUBIO FOR WSJ

Pasternak said UnitedHealth offered to send nurses to visit those patients to diagnose them more fully. The company would pay him $250 for each patient their nurses examined, he said.

"That's more than I get paid for treating my own patients," he said. He said the focus on diagnosing has soured him on Medicare Advantage, and made him grateful when patients younger than 65 come to his office.

One UnitedHealth document reviewed by the Journal projected Pasternak could receive as much as $23,250 a year in such payments. A UnitedHealth executive in his area told him in an email his practice also would benefit from any additional diagnoses made by the nurse.

Valerie O'Meara, a former UnitedHealth nurse practitioner, said she never provided treatment for the patients she saw in doctors' offices in Washington state. "Your job is finding diagnoses, that was clear as a bell," she said. "I was like, am I finding all these things that the doctors who are taking care of these people didn't find?"

She said a Minnesota-based UnitedHealth manager urged her to make new diagnoses beyond what doctors had treated. Patients were often confused, she said, about why she, not their own doctor, was examining them. "They don't tell the patient, the nurse needs to see you to make sure your high-scoring medical problems are checked off this year."

## Suspicious patient

Chris Henretta, a UnitedHealth Medicare Advantage plan member who lives in The Villages, a retirement community in central Florida, was suspicious when his primary-care doctor diagnosed him as morbidly obese during his annual exam in October.

He is a lifelong weightlifter, plays water volleyball five times a week and has an athletic build.

"I told her I didn't think I was obese," Henretta said. When she recorded morbid obesity anyway, he said, he began to "suspect my doctor may have a financial incentive to portray people as higher risk."

The diagnosis can trigger payments of about $2,400 a year to Medicare Advantage insurers.

A widely used measure to diagnose obesity, body-mass index, has been criticized for sometimes mischaracterizing muscular people as overweight. Henretta's medical record shows that even by that standard, he didn't qualify as morbidly obese. His BMI was 32.3 at the time of his October visit, nearly three points below the minimum threshold for morbid obesity.



Chris Henretta, a UnitedHealth Medicare Advantage plan member, said he was suspicious when his primary-care doctor diagnosed him as morbidly obese. PHOTO: ZACK WITTMAN FOR WSJ

3/19/25, 4:23 PM
CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 08/25/25    Page 47 of 179
UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare - WSJ



Henretta said he began to 'suspect my doctor may have a financial incentive to portray people as higher risk.' PHOTO: ZACK WITTMAN FOR WSJ

Henretta's doctor at The Villages Health, a clinic that contracts with UnitedHealth, also diagnosed him with qualitative platelet disorder, a condition that affects blood clotting.

Henretta said his doctor added the diagnosis after he agreed that his blood seemed to clot slightly more slowly after he started taking baby aspirin several years earlier. His doctor had recommended the baby aspirin after he was diagnosed, in 2021, with aortic atherosclerosis—which could trigger Medicare payments of about $2,700 a year at the time.

Dr. Rachel Bercovitz, a hematologist and professor at Northwestern University's medical school, said aspirin inhibits platelet function, so Henretta's doctor is "diagnosing the intended effect of the medication" as a separate disease.

A qualitative platelet disorder diagnosis can trigger extra payments of about $2,000 a year to insurers.

The Villages Health, its top executives and Henretta's doctor didn't respond to phone calls and emails requesting comment.



Dr. Coleen Madigan used to work for a UnitedHealth medical practice in Texas. PHOTO: KAYLEE GREENLEE FOR WSJ

Dr. Coleen Madigan, who worked for a UnitedHealth medical practice in Texas for a little over a year before leaving in 2020, said one of her patients there didn't know what she was talking about when she asked when he had been diagnosed with chronic obstructive pulmonary disease, and got upset when she told him his chart included the illness.

The patient was a smoker who had bronchitis in the past, but he had never been tested to confirm COPD, Madigan said. She added a note to his record saying there wasn't documentation to support the lung disease diagnosis, she said, but it was difficult to remove completely.

During her time at UnitedHealth, Madigan, now mostly retired, said she felt "an insidious pressure" to document diagnoses. "It distracts you from focusing on the patient."

—*Mark Maremont contributed to this article.*

Write to Christopher Weaver at Christopher.Weaver@wsj.com, Anna Wilde Mathews at Anna.Mathews@wsj.com and Tom McGinty at Tom.McGinty@wsj.com

*Appeared in the December 31, 2024, print edition as 'UnitedHealth's Army of Doctors Helped It Boost Medicare Payments'.*

# EXHIBIT 12

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 03/25/25    Page 51 of 179

**EXCLUSIVE**

# DOJ seeks interviews with former UnitedHealth Group doctors

Clinicians told STAT that UnitedHealth pressured them to apply lucrative diagnosis codes to patients

Jenn Ackerman for STAT

 **By Tara Bannow**   Jan. 12, 2025

Hospitals and Insurance Reporter

The Justice Department is interviewing former UnitedHealth Group physicians about their experiences working at practices owned by the health care giant, two sources with knowledge of the inquiries told STAT.

Representatives from the DOJ reached out recently to at least two physicians who were interviewed for STAT's Health Care's Colossus series. Both doctors described how the quality of patient care deteriorated at their practices after they were acquired by UnitedHealth's Optum subsidiary. A representative from the California Attorney General's office contacted one of the people as well, they said.

The DOJ is investigating UnitedHealth's market power and the relationships between its insurance and provider subsidiaries, the Examiner News, based in New York's Hudson Valley, and the Wall Street Journal reported. It's unclear if the new interviews confirmed by STAT are part of that investigation or a separate inquiry.

California's interest in UnitedHealth hasn't previously been reported.

The outreach comes in the wake of extraordinary public attention on UnitedHealth after the killing last month of UnitedHealthcare CEO Brian Thompson.

Representatives of the DOJ and the office of California's attorney general declined to comment. UnitedHealth did not respond to a request for comment.

UnitedHealth is the country's largest health insurer and has more doctors under its umbrella than any other company, some 90,000 clinicians. Doctors told STAT that after UnitedHealth took over their practices, it placed tremendous pressure on them to apply lucrative diagnosis codes to their Medicare Advantage patients. The government pays insurers more to cover sicker members.

One of the doctors, Susan Baumgaertel, said she was recently contacted to discuss UnitedHealth by an attorney from the DOJ's antitrust division who had read STAT's articles. She said she plans to meet virtually with four government attorneys this week. Baumgaertel, an internal medicine physician, spent 25 years working for The Polyclinic, a large multispeciality group in Seattle that Optum took over in 2018.

Baumgaertel told STAT that UnitedHealth pressured her and her colleagues to apply codes to Medicare Advantage patients for conditions they didn't think were appropriate. She quit in 2021.

"We were not truly caring for patients anymore," she said. "We were just micromanaging their care to bring in money. It just felt so unconscionable."

The other physician, who was contacted by both California's attorney general and by the Justice Department, did not want to be public about the conversations with regulators.

Jonathan Kanter, who headed the DOJ's antitrust division for most of Biden's presidency, told STAT in an exclusive interview that government officials need to consider breaking up powerful health care conglomerates that have price-gouged patients and suppressed competition. Under Kanter's watch, the DOJ sued to block two different UnitedHealth acquisitions: that of the home health and hospice company Amedisys, a case that's ongoing, and the technology company Change Healthcare, which the government lost.

"We are at real risk that this sort of platformization concept will result in markets tipping throughout our entire health care system to a very small number," said Kanter, who stepped down last month. "And by very small, I mean one or two companies that have a massive amount of power and control with a small number of also-rans lingering about."

# EXHIBIT 13

Department of Health and Human Services

# Office of Inspector General

## Office of Evaluation and Inspections

October 2024 | OEI-03-23-00380

# Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions

OIG.HHS.GOV

# REPORT HIGHLIGHTS

October 2024 | OEI-03-23-00380

# Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions

## Why OIG Did This Review

- Medicare Advantage (MA) companies receive higher risk-adjusted payments from CMS for enrollees who are sicker, which helps to ensure that plans receive sufficient payment to cover more costly care and enrollees have continued access to MA plans.  However, taxpayers fund billions of dollars in overpayments to MA companies each year based on unsupported diagnoses for MA enrollees.  Unsupported diagnoses inflate risk-adjusted payments and drive improper payments in the MA program.

- Using 2016 MA encounter data, prior OIG work identified two sources of enrollee diagnoses—health risk assessments (HRAs) and chart reviews—as vulnerable to misuse by MA companies.  This evaluation updates that work and determines whether vulnerabilities persist regarding the appropriateness of resulting risk-adjusted payments and the quality of care for enrollees with diagnoses reported only on HRAs and on no other records of services (i.e., service records) in the 2022 MA encounter data.  This evaluation also newly examines the extent to which MA companies use chart reviews of information gathered as part of HRAs to add diagnoses that increase their risk-adjusted payment (HRA-linked chart reviews).

## What OIG Found

 **Diagnoses reported only on enrollees' HRAs and HRA-linked chart reviews, and not on any other 2022 service records, resulted in an estimated $7.5 billion in MA risk-adjusted payments for 2023.**  The lack of any other followup visits, procedures, tests, or supplies for these diagnoses in the MA encounter data for 1.7 million MA enrollees raises concerns that either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews.

**In-home HRAs** and **HRA-linked chart reviews** generated almost two-thirds of the estimated $7.5 billion in risk-adjusted payments.  In-home HRAs and HRA-linked chart reviews may be more vulnerable to misuse because these tools are often administered by MA companies or their third-party vendors and not enrollees' own providers.  Diagnoses reported only on these types of records heighten concerns about the validity of the diagnoses or the coordination of care for MA enrollees.



 **Just 20 MA companies drove 80 percent of the estimated $7.5 billion in payments**.  Also, these MA companies generated a substantially greater share of payments resulting from HRAs or HRA-linked chart reviews for certain health conditions, including serious and chronic illnesses, such as diabetes and congestive heart failure.

## What OIG Recommends

In addition to implementing prior OIG recommendations, CMS should: (1) impose additional restrictions on the use of diagnoses reported only on in-home HRAs or chart reviews that are linked to in-home HRAs for risk-adjusted payments, (2) conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews, and (3) determine whether select health conditions that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.  CMS concurred with our third recommendation but not the other two.

# Primer: The Medicare Advantage Program and Health Risk Assessments



## The Medicare Advantage Program

Under Medicare Advantage (MA), also known as Medicare Part C, the Centers for Medicare & Medicaid Services (CMS) contracts with MA companies[1] to provide coverage of Parts A and B services through private health plan options.[2]  In 2023, half of Medicare enrollees—32 million—elected to enroll with MA companies rather than the Medicare fee-for-service program.  MA program costs were $448 billion of the total $1 trillion in Medicare program costs in fiscal year 2023.[3]

**MA risk-adjusted payments.**  For each enrollee, MA companies receive a capitated payment that reflects CMS's predicted cost of providing care to an MA enrollee.  CMS risk-adjusts payments to pay MA companies more for enrollees with higher expected health care costs.  To calculate these payments, MA companies submit records of services provided to enrollees to CMS's MA Encounter Data System that contain claims information or administrative data, including the diagnoses.  CMS identifies diagnoses that are eligible for risk adjustment and groups them into hierarchical condition categories (HCCs) of clinically related diagnoses.[4]  Each HCC has relative numerical values (i.e., relative factors) that represent expected costs associated with treating the medical conditions in the category.[5]  The enrollee's risk score equals the sum of the relative factors that correspond with the enrollee's HCCs and demographic characteristics.  The total risk-adjusted payment to an MA company for an enrollee equals the enrollee's risk score multiplied by the MA plan's base payment rate.[6]

The risk-adjustment payment policy creates financial incentives for MA companies to misrepresent enrollees' health statuses by submitting unsupported diagnoses to CMS for additional conditions that inappropriately inflate their risk-adjusted payments.  Unsupported risk-adjusted payments have been a major driver of improper payments in the MA program.  For fiscal year 2023, CMS identified $12.7 billion in net overpayments that resulted from plan-submitted diagnoses that were not supported by documentation in enrollees' medical records.[7]  Similarly, OIG[8] and other oversight entities[9, 10] tasked with safeguarding MA program integrity have identified vulnerabilities related to MA companies inflating their enrollees' risk scores, as shown in Appendix A.

## HRAs and HRA-Linked Chart Reviews

CMS allows MA companies to use HRAs and chart reviews as sources of diagnoses for risk adjustment.[11]  OIG and other entities have raised concerns that some MA companies may be misusing these mechanisms to report unsupported enrollee diagnoses and inflate their risk-adjusted payments.  For example, in September 2023, the Department of Justice announced a $172 million settlement with The Cigna Group and its subsidiaries, achieved in partnership with OIG.  This settlement resolved allegations that Cigna improperly increased its risk-adjusted payments from CMS by misusing chart reviews and in-home HRAs.

**HRAs.**  In Medicare, health care professionals conduct HRAs to collect information from enrollees about their health status, health risks, and daily activities.  HRAs are part of enrollees' annual wellness visits, which typically occur in physician offices or other health care facilities.  Annual wellness visits also may

occur via telehealth.  HRAs also may be conducted during other visits with enrollees—including visits to enrollees' homes.  Thus, Medicare enrollees may receive an in-home HRA, a telehealth HRA, or a facility-based HRA.

CMS encourages MA companies to have providers conduct initial and annual HRAs.[12]  Ideally, assessing an enrollee's health risks affords the opportunity for care coordination that may include developing a plan of care, arranging services, delivering interventions, and reassessing and adjusting the plan of care as needed.  CMS also encourages MA companies to adopt best practices that support care coordination when implementing in-home HRA programs, as shown in Exhibit 1.

### Exhibit 1: Examples of CMS's best practices for ensuring care coordination related to in-home HRAs

Schedule appointments with appropriate providers.

Make referrals to appropriate community resources.

Verify that needed followup care is provided.

Verify that information obtained during the assessment is provided to the appropriate providers.

Provide a summary to the enrollee that includes their diagnoses, medications, scheduled followup appointments, plan for care coordination, and contact information for community resources.

Place the enrollee in the MA company's disease management or case management program, as appropriate.

Source: CMS, "Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," p. 146.  Accessed at https://www.cms.gov/medicare/health-plans/medicareadvtgspecratestats/downloads/announcement2016.pdf on Apr. 11, 2024.

**Concerns regarding HRAs.**  Oversight entities have questioned whether MA companies use HRAs or HRA-type assessments[13] primarily as a tool to maximize risk-adjusted payments rather than to improve care provided to enrollees.  Previous OIG work found that diagnoses that MA companies reported only on HRAs in the encounter data resulted in an estimated $2.6 billion in risk-adjusted payments for 2017.  HRAs conducted in enrollees' homes generated $2.1 billion of the $2.6 billion in risk-adjusted payments.  Most of these in-home HRAs were conducted by third-party vendors that MA companies partnered with or hired to conduct HRAs and likely were not conducted by enrollees' own primary care providers, which may have created gaps in care coordination.  OIG's findings raised concerns about the appropriateness of risk-adjusted payments generated by HRAs, the quality of care coordination for enrollees, and the completeness of encounter data.  The Medicare Payment Advisory Commission (MedPAC) conducted similar analyses and noted that diagnoses identified only through in-home HRAs may be less accurate because they often are based on enrollee self-reporting or may require verification by diagnostic equipment not present during the visit.[14]

CMS does not require MA companies to indicate in the Encounter Data System that a diagnosis resulted from an HRA, which also presents challenges for overseeing the appropriate use of HRAs.  For this and our prior evaluations of HRAs, we had to reasonably approximate our identification of these diagnoses based on OIG analysis and discussion with CMS, as detailed in our Methodology on page 12.

**HRA-linked chart reviews.**  In CMS's Encounter Data System, MA companies may add diagnoses to service records using chart review records.  CMS allows MA companies to link these chart reviews to records of HRA visits (hereafter referred to as "HRA-linked chart reviews").  A chart review is an MA company's retrospective review of an enrollee's medical record documentation to identify diagnoses that a provider did not submit to the MA plan or submitted to the plan in error.  MA companies may conduct chart reviews to ensure that the correct diagnoses are reported for risk adjustment.  To perform these reviews, MA companies may hire third-party vendors to examine enrollees' medical records.  These vendors may employ staff with clinical or health care coding experience, or they may use artificial intelligence software.  When conducting chart reviews, vendors or other reviewers may add diagnoses based on their review of information in the enrollee's medical record, including diagnoses that they believe were missed in the original HRA documentation.

**Concerns regarding HRA-linked chart reviews.**  Previous OIG work raised concerns that chart reviews may provide MA companies with opportunities to inflate risk-adjusted payments inappropriately.  OIG found that diagnoses that MA companies reported only on chart reviews—and not on any service records in the encounter data—resulted in an estimated $6.7 billion in risk-adjusted payments for 2017. Diagnoses collected from MA companies' chart reviews may be less likely to be supported by medical records compared to diagnoses submitted to MA companies by providers.[15]

Chart reviews that are linked to HRAs—regardless of where the HRA was performed—may be even more vulnerable to misuse than chart reviews previously identified by OIG because HRA-linked chart reviews contain both the vulnerabilities associated with chart reviews and the vulnerabilities associated with HRAs.  Thus, if MA companies submit diagnoses derived from their own chart reviews of HRAs, this heightens concerns regarding the validity of these diagnoses or the quality of care for MA enrollees.

Although all HRA-linked chart reviews raise concerns, the specific subset of chart reviews that are linked to in-home HRAs may be even more vulnerable to misuse than those linked to facility-based HRAs because in-home HRAs may: (1) be conducted by someone other than the enrollee's primary care provider and (2) occur in a setting with less diagnostic equipment than would be in a health care facility. By adding diagnoses to an in-home HRA via a chart review without also implementing best practices for care coordination, MA companies may further circumvent the provider-enrollee relationships that ensure high-quality coordination of care.

**Estimated Risk-Adjusted Payments**

## Diagnoses reported only on HRAs and HRA-linked chart reviews resulted in an estimated $7.5 billion in risk-adjusted payments for 2023

Diagnoses reported only on HRAs and HRA-linked chart reviews, and on no other service records for the entire year, resulted in an estimated $7.5 billion in risk-adjusted payments for 2023.[16]  Most MA companies (157 of 170) generated risk-adjusted payments from HRAs and HRA-linked chart reviews for 1.7 million MA enrollees with no other encounter records of visits, procedures, tests, or supplies that contained these diagnoses.

In-home HRAs and HRA-linked chart reviews generated 63 percent of the estimated $7.5 billion in risk-adjusted payments, as shown in Exhibit 2.  Diagnoses reported only on an HRA—conducted in any setting—but on no other service records raise questions about whether the diagnoses are valid and whether enrollees got needed care.  However, it is especially concerning when diagnoses result solely from in-home HRAs or from HRA-linked chart reviews conducted in any setting.  In-home HRAs and HRA-linked chart reviews conducted in any setting may be more vulnerable to misuse because these tools are often administered by MA companies or their third-party vendors and not enrollees' own providers.  Diagnoses reported *only* on these types of records heighten concerns about the validity of the diagnoses or the coordination of care for MA enrollees.

**Exhibit 2**: In-home HRAs and HRA-linked chart reviews drove almost two-thirds of the estimated risk-adjusted payments from diagnoses reported only on HRAs and HRA-linked chart reviews



Source: OIG analysis of 2022 MA encounter data from CMS's Integrated Data Repository Cloud (IDRC).
Note: Before rounding, the sum of payments from in-home HRAs ($3.45 billion) and HRA-linked chart reviews ($1.29 billion) totaled $4.7 billion.

HRA-linked chart reviews generated an estimated $1.3 billion in risk-adjusted payments.  HRA-linked chart reviews are chart reviews that may retrospectively add diagnoses using the information collected by the HRA, even though the original HRA did not contain that diagnosis.  Of the total payments from HRA-linked chart reviews, 57 percent were linked to HRAs conducted in homes ($738.9 million of $1.3 billion).  In contrast, chart reviews of HRAs conducted in facilities generated 42 percent of risk-adjusted payments from HRA-linked chart reviews ($546 million of $1.3 billion).  Chart reviews that were linked to HRAs conducted via telehealth generated less than 1 percent of risk-adjusted payments from HRA-linked chart reviews ($7.4 million of $1.3 billion).

Taken together, in-home HRAs and the subset of chart reviews that relied upon in-home HRAs generated an estimated $4.2 billion of the total $7.5 billion in risk-adjustment payments.[17]  Any inaccurate diagnoses from these in-home HRAs and associated chart reviews may have resulted in overpayments to the MA companies.  For diagnoses that were accurate, enrollees may have gone without needed care.

## MA companies generated a higher payment for each in-home HRA submitted than for other types of HRAs and HRA-linked chart reviews

On average, for each in-home HRA, MA companies generated $1,869 in estimated risk adjusted payments, as shown in Exhibit 3.  On average, for each facility-based HRA, MA companies generated $365 in estimated risk-adjusted payments.

**Exhibit 3: On average, MA companies generated a higher payment for each in-home HRA submitted than for other types of HRAs and HRA-linked chart reviews**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

Overall, 46 percent of the estimated $7.5 billion in risk-adjusted payments from HRAs and HRA-linked chart reviews were generated by in-home HRAs, yet these in-home visits accounted for only 13 percent of the HRAs and HRA-linked chart review records in the 2022 MA encounter data, as shown in Exhibit 4.  While the percentage of in-home HRA records submitted was smaller than the percentage of estimated payments generated by those in-home HRAs, the percentage of facility-based HRAs and HRA-linked chart reviews had the opposite relationship.

**Exhibit 4: Although in-home HRAs generated a substantial portion of estimated payments from HRAs and HRA-linked chart reviews, these visits accounted for only 13 percent of the HRA and HRA-linked chart review records in the 2022 MA encounter data**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

2

**Top Health Conditions**

## Just 13 health conditions drove 75 percent of the estimated $7.5 billion in 2023 risk-adjusted payments from HRAs and HRA-linked chart reviews

The hierarchical condition categories (HCCs) generated by diagnoses reported only on HRAs and HRA-linked chart reviews included serious, chronic illnesses, such as diabetes and congestive heart failure. However, there were no service records in the encounter data directly demonstrating that these enrollees received treatment for these and other serious conditions. The top 13 health conditions generated $5.6 billion of the estimated $7.5 billion in risk-adjusted payments for 2023, as shown in Exhibit 5. Almost half of these payments ($2.7 billion of $5.6 billion) were generated by **in-home HRAs**. On the other end of the spectrum, 1 percent of these payments ($67.6 million of $5.6 billion) were generated by telehealth HRAs. Appendix B provides the amount of risk-adjusted payments for each condition that resulted from diagnoses reported solely on HRAs and HRA-linked chart reviews.

**Exhibit 5: Thirteen health conditions drove three-fourths of the risk-adjusted payments from HRAs and HRA-linked chart reviews for 2023**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

3

# Diagnoses for Top Health Conditions

## Certain diagnoses associated with the top 13 health conditions were most commonly generated by in-home HRAs

MA companies relied mainly on in-home HRA visits to collect certain diagnoses associated with some of the top 13 health conditions, as shown in Exhibit 6.  For example, MA companies used in-home HRAs to report a diagnosis of "secondary hyperaldosteronism" for 74 percent of all enrollees (59,281 of 80,130) with this diagnosis on either an HRA or HRA-linked chart review that resulted in payment.  However, only 3 percent of enrollees (2,240 of 80,130) received this diagnosis during a facility-based HRA visit that resulted in payment.

**Exhibit 6: Certain diagnoses were reported more often on in-home HRAs than on other types of records**

| Diagnosis (Associated HCC) | Percentage of MA Enrollees With Diagnoses That Generated Payment From HRAs or HRA-Linked Chart Reviews | | | |
| --- | --- | --- | --- | --- |
| | In-Home HRA | Facility-Based HRA | HRA-Linked Chart Review | Telehealth HRA |
| Type 2 diabetes mellitus with diabetic polyneuropathy (Diabetes with Chronic Complications) | 82% | 9% | 9% | <1% |
| Rheumatoid polyneuropathy with rheumatoid arthritis of unspecified site (Myasthenia Gravis/Myoneural Disorders and Guillain-Barré Syndrome/Inflammatory and Toxic Neuropathy; Rheumatoid Arthritis and Inflammatory Connective Tissue Disease) | 81% | <1% | 18% | <1% |
| Type 2 diabetes mellitus with diabetic cataract (Diabetes with Chronic Complications) | 74% | 8% | 16% | <1% |
| Secondary hyperaldosteronism (Other Significant Endocrine And Metabolic Disorders) | 74% | 3% | 23% | <1% |
| Type 2 diabetes mellitus with hyperglycemia (Diabetes with Chronic Complications) | 74% | 18% | 7% | <1% |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.
Note: The percentages may not sum to 100 percent due to rounding.  In addition, the diagnosis code "rheumatoid polyneuropathy with rheumatoid arthritis of unspecified site" is associated with two HCCs.

# Top MA Companies

## Twenty MA companies had a disproportionate share of the estimated $7.5 billion in risk-adjusted payments resulting solely from HRAs and HRA-linked chart reviews

Most MA companies' (137 of 157) share of these payments was proportional to or lower than their percentage of enrollees.  However, the **top 20 MA companies** each had a share of payments from HRAs and HRA-linked chart reviews that exceeded their percentage of enrollees by more than 25 percent (see Appendix C).  Taken together, these 20 MA companies generated 80 percent of the estimated $7.5 billion in 2023 risk-adjusted

4

payments while covering only half of MA enrollees, as shown in Exhibit 7.  In contrast, the other 137 MA companies generated 20 percent of payments.

Exhibit 7: Just 20 MA companies drove 80 percent of risk-adjusted payments from diagnoses reported only on HRAs and HRA-linked chart reviews while covering only half of MA enrollees



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

## The top 20 MA companies generated a substantially greater share of the payments resulting from HRAs and HRA-linked chart reviews for 7 of the top 13 health conditions

Overall, the top 20 MA companies had between 81 and 91 percent of the payments resulting from HRAs and HRA-linked chart reviews for each of 7 conditions, as shown in Exhibit 8.  For example, these 20 MA companies drove 88 percent ($476.8 million of $539 million) of the estimated risk-adjusted payments from HRAs and HRA-linked chart reviews for "Disorders of Immunity."  In contrast, the other 137 MA companies generated only 12 percent ($62.4 million of $539 million) of the estimated risk-adjusted payments from HRAs and HRA-linked chart reviews for the same health condition.

Exhibit 8: For some of the top health conditions, the top 20 MA companies had a substantially greater share of the payments resulting from HRAs and HRA-linked chart reviews, in comparison to their peers



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

5

# One top MA company drove payments from in-home HRAs and HRA-linked chart reviews

One top MA company stood out from its peers in its use of in-home HRAs and HRA-linked chart reviews to generate risk-adjusted payments.  As shown in Exhibit 9, this one top MA company drove about two-thirds of risk-adjusted payments from diagnoses reported only on in-home HRAs and HRA-linked chart reviews.  Yet, this MA company covered only 28 percent of 2022 MA enrollees.  In contrast, the other companies had a greater share of the payments from diagnoses reported solely on facility-based and telehealth HRAs.

Exhibit 9: One top MA company had a greater share of the payments from diagnoses reported solely on in-home HRAs and HRA-linked chart reviews, whereas the other companies had more of the payments from diagnoses reported solely on facility-based and telehealth HRAs



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.
Note: Before rounding, the sum of payments from in-home HRAs ($3.45 billion) and HRA-linked chart reviews ($1.29 billion) totaled $4.74 billion.

The other top 19 MA companies accounted for almost a quarter of payments ($1.2 billion of $4.7 billion) from in-home HRAs and HRA-linked chart reviews and covered 22 percent of enrollees.  The remaining 137 companies accounted for 10 percent of payments ($495.4 million of $4.7 billion) from in-home HRAs and HRA-linked chart reviews yet covered half of enrollees.

# Among the top 20 MA companies, enrollees who were dually eligible and/or eligible for the low-income subsidy were disproportionately represented

For the top 20 MA companies, enrollees who were dually eligible for Medicare and Medicaid and/or eligible for the Part D low-income subsidy[18] represented 21 percent of all MA enrollees but accounted for 29 percent of enrollees with diagnoses reported only on HRAs or HRA-linked chart reviews that generated payment, as shown in Exhibit 10 on the next page.

In contrast, for the other 137 companies, 17 percent of all MA enrollees were dually eligible and/or eligible for the low-income subsidy and accounted for 16 percent of enrollees that had diagnoses from HRAs or HRA-linked chart reviews that resulted in payments.

**Exhibit 10:** The top 20 MA companies **had a higher percentage of enrollees who were dually eligible and/or eligible for the low-income subsidy and these enrollees were disproportionately represented among those with diagnoses that generated payment from HRAs or HRA-linked chart reviews**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

Of the top 20 MA companies, 8 companies mainly offered Special Needs Plans (SNPs), and at least 90 percent of their enrollees were dually-eligible for Medicare and Medicaid.[19]  Besides meeting the same coverage requirements as other MA plans, CMS also requires that companies offering SNPs conduct HRAs and take additional measures to address the specific health care and care coordination needs of the populations they serve.[20]  Thus, even more so than for other types of MA plans, it is concerning that enrollees in SNPs would potentially lack followup care given these additional requirements.

## MA Enrollees With No Other 2022 Service Records

## Thousands of MA enrollees had no service records in the 2022 encounter data other than a single in-home HRA

Of the 1.7 million MA enrollees who had no other service records for certain diagnoses reported only on HRAs and HRA-linked chart reviews, most had service records for other types of diagnoses.  However, 19,028 of those enrollees had no other service records *at all* in 2022, besides a single HRA.

In-home HRAs accounted for 74 percent of the total $81.9 million in estimated risk-adjusted payments generated for enrollees for whom there was not a single record of any other service in 2022, as shown in Exhibit 11.  Specifically, 77 MA companies generated $60.6 million in payments for 14,103 enrollees who did not have an encounter record of receiving any tests, supplies, or services other than an in-home HRA.  In contrast, facility-based HRAs accounted for 23 percent

**Exhibit 11:** In-home HRAs **generated almost three-quarters of the $81.9 million in risk-adjusted payments for enrollees without a single record of any other service in 2022**



Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

of the total payments ($18.5 million of $81.9 million) generated for enrollees who lacked any other service record in the 2022 encounter data.

While 77 MA companies had estimated risk-adjusted payments for enrollees who had only 1 in-home HRA and no other record in the 2022 encounter data, just 8 of the 77 MA companies drove 96 percent of the $60.6 million in payments.  Of these eight MA companies, just one MA company generated more than half—$36.9 million—of these payments.

## Why This Matters

HRAs can be used for early identification of health risks to improve enrollees' care and health outcomes.  In fact, CMS has provided guidance to MA companies on a wide range of best practices that they can use to help connect enrollees with appropriate care based on HRA results.  Additionally, chart reviews can be a tool to improve the accuracy of risk-adjusted payments.  However, HRAs and HRA-linked chart reviews raise concerns if MA companies use them to add diagnoses and maximize risk-adjusted payments without improving enrollees' care.

We found that diagnoses that MA companies reported solely on HRAs and HRA-linked chart reviews generated an estimated $7.5 billion in risk-adjusted payments for 2023.  In-home HRAs and HRA-linked chart reviews— which may be particularly vulnerable to misuse by MA companies—accounted for $4.7 billion, or 63 percent, of these payments.

These findings reinforce three types of concerns OIG identified in its prior work on HRAs and chart reviews.

 **Payment Integrity:** MA companies may have submitted diagnoses on the HRAs that were not documented in the enrollees' medical record and, therefore, may have received inappropriate payments from CMS.

 **Quality of Care:** MA companies may not have coordinated care following these enrollees' HRAs, including verifying that information was provided to the enrollees' provider(s) and verifying that appropriate followup care was provided to the enrollees.

 **Data Integrity**: MA companies may not have ensured that the encounter data contained all records of items and services provided to enrollees.

Most of the $7.5 billion in risk-adjusted payments were concentrated among 13 health conditions, including serious, chronic illnesses, such as congestive heart failure and diabetes.  The serious nature of some top health conditions raises questions about whether in-home HRA visits would include the appropriate testing supplies and equipment needed to accurately diagnose these conditions.  If the conditions were accurately diagnosed, the serious nature of some conditions heightens concerns about whether enrollees received needed care to treat these conditions.  Some MA companies may warrant further oversight and followup, especially those whose use of HRAs and HRA-linked chart reviews drove disproportionate shares of risk-adjusted payments and those with HRA-generated payments for enrollees who had no service records whatsoever.

## What OIG Recommends

The results of this latest analysis, combined with OIG's prior evaluations and enforcement work, call into question whether in-home HRAs should be allowed to drive billions of dollars in risk adjustment without: (1) tighter controls over the accuracy of the diagnoses generated by them and (2) controls to ensure that MA companies are taking meaningful actions to connect enrollees to appropriate care based on HRA results.

At the policy level, OIG recommends that CMS:

> **Impose additional restrictions on the use of diagnoses reported only on in-home HRAs or chart reviews that are linked to in-home HRAs for risk-adjusted payments.** While there are general requirements and oversight in place for the MA risk adjustment payment process, CMS should take additional steps specific to in-home HRAs or chart reviews linked to in-home HRAs. Additional restrictions are needed to mitigate the risks to payment integrity and enrollee coordination of care arising from diagnoses reported only through these sources. Such restrictions could be excluding such diagnoses from eligibility for risk-adjusted payments. Alternatively, CMS could require that the enrollee's medical record contain evidence that the MA company took meaningful actions to connect the enrollee to appropriate care based on the results of the in-home HRA as a condition for the in-home HRA to be an allowable source for risk-adjusted payment.

However, as long as CMS continues its policy of allowing diagnoses from in-home HRAs and chart reviews linked to in-home HRAs to generate risk-adjusted payments, it needs to strengthen its oversight of MA companies in several ways. To improve its oversight, OIG recommends that CMS:

> **Conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews.** CMS should incorporate risk-adjustment eligible diagnoses from in-home HRAs and HRA-linked chart reviews into its contract-level Risk Adjustment Data Validation (RADV) audits of risk-adjusted payments. In addition, CMS should ensure that audits include a representative or targeted sample of diagnoses reported on in-home HRAs and HRA-linked chart reviews. After conducting these contract-level RADV audits of in-home HRAs and HRA-linked chart reviews, CMS should take steps to mitigate any vulnerabilities identified in its audits and oversight of in-home HRAs and HRA-linked chart reviews.

> **Determine whether select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.** CMS should determine whether diagnoses for select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews are particularly subject to intentional or unintentional coding variation or inappropriate coding by health plans or providers. OIG identified 13 top health conditions that accounted for a substantial portion of MA companies' estimated payments from HRAs and HRA-linked chart reviews. We also identified five diagnoses (and associated top HCCs) that were reported more often for in-home HRAs than for other types of HRA visits. Finally, for 7 of the 13 HCCs, certain MA companies had a substantially greater share of payments driven by diagnoses reported solely on HRAs and HRA-linked chart reviews than their peers.

> OIG is aware that CMS has begun implementing a revised HCC diagnostic classification system that aims to address discretionary coding variation. These revisions impact some conditions highlighted in this report, such as diabetes and congestive heart failure.[21] This is consistent with one of the principles (Principle 10) that CMS uses to guide its HCC diagnostic classification system, which states "diagnoses

that are particularly subject to intentional or unintentional discretionary coding variation or inappropriate coding by health plans/providers" should not increase risk-adjusted payments to MA companies.[22]  If CMS determines through ongoing analysis that additional health conditions are more susceptible to coding variation, CMS should determine whether the degree of coding variation warrants changes to the use of these conditions for risk adjustment.

We note that this new evaluation provides further support for open recommendations that OIG has previously made to CMS to strengthen its oversight of HRAs and chart reviews.  These include:

(1)  require MA companies to implement best practices to ensure care coordination for HRAs,[23]

(2)  provide targeted oversight of MA companies that drove most of the payments resulting from in-home HRAs,[24]

(3)  require MA organizations to flag in their MA encounter data any HRAs they initiate,[25]

(4)  conduct audits that validate diagnoses reported on chart reviews in the MA encounter data,[26] and

(5)  perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs.[27]

## Agency Comments and OIG Response

CMS did not concur with our recommendation to restrict the use of diagnoses reported only on in-home HRAs or chart reviews linked to in-home HRAs for risk-adjusted payments.  Although CMS recognizes concerns regarding MA companies' potential misuse of HRAs, CMS noted that our analysis did not determine whether diagnoses reported only on HRAs were supported by medical record documentation.  CMS also stated that the lack of a definitive method for identifying in-home HRAs raises challenges in any effort to reconsider allowing these diagnoses for risk adjustment.  We share CMS's concerns regarding the lack of a definitive method for identifying various types of in-home HRAs.  To resolve this specific challenge, CMS should implement our prior recommendation to require MA organizations to flag in their MA encounter data any HRAs they initiate.  Ultimately, OIG continues to recommend that CMS impose additional restrictions on the use of diagnoses reported solely on in-home HRAs and chart reviews linked to in-home HRAs.

CMS did not concur or nonconcur with our recommendation for it to conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews.  Instead, CMS noted that it will use data gathered from its 2018 RADV audits and other analyses to assess whether to conduct future RADV audits of a sample of diagnoses derived from in-home HRAs and HRA-linked chart reviews.  CMS stated it will share the results of its 2018 audits with OIG.  OIG encourages CMS to implement our recommendation to conduct its own audits of diagnoses reported only on in-home HRAs and HRA-linked chart reviews.  We appreciate CMS's plan to share the results of its assessment with OIG.  OIG also is conducting RADV-like audits of diagnoses reported only on in-home HRAs.

CMS concurred with our recommendation to determine whether select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.  CMS states that it has implemented this recommendation and has begun taking steps to exclude or constrain certain

10

HCCs that CMS determined were more susceptible to coding variation by MA companies—including HCCs highlighted by OIG as driving payments from HRAs and HRA-linked chart reviews.  OIG appreciates the actions CMS has taken to revise its HCC classification system.  Going forward, we encourage CMS to continue to analyze any changes in coding variation for health conditions generated solely by HRAs and HRA-linked chart reviews, and reassess the use of such conditions for risk adjustment.

We ask that, in its Final Management Decision, CMS reconsider its position on our first recommendation, clarify its position on our second recommendation, and provide updates on its plans and actions related to each of these recommendations.

The full text of CMS's comments can be found in Appendix E.

## Methodology

We reviewed HRAs and HRA-linked chart reviews from the 2022 MA encounter data stored in CMS's Integrated Data Repository Cloud (IDRC) to determine the amount of 2023 MA risk-adjusted payments that would have resulted from diagnoses reported only on HRAs or HRA-linked chart reviews.[28]  For our analysis, we included only enrollees in the same MA contract for all 12 months of 2022.  In addition, we excluded enrollees who were diagnosed with end-stage renal disease, were receiving hospice care, or did not reside in a U.S. State or Washington D.C.  We excluded cost plans, demonstration plans, programs of all-inclusive care for the elderly organizations, and Medicare medical savings account plans.

**Identifying HRAs.**  Because CMS does not require MA companies to flag diagnoses that resulted from HRAs, we used a two-step process to identify 2022 service records that met our criteria for an HRA.  First, we identified service records containing distinct procedure codes for annual wellness visits, initial preventive physical exams, and evaluation and management home visits.[29]  We then excluded from our analysis all service records for enrollees who had more than one HRA record with a procedure code identified in step one.  We identified the place of service codes and procedure code modifiers reported on HRA records to determine whether the HRA visits were conducted in enrollees' homes, via telehealth, or in health care facilities.

**Identifying HRA-linked chart reviews.**  We identified HRA-linked chart reviews as chart review records[30] that contained an original control number and had a four-part effective key that matched the four-part key of an HRA.

**Calculating risk-adjusted payments.**  We analyzed diagnoses reported on 9.3 million HRAs and 4.9 million HRA-linked chart reviews submitted by MA companies to calculate the impact of HRAs and HRA-linked chart reviews on risk-adjusted payments for 2023.  We identified enrollees with HCCs generated only by diagnoses reported on risk-adjustment-eligible HRAs and HRA-linked chart reviews that were not reported on any other 2022 record submitted to CMS's Encounter Data System.[31]  We extracted enrollment and payment information for these enrollees, including information from the Medicare Advantage and Prescription Drug data, to calculate estimated risk-adjusted payments for diagnoses reported only on HRAs and HRA-linked chart reviews.

**Conducting summary analyses.**  For payment year 2023, we conducted summary analyses on the MA companies with payments from diagnoses reported only on HRAs and HRA-linked chart reviews.  We analyzed variation across MA companies to determine whether certain companies had a disproportionately higher share of risk-adjusted payments due to diagnoses reported only on HRAs and HRA-linked chart reviews.  We summarized the percentage of HRAs that were administered in enrollees' homes, via telehealth, or in health care facilities.  We also summarized the number and type of HCCs and diagnoses that resulted in payments.  For our analysis of diagnoses that were most commonly generated by in-home HRAs, we limited the analysis to diagnoses reported for at least 5,000 enrollees on in-home HRAs.  To determine whether certain enrollees may have been disproportionately represented among enrollees with diagnoses that resulted in payments, we compared the percentage of all MA enrollees with certain demographic characteristics to the percentage of enrollees with these characteristics who also had diagnoses reported only on HRAs or HRA-linked chart reviews that resulted in payments, as shown in Appendix D.

## Limitations

We did not determine whether diagnoses reported only on HRAs or HRA-linked chart reviews were supported by documentation in enrollees' medical records.  For enrollees with diagnoses reported only on HRAs or

HRA-linked chart reviews, we did not determine whether their MA companies had submitted all required service records to CMS's Encounter Data System.  In addition, our review did not include records of services provided to MA enrollees but not covered or paid under Medicare Part C by an MA company, such as services provided through the Veterans Health Administration.

Because CMS does not require MA companies to flag in the encounter data that a diagnosis resulted from an HRA, we had to reasonably approximate our identification of these diagnoses based on OIG analysis and discussion with CMS.  Our approximation may have included diagnoses reported during visits in which medical care was provided and an HRA was not administered.  Alternatively, our approximation may have missed diagnoses that resulted from HRAs that MA companies reported on types of records that we did not include.

For this analysis we used MA enrollees' race and ethnicity data contained in the IDRC, which is based on data collected from the Social Security Administration and an algorithm developed by the Research Triangle Institute.  CMS and OIG have identified inaccuracies in Medicare enrollees' race and ethnicity data that CMS has been working to improve.  The race and ethnicity data are less accurate for certain racial and ethnic communities.[32]

## Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# Appendix A: Recent HHS-OIG Work Related to MA Risk Adjustment

Information on OIG's work on managed care can be found on our Managed Care web page.  Below is a list of recent OIG work on risk adjustment in MA.

## Exhibit A-1: HHS-OIG's recent work on risk adjustment in MA

| Recent HHS-OIG Evaluations Related to Risk Adjustment in MA | Report Number | Date Issued |
|---|---|---|
| *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments* | OEI-03-17-00474 | September 2021 |
| *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* | OEI-03-17-00471 | September 2020 |
| *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns* | OEI-03-17-00470 | December 2019 |
| **Recent HHS-OIG Audits Related to Risk Adjustment in MA** | **Report Number** | **Date Issued** |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That MediGold (Contract H3668) Submitted to CMS* | A-07-20-01198 | February 2024 |
| *Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes* | A-07-23-01213 | December 2023 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That SelectCare of Texas, Inc. (Contract H4506) Submitted to CMS* | A-06-19-05002 | November 2023 |
| *Medicare Advantage Compliance Audit of Diagnosis Codes That CarePlus Health Plans, Inc. (Contract H1019) Submitted to CMS* | A-04-19-07082 | October 2023 |
| *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That Aetna, Inc. (Contract H5521) Submitted to CMS* | A-01-18-00504 | October 2023 |
| **Recent Fraud Enforcement Actions Related to Risk Adjustment in MA** | | **Date Released** |
| *Former Executive at Medicare Advantage Organization Charged for Multimillion-Dollar Medicare Fraud Scheme* | | October 2023 |
| *Cigna Group to Pay $172 Million to Resolve False Claims Act Allegations* | | September 2023 |
| *Martin's Point Health Care Inc. to Pay $22,485,000 to Resolve False Claims Act Allegations* | | July 2023 |
| *Sutter Health and Affiliates to Pay $90 Million to Settle False Claims Act Allegations of Mischarging the Medicare Advantage Program* | | August 2021 |
| *Medicare Advantage Provider and Physician to Pay $5 Million to Settle False Claims Act Allegations* | | August 2019 |

Source: OIG, *Managed Care,* 2024.  Accessed at https://oig.hhs.gov/reports-and-publications/featured-topics/managed-care/ on May 1, 2024.

14

# Appendix B: Estimated Risk-Adjusted Payments, by Health Condition

For enrollees who had diagnoses reported only on HRAs or HRA-linked chart reviews in the 2022 encounter data, we identified HCCs generated by these diagnoses.[33]  The estimated 2023 risk-adjusted payments for each HCC added by HRAs and HRA-linked chart reviews ranged from $4,102 to $966.9 million.

**Exhibit B-1: Estimated 2023 risk-adjusted payments resulting from diagnoses reported on HRAs and HRA-linked chart reviews, by HCC**

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|-----|----------------|-------------|----------------|------------------|-----------|-------------|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews[1] |
| **Disease Coefficients** | | | | | | |
| HCC108 | Vascular Disease | $449,445,460 | $378,998,488 | $126,270,515 | $12,150,099 | $966,864,562 |
| HCC59 | Major Depressive, Bipolar, and Paranoid Disorders | $347,823,621 | $357,037,555 | $151,455,752 | $11,785,322 | $868,102,250 |
| HCC47 | Disorders of Immunity | $269,452,102 | $154,895,605 | $109,045,565 | $5,799,045 | $539,192,317 |
| HCC22 | Morbid Obesity | $214,358,309 | $191,247,145 | $68,182,478 | $4,816,980 | $478,604,914 |
| HCC111 | Chronic Obstructive Pulmonary Disease | $179,166,596 | $150,563,075 | $74,344,490 | $5,159,893 | $409,234,055 |
| HCC75 | Myasthenia Gravis/Myoneural Disorders and Guillain-Barré Syndrome/ Inflammatory and Toxic Neuropathy | $234,607,699 | $76,686,141 | $84,797,282 | $3,171,926 | $399,263,048 |
| HCC48 | Coagulation Defects and Other Specified Hematological Disorders | $188,787,739 | $132,521,844 | $55,920,502 | $5,312,063 | $382,542,148 |
| HCC18 | Diabetes with Chronic Complications | $218,972,306 | $78,372,669 | $50,262,469 | $3,847,087 | $351,454,531 |
| HCC85 | Congestive Heart Failure | $150,144,292 | $95,259,585 | $56,650,960 | $3,058,638 | $305,113,476 |
| HCC55 | Substance Use Disorder, Moderate/Severe, or Substance Use with Complications | $124,770,917 | $112,706,642 | $49,461,675 | $6,584,704 | $293,523,938 |
| HCC40 | Rheumatoid Arthritis and Inflammatory Connective Tissue Disease | $88,936,971 | $97,563,627 | $50,322,381 | $2,605,476 | $239,428,455 |
| HCC23 | Other Significant Endocrine and Metabolic Disorders | $120,995,551 | $46,639,219 | $47,980,544 | $1,535,638 | $217,150,953 |
| HCC96 | Specified Heart Arrhythmias | $75,115,883 | $61,642,913 | $25,388,402 | $1,739,813 | $163,887,011 |
| HCC52 | Dementia Without Complications | $55,730,562 | $60,950,598 | $27,236,614 | $1,677,754 | $145,595,528 |

[1] Note: Due to rounding, amounts presented may not add up precisely to the totals provided.

continued on next page

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC21 | Protein-Calorie Malnutrition | $69,535,306 | $44,916,938 | $20,185,127 | $1,318,266 | $135,955,636 |
| HCC103 | Hemiplegia/Hemiparesis | $43,008,840 | $20,615,381 | $16,391,746 | $1,057,499 | $81,073,466 |
| HCC8 | Metastatic Cancer and Acute Leukemia | $30,849,236 | $31,459,605 | $14,864,583 | $822,276 | $77,995,700 |
| HCC88 | Angina Pectoris | $42,730,576 | $22,062,311 | $11,764,412 | $743,885 | $77,301,185 |
| HCC84 | Cardio-Respiratory Failure and Shock | $26,039,031 | $10,382,052 | $12,089,081 | $444,861 | $48,955,024 |
| HCC138 | Chronic Kidney Disease, Moderate (Stage 3) | $4,565,138 | $33,965,578 | $8,597,005 | $640,425 | $47,768,146 |
| HCC189 | Amputation Status, Lower Limb/Amputation Complications | $25,041,287 | $9,126,151 | $10,080,453 | $331,622 | $44,579,513 |
| HCC12 | Breast, Prostate, and Other Cancers and Tumors | $5,434,885 | $33,228,434 | $4,168,367 | $511,457 | $43,343,144 |
| HCC10 | Lymphoma and Other Cancers | $14,582,936 | $17,716,797 | $6,939,581 | $422,761 | $39,662,075 |
| HCC72 | Spinal Cord Disorders/Injuries | $9,325,152 | $20,789,183 | $7,653,223 | $608,081 | $38,375,640 |
| HCC57 | Schizophrenia | $24,172,735 | $6,254,262 | $5,914,660 | $410,202 | $36,751,859 |
| HCC46 | Severe Hematological Disorders | $13,898,957 | $11,764,644 | $8,131,866 | $822,106 | $34,617,573 |
| HCC112 | Fibrosis of Lung and Other Chronic Lung Disorders | $4,446,102 | $23,205,703 | $5,327,014 | $511,708 | $33,490,527 |
| HCC78 | Parkinson's and Huntington's Diseases | $16,567,993 | $9,433,569 | $5,657,828 | $346,911 | $32,006,301 |
| HCC107 | Vascular Disease with Complications | $5,586,614 | $19,863,773 | $3,439,267 | $497,723 | $29,387,377 |
| HCC79 | Seizure Disorders and Convulsions | $12,280,655 | $10,995,392 | $5,682,999 | $401,591 | $29,360,638 |
| HCC161 | Chronic Ulcer of Skin, Except Pressure | $10,077,326 | $11,944,823 | $6,086,542 | $303,618 | $28,412,310 |
| HCC35 | Inflammatory Bowel Disease | $9,154,339 | $11,625,435 | $6,543,364 | $331,993 | $27,655,131 |
| HCC9 | Lung and Other Severe Cancers | $7,913,969 | $12,189,251 | $4,312,014 | $246,020 | $24,661,253 |
| HCC124 | Exudative Macular Degeneration | $8,784,872 | $10,069,888 | $4,105,846 | $297,634 | $23,258,240 |
| HCC51 | Dementia With Complications | $8,987,095 | $8,766,680 | $3,835,742 | $326,870 | $21,916,386 |
| HCC27 | End-Stage Liver Disease | $6,783,347 | $9,357,954 | $5,208,657 | $422,065 | $21,772,022 |

continued on next page

16

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC11 | Colorectal, Bladder, and Other Cancers | $1,798,133 | $16,541,206 | $1,554,916 | $264,206 | $20,158,462 |
| HCC56 | Substance Use Disorder, Mild, Except Alcohol and Cannabis | $8,228,357 | $6,754,944 | $4,091,264 | $338,908 | $19,413,474 |
| HCC106 | Atherosclerosis of the Extremities with Ulceration or Gangrene | $6,634,418 | $6,892,507 | $5,177,434 | $358,672 | $19,063,030 |
| HCC19 | Diabetes without Complication | $5,542,196 | $6,722,041 | $4,151,003 | $246,374 | $16,661,614 |
| HCC71 | Paraplegia | $10,253,894 | $3,607,313 | $2,334,208 | $265,958 | $16,461,374 |
| HCC28 | Cirrhosis of Liver | $5,278,788 | $5,811,443 | $3,991,972 | $164,030 | $15,246,233 |
| HCC39 | Bone/Joint/Muscle Infections/Necrosis | $5,801,586 | $6,715,789 | $2,464,231 | $210,658 | $15,192,264 |
| HCC104 | Monoplegia, Other Paralytic Syndromes | $8,250,466 | $3,172,363 | $2,372,446 | $182,750 | $13,978,025 |
| HCC29 | Chronic Hepatitis | $5,997,403 | $4,813,030 | $2,377,450 | $193,571 | $13,381,454 |
| HCC188 | Artificial Openings for Feeding or Elimination | $5,730,662 | $3,875,265 | $2,767,342 | $196,704 | $12,569,973 |
| HCC100 | Ischemic or Unspecified Stroke | $252,125 | $11,453,815 | $402,001 | $292,516 | $12,400,457 |
| HCC137 | Chronic Kidney Disease, Severe (Stage 4) | $3,551,613 | $5,359,449 | $2,635,282 | $194,164 | $11,740,508 |
| HCC77 | Multiple Sclerosis | $3,633,122 | $4,620,005 | $2,051,661 | $170,216 | $10,475,005 |
| HCC70 | Quadriplegia | $5,208,069 | $2,290,742 | $1,733,836 | $284,130 | $9,516,777 |
| HCC186 | Major Organ Transplant or Replacement Status | $3,211,750 | $2,602,633 | $3,137,020 | $34,750 | $8,986,153 |
| HCC34 | Chronic Pancreatitis | $3,517,619 | $3,138,792 | $2,068,456 | $145,882 | $8,870,749 |
| HCC169 | Vertebral Fractures without Spinal Cord Injury | $63,603 | $7,334,976 | $680,578 | $173,357 | $8,252,515 |
| HCC158 | Pressure Ulcer of Skin with Full Thickness Skin Loss | $2,723,756 | $1,543,644 | $1,948,712 | $53,430 | $6,269,542 |
| HCC135 | Acute Renal Failure | $121,752 | $5,320,618 | $456,137 | $181,649 | $6,080,156 |
| HCC122 | Proliferative Diabetic Retinopathy and Vitreous Hemorrhage | $1,701,407 | $2,788,255 | $1,143,594 | $146,027 | $5,779,282 |
| HCC82 | Respirator Dependence/ Tracheostomy Status | $1,857,610 | $1,984,754 | $1,146,274 | $107,192 | $5,095,830 |
| HCC87 | Unstable Angina and Other Acute Ischemic Heart Disease | $155,402 | $3,483,505 | $1,348,893 | $95,356 | $5,083,155 |

continued on next page

17

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC176 | Complications of Specified Implanted Device or Graft | $267,909 | $3,806,856 | $604,122 | $93,433 | $4,772,320 |
| HCC86 | Acute Myocardial Infarction | $120,083 | $4,031,632 | $210,514 | $74,109 | $4,436,338 |
| HCC33 | Intestinal Obstruction/Perforation | $167,118 | $3,191,104 | $432,375 | $96,332 | $3,886,929 |
| HCC159 | Pressure Ulcer of Skin with Partial Thickness Skin Loss | $1,099,883 | $1,653,041 | $791,404 | $47,677 | $3,592,004 |
| HCC58 | Reactive and Unspecified Psychosis | $929,255 | $892,100 | $841,204 | $96,994 | $2,759,553 |
| HCC136 | Chronic Kidney Disease, Stage 5 | $663,267 | $1,217,781 | $781,087 | $50,228 | $2,712,363 |
| HCC1 | HIV/AIDS | $1,145,080 | $946,633 | $490,726 | $24,803 | $2,607,242 |
| HCC73 | Amyotrophic Lateral Sclerosis and Other Motor Neuron Disease | $1,071,846 | $809,811 | $645,100 | $62,687 | $2,589,444 |
| HCC54 | Substance Use with Psychotic Complications | $1,090,572 | $836,473 | $479,552 | $42,120 | $2,448,718 |
| HCC80 | Coma, Brain Compression/Anoxic Damage | $543,296 | $1,325,695 | $508,698 | $49,996 | $2,427,685 |
| HCC6 | Opportunistic Infections | $129,005 | $1,759,255 | $315,022 | $29,036 | $2,232,318 |
| HCC17 | Diabetes with Acute Complications | $48,283 | $1,770,721 | $298,093 | $37,925 | $2,155,022 |
| HCC99 | Intracranial Hemorrhage | $54,077 | $1,844,277 | $219,984 | $25,294 | $2,143,631 |
| HCC76 | Muscular Dystrophy | $869,981 | $829,620 | $369,355 | $35,024 | $2,103,980 |
| HCC134 | Dialysis Status | $872,599 | $294,034 | $579,117 | $20,142 | $1,765,891 |
| HCC74 | Cerebral Palsy | $486,615 | $788,724 | $253,763 | $21,490 | $1,550,593 |
| HCC170 | Hip Fracture/Dislocation | $54,336 | $1,143,504 | $101,942 | $49,442 | $1,349,225 |
| HCC157 | Pressure Ulcer of Skin with Necrosis Through to Muscle, Tendon, or Bone | $463,230 | $350,727 | $398,941 | $111,868 | $1,324,765 |
| HCC110 | Cystic Fibrosis | $574,372 | $249,539 | $372,000 | $53,498 | $1,249,409 |
| HCC167 | Major Head Injury | $134,861 | $838,304 | $150,002 | $27,908 | $1,151,075 |
| HCC173 | Traumatic Amputations and Complications | $26,792 | $949,978 | $70,776 | $26,633 | $1,074,179 |
| HCC60 | Personality Disorders | $176,692 | $632,655 | $187,713 | $17,249 | $1,014,309 |

continued on next page

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|-----|----------------|----------------|-------------|------------------|-----------|-------------------|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| HCC2 | Septicemia, Sepsis, Systemic Inflammatory Response Syndrome/Shock | $97,508 | $547,065 | $138,218 | $69,503 | $852,294 |
| HCC114 | Aspiration and Specified Bacterial Pneumonias | $83,545 | $577,722 | $135,202 | $43,464 | $839,933 |
| HCC115 | Pneumococcal Pneumonia, Empyema, Lung Abscess | $38,923 | $269,613 | $56,147 | $8,761 | $373,444 |
| HCC162 | Severe Skin Burn or Condition | $11,730 | $67,040 | $10,985 | $0 | $89,755 |
| HCC166 | Severe Head Injury | $6,430 | $34,466 | $0 | $0 | $40,896 |
| HCC83 | Respiratory Arrest | $3,256 | $23,649 | $0 | $2,987 | $29,893 |
| **Disease Interactions** | | | | | | |
| HCC47_gCancer | Immune Disorders*Cancer | $76,083,887 | $41,101,759 | $26,867,505 | $1,272,171 | $145,325,321 |
| CHF_gCopdCF | Congestive Heart Failure*Chronic Obstructive Pulmonary Disease | $39,523,130 | $25,726,629 | $13,094,293 | $865,053 | $79,209,105 |
| HCC85_gRenal_v24 | Congestive Heart Failure*Renal | $26,167,774 | $26,918,623 | $11,273,423 | $867,561 | $65,227,381 |
| Diabetes_CHF | Congestive Heart Failure* Diabetes | $35,469,501 | $15,731,310 | $9,115,017 | $615,038 | $60,930,865 |
| HCC85_HCC96 | Congestive Heart Failure*Specified Heart Arrythmias | $23,622,218 | $10,144,555 | $6,445,076 | $362,823 | $40,574,672 |
| gSubstanceUseDisorder_gPsych | Substance Abuse Group*Psychiatric | $23,216,867 | $9,417,621 | $6,987,511 | $943,865 | $40,565,863 |
| gCopdCF_CARD_RESP_FAIL | Cardiorespiratory Failure*Chronic Obstructive Pulmonary Disease | $12,187,187 | $6,551,516 | $4,701,072 | $299,523 | $23,739,298 |
| SCHIZO-PHRENIA_gCopdCF | Schizophrenia*Chronic Obstructive Pulmonary Disease | $44,676 | $38,020 | $20,434 | $7,726 | $110,856 |
| SCHIZO-PHRENIA_SEIZURES | Schizophrenia*Seizure Disorders and Convulsions | $21,967 | $11,378 | $14,036 | $5,569 | $52,951 |
| gCopdCF_ASP_SPEC_BACT_PNEUM | Chronic Obstructive Pulmonary Disease*Aspiration and Specified Bacterial Pneumonias | $15,267 | $9,751 | $4,376 | $0 | $29,394 |

continued on next page

19

| HCC | HCC Description | Estimated Risk-Adjusted Payments From: | | | | |
|---|---|---|---|---|---|---|
| | | In-Home HRAs | Facility HRAs | HRA-Linked Chart Reviews | Telehealth HRAs | HRAs and HRA-Linked Chart Reviews |
| SCHIZO-PHRENIA_CHF | Schizophrenia*Congestive Heart Failure | $13,685 | $9,838 | $3,899 | $1,333 | $28,755 |
| ART_OPENINGS_PRESSURE_ULCER | Artificial Openings for Feeding or Elimination*Pressure Ulcer | $3,180 | $3,507 | $6,136 | $0 | $12,824 |
| SEPSIS_ARTIF_OPENINGS | Sepsis*Artificial Openings for Feeding or Elimination | $0 | $5,323 | $1,559 | $0 | $6,883 |
| **Disabled/Disease Interactions** | | | | | | |
| DISABLED_HCC85 | Disabled, Congestive Heart Failure | $19,350 | $9,426 | $5,396 | $0 | $34,172 |
| DISABLED_HCC161 | Disabled, Chronic Ulcer of the Skin, Except Pressure Ulcer | $10,048 | $2,852 | $0 | $0 | $12,901 |
| DISABLED_PRESSURE_ULCER | Disabled, Pressure Ulcer | $10,422 | $0 | $0 | $0 | $10,422 |
| DISABLED_HCC39 | Disabled, Bone/Joint Muscle Infections/Necrosis | $5,161 | $0 | $0 | $0 | $5,161 |
| DISABLED_HCC77 | Disabled, Opportunistic Infections | $0 | $0 | $4,102 | $0 | $4,102 |
| Total | | $3,455,232,997 | $2,669,010,125 | $1,292,319,589 | $91,823,780 | $7,508,386,491 |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.
Note: For 4 of the 108 HCCs from the 2020 CMS-HCC model, there were no risk-adjusted payments that resulted from diagnoses reported only on HRAs or HRA-linked chart reviews.

# Appendix C: Top MA Companies

Twenty MA companies each had a share of payments from HRAs and HRA-linked chart reviews that exceeded their percentage of enrollees by more than 25 percent. Taken together, these 20 MA companies generated 80 percent ($6 billion of $7.5 billion) of the estimated 2023 risk-adjusted payments from HRAs and HRA-linked chart reviews while covering only half of MA enrollees. One top MA company, UnitedHealth Group, Inc., stood out from its peers, especially in its use of in-home HRAs and HRA-linked chart reviews to generate risk-adjusted payments.

**Exhibit C-1: The top 20 MA companies with a disproportionate share of estimated 2023 risk-adjusted payments from HRAs and HRA-linked chart reviews**

| MA Company | Estimated Risk-Adjusted Payments From HRAs and HRA-Linked Chart Reviews |
|---|---|
| AIDS Healthcare Foundation | $2,373,994 |
| Alignment Healthcare USA, LLC | $59,960,609 |
| Associated Care Ventures, Inc. | $1,703,317 |
| Community Care, Inc. | $193,985 |
| First Sacramento Capital Funding LLC | $187,090 |
| HealthPartners, Inc. | $15,857,479 |
| Humana Inc. | $1,709,202,266 |
| Independent Health Association, Inc. | $38,729,065 |
| Intermountain Health Care, Inc. | $18,538,874 |
| ISNP Holdings, LLC | $160,789 |
| Marquis Companies I, Inc. | $236,123 |
| Missouri Healthcare Advisors, LLC | $272,233 |
| Orange County Health Authority | $770,131 |
| Renown Health | $7,171,111 |
| Scan Group | $127,644,675 |
| The Cigna Group | $236,951,359 |
| Triton Health Systems, L.L.C. | $23,711,322 |
| UnitedHealth Group, Inc. | $3,726,358,748 |
| Visiting Nurse Service Of New York | $1,822,637 |
| Zing Health Consolidator, Inc | $1,356,993 |
| TOTAL | $5,973,202,800 |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

21

# Appendix D: MA Enrollees' Demographic Characteristics

For MA enrollees included in our review, we compared the percentage of 2022 MA enrollees with certain demographic characteristics to the percentage of enrollees with these characteristics who also had diagnoses reported only on HRAs or HRA-linked chart reviews that resulted in 2023 risk-adjusted payments.

**Exhibit D-1: Comparison of 2022 MA enrollees with diagnoses reported only on HRAs or HRA-linked chart reviews that generated payment, by demographic characteristic**

| Eligibility for Coverage | Percent of 2022 MA Enrollees | Percent of 2022 MA Enrollees With Diagnoses Reported Only on HRAs or HRA-Linked Chart Reviews That Generated Payment |
|---|---|---|
| Eligible for Medicare due to disability | 22% | 28% |
| Eligible for Medicare and Medicaid | 19% | 26% |
| Eligible for the Part D low-income subsidy | 19% | 26% |

| Geographic Location | Percent of 2022 MA Enrollees | Percent of 2022 MA Enrollees With Diagnoses Reported Only on HRAs or HRA-Linked Chart Reviews That Generated Payment |
|---|---|---|
| Rural | 14% | 15% |
| Urban | 86% | 85% |

| Race and Ethnicity[1] | Percent of 2022 MA Enrollees[2] | Percent of 2022 MA Enrollees With Diagnoses Reported Only on HRAs or HRA-Linked Chart Reviews That Generated Payment |
|---|---|---|
| American Indian/Alaska Native | <1% | <1% |
| Asian/Pacific Islander | 4% | 3% |
| Black (or African American) | 12% | 16% |
| Hispanic | 10% | 10% |
| Non-Hispanic White | 71% | 68% |
| Other | <1% | <1% |

Source: OIG analysis of 2022 MA encounter data from CMS's IDRC.

[1] These percentages may not sum to 100 percent due to rounding and unknown or missing values.

[2] For 2 percent of 2022 MA enrollees reviewed, the Research Triangle Institute Race Code value in the IDRC was "unknown" or missing.

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Centers for Medicare & Medicaid Services

Administrator
Washington, DC  20201

**DATE:**       September 5, 2024

**TO:**         Juliet T. Hodgkins
              Principal Deputy Inspector General

**FROM:**       Chiquita Brooks-LaSure
              Administrator

**SUBJECT:**    Office of Inspector General (OIG) Draft Data Brief: *Medicare Advantage:
              Questionable Use of Health Risk Assessments Continues To Drive Up Payments
              to Plans by Billions*, (OEI-03-23-00380)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to review and comment on the Office of Inspector General's (OIG) draft report regarding the accuracy of diagnoses that Medicare Advantage (MA) organizations submit to CMS for risk-adjusted payments and the role of Health Risk Assessments (HRAs) in this process. CMS is committed to ensuring that diagnoses used in risk adjustment are accurate and HRAs are used appropriately to improve care.

CMS pays each MA organization a monthly per-person amount for each beneficiary enrolled in its plan (or plans). The per-person amount reflects an adjustment for the risk of the beneficiary (referred to as a "beneficiary risk score"), which takes into account differences in health status and demographic characteristics between enrolled beneficiaries.

In addition to demographic factors, to account for health status, the beneficiary risk score is calculated with diagnoses that the MA organizations report to CMS. These risk-adjusted payments ensure that a plan is paid more for a sicker enrollee than a healthier enrollee, which helps to ensure that MA organizations are paid appropriately to provide the services that their enrollees need.

Diagnosis codes used for risk adjustment must meet specific criteria, including that the diagnosis is documented in the medical record. Diagnosis codes reported by MA organizations are reported to the Encounter Data System, where MA organizations submit a larger set of information on each service provided. CMS allows MA organizations to use activities described as "health risk assessments" (HRAs), described in more detail below, as a source of diagnoses for MA beneficiaries used in the calculation of risk-adjusted payments.

HRAs, used in both MA and traditional Medicare (i.e., Medicare Parts A and B), are intended to be a tool for early identification of health risks to improve beneficiaries' health outcomes through care coordination. Physicians or other health care professionals conduct HRAs to collect information from beneficiaries about their health status, health risks, and daily activities. In the MA program, HRAs are generally part of annual wellness visits and are often conducted during other visits in non-clinical settings. In recent years, HRA-type assessments, or visits that do not

23

incorporate the use of a formal HRA but may have the same purpose of identifying diagnoses that may not be used for follow up care, have been conducted in the home. Diagnoses associated with these assessments submitted by MA organizations are eligible for use in risk adjustment when they are documented in the medical record and are associated with a risk-adjustment allowable procedure code.

All diagnoses used for risk adjustment may be subject to Risk Adjustment Data Validation (RADV) audits to ensure they meet program rules. CMS is committed to ensuring that diagnoses that MA organizations submit for risk adjustment, including those associated with HRAs conducted in the home, are accurate, and can be validated through medical record reviews. CMS has already taken action to target plans at higher risk for improper payment. For example, CMS uses contract-specific RADV audits to validate that diagnoses used for risk adjustment meet program rules. RADV audits measure the accuracy of the plan-submitted diagnostic information through medical record and coding abstraction and uses the results of these audits to identify and recover overpayments from individual MA plans. For purposes of RADV, results of HRA screening portions are not considered confirmed diagnoses by MA organizations unless supported by the final assessment documentation according to ICD-10-CM coding guidelines and AHA coding clinics.[1] To assess potential risk of overpayments, CMS takes into consideration various factors, including results of past RADV audits. Because RADV contract selection focuses on the top decile of high-risk enrollees according to MA improper payment prediction models, our current methodology already captures plans at high risk for improper payment. The results of these audits are used to identify and recover overpayments for individual MA organizations.

CMS has also issued guidance to ensure MA organizations are utilizing HRAs appropriately. In the CY 2016 Rate Announcement, CMS established guidance encouraging plans to adopt, as a best practice, a core set of components for the in-home HRAs they perform, including administration in accordance with the Center for Disease Control and Prevention's (CDC) model HRA framework. CMS noted that plans' adoption of comprehensive in-home HRAs should provide additional information to support care planning and care coordination and could lead to improved enrollee health outcomes.

In addition to these efforts, CMS continues to consider the role HRAs play in the MA program, both to improve the care provided, as well as how MA organizations use these activities to identify enrollees' diagnoses. MA organizations often use these assessments to capture diagnoses that were recorded in a prior year, and to identify new diagnoses. We recognize that there is increasing concern that these types of assessments, especially those conducted in the home, could lead to increased MA coding growth. We also recognize that this practice is not used uniformly throughout the industry, leading to potential anti-competitive concerns.

CMS will continue to consider the relationship of HRAs to the care provided to beneficiaries. While home visits may be valuable in meeting beneficiaries' care and social needs and

---

[1] CMS abstracts diagnosis codes in accordance with International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM) Guidelines for Coding and Reporting: https://www.cdc.gov/nchs/icd/icd-10-cm/index.html, and *Coding Clinic for ICD-10-CM and ICD-10-PCS* quarterly newsletters published by American Hospital Association's Central Office on ICD-10-CM and ICD-10-PCS.

24

identifying early interventions, CMS recognizes the concern that these visits may often be primarily for assessments that lead to diagnoses that never result in early intervention, follow-up care, or care coordination, in the home or otherwise. Any evaluation of concerns and exploration of policy solutions around HRAs needs to address the complexities of whether it is possible to identify diagnoses from home visits that are primarily used for coding assessments versus home visits where the primary purpose is treatment, and if so, how these differences can be identified. As there is no single procedure code for HRAs that is uniformly used, any evaluation of HRAs would entail looking at procedure codes for other types of visits, as was the case in the OIG's report. For example, the OIG looked at all procedure codes for annual wellness visits, initial preventive physical exams, and evaluation and management (E&M) home visits. Further, there might be ongoing changes in how these procedure codes are used over time, and it might be challenging to distinguish whether visits are primarily for coding purposes versus services that are intended as assessment for further treatment, or for treatment itself. OIG also excluded individuals from the analysis who had more than one of the identified procedure codes, which given the need to assess visit purposes, might be omitting certain HRA-like visits. As we further consider this important issue, CMS will need to carefully explore the purpose of the different types of visits made in the home as well as the extent to which these home visits generate diagnoses for risk adjustment without leading to necessary follow up care or care coordination.

OIG's recommendations and CMS' responses are below.

## OIG Recommendation
CMS should restrict the use of diagnoses reported only on in-home HRAs or chart reviews that are linked to in-home HRAs for risk-adjusted payments.

## CMS Response
CMS does not concur with this recommendation. CMS requires MA organizations to submit all diagnoses codes through encounter data, and CMS allows MA organizations to use HRAs as a source of diagnoses used for the calculation of risk adjusted payments, as long as those diagnoses meet CMS's criteria for risk adjustment eligibility. Although OIG has expressed concern that these diagnoses may be inaccurate, they have not conducted medical record reviews of the diagnoses that came from visits that may have contained an HRA and have not concluded that these diagnoses are not accurate.

Additionally, CMS believes the recommendation does not adequately address the complexities of identifying home visits where the primary purpose is for coding assessment or whether the primary purpose is for treatment. As such, the recommendation does not address how to classify different types of home visits, whether they include an in-home "health risk assessment" or not. CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years. CMS will continue its efforts to conduct RADV audits to inform our understanding of the accuracy of these diagnoses. If CMS determines that diagnosis codes from such visits should be excluded from risk adjusted payments or that other requirements need to be met for them to be a source of diagnoses towards payment, we note that there are many important issues to address, such as whether to exclude some, and not all, in-home services as a source of diagnoses for risk adjustment. CMS believes that Medicare beneficiaries should have access to care

25

that is appropriately provided in the home setting and we would want to take into account this consideration if we were to contemplate a policy of not using diagnoses from home visits. Since the E&M codes identified by OIG as potential HRAs can cover a wide variety of services, we would need to assess the extent to which the result may disincentivize the provision of home-based services, for example, a scenario where an enrollee is receiving treatment in the home and the provider identifies an emerging condition that should be treated. Another issue is how to identify visits that do not incorporate the use of a formal HRA, but may have the same purpose of identifying diagnoses that may not be used for follow up care, such that excluding only HRAs may not achieve what is intended.

**OIG Recommendation**
CMS should conduct audits to validate diagnoses reported only on in-home HRAs and HRA-linked chart reviews.

**CMS Response**
In the PY 2018 RADV audits, CMS will flag medical records that include HRAs during the medical record review process to gather preliminary data on whether such records are less likely to validate an audited hierarchical condition category (HCC). Using this assessment and other relevant analyses, CMS will then determine if a representative or targeted sample of diagnoses derived from in-home HRAs, and HRA-linked chart reviews is appropriate for future RADV audits. As part of CMS's longstanding collaboration with HHS-OIG, which also conducts its own RADV-like audits of MAOs, we will also share these findings so that the OIG sampling methodologies can be similarly adjusted to account for areas of risk.

**OIG Recommendation**
CMS should determine whether select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews may be more susceptible to misuse among MA companies.

**CMS Response**
CMS concurs with the recommendation, has implemented this recommendation, and considers it closed. In its description of its recommendation, OIG states that CMS should determine whether diagnoses for select HCCs that drove payments from in-home HRAs and HRA-linked chart reviews are particularly subject to intentional or unintentional coding variation or inappropriate coding by health plans or providers, consistent with one of the principles (Principle 10) that CMS uses to guide its HCC diagnostic classification system. The OIG report provides findings based on the 2020 CMS-HCC risk adjustment model, which was the risk adjustment model used to determine payments for MA organizations from CY 2020 through CY 2023. As finalized in the CY 2024 Rate Announcement, CMS is phasing out the 2020 CMS-HCC risk adjustment model and phasing in the updated 2024 CMS-HCC risk adjustment model, which addresses this recommendation. As part of this update, CMS rebuilt the CMS-HCC condition categories using the *International Classification of Diseases, Tenth Revision* (ICD-10) codes. This clinical reclassification involved evaluating all HCCs, including those mentioned in the OIG's recommendation, and adjustments were made so that diagnoses that are not consistently accurate predictors of costs, such as diagnosis codes that are duplicative or discretionary, were excluded from the model or grouped into more meaningful condition categories.

CMS additionally conducted a focused assessment on conditions more subject to coding variation, consistent with Principle 10 of the longstanding model principles. Secondary to this assessment, CMS made model updates, such as no longer including certain HCCs in the model and the application of HCC constraints, to limit the sensitivity of the model to coding variation, thereby maintaining the integrity of the condition categories in the model and their ability to accurately predict costs. Through this reclassification and assessment, and in consultation with clinical experts, all HCCs were evaluated in alignment with the risk adjustment principles (including Principle 10), resulting in HCCs (along with underlying diagnoses) being removed, restructured, or added. Because CMS began implementing this new model in CY 2024 and laid out a schedule to finish implementing in CY 2026, we consider this recommendation closed.

CMS thanks OIG for their efforts on this issue and looks forward to working with OIG on this and other issues in the future.

# Acknowledgements and Contact

Jacqualine Reid served as the team leader for this study.  Sadie Ellington in the Office of Evaluation and Inspections also conducted the study.  Office of Evaluation and Inspections headquarters staff who provided support include Kristen Calille, Robert Gibbons, Lyndsay Hopper, and Althea Hosein.

We would also like to acknowledge the contributions of other OIG staff, including Tanaz Dutia and Logan Kingma.

This report was prepared under the direction of Joanna Bisgaier, Regional Inspector General for Evaluation and Inspections in the Philadelphia Regional Office; Edward Burley, Deputy Regional Inspector General; and Amy Sernyak, Assistant Regional Inspector General.

**Contact**

To obtain additional information concerning this report, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov.  OIG reports and other information can be found on the OIG website at oig.hhs.gov.

Office of Inspector General
Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC 20201

# Endnotes

[1] An MA company owns or has controlling interest in one or more MA organizations (MAOs) that contract with CMS to provide coverage to Medicare enrollees.  We use the term "MA company" to summarize the activities of MAOs.

[2] MA companies may also offer prescription drug coverage under Medicare Part D.

[3] CMS, *Financial Report FY 2023*, November 2023, p. 49.  Accessed at https://www.cms.gov/files/document/cms-financial-report-fiscal-year-2023.pdf on Feb. 9, 2024. CMS, *Monthly Contract and Enrollment Summary Report: December 2023*.  Accessed at https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/mcradvpartdenroldata/monthly/contract-summary-2023-12 on Feb. 9, 2024.

[4] To be eligible for risk adjustment, a diagnosis must be: (1) documented in a medical record from a hospital inpatient stay, hospital outpatient visit, or visit with a physician or other eligible health care professional during the prior year; (2) documented as a result of a face-to-face visit between the enrollee and the provider; and (3) submitted to CMS on an encounter record by the final risk-adjustment data submission deadline.  To identify diagnoses that meet these eligibility criteria, CMS extracts, or filters, diagnoses in the encounter data based on whether the encounter record contains an acceptable procedure code (i.e., Current Procedural Terminology or Healthcare Common Procedure Coding System code) and/or type of bill code.

[5] Specifically, the relative factors represent the marginal expected cost of an HCC relative to the average expected cost in the Medicare fee-for-service program.

[6] CMS adjusts risk scores by normalization factors and coding adjustment factors prior to calculating payments.  An MA plan's base payment rate is the plan's standardized bid adjusted by the county Intra-Service Area Rate factor for the enrollee's county of residence.

[7] CMS, *Part C Improper Payment Measure (Part C IPM) Fiscal Year 2023 (FY 2023) Payment Error Rate Results*, p. 1.  Accessed at https://www.cms.gov/files/document/fy-2023-medicare-part-c-error-rate-findings-and-results.pdf-0 on Apr. 11, 2024.

[8] *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns* (OEI-03-17-00470) December 2019.  *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.  *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments* (OEI-03-17-00474) September 2021.  *Medicare Advantage Compliance Audit of Specific Diagnosis Codes That SelectCare of Texas, Inc. (Contract H4506) Submitted to CMS* (A-06-19-05002) November 2023.  *Toolkit To Help Decrease Improper Payments in Medicare Advantage Through the Identification of High-Risk Diagnosis Codes* (A-07-23-01213) December 2023.

[9] CMS, "Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Apr. 6, 2015, pp. 144-146.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf on Apr. 11, 2024.  Government Accountability Office (GAO), *Medicare Advantage: Limited Progress Made to Validate Encounter Data Used to Ensure Proper Payments*, January 2017, p. 18.  Accessed at https://www.gao.gov/assets/gao-17-223.pdf on Feb. 9, 2024.  Medicare Payment Advisory Commission (MedPAC), *Report to the Congress: Medicare Payment Policy,* March 2023, p. 325.  Accessed at https://www.medpac.gov/wp-content/uploads/2023/03/Mar23_MedPAC_Report_To_Congress_v2_SEC.pdf on Apr. 11, 2024.

[10] United States Department of Justice (DOJ), *Cigna Group to Pay $172 Million to Resolve False Claims Act Allegations*, Sept. 30, 2023.  Accessed at https://www.justice.gov/opa/pr/cigna-group-pay-172-million-resolve-false-claims-act-allegations on Feb. 13, 2024.  DOJ, *Martin's Point Health Care Inc. to Pay $22,485,000 to Resolve False Claims Act Allegations*, July 31, 2023.  Accessed at https://www.justice.gov/opa/pr/martins-point-health-care-inc-pay-22485000-resolve-false-claims-act-allegations on Feb. 13, 2024.

[11] CMS does not require MA companies to flag diagnosis codes submitted to the Encounter Data System that result from HRAs.  However, CMS requires MA companies to flag chart review submissions.

[12] MA companies must make a "best-effort" attempt to conduct an initial and annual HRA to assess each enrollee's health care needs.  42 CFR § 422.112(b)(4)(i).  CMS, *Medicare Managed Care Manual, Chapter 4 – Benefits and Beneficiary Protections*, Pub. No. 100-16 (Rev. 121, Apr. 22, 2016), ch. 4, § 110.  Accessed at https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/mc86c04.pdf on April 3, 2024.  MA companies offering Special Needs Plans (SNPs) must conduct initial and annual HRAs of individuals' physical, psychosocial, and functional needs using a comprehensive risk assessment tool that CMS may review during oversight activities.  Social Security Act, § 1859(f)(5)(A)(ii)(I).  42 CFR § 422.101(f)(1)(i).

[13] According to CMS, HRA-type assessments, or visits that do not incorporate the use of a formal HRA but may have the same purpose of identifying diagnoses, have been conducted in MA enrollees' homes in recent years.  For this evaluation, we use the term HRA to refer to formal HRAs and HRA-type assessments.

[14] MedPAC, *Report to the Congress: Medicare Payment Policy*, March 2016, p. 350.  Accessed at https://www.medpac.gov/wp-content/uploads/2021/10/march-2016-report-to-the-congress-medicare-payment-policy.pdf on Apr. 11, 2024.

[15] GAO, *Medicare Advantage: Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments*, April 2016, p. 13.  Accessed at https://www.gao.gov/assets/d1676.pdf on Apr. 3, 2024.

[16] CMS bases risk-adjusted payments for a given year on diagnoses from specified face-to-face visits provided to the enrollee in the previous year.  Thus, we estimated the financial impact of HRAs and HRA-linked chart reviews on 2023 MA payments by using the encounter data submitted by MA companies for services provided to enrollees in 2022.

[17] The amounts of estimated risk-adjusted payments generated by diagnoses reported only on chart reviews that were linked to in-home HRAs, facility-based HRAs, or telehealth HRAs were $738.9 million, $546 million, and $7.4 million, respectively.

[18] The Part D low-income subsidy provides Federal assistance with prescription drug costs to eligible Medicare enrollees whose income and resources are limited.  CMS, *Guidance to States on the Low-Income Subsidy*, February 2009.  Accessed at https://www.cms.gov/medicare/eligibility-and-enrollment/lowincsubmedicareprescov/downloads/statelisguidance021009.pdf on Mar. 21, 2024.

[19] Of these eight companies, five companies only offered SNPs for 2022.  One of the other eight companies also offered a non-SNP plan.  Two of the remaining eight companies also offered programs of all-inclusive care for the elderly (PACE) plans or a demonstration plan.  The PACE and demonstration plans were not included in our review.

[20] MA companies offering SNPs must conduct initial and annual HRAs of individuals' physical, psychosocial, and functional needs using a comprehensive risk assessment tool that CMS may review during oversight activities.  Social Security Act, § 1859(f)(5)(A)(ii)(I).  42 CFR § 422.101(f)(1)(i).  CMS, *Medicare Managed Care Manual, Chapter 16-B – Special Needs Plans*, Pub. No. 100-16 (Rev. 130, Jan. 12, 2024), ch.16-b, § 70.2.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c16b.pdf on Mar. 27, 2024.  CMS, *Medicare Managed Care Manual, Chapter 5 – Quality Assessment*, Pub. No. 100-16 (Rev, 117, Aug. 8, 2014), ch.5, § 20.2.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c05.pdf on Mar. 27, 2024.

[21] CMS, "Announcement of Calendar Year (CY) 2024 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies," Mar. 31, 2023, pp. 90-92.  Accessed at https://www.cms.gov/files/document/2024-announcement-pdf.pdf on Apr. 6, 2024.

[22] CMS, *Report to Congress: Risk Adjustment in Medicare Advantage*, December 2021, pp. 14-16.  Accessed at https://www.cms.gov/files/document/report-congress-risk-adjustment-medicare-advantage-december-2021.pdf on Apr. 30, 2024.  Gregory C. Pope et al., *Diagnostic Cost Group Hierarchical Condition Category Models for Medicare Risk Adjustment: Final Report*, December 2000, pp. 42-46.  Accessed at https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Reports/downloads/pope_2000_2.pdf on Apr. 30, 2024.

[23] *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concern*s (OEI-03-17-00471) September 2020.

[24] *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.

[25] *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns* (OEI-03-17-00471) September 2020.

[26] *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns* (OEI-03-17-00470) December 2019.

[27] *Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments* (OEI-03-17-00474) September 2021.

[28] CMS's deadline for submission of 2022 risk-adjustment data was Jan. 31, 2024.  We extracted MA encounter data in February 2024.

[29] We identified annual wellness visits using procedure codes G0438 and G0439, initial preventive physical exams using procedure code G0402, and evaluation and management home visits using procedure codes 99341-99345 and 99347-99350.  For evaluation and management home visits, we also ensured that the place of service was the enrollee's home.

[30] We identified chart reviews as records with: (1) a claim type code of 4700 or 4800, (2) a chart review switch value of "Y," and (3) a chart review effective switch of "Y."

[31] For enrollees with diagnoses reported on HRAs and HRA-linked chart reviews with a claim through date between Oct. 1, 2022, and December 31, 2022, we also identified all encounter records that had a claim through date between Jan. 1, 2023, and Mar. 31, 2023.

[32] CMS, *Report to Congress: Improving Medicare Post-Acute Care Transformation (IMPACT) Act of 2014 Strategic Plan for Accessing Race and Ethnicity Data*, Jan. 5, 2017.  Accessed at https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Research-Reports-2017-Report-to-Congress-IMPACT-ACT-of-2014.pdf on Mar. 21, 2024.  *Inaccuracies in Medicare's Race and Ethnicity Data Hinder the Ability To Assess Health Disparities* (OEI-02-21-00100) June 2022.

[33] We used CMS's 2020 CMS-HCC Model to identify HCCs generated by diagnoses reported only on HRAs and HRA-linked chart reviews.  CMS, "Announcement of Calendar Year (CY) 2020 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter," Apr. 1, 2019, p. 75-80.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2020.pdf on July 8, 2022.

# Report Fraud, Waste, and Abuse

OIG Hotline Operations accepts tips and complaints from all sources about potential fraud, waste, abuse, and mismanagement in HHS programs.  Hotline tips are incredibly valuable, and we appreciate your efforts to help us stamp out fraud, waste, and abuse.



### TIPS.HHS.GOV

### Phone: 1-800-447-8477

### TTY: 1-800-377-4950

## Who Can Report?

Anyone who suspects fraud, waste, and abuse should report their concerns to the OIG Hotline.  OIG addresses complaints about misconduct and mismanagement in HHS programs, fraudulent claims submitted to Federal health care programs such as Medicare, abuse or neglect in nursing homes, and many more.  Learn more about complaints OIG investigates.

## How Does it Help?

Every complaint helps OIG carry out its mission of overseeing HHS programs and protecting the individuals they serve.  By reporting your concerns to the OIG Hotline, you help us safeguard taxpayer dollars and ensure the success of our oversight efforts.

## Who Is Protected?

Anyone may request confidentiality.  The Privacy Act, the Inspector General Act of 1978, and other applicable laws protect complainants.  The Inspector General Act states that the Inspector General shall not disclose the identity of an HHS employee who reports an allegation or provides information without the employee's consent, unless the Inspector General determines that disclosure is unavoidable during the investigation.  By law, Federal employees may not take or threaten to take a personnel action because of whistleblowing or the exercise of a lawful appeal, complaint, or grievance right.  Non-HHS employees who report allegations may also specifically request confidentiality.



# Stay In Touch

Follow HHS-OIG for up to date news and publications.

    OIGatHHS

 HHS Office of Inspector General

## Subscribe To Our Newsletter

## OIG.HHS.GOV

# Contact Us

For specific contact information, please visit us online.

U.S. Department of Health and Human Services
Office of Inspector General
Public Affairs
330 Independence Ave., SW
Washington, DC 20201

Email: Public.Affairs@oig.hhs.gov

# EXHIBIT 14

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

California Public Employees' Retirement System ("Plaintiff") declares:

1.      Plaintiff has reviewed the complaint filed in this matter.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action filed under the federal securities laws within the three-year period prior to the date of this Certification except as listed below:

*Cupat v. Palantir Technologies Inc.*, No. 1:22-cv-02384 (D. Colo.)
*Kachrodia v. Acadia Healthcare Company*, No. 3:24-cv-01238 (M.D. Tenn.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of August, 2025.

California Public Employees' Retirement System


By:   *Matthew Jacobs*
        Matthew G. Jacobs, General Counsel

UNITEDHEALTH

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 10/28/2021 | 24 | $455.44 |
| 12/17/2021 | 32 | $487.12 |
| 12/17/2021 | 218 | $487.12 |
| 12/17/2021 | 268 | $487.12 |
| 12/17/2021 | 341 | $487.12 |
| 01/07/2022 | 16,633 | $459.89 |
| 01/10/2022 | 8,538 | $461.01 |
| 01/13/2022 | 29,150 | $469.85 |
| 01/25/2022 | 46,084 | $454.47 |
| 02/09/2022 | 9,257 | $498.46 |
| 02/10/2022 | 24,474 | $489.38 |
| 02/25/2022 | 25,533 | $472.39 |
| 02/28/2022 | 29,769 | $471.69 |
| 03/23/2022 | 10,819 | $504.08 |
| 03/31/2022 | 35,348 | $515.31 |
| 04/04/2022 | 55 | $510.02 |
| 04/20/2022 | 10,192 | $544.92 |
| 05/04/2022 | 43 | $495.99 |
| 05/05/2022 | 50,047 | $493.80 |
| 05/12/2022 | 20 | $478.80 |
| 05/12/2022 | 53 | $478.80 |
| 05/12/2022 | 88 | $478.80 |
| 05/12/2022 | 1,334 | $478.80 |
| 07/14/2022 | 54,925 | $502.43 |
| 07/19/2022 | 36,001 | $533.45 |
| 07/28/2022 | 49,782 | $541.49 |
| 08/04/2022 | 30,758 | $533.75 |
| 08/10/2022 | 36 | $537.72 |
| 08/23/2022 | 34,978 | $535.80 |
| 09/08/2022 | 52,384 | $527.51 |
| 09/16/2022 | 59 | $521.02 |
| 09/16/2022 | 140 | $521.02 |
| 09/16/2022 | 1,080 | $521.02 |
| 09/16/2022 | 1,113 | $521.02 |
| 09/16/2022 | 13,665 | $521.02 |
| 09/16/2022 | 20,394 | $521.02 |
| 09/30/2022 | 32,170 | $505.04 |
| 11/16/2022 | 19 | $511.52 |
| 11/16/2022 | 20 | $511.52 |
| 12/09/2022 | 184,000 | $539.20 |
| 12/16/2022 | 6,654 | $523.70 |
| 12/16/2022 | 12,787 | $523.70 |
| 12/16/2022 | 15,537 | $523.70 |
| 12/16/2022 | 69,698 | $523.70 |
| 12/16/2022 | 70,247 | $523.70 |
| 01/04/2023 | 117 | $504.50 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/04/2023 | 191 | $504.50 |
| 01/04/2023 | 536 | $504.50 |
| 05/10/2023 | 137 | $490.07 |
| 06/20/2023 | 1,123 | $469.27 |
| 07/10/2023 | 113 | $463.05 |
| 07/26/2023 | 9,840 | $508.00 |
| 08/02/2023 | 12,532 | $504.80 |
| 08/08/2023 | 3,549 | $505.86 |
| 08/08/2023 | 3,862 | $505.86 |
| 08/10/2023 | 10,500 | $503.48 |
| 08/14/2023 | 35,000 | $510.93 |
| 08/18/2023 | 27,490 | $498.44 |
| 08/21/2023 | 876 | $497.71 |
| 09/05/2023 | 80 | $480.81 |
| 09/15/2023 | 1,037 | $486.70 |
| 09/15/2023 | 1,380 | $486.70 |
| 09/15/2023 | 81,876 | $486.70 |
| 09/27/2023 | 10,671 | $503.73 |
| 09/29/2023 | 129 | $504.19 |
| 10/05/2023 | 5,313 | $516.23 |
| 10/16/2023 | 57 | $538.03 |
| 10/17/2023 | 180 | $536.65 |
| 10/17/2023 | 1,787 | $536.65 |
| 10/17/2023 | 3,809 | $536.65 |
| 10/17/2023 | 9,986 | $536.65 |
| 11/07/2023 | 270,000 | $537.83 |
| 11/29/2023 | 185,000 | $534.98 |
| 12/01/2023 | 181,000 | $547.16 |
| 12/11/2023 | 182,000 | $543.68 |
| 12/15/2023 | 820 | $531.12 |
| 12/15/2023 | 1,691 | $531.12 |
| 12/15/2023 | 5,551 | $531.12 |
| 12/15/2023 | 28,924 | $531.12 |
| 12/27/2023 | 130 | $522.79 |
| 12/28/2023 | 15 | $524.90 |
| 02/29/2024 | 9 | $493.60 |
| 02/29/2024 | 32 | $493.60 |
| 02/29/2024 | 35 | $493.60 |
| 03/15/2024 | 853 | $490.82 |
| 03/15/2024 | 4,838 | $490.82 |
| 03/15/2024 | 46,277 | $490.82 |
| 03/19/2024 | 3 | $493.32 |
| 03/19/2024 | 11 | $493.32 |
| 04/05/2024 | 141 | $455.30 |
| 04/08/2024 | 5,686 | $455.31 |
| 06/28/2024 | 47 | $509.26 |
| 06/28/2024 | 11,261 | $509.26 |
| 07/18/2024 | 1,645 | $564.34 |
| 09/20/2024 | 168 | $575.00 |
| 09/20/2024 | 252 | $575.00 |
| 09/20/2024 | 1,746 | $575.00 |
| 09/30/2024 | 52 | $584.68 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 09/30/2024 | 5,333 | $584.68 |
| 10/21/2024 | 130 | $571.47 |
| 10/21/2024 | 1,292 | $571.47 |
| 12/31/2024 | 3,514 | $505.86 |
| 01/14/2025 | 1,881 | $543.74 |
| 02/18/2025 | 28,557 | $501.77 |
| 02/21/2025 | 11,156 | $462.62 |
| 02/26/2025 | 11,641 | $464.23 |
| 03/28/2025 | 178 | $518.07 |
| 03/31/2025 | 871 | $523.75 |
| 03/31/2025 | 1,282 | $523.23 |
| 04/08/2025 | 2,206 | $553.08 |
| 04/15/2025 | 3,454 | $585.81 |
| 05/09/2025 | 8,240 | $380.66 |
| 05/12/2025 | 4,284 | $378.73 |
| 05/13/2025 | 1,432 | $311.38 |
| 05/14/2025 | 1,432 | $308.01 |
| 06/06/2025 | 32,422 | $301.15 |
| 07/16/2025 | 371,700 | $292.49 |
| 07/18/2025 | 213 | $282.65 |
| 07/18/2025 | 26,579 | $282.65 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 10/26/2021 | 14,410 | $454.64 |
| 11/23/2021 | 12,897 | $447.13 |
| 12/27/2021 | 13,564 | $499.50 |
| 12/31/2021 | 39,813 | $502.14 |
| 01/26/2022 | 16,210 | $458.43 |
| 02/23/2022 | 26,440 | $459.62 |
| 03/18/2022 | 53 | $506.12 |
| 03/18/2022 | 1,372 | $506.12 |
| 03/18/2022 | 20,851 | $506.12 |
| 03/31/2022 | 57,569 | $509.97 |
| 04/25/2022 | 18,876 | $524.27 |
| 04/27/2022 | 3,042 | $512.20 |
| 05/25/2022 | 41,209 | $498.09 |
| 06/17/2022 | 21 | $452.06 |
| 06/17/2022 | 76 | $452.06 |
| 06/17/2022 | 996 | $452.06 |
| 06/17/2022 | 6,601 | $452.06 |
| 06/17/2022 | 41,734 | $452.06 |
| 06/23/2022 | 9,330 | $498.32 |
| 06/24/2022 | 62,406 | $493.53 |
| 07/01/2022 | 2,052 | $507.63 |
| 08/12/2022 | 25,038 | $541.71 |
| 08/15/2022 | 28,201 | $544.73 |
| 09/21/2022 | 2,002 | $512.08 |
| 10/27/2022 | 5,529 | $541.80 |
| 12/14/2022 | 28,493 | $538.86 |
| 12/21/2022 | 652 | $527.54 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 01/11/2023 | 27,192 | $493.40 |
| 01/30/2023 | 10,712 | $485.79 |
| 02/09/2023 | 34,151 | $485.73 |
| 02/16/2023 | 23,820 | $487.35 |
| 02/23/2023 | 58,471 | $491.69 |
| 03/08/2023 | 19,539 | $470.60 |
| 03/17/2023 | 2 | $469.50 |
| 03/17/2023 | 5 | $469.50 |
| 03/17/2023 | 7 | $469.50 |
| 03/17/2023 | 10 | $469.50 |
| 03/27/2023 | 45,846 | $481.90 |
| 04/25/2023 | 32,699 | $491.92 |
| 05/25/2023 | 1,864 | $477.70 |
| 05/25/2023 | 22,422 | $477.70 |
| 06/16/2023 | 868 | $458.49 |
| 06/16/2023 | 898 | $458.49 |
| 06/16/2023 | 1,604 | $458.49 |
| 06/30/2023 | 29,783 | $480.64 |
| 09/29/2023 | 18,165 | $504.19 |
| 10/20/2023 | 742 | $527.03 |
| 10/26/2023 | 27,987 | $528.36 |
| 10/31/2023 | 147 | $535.56 |
| 11/08/2023 | 192 | $536.73 |
| 11/27/2023 | 32,382 | $543.59 |
| 11/30/2023 | 31 | $552.97 |
| 12/29/2023 | 83 | $526.47 |
| 12/29/2023 | 164 | $526.47 |
| 02/12/2024 | 119,000 | $517.64 |
| 02/26/2024 | 12,936 | $525.32 |
| 03/07/2024 | 9,929 | $478.78 |
| 03/26/2024 | 26,043 | $492.31 |
| 03/28/2024 | 218 | $494.70 |
| 03/28/2024 | 612 | $494.70 |
| 04/04/2024 | 181,000 | $455.38 |
| 04/16/2024 | 8,762 | $468.89 |
| 04/16/2024 | 14,036 | $468.89 |
| 04/23/2024 | 195 | $486.18 |
| 04/26/2024 | 8,091 | $495.35 |
| 04/26/2024 | 11,933 | $495.35 |
| 05/08/2024 | 19,378 | $503.29 |
| 05/13/2024 | 616 | $511.42 |
| 05/15/2024 | 11,718 | $517.55 |
| 05/15/2024 | 15,008 | $517.55 |
| 05/21/2024 | 11,049 | $523.55 |
| 05/29/2024 | 9,811 | $484.72 |
| 06/05/2024 | 13,998 | $503.12 |
| 06/12/2024 | 8,502 | $493.07 |
| 06/21/2024 | 2,621 | $482.59 |
| 06/21/2024 | 3,043 | $482.59 |
| 06/21/2024 | 11,951 | $482.59 |
| 06/28/2024 | 328 | $509.26 |
| 07/11/2024 | 13,422 | $504.36 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 07/12/2024 | 2,722 | $511.53 |
| 07/12/2024 | 2,796 | $511.53 |
| 07/12/2024 | 14,812 | $510.74 |
| 07/15/2024 | 22,342 | $516.45 |
| 07/26/2024 | 13,475 | $569.72 |
| 08/27/2024 | 20,571 | $587.35 |
| 10/03/2024 | 4,722 | $591.27 |
| 10/17/2024 | 21,960 | $565.55 |
| 10/28/2024 | 23,834 | $565.24 |
| 10/31/2024 | 36,598 | $564.50 |
| 11/12/2024 | 23,066 | $616.26 |
| 11/22/2024 | 23,079 | $590.87 |
| 12/20/2024 | 24,760 | $500.13 |
| 12/31/2024 | 509 | $505.86 |
| 01/02/2025 | 13,922 | $504.47 |
| 01/28/2025 | 111 | $542.48 |
| 01/28/2025 | 3,665 | $542.48 |
| 01/28/2025 | 16,087 | $542.48 |
| 03/21/2025 | 90 | $516.85 |
| 03/21/2025 | 444 | $516.85 |
| 03/21/2025 | 955 | $516.85 |
| 03/21/2025 | 4,188 | $516.85 |
| 03/21/2025 | 6,817 | $516.85 |
| 03/25/2025 | 10,216 | $513.43 |
| 04/25/2025 | 14,352 | $418.64 |
| 05/27/2025 | 18,552 | $295.00 |
| 06/20/2025 | 24 | $302.01 |
| 06/20/2025 | 3,517 | $302.01 |
| 06/20/2025 | 4,149 | $302.01 |
| 06/20/2025 | 19,620 | $302.01 |
| 06/20/2025 | 133,990 | $302.01 |
| 06/20/2025 | 159,172 | $302.01 |
| 06/25/2025 | 25,061 | $302.02 |
| 06/30/2025 | 98 | $311.97 |
| 06/30/2025 | 856 | $311.97 |
| 07/02/2025 | 367,000 | $307.56 |
| 07/21/2025 | 100,000 | $282.14 |

Prices listed are rounded up to two decimal places.

*Opening position of 2,130,594 shares.

# EXHIBIT 15

U.S. Department of Health and Human Services
# Office of Inspector General



# Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments

**Suzanne Murrin**

Deputy Inspector General for Evaluation and Inspections

September 2021, OEI-03-17-00474



U.S. Department of Health and Human Services

# Office of Inspector General
## Report in Brief
September 2021, OEI-03-17-00474



## Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments To Disproportionately Drive Payments

### Why OIG Did This Review

We undertook this evaluation because of concerns that companies with contracts under Medicare Advantage (MA companies) may leverage both chart reviews and health risk assessments (HRAs) to maximize risk-adjusted payments, without beneficiaries receiving care for those diagnoses. Unsupported risk-adjusted payments have been a major driver of improper payments in the MA program.

The risk-adjustment program is an important payment mechanism for MA. It levels the playing field for MA companies that enroll beneficiaries who need a costlier level of care, which helps to ensure that these beneficiaries have continued access to MA plans. Chart reviews and HRAs can be tools for improving the MA program. However, two prior OIG evaluations found that the diagnoses that MA companies reported *only* on chart reviews or HRAs in the 2016 encounter data— i.e., on no other service records— resulted in billions in risk-adjusted payments for 2017. These prior evaluations raised concerns about the completeness of encounter data; the validity of submitted diagnoses on chart reviews or HRAs; and the quality of care provided to MA beneficiaries. The current evaluation builds on those two evaluations to identify MA companies that disproportionately drove increases in risk-adjusted payments from both chart reviews and HRAs.

### Key Takeaway

Some Medicare Advantage companies' disproportionate use of chart reviews and health risk assessments to maximize risk-adjusted payments raises concerns and highlights the need for more targeted oversight.

The Centers for Medicare & Medicaid Services (CMS) risk-adjusts payments by using beneficiaries' diagnoses to pay higher capitated payments to MA companies for beneficiaries expected to have higher-than-average medical costs. This may create financial incentives for MA companies to make beneficiaries appear as sick as possible. For CMS to risk-adjust payments, MA companies report beneficiaries' diagnoses—based on services provided to beneficiaries—to CMS's MA encounter data system and the Risk Adjustment Processing System.

Chart reviews and HRAs are allowable sources of diagnoses for risk adjustment. A chart review is an MA company's review of a beneficiary's medical record to identify diagnoses that a provider did not submit or submitted in error. An HRA occurs when—in order to diagnose a beneficiary and identify possible gaps in care—a health care professional collects information from a beneficiary about the beneficiary's health.

### What OIG Found

Our findings raise concerns about the extent to which certain MA companies may have inappropriately leveraged both chart reviews and HRAs to maximize risk-adjusted payments. We found that 20 of the 162 MA companies drove a disproportionate share of the $9.2 billion in payments from diagnoses that were reported only on chart reviews and HRAs, and on no other service records. These companies' higher share of payments could not be explained by the size of their beneficiary enrollment. Each company generated a share of payments from these chart reviews and HRAs that was more than 25 percent higher than its share of enrolled MA beneficiaries.

Among these 20 MA companies, 1 company further stood out in its use of chart reviews and HRAs to drive risk-adjusted payments without encounter records of any other services provided to the beneficiaries for those diagnoses. This company had 40 percent of the risk-adjusted payments from both mechanisms, yet enrolled only 22 percent of MA beneficiaries. In addition, this company accounted for about a third of all payments from diagnoses reported solely on chart reviews and more than half of all

# Report in Brief continued
Report No. OEI-03-17-00474

## How OIG Did This Review

Using previously collected MA encounter data from 2016, we determined whether any MA companies' use of chart reviews and HRAs increased their risk-adjusted payments disproportionately relative to their size and their peers.

payments from diagnoses reported solely on HRAs. Further, almost all of its HRAs were conducted in beneficiaries' homes. Since in-home HRAs are often conducted by vendors hired by MA companies (and not likely conducted by beneficiaries' primary care providers), this raises particular concerns about the quality of care coordination for these beneficiaries and the validity of diagnoses that were reported on the HRAs.

## What OIG Recommends

CMS should (1) provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs; (2) take additional actions to determine the appropriateness of payments and care for the 1 MA company that substantially drove risk-adjusted payments from chart reviews and HRAs; and (3) perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs. To assist CMS with its efforts, we will provide information on which companies had a substantially disproportionate share of risk-adjusted payments from diagnoses that were reported only on chart reviews and/or HRAs. CMS neither concurred nor nonconcurred with our three recommendations and stated that it will take our recommendations under consideration as part of its ongoing process to determine policy options for future years.

# TABLE OF CONTENTS

**BACKGROUND** — 1

    Methodology — 5

**FINDINGS** — 8

    Twenty MA companies drove a disproportionate share of the $9.2 billion from chart reviews and HRAs — 8

    One MA company stood out from its peers in its use of chart reviews and HRAs to drive risk-adjusted payments — 10

**CONCLUSION AND RECOMMENDATIONS** — 15

    Provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs — 16

    Take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs — 16

    Perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs — 17

**AGENCY COMMENTS AND OIG RESPONSE** — 18

**APPENDIX A** — 19

**ACKNOWLEDGMENTS AND CONTACT** — 23

**ABOUT THE OFFICE OF INSPECTOR GENERAL** — 24

**ENDNOTES** — 25

# BACKGROUND

## Objective

To determine whether any Medicare Advantage (MA) companies' use of chart reviews and health risk assessments (HRAs) disproportionately increased risk-adjusted payments relative to those of their peers.

Under MA, also known as Medicare Part C, CMS contracts with MA organizations (MAOs) to provide coverage of Parts A and B services through private health plan options.[1]  An MA company is a company that owns or has a controlling interest in one or more MAOs. [2]  Ensuring that MA companies receive accurate payments to provide appropriate care to Medicare beneficiaries is critically important.  Toward this end, the Centers for Medicare & Medicaid Services (CMS) risk-adjusts payments by using beneficiaries' diagnoses to pay higher capitated payments to MA companies for beneficiaries who are expected to have higher-than-average medical costs.  This payment policy may create financial incentives for MA companies to misrepresent beneficiaries' health statuses and make beneficiaries appear to have additional illnesses and other conditions that would command higher payment.

Unsupported risk-adjusted payments—payments that are not supported by diagnoses documented in beneficiaries' medical records—have been a major driver of improper payments in the MA program.  The Office of Inspector General (OIG), CMS, the United States Department of Justice (DOJ), the Government Accountability Office (GAO), and the Medicare Payment Advisory Commission (MedPAC) have identified vulnerabilities related to MA companies' inflating their beneficiaries' risk scores.  Two prior OIG evaluations found that diagnoses that MA companies reported only on two specific sources of diagnoses—chart reviews and HRAs—resulted in billions in risk-adjusted payments for 2017.[3]  This evaluation builds on those two evaluations to identify MA companies that disproportionately drove increases in risk-adjusted payments from both chart reviews and HRAs.

## The Medicare Advantage Program

In 2020, 40 percent of Medicare beneficiaries—25 million—elected to enroll with MA companies rather than the Medicare fee-for-service program.  In fiscal year 2020, MA program costs were $314 billion of the total $780 billion in Medicare program costs.[4]

**MA risk-adjusted payments.**  For each beneficiary enrolled, MA companies receive a capitated payment that reflects CMS's predicted cost of providing care to an MA

beneficiary.  CMS risk-adjusts payments to pay MA companies more for beneficiaries who have higher expected health care costs.

CMS bases risk adjustments on MA beneficiaries' demographic information and diagnoses from the prior year.  Exhibit 1 outlines CMS's risk-adjustment process as it relates to diagnoses that MA companies report.[5]

**Exhibit 1: MA risk-adjustment process**



| Beneficiary receives a service. | Provider submits service information to the MA company. | The MA company submits a service record to the CMS encounter data system. |

| CMS performs data integrity checks on the service record submitted by the MA company. | From the submitted service record, CMS identifies diagnoses that are eligible for risk adjustment. | CMS risk-adjusts payments and pays the MA company. |

Source: OIG summary of CMS's guidance on the MA risk-adjustment process.[6]

The risk-adjustment process generally begins when the beneficiary receives a service or medical item from a provider.  The provider submits claims information, including diagnoses, to the MA company on the basis of the service or medical item provided to the beneficiary.  The MA company submits a record of the service (hereafter referred to as a service record) to CMS's MA encounter data system.  This service record contains claims information or administrative data, including the diagnoses.  MA companies also submit data on beneficiaries' diagnoses to CMS through the Risk Adjustment Processing System (RAPS).[7]

CMS groups the risk-adjustment-eligible diagnoses into hierarchical condition categories (HCCs)—categories of clinically related diagnoses.[8]  Each HCC has relative numerical values (i.e., relative factors) that represent the expected costs associated with treating the medical conditions in that category.[9]  A beneficiary's risk score

equals the sum of the relative factors that correspond with the beneficiary's HCCs and demographic characteristics.  The total risk-adjusted payment to an MA company for an enrolled beneficiary equals the risk score multiplied by the MA plan's base payment rate.[10]

# Chart Reviews and Health Risk Assessments

CMS allows chart reviews and HRAs to be used as sources of diagnoses for risk adjustment.  However, the use of chart reviews and HRAs by MA companies have raised concerns as they may use them inappropriately to collect diagnoses and increase their risk-adjusted payments.

## Chart Reviews

In addition to reporting diagnoses to CMS on service records, MA companies may also perform chart reviews—retrospective reviews of beneficiaries' medical record documentation to identify diagnoses that providers did not originally submit to the MA companies.[11]  To perform these reviews, MA companies may employ third-party vendors (hereafter referred to as vendors) to examine beneficiaries' medical records. These vendors may use staff with clinical or coding experience, or they may use artificial intelligence software.  MA companies may report diagnoses identified by these reviews to the encounter data system in the form of chart review records.  CMS allows diagnoses reported on chart reviews to support risk-adjusted payments.

In the MA encounter data, CMS does not require MA companies to link chart reviews to previously accepted records of services provided to beneficiaries.  Linking a chart review to a previously accepted service record would allow CMS and other oversight entities to identify the specific item or service that is associated with a diagnosis that is eligible for risk adjustment.[12]  However, CMS also permits MA companies to submit unlinked chart reviews that add diagnoses to the encounter data without identifying the specific items or services associated with the diagnoses.[13]  In addition, when MA companies do not know the actual procedure codes associated with diagnoses submitted on unlinked chart reviews, CMS allows MA companies to submit any procedure codes of their choosing; CMS refers to such codes as default procedure codes.[14]

**OIG concerns about chart reviews.**  A December 2019 OIG report raised concerns that chart reviews may provide MA companies with opportunities to circumvent CMS's risk-adjustment rules and inflate risk-adjusted payments inappropriately— particularly when the chart reviews are not linked to service records.  Specifically, allowing MA companies to submit default procedure codes on chart reviews may create an opportunity for MA companies to circumvent the requirement for a face-to-face visit for risk adjustment.[15]  OIG found that the diagnoses that MA companies reported only on chart reviews—and not on any service records in the encounter data—resulted in an estimated $6.7 billion in risk-adjusted payments for 2017.[16]  Of this $6.7 billion amount, CMS based $2.7 billion in risk-adjusted payments on

diagnoses that MA companies reported only on *unlinked* chart reviews.  For the unlinked chart reviews for which CMS uses procedure codes to identify diagnoses for risk adjustment, we found that 67 percent contained default procedure codes.  CMS does not have safeguards in place to prevent an MA company from receiving payment for a diagnosis that is *not* eligible for risk adjustment when the MA company chooses to submit a default procedure code that *is* eligible for risk adjustment.  In addition, for both chart reviews overall and unlinked chart reviews specifically, a small number of MAOs and MA companies drove a substantial portion of the resulting risk-adjusted payments.

CMS concurred with the December 2019 report's recommendations to provide oversight of certain MAOs, conduct audits of diagnoses reported on chart reviews, and reassess allowing unlinked chart reviews as sources of diagnoses for risk adjustment.  In June 2020, CMS provided reports to MAOs that highlighted beneficiaries with unlinked chart reviews but no service records for 2018.[17]  CMS requested that MAOs that detected errors on the basis of these reports (1) provide explanation for such errors; (2) describe any planned actions to prevent further errors; and (3) provide information about whether corrected or missing encounter records would be resubmitted.  In addition, CMS has stated that it would include chart reviews in its audits of information from 2015 and 2016 that validate diagnoses for risk adjustment.  As of August 2021, CMS had not yet fully implemented these recommendations.

**DOJ and GAO concerns about chart reviews.**  DOJ and GAO have also raised concerns about MA companies' use of chart reviews for risk adjustment.  In 2017, the United States joined a whistleblower lawsuit—filed under the False Claims Act—that included an allegation that an MA company used the results of chart reviews to submit diagnoses that the treating physician did not originally report but did not use the chart review results to delete previously submitted diagnoses that these chart reviews had found to be invalid.[18]  In March 2020, the United States filed a False Claims Act lawsuit against another MA company regarding similar allegations.[19]  In 2016, GAO stated its concern that diagnoses collected from MAOs' retrospective chart reviews may be less likely to be supported by medical records than diagnoses submitted to MAOs by providers.[20]

## Health Risk Assessments

Physicians or other health care professionals administer HRAs to collect information from beneficiaries about health status, health risks, and daily activities.  In the Medicare fee-for-service program, HRAs are part of beneficiaries' annual wellness visits, which typically occur in physician offices or other health care facilities.[21]  CMS encourages MA companies to have providers conduct initial and annual HRAs.[22]  In the MA program, HRAs may also be conducted during other visits with beneficiaries—including visits to beneficiaries' homes performed by third-party vendors hired by MA companies.  Care coordination that results from assessing a beneficiary's health risks

may include developing a plan of care; arranging services; delivering interventions; and reassessing and adjusting the plan of care as needed.

**OIG concerns about HRAs.** A September 2020 OIG report found that diagnoses that MA companies reported only on HRAs in the encounter data resulted in an estimated $2.6 billion in risk-adjusted payments for 2017.[23, 24] HRAs conducted in beneficiaries' homes generated $2.1 billion of these risk-adjusted payments. Most of these in-home HRAs were conducted by vendors that MA companies' partner with or hire to conduct HRAs. As with chart reviews, a small number of MAOs and MA companies drove a substantial portion of the risk-adjusted payments that resulted from HRAs overall and in-home HRAs specifically.

Of this September 2020 report's five recommendations, CMS concurred with two recommendations to provide targeted oversight of certain MA companies that drove payments resulting from in-home HRAs. CMS has not yet implemented these two recommendations. CMS stated that it did not concur with three recommendations because it did not determine that a change in policy was warranted.

**CMS and MedPAC concerns about HRAs.** CMS and MedPAC have questioned whether MAOs use HRAs primarily as a strategy to find and submit more diagnoses to increase payments rather than a means to improve the care provided to beneficiaries. In 2015, CMS stated that it had observed an increase in in-home visits to assess MA enrollees.[25] According to CMS, nonphysician practitioners working for vendors hired by MAOs usually performed in-home HRAs, and the resulting care coordination appeared to vary across plans. At that time, CMS provided guidance to MA companies on best practices that promote the primary use of in-home HRAs as tools for improving care for MA enrollees, not just as a process for collecting diagnoses to increase risk-adjusted payments.[26]

In 2016, MedPAC—a nonpartisan legislative-branch agency that provides Congress with analysis and policy advice on the Medicare program—recommended that the Secretary of Health and Human Services eliminate HRAs as a source of diagnoses for MA risk adjustment. MedPAC contended that a small number of MAOs were using HRAs to increase Medicare payment without providing followup care.[27] In addition, MedPAC raised concerns about the reportedly aggressive tactics that some MAOs use to recruit beneficiaries for in-home HRAs, and it questioned the accuracy of diagnoses identified only through in-home HRAs.

# Methodology

## Data Sources

To determine whether any MA companies' use of chart reviews and HRAs increased risk-adjusted payments disproportionately relative to those of their peers, we used previously collected data for 162 MA companies that had payments resulting from diagnoses reported only on chart reviews and HRAs. For prior work, we extracted

chart reviews[28] and HRAs[29] in the 2016 MA encounter data, as well as beneficiary enrollment data stored within CMS's Integrated Data Repository (IDR).[30]  For beneficiaries who had risk-adjustment-eligible diagnoses that were reported only on chart reviews or HRAs, we determined the HCCs generated from mapping the diagnoses reported only on chart reviews or HRAs.[31]  We calculated estimates of the amount of risk-adjusted payments associated with each HCC by multiplying the MA plan's monthly base payment rate by the relative factor of the HCC.[32, 33]  We then multiplied monthly amounts of payments by 12 to determine the annual estimated risk-adjusted payments from diagnoses reported only on chart reviews or HRAs and not on any other encounter records.

For this evaluation, we combined these data for the 162 MA companies with estimated payments from chart reviews and HRAs into a dataset.  To compare risk-adjusted payments by MA companies' enrollment size, we used CMS data on the number of beneficiaries enrolled with each MA company as of January 1, 2016.

## Analysis of Payment Amounts From Both Chart Reviews and HRAs

Using our combined dataset of previously collected information, we determined the number of MA companies with payments from chart reviews and HRAs.  Overall, 162 MA companies generated payments from diagnoses reported only on chart reviews and HRAs.  Of these companies, 126 had payments from both chart reviews and HRAs.  Of the 36 remaining companies, 30 had payments solely from HRAs and 6 companies had payments solely from chart reviews.  For each of the 162 MA companies, we totaled their payments from these mechanisms.  We then assessed the distribution of payments across MA companies to determine whether any MA companies had higher amounts of risk-adjusted payments from chart reviews and HRAs.  In addition, we compared MA companies' payments from chart reviews to their payments from HRAs, to determine whether any MA companies had higher amounts of risk-adjusted payments from chart reviews in comparison to their risk-adjusted payments from HRAs.

We summarized the number and type of HCCs and diagnoses that increased payments as a result of chart reviews and HRAs.  For our analysis of diagnoses, we limited the analysis to diagnoses reported for at least 5,000 beneficiaries on in-home HRAs.  We also summarized the number of beneficiaries with diagnoses from chart reviews and HRAs.  Finally, we calculated and compared the difference between each MA company's share of the payments from these mechanisms and its share of MA enrollment.  We identified companies with a share of payments that exceeded their share of enrollment by more than 25 percent.  We used this same approach to determine whether certain MA companies had higher amounts of risk-adjusted payments from unlinked chart reviews[34] and in-home HRAs.[35]  We are not including the names of MA companies in this report, but we will provide information to CMS regarding which companies had a substantially disproportionate share of risk-adjusted payments from diagnoses reported only on chart reviews and HRAs.

## Limitations

In calculating risk-adjusted payments for diagnoses reported only on chart reviews and HRAs during the previous evaluations, we estimated the potential impact of chart reviews and HRAs on the MA program for 2017 by using the encounter data submitted by MA companies for 2016.[36]  We did not review CMS's final payment data to MA companies for 2017.  CMS's actual monthly payments to MA companies may change each month if there are changes in certain beneficiary characteristics, such as long-term institutional status, dual eligibility status, and county of residence.  For analytic efficiency, we calculated payment estimates for the entire year using 2016 encounter data and beneficiaries' characteristics as of January 2016.  Finally, we did not incorporate diagnoses stored in CMS's RAPS data into our payment calculations because RAPS does not identify diagnoses collected from chart reviews or HRAs.[37]  However, we checked RAPS and found that 99.5 percent of the diagnoses included in our HRA payment analysis were also reported in RAPS.

# Standards

We conducted this study in accordance with the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.

# FINDINGS

## Twenty MA companies drove a disproportionate share of the $9.2 billion from chart reviews and HRAs

MA companies generated an estimated $9.2 billion in risk-adjusted payments from diagnoses that were reported only on chart reviews and HRAs in the encounter data. Most of these companies (142 of 162) had an amount of payments proportional to or lower than their size, as defined by their share of enrolled beneficiaries. However, 20 companies had a share of payments that was disproportionally higher than their size. For each of these top 20 companies, their share of payments from chart reviews and HRAs was more than 25 percent higher than their share of enrolled beneficiaries. Of the remaining 142 companies, 8 had a share of payments that was between 2 and 17 percent higher than their share of enrolled beneficiaries. The other 134 companies had a share of payments that was *lower* than their share of enrolled beneficiaries.

The top 20 companies generated $5.0 billion from chart reviews and HRAs that were the sole source of diagnoses in the encounter data. These 20 companies generated 54 percent of the $9.2 billion in payments from diagnoses submitted solely on chart reviews and HRAs, but enrolled only 31 percent of MA beneficiaries, as shown in Exhibit 2. In contrast, the other 142 companies generated 46 percent of the payments, but enrolled 69 percent of MA beneficiaries.

**Exhibit 2: Twenty MA companies drove over half of the risk-adjusted payments from diagnoses submitted solely on chart reviews and HRAs, yet they enrolled only 31 percent of MA beneficiaries.**



**20 MA companies**

generated **54%** of risk-adjusted **payments** from chart reviews and HRAs

enrolled **31%** of MA **beneficiaries**

Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

## Half of the 20 companies drove payments mainly using the types of chart reviews and HRAs that are more vulnerable to misuse

Unlinked chart reviews and in-home HRAs may be particularly vulnerable to misuse by MA companies to maximize risk-adjusted payments inappropriately. Specifically:

- Unlinked chart reviews do not identify the specific item or service associated with the diagnoses and may often contain default procedure codes, which

may provide opportunities for MA companies to circumvent CMS's face-to-face visit requirement for risk adjustment.

- In-home HRAs are often conducted by vendors that partner with or are hired by MA companies to conduct these assessments (and therefore are not likely conducted by the beneficiary's own primary care provider). This may create gaps in care coordination for the beneficiary.

For half of the 20 MA companies that had a disproportionate share of payments from diagnoses that were reported solely on chart reviews and HRAs, *unlinked* chart reviews and/or *in-home* HRAs accounted for most of each company's combined payments. These 10 companies each had more than 80 percent of their payments resulting from diagnoses that were reported only on unlinked chart reviews and/or in-home HRAs. Seven of these 10 companies each generated more than 90 percent of their payments from diagnoses that were reported only on unlinked chart reviews and/or in-home HRAs.

## Compared to their peers, the top 20 companies more often had chart reviews and HRAs as the sole source of diagnoses for their beneficiaries

Among the top 20 companies, a higher percentage of their enrolled beneficiaries had risk-adjustment-eligible diagnoses that were reported only on a chart review and/or HRA, in comparison to beneficiaries enrolled with the other 142 companies, as shown in Exhibit 3. These companies reported diagnoses solely on these mechanisms for more than half (56 percent) of their enrolled beneficiaries, in contrast to only one-third (32 percent) of beneficiaries enrolled with the other 142 companies.

**Exhibit 3: The top 20 MA companies relied more heavily than their peers on diagnoses reported solely on chart reviews and HRAs.**



**Top 20 Companies**

**56%** of beneficiaries with diagnoses reported only on a chart review and/or HRA

**Other 142 Companies**

**32%** of beneficiaries with diagnoses reported only on a chart review and/or HRA

Source: OIG analysis of 2016 MA encounter data from CMS's IDR.

The top 20 companies had risk-adjusted payments for 38 percent of their beneficiaries who had diagnoses that were reported only on chart reviews and/or HRAs. The other 142 companies had risk-adjusted payments for 30 percent of their

beneficiaries who had diagnoses that were reported only on chart reviews and/or HRAs.

## Just 12 health conditions accounted for two-thirds of the $5 billion in risk-adjusted payments from chart reviews and HRAs for the top 20 companies

The HCCs generated by diagnoses reported only on chart reviews and HRAs included serious illnesses, such as diabetes and heart disease.  However, there were no service records directly demonstrating that beneficiaries who had a chart review and/or HRA received treatment for these serious health diagnoses.  For the 20 companies, 68 percent of their risk-adjusted payments ($3.4 billion of $5.0 billion) from diagnoses reported only on chart reviews and HRAs were concentrated among 12 of the 101 possible HCCs, as shown in Exhibit 4.[38]

**Exhibit 4: For 20 MA companies, 12 health conditions drove billions in risk-adjusted payments from chart reviews and HRAs.**



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

## One MA company stood out from its peers in its use of chart reviews and HRAs to drive risk-adjusted payments

Among the top 20 MA companies, 1 MA company generated 40 percent ($3.7 billion of $9.2 billion) of all payments from diagnoses submitted solely on chart reviews and HRAs, yet it enrolled only 22 percent of all MA beneficiaries, as shown in Exhibit 5.

The remaining top 19 companies accounted for a much smaller—yet still disproportionate—share of payments.[39]  The other 142 companies that had payments from chart reviews and/or HRAs enrolled 69 percent of all MA beneficiaries and accounted for just 46 percent of these payments.

**Exhibit 5: One top MA company generated billions in payments and a disproportionately high share of payments from diagnoses submitted solely on chart reviews and HRAs.**



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

## The MA company with the largest share of payments particularly stood out in its use of HRAs

This one top company stood out from its peers because of its disproportionally large share of the payments generated by (1) HRAs, (2) in-home HRAs, and (3) certain health conditions identified only during HRA visits.  It also stood out for its more intensive reporting of certain diagnoses on in-home HRAs.

**Although this one MA company drove payments from both chart reviews and HRAs, it had a disproportionately higher share of the payments from HRAs.**  This company generated 58 percent ($1.5 billion of $2.6 billion) of all payments from HRAs, as shown in Exhibit 6.  The other top 19 companies accounted for only 4 percent of payments from HRAs.  The remaining 142 companies generated 38 percent of the payments from HRAs.

**Exhibit 6: The one top MA company had a greater share of the payments from diagnoses reported solely on HRAs, whereas the other companies had more of the payments from diagnoses reported solely on chart reviews.**



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

**This one company differed from its peers in the share of the HRA-driven payments for certain health conditions.** For six HCCs, this company had a substantially greater share of the payments driven by diagnoses reported solely on HRAs, as shown in Exhibit 7.

**Exhibit 7: One top MA company had a substantially greater share of the payments resulting from HRAs for certain health conditions, in comparison to its peers.**



Source: OIG estimation of 2017 payment amounts using 2016 MA encounter data from CMS's IDR.

Overall, this 1 company had more than twice the amount of HRA-driven payments for these 6 HCCs as did the other 161 companies combined ($704.8 million versus $308.8 million).  Although this 1 company enrolled 22 percent of MA beneficiaries, it accounted for at least 60 percent of the beneficiaries identified as having each of these health conditions during HRAs.  This one company's substantially higher share of HRA-driven payments for these health conditions—and its correspondingly higher share of beneficiaries identified with these conditions only during HRAs—raise concerns about the validity of the diagnoses submitted only on HRAs and about the lack of evidence of followup care for beneficiaries with these conditions.

**This one MA company drove risk-adjusted payments from in-home HRAs.**  HRAs can be an important tool for early identification of health risks to improve beneficiaries' care and health outcomes.  However, conducting in-home HRAs that drive risk-adjusted payment but do not result in needed followup care raises concerns about the role that these assessments are playing in providing high-quality coordinated care.  The one top company accounted for two-thirds ($1.38 billion of $2.05 billion) of all risk-adjusted payments resulting from diagnoses reported only on in-home HRAs and on no other service records.  In contrast, the other 19 companies with a disproportionate share of payments from chart reviews and HRAs accounted for just 1 percent of payments from in-home HRAs.  The remaining 142 companies accounted for 31 percent of payments from in-home HRAs.

Almost all of the company's payments from HRAs resulted from diagnoses collected in beneficiaries' homes.  Diagnoses reported only on in-home HRAs resulted in 93 percent ($1.38 billion of $1.5 billion) of the company's payments from HRAs.  Eighteen other companies also generated more than 90 percent of their HRA payments from in-home HRAs.  However, these 18 other companies were much smaller and their payments from in-home HRAs totaled just $41 million.

**This one MA company used certain diagnosis codes more than its peers to generate risk-adjusted payments from in-home HRAs.**  For this one company, the top three diagnoses from in-home HRAs that generated risk-adjusted payments were "peripheral vascular disease, unspecified," "major depressive disorder, recurrent, mild," and "type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene." This company reported these 3 diagnoses only on in-home HRAs and on no other service records for 125,632 beneficiaries.  In contrast, all other 161 companies combined reported these 3 diagnoses only on in-home HRAs for just 21,618 beneficiaries.  The top 3 diagnoses that generated risk-adjusted payments resulting solely from in-home HRAs for the other 161 companies were "morbid (severe) obesity due to excess calories," "atherosclerotic heart disease of native coronary artery with unspecified angina pectoris," and "heart failure, unspecified."

In addition, the top MA company accounted for almost all of the beneficiaries with certain diagnoses.  For nine other diagnoses that generated payments from in-home HRAs, this one company had at least 90 percent of the beneficiaries who had these diagnoses reported only on an in-home HRA, as shown in Exhibit 8.  For example, the

company reported a diagnosis of "other forms of angina pectoris" for 99 percent (6,719 of 6,795) of the beneficiaries with this diagnosis on an in-home HRA that generated payment. All other 161 companies combined had payments generated by this diagnosis from in-home HRAs for just 76 beneficiaries. It seems unusual that one company accounted for such a substantially higher share of the beneficiaries with these diagnoses.

**Exhibit 8: The one top MA company had almost all of the beneficiaries with certain diagnoses from in-home HRAs that generated payments.**

| Diagnosis Code | Description of Diagnosis Code | Top Company's Percentage of All Beneficiaries With the Diagnosis on an In-Home HRA That Generated Payment |
|---|---|---|
| I208 | Other forms of angina pectoris | 99% |
| F3342 | Major depressive disorder, recurrent, in full remission | 99% |
| F3341 | Major depressive disorder, recurrent, in partial remission | 98% |
| E1139 | Type 2 diabetes mellitus with other diabetic ophthalmic complication | 97% |
| E1136 | Type 2 diabetes mellitus with diabetic cataract | 96% |
| G63 | Polyneuropathy in diseases classified elsewhere | 96% |
| E1169 | Type 2 diabetes mellitus with other specified complication | 95% |
| F330 | Major depressive disorder, recurrent, mild | 90% |
| E46 | Unspecified protein-calorie malnutrition | 90% |

Source: OIG analysis of 2016 MA encounter data from CMS's IDR.

# CONCLUSION AND RECOMMENDATIONS

The risk-adjustment program is an important payment mechanism for MA.  It levels the playing field for MA companies that enroll beneficiaries who need a costlier level of care, which helps to ensure these beneficiaries have continued access to MA plans. Chart reviews can be a tool to improve the accuracy of risk-adjusted payments, and HRAs can be used for early identification of health risks to improve beneficiaries' care and health outcomes.  However, these mechanisms raise concerns if MA companies use them to add diagnoses and maximize risk-adjusted payments without any other encounter records indicating that they provided care for conditions reported by these mechanisms.

Of the 162 MA companies with estimated risk-adjusted payments from diagnoses reported only on chart reviews and/or HRAs, 20 companies had a disproportionate share of the $9.2 billion in risk-adjusted payments from both mechanisms.  This disproportion could not be explained by their enrollment size.  Overall, these 20 companies generated $5 billion in payments for beneficiaries who may not have received any other services for the medical conditions indicated by the diagnoses.  For half of these 20 companies, unlinked chart reviews and in-home HRAs—which may be particularly vulnerable to misuse by MA companies—accounted for most of their estimated payments generated by chart reviews and HRAs.  Among these top 20 MA companies, 1 large company further stood out for its large share of risk-adjusted payments from chart reviews and HRAs.  This company enrolled 22 percent of MA beneficiaries, yet it generated 40 percent of all risk-adjusted payments from these mechanisms.  In addition, it accounted for half of all payments from HRAs.  Finally, almost all its payments from HRAs resulted from diagnoses reported only on in-home HRAs.

These findings, along with prior OIG work, raise concerns that certain MA companies may be using both chart reviews and HRAs more than their peers to maximize risk-adjusted payments inappropriately.  These findings also reinforce the three types of potential concerns identified during prior work on chart reviews and HRAs: (1) a data integrity concern that MA companies are not submitting all service records as required; (2) a quality-of-care concern that beneficiaries are not receiving needed services to address diagnoses identified on these mechanisms; and (3) a payment integrity concern that if diagnoses are inaccurate or unsupported, the associated risk-adjusted payments would then be inappropriate.

MA companies should receive appropriate compensation for providing care to beneficiaries with serious and chronic health conditions.  However, mechanisms such as chart reviews and HRAs should not be misused to collect diagnoses that inappropriately increase payments to MA companies and do not result in improved care for MA beneficiaries.

## We recommend that CMS:

## Provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs

CMS should perform oversight of the 20 MA companies that each had a share of payments from chart reviews and HRAs that was more than 25 percent higher than its share of enrolled MA beneficiaries.  When OIG issues this report, we will provide CMS with a list of the 20 MA companies, including the estimated risk-adjusted payments from chart reviews and HRAs.  CMS should assess the following:

- whether there are quality-of-care issues regarding the beneficiaries for whom there were diagnoses reported only on chart reviews or HRAs (i.e., whether the lack of additional MA service records for some of the serious conditions being represented by these diagnoses raises concerns about the adequacy of care provided to these beneficiaries);

- whether MA companies are submitting records of all services for beneficiaries with diagnoses reported only on chart reviews or HRAs; and

- whether the diagnoses reported solely on chart reviews or HRAs submitted by these 20 MA companies are accurate.

CMS may need to work across different Centers (e.g., the Center for Clinical Standards and Quality and the Center for Program Integrity) to conduct these assessments.

## Take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs

CMS should perform additional oversight of the MA company that had a high and disproportionate share of the payments from *both* chart reviews and HRAs for beneficiaries who may not have received any other services for the diagnoses reported only on these mechanisms.  OIG identified six health conditions that accounted for a substantial portion of the company's payments from HRAs.  We also identified nine diagnoses from in-home HRAs that generated payments and were reported for many more of the company's beneficiaries than for those of its peers.  CMS should work across its different Centers to examine the appropriateness of payments and care specifically for these conditions and diagnoses.  In addition, CMS should assess the company's requirements for care coordination after in-home HRAs and determine whether the company effectively implements these requirements.

CMS should take action(s) to remedy any problems identified and improve the integrity of this company's chart review and/or HRA programs.  Specifically, if the company does not ensure that beneficiaries receive appropriate care for diagnoses reported on these mechanisms, CMS should require the company to implement practices that ensure care coordination for beneficiaries.  In addition, if the company submitted a chart review or HRA to CMS with unsupported diagnoses, CMS should recover risk-adjusted overpayments as appropriate.

## Perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs

CMS should conduct periodic reviews to identify MA companies that generate shares of payments from chart reviews and HRAs that are disproportionately higher than their respective shares of enrolled MA beneficiaries.  These periodic reviews should determine whether the 20 MA companies, or other MA companies, generate a disproportionately higher share of the payments from these mechanisms in a given payment year.  CMS should use this information to provide targeted oversight of companies that consistently generate a share of payments that cannot be explained by their enrollment size.  These reviews should include (1) assessing whether these companies are providing quality care for their beneficiaries, and/or (2) determining the accuracy of diagnoses reported only on chart reviews or HRAs submitted by these companies.

# AGENCY COMMENTS AND OIG RESPONSE

In response to our draft report, CMS stated that it is committed to ensuring that diagnoses that MA companies submit for risk adjustment are accurate.  However, CMS neither concurred nor nonconcurred with our three recommendations.  Instead, CMS stated that it will take our recommendations under consideration as part of its ongoing process to determine policy options for future years.  CMS acknowledged concerns that in-home HRAs could be used by some MA companies primarily for the gathering of diagnoses for payment rather than to provide treatment and/or followup care to beneficiaries.  CMS noted that it has issued guidance in recent years to ensure MA companies are using HRAs and chart reviews appropriately.  CMS stated that it also uses Risk Adjustment Data Validation (RADV) audits to verify the accuracy of diagnoses reported by MA companies for risk adjustment and to recoup overpayments.

OIG recognizes the actions that CMS has taken to provide oversight of MA companies' use of HRAs and chart reviews.  However, some companies' disproportionate use of these mechanisms to maximize risk-adjusted payments raises concerns and highlights the need for more targeted oversight.  We continue to recommend that CMS:

- provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs;

- take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs; and

- perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs.

OIG requests that CMS include in its Final Management Decision details on any plans or progress it has made toward implementing our recommendations.

The full text of CMS's comments can be found in Appendix A.

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

*Administrator*
Washington, DC 20201

**DATE:**        August 20, 2021

**TO:**          Christi Grimm
                 Principal Deputy Inspector General
                 Office of Inspector General

**FROM:**        Chiquita Brooks-LaSure
                 Administrator
                 Centers for Medicare & Medicaid Services

**SUBJECT:**     Office of Inspector General (OIG) Draft Report: Some Medicare Advantage
                 Companies Leveraged Chart Reviews and Health Risk Assessments to
                 Disproportionately Drive Payments (OEI-03-17-00474)

The Centers for Medicare & Medicaid Services (CMS) appreciates the opportunity to review and comment on the OIG's draft report regarding the role of chart reviews and Health Risk Assessments (HRAs) in identifying diagnoses that Medicare Advantage Organizations (MAOs) submit to CMS for risk adjusted payments.

CMS pays each MAO a monthly per-person amount for each beneficiary enrolled in its plan. The per-person amount is adjusted for the risk of the beneficiary, which takes into account differences in health status between enrolled beneficiaries. Plans that disproportionately enroll healthy beneficiaries are paid less than they would be if they enrolled beneficiaries with the average risk profile, while plans that disproportionately enrolled the sickest patients are paid more than if they enrolled beneficiaries with the average risk profile.

Beneficiary risk scores are calculated with diagnoses that MAOs report to CMS. Diagnosis codes used for risk adjustment must meet specific criteria, including that the diagnosis is documented in the medical record. Historically, MAOs have reported diagnosis codes to CMS in two ways: (1) to a legacy system called the Risk Adjustment Payment System (RAPS) using an abbreviated data set, including diagnosis codes; and (2) to the Encounter Data System, where MAOs submit a larger set of information on each service provided, including diagnosis codes. CMS allows MAOs to use HRAs and chart reviews, both described in more detail below, as a source of diagnoses for Medicare Advantage (MA) beneficiaries used in the calculation of risk-adjusted payments. It is also important to note that risk adjustment requirements do not require that a service be provided for every diagnosis. For example, MAOs may report diagnoses for which there might not be a service directly linked to a condition status, but could be for associated comorbidities (e.g., morbid obesity).

HRAs are a tool for early identification of health risks to improve beneficiaries' health outcomes through care coordination. Physicians or other health care professionals conduct HRAs to collect information from beneficiaries about their health status, health risks, and daily activities. In the MA program, HRAs are either a part of annual wellness visits or conducted during other visits in

non-clinical settings. MAOs may submit diagnoses documented in HRAs for risk adjustment. All diagnoses submitted for risk adjustment are subject to Risk Adjustment Data Validation (RADV) audits to ensure they meet program rules. MAOs review conditions listed on HRAs to evaluate for chronicity and support in the full medical record, such as history, medications, and final assessment. Results of HRA screening portions are not considered confirmed diagnoses by MAOs unless supported by the final assessment documentation.[1] In addition, CMS has created an indicator in RAPS data that requires MAOs to identify diagnoses that result from a non-clinical setting visit during which an annual wellness visit was completed.

CMS has issued guidance in recent years to ensure MAOs are utilizing HRAs appropriately. In 2015, CMS provided guidance to MAOs on best practices that promote the primary use of in-home HRAs as tools for improving care for MA enrollees.[2] These practices included making referrals to appropriate community resources, verifying that needed follow-up care is provided, and verifying that information obtained during the assessment was provided to the appropriate providers. CMS released additional guidance in 2016 related to coordination of care for services provided to MA beneficiaries.[3] This guidance states that MAOs must ensure continuity of services, including implementing procedures to make a best effort to conduct HRAs annually and to ensure an appropriate and timely exchange of clinical information among providers. This will help ensure that diagnoses collected from HRAs are substantiated through appropriate follow up care.

Chart review records are a type of Medicare Advantage encounter data. They allow MAOs to submit diagnosis codes for risk adjustment that were not reported on the record that was submitted to report the encounter. That typically occurs because the data used to report the encounter was taken from a claim that a provider submitted to the MAO. Such a claim would not necessarily include all the diagnoses documented in the medical record during the respective encounter. While MAOs are required to submit all encounters to CMS, chart review records are intended for the submission of additional diagnosis codes submitted for risk adjustment. Based on their reviews of medical records, MAOs may also use chart review records to delete previously submitted diagnosis codes that are not supported by those medical records.

CMS has also issued guidance in recent years to ensure MAOs are utilizing chart reviews appropriately. In January 2020, CMS released a Frequently Asked Questions document to MAOs that included information on adding or deleting diagnoses codes through chart reviews, the use of default procedure codes for unlinked chart reviews, and how MAOs can avoid duplicate errors when submitting diagnoses.[4]

---

[1] Contract-level Risk Adjustment Data Validation: Medical Record Reviewer Guidance
https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-Risk-Adjustment-Data-Validation-Program/Other-Content-Types/RADV-Docs/Medical-Record-Reviewer-Guidance.pdf

[2] Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter
https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf

[3] Medicare Managed Care Manual
https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c04.pdf

[4] FAQs about MAOs Encounter Data Submission and Processing
https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2012232368-lw-faqsmaosencounterdatasubmissionandprocessing.pdf

## Appendix A:  Agency Comments

CMS is committed to ensuring that diagnoses that MAOs submit for risk adjustment are accurate, and we have already taken action to target plans at higher risk for improper payment. For example, CMS uses contract-level RADV audits to validate that diagnoses used for risk adjustment meet program rules. RADV audits measure the accuracy of the plan-submitted diagnostic information through medical record and coding reviews, and uses the results of these audits to identify and recover overpayments for individual MA plans. CMS audits approximately 200 plans per payment year, using advanced statistical modeling and known areas of improper payment to focus audits on higher risk areas when drawing enrollee samples. To assess potential risk of overpayments, CMS takes into consideration various factors, including results of past RADV audits. Because the plan selection methodology for RADV audits already focuses on high-risk plans, our current methodology would already capture plans at high risk for improper payment.

**OIG Recommendation**
Provide oversight of the 20 MA companies that had a disproportionate share of the risk-adjusted payments from chart reviews and HRAs.

**CMS Response**
While CMS continues to support the use of enrollee risk assessments for wellness, care coordination, and disease prevention, we recognize that concerns remain that home visits could be used by some MA organizations primarily for the gathering of diagnoses for payment rather than to provide treatment and/or follow-up care to beneficiaries. CMS is consistently monitoring the operations of the program to determine appropriate policy options for consideration in future years, but presently, HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program. RADV audits are CMS's primary corrective action to recoup overpayments. RADV uses medical record review to verify the accuracy of enrollee diagnoses submitted by MA organizations for risk adjusted payment. CMS' RADV audits are designed to develop audit and sampling methodologies that target a combination of plans, enrollees, and diagnoses that are most at risk for improper payments. Because of this, MA companies that are at higher risk for overpayments already have an increased likelihood of being included in RADV audits. However, CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years.

**OIG Recommendation**
Take additional actions to determine the appropriateness of payments and care for the one MA company that substantially drove risk-adjusted payments from chart reviews and HRAs.

**CMS Response**
While CMS continues to support the use of enrollee risk assessments for wellness, care coordination, and disease prevention, we recognize that concerns remain that home visits could be used by some MA organizations primarily for the gathering of diagnoses for payment rather than to provide treatment and/or follow-up care to beneficiaries. CMS is consistently monitoring the operations of the program to determine appropriate policy options for consideration in future years, but presently, HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program. CMS' RADV audits are designed to develop audit and sampling methodologies that target a combination of plans, enrollees, and diagnoses that are most at risk

for improper payments. Because of this, MA companies that are at higher risk for overpayments already have an increased likelihood of being included in RADV audits. However, CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years.

### OIG Recommendation

Perform periodic monitoring to identify MA companies that had a disproportionate share of risk-adjusted payments from chart reviews and HRAs.

### CMS Response

While CMS continues to support the use of enrollee risk assessments for wellness, care coordination, and disease prevention, we recognize that concerns remain that home visits could be used by some MA organizations primarily for the gathering of diagnoses for payment rather than to provide treatment and/or follow-up care to beneficiaries. CMS is consistently monitoring the operations of the program to determine appropriate policy options for consideration in future years, but presently, HRAs and chart reviews are allowable sources of diagnoses for risk adjusted payments in the MA program. RADV audits are CMS's primary corrective action to recoup overpayments. CMS' RADV audits are designed to develop audit and sampling methodologies that target a combination of plans, enrollees, and diagnoses that are most at risk for improper payments. Because of this, MA companies that are at higher risk for overpayments already have an increased likelihood of being included in RADV audits. However, CMS will take OIG's recommendation under consideration as part of our ongoing process to determine policy options for future years.

# ACKNOWLEDGMENTS AND CONTACT

## Acknowledgments

Jacqualine Reid served as the team leader for this study.  Others in the Office of Evaluation and Inspections who conducted the study include San Le.  Office of Evaluation and Inspections staff who provided support include Joe Chiarenzelli, Kevin Farber, and Christine Moritz.

This report was prepared under the direction of Linda Ragone, Regional Inspector General for Evaluation and Inspections in the Philadelphia regional office, and Joanna Bisgaier, Deputy Regional Inspector General.

## Contact

To obtain additional information concerning this report, contact the Office of Public Affairs at Public.Affairs@oig.hhs.gov.  OIG reports and other information can be found on the OIG website at oig.hhs.gov.

Office of Inspector General
U.S. Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC 20201

# ABOUT THE OFFICE OF INSPECTOR GENERAL

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs.  This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

**The Office of Audit Services (OAS)** provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others.  Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations.  These audits help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

**The Office of Evaluation and Inspections (OEI)** conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues.  These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs.  To promote impact, OEI reports also present practical recommendations for improving program operations.

**The Office of Investigations (OI)** conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries.  With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities.  The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

**The Office of Counsel to the Inspector General (OCIG)** provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations.  OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases.  In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements.  OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

# ENDNOTES

[1] MAOs may also offer prescription drug coverage under Medicare Part D.

[2] An MA company can also be referred to as a parent organization or parent company.  We use the term "MA companies" to encompass MAOs.

[3] OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019; OIG, *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns*, OEI-03-17-00471, September 2020.

[4] CMS, *CMS Financial Report Fiscal Year 2020*, November 2020, p. 53.  Accessed at https://www.cms.gov/files/document/cms-financial-report-fiscal-year-2020.pdf on January 5, 2021.

[5] Although MAOs may receive service information from providers, submit diagnoses for risk adjustment, and receive payments from CMS, this report uses the term "MA companies" (i.e., companies that own or have a controlling interest in one or more MAOs) to encompass MAOs.

[6] CMS, *Encounter Data Submission and Processing Guide, Medicare Advantage Program*, October 2020.  Accessed at https://www.csscoperations.com/internet/csscw3_files.nsf/F/CSSCED_Submission_Processing_Guide_20201009.pdf/$FILE/ED_Submission_Processing_Guide_20201009.pdf on June 17, 2021.  CMS, *Medicare Managed Care Manual, Risk Adjustment*, Pub. No. 100-16 (Rev. 118, September 19, 2014), ch. 7.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/mc86c07.pdf on May 4, 2021.  CMS, *Final Encounter Data Diagnosis Filtering Logic*, December 2015. Accessed at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/final%20industry%20memo%20medicare%20filtering%20logic%2012%2022%2015_2.pdf on December 27, 2018.

[7] The RAPS data include only select information for services provided by a limited set of provider types.  CMS began collecting the more comprehensive encounter data from MA companies in 2012 as part of an effort to improve MA payment accuracy and better perform MA quality reviews.

[8] To be eligible for risk adjustment, a diagnosis must be (1) documented in a medical record from a hospital inpatient stay, hospital outpatient visit, or visit with a physician or other eligible health care professional during the prior year, (2) documented as a result of a face-to-face visit between the beneficiary and the provider, and (3) submitted on an encounter record by the final risk adjustment data submission deadline.  To identify which diagnoses meet these eligibility criteria, CMS extracts—or filters—diagnoses in the encounter data on the basis of whether the service record contains an acceptable procedure code (i.e., Current Procedural Terminology (CPT) or Healthcare Common Procedure Coding System (HCPCS) code) and/or type of bill code.

[9] Specifically, the relative factors represent the marginal expected cost of an HCC relative to the average expected cost in the Medicare fee-for-service program.

[10] CMS adjusts risk scores by normalization factors and coding adjustment factors prior to calculating payments.  An MA plan's base payment rate is the plan's standardized bid adjusted by the county Intra-Service Area Rate factor for the beneficiary's county of residence.

[11] MA companies may also perform chart reviews to delete diagnoses that providers submitted in error, but prior OIG work found that the use of chart reviews for this purpose was rare.  OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019.

[12] On a linked chart review, MA companies identify the previously accepted service record by reporting that service record's unique internal control number.

[13] CMS permits MA companies to submit unlinked chart reviews because of CMS's concerns regarding the burden on some MA companies of linking chart reviews.

[14] In August 2018, CMS issued a clarification to MA companies that "diagnoses that are disallowed for risk adjustment should not be submitted with default [procedure] codes that would cause the diagnoses to be allowed for risk-adjusted payment." CMS, *Additional Guidance for Chart Review Record (CRR) Submissions*, August 2018.  Accessed at https://www.hhs.gov/guidance /sites/default/files/hhs-guidance-documents/hpms%2520memo%2520chart_review_final_08-28-2018_4.pdf on February 19, 2021.

[15] To be eligible for risk adjustment, a diagnosis must be documented as a result of a face-to-face visit between the beneficiary and the provider.  To identify which diagnoses meet eligibility criteria, CMS extracts—or filters—diagnoses in the encounter data on the basis of whether the service record contains an acceptable procedure code (i.e., Current Procedural Terminology (CPT) or Healthcare Common Procedure Coding System (HCPCS) code) and/or type of bill code.

[16] OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019.

[17] CMS, *Medicare Advantage Encounter Data—Data Exchange Reports—June 2020*, June 2020.  Accessed at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/ma%20encounter%20data_data%20exchange _6.25.2020_8.pdf on February 22, 2021.

[18] DOJ, *U.S. Intervenes in Second "Whistleblower" Lawsuit Alleging UnitedHealth Mischarged the Medicare Advantage and Prescription Drug Programs*, May 2017.  Accessed at https://www.justice.gov/usao-cdca/pr/us-intervenes-second-whistleblower-lawsuit-alleging-unitedhealth-mischarged-medicare on April 14, 2021; United States ex rel. Poehling v. UnitedHealth Group, Inc. et al., No. CV 16-8697-MWF (SSX), (C.D. Cal. filed May 16, 2017).

[19] DOJ, *Manhattan U.S. Attorney Files Civil Fraud Suit Against Anthem, Inc., For Falsely Certifying The Accuracy Of Its Diagnosis Data*, March 2020.  Accessed at https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-files-civil-fraud-suit-against-anthem-inc-falsely-certifying on October 16, 2020.  United States v. Anthem, Inc., No. 20-cv-2593 (U.S. District Court for the Southern District of New York, filed March 26, 2020).

[20] GAO, *Fundamental Improvements Needed in CMS's Effort to Recover Substantial Amounts of Improper Payments*, GAO-16-76, April 2016, p.13.  Accessed at https://www.gao.gov/assets/680/676441.pdf on August 12, 2020.

[21] An annual wellness visit should incorporate reviews of a beneficiary's health risks, medical history, and current providers, along with routine measurements and personalized health advice.  CMS, *Medicare Wellness Visits*, October 2020.  Accessed at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/preventive-services/medicare-wellness-visits.html on April 15, 2021.

[22] MA companies must make a "best-effort" attempt to conduct an initial and annual HRA to assess each enrollee's health care needs.  42 CFR § 422.112(b)(4)(i); CMS, *Medicare Managed Care Manual, Benefits and Beneficiary Protections*, Pub. No. 100-16 (Rev. 121, April 22, 2016), ch. 4, § 110.  Accessed at https://www.cms.gov/Regulations-and-Guidance/Guidance/ Manuals/Downloads/mc86c04.pdf on June 16, 2021.  MA companies offering Special Needs Plans (SNPs) must conduct initial and annual HRAs of individuals' physical, psychosocial, and functional needs, using a comprehensive risk assessment tool that CMS may review during oversight activities.  Social Security Act, § 1859(f)(5)(A)(ii)(I); 42 CFR § 422.101(f)(1)(i).

[23] OIG, *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns*, OEI-03-17-00471, September 2020.

[24] We identified diagnoses reported on HRAs using a twofold process.  First, we aggregated records from CMS's Integrated Data Repository (IDR) that identify potential HRAs, including annual wellness visits; initial preventive physical exams; and

evaluation and management home visits.  Second, among these types of records, we excluded from our analysis any beneficiaries who had more than one procedure code in 2016 that met our criteria for a potential HRA.

[25] CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2015.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf on August 12, 2020.

[26] CMS, *Announcement of Calendar Year (CY) 2016 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, April 2015.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2016.pdf on August 12, 2020.

[27] As part of this recommendation, MedPAC recommended that the Secretary develop a risk adjustment model that uses 2 years of Medicare fee-for-service and MA diagnostic data.  MedPAC, *Report to the Congress: Medicare Payment Policy*, March 2016, p. 352.  Accessed at http://www.medpac.gov/docs/default-source/reports/march-2016-report-to-the-congress-medicare-payment-policy.pdf on August 12, 2020.

[28] For encounter records with dates of service in 2016, we identified chart reviews as records with (1) a claim type code between 4000 and 4800; (2) a chart review switch value of "Y"; and (3) a chart review effective switch of "Y."

[29] We identified HRAs in the 2016 MA encounter data using a twofold process.  First, we aggregated records from the Integrated Data Repository (IDR) containing a procedure code that identifies a potential HRA, including a procedure code for an annual wellness visit (G0438 or G0439), an initial preventive physical exam (G0402), or an evaluation and management home visit (99341–99345 or 99347–99350).  For evaluation and management home visits, we also ensured that the place of service was at home—i.e., that the code for the place of service was home (12), temporary lodging (16), custodial care facility (33), group home (14), or homeless shelter (04).  Second, among these types of records, we excluded from our analysis any beneficiaries who had more than one procedure code in 2016 that met our criteria for a potential HRA.

[30] We excluded beneficiaries who—according to information contained in the IDR's MA prescription drug (MARx) data—had end stage renal disease, were receiving hospice care, or did not reside in a U.S. State.  To ensure data accuracy, we also excluded beneficiaries with inconsistencies between their MA encounter data, Medicare beneficiary data, and MARx data contained in the Integrated Data Repository.  In addition, we included only beneficiaries who were enrolled with the same MA plan for all 12 months of 2016.

[31] We used the 2017 CMS-HCC model and CMS's CMS-HCC mapping software to identify the HCCs generated by the diagnoses that were reported only on chart reviews or HRAs.  CMS, *Announcement of Calendar Year (CY) 2017 Medicare Advantage Capitation Rates and Medicare Advantage and Part D Payment Policies and Final Call Letter*, *Table VI-1. 2017 CMS-HCC Model Relative Factors for Community and Institutional Beneficiaries*, April 2016, pp. 78-84.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Downloads/Announcement2017.pdf on December 19, 2018.  CMS, *2017 Model Software/ICD-10 Mappings, V2217.79.O1.*  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Risk-Adjustors.html on May 9, 2018.

[32] Prior to calculating payment estimates, we adjusted each HCC's relative factor by CMS's normalization factors and coding adjustment factors for 2017.

[33] For MA plans that submit bids to CMS, we identified base payment rates for December 2017 in the Approved Bid Pricing Tool Extract from CMS's Health Plan Management System.  For Employer Group Waiver Plans (EGWPs), which do not submit bids to CMS, we identified base payment rates using CMS's EGWP county-level ratebooks for regional and local EGWPs and information on each EGWP's star rating.  We identified EGWPs' 2017 star ratings by using the Approved Bid Pricing Tool Extract and the MA Quality Bonus Payment Rating files from CMS's Health Plan Management System.  The 2017 MA plan information that we used in our analysis included information from the Approved Bid Pricing Tool Extract and the Plan Benefit Package Extract in CMS's Health Plan Management System, as well as CMS's EGWP county-level ratebooks.  CMS, *2017 Medicare*

*Advantage Ratebook and Prescription Drug Rate Information*, 2017.  Accessed at https://www.cms.gov/Medicare/Health-Plans/MedicareAdvtgSpecRateStats/Ratebooks-and-Supporting-Data.html on January 5, 2018.

[34] We identified linked chart reviews as chart reviews that contained an original control number and had a four-part effective key that matched the four-part effective key of an accepted service record with a date of service in 2016.  We considered all other chart reviews to be unlinked.

[35] We identified in-home HRAs as records containing a place of service code of "home" (12), "temporary lodging" (16), "custodial care facility" (33), "group home" (14), or "homeless shelter" (04).  We considered records containing all other place of service codes—including codes for physician offices, clinics, and hospitals—to be facility-based HRAs.

[36] These evaluations included only beneficiaries enrolled in the same MA plan for all 12 months of 2016.  We excluded beneficiaries who had end-stage renal disease, were receiving hospice care, or did not reside in a U.S. State.  We also excluded cost plans, demonstration plans, programs of all-inclusive care for the elderly (PACE) organizations, and Medicare medical savings account plans.

[37] For 2017, CMS calculated a blended risk score for each beneficiary by combining 25 percent of the risk score calculated from diagnoses in the encounter data and 75 percent of the risk score calculated from diagnoses in the RAPS data.  Ultimately, CMS plans to rely exclusively on encounter data to calculate risk scores.

[38] Prior OIG reports provide the amount of risk-adjusted payments for all 101 HCCs that resulted from diagnoses reported only on each of these mechanisms.  OIG, *Billions in Estimated Medicare Advantage Payments From Chart Reviews Raise Concerns*, OEI-03-17-00470, December 2019, Appendix B, pp. 29–33; OIG, *Billions in Estimated Medicare Advantage Payments From Diagnoses Reported Only on Health Risk Assessments Raise Concerns*, OEI-03-17-00471, September 2020, Appendix B, pp. 33-36.

[39] Only 4 of these 19 companies had a more disproportionate share of payments than the large company.  However, those 4 companies were small, each enrolling less than 1 percent of all MA beneficiaries.

# EXHIBIT 16

5/1/25, 3:30 PM
Study: How UnitedHealth codes in Medicare Advantage | STAT
CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 08/25/25    Page 134 of 179

**INSURANCE**

# Study shows how UnitedHealth uses coding to rake in extra cash from Medicare Advantage

The insurer uses several strategies to make its members seem sicker and collect more payments, the study found



Adobe

**By Tara Bannow**  April 7, 2025

Hospitals and Insurance Reporter

5/1/25, 3:30 PM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 135 of 179
Study: How UnitedHealth codes in Medicare Advantage | Stat

Health insurers in the private Medicare business have a big incentive to diagnose their members with lots of health conditions: The government pays them more money.

A new study shows the extent to which the biggest player in that business, UnitedHealth Group, stands out from the rest for its prowess at raking in extra cash from that program.

Medicare Advantage insurers pulled in an estimated $33 billion in additional payment from the government in 2021 as a result of these extra diagnoses, or codes, that made their members seem sicker, relative to people in the traditional Medicare program. Almost $14 billion of that, or 42%, went to a single company: UnitedHealth, according to the research, published Monday in the Annals of Internal Medicine. Other insurers, like Humana and Aetna, comprised much smaller shares: 19% and 6%, respectively.

"United is just coding a lot more than the other largest insurers," said Richard Kronick, the study's lead author and a professor in the Herbert Wertheim School of Public Health at the University of California, San Diego.

To be fair, UnitedHealth also covered more members in 2021 than anyone else: 7.5 million people or 27% of all members in the program. But that's still a smaller share than its cut of the coding proceeds.

The study is the first to comprehensively compare the extra revenue from Medicare Advantage coding among individual insurers. It did so by quantifying the differences in coding between private Medicare, the program run by private insurers, and traditional Medicare, in which the government pays providers directly and there's no financial incentive to apply certain diagnosis codes.

Kronick said the coding differences are mainly driven by companies' business practices, and whether or not they place a heavy emphasis on identifying more diagnoses for their Medicare Advantage patients. The study bolsters that conclusion with its finding that virtually all of the coding differences between Medicare Advantage and traditional Medicare are contained within just 10 diagnostic groups. With few exceptions, the researchers didn't find differences in other diagnostic groups that affected similar body systems.

## UnitedHealth draws the lion's share

Estimated share of Medicare Advantage revenue as a result of differential coding



Chart: J. Emory Parker/STAT • Source: Kronick et al. (2025), Annals of Internal Medicine

The diagnostic groups that accounted for the coding differences include vascular disease, major depressive disorder, and drug and alcohol dependence. The common theme among them is they're more open to interpretation than other conditions with respect to whether patients have them or not, Kronick said. They're all also relatively common, especially among older adults, he said.

Not all of the coding differences between Medicare Advantage and traditional Medicare are the result of upcoding, or applying inappropriate codes just to get paid more. At least some of the disparity could be because of genuine differences in members' health statuses. Research has also found that doctors in some cases don't fully code patients' health conditions if they have traditional Medicare, and that's less often the case in Medicare Advantage.

But even if that's true, Kronick said that shouldn't affect how much money insurers get from the government.

"What we see is that the risk score magically changes as people go into Medicare Advantage," he said. "The risk score for a person in Medicare Advantage is a lot higher

than it would be if she were in traditional Medicare, and in particular, a lot different at United than at Kaiser."

The Better Medicare Alliance, a group that lobbies on behalf of the Medicare Advantage industry, contested the findings. In a statement, Kaitlyn Saal-Ridpath, the group's vice president of policy and research, called the study a "flawed apples-to-oranges analysis" because it doesn't account for under-coding in traditional Medicare and differences in health status between members in the programs. She also noted that the study does not account for recent risk adjustment changes made under the Biden administration.

"We welcome serious analyses to help drive policy conversations around Medicare Advantage, but this study misses the mark," Saal-Ridpath said.

The study also examined how the codes got added to Medicare Advantage members' records. It found that roughly half of them came from chart reviews, where insurers direct staffers to mine members' records for more diagnoses, and health risk assessments, where insurers send clinicians into members' homes to perform tests that could yield more diagnoses. Of that 50%, the study found that two-thirds came from chart reviews and the rest from health risk assessments.

In particular, the study showed that UnitedHealth got much more money from in-home health risk assessments than other insurers. UnitedHealth also led the pack with respect to chart reviews. UnitedHealth did not comment on the study's findings.

Coding differences between Medicare Advantage and traditional Medicare are also driven by financially incentivizing doctors to add the codes. In addition to being the biggest private insurer, UnitedHealth also employs or affiliates with almost 1 in 10 U.S. doctors. STAT's Health Care's Colossus series examined how the company uses its influence over them to tack more  diagnosis codes onto its Medicare Advantage members. STAT interviewed doctors who described intense pressure from UnitedHealth to apply lucrative, yet dubious, codes to their patients. Doctors said the company offered bonuses of up to $10,000 and managers sent emails ranking them and their peers.

Not all companies make coding such a big part of their Medicare Advantage strategy. Some insurers, like Kaiser Permanente, code in a manner that's much closer to traditional

CASE 0:24-cv-01743-JMB-JFD     Doc. 152-4     Filed 08/25/25     Page 138 of 179

Medicare, in which there's no incentive to upcode. In 2021, the study found Kaiser drew $500 million from coding, or just 1% of its Medicare Advantage revenue.

The study's findings, particularly the dramatic variation in coded disease, are striking because nobody would expect to see such wide differences in disease prevalence among Medicare Advantage and traditional Medicare members, J. Michael McWilliams, a health care policy professor at Harvard Medical School, wrote in an accompanying editorial.

The results also make it clear that an across-the-board pay cut to insurers is not the right way to address the issue, because it would put the smaller ones out of business, McWilliams wrote. Instead, he said reforms should be directed at the risk adjustment system itself, including by stripping out diagnoses that are more easily manipulated.

The Biden administration has phased in changes designed to do just that: weed out the most abused diagnosis codes. Instead of implementing the reforms all at once, they've been phased in over three years, and are scheduled to fully take effect in 2026.

Mehmet Oz, who was confirmed last week as the new head of the Centers for Medicare and Medicaid Services, pledged to crack down on Medicare Advantage upcoding, referring to himself as the "new sheriff in town."

# EXHIBIT 17

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 08/25/25    Page 140 of 179

**Support the Guardian**
Fund the free press with $5 per month

**Support us** →

**Sign in**

US

News    |    **Opinion**    |    **Sport**    |    **Culture**    |    **Lifestyle**    ☰

**Too big to care**  US Medicare

# Revealed: UnitedHealth secretly paid nursing homes to reduce hospital transfers

A Guardian investigation finds insurer quietly paid facilities that helped it gain Medicare enrollees and reduce hospitalizations. Whistleblowers allege harm to residents

US nursing home employees: do you have information about UnitedHealth's nursing home practices?

6/11/25, 12:42 PM    Revealed: UnitedHealth secretly paid nursing homes to reduce hospital transfers | US Medicare | The Guardian

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 08/25/25    Page 141 of 179



Illustration: Angelica Alzona/Guardian design

## George Joseph

Wed 21 May 2025 11.45 EDT

UnitedHealth Group, the nation's largest healthcare conglomerate, has secretly paid nursing homes thousands in bonuses to help slash hospital transfers for ailing residents – part of a series of cost-cutting tactics that has saved the company millions, but at times risked residents' health, a Guardian investigation has found.

Those secret bonuses have been paid out as part of a UnitedHealth program that stations the company's own medical teams in nursing homes and pushes them to cut care expenses for residents covered by the insurance giant.

In several cases identified by the Guardian, nursing home residents who needed immediate hospital care under the program failed to receive it, after interventions from UnitedHealth staffers. At least one lived with permanent

6/11/25, 12:42 PM
CASE 0:24-cv-01743-JMB-JFD    Doc. 153-4    Filed 08/25/25    Page 142 of 179
Revealed: UnitedHealth secretly paid nursing homes to reduce hospital transfers | US Medicare | The Guardian

brain damage following his delayed transfer, according to a confidential nursing home incident log, recordings and photo evidence.

"No one is truly investigating when a patient suffers harm. Absolutely no one," said one current UnitedHealth nurse practitioner who recently filed a congressional complaint about the nursing home program. "These incidents are hidden, downplayed and minimized. The sense is: 'Well, they're medically frail, and no one lives for ever.'"

The Guardian's investigation is based on thousands of confidential corporate and patient records obtained through sources, public records requests and court files, interviews with more than 20 current and former UnitedHealth and nursing home employees, and two whistleblower declarations submitted to Congress this month through the non-profit legal group Whistleblower Aid.

The documents and sources provide a never-before-seen window into the company's successful effort to insert itself into the day-to-day operations of nearly 2,000 nursing homes in small towns and urban commercial strips across the nation – an approach which has helped UnitedHealth secure a vast stream of federal dollars from Medicare Advantage plans that cover more than 55,000 long-term nursing home residents.

UnitedHealth said the suggestion that its employees have prevented hospital transfers "is verifiably false". It said its bonus payments to nursing homes help prevent unnecessary hospitalizations that are costly and dangerous to patients and that its partnerships with nursing homes improve health outcomes.

Under Medicare Advantage, insurers collect lump sums from the federal government to cover seniors' care. But the less insurers spend on care, the more they have for potential profit – an opportunity that UnitedHealth higher-ups have systematically sought to exploit when it comes to long-term nursing home residents.

## UnitedHealth's long-term nursing home plans enroll nearly as many as all other Medicare Advantage plans combined



Guardian graphic. Source: Centers for Medicare and Medicaid services. Notes: Enrollment numbers are for Institutional Special Needs Plans (I-SNPs)

To reduce residents' hospital visits, UnitedHealth has offered nursing homes an array of financial sweeteners that sounded more like they came from stockbrokers than medical professionals.

Over the past seven years, the company has shelled out "Premium Dividend" and "Shared Savings" payments that boosted nursing homes' bottom lines. Through its "Quality and Shared Risk" program, UnitedHealth offered an even bigger cut to nursing homes that drove down medical spending, but threatened to claw back money from those that didn't, according to former employees and internal corporate documents.

One term that UnitedHealth executives obsessed over was "admits per thousand" – APK for short. It was a measure of the rate that nursing homes sent their residents to the hospital. Under the "Premium Dividend" program, a low APK qualified a nursing home for the various bonus payments the insurer offered. A high APK meant that a nursing home received nothing.

"APK drove everything," said one former national UnitedHealth executive who worked on the initiative with nursing homes in more than two dozen states and spoke about the confidential contracts on the condition of anonymity. "You gain profitability by denying care, and when profitability

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 144 of 179

suffers for the shareholders, that's when people get crazy and do things that are not appropriate."



📷 Supporters of Luigi Mangione outside Manhattan criminal court as he appeared for his hearing on state murder and terrorism charges on 21 February. Photograph: Mostafa Bassim/Anadolu/Getty Images

The revelations come at a time of crisis for UnitedHealth, which became the subject of public outrage after December's fatal shooting of Brian Thompson, a top executive at the company, and the arrest of a suspect named Luigi Mangione.

The killing reignited concerns over the healthcare giant's Medicare windfalls and denials of care to patients. But a full accounting of UnitedHealth's cost-cutting push inside nursing homes has not previously surfaced amid government and media investigations into the company's conduct.

## Cost-cutting tactics

The secret bonuses were just one of many maneuvers UnitedHealth devised to track and cut expenses in its nursing home initiative.

Internal emails show, for example, that UnitedHealth supervisors gave their teams "budgets" showing how many hospital admissions they had "left" to

use up on nursing home patients.

The company also monitored nursing homes that had smaller numbers of patients with "do not resuscitate" – or DNR – and "do not intubate" orders in their files. Without such orders, patients are in line for certain life-saving treatments that might lead to costly hospital stays.

Two current and three former UnitedHealth nurse practitioners told the Guardian that UnitedHealth managers pressed nurse practitioners to persuade Medicare Advantage members to change their "code status" to DNR even when patients had clearly expressed a desire that all available treatments be used to keep them alive.

> will find the breakdown of the SIC/MRA report for our market. Please review with your teams to help them to target members and buildings for focused SICs. I am identifying members who are full code and facilities with high full code rates that members have aggressive goals of care and may benefit from a SIC. The goal is help members to understand prognosis and disease trajectory, and to help us to

"They're pretending to make it look like it's in the best interest of the member," another current UnitedHealth nurse practitioner said. "But it's really not."

In response to questions, UnitedHealth said its nursing home initiative improves care for older residents by providing "on-site nurse practitioners, tailored care plans for chronic conditions, and enhanced communication between staff, families and providers".

The company denied that it had prevented hospital transfers or inappropriately pushed patients to change their code status to DNR.

## Send us a tip

If you are a current or former UnitedHealth or nursing home employee and have information you'd like to share securely with the Guardian about nursing home care, please use a non-work device to call or text investigative reporter George Joseph via the Signal messaging app at 929-486-4865.

The program's cost-cutting schemes were only possible because of the sprawling nature of UnitedHealth, a $300bn-plus conglomerate which has grown into one of the world's biggest companies thanks to its relentless efforts to embed itself into nearly every corner of the healthcare industry.

UnitedHealth's insurance arm covers millions more Medicare Advantage seniors than any of its rivals, and another subsidiary, Optum, employs or affiliates with tens of thousands of doctors and nurse practitioners.

When nursing homes under the bonus program allowed medical teams from one UnitedHealth subsidiary to work in their facilities, they allowed the corporate giant to influence critical healthcare decisions for residents, which had a direct impact on the insurance side of its business.

The Guardian's reporting also found that the program offered nursing homes even larger sums for every senior enrolled in the insurer's offerings for long-term nursing home residents, which are called "Institutional Special Needs Plans". In some cases, these payments incentivized nursing homes to leak confidential resident records to UnitedHealth sales teams so they could directly solicit elderly residents and their families, according to a whistleblower lawsuit currently being fought in federal court in Georgia as well as internal nursing home records and interviews with more than a dozen current and former nursing home employees and UnitedHealth salespeople.

One former UnitedHealth employee in Georgia admitted to the Guardian that she got nursing home staff to leak her confidential resident records then backdated permission-to-contact forms to circumvent federal rules meant to protect seniors from aggressive sales pitches. The employee was fired after failing to meet her sales quota, according to a former colleague.

After one nursing home near Savannah, Georgia, disclosed confidential patient records to UnitedHealth, families complained that their loved ones had been shifted on to the company's Medicare Advantage plan even though they lacked the cognitive ability to make such decisions, according to a former UnitedHealth executive, federal court filings in Georgia and leaked patient files reviewed by the Guardian.

All told, the various payments that came with increasing UnitedHealth enrollments and minimizing medical expenses could add up to hundreds of thousands of dollars annually for a typical midsize nursing home, sources said.

But the nursing home residents, who had signed up for UnitedHealth's Medicare Advantage program and whose federal dollars were financing the program, did not know about the confidential incentive payments and anti-hospitalization tactics affecting their care.

CASE 0:24-cv-01743-JMB-JFD Doc. 153-4 Filed 08/25/25 Page 147 of 179

UnitedHealth declined to answer questions about how much it has paid out to nursing homes through the secret contract clauses. The company said its payments incentivize high-quality outcomes for residents and reward efforts that lead to improved care.



| ADMITS PER THOUSAND TIERS | Year 1 | Tier 3 | Tier 2 | Tie |
|---|---|---|---|---|
| Admit Per Thousand Target | 350 | 300 | 265 | 22 |

| ADMITS PER THOUSAND PAYMENT | Year 1 |
|---|---|
| Payment Amount Per Tier | |

Maxwell Ollivant, a former UnitedHealth nurse practitioner, filed a congressional declaration this month with help from Whistleblower Aid, asking the federal government to hold the healthcare giant accountable.

In an interview with the Guardian – his first-ever public comment on the nursing home initiative – Ollivant urged lawmakers to make sure that UnitedHealth was "not skimping out on care" and that patients were not "signing up for a service and not receiving the service when the time comes".

Ollivant previously filed a lawsuit in federal court in Washington state accusing UnitedHealth of withholding necessary services to nursing home residents, making their requests for Medicare payments violations of the federal False Claims Act. In 2023, the nurse practitioner dropped the suit after the Department of Justice declined to intervene. His congressional declaration provides new details of his experience.

In a statement, UnitedHealth said Ollivant "lacks both the necessary data and expertise" to assess the effectiveness of its programs. "The US Department of Justice investigated these allegations, interviewed witnesses, and obtained thousands of documents that demonstrated the significant factual inaccuracies in the allegations," the company said. "After reviewing all the evidence during its multi-year investigation, the Department of Justice declined to pursue the matter."

# Dubious diagnoses, delayed hospitalizations

UnitedHealth pitches its nursing home initiative as a positive for long-term residents. It provides them access to UnitedHealth nurse practitioners via in-person visits as well as to remote medical professionals who provide guidance to facility nurses at night and on weekends.

This "enhanced care coordination", as the company puts it, is supposed to help reduce unnecessary hospitalizations, which are costly for UnitedHealth and can expose patients to additional complications.

In several cases identified by the Guardian, the company's insertion of itself into nursing home emergency protocols helped delay or avert transfers for patients who could have benefited from immediate hospital care.



📷 UnitedHealthcare building in Phoenix, Arizona. Composite: Patrick T Fallon/AFP/Getty Images

In one incident from 2019, a remote UnitedHealth medical provider working for the program received a report shortly after midnight about a nursing home resident in Renton, Washington, who was slurring her words and unable to move her arm - textbook stroke symptoms.

In stroke cases, every minute counts. When blood flow to the brain is blocked or interrupted, brain cells quickly die. The sooner patients get to the

6/11/25, 12:42 PM
CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 149 of 179
Revealed: UnitedHealth secretly paid nursing homes to reduce hospital transfers | US healthcare | The Guardian

hospital, the better the chance doctors have to prevent long-term neurological damage.

In this case, the nurse at her nursing home reported to UnitedHealth that it looked like a stroke, according to an incident log. But instead of greenlighting an immediate hospitalization for a possible stroke, the remote UnitedHealth employee suggested the resident might be suffering from a less serious condition called a transient ischemic attack (TIA), a temporary loss of brain function caused by blood flow blockage.

The remote employee then advised the nurse to run a blood test and update the company again in four hours, confidential UnitedHealth records show.

The patient's independent primary care doctor told the Guardian she was never informed of this failure to transfer her patient.

"I would have wanted them to contact me right away so that I could have made a decision," she said, speaking on the condition of anonymity to discuss sensitive patient matters. "The time frame matters."

The independent doctor also said she was disturbed by the remote UnitedHealth employee's working diagnosis, which called for ruling out a TIA, rather than a stroke. The remote employee was an early-career nurse practitioner, not a physician.

"Their diagnosis says TIA, [but] nobody can say that so early," the patient's doctor said.

In another incident that year, a nursing home nurse in Puyallup, Washington, delayed hospitalizing a resident also exhibiting potential stroke symptoms because of UnitedHealth protocols that pushed facility staff to wait for guidance from the company.

According to confidential nursing home records obtained by the Guardian, the nurse phoned a remote UnitedHealth provider, who was unsure about what to do and failed to call for an immediate transfer. Tired of waiting for a callback, the nurse finally bypassed the remote provider and called an independent doctor, who ordered the patient to be transferred.

But the delay meant that about an hour passed before the resident was actually taken to the hospital, which was only a few minutes away from his facility.

After the belated hospitalization, the patient suffered permanent verbal slurring and facial droop on the right side of his face, audio recordings and

photos obtained by the Guardian show.

Citing confidentiality rules, UnitedHealth declined to comment on the specific patient cases. But the company noted that it does not prevent nursing homes themselves from contacting residents' independent doctors, and that hospitalization decisions can depend on many factors including a patient's goals of care, symptoms and the input of their care team.

## UnitedHealth's pressure on nursing home staff

UnitedHealth denied that its employees prevented hospital transfers and said it was the responsibility of the treating physician and the facility to decide on a patient's best course of care.

But in practice, the company's tactics put pressure on facility nurses to turn over patient care decisions to UnitedHealth staffers, according to internal documents and interviews with current and former UnitedHealth medical providers.

"There was never any caveat, given, like, 'It's up to you all,'" said one former UnitedHealth doctor involved in the program. Nurses at the long-term care facilities "were calling the nurse practitioner or on-call provider who was responsible. The implication was that they were calling for advice that was meant to be followed."

"A lot of times the nurses want to send people out and we have to go in and try to stop it," said another current UnitedHealth nurse practitioner, who also spoke to the Guardian anonymously citing fears of retaliation. "And if we don't, it's on us. They take us out on to the carpet."

In one patient case identified by the Guardian, nursing home staff sent a resident to the hospital because she was found unresponsive, drooling and with a "slant to the side" – possible stroke symptoms. She was admitted to the intensive care unit for a brain bleed, according to a UnitedHealth email reviewed by the Guardian.

But after the incident, instead of praising the facility team for the prompt hospitalization, a UnitedHealth manager alerted her subordinates that the facility team had bypassed the company's protocol, failing to contact UnitedHealth's remote on-call team first to receive guidance.

CASE 0:24-cv-01743-JMB-JFD Doc. 152-4 Filed 08/25/25 Page 151 of 179

The manager met with the nursing home's director of nursing services, and scheduled training to re-educate the facility's nurses, the email shows.

UnitedHealth notes that unnecessary hospitalizations can expose patients to pressure injuries, falls and other complications. In response to questions from the Guardian, UnitedHealth pointed to one 2019 study which heralded the program's success in reducing hospitalizations and noted the potential harms of hospital care.

But in an interview with the Guardian, Ollivant, the former UnitedHealth nurse practitioner turned whistleblower, argued such analyses fail to account for the negative health outcomes that patients suffer from missing hospital care.

"How many of those people were further harmed because they never received the care that they needed?" he said. "When you just look at the percentage reductions in hospitalizations, it doesn't say anything about patient outcomes."

## A plan of care, an ailing patient

Kevin Keep never knew – until the Guardian called him last month and told him – that his father had suffered a possible stroke at a nursing home that partnered with UnitedHealth.

On the evening of 23 February 2019, a UnitedHealth remote employee received a report about Keep's father, Donald Keep, a retired auto mechanic with dementia and an amputated leg living at a nursing home in Bremerton, Washington.

On that day, Keep was experiencing forgetfulness and drooping on the right side of his face – "possible stroke symptoms", according to a confidential UnitedHealth incident log.

But instead of sending the octogenarian straight to the hospital, the remote employee referred to a plan of care that called for bloodwork and giving Keep an aspirin – a course of action which



one former UnitedHealth doctor said "doesn't make sense", given the risk of brain damage.

"That's not useful when it might be a stroke," said the doctor, who spoke on the condition of anonymity to comment on Keep's confidential patient records that he reviewed at the request of the Guardian. "What they really need is a physical exam and an MRI of the brain, and it needs to be done expeditiously."

📷 Donald Keep on his wedding day.
Photograph: Kevin Keep

The incident log, which doesn't mention a hospital transfer, suggests that the UnitedHealth team didn't treat the case with the urgency that a possible stroke would require.

Keep's symptoms were logged shortly before 10pm on a Saturday night. The next afternoon, a UnitedHealth employee emailed the company's nurse practitioners a follow-up note to look into what was wrong with Keep.

The email lists the proposed work-up as being for a "TIA" – the transient, less serious neurological condition, not a stroke.

As of 4pm on that Sunday, more than 18 hours after Keep was found with his face drooping, the work-up was still listed as "pending".

Citing patient confidentiality, UnitedHealth did not respond to an inquiry about whether the retiree was ever sent to the hospital.

*Hannah Recht contributed data reporting*

CASE 0:24-cv-01743-JMB-JFD Doc. 153-4 Filed 08/25/25 Page 153 of 179

## Most viewed

# EXHIBIT 18

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/u-s-launches-antitrust-investigation-of-healthcare-giant-unitedhealth-ff5a00d2

HEALTH | HEALTHCARE

# U.S. Opens UnitedHealth Antitrust Probe

Investigators question industry officials who compete with the healthcare giant

By *Anna Wilde Mathews* [ Follow ] and *Dave Michaels* [ Follow ]

*Updated* Feb. 27, 2024 5:32 pm ET



UnitedHealth offices in Minnetonka, Minn. PHOTO: UNITEDHEALTH GROUP/VIA REUTERS

The Justice Department has launched an antitrust investigation into UnitedHealth, owner of the biggest U.S. health insurer, a leading manager of drug benefits and a sprawling network of doctor groups.

The investigators have in recent weeks been interviewing healthcare-industry representatives in sectors where UnitedHealth competes, including doctor groups, according to people with knowledge of the meetings.

During their interviews, investigators have asked about issues including certain relationships between the company's UnitedHealthcare insurance unit and its Optum health-services arm, which owns physician groups, among other assets.

Investigators have asked about the possible effects of the company's doctor-group acquisitions on rivals and consumers, the people said.

Spokespeople for UnitedHealth and the Justice Department declined to comment. UnitedHealth executives have said Optum and UnitedHealthcare don't favor one another, and routinely work with competitors.

The probe comes as the Biden administration's antitrust enforcers have stepped up investigations of some of the biggest U.S. companies, such as Apple, Amazon.com, Live Nation Entertainment and Alphabet's Google unit. The Justice Department's top antitrust official, Jonathan Kanter, has pushed to revive enforcement of laws that restrain monopolies in the U.S. The department has had mixed results on merger enforcement, but its challenges to monopolies are continuing.

The administration has signaled the healthcare industry is a priority in its antitrust efforts.

The UnitedHealth investigation is taking aim at a healthcare giant that has been a previous antitrust target, though the company was able to beat back a Justice Department challenge to an acquisition two years ago.

UnitedHealth, based in Minnetonka, Minn., had $372 billion in revenue last year. Its insurance unit covers about 53 million people, across a range of plans including employer, Medicaid and Medicare coverage.

After years of acquisitions, Optum includes about 90,000 physicians, as well as surgery centers, an array of health data and technology units, and one of the largest pharmacy-benefit managers.

The Justice Department has been scrutinizing UnitedHealth's planned acquisition of home-health company Amedisys for about $3.3 billion. Amedisys said in August it had received a second request for information about the planned deal from Justice Department antitrust enforcers.

UnitedHealth is also facing a private antitrust suit by a California hospital system called Emanate Health, alleging that the company tried to strong-arm the nonprofit over its affiliated physician groups and exert control over primary-care doctors in its region.

The new Justice Department inquiry, reported earlier by the Examiner News, a news organization based in New York's Hudson Valley, is partly examining Optum's acquisitions of doctor groups and how the ownership of physician and health-plan units affects competition, according to the people with knowledge of the matter.

Investigators have asked whether UnitedHealthcare favored Optum-owned groups in its contracting practices, potentially squeezing rival physicians out of certain types of attractive payment arrangements.

Investigators have also explored whether Optum's ownership of healthcare providers could present challenges to health insurers that are rivals to UnitedHealthcare.

In addition, the Justice Department officials are investigating Medicare billing issues, including the company's practices around documenting patients' illnesses.

Payments to Medicare plans go up if patients have more health conditions, so aggressive documentation practices by doctors and other healthcare providers can be lucrative for insurers such as UnitedHealthcare.

And investigators have asked whether and how the tie-up between UnitedHealthcare and Optum medical groups might affect its compliance with federal rules that cap how much a health-insurance company retains from the premiums it collects from customers.

Under those rules, insurance plans are supposed to absorb no more than 15% or 20% of the premium for their administrative costs and profits, with the percentage varying depending on the type of plan. The rest is supposed to be spent on patient care, or rebated back to customers.

When the same company owns both the health insurer and the physicians and other healthcare providers who take care of patients, the combined firm may absorb far more than the capped amount, however.

In 2022, the Justice Department lost its challenge aimed at blocking Optum's acquisition of health-technology firm Change Healthcare. In that case, the Justice Department zeroed in on the alleged anticompetitive potential of putting

the insurer and Change under the same corporate parent. UnitedHealth Chief Executive Andrew Witty testified in that case that Optum maintains a "strictly arm's length relationship" with UnitedHealthcare.

A federal judge rejected the Justice Department's arguments, and Change is now part of Optum.

Write to Anna Wilde Mathews at Anna.Mathews@wsj.com and Dave Michaels at dave.michaels@wsj.com

*Appeared in the February 28, 2024, print edition as 'UnitedHealth Faces New Probe By DOJ Over Antitrust Issues'.*

## Videos

CASE 0:24-cv-01743-JMB-JFD    Doc. 152-4    Filed 08/25/25    Page 159 of 179

# EXHIBIT 19

Exclusive | UnitedHealth Medicare Billing Practices Under Investigation by DOJ - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/health/healthcare/unitedhealth-medicare-doj-diagnosis-investigation-66b9f1db

**EXCLUSIVE**    **HEALTHCARE**

# DOJ Investigates Medicare Billing Practices at UnitedHealth

Civil probe of diagnoses that triggered extra payments to the company's Medicare Advantage plans adds to scrutiny of the healthcare giant

By *Christopher Weaver* [Follow] and *Anna Wilde Mathews* [Follow]
*Updated Feb. 21, 2025 9:42 am ET*



The Justice Department's look into UnitedHealth's billing practices is separate from a longer-running antitrust probe. PHOTO: MAANSI SRIVASTAVA FOR WSJ

The Justice Department has launched an investigation into UnitedHealth Group's UNH **-8.79%** ▼ Medicare billing practices in recent months, people familiar with the matter say.

The new civil fraud investigation is examining the company's practices for recording diagnoses that trigger extra payments to its Medicare Advantage plans, including at physician groups the insurance giant owns.

A series of articles in The Wall Street Journal last year showed that Medicare paid UnitedHealth billions of dollars for questionable diagnoses. Attorneys with the Justice Department as recently as Jan. 31 interviewed medical providers named in the articles.

In the Medicare Advantage system, insurers get lump-sum payments from the federal government to oversee enrollees' Medicare benefits. When patients have certain diagnoses, the payments go up, creating an incentive to diagnose more diseases.

Shares in UnitedHealth fell more than 8% in early trading Friday, weighing on the Dow Jones Industrial Average.

The Medicare billing investigation adds to the scrutiny on UnitedHealth, the $400 billion company that owns the largest U.S. health insurer and a sprawling network of other health-industry assets including its doctor practices, a large pharmacy-benefit manager and data and technology operations.

The civil investigation, some of the people said, is separate from a longer-running Justice Department antitrust probe that the Journal reported last February. The DOJ also has sued to block UnitedHealth's $3.3 billion planned acquisition of home-health company Amedisys on antitrust grounds.



The probe of UnitedHealth's Medicare billing comes on top of a DOJ effort to block its planned $3.3 billion acquisition of a home-health company. PHOTO: PATRICK SISON/ASSOCIATED PRESS

A spokesman for the Justice Department declined to comment. A spokeswoman for the Department of Health and Human Services' Office of Inspector General,

which is also involved in the civil fraud probe, declined to comment.

UnitedHealth declined to comment. UnitedHealth previously has said its practices lead to more accurate diagnoses, that it performs well in Medicare audits and that its approach benefits patients.

In December, the Journal reported that its analysis of billions of Medicare records showed that patients examined by UnitedHealth-employed doctors had huge increases in lucrative diagnoses after joining the company's Medicare Advantage plans.

Doctors said UnitedHealth, based in the Minneapolis area, trained them to document revenue-generating diagnoses, including some they felt were obscure or irrelevant. The company also used software to suggest conditions and paid bonuses for considering the suggestions, among other tactics, according to the doctors.

Last summer, the Journal also reported that UnitedHealth added diagnoses to patients' records for conditions that no doctor treated, which triggered an extra $8.7 billion in federal payments in 2021. The untreated diagnoses stemmed from sources including in-home visits by nurses working for the company's HouseCalls unit. Each visit by the UnitedHealth-employed nurses was worth an average of $2,735 in additional federal payments, a Journal analysis of Medicare data spanning 2019 to 2021 found.

Last month, Justice Department lawyers from the offices of the U.S. Attorney for Minnesota and the Washington, D.C.-based Civil Division contacted at least three doctors and a nurse practitioner who were named in the Journal's story on UnitedHealth-owned clinics. One of the people was told the health department's Office of Inspector General was involved as well.

Three said they were questioned about specific diagnoses UnitedHealth promoted for employees to use with patients, incentive arrangements and pressure to add the diagnoses. At least two provided documents, including a contract with a UnitedHealth unit, to the Justice Department.

Valerie O'Meara, a nurse practitioner who worked for UnitedHealth in Washington state, said she was interviewed on Jan. 31 by Justice Department

attorneys who were interested in the company software that suggested diagnoses and the role of a UnitedHealth manager who she said urged her to make new diagnoses beyond what doctors had treated.

The attorneys zeroed in on certain diagnoses the company often suggested, such as an obscure hormonal condition called secondary hyperaldosteronism, she said. The Journal's analysis found the condition was rarely diagnosed by Medicare doctors not working for UnitedHealth.

O'Meara said the attorneys focused on her account of how she was told she could add the hyperaldosteronism diagnosis to patients' records without a lab test.

More broadly, she said, "they were looking at, 'Is this abuse?' "

UnitedHealth has said its practices help detect diseases earlier, saving money for the health system. The company says Medicare Advantage plans generate better health outcomes and reduce costs.

In a press release published on its website on Dec. 30, UnitedHealth said the Journal's articles "rely on often incomplete and inaccurate data to conduct flawed studies through a murky government 'agreement'."

The Journal's analyses used data UnitedHealth and other Medicare Advantage insurers themselves submitted to the federal government for payment purposes. Reporters accessed the data under a standard research agreement with the agency overseeing Medicare.

UnitedHealth has faced investigations of its diagnosis-documenting practices before, and its Medicare payments have been examined in health department inspector general reports. The Justice Department took over an earlier lawsuit by a former UnitedHealth employee alleging the company failed to retract inaccurate diagnoses added to patients' records.

UnitedHealth has disputed the allegations against it in that continuing case.

Write to Christopher Weaver at Christopher.Weaver@wsj.com and Anna Wilde Mathews at Anna.Mathews@wsj.com

## We Want to Hear From You

Have you had a Medicare Advantage plan? Share your experience with us.

Name*

Email*

City, State*

SUBMIT

By submitting your response to this questionnaire, you consent to Dow Jones processing your special categories of personal information and are indicating that your answers may be investigated and published by The Wall Street Journal and you are willing to be contacted by a Journal reporter to discuss your answers further. In an article on this subject, the Journal will not attribute your answers to you by name unless a reporter contacts you and you provide that consent.

## Further Reading

### Health Insurers Deny 850 Million Claims a Year. The Few Who Appeal Often Win.

### How Health Insurers Racked Up Billions in Extra Payments From Medicare Advantage

UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare

How American Health Insurance Got So Infuriating

J&J Accuses Big Health Insurer of Helping Drain Its Drug Copay Funds

---

**Videos**

# EXHIBIT 20

**HEALTH TECH**

# Device maker that helped UnitedHealth collect billions offers to settle fraud claims with DOJ

Semler Scientific proposes nearly $30 million, but government could still reject offer



Cleared in 2015 through an FDA pathway that requires limited testing, QuantaFlo calculates artery blood volume by measuring reflected infrared light through sensors placed on a patients' fingers and toes. STAT

By Lizzy Lawrence    April 16, 2025

FDA Reporter

Semler Scientific has offered to pay the Department of Justice nearly $30 million to settle federal health care fraud claims related to its peripheral artery disease test, QuantaFlo — a product used by UnitedHealth Group and other large insurers.

Semler revealed the preliminary agreement in an SEC filing Tuesday, but noted the government could still reject the offer. The deal would cap an investigation Semler first disclosed in February into whether federal health programs paid out improper claims based on the use of QuantaFlo, which would violate the False Claims Act. The DOJ began looking into the company in 2017, according to Semler, but re-upped its investigation in late 2024 and early 2025.

"Should the parties not be able to reach settlement and DOJ file a complaint, Semler Sci intends to vigorously defend itself in any such action," Semler wrote.

The company also offered an early, unaudited look into its finances. Semler anticipates reporting just under $9 million in revenue for the first quarter of this year, which would be a 44% decline from the same period last year. Semler did not explain why revenue dropped so much and did not immediately respond to a request for comment from STAT.

The company also has leaned heavily into Bitcoin in recent months, but has lost around $42 million in those holdings since December.

Semler's only product is QuantaFlo, which calculates artery blood volume by measuring reflected infrared light through sensors placed on a patient's fingers and toes. It was cleared by the Food and Drug Administration in 2015 through a pathway that requires limited clinical testing. It is meant to serve as a tool to aid doctors in diagnosing peripheral artery disease, not to be used as a standalone diagnostic device.

But a STAT investigation last year revealed that UnitedHealth Group, which owns the country's largest Medicare Advantage insurer, used QuantaFlo as a standalone diagnostic on patients in their clinics and their homes. The company dramatically boosted Medicare reimbursements by using QuantaFlo to screen patients for vascular disease. Nine clinicians told STAT that many of the diagnoses were not medically useful, either because they were false positives or because they flagged early-stage disease, which isn't typically treated.

5/1/25, 4:13 PM
CASE 0:24-cv-01743-JMB-JFD   Doc. 152-4   Filed 08/25/25   Page 170 of 179
test maker that helped UnitedHealth collect billions, offers to settle with DOJ

Each diagnosis of the disease is worth about $3,000 a year from Medicare. UnitedHealth dramatically scaled up use of QuantaFlo in recent years through its HouseCalls program, in which it sends clinicians to the homes of insured patients to conduct medical examinations for various chronic illnesses. The company also pressed doctors to use QuantaFlo in UnitedHealth-owned clinics.

From 2018 to 2021, UnitedHealth tallied more than 1.3 million unspecified artery disease diagnoses, according to an analysis conducted for STAT by the Lown Institute, a nonpartisan health research organization. Based on the roughly $3,000 value of each diagnosis in Medicare reimbursement, UnitedHealth took in approximately $4 billion in taxpayer money from both valid and questionable peripheral artery disease diagnoses during that four-year stretch.

Medicare began cracking down on the aggressive diagnosis of peripheral artery disease in 2024, removing a diagnostic code from its payment formula that allowed UnitedHealth and other Medicare Advantage insurers to get extra reimbursement for diagnosing patients even if they weren't experiencing symptoms. In the following months, diagnoses of the condition began to decline.

Semler's main customers are UnitedHealth and other private insurers. Signify Health, a company owned by CVS Health that conducts home visits for Medicare Advantage insurers, also used the test on behalf of several large clients.

UnitedHealth did not immediately respond to a request for comment from STAT. In a statement provided in response to STAT's findings last year, UnitedHealth wrote: "Screening patients with an increased risk for PAD aligns with guidance provided by the American Heart Association and the American College of Cardiology, and helps to identify and treat an under-diagnosed condition that, if left unmonitored and untreated, can lead to serious health consequences."

# EXHIBIT 21

# How UnitedHealth Quietly Boosted Earnings With Asset Sales

🅑 **bloomberg.com**/news/features/2025-07-15/how-unitedhealth-quietly-boosted-earnings-with-asset-sales

Michelle F Davis, Zachary R Mider, Ike Swetlitz, John Tozzi                    July 15, 2025



By [Michelle F Davis](#), [Zachary R Mider](#), [Ike Swetlitz](#), and [John Tozzi](#)
Until this year, [UnitedHealth Group Inc.](#) had managed to pull off an impressive feat: more than 60 consecutive quarters of earnings that beat Wall Street estimates.

As the end of last year approached, that streak was getting harder to maintain. Ballooning medical costs and stricter government payment policies were eroding the health conglomerate's profit margin.

But shortly before the books closed for 2024, more profits appeared. They came from the discreet sale of stakes in business units to firms including Warburg Pincus and KKR & Co., according to people familiar with the matter. Some of the deals included terms that could require UnitedHealth to buy the interests back at a higher price in a matter of years, the people said.

Those terms — along with UnitedHealth's insistence that transactions be completed by Dec. 31 and not be publicized even after they closed — gave people with knowledge of the deals the sense that the insurance giant was putting them together with an eye toward meeting earnings targets.

In the end, the deals helped UnitedHealth book an additional $3.3 billion of annual profit, mostly in the fourth quarter. The company alluded to the dispositions in its January earnings statement and analyst call, saying they improved operating costs. It disclosed the $3.3 billion in its annual report the next month, without specifying what it sold.

Details about UnitedHealth's year-end deals haven't been previously reported and the effect on earnings went little noticed by Wall Street analysts at the time. Without the gain, the company would have missed estimates for the first time in more than 15 years.

UnitedHealth counted the $3.3 billion from asset sales toward last year's operating income and adjusted earnings per share, two closely watched profit measures. At the same time, it excluded a $7.1 billion loss on the sale of its Brazil business from those measures. The moves were "unusual" but allowed under US accounting rules, said Jack Ciesielski, an accounting analyst and the founder of R.G. Associates Inc. in Baltimore.

"If the company is manufacturing earnings by chopping up their furniture or selling their assets, that's not exactly a great business model," Ciesielski said. "The risk is that it might be masking a weakness in the operations."

A UnitedHealth spokesman said the company had valid business reasons for the deals and has consistently reported gains and losses from routine asset sales — what it calls "portfolio refinement" — in operating costs and adjusted earnings. The sale of the Brazil unit was excluded because the company left the market entirely, making it an infrequent occurrence that included losses from foreign currency effects, he said.

"We certainly stand by our practices yet these matters are hardly news, since we disclosed the information through quarterly earnings calls, SEC filings and more dating back to January," he said in an emailed statement.

Companies report adjusted earnings figures to give investors a clearer view of the ongoing profitability of an enterprise, often by excluding events such as asset sales that don't reflect the normal course of business. There's no formal definition of the figures under accounting rules, but companies are required to be consistent about which kinds of items are included or excluded, Ciesielski said. As long as the company can argue the transactions were fundamentally different — as UnitedHealth does with its Brazil sale — there's no conflict with disclosure rules, he said.

UnitedHealth went on to snap its streak of earnings outperformance in the first quarter and withdraw its forecast for 2025, citing higher-than-expected costs in Medicare Advantage. Chief Executive Officer Andrew Witty abruptly resigned in May, replaced by former CEO Stephen Hemsley. The *Wall Street Journal* reported the next day that the insurer is under criminal investigation over Medicare billing practices. The company has defended its practices.

Inside UnitedHealth, there's a culture of meeting financial targets and pressure to find ways to make up for missing targets, according to people close to the firm. Witty, in the company's fourth-quarter earnings call in January, said that the insurer delivers on its commitments to investors.

"Even in highly challenging periods like 2024, our results bear out that we find a way, even if it's not always how we may have initially envisioned the path," he said.

But some analysts didn't grasp the deals' impact on earnings until later. An April 28 note from Wolfe Research noted that "a thorough reading of disclosures" revealed the gains from asset sales, and stripping those out would lead to a lower baseline for earnings. John Ransom, an analyst at Raymond James, slashed his profit forecast for UnitedHealth in May after combing through the annual report and finding details about the gains. He called those earnings "low-quality and non-recurring in nature."

The gains "probably should not have been included in the adjusted earnings," said Jeff Jonas, a portfolio manager at Gabelli Funds, which owns UnitedHealth shares. Proceeds from a sale couldfar exceed a unit's annual earnings, he said. "When you include that gain, you're really including the equivalent of multiple years of earnings in one year."

Jonas said he didn't realize the full extent of how the gains had affected the 2024 results until around the time of the CEO change in May.

"I think a lot of us, including myself, were missing it or just giving them the benefit of the doubt because everyone loved the company and they'd been so consistent for so many years," Jonas said.

The UnitedHealth spokesman said the company aims to help stakeholders understand its business performance "through compliant, transparent and useful disclosures."

## Making Deals

While best known for its UnitedHealthcare insurance unit that covers more than 50 million people, UnitedHealth gets a growing share of revenue and profits from health-services businesses under its Optum arm, which it built through dozens and dozens of acquisitions. At

the same time, the Eden Prairie, Minnesota-based company is facing government scrutiny that has made it increasingly difficult to conduct the types of deals that have fueled its growth.

The Department of Justice last year sued to block UnitedHealth's takeover of Amedisys, a home health company. The government previously unsuccessfully tried to block its acquisition of Change Healthcare, which provides the infrastructure for health insurance payments. The Federal Trade Commission is suing UnitedHealth and two rivals over insulin costs. UnitedHealth has called the FTC case "baseless" and said it misunderstands how drug pricing works.

The increased scrutiny has made some counterparties nervous to sell to UnitedHealth. The company earlier this year offered to buy health-tech firm Edifecs but its private equity owners went with a lower offer in part because they were worried that a deal with UnitedHealth would get caught in regulatory limbo, people familiar with the matter said.

UnitedHealth, which has a market value of $273 billion, has said that deals that it considers to be relatively minor don't meet its threshold for requiring material disclosure. But the company has gone a step further, sometimes asking its private equity counterparties not to disclose information about their new investments as well, people familiar with the matter said. (The UnitedHealth spokesman said the company discloses transactions when it or the counterparty is legally obligated to do so.)

A handful of deals, some of which were struck in December, accounted for the bulk of the $3.3 billion gain, some of the people said.

Warburg Pincus, for example, purchased a controlling stake in a UnitedHealth hearing-benefits business known as Epic Hearing Healthcare. The company's website still identifies it as part of UnitedHealthcare, but a recent job posting by UnitedHealth stated that Epic Hearing is a joint venture with Warburg Pincus that "will become an independent company."

The private equity firm also invested in a UnitedHealth unit in Louisville, Kentucky, that helps health plans identify third parties that might be responsible for paying medical claims, a process known as subrogation, some of the people said. In April, UnitedHealth posted a job opening involving its subrogation business in Kentucky that referenced "the OptumInsight/Warburg Pincus joint venture."

KKR, meanwhile, invested in a UnitedHealth business that provides fitness programs for seniors on Medicare, some of the people said. There's similarly no mention of the investment on the company's website. Business records on file in Delaware show UnitedHealth formed a limited partnership in December whose general partner is a company located at KKR's New York headquarters.

4/5

Neither Warburg nor KKR announced the deals. Representatives for the firms declined to comment.

In some of the deals, UnitedHealth is getting an earnings benefit from selling stakes in assets without necessarily parting with them forever. It retains options to buy back its stakes within a few years. If it doesn't, the private-equity firms can later force it to buy them back at a higher price.

UnitedHealth could end up paying as much as $3.4 billion if it buys stakes back under the options, it said in the annual report.

In January, UnitedHealth reported fourth-quarter adjusted earnings of $6.81 a share, beating the Wall Street profit forecast by a dime. The gains from the stake sales were worth roughly $3.50 a share and took place mostly in the fourth quarter — enough to spell the difference between barely meeting expectations and missing them by wide margins.

UnitedHealth also reported the gains as part of annual operating income, a measure that typically reflects the money generated from a company's core business activities, such as selling insurance. As with adjusted earnings, companies have broad leeway to determine what's operating income and what isn't, said Tom Linsmeier, chair of the accounting and information systems department at Wisconsin School of Business and a former member of the Financial Accounting Standards Board. Still, he called UnitedHealth's handling of the matter "curious."

"It's reasonable to ask why losses on strategic transactions are outside of operating income, but a huge gain on a strategic transaction is within operating income," he said.

5/5

# EXHIBIT 22

CHARLES E. GRASSLEY, IOWA, CHAIRMAN

LINDSEY O. GRAHAM, SOUTH CAROLINA    RICHARD J. DURBIN, ILLINOIS
JOHN CORNYN, TEXAS                   SHELDON WHITEHOUSE, RHODE ISLAND
MICHAEL S. LEE, UTAH                 AMY KLOBUCHAR, MINNESOTA
TED CRUZ, TEXAS                      CHRISTOPHER A. COONS, DELAWARE
JOSH HAWLEY, MISSOURI                RICHARD BLUMENTHAL, CONNECTICUT
THOM TILLIS, NORTH CAROLINA          MAZIE K. HIRONO, HAWAII
JOHN KENNEDY, LOUISIANA              CORY A. BOOKER, NEW JERSEY
MARSHA BLACKBURN, TENNESSEE          ALEX PADILLA, CALIFORNIA
ERIC SCHMITT, MISSOURI               PETER WELCH, VERMONT
KATIE BOYD BRITT, ALABAMA            ADAM B. SCHIFF, CALIFORNIA
ASHLEY MOODY, FLORIDA

**United States Senate**

COMMITTEE ON THE JUDICIARY

WASHINGTON, DC 20510–6275

February 24, 2025

<u>**VIA ELECTRONIC TRANSMISSION**</u>

Mr. Andrew Witty
Chief Executive Officer
UnitedHealth Group, Inc.

Dear Mr. Witty:

Twenty-five years ago, I helped shepherd Medicare Part C into law, and I have repeatedly advocated for the program.[1]  Further, since 2015, I have pressed the Centers for Medicare & Medicaid Services (CMS) and the Department of Justice (DOJ) to recover improper payments made to Medicare Advantage Organizations (MAO), including UnitedHealth Group.[2]  Despite these oversight efforts, MAOs continue to defraud the American taxpayer, costing them billions of dollars a year.[3]

On February 21, 2025, the *Wall Street Journal* published an article titled, "DOJ Investigates Medicare Billing Practices at UnitedHealth," which reported that the DOJ launched an investigation into UnitedHealth Group's Medicare billing practices.[4]  According to the *Journal*, UnitedHealth Group used in-home health risk assessments (HRA) and chart reviews to diagnose enrollees with obscure revenue-generating diagnoses that were irrelevant or inaccurate.[5]  Further, according to the reporting, the inappropriate diagnoses resulted in extra payments of $8.7 billion in just 2021.[6]

On October 24, 2024, the Health and Human Services Office of Inspector General (HHS OIG) released a report titled, *Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions*.[7]  The HHS OIG found that UnitedHealth Group received more money from CMS for diagnoses only made during in-home HRAs and chart reviews than any other MAO.[8]  The OIG, which

---

[1] Thomas Oliver, Philip Lee, and Helene Lipton, *A Political History of Medicare and Prescription Drug Coverage*, The Millbank Quarterly (June 2004), https://pmc.ncbi.nlm.nih.gov/articles/PMC2690175/; Webpage, Cuts to the Medicare Advantage Program, Off. of Senator Charles E. Grassley (Feb. 27, 2014), https://www.grassley.senate.gov/news/video/watch/cuts-to-the-medicare-advantage-program; Letter from Senator Charles E. Grassley, Chairman, Senate Comm. on Finance, to Seema Verna, Administrator, Cntrs. for Medicare & Medicaid Srvcs. (Mar. 29, 2019), https://www.finance.senate.gov/imo/media/doc/03292019%20Medicare%20Advantage%20Letter.pdf.

[2] Letter from Senator Charles E. Grassley, Ranking Member, Senate Comm. on the Budget, to Chiquita Brooks-LaSure, Administrator, Cntrs. for Medicare & Medicaid Srvcs. (Dec. 16, 2024), https://www.grassley.senate.gov/imo/media/doc/grassley_to_cms_-_radv_final_rule.pdf; Letter from Senator Charles E. Grassley, Chairman, Senate Comm. on the Judiciary, to Seema Verna, Administrator, Cntrs. for Medicare & Medicaid Srvcs. (Apr. 17, 2017), https://www.grassley.senate.gov/imo/media/doc/2017-04-17%20CEG%20to%20CMS%20(Risk%20Score%20Follow%20Up).pdf; Letter from Senator Charles E. Grassley, Chairman, Senate Comm. on the Judiciary, to Andrew Slavitt, Administrator, Cntrs. for Medicare & Medicaid Srvcs. (May 19, 2015), https://media.npr.org/documents/2015/may/grassley_cms.pdf; Letter from Senator Charles E. Grassley, Chairman, Senate Comm. on the Judiciary, to Loretta Lynch, Attorney General, Dept. of Justice (May 19, 2015), https://media.npr.org/documents/2015/may/grassley_doj.pdf.

[3] *Medicare Advantage Provider Independent Health to Pay Up To $98M to Settle False Claims Act Suit*, Dept. of Justice (Dec. 20, 2024), https://www.justice.gov/archives/opa/pr/medicare-advantage-provider-independent-health-pay-98m-settle-false-claims-act-suit; *Oak Street Health Agrees to Pay $60M to Resolve Alleged False Claims Act Liability for Paying Kickbacks to Insurance Agents in Medicare Advantage Recruitment Scheme*, Dept. of Justice (Sep. 18, 2024), https://www.justice.gov/archives/opa/pr/oak-street-health-agrees-pay-60m-resolve-alleged-false-claims-act-liability-paying-kickbacks.

[4] Christopher Weaver and Anna Wilde Mathews, *DOJ Investigates Medicare Billing Practices at UnitedHealth*, The Wall Street Journal (Feb. 21, 2025), https://www.wsj.com/health/healthcare/unitedhealth-medicare-doj-diagnosis-investigation-66b9f1db?msockid=1979114121c76140288a04d6207560b1.

[5] *Id*.; Christopher Weaver, Anna Wilde Mathews, and Tom McGinty, *UnitedHealth's Army of Doctors Helped It Collect Billions More From Medicare*, The Wall Street Journal (Dec. 29, 2024), https://www.wsj.com/health/healthcare/unitedhealth-medicare-payments-doctors-c2a343db?msockid=1979114121c76140288a04d6207560b1; Anna Wilde Mathews et al., *The One-Hour Nurse Visits That Let Insurers Collect $15 Billion From Medicare*, The Wall Street Journal (Aug. 4, 2024), https://www.wsj.com/health/healthcare/medicare-extra-payments-home-visits-diagnosis-057dca8b?msockid=1979114121c76140288a04d6207560b1; Christopher Weaver et al., *Insurers Pocketed $50 Billion From Medicare for Diseases No Doctor Treated*, The Wall Street Journal (July 8, 2024), https://www.wsj.com/health/healthcare/medicare-health-insurance-diagnosis-payments-b4d99a5d?msockid=1979114121c76140288a04d6207560b1.

[6] Weaver & Mathews, *supra* note 4.

[7] U.S. Dep't of Health and Human Services, Office of Inspector General, *Medicare Advantage: Questionable Use of Health Risk Assessments Continues To Drive Up Payments to Plans by Billions*, OEI-03-23-00380 (Oct. 24, 2024), https://oig.hhs.gov/documents/evaluation/10028/OEI-03-23-00380.pdf.

[8] *Id.*

reviewed all MAO enrollees, noted that, "the lack of any other follow-up visits, procedures, tests, or supplies for these diagnoses…raises concerns that either: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions reported only on HRAs or HRA-linked chart reviews."[9]  In this context, UnitedHealth Group benefited financially more than any other MAO, which raises serious questions about its practices.  The apparent fraud, waste, and abuse at issue is simply unacceptable and harms not only Medicare beneficiaries, but also the American taxpayer.

For Congress and the American public to better understand UnitedHealth Group's billing practices, please provide answers to the following questions no later than March 10, 2025:

1. What steps has UnitedHealth Group taken to review all diagnoses submitted to CMS for its Medicare Advantage enrollees ("enrollees") that were identified only by HRAs or chart reviews (either manual or artificial intelligence) and to identify all submitted diagnoses that are obscure, irrelevant, or inaccurate? Quantify the number and amount of inappropriate payments identified as a result of these actions. Provide all records.[10]

2. Provide all records that relate to the compliance program that UnitedHealth Group had in place from 2019-2024 to monitor the accuracy and appropriateness of the diagnosis codes submitted to CMS for enrollees, including the design and results of all audits conducted.

3. Provide all training manuals and guidance documents for conducting HRAs and manual chart reviews, a list of all software used during the course of an HRA and a manual chart review, and the logic rules for all electronic decision support tools embedded in the software.  Does UnitedHealth Group use artificial intelligence to conduct the aforementioned processes?  Are all diagnoses identified by artificial intelligence confirmed by a trained medical record reviewer?

4. Provide all policies and procedures for obtaining diagnostic confirmation from an enrollee's primary care provider and ensuring the receipt of treatment for a new diagnosis identified by an HRA or a chart review.  Provide all documentation related to compliance audits of this process.

Thank you for your prompt review and response.  If you have any questions, please contact Tucker Akin with my Committee staff at (202) 224-5225.

Sincerely,

Charles E. Grassley
Chairman
Committee on the Judiciary

---

[9] *Id.*

[10] Records" include any written, recorded, or graphic material of any kind, including letters, memoranda, reports, notes, electronic data (e-mails, email attachments, and any other electronically-created or stored information), calendar entries, inter-office communications, meeting minutes, phone/voice mail or recordings/records of verbal communications, and drafts (whether or not they resulted in final documents).