# EXHIBIT 9

CASE 0:24-cv-01743-JMB-JFD    Doc. 158-9    Filed 08/29/25    Page 2 of 14



NATSUMI CHIKAYASU FOR STAT

A STAT INVESTIGATION

# Health Care's *Colossus*

---

**UnitedHealth pays its own physician groups considerably more than others, driving up consumer costs and its profits**

*By* Bob Herman, Casey Ross, Lizzy Lawrence, *and* Tara Bannow

Nov. 25, 2024

**This is part 5 of Health Care's Colossus**, a series about how UnitedHealth Group wields its unrivaled physician empire to boost its profits and expand its influence.

UnitedHealth Group is paying many of its own physician practices significantly more than it pays other doctor groups in the same markets for similar services, undermining competition and driving up costs for consumers and businesses, a STAT investigation reveals.

The findings, drawn from a sample of practices across the country, expose the effects of a deepening conflict of interest: Rather than use its size and market power to drive down the cost of care, UnitedHealth, as the corporate parent of both a dominant insurance company and health care provider, can capture larger profits by paying itself higher prices for basic checkups, surgeries, and procedures.

STAT uncovered the above-market payments in a first-of-its-kind analysis conducted in partnership with health analytics company Tribunus Health. The analysis examined UnitedHealth's own data, which must be reported to the federal government, showing what its commercial insurance unit pays 16 of its Optum-branded doctor groups for common or expensive services that account for the most spending.

The higher prices reward UnitedHealth at the expense of almost everyone else. Patients end up paying more when they see their doctors and struggle to afford recommended follow-up care. Employers counting on the insurance giant to control ever-rising costs get little or no relief. And doctors trying to compete with UnitedHealth's practices find themselves frozen out of the higher rates the company is paying its own providers, making it more difficult to remain independent and keep their doors open.

STAT previously reported how UnitedHealth has used an unparalleled empire of clinicians to make older patients appear sicker and extract higher government payments for its Medicare Advantage business. The new investigation highlights the consequences of UnitedHealth's growing control of physicians on the broader commercial insurance marketplace, funded by employers and their workers.

The analysis found that UnitedHealthcare, the company's insurance subsidiary, paid 13 of the 16 Optum practices more on average for common services than the market price, which refers to the average UnitedHealthcare pays in-network providers, including Optum and non-Optum practices, within the same specialty in a given county or service area.

There's variability within that finding — UnitedHealthcare paid Optum practices anywhere from 3% to 111% above the market average. The analysis has limitations and isn't comprehensive. For example, UnitedHealth's own data files are imperfect and do not include certain information, like how common certain services are at individual practices, or the type of facility where care was provided. And the analysis included only a subset of common services and procedures (read the methodology below).

## How UnitedHealth payments to its provider groups compare to the market average

Rate at which UnitedHealth compensates its own practices compared to the average market rate



| | |
|---|---|
| Kelsey Seybold (TX) | 111% |
| CareMount (NY) | 91% |
| Healthcare Partners (CA) | 47% |
| Applecare Medical Group (CA) | 42% |
| Crystal Run (NY) | 41% |

−20%    0%    20%    40%    60%    80%    100%

3/20/25, 8:31 AM
CASE 0:24-cv-01743-JMB-JFD Doc. 158-9 Filed 08/29/25 Page 4 of 14
UnitedHealthcare pays its Optum providers above-market rates | STAT

| | |
|---|---|
| Oregon Medical Group (OR) | 35% |
| Polyclinic (WA) | 15% |
| ProHealth Physicians (CT) | 15% |
| Everett Clinic (WA) | 13% |
| Atrius Health (MA) | 12% |
| Reliant Medical Group (MA) | 10% |
| Beaver Medical Group (CA) | 8% |
| New West Physicians (CO) | 3% |
| WellMed (TX) | −10% |
| Davita Medical Group (CO) | −30% |
| Astra Medical Clinic (AZ) | −37% |

Chart: J. Emory Parker/STAT • Source: Tribunus analysis for STAT

Even so, STAT found that for some types of care, UnitedHealthcare is doling out approximately two times the average market price at its own practices.

In New York's Westchester County north of New York City, UnitedHealthcare's commercial plans pay Optum's practices as much as double the average market rate for colonoscopies, upper endoscopies, and breast imaging. In Houston, the insurer pays Optum practices more than twice the average market rate for MRIs, colonoscopies, Mohs skin cancer removal procedures, and routine primary care visits. And in Oregon, an Optum group gets double the market rate for CT scans, MRIs for legs and knees, and 3D mammograms.

The federal government has attempted to limit insurers' profits by requiring them to spend most of the premiums they collect on medical care. UnitedHealth and other health services conglomerates have found a way around that restriction: By acquiring physician practices, they can shift more of those dollars to parts of their businesses where profits are unregulated. UnitedHealth's financial reports highlight how these payments across all of its practices amount to tens of billions of dollars going from one side of the company to the other.

In a recent speech, Jonathan Kanter, the top antitrust enforcer at the U.S. Department of Justice, referred to this practice as "regulatory gamesmanship" that has arisen from unchecked consolidation by companies like UnitedHealth.

"America's largest health care companies are no longer just health insurers or pharmacy benefit managers, and they are no longer just medical groups or hospitals. They are all of the above at once," Kanter said, adding: "Instead of increasing efficiency, health care platform integration and annexation has created perverse incentives, conflicts of interest, and opportunities for self-preferencing, steering, and self-dealing." UnitedHealth has faced a DOJ antitrust investigation over how its insurance company and medical groups compete with others.

UnitedHealth argues in marketing materials that its control of medical providers delivers greater efficiency, better care coordination, and lower costs. Health economists say, however, that consolidation has not delivered on those promises. Most research, in fact, shows there is no evidence of lower insurance premiums and prices when companies own businesses in adjacent markets. Instead, premiums for job-based coverage have jumped 7% in each of the past two years, which UnitedHealth and other insurers attribute to increasing prices and use of medical services.

STAT shared the data analysis and a list of questions with UnitedHealth before publication. The company declined to make anyone available for an on-the-record interview. Spokesperson Eric Hausman provided a statement that called the analysis "flawed." The company said it ran its own analyses and asserted that, "UnitedHealthcare pays Optum Health consistent with other payers in the market." The company declined to share its analyses with STAT. However, nothing within UnitedHealth's statement directly challenges the central finding that UnitedHealthcare pays Optum providers considerably more than non-Optum providers.

In addition to the data analysis, STAT reviewed provider payment documents and interviewed UnitedHealth physicians, health economists, insurance and policy experts, and physicians who compete with UnitedHealth's medical groups.

Chris Whaley, a health economist at Brown University, said multiple scenarios may explain the big transfers of money between UnitedHealth's insurance company and providers: One is that UnitedHealth acquires a physician group and then increases the amounts its insurance company pays that group. But the more likely strategy, he said, is that UnitedHealth takes over dominant practices its insurance arm already pays more, and then drives more patients to those practices by making them preferred options in its insurance networks.

The data STAT and Tribunus analyzed represent a snapshot of UnitedHealth's payment rates this year, so they do not show whether the company increased rates over time, or whether acquired practices were already getting higher amounts. Either way, UnitedHealth's high rates undermine the economic theory that consolidation and scale among large insurers will lead to better deals for consumers — especially when the providers on the other side of the table have the same owner.

It leads to what Whaley called a "surprising" dynamic in local health care markets. "The largest insurer in the country either doesn't have or is not using its negotiation clout to put downward pressure on prices," said Whaley, who is studying UnitedHealth's payments to its own surgery centers.

In some markets with limited competition, UnitedHealth benefits from driving up those prices, STAT's reporting shows.



UnitedHealth Group headquarters in Minnetonka, Minn. *Jenn Ackerman for STAT*

The New York City region exemplifies this strategy. UnitedHealth has aggressively targeted physician groups in New York and New Jersey, and it has had a compelling reason to do so: It dominates the region's insurance markets. During the past few years, Optum has taken over the management of CareMount Medical, ProHEALTH Physicians, Riverside, and Crystal Run.

CareMount, in particular, stands out for the rates it gets from its sister company. UnitedHealthcare paid CareMount practices 91% above the market average across all the medical specialties and services studied — the second-highest of any practice in the data analysis.

A physician who used to work within one of Optum's New York practices said that since leaving for a different practice, UnitedHealth's various insurance subsidiaries have paid the same physician anywhere from one-quarter to one-half of the amount paid for the same services they provided while the physician worked for Optum. The physician, who asked to remain anonymous because they still have relationships with UnitedHealthcare, shared billing remittances with STAT that showed the payment amounts.

"It's really a game the way they switch money from their right pocket to their left," the physician said.

UnitedHealth did not respond to specific questions about its Optum practices in New York. The statement said broadly that "UnitedHealthcare's payments to Optum are consistent with the rates paid by other health plans and its payment practices are unchanged by Optum's provider group acquisitions."

Doctors who compete with Optum said the power imbalance in their markets is obvious. Thomas Lee is a neurosurgeon who practiced in Westchester County, N.Y., where CareMount practices are located, for 24 years before becoming executive vice president of the Medical Society of the State of New York, an advocacy group for doctors, earlier this year. He said it's become difficult to compete with UnitedHealth's market power as an insurer and a provider.

"They have almost a near monopoly in the downstate area in terms of insured lives," Lee said. "When any provider group is speaking to UnitedHealthcare, obviously, it's take it or leave it, if they even speak to you."

A similar dynamic has played out with the smaller medical groups neighboring Optum's Crystal Run in Orange County, N.Y. UnitedHealthcare's commercial plans paid Crystal Run doctors 41% above market rates on average across all services, the data analysis shows.

"If they have their own doctors, they're not going to give me the same rate," said Ray Basri, a longtime internal medicine doctor who practices in Middletown, N.Y., where he said Crystal Run is far and away the largest provider. "They're going to pay their own people significantly more. We know they're just paying themselves."

Several of the medical groups UnitedHealth bought, CareMount and Crystal Run included, loomed large in their markets well before the deals closed. At least some of the higher payments from UnitedHealthcare are because those practices command higher payments from all insurers. But that doesn't fully explain the higher amounts paid by UnitedHealthcare nationally, according to the data analysis. Tribunus compared the rates UnitedHealthcare paid Optum practices for the subset of services included in the analysis with the rates paid by major Blue Cross Blue Shield insurers in their markets, using BCBS data. The firm found that UnitedHealthcare's contracted rates for Optum providers were 22% higher on average than those providers' rates with BCBS plans.

In its statement, UnitedHealth said the rates its insurance subsidiary "pays most Optum providers are within a few percentage points of the rates paid by other health plans."

Cheryl Damberg, a senior economist and chair of health care payment policy at RAND Corp., said the analysis "is just one more piece of evidence that state and federal regulators should be really concerned about what is going on in the marketplace and working to take action sooner than later." She added, "It's very difficult to break up entities after they've been acquired."

## UnitedHealthcare's higher rates

What UnitedHealthcare pays Optum CareMount practices in N.Y. compared to what Anthem BCBS pays

| Service | Anthem BCBS | UnitedHealthcare | % difference | |
|---|---|---|---|---|
| Dermatology office visit (99213) | $184 | $210 | 14% | |
| Family medicine office visit (99214) | $275 | $302 | 10% | |
| Colonoscopy (45385) | $763 | $2,268 | | 197% |
| Oncology office visit (99214) | $275 | $302 | 10% | |
| CT scan of abdomen and pelvis (74177) | $992 | $1,298 | 31% | |

Table: J. Emory Parker/STAT • Source: Tribunus analysis for STAT

UnitedHealth's consolidation strategy took shape following passage of the Affordable Care Act. That law created a regulation with a seemingly straightforward goal: to make sure health insurance companies were spending premiums mostly on people's care instead of hoarding profit. Thus began the era of the medical loss ratio.

The regulation requires that at least 80% to 85% of premiums go toward care, depending on the type of insurance. But UnitedHealth's leadership team, led by current board chair and former CEO Stephen Hemsley, saw a way around it and began preaching the virtues of being on both sides of a transaction. Rather than letting those dollars leak out to other providers, UnitedHealth would pay its own.

In 2014, Larry Renfro, who led Optum at the time, told investors the company was doing everything to "support UnitedHealthcare as Optum's largest client and partner."

The following year, Wall Street analysts wanted to know how UnitedHealthcare fit within the growth plans of Optum's medical groups. Dan Schumacher, UnitedHealth's current chief strategy and growth officer who was a top executive within UnitedHealthcare at the time, made it clear the company wanted to steer more insurance members to those provider groups.

"Where we are partnered with Optum, we really like the outcomes," Schumacher said. "And so we are endeavoring, as they look to grow that business, to grow right alongside them … we are trying to orient a greater share through our Optum delivery partners over time."

Those comments came right as UnitedHealth took over ProHealth Physicians and MedExpress, and then continued its buying spree with Surgical Care Affiliates and several other large medical groups.

Last year, at an investment bank conference, current UnitedHealth CEO Andrew Witty reinforced how important its insurance company and providers were to each other. He said the company is "making sure that we're exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements are needed there," according to an event transcript from financial database firm AlphaSense. The "firewall" refers to UnitedHealth executives' assertion that UnitedHealthcare and Optum negotiate with each other at arm's length.

The strategy has played out in the company's financial results. UnitedHealth tallies the money its Optum physicians and other providers take in from all UnitedHealthcare plans through an accounting measure known as "intercompany eliminations." The company is on pace to register $153 billion worth of intercompany eliminations this year, almost quadruple what it recorded a decade ago and roughly the size of Morocco's entire economy. Optum's physicians and other providers have made up 43% of UnitedHealth's total "eliminations" so far in 2024. They accounted for just 20% a decade ago.

All of those eliminations count when it comes to reporting its expenses under the medical loss ratio rules. Amounts that insurers pay to their own physician groups can be treated as medical costs "even if some of that spending represents profits for the parent company," according to a Brookings Institution analysis that looked at vertically integrated Medicare Advantage plans.

3/20/25, 8:31 AM
CASE 0:24-cv-01743-JMB-JFD   Doc. 158-9   Filed 08/29/25   Page 9 of 14
UnitedHealthcare pays its Optum providers above-market rates | STAT

"You're cooking the books here by pushing things that are really insurance company profit over to medical expenses, because you own those doctors," said Ron Howrigon, a health care consultant who used to be an executive at large health insurers.



The building that houses the ProHealth Physicians office in Middletown, Conn., one of the Optum practices that UnitedHealthcare paid more than the average market rate. *Tim Tai for STAT*

In 2022, the government required health insurers to start publishing the negotiated rates they pay to hospitals, doctors, and other providers, making it possible to see how much UnitedHealthcare is paying Optum's medical groups. The data files — so big they're typically measured in terabytes — are unwieldy, so STAT worked with Tribunus, which uses sophisticated techniques to mine insurers' payment files in the course of its business. Tribunus uses the data to help providers negotiate higher payment rates from insurers.

STAT identified the five medical services that accounted for the most spending in each of eight outpatient specialties, based on data produced by FAIR Health, a nonprofit organization that houses national health insurance data. Tribunus then analyzed [UnitedHealthcare's payments](#) for each of those services across 16 Optum physician practices that were highlighted in previous STAT reporting, and compared them with the insurer's payments to providers it doesn't own in the same counties.

UnitedHealth said in its statement that STAT "is knowingly using a flawed analysis to push a predetermined narrative and has ignored our attempts to point out the problems," which it said included "cherry-picking data" and "simple math mistakes." However, after the company provided feedback on the initial analysis, STAT and Tribunus incorporated UnitedHealth's suggestions — such as cleaning up payment rates and excluding certain providers that could not definitively be tied to particular markets — to the extent possible. The company also said the services analyzed "capture less than 20% of total spend" and criticized the analysis for not incorporating bundled rates or weighting for the number of visits and procedures; however, that information is not included in the data files.

STAT and Tribunus shared the updated analysis with UnitedHealth, which responded with its statement. The company provided no level of detail about its own analysis and would not share any further data.

Overall, the data analysis found UnitedHealthcare paid most of the Optum practices more than it paid others, on average, across all the markets studied. Ben Handel, a health economist at the University of California, Berkeley, said higher costs would inevitably be paid by people who have UnitedHealthcare insurance. "They're raising the costs of providers in markets where they have market power," he said, adding that the higher payment rates put upward pressure on premiums.

There is variation across medical groups, however. UnitedHealth is not paying itself higher commercial rates across the board, and in some places, it pays its practices less than the market average.

For example, UnitedHealthcare paid Optum's WellMed clinics in Texas roughly 10% below the market average across all the medical services examined by STAT and Tribunus. However, WellMed is entirely focused on treating older adults who are enrolled in Medicare Advantage or traditional Medicare, so the prices WellMed gets paid by commercial insurers mean almost nothing since they are such a small part of its clinics' business.

Medicare Advantage payment rates are not included in the datasets but are a vital source of business. UnitedHealth has acquired medical groups and outpatient centers where it has the dominant share of Medicare Advantage enrollment. Because Medicare Advantage payment rates are lower than commercial ones, experts say that makes volume just as important as prices — and that UnitedHealth is focusing on routing as many Medicare Advantage members as possible to its own clinics to catch those payments.

"I think this is sort of purely an MLR game," said Matt Fiedler, a health economist and senior fellow at the Brookings Institution. "It allows United to take a higher profit margin than its competitors."

STAT's findings trigger concerns beyond the medical loss ratio. They raise the question of whether UnitedHealth is causing employers to overpay for health care, said Howrigon, the consultant and former insurance executive. Most employers that offer health insurance assume the financial risk of insuring their workers and outsource plan administration to insurers like UnitedHealthcare. These employer plans, called "self-funded," are not subject to medical loss ratio rules.

But under federal law, self-funded employers that offer health coverage are obligated as fiduciaries to act "prudently" and pay "only reasonable plan expenses." Several employers recently sued the insurers that administer their plans, arguing they are also fiduciaries that should be held responsible for overpaying for medical care. The Department of Labor supported one such case that ultimately lost. Howrigon sees those fiduciary standards applying in cases where UnitedHealthcare pays its own providers more, which runs up costs for the employers that hired it.

"An employer could argue, 'You violated that responsibility,'" Howrigon said. "'You have an obligation to be good stewards of my money and to try to save me money. And you were intentionally overcharging me for these services, where that money then goes into your pocket.' That's a conflict."

UnitedHealth's increasing reliance on shifting money between subsidiaries isn't just fattening its earnings. It is threatening the future of some doctors' practices.

David Podwall, a neurologist in Nassau County, N.Y., who is surrounded by Optum's ProHEALTH providers, said UnitedHealthcare's Oxford insurance plan pays his private practice significantly less than other commercial insurers. UnitedHealthcare pays Optum practices in the county 16% more for an office visit by an established patient than Podwall receives, according to the Tribunus analysis.

"What that means is that smaller practices like us either discontinue those plans, or you limit the number of patients you see in those plans," Podwall said. "Then those patients are more likely to funnel back to [Optum]."

Irina Koreen is an ophthalmologist in New York's Orange County near Optum's Crystal Run practices, which dominate the area. Koreen was one of just five doctors in her practice going into this year, but three have either retired or are on their way out. The practice has tried unsuccessfully to bring in new eye doctors for the past two years. Koreen said they can't match Optum's high pay.

When asked if she would join Optum, Koreen said no. She said Optum's practices have a reputation of seeing more patients per hour than she's comfortable with. For the time being, Koreen will continue to try and recruit new doctors and live with her payment rates from UnitedHealthcare, which she said are "slightly below" Medicare and don't fully cover her costs. UnitedHealthcare pays Crystal Run practices at least 80% more than what it pays Koreen for routine office visits and ophthalmological exams, according to the data analysis. She doesn't think her practice can survive much longer.

"We're going to have to close the practice eventually. You can't find doctors to replace the ones who are retiring," she said. "I don't want to think about it."

## Methodology

The goal of this project was to determine how much UnitedHealth Group's insurance company, UnitedHealthcare, is paying its own physician groups. UnitedHealth benefits when its UnitedHealthcare insurance members seek care at practices it owns or controls, which are branded as Optum. When UnitedHealthcare members go to Optum practices, UnitedHealth essentially gets to pay itself for their care, instead of making payments to outside providers. Until now, no analysis has been able to quantify how much UnitedHealthcare pays its Optum providers, or how those rates compare to what it pays unaffiliated practices.

Starting July 1, 2022, federal law required health insurers to publish machine-readable files with the negotiated prices paid to in-network hospitals and doctors. These are commonly called "Transparency in Coverage" files. Because of the files' large sizes and complexity, STAT partnered with Tribunus Health, a firm that examines these datasets and helps providers in their contract negotiations with insurance companies. Tribunus analyzed more than 94 million rows of data from the UnitedHealthcare files and specifically looked at how much the company paid 16 different Optum physician practices across nine states for various health care services.

Those 16 practices are Applecare (California), Astra Medical Clinic (Arizona), Atrius Health (Massachusetts), Beaver Medical Group (California), CareMount (New York), Crystal Run (New York), DaVita Medical Group (Colorado), Everett Clinic (Washington), Healthcare Partners (California), Kelsey Seybold (Texas), New West Physicians (Colorado), Oregon Medical Group, The Polyclinic (Washington), ProHealth Physicians (Connecticut), Reliant Medical Group (Massachusetts), and WellMed (Texas).

To determine which services to examine, STAT worked with FAIR Health, a nonprofit organization that houses national health insurance data. FAIR produced data showing the five services, or medical codes, that account for the most "allowed" spending within eight outpatient specialties: cardiology, cardiovascular surgery, dermatology, family medicine, gastroenterology, internal medicine, oncology, and radiology. UnitedHealthcare's data do not include claims volume. This served as a workaround so that the analysis would focus on the services that physicians frequently perform and bring in the most revenue for most practices. "Allowed" in FAIR's data refers to the negotiated amount a health plan pays.

Tribunus then analyzed UnitedHealthcare's data files to see how the company's payments to Optum practices for each code compared with its payments to relevant non-Optum practices in the same counties or service areas. The payment rates were connected to physicians' national provider identifiers (NPIs). Some markets included physicians or practices that may be located out of state but had received rates from UnitedHealthcare in that market at some point. Those providers were included if Tribunus confirmed their NPI was still in the state even if the practice was out of state. The analysis excluded providers from a market if providers were only tied to an out-of-state practice.

Some California providers were not listed as part of an Optum group in the data files but were listed on the group's website, and STAT and Tribunus included them as Optum doctors in the analysis.

The payment rates are only reflective of UnitedHealthcare's commercial plans. They also do not include capitated contracts that pay providers bundled amounts because the files do not have to include that type of data. The payments in the files are "allowable amounts," which includes what the insurance company paid as well as any cost-sharing owed by the patient. Not all specialties were represented at each Optum practice. Some Optum practices had only one relevant physician for a given specialty or code, or had contracted rates for only a small number of the codes studied.

Tribunus looked at the maximum rates that UnitedHealthcare paid to providers. This was done in part to reduce noise in the data. For example, the data did not clearly show whether a service was provided in a doctor's office or a hospital outpatient clinic, which are usually paid more. Choosing the maximum rate reduces the chances that different sites of services were compared with each other.

Here's an example of what the analysis revealed: In Westchester County in New York, the average rate that UnitedHealthcare pays in-network internal medicine physician practices for medical code 99213, which is a routine visit with an established patient, is $134. Again, this average covers what UnitedHealthcare says it paid both Optum and non-Optum providers. Optum's CareMount practice in that county is paid $209.50 by UnitedHealthcare, or 56% more than the average for the entire market.

3/20/25, 8:31 AM
CASE 0:24-cv-01743-JMB-JFD Doc. 158-9 Filed 08/29/25 Page 13 of 14
UnitedHealthcare pays its Optum providers above-market rates STAT

Tribunus also collected relevant payment data from Blue Cross Blue Shield insurers in each county to use as a basis of comparison for how much Optum practices are paid by UnitedHealthcare.

**STORY CREDITS**

**Writing and Reporting:** Bob Herman, Casey Ross, Lizzy Lawrence, Tara Bannow
**Editing:** Gideon Gil
**Graphics:** Emory Parker
**Illustrations:** Natsumi Chikayasu
**Art and Photo Direction:** Alissa Ambrose
**Additional photo editing:** Crystal Milner
**Copy editing:** Karen Pennar
**Additional editing:** Zachary Tracer
**Design and development:** Jennifer Keefe, Julia Bujalski, Ben Lokshin

## About the Authors



**Bob Herman**

Business of Health Care Reporter

Bob Herman covers health insurance, government programs, hospitals, physicians, and other providers — reporting on how money influences those businesses and shapes what we all pay for care. He is also the author of the [Health Care Inc. newsletter](#). You can reach Bob on Signal at bobjherman.09.

bob.herman@statnews.com
@bobjherman



**Casey Ross**

Chief Investigative Reporter, Data & Technology

Casey Ross covers the use of artificial intelligence in medicine and its underlying questions of safety, fairness, and privacy.

casey.ross@statnews.com
@caseymross



**Lizzy Lawrence**

FDA Reporter

Lizzy Lawrence leads STAT's coverage of the Food and Drug Administration. She was previously a medical devices reporter. You can reach Lizzy on Signal at lizzylaw.53.

lizzy.lawrence@statnews.com
@LizzyLaw_
@lizzylawrence.bsky.social
linkedin.com/in/lizzy-lawrence1/



**Tara Bannow**

Hospitals and Insurance Reporter

Tara Bannow covers hospitals, providers, and insurers. You can reach Tara on Signal at tarabannow.70.

tara.bannow@statnews.com
@TaraBannow

To submit a correction request, please visit our Contact Us page.