# EXHIBIT 20

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITEDHEALTH GROUP<br>INCORPORATED, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:22-cv-0481 (CJN) |

<u>**UNITEDHEALTH GROUP INCORPORATED'S ANSWER TO THE COMPLAINT**</u>

Defendant UnitedHealth Group Incorporated ("UHG") responds to the allegations of the Complaint as set forth below. Any allegation not specifically and expressly admitted is denied.

**GENERAL RESPONSE TO PLAINTIFFS' ALLEGATIONS**

1. The U.S. healthcare system suffers from significant waste and inefficiency. This is particularly true with respect to the processes by which healthcare providers (*e.g.*, doctors and hospitals) submit health insurance claims and ultimately receive reimbursement from insurers and other payers. A single patient visiting his or her doctor can result in a bevy of communications between the provider and the insurer—including insurance pre-authorization requests, confirmation of insurance benefits, initial claim submissions, review of those claim submissions, appeals of any claim denials, and ultimate payment to the provider. This administrative process takes up a massive amount of time, money, and effort for providers and insurers alike—resources that should be focused instead on improving the quality of healthcare in the U.S.

2. Technologies for submitting insurance claims electronically over Electronic Data Interchange ("EDI") networks, and automatically evaluating those claims through claims-editing

1

software, are a dramatic improvement over the old process of manual claim submission, evaluation, and payment. But even today, there is significant "friction" in the U.S. healthcare system in the form of millions of communications bouncing between providers and insurers *every single day*.

3. That friction is costly. The U.S. healthcare industry wastes an estimated $267 *billion* annually on simply ensuring that healthcare providers submit valid and properly documented claims and that insurers pay the correct amount for the services provided.

4. Also plaguing the U.S. healthcare system are inefficient clinical processes involving unnecessary tests and missed opportunities to treat injuries and illnesses using less invasive and/or less costly processes that provide equivalent outcomes. Doctors, nurses, and other caregivers often lack access to digestible information to support their real-time clinical decisions. The industry needs services that provide such information in a manner that is integrated into a provider's existing patient care workflows.

5. UHG seeks to change the paradigm. UHG is a vertically integrated company that operates both a health-insurance business, UnitedHealthcare ("UHC"), and a healthcare information-and-analytics business, OptumInsight. OptumInsight is focused squarely on improving the quality and efficiency of healthcare delivery by providing data, research, consulting, technology, and other services. OptumInsight has been successfully providing its services not just to UHC, but also to many other large, national insurers that directly compete with UHC.

6. UHG's acquisition of Change Healthcare Inc. ("Change") will dramatically enhance UHG's ability to improve the quality and efficiency of healthcare delivery. OptumInsight's current offerings will fuse seamlessly with Change's suite of products and services, which include a modern EDI network that provides greater connectivity with payers and

providers and resources to better assist physicians with making clinical decisions. By combining Change's assets with its own, UHG and its OptumInsight subsidiary will be able to expedite their development of a "frictionless" platform that will significantly reduce administrative waste and inefficiency. That frictionless platform will benefit providers: rather than waiting for clinical guidance, coverage determinations, appeals of claim denials, and lengthy payment cycles, providers will receive clinical guidance directly in their workflow, immediate access to eligibility determinations and prior authorizations for that care, and immediate electronic payments that eliminate the need for guesswork and administrative waste. The frictionless platform will also benefit insurers: they will experience a reduction in unnecessary medical services, more accurate claims submissions, and lower administrative-support costs. And importantly, the frictionless platform will benefit patients: they will get a simplified consumer experience, lower costs, and better point-of-care delivery due to improved adherence to best clinical evidence. This is the healthcare system of the future, and UHG's acquisition of Change will help make it a reality. The Government's Complaint tries to spin this new innovation as a bad thing, alleging that UHG would keep new innovations to itself and not share them with the marketplace. Setting aside the fact that the antitrust laws were designed to encourage—not impede—the very innovation UHG seeks to achieve, the entire business rationale for the transaction is for UHG to develop innovations that it can sell externally to other health insurers and healthcare providers.

7. None of the actual antitrust theories the Government asserts to challenge the transaction can be squared with the facts on the ground. The Government primarily argues that UHG's acquisition of Change would create a "monopoly in first-pass claims editing solutions." But UHG *already agreed to divest* Change's claims editing business months ago. UHG and Change are currently receiving final bids for that business, and a signed agreement with a strong

buyer that will fully replicate Change's market leading competitive position in first-pass claims editing is expected to be completed within a matter of weeks. Nothing will remain of the Government's horizontal theory once the divestiture is complete.

8. The Government's novel vertical theories fare no better. In a vertical challenge, there is no "presumption of anticompetitive effect" based on market concentration statistics. *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (rejecting vertical-theory case brought by the Government). Rather, the Government must prove through a "fact-specific" showing that the merger of two companies occupying different levels of the supply chain is "likely to be anticompetitive." *Id.* Resorting to simple theory is not enough; the Government bears the burden of proving, with hard evidence tested through discovery and admissible at trial, that "the proposed merger is *likely* to *substantially* lessen competition." *Id.* (second emphasis in original).

9. The Government cannot meet that burden of proof here. The Government's entire case rests on vague and speculative theories—notably unsupported by any past conduct—that UHG will somehow exploit Change's products and services to secure an unfair advantage for UHC's health-insurance business. The Government offers two theories for how that is likely to occur. Neither of them is viable.

10. *First*, there is no basis for believing that UHG will misuse the competitively sensitive information ("CSI") that passes through Change's EDI network in an effort to benefit UHC's health-insurance business. To start, OptumInsight's business model and financial success is dependent on providing products and services to external customers *other than UHC*. Any misuse of customer CSI would be economic suicide for OptumInsight because its sophisticated external customer base would simply cease using OptumInsight's services and turn to any number of competitors. It is for that very reason that OptumInsight has a strong culture of operating at

arm's-length from and independently of UHC, and a hard-earned reputation for serving all health-insurer and provider customers faithfully.  Breaching that trust would harm the value of the newly combined business by orders of magnitude greater than any conceivable gain.

11.     Moreover, although the Government makes no mention of it in its Complaint, the simple truth is that OptumInsight *already has access to* UHC's competitors' CSI through services that OptumInsight currently provides to some of the largest insurance companies in the nation.  But far from abusing that information, OptumInsight invests extraordinary time, money, and resources into safeguarding that information and keeping it walled off from UHC.  To that end, UHG's existing firewalls and data-security policies prohibit employees from sharing external-customer CSI.  Its firewalls are similar to those accepted and lauded by the Government in prior merger challenges, and they have been subject to regular audits by UHG's customers and others.  No customer would ever share data with OptumInsight without such protections, and OptumInsight's contracts reflect its legal commitment—above and beyond its firewall policies—to protect CSI.  The Government's unfounded theory that UHG will suddenly stop enforcing those policies and obeying those commitments is implausible, and provides no basis for blocking a merger with such pro-competitive and pro-consumer implications.

12.     *Second*, the Government's theory that UHG will raise prices, degrade quality, or withhold innovations from its rivals—through manipulating Change's EDI network—is similarly nonsensical.  It would make no economic sense for UHG to discriminate against rival health insurers with respect to EDI services, which constitute less than 1% of a payer's cost structure and are sometimes provided for free.  Therefore, contrary to the Government's speculation, increasing the cost of those services would have zero impact on "downstream" competition for large employer groups and national account insurance customers.  In any event, it is easy for health insurers to

switch to alternative EDI clearinghouses, and many insurers "multi-home" or connect with multiple EDI networks already. In such an intensively competitive market, any EDI clearinghouse that failed to provide timely and reliable delivery of all EDI transactions it received would quickly find itself out of business.

13. Nor is there any support for the Government's speculation that the acquisition of Change will lead to UHG hoarding for itself the product and service innovations that could result. OptumInsight has served third-party payers for years, and has consistently shared innovations with the marketplace generally. Indeed, the returns associated with sharing innovations with the marketplace are the driver of UHG pursuing this transaction in the first place.

14. For all of those reasons, the Government's theories of competitive harm have no basis in fact or law, and do not provide any basis for blocking what is clearly a pro-competitive, pro-consumer transaction. Nonetheless, in an effort to address the Government's concerns—as speculative and implausible as they were—UHG agreed to make binding commitments to its customers and the Government that fully address those concerns. In particular, UHG agreed to: (1) not alter Change's current practice of making certain aggregated, de-identified data available externally to the marketplace; (2) maintain its robust firewall processes—and extend them to Change's business—to protect sensitive customer data and provide information to customers to allow them to verify those firewall processes; (3) continue to process EDI transactions consistent with industry standards and in the most efficient, contractually available manner; and (4) consistent with Optum's current business practices, make any new products or services developed using medical EDI transaction data available to the marketplace. Because UHG has no intent or economic incentive to do otherwise, all of those commitments are sleeves off UHG's vest.

6

15. In short, UHG and Change are pursuing this transaction due to a shared belief that the companies can do far more *together* to accelerate product development that will remove excessive waste from the U.S. healthcare system and provide better clinical outcomes than they could do independently. These benefits will be shared with the entire industry, including health insurers, healthcare providers, employers, and patients. As a result of the proposed claims editing divestiture, UHG and Change have recognized and fully addressed the only potential horizontal competitive harm that could result from the transaction. And the Government's vertical theories are economically nonsensical, lacking in evidentiary support, and refuted by OptumInsight's decade-plus track record of working with—and protecting the data of—health insurers that compete with UHC's health insurance business.

## RESPONSE TO SPECIFIC ALLEGATIONS

1. *Health insurance helps protect American families from the financial risks associated with sickness and injury. It also facilitates access to the U.S. healthcare system, thereby improving health outcomes and affecting the lives of hundreds of millions of people living in the United States. Each year, Americans visit a doctor or hospital more than one billion times and spend more than four trillion dollars on healthcare—almost one-fifth of the U.S. gross domestic product. Roughly 155 million people, or almost half of all Americans, get their health insurance through an employer. Employers count on competition between health insurers to provide affordable, high quality, and innovative health plans to meet the needs of employees and their families. United's proposed acquisition of Change threatens this competition.*

**ANSWER:** UHG admits the allegations in this paragraph except for the allegations in the last sentence, which it denies.

2. *United is a behemoth in the healthcare industry. A serial acquirer that has purchased more than 35 healthcare companies over the last 10 years, United operates, among other things: the largest health insurance company in the United States; a large network of physician groups, outpatient surgical centers, and other healthcare providers, including over 53,000 physicians across 15 states; a pharmacy benefit manager (PBM) that handles over a billion prescriptions every year; and a healthcare technology business that facilitates, among other things, the transmission, analysis, and review of health insurance claims.*

7

**ANSWER:** UHG admits that it is a diversified healthcare company with various separate and distinct subsidiary businesses, including: OptumHealth, which includes OptumCare, a care delivery business; OptumInsight, which offers healthcare technology products and services; UHC, which offers a full spectrum of health benefit products and services; and OptumRx, which offers pharmaceutical benefit management services. UHG admits that it has acquired companies, always with the Government's approval when required, to help it achieve its goal of providing better products and services to customers. UHG denies the remaining allegations in the paragraph.

3. *Change is the leading independent supplier of technologies used by healthcare providers to submit health insurance claims, and by health insurance companies to evaluate and process these claims. It is not owned by any healthcare provider or health insurer. Change operates the nation's largest electronic data interchange (EDI) clearinghouse, which transmits data between healthcare providers and insurers, allowing them to exchange insurance claims, remittances, and other healthcare-related transactions. The claims and remittances are referred to as "claims data." The claims data shows, among other things, the treatment an individual receives and the insurance coverage that they have, and provides a window into the inner workings of the health insurers and their plans. Change also sells a license to its separate state of-the-art claims editing technology that enables health insurers to process, in real time, millions of healthcare claims each day to ensure compliance with their health insurance policies.*

**ANSWER:** UHG admits that Change is one of many companies that supplies healthcare technologies for submitting, evaluating, and processing health insurance claims, including an electronic data interchange ("EDI") clearinghouse. UHG admits that Change is one of many companies that licenses claims editing technology. UHG admits that Change is not owned by a healthcare provider or health insurer. UHG admits that claims data may include claims submitted by healthcare providers and remittances submitted by health insurers, but denies that claims data shows a subscribers' insurance coverage or the "inner workings" of health insurers. UHG lacks knowledge sufficient to admit or deny the allegations in the third sentence of this paragraph. UHG denies the remaining allegations in this paragraph.

4. *Nearly all of United's major health insurance rivals rely on Change's EDI clearinghouse and claims editing technology to compete with United's commanding health insurance business, and they have leveraged these tools to save billions of dollars each year. Change's technologies are critical tools that allow United's health insurance rivals to keep healthcare costs down for their members and pay providers' claims quickly so they can compete more effectively with United and one another for health insurance customers.*

**ANSWER:** UHG responds that its major health insurance competitors do not rely exclusively on Change's EDI clearinghouse, and that many of those competitors do not connect to Change's EDI clearinghouse at all. UHG admits that EDI claims travel over an interconnected network of EDI providers, which may include Change among many other EDI clearinghouses. UHG admits that healthcare technology companies like Optum, Change, and many others provide tools, such as claims editing, that can save health insurance companies and their self-funded customers significant amounts of money. UHG denies the characterization of Change's technology as "critical." UHG denies the remaining allegations in the paragraph.

5. *Change is the leading independent provider of technology used to transmit and review health insurance claims. As Change told analysts in 2019 "the SCALE, size, and independence of our business is a competitive advantage." It has access to a vast trove of competitively sensitive claims data that flows through its EDI clearinghouse—over a decade's worth of historic data as well as billions of new claims each year. According to United, 50 percent of all medical claims in the United States pass through Change's EDI clearinghouse. Change's self-described "pervasive network connectivity," including approximately "900,000 physicians, 118,000 dentists, 33,000 pharmacies, 5,500 hospitals and 600 laboratories," means that even when United's health insurer rivals choose not to be a Change customer, health insurers have no choice but to have their claims data pass through Change's EDI clearinghouse. Not only does Change process vast amounts of competitively sensitive claims data, but it also has secured "unfettered" rights to use over 60 percent of this data for its own business purposes including, for example, using claims data for healthcare analytics. Additionally, through its claims editing product, Change has access to the proprietary plan and payment rules for all of United's most significant health insurance competitors.*

**ANSWER:** UHG admits that Change is one of many companies that supplies healthcare technologies for submitting, evaluating, and processing health insurance claims. UHG admits that Change also licenses claims editing technology. UHG admits that EDI claims travel over an

9

interconnected network of EDI providers, which may include Change among many other EDI clearinghouses. UHG further responds that Plaintiffs' quotations from unidentified written material are taken out of context and are misleading. UHG lacks knowledge sufficient to admit or deny the remaining allegations in this paragraph.

6. *Change has access to claims data and health insurers' proprietary plan and payment rules. Health insurers consider this information to be competitively sensitive. This data is especially valuable because it can be used to understand how an insurer designs its plans for particular employers, and glean insights into the plans' payment and operational rules.*

**ANSWER:** UHG admits that Change has access to certain claims data, but denies that claims data is necessarily competitively sensitive. UHG denies that Change has access to proprietary plan and payment rules and further denies that claims data shows health plan design. UHG denies the remaining allegations in this paragraph.

7. *United operates its own EDI clearinghouse and offers a competing claims editing technology through OptumInsight, its healthcare technology business. But United's major rival health insurers rely on Change for its innovative, high-quality products, including claims editing technology and EDI clearinghouse, avoiding United's claims editing and clearinghouse products to protect their competitively sensitive data from their largest rival. United is well aware of its rivals' reluctance to use United's EDI clearinghouse and claims editing products. OptumInsight euphemistically refers to this reluctance as the "'U'-factor,"—a reference to United's insurance business. An internal strategy document discussing the competitive perception of OptumInsight's claims editor put it bluntly: "health plans don't typically want to go with Optum because Optum is a competitor."*

**ANSWER:** UHG admits that OptumInsight offers a claims editing product, CES, which both UHC and many of UHC's largest competitors use and rely on. UHG admits that OptumInsight operates an EDI clearinghouse. The market for EDI services is highly competitive and commoditized. UHG admits that certain customers, in the past, have chosen not to use OptumInsight services for various reasons, but denies that health insurers rely on Change in order to avoid using OptumInsight services. OptumInsight imposes strict limitations on the use or

disclosure of external customer data, and external health insurer customers trust OptumInsight to provide services, including claims editing services. The foundation of OptumInsight's business is selling to external customers, and the proposed transaction is intended to expand the innovation and efficiency that OptumInsight can provide to those external customers. Over half of OptumInsight's revenues come from sales to customers outside UHG. UHG further responds that Plaintiffs' quotations from unidentified written material are taken out of context and are misleading. UHG objects to Plaintiffs' citation to confidential documents and information that was submitted to DOJ pursuant to the Premerger Notification Program in a public pleading without providing any notice to Defendants or an opportunity to object and seek a protective order. *See* 45 Fed. Reg. 21,215-16; Antitrust Div. Manual (5th ed.) p. III-32. UHG denies the remaining allegations in this paragraph.

> 8. *United, for its part, actively avoids placing its own competitively sensitive claims data in the hands of its actual or potential health insurance competitors. United requires its business units to limit the disclosure of data outside of United "to the minimum necessary." And its internal policies reflect the competitive importance of claims data to UnitedHealthcare (United's health insurance business) and to the commercial health insurance industry generally. For example, United will not permit its business units to license claims data to a third-party unless it is justified "as being in the best interests of the Enterprise [United] (taking into account all business segments)." United also restricts data licenses to third-parties if they are "primarily for the benefit of a significant competitor." United implements these policies to protect its financial interests.*

**ANSWER:** UHG admits that it implements policies regarding claims data for a variety of reasons, including to protect customer and patient privacy and data security. UHG denies that claims data is necessarily competitively sensitive. UHG responds that these allegations ignore the commitments UHG made to share data broadly with the healthcare market as described in introductory paragraph 14 above. UHG further responds that Plaintiffs' quotations from unidentified written material are taken out of context and are misleading. UHG objects to