# EXHIBIT 22

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:22-cv-0481 (CJN) |
| UNITEDHEALTH GROUP INCORPORATED, *et al.*, | **[REDACTED VERSION]** |
| *Defendants*. | |

## <u>AMENDED PRETRIAL BRIEF OF DEFENDANTS UNITEDHEALTH GROUP INCORPORATED AND CHANGE HEALTHCARE INC.</u>

Ability, and Zelis, among others. *See* DX-0445 at UHG-2R-0002976381; DX-0624; Murphy Rpt. ¶ 64 & Ex. 4; DX-0176; PX820 Ex. 7. EDI transaction fees are a microscopic portion of overall administrative costs in the sale of commercial insurance. *See* Murphy Rpt. Ex. 20 (EDI's fees would make up just ███ of UHC's administrative costs).

████████████████████████████████████████

████████████████████████████████████████

████████████ . *See* 6/15/22 A. Chennuru Dep. Tr. 183:10-184:18.

### D. OptumInsight

OptumInsight uses data analytics to provide a variety of services to its customers, the largest of which are payers and providers. For payers, OptumInsight provides payment integrity services (including claims editing), risk and quality services, analytic platforms, and consulting services to improve clinical and administrative performance. DX-624 at UHG-LIT-0122643. For providers, OptumInsight provides analytics and consulting to assist in revenue cycle management, 5/24/22 E. Schmuker Dep. Tr. 26:6-9; software to assist payers in assessing health risk and quality metrics, 12/7/22 R. Hardy Dep. Tr. 163:15-164:16; and solutions for value-based care programs, Murphy Rpt. ¶ 46. Finally, as for EDI, OptumInsight has contracted with a separate EDI vendor, ███████, to handle some EDI traffic that OptumInsight collects. 12/7/21 T. Gustin Dep. Tr. 181:13-19; *see* DX-0524. OptumInsight still provides managed gateway services for UHC, as well as for certain legacy customers, but the vast majority of OptumInsight's "non-UHC EDI volume" goes through ███████ . *See* 12/7/21 T. Gustin Dep. Tr. 181:13-19, 183:23-184:13.

Although UHC is one of OptumInsight's payer customers, OptumInsight is "fiercely multi-payer." *See* 12/10/21 D. Wichmann Dep. Tr. 155:25-156:17; *see also* 1/19/22 P. McKinney Dep. Tr. 59:17-60:1; 4/21/22 C. Hasslinger Dep. Tr. 187:3-188:2. As the evidence

will show, of the roughly top 200 payers (on an entity-wide basis) in the United States, most of them do business with OptumInsight, including nine out of the ten largest insurers. Optum's multi-payer commitment also means that OptumInsight deals at "arm's length" with UHC, *see* 12/21/21 A. Witty Dep. Tr. 266:20-267:25, and that UHC does not receive special discounts, *see, e.g.*, DX-0409; DX-0410 at UHG-2R-0000101652.

Because OptumInsight provides legacy EDI services and claims editing services to payers across the industry, it already receives substantial amounts of competitively sensitive payer information, including claims, member, and provider data. *See* DX-0624; Murphy Rpt. ¶ 120. Through its EDI services alone, in 2021, OptumInsight received claims from over ▮▮▮▮ different providers and sent claims to over ▮▮▮ non-UHC payers (on a plan basis). Murphy Rpt. ¶ 119. This included ▮▮▮▮▮ non-UHC payer claims per month, including from UHC competitors like ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id*. Optum also receives competitively sensitive information through its payment integrity services, including its claims editing solution, CES. For instance, OptumInsight today provides certain ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see, e.g.*, DX-0472 at UHG-2R-0004420987 to 4420988; provides ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮, *see* PX583; DX-0015; and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see, e.g.*, DX-0308; DX-0377. All told, OptumInsight has the "[l]argest collection of claims and [electronic medical record] data in the industry," DX-0749 at 3, extending to "nearly 270 million deidentified lives," DX-0782.

OptumInsight does not share with UHC either the claims data it receives from external customers, or competitive intelligence or insights that could be gleaned from that data.

OptumInsight's business model, financial success, and reputation depend on providing products and services to external customers, including many that compete with UHC. *See* DX-0816 ("No competitor to UHC wants to work with Optum if there was any risk of that leading to a loss of competitiveness . . . ."). Accordingly, it is "[f]undamental and core to [Optum's] strategy" that it "maintain[] the integrity and trust . . . of these customers that their data will not be utilized in a manner that they don't authorize." 12/10/21 D. Wichmann Dep. Tr. 156:18-157:25.

OptumInsight has always worked "to the best of [its] ability" to "ensure that . . . this data is never shared." *Id.* Consistent with UHG's longstanding commitment and culture of ethical business practices, OptumInsight employees are prohibited from sharing external customer data with UHC absent legitimate reasons and permissions for doing so. DX-0780 at 18-20. As UHG's CEO previously stated, protecting competitively sensitive information is "a religion we really operate by." DX-0816.

Fortifying this culture of integrity are UHG's firewalls and data-usage policies, which prohibit OptumInsight from sharing—and UHC from accessing—competitively sensitive information of Optum's payer-customers. UHG has a 23-year track record of ensuring that competitively sensitive information and personal health information are sufficiently protected. DX-0664 at UHG-LIT-01779311. The fundamental and default principle of UHG's firewalls is that UHG personnel cannot access a customer's competitively sensitive information unless it is required for them to perform services for the customer. *Id.* at UHG-LIT-01779312.

UHG had these policies in place prior to this action, *see id.*, but to eliminate any doubt on a go-forward basis, UHG updated its policies to make clear, in no uncertain terms, that those protections would extend to new assets following the merger. These policies provide:

- "The disclosure of External Customer CSI to UHG business units that are competitors of such External Customers is strictly prohibited";

- "The use of External Customer CSI to benefit UHG business units that are competitors of such External Customers is strictly prohibited"; and

- "UHG employees may not access External Customer CSI unless such access is necessary to perform their job responsibilities."

DX-0654 at UHG-LIT-01343683. As an additional backstop, UHG has an antitrust compliance policy that also prohibits the sharing of competitively sensitive information between UHG business units. *See* DX-0529 at UHG-2R-0017320326; DX-0527 at UHG-2R-0018175027.

In addition to internal policy controls, UHG's contracts with its payer customers reflect and require commitments to data privacy. For example, most of UHG's contracts forbid use of raw claims data: de-identification is almost always a prerequisite to secondary-use rights. UHG strictly prohibits attempts at re-identification. Over the years, Optum has cultivated trust with its customers through audits—performed by both Optum and Optum's customers—to confirm compliance with these contractual obligations. 12/2/21 P. Dumont Dep. Tr. 21:7-12.

UHG follows its policies and contractual obligations to the letter and will continue to do so following the merger. 12/10/21 D. Wichmann Dep. Tr. 155:25-157:25. To ensure compliance across the company, UHG has an "advanced and sophisticated technology architecture and infrastructure" of internal firewalls that prevent the sharing of competitively sensitive information across business units. *Id.* There is no evidence that UHG has breached its firewalls to obtain the competitively sensitive information or claims data of Optum's payer-customers for the benefit of UHC. Following an in-depth review of its own compliance, ███

████████████████████████████████████████

██████████████████████████████████████. *See* DX-0780 at 18-

19. ████████████████████████████████████████

████████████████████████████████████████

███████████████. *Id.* at 19.

14