# EXHIBIT 23

CASE 0:22-cv-00481-HCB-NJF Document 17292 Filed 09/06/23/25 Page Page 1296 f 8

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs*,

        v.

UNITEDHEALTH GROUP INCORPORATED,
and CHANGE HEALTHCARE INC.,

        *Defendants*.

1:22-cv-00481 (CJN)

**FILED UNDER SEAL**

**[REDACTED VERSION]**

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## OF THE UNITED STATES, STATE OF MINNESOTA, AND STATE OF NEW YORK

Dated: August 31, 2022

customers would have no meaningful ability to evaluate whether and how their CSI would be used by United.[155]

215.    These deficiencies reflect United's strong incentives to use Change's data. United's lawyers drafted these commitments in full view of the Government's complaint and concerns about data use.  The obvious explanation is that United sought to preserve its flexibility to use Change's data as it sees fit.  *See, e.g.*, **8/10P**, 32:9-33:6, 35:20-22 (Witty) (admitting that United's "careful" and "precise" lawyers work to protect United's interests).

216.    Indeed, United's "careful" and "precise" lawyers know how to exploit contractual terms to United's benefit.  For example, when one of Optum's external payer customers raised concerns about Optum potentially sharing its data with UHC, United would only agree to monetary compensation upon disclosure of the data if the payer could first show that Optum "intentionally discloses (A) in writing; or (B) via electronic data transfer" its data to UHC.  Nor could the payer even disclose the existence of the contractual term lest it become invalid.  Optum's executives expressly sought to place a "high burden of proof" on their customer, and United's lawyers delivered.  **8/4P**, 121:21-132:17 (Yurjevich); **PX-993** at -823-24; **PX-132** at -649-58.

### *(d)*    *United's Past Data Governance Practices* <br> *Undermine Its Promises of Future Protection*

217.    United's assertion that its corporate culture and reputational concerns would prevent it from using insights from rivals' data is undermined by its data governance practices.

218.    *First*, United has repeatedly granted UHC employees or Optum employees assigned to UHC projects access to sensitive data of external competitors.  Despite claiming at

---

[155] Based on the return responses from Change's customers as to the commitments, customers themselves harbor concerns about the commitment—87% of Change's customers have not signed the amendment.  *See* **DX-0214S**.

trial that its antitrust compliance policy prohibited sharing external payers' data with UHC, United classified many fields of the external payer data, including the "covered amount" (meaning essentially the allowed amount), as "standard" fields available in many different "views" of its secondary-use databases. **PX-1042** (171:6-172:18) (Dumont United 30(b)(6) testimony). United's permission logs reveal that the employees granted access to external customer data have included:

- A Director of Healthcare Economics for United's commercial health insurance business (**PX-668**, rows 15851-56 and 17385-88; **PX-670**, rows 7386-436; *see also* **PX-962** at -587-89);

- A Healthcare Economics Consultant for UHC Networks (**PX-668**, rows 16330-34; **PX-670**, rows 18728-48; *see also* **PX-962** at -589);

- A Director of Data Science for UHC's Government Benefit Operations Segment. (**PX-668**, rows 5043-48 and 13806-15; **PX-670**, rows 6059-109);

- A Director of Data Analytics for UHC's Clinical Services Segment. (**PX-668**, rows 4122-27 and 14170-80; **PX-670**, rows 25282-332; *see also* **PX-962** at -589);

- A Business Analyst Consultant for UHC's Medicare and Retirement segment (**PX-668**, rows 5956-61 and 15293-15298; **PX-670**, rows 9419-60);

- A Senior Manager of Data Science for UHC's Clinical Services Segment. (EE 668423) (**PX-668**, rows 4952-54 and 17396-98; **PX-670**, rows 29650-29664; *see also* **PX-962** at -589);

- An Associate Director of Business Analysis for UHC's Payment Integrity Strategic Performance Division (**PX-668**, rows 3819-20 and 13087-88; **PX-670**, rows 3707-57);

- A Senior Director of Actuarial Services for UHC's Medicare and Retirement Underwriting and Healthcare Economics Division. (**PX-668**, rows 2769-73 and 17425-29, **PX-670**, rows 20798-831; *see also* **PX-962** at -589);

- An OptumInsight employee who received access for "a contract with United Healthcare Employer & Individual to provide de-identify [sic] benchmarking data" (**PX-668**, 6348-51; **PX-1032**, rows 6348-51; *see* **8/5A**, at 154:23-157:16 (Dumont));

- An OptumInsight employee who received access for "a funded agreement with

110

UHC to do cost predictions for various groups from E&I," which is UHC's commercial health insurance business (**PX-668,** rows 8891-96 and 14051-56; **PX-1032**, rows 8891-96 and 14051-56); and

- An OptumInsight employee who indicated that "currently access is required to fulfill my role to pull and analyse [sic] data for a UHC group pricing project." (**PX-668**, rows 3812-18; **PX-1032**, rows 3812-18; **PX-670**, rows 7692-742).[156]

219. United's recordkeeping failures make it practically impossible to assess the extent and frequency of improper access. United has no access logs for its dNHI database—an Optum database containing de-identified claims data—before May 2021,[157] approximately three months after the Government's investigation began. **8/5A**, 162:7-9 (Dumont). To compensate, United merely asked employees orally whether they accessed the non-UHC data, without confirming anything in writing. **PX-1042** (220:3-221:5) (Dumont United 30(b)(6) testimony); **8/5A**, 162:13-18 (Dumont). United did not notify any of the external customers whose data resided in these servers, such as Anthem, that it granted UHC-affiliated employees access to their data. **PX-1042** (228:18-229:3, 229:22-230:13) (Dumont United 30(b)(6) testimony); **PX-665** at 2.

220. At times, United has authorized access even when squarely prohibited by contract.

---

[156] Despite claiming at trial that it removed payers' identities in these databases, *see* **8/5P**, 30:16-19 (Dumont), United actually assigned each payer a "data supplier code" whose referent is apparent. **PX-1042** (157:14-16) (Dumont United 30(b)(6) testimony); **PX-655** at 2. For example, all the BlueCross plans follow the nomenclature "X" followed by the name of the state or region the payer covers—*e.g.*, XMA01 for BlueCross BlueShield of Massachusetts, XNC01 for BlueCross BlueShield of North Carolina, XKC01 for BlueCross BlueShield of Kansas City, and XLA01 for BlueCross BlueShield of Louisiana. **PX-665** at 2. Likewise, United referred to Anthem as "ANT04." *Id.*

[157] For the period from May through October 2021, United provided only a partial access log that omitted employee numbers and Req IDs, making the data impossible to match for a large share of employees. Thus, the only access log that the Government could effectively use begins in November 2021. Even the data on employees' access rights lack information on a substantial share of employees' email domains and roles within United from PeopleSoft. *See generally* **PX-668**; **PX-670**; **PX-1032**.

111

Under OptumRx's contracts with its external customers, "UHC employees are not allowed to see or use the non-UHC book of business." **PX-60** at -638. Contrary to these agreements, United granted "a handful" of UHC-affiliated employees access to the OptumRx external customer data in dNHI. **PX-60** at -636. A manager responsible for maintaining dNHI, Timothy Josephson, informed Mr. Dumont about improper access in January 2021, adding he "was not aware of the restrictions on access to the non-UHC OptumRx claims." **PX-60** at -636. In response, Mr. Dumont responded, "I'm [sic] don't have serious concerns" because the "data is de-identified in compliance with HIPAA, not PHI." **PX-60** at -636. There is no evidence that United ever notified its external customers that it breached its commitments by granting UHC-affiliated employees access to this OptumRx external customer data.[158]

221. Further, UHC employees have accessed external customer data as recently as March 2022. In a "very, very concerning" incident, UHC employees both were "able to access their competitors['] data," **PX-673**; **8/5P**, 64:7-65:9, 65:25-66:10 (Dumont), and "actually copied [such data] over into UHC's own case tracking system," **PX-674**; **8/5P**, 68:22-69:18 (Dumont). These "scary" breaches reflect the lack of safeguards implemented by Optum: an administrative employee merely asked "requesters [to] sign a confidentiality agreement that they won't look at things they shouldn't," which another employee acknowledged was "worthless without technical control in place to block access" because employees "can play dumb." **PX-676**; **8/5P**, 67:18-68:21

---

[158] When confronted at trial with evidence of this January 2021 incident, Mr. Dumont contended that the only affected employee was Ms. Love, who had left UHC for Optum. **8/5A**, 145:13-146:9 (Dumont); **8/5P**, 3:17-23, 30:18-25 (Dumont). But the email exchange reflects that Ms. Love's request for approval of a project had simply prompted the discussion of the "handful" of UHC-employees with access to the external OptumRx data. **PX-60** at -636, -638, -643; **PX-61**. Unlike at trial, Mr. Dumont recalled nothing about this incident during his deposition in December 2021. **8/5P**, 6:9-12 (Dumont); *see* **PX-60, PX-61** (relating clearly to the same incident).

(Dumont). Despite learning of the lapse no later than December 2021, **PX-675**; **8/5P**, 66:11-19 (Dumont), United's data governance employees failed to address it until at least March 2022, **PX-676**, with Optum data security employees chatting initially in January 2022 that, while one sought "a more aggressive timeline," he "d[idn't] want to look for problems" and they were not only failing to "mak[e] much headway," but in fact "going backwards from our last discussion." **PX-678**; **8/5P**, 67:1-10 (Dumont).

222.    In yet another incident identified in December 2020, Optum's Cancer Guidance Program, which serves 24 million people, breached its obligation not to offshore data for ten state Medicaid programs. **PX-59**; **8/5A**, 165:2-11 (Dumont). When this issue surfaced, there had been no assessment of Optum's compliance with its offshoring obligations "since the program's CGP launch in the fall of 2018," two years prior. **PX-59** at -661.

223.    United has been given clear notice of its data governance failures, but failed to remediate them. In December 2021, United's Internal Audit and Advisory Services conducted an audit of United's data management practices. **PX-600**; **8/10P**, 72:22-25 (Witty). "Given the potential pervasiveness and severity of the observations noted during the assessment," the auditors "assigned a rating of Needs Improvement to the Data Governance Internal audit." **PX-600** at -327. In particular, United's internal auditors concluded that there was:

- a "heightened risk of data being mismanaged" at Optum, **PX-600** at -329; **8/10P**, 73:23-74:2 (Witty);

- a "large opportunity for classification error and inconsistency and subsequent treatment of PHI and PII data," **PX-600** at -329; **8/10P**, 74:22-75:5 (Witty); and

- "no effective means of enforcement if or when data misuse is discovered or reported" leading to a "risk that the [Enterprise Data Management Office] will be unable to effectively intervene and reinforce data management practices," **PX-600** at -330; **8/10P**, 75:6-15 (Witty).

Mr. Witty forwarded the report to Mr. McMahon, writing: "A lot to do here." **PX-600** at -322;

113

**8/10P**, 75:16-23 (Witty). Yet in June 2022—six months later—he still did not know whether any changes had been made to strengthen United's data governance. **8/10P**, 75:24-76:7 (Witty).

### B. Proposed Conclusions of Law

224. The proposed merger is an illegal vertical merger, because following it, United would have the ability and incentive to use its rivals' competitively sensitive information to its advantage and their detriment, thereby harming competition.

#### 1. Relevant Markets

225. As a preliminary matter, the sale of commercial health insurance to (i) national accounts in the United States and (ii) large group employers in local markets are relevant antitrust markets. *Anthem*, 236 F. Supp. 3d at 192-93; *see also Brown Shoe*, 370 U.S. at 325-26, 343-45. This was effectively undisputed at trial. **FOF** ¶ 66.

#### 2. Related Products

226. With respect to related products, the Government need not go through a formal market definition exercise, and any contention to the contrary is without support.

227. In a vertical merger, competitive concern in a relevant market may flow from a "related product" that is "positioned vertically or is complementary to the products and services in the relevant market," such as an input, a means of distribution, or a complement. **VMG** at 3. Here, the Government has shown that EDI clearinghouses—and in particular, Change's EDI clearinghouse—are the related product. Because the related product is not in the market in which harm to competition is predicted, there is no need for plaintiffs in Section 7 cases to use market-definition tools to identify the product and geographic markets for the related product. *See* **VMG** at 3-4; *see also Brown Shoe*, 370 U.S. at 320-21 (relevant market is the "locus of competition [] within which the anti-competitive effects of a merger [are] to be judged").

228. Defendants have suggested that Change lacks market power in EDI clearinghouses

114