# EXHIBIT 24

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　　　*Plaintiffs*,<br><br>v.<br><br>UNITEDHEALTH GROUP<br>INCORPORATED, *et al.*,<br><br>　　　　　　　*Defendants*. | Civil Action No. 1:22-cv-0481 (CJN)<br><br>**[REDACTED VERSION]** |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANTS**
**UNITEDHEALTH GROUP INCORPORATED AND CHANGE HEALTHCARE INC.**

violate UHG's firewall policies.  *See* 8/5/22 PM Trial Tr. 52:14–54:2 (Dumont).

> 3.  *UHG's has strong post-merger legal, reputational, and financial incentives not to engage in anticompetitive conduct.*

381.  The financial and reputational costs of breaching or altering firewall policies factor into UHG's incentive to use data in the ways Plaintiffs theorize.  *See* 8/12/22 Trial Tr. 95:13–22 (Tucker) ("[The Court:] But then, and I think this is an important part of your report, you also have to think about the other incentives that would be pushing in the other direction, to include the firewall policies, reputational risk, and the like.  Correct?  [A.] Yes, that's precisely correct.  And the way I might characterize it is to understand the dynamics of the incentives in this situation and the extent to which United and Optum can anticipate the very negative consequence of a breach of firewalls, for example."); *see id.* at 96:21–97:7.

382.  UHG's own due diligence documents recognize the "risk of customer abrasion and a potential for [Change] to lose some of its customer base if there is a perception that certain competitively sensitive data can be used by other businesses within UHG or that Optum will add existing de-identified data to [Change's] data products."  PX945 at UHG-2R-0018222214.

383.  Moreover, the market, which includes rivals of UHC, trusts OptumInsight with its data precisely because UHG understands, and takes seriously, reputational risks surrounding data use.  *See* DX-0472 at .0004 ("This Plan is highly confident and convinced that Optum will not risk their credibility or brand reputation to share their Plan's information with United Healthcare."). Not a single rival payer testified otherwise at trial.

384.  Post-merger, UHG would continue to have strong reputational and financial incentives to protect other payers' data.  Last year, non-UHG customers accounted for approximately $4.1 billion in OptumInsight revenue and approximately $63 billion in total Optum revenue.  8/10/22 AM Trial Tr. 71:9–22 (Schumacher); PX830 at USDOJ-008-000001519.  Optum

would put all of that $63 billion "immediately at risk" if, after the merger, it removed or modified its firewalls and began providing other payers' data to UHC. 8/5/22 AM Trial Tr. 31:17–32:4 (Yurjevich).

385. Plaintiffs have suggested that not all of that revenue would be at risk because OptumRx and OptumHealth account for some of the $63 billion. As Mr. Yurjevich explained, however, "OptumRx and OptumHealth serve the same customers that we serve within OptumInsight. So our customers don't think of us as OptumInsight, OptumHealth or OptumRx. Our customers think of us as Optum." *Id.* at 31:24–32:11. And if those customers cannot trust one Optum business unit with their data, they will not trust any Optum business unit with their data. *See id.* Thus, if OptumInsight misused rival payers' data, that would "put our entire book of external business at risk, that $63 billion that we talked about earlier." *Id.* at 71:6–14.

386. Contrary to Plaintiffs' suggestion, Optum would actually have *greater* incentive to protect other payers' data post-merger. For one thing, Change generated about $3 billion in revenue in fiscal year 2021. PX823 at US-DOJ-008-000000712; ███████████████████████. Less than ███ of that revenue comes from ClaimsXten, so as Dr. Murphy explained, Optum would put the remaining Change revenue at risk if it began misusing rival payers' data post-merger. 8/15/22 AM Trial Tr. 39:24–41:17 (Murphy) ("But the other side of the equation is the cost of misusing data goes up, too, because you're not now just putting the existing Optum business at risk by misusing data, you're putting the Change business at risk by misusing data.").

387. Even setting Change's revenue aside, UHG expects that Optum will have more than $63 billion in external revenue in future years and anticipates that Optum's external-payer business will "continue to grow." 8/9/22 PM Trial Tr. 87:20–25 (McMahon). Indeed, UHG considers the

growth of Optum's external-payer business to be "an essential element of the future growth of the company" as a whole. 8/10/22 AM Trial Tr. 72:20–25 (Schumacher).

388. Optum's post-merger incentives not to misuse data go beyond the risk of losing business. Change's standard contract with EDI customers prohibits using one payer's data for another payer's benefit. 8/3/22 AM Trial Tr. 47:12–24 (Suther) ("[The Court:] Part of your answer just now was about not licensing or selling to a particular payer information about its competitors. In your view, based on your experience, are there contractual prohibitions that would kick in to prevent that or is that a business practice or would that be? I understand this is a hypothetical situation. A. I'd say they're mostly contractual. So, again, we're very attentive to the trust that our customers have placed in us. And if we felt that a[n] interested health insurer w[as] trying to, you know, reverse engineer the business practices of one of [its] competitors, that, in our mind, would be a violation of our confidentiality obligations under our agreement and wouldn't permit it.").

389. To avoid all doubt, UHG has offered to amend Change's contracts with EDI customers to guarantee that "UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed" to UHC. DX-0766 at .0004. UHG has pledged to honor that guarantee even for EDI customers who do not formally amend their contracts. *Id.* at .0002–3.

390. Moreover, at trial, multiple UHG witnesses were asked point blank whether UHG would use rival payer data from Change's EDI to benefit UHC. Every witness answered—in court, under oath, and without equivocation—that UHG would not do so. *E.g.*, 8/10/22 PM Trial Tr. 28:2–24 (Witty); 8/4/22 PM Trial Tr. 31:4–7 (Wichmann); 8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich); 8/8/22 AM Trial Tr. 89:25–90:10 (Higday); 8/9/22 PM Trial Tr. 101:11–17

101

(McMahon); 8/10/22 AM Trial Tr. 73:14–74:16 (Schumacher); 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach).

391. Given the contracts and UHG witnesses' sworn representations, UHG would expose itself to potentially disastrous legal liability if it were to use Change's EDI data to benefit UHC. That risk of legal liability is yet another incentive against misusing rival payers' data post-merger. *See* 8/2/22 AM Trial Tr. 123:19–124:17 (de Crescenzo) ("Q. Now, let's say a customer has granted secondary-use data rights to Change let's say in accordance with your standard contract language. Does that mean that Change can just do whatever it wants with that data? A. Absolutely not. First of all, as I mentioned, whether it's personal to our standard contract or not, there [are] a number of contractual restrictions that our customers have put upon us that, of course, we wouldn't violate, never mind the reputational and business risks but the financial liability of doing so against customer contracts. . . ."); *see also* 8/3/22 AM Trial Tr. 47:12–24 (Suther).

392. Despite the fact that UHG would risk both lost business and legal liability by misusing rival payers' data, Plaintiffs' economic expert, Dr. Gowrisankaran, opined that the costs of such misuse would be "negligible" because "rivals aren't going to know whether United uses this information." 8/9/22 PM Trial Tr. 54:5–55:19 (Gowrisankaran).

393. Dr. Gowrisankaran, who is not an expert in firewalls or data security, did not investigate whether external payers would be able to detect UHG's misuse of their data. Nor did he provide any methodology that could be used in such an investigation.

394. Moreover, Dr. Gowrisankaran's opinion about "negligible" costs is predicated on the counterfactual assumption that UHG would face no legal ramifications if it misused rival payers' data to benefit UHC. *See* 8/15/22 PM Trial Tr. 28:8–29:11 (Gowrisankaran).

395. Dr. Gowrisankaran's misunderstanding of UHG's enterprise incentives runs deeper. In his expert report and testimony, Dr. Gowrisankaran cites UHG's CEO, Andrew Witty, as saying "that UnitedHealth Group needs to think about United at an enterprise level," 8/9/22 AM Trial Tr. 90:4–18 (Gowrisankaran); PX947 ¶ 25 & n.43. But that rendering omits important context. In full, Mr. Witty's deposition testimony makes clear that maximizing enterprise value "sometimes . . . would involve [separate business units'] assets being worked together," and "sometimes individually," all subject to "the important caveat of all of the rule sets" that limit UHG's conduct. *See* DX-0852 at 296:1–297:17. All of UHG's efforts, then—whether "meeting the needs of the marketplace" or "meeting the needs of physicians and patients"—seek to "mak[e] the best of" the organization's assets, subject to meaningful "constraints," including market incentives, contractual limitations, firewall policies, and business ethics. *See id.*

396. Given those massive risks, if UHG were considering a strategy built around misusing other payers' data, one would expect to see business documents weighing the pros and cons. No such documents exist.

397. On the other side of the scale, Plaintiffs have not presented any economic evidence quantifying the gains that UHC could purportedly make by using other payers' claims data to reverse engineer those payers' innovations. More specifically, Plaintiffs' economic expert, Dr. Gowrisankaran, did not calculate any of the following: (i) the number of innovations that UHC could reverse engineer from data that UHG currently possesses; (ii) the incremental number of innovations that UHC could reverse engineer once UHG had access to Change's EDI data; or (iii) the value of those incremental innovations—that is, the dollar value of new national-account or large-group business that UHC could win as a result of the incremental innovations.

398.     With no quantifiable proof, Plaintiffs' theory therefore boils down to speculation that turns on the inconceivable premise that Optum will irreparably tarnish its reputation as a trusted business partner, plus risk billions of dollars in lost business and untold sums more in legal liabilities, all in exchange for a theoretical, unquantified, and likely unquantifiable amount of new business for UHC.  To describe that theory is to discredit it.

399.     No rival payer offered any corporate testimony that they would innovate less or compete less aggressively with respect to claims edits or plans offered to large-group or national-account customers.  No employee or former employee of a rival payer offered such testimony either.  In fact, witnesses testified to just the opposite.  *See, e.g.*, ██████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████; 8/1/22 PM

Trial Tr. 14:17–22 (Garbee) ("[Q.] After the United-Change transaction was announced, you don't recall Cigna competing less aggressively for employer business?  A. No.  In innovating, though, they would be more careful where they put their edits.  They would still innovate but be more careful about where they put it."); *id.* at 15:22–16:12 ("Q. And when you were speaking with Mr. Culley, you had stated you would be more careful about where you put your edits.  Can you explain what you meant by that?  A. Just like I said, we had actually, like, add-on routines that we would run post ClaimsXten that you could put our custom edits and not have it be seen by Change.  So

104

we might elect to put or [sic] innovative edits in that place instead of running it right in the software."); 8/1/22 PM Trial Tr. 94:23–95:2 (Lautzenhiser) ("Q. This transaction certainly won't cause your group at Aetna to innovate less, will it? A. It should not. Q. You don't foresee any less innovation; is that fair? A. I'm not forecasting any."); PX1005 at 169:14–16, 169:19–170:6 (Dill) ("Q[:] You are not going to compete less aggressively after UnitedHealthcare acquires Change Healthcare? . . . [A:] So in my personal opinion, I don't think we ever compete less for any reason. Right. We always go at it really hard. That's our job.").

400. UHG's data diligence also considered the importance of contractual restrictions on data use. *See, e.g.*, PX944 at UHG-2R-0003671294 ("Careful consideration must be given to not only legal, compliance and privacy issues, but also to the public perception and business abrasion issues that could result from seeking consent from one market participant relative to another (e.g. public and patient concerns regarding Google / Ascension data activities or conversely, a potential payer or provider customer of Optum may have concerns if Optum were to approach their patient / customer)."); *see also* PX027 at UHG-2R-0006509715 ("Legal language as shared in Cambridge's contract template is highly aligned with Optum's approach to data rights in that both Optum and Cambridge only de-identify data where given the explicit right to do so by the customer.").

401. Plaintiffs presented no evidence that UHG intends to alter its longstanding firewall protections, *see supra* FOF ¶¶ 103–41; depart from Change's understanding and application of its standard contractual language, *see supra* FOF ¶¶ 228–38; or abandon OptumInsight's multi-payer business model, *see supra* FOF ¶¶ 45–81. In fact, the record showed precisely the opposite. *See also, e.g.*, 8/10/22 PM Trial Tr. 32:1–35:4 (Witty) (explaining that UHG's renewed contractual commitments to Change's customers are "consistent with what [UHG] believe[s] is the right way

of managing the information and the relationship" and Mr. Witty "do[esn't] think we foresee any change here"); DX-0686; 8/10/22 AM Trial Tr. 81:2–12 (Schumacher) (answering "[n]o" when asked whether he was "aware of any efforts to change [UHG's] policies regarding the exchange of information, competitively-sensitive information, between Optum and UnitedHealthcare" and whether it is "likely . . . that any of those policies would be changed in the near future").

402.    In sum, "access to data wasn't a part of the core thesis and the real driver of [UHG's] interest in Change Healthcare."  8/4/22 PM Trial Tr. 80:10–20 (Hasslinger); *see also* DX-0450 at .0001 ("[W]e had roughly zero value to data in our thesis presented to Dave [Wichmann] and [John] Rex.  I think the deal stands without it and data is not our message.").

4.    *Contractual commitments to Change's customers legally constrain UHG's ability to engage in anticompetitive conduct.*

403.    To avoid any doubt regarding possible use of Change's data, UHG has made contractual commitments and offered amendments to Change's EDI customers that maintain Change's firewalls and allow for annual customer review to ensure compliance after the transaction's close.  DX-0766 at .0002–3; *see also* DX-0765 at .0001 (similar commitment informing Change's data solutions customers that UHG "is committed to continuing Change's business of making aggregated or de-identified data, and insights and benchmarking derived from it, available in the marketplace in the same manner as Change does today").

404.    UHG additionally has promised to make any innovation developed through claims data from Change's EDI network available to all payers and providers, while continuing to provide industry-standard EDI services.  DX-0766 at .0002–3.

405.    UHG agreed to make these commitments, and notified Plaintiffs of its intent to do so, **before** Plaintiffs filed suit to block this transaction.  ECF No. 37) at General Resp. to Pls.' Allegations ¶ 14; *see also* PX596 at UHG-LIT-01672120 (attorney for Plaintiffs writing "[w]e

would also appreciate hearing you describe any additional commitments, such as those Matt

[Reilly, counsel for UHG,] mentioned yesterday, that the parties are willing to make to ensure that

United would not use Change's EDI clearinghouse to advantage itself relative to rival insurers").

406.    The final commitments made to Change's EDI customers are comprehensive in

scope and detailed in nature, as explained in UHG's notification letter which states:

- Protecting Potentially Sensitive Business Information — For years, UHG has maintained robust firewall and data security policies specifically designed to make sure customers' potentially sensitive information is protected and not misused in any way. UHG commits to apply these same firewall and data security policies to customer data held by Change on behalf of Change's EDI customers, and to uphold all contractual rights of Change's customers to audit the protection and security of their data.

- EDI Clearinghouse Network — We understand that the payer and provider customers of Change's EDI clearinghouse network expect timely and accurate transmission of claims, eligibility, and other data. UHG commits to maintaining Change's exceptional service level following the merger.

- Innovative Products — We expect the combination of UHG and Change to facilitate new or improved products and services. UHG commits to make available to our customers any new or improved products or services developed using Change's EDI clearinghouse network data.

DX-0766 at .0002.

407.    The contractual amendment offered to Change's EDI customers confirms UHG's

commitments made in the letter:

- **Confidential Information Controls.**  UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed to UHG's health insurance, health plan administrative services, or health care provider businesses. Upon request, which shall be made no more than once annually, UHG agrees to conduct a review of Customer's Confidential Information held by Change or the UHG subsidiary into which Change's medical EDI clearinghouse business is integrated and to provide a report to Customer identifying any violations of UHG's firewall and information security policies relating to the disclosure of Customer Confidential Information and the corrective actions undertaken to resolve such violations. Nothing herein shall interfere with Customer's existing contractual rights to audit the protection and security of Customer's Confidential Information.

- **EDI Clearinghouse Network.** UHG agrees to provide medical EDI clearinghouse services at levels consistent with Change's current medical EDI clearinghouse network service level and all applicable industry standards and regulations.

- **New or Improved Products and Services.** If the UHG subsidiary into which Change's medical EDI clearinghouse business is integrated or operated develops new products and services, or improves upon existing products and services, by using Change's medical EDI clearinghouse transaction data (which will only be done in accordance with all applicable laws, regulations, and contracts), and if that subsidiary makes such products and services available to a UHG entity outside of a limited pilot or development trial, it also will make such products and services available to Customer as soon as reasonably practicable and at commercially reasonable rates.

*Id.* at .0004.

408. Each of these binding commitments eliminates Plaintiffs' theories of competitive harm: UHG's commitment to protect Change's data with firewalls protects against any misuse of competitively sensitive information received from customers; UHG's commitment to maintain industry-standard service levels safeguards customers from any throttling or degradation of quality from Change's EDI clearinghouse; and UHG's commitment to share any innovation stemming from Change's EDI clearinghouse data undercuts the notion that UHG will hoard post-transaction innovations. *See* DX-0766 at .0002–4.

409. As of August 12, 2022, Change had received 3,119 signed amendments reflecting these commitments, which—based on customers having multiple accounts—represents 2,880 of Change's customers. DX-0214S ¶ 4 & Ex. A.

410. But regardless of whether Change's customers sign these amendments, UHG has agreed to "uphold these commitments for all Change EDI customers after the merger is complete. As added assurance, UHG is offering to incorporate these provisions into Change's EDI customer contracts." DX-0766 at .0002; *see also* 8/2/22 AM Trial Tr. 136:13–20 (de Crescenzo) ("Q. All right. Do customers have to pay anything to get this amendment? A. Absolutely nothing. We even included a postpaid envelope for them to return the signed letter and amendment. Q. Do they

108

have to agree to any other changes in their existing contracts in order to get the benefit of the amendment? A. Nothing whatsoever.").

411. No plans exist to alter these commitments in the future, with any change nevertheless requiring renegotiation between UHG and customers. 8/10/22 PM Trial Tr. 34:19– 35:4 (Witty) ("Q. Okay. We will get to the contract amendment in the future, but it would just be, then, for the length of that contract, the term of that contract? A. So first of all, I don't think we foresee any change here, because obviously, what's laid out here is consistent with what we believe is the right way of managing the information and the relationship. Secondly, while the contract's in place, those would be the terms. Obviously, if anything changed, it would require a renegotiation, and therefore, the customer would have the chance to choose whether to re-sign or not.").

412. In sum, UHG has memorialized its market incentives to not misuse competitively sensitive information into binding agreements with legal and financial consequences, further reinforcing the speculative nature of any supposed harm resulting from the hypothetical conduct alleged by Plaintiffs.

5. *Plaintiffs failed to prove harm to competition in their alleged markets.*

413. Even if UHC were to misuse data to copy rivals' innovations, withhold innovations, or otherwise degrade the quality of EDI services offered to non-UHC payers, Plaintiffs offered no evidence of harm to competition for the sale of commercial health insurance to large-group employers or national accounts.

414. ***First***, Plaintiffs offered no evidence establishing: (i) the specific innovations from particular rivals UHC would be able to copy in the post-merger world; (ii) in what networks, and against which rivals, UHC would deploy these copied innovations; (iii) whether the innovations would enable UHC to win bids for any specific national-account or large-group employer