# EXHIBIT 25

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:22-cv-0481 (CJN) |
| UNITEDHEALTH GROUP INCORPORATED, *et al.*, | **[REDACTED VERSION]** |
| *Defendants*. | |

<u>**POST-TRIAL BRIEF OF DEFENDANTS UNITEDHEALTH GROUP INCORPORATED
AND CHANGE HEALTHCARE INC.**</u>

## II. PLAINTIFFS FAILED TO PROVE A LIKELY AND SUBSTANTIAL LESSENING OF COMPETITION UNDER ANY OF THEIR VERTICAL THEORIES.

Unable to make a horizontal case, Plaintiffs resorted to vertical theories of competitive harm, all of which are speculative and unsupported by the record.

### A. Plaintiffs failed to prove a likely and substantial lessening of competition under their data-misuse theory.

Plaintiffs' first vertical theory is that UHG would use the claims data that passes through Change's EDI clearinghouse to benefit UHC. One version of that theory claims that UHG would use Change's EDI data to reverse engineer rival payers' innovations, which would enable UHC to copy those innovations and chill rival payers from innovating further, thereby harming competition in the relevant markets for the sale of commercial health insurance. A second version of Plaintiffs' theory claims that UHG would use Change's EDI data to improve the GRA underwriting tool, which would enable UHC (and UHC alone) to bid less competitively (or not bid at all) on certain high-risk employer customers.

Both versions of Plaintiffs' data-misuse theory suffer from the same fundamental defects. *First*, Plaintiffs assert that UHG would act in ways that contradict more than a decade of experience as a vertically integrated company, despite having no meaningful evidence that the merger will materially change UHG's incentives. Although Plaintiffs predict a tectonic shift in UHG's corporate culture and strategy, there are no internal UHG documents or testimony that show UHG even considering such a shift, much less making one, and Plaintiffs' economic expert offered neither an accepted methodology for assessing UHG's post-merger incentives, nor any quantification of those incentives. *Second*, rival payers—large, sophisticated firms with powerful incentives to keep UHC from gaining a leg up—offered no testimony in support of Plaintiffs' theory. Indeed, rival payers squarely contradicted the "copying innovations" version of the theory, stating that the merger will not cause them to innovate any less with respect to health plans offered

14

to national accounts and large-group employers. ***Third***, no evidence whatsoever establishes that any of the actions Plaintiffs predict UHG would take after the merger would result in higher prices, lower quality, or any other harm to competition in the relevant commercial insurance markets.

1.  The record does not support the "copying innovations" version of Plaintiffs' data-misuse theory.

The "copying innovations" version of Plaintiffs' data-misuse theory predicts that UHG will make radical changes to the way it has always done business despite a total absence of proof that the merger will change UHG's incentives. UHG's Optum subsidiary is—and always has been— "fiercely multi-payer in [its] orientation." 8/4/22 PM Trial Tr. 23:5–25 (Wichmann); 8/10/22 PM Trial Tr. 21:7–22:9 (Witty) ("I strongly, strongly believe that being multi-payer is a key feature of Optum, a key feature really, therefore, of UnitedHealth Group."); FOF ¶ 45. That means that Optum tries to sell each of its products to external payers. DX-0850; 8/5/22 AM Trial Tr. 62:23– 63:3 (Yurjevich); FOF ¶¶ 46, 48, 73–74. Optum has been successful at doing so: of the approximately 230 payers in the United States, Optum has contracts with about 220 of them. 8/5/22 AM Trial Tr. 19:6–12 (Yurjevich); FOF ¶ 78. The list includes Aetna, Anthem, Cigna, many of the largest BlueCross BlueShield plans, and nearly all of UHC's other most significant rivals. *See* 8/5/22 AM Trial Tr. 12:8–18, 19:13–18 (Yurjevich); FOF ¶¶ 78, 87. Because Optum does business with so many external payers, it already has access to huge volumes of external payers' data. DX-0862 at .0014–15; FOF ¶¶ 83–87. Indeed, Optum currently has access to huge volumes of external payers' *claims data*—the exact form of data that passes through Change's EDI clearinghouse—in addition to other competitively sensitive pieces of information, such as payer-

provider reimbursement terms, payer-provider contracts, and payer-specific adjudication rules. DX-0862 at .0014–15; FOF ¶¶ 83–99.

UHG has every incentive to take the protection of such data "very seriously." 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach); FOF ¶ 104. For as long as Optum has existed, UHG has maintained an enterprise-wide firewall policy that prohibits employees of one business unit from "participat[ing] in or facilitat[ing] communications that may reduce or eliminate competition between another Business Unit and its competitor(s)." DX-0529A at .0002; FOF ¶¶ 121–23. UHG has also operationalized its firewall policy through "robust" technological systems that prevent employees of one UHG business unit from accessing data housed within another UHG business unit. 8/5/22 PM Trial Tr. 31:12–32:4 (Dumont); FOF ¶¶ 124–26. UHG's firewall policy—and the technology behind it—have worked. Plaintiffs spent 18 months probing the effectiveness of UHG's firewalls through depositions, document productions, and written discovery. Yet Plaintiffs have not identified ***a single instance*** of Optum sharing external payers' data with UHC or UHC accessing external payers' data housed within Optum. FOF ¶¶ 127–29. That is no surprise: Optum's customers audit UHG's firewalls frequently, and none of those audits have turned up a breach. DX-0755; FOF ¶¶ 116–19. It is telling that after 18 months of scrutiny, and in-depth discovery into UHG's firewalls, Plaintiffs now deem UHG's track record regarding its firewall policies "irrelevant." *See* 8/1/22 AM Trial Tr. 13:22–14:4 (Pls.' Opening). But the Clayton Act does not permit Plaintiffs to ignore historical evidence simply because it hurts their case; it demands a "'fact-specific' showing that the effect of the proposed merger 'is likely to be anticompetitive,'" based on the "'structure, ***history***[,] and probable future'" of the markets at issue. *See AT&T*, 310 F. Supp. 3d at 192, 221 (emphasis added) (citations omitted); COL ¶¶ 44, 46–47.

16

As belt and suspenders, UHG also attempted to assuage Plaintiffs' unfounded concerns about its firewalls by adopting an additional, merger-specific firewall policy that reaffirms the company's existing policies and practices. UHG's merger-specific policy expressly prohibits the "disclosure of External Customer CSI to UHG business units that are competitors of such External Customers" as well as the "use of External Customer CSI to benefit UHG business units that are competitors of such External Customers." DX-0654 at .0002; FOF ¶¶ 130–33. After the merger, then, external payers would have the benefit of not one but two layers of firewall protection.

Plaintiffs seem to believe that neither layer of protection would prevent rogue employees from using data to reverse engineer other payers' innovations and then passing those innovations to UHC "remotely and over the phone." *See* 8/1/22 AM Trial Tr. 15:1–7 (Pls.' Opening). This "telephone" theory reflects an astonishingly naive view of how vertically integrated businesses operate, but more importantly it misunderstands the complicated nature of the data and insights at the heart of Plaintiffs' theory. As Plaintiffs' own claims-data expert, Dr. Handel, testified, reverse engineering rival payers' innovations "would take a team of analytics professionals some months or some meaningful amount of time." 8/8/22 PM Trial Tr. 38:16–39:3 (Handel); FOF ¶ 375. This is the stuff of machine learning models, regressions, and complex statistics—not whisper down the lane—and it severely undermines Plaintiffs' suggestion that any data misuse would be undetectable. In any event, if Plaintiffs' theory of data misuse were correct, Section 7 would prohibit the extensive vertical integration that exists in the healthcare space today because of the inherent risk of data misuse in every telephone conversation between employees of different business units. To state the obvious, that is not the law. *See United States v. CVS Health Corp.*, 2019 WL 4793060 (D.D.C. Sept. 4, 2019) (final judgment authorizing the merger of CVS and Aetna).

17

UHG's maintenance and enforcement of strong firewall policies is entirely consistent with its economic incentives and business model. Last year alone, non-UHG customers accounted for approximately $63 billion in Optum revenue, with OptumInsight accounting for $4.1 billion of that share. PX830 at USDOJ-008-000001519; 8/10/22 AM Trial Tr. 71:9–22 (Schumacher); FOF ¶ 384. If external payers stopped trusting Optum to keep their data away from UHC, then that "entire book of external business" would be "immediately at risk." 8/5/22 AM Trial Tr. 31:13–32:11, 71:6–14 (Yurjevich); FOF ¶ 385. If an external payer cannot trust one Optum business unit with its data, then it cannot trust any Optum business unit with its data, meaning that Optum risks losing the payer's business entirely, not just the $4.1 billion share from OptumInsight. 8/5/22 AM Trial Tr. 31:24–32:11 (Yurjevich); PX830 at USDOJ-008-000001519; 8/10/22 AM Trial Tr. 71:9–22 (Schumacher); FOF ¶¶ 384–85.

Although Plaintiffs cannot seem to grasp that UHG's firewalls align with its financial incentives in the pre- and post-merger world, the market gets it. One ███████ plan, for example, was "highly confident and convinced" that Optum would not "share their Plan's information with United Healthcare" because doing so would "risk [Optum's] credibility or brand reputation." DX-0472 at .0004; FOF ¶¶ 95, 139, 383. That is exactly right—and credibility and reputation are all that stand between Optum and a $63 billion loss from misuse of data in the post-transaction world.

Plaintiffs discount all of the above—UHG's firewalls, their track record, and what they reveal about UHG's incentives—as "not relevant." 8/1/22 AM Trial Tr. 13:22–14:4 (Pls.' Opening). The transaction will change UHG's incentives, Plaintiffs say, and UHG's firewalls will change accordingly. *Id.* at 50:6–13. But Plaintiffs cannot meet their burden simply by intoning "changed incentives" like a mantra, and "things might change" is not a viable theory of vertical antitrust harm. To carry their burden, Plaintiffs needed to make a "'fact-specific' showing" that

18

the merger would change UHG's incentives, *AT&T*, 916 F.3d at 1032 (citation omitted); COL ¶ 43, and they have fallen well short of doing so.

The record reveals that, post-merger, Optum would have an equal or greater incentive to prohibit UHC from using rival payers' data to copy their innovations. Post-merger, Optum would still stand to lose at least $63 billion by sharing external payers' data (or innovations derived from that data) with UHC, including the $4.1 billion in external payer revenue generated by OptumInsight. *See* 8/5/22 AM Trial Tr. 31:24–32:11 (Yurjevich) ("Q. Why do you say that? Because Change is just going to be part of OptumInsight, but why are OptumRx and OptumHealth also affected? A. OptumRx and OptumHealth serve the same customers that we serve within OptumInisght. So our customers don't think of us as OptumInsight, OptumHealth or OptumRx. Our customers think of us as Optum."); FOF ¶¶ 384–85. Change likewise has billions in revenue from non-UHC payers that would be put at risk, even excluding the revenue (███████████

███████) that comes from ClaimsXten. 8/10/22 AM Trial Tr. 134:19–24 (Schumacher); 8/15/22 AM Trial Tr. 39:24–41:17 (Murphy) ("But the other side of the equation is the cost of misusing data goes up, too, because you're not now just putting the existing Optum business at risk by misusing data, you're putting the Change business at risk by misusing data."); FOF ¶ 386. Setting the Change revenue aside, UHG expects that Optum's external-payer business will "continue to grow," 8/9/22 PM Trial Tr. 87:20–25 (McMahon); FOF ¶ 387, so Optum likely will have more than $63 billion to lose in future years, as compared to the approximately ████████ in revenue that UHC generates from national-account and large-group customers, ███████████████

███████████████████████████████████

███████████████████████████████████

███████ ; FOF ¶ 35.

19

The consequences of data misuse do not end with the risk of lost business. When questioned by the Court, Change's Senior Vice President and General Manager of Data Solutions unequivocally testified that Change's standard EDI contract prohibits the use of one payer's data for another payer's benefit. 8/3/22 AM Trial Tr. 47:12–24 (Suther) ("And if we felt that a [sic] interested health insurer were trying to, you know, reverse engineer the business practices of one of their competitors, that, in our mind, would be a violation of our confidentiality obligations under our agreement and wouldn't permit it."); FOF ¶¶ 232, 388. This testimony is corroborated by Change's longstanding business practice: Change has never sold one payer's data to a rival payer. 8/2/22 PM Trial Tr. 119:25–120:1 (Suther); FOF ¶ 233. Plaintiffs' theory of harm thus requires an inference that UHG would adopt a different interpretation of Change's contracts post-merger, thereby exposing itself to significant legal liability. Further, UHG offered amendments to Change's customer contracts to guarantee that "UHG will maintain commercially reasonable firewall and information security policies to protect Customer's Confidential Information from being disclosed" to UHC. DX-0766 at .0004; FOF ¶¶ 403–08, 410–11. Nearly 2,900 of Change's customers took UHG up on that offer. DX-0214S; FOF ¶ 409. UHG has therefore voluntarily assumed additional contract liability that constrains its ability to act in the manner Plaintiffs hypothesize. That is not the conduct of a company that intends to turn around and misuse rival payers' data to copy their innovations, and Plaintiffs have no evidence suggesting otherwise.

Rather than address the substantial costs that data misuse would impose on UHG, Plaintiffs and their economist take the position that any such costs would be "negligible" because "rivals aren't going to know whether United uses this information." 8/9/22 PM Trial Tr. 54:5–55:19 (Gowrisankaran); FOF ¶ 392. This is pure speculation: Dr. Gowrisankaran conducted no investigation whatsoever into whether external payers would be able to detect UHG's misuse of

20

their data.  FOF ¶ 393.  Nor did he provide any methodology to the Court that comes close to satisfying Rule 702 of the Federal Rules of Evidence.  FOF ¶ 393.  Equally problematic, Dr. Gowrisankaran simply zeroed out the potential costs to UHG by assuming away the "legal ramifications" that would flow from data "sharing," even though the sharing he hypothesizes is contrary to UHG's policies, contractual commitments, and—under Plaintiffs' theory—qualifies as a violation of antitrust law.  *See* 8/15/22 PM Trial Tr. 28:8–29:11 (Gowrisankaran) ("I made no contention that, as a result of this merger, UnitedHealth Group was going to misuse its rivals' data that it's going to use it in a way that violates legal standards or its contracts."); FOF ¶ 394.  The risk of legal liability is real and significant—and it cannot be ignored simply because it is inconsistent with Plaintiffs' theory.

On the other side of the scale, Plaintiffs have vanishingly little proof that UHG stands to gain anything by misusing external payers' data.  Today, UHG does not use external payers' data to reverse engineer those payers' innovations.  *See, e.g.*, 8/4/22 PM Trial Tr. 31:4–7 (Wichmann); 8/5/22 AM Trial Tr. 13:23–14:16 (Yurjevich); 8/8/22 AM Trial Tr. 89:25–90:10 (Higday); 8/10/22 AM Trial Tr. 73:14–74:16 (Schumacher); 8/10/22 PM Trial Tr. 119:22–120:11 (Gehlbach); FOF ¶ 104.  By Plaintiffs' own logic, that means UHG does not currently have sufficient incentive to engage in reverse engineering.  Plaintiffs therefore needed to prove that Change's EDI data would give UHG *additional* incentive to engage in reverse engineering, and such incentive would exist only if Change's EDI data made reverse engineering more valuable than it is today.

Plaintiffs have not come close to showing that reverse engineering would be more valuable post-merger.  Optum currently has huge volumes of external payers' claims data.  DX-0862 at .0014–15; FOF ¶¶ 83–87, 90–96.  Plaintiffs have not shown how much of that data Optum has; what innovations could be reverse engineered from that data; or how valuable those innovations

would be—*i.e.*, how much new national-account or large-group business UHC could win as a result of the innovations. Optum also has significant volumes of other types of external payers' data (*e.g.*, provider guides, contracts, and payer-specific adjudication rules that Optum receives in connection with its payment-integrity products). DX-0862 at .0015; FOF ¶¶ 83–84, 88–93, 95–99. Plaintiffs have not shown how much of that other data Optum has; what innovations could be reverse engineered from that data; or how valuable those innovations would be. In short, Plaintiffs have not established a baseline of how valuable reverse engineering would be today, and without that baseline, Plaintiffs cannot prove that reverse engineering would be ***more*** valuable post-merger.

Plaintiffs' inability to estimate and compare the value of innovations that Optum could reverse engineer before and after the merger is not just a failure of proof, it highlights the implausibility of their theory more broadly. What is difficult for Plaintiffs to estimate is equally difficult for UHG, and no evidence establishes that UHG would be able to confirm that the innovations it could reverse engineer from Change's EDI data would give a greater benefit to UHC than the $63 billion in lost sales that they would cost Optum, to say nothing of the additional legal liabilities. In fact, Optum was never able to quantify the incremental data that it would receive through the merger, nor was Optum ever able to determine the incremental percentage of claims for which it would obtain secondary-use rights. *See* 8/5/22 AM Trial Tr. 123:4–11 (Musslewhite); 8/10/22 AM Trial Tr. 96:21–97:1 (Schumacher); PX027 at UHG-2R-0006509717 ("Due to potential data overlaps between Optum primary data sets (NHI/dNHI and Optum Labs Data Warehouse (OLDW), which leverages NHI data plus external sources) and Cambridge data, estimating how much additional data will be added to Optum's pool is very difficult."); FOF ¶¶ 335–36.

In any event, a reverse-engineering strategy would be self-defeating in the long run. The few major payers that use Change's EDI clearinghouse could stop doing so and could apply pressure to providers to do the same. Empirical evidence shows that switching is not prohibitively expensive for many providers. As Plaintiffs' own economist opined, between 2018 and 2020, 30.2% of all Change's provider customers reduced the volume of claims that they transmitted through Change's EDI clearinghouse by 50% or more. 8/9/22 PM Trial Tr. 4:6–16 (Gowrisankaran); FOF ¶ 205. Against these statistics, Plaintiffs offered only anecdotal evidence from two provider witnesses who testified that switching clearinghouses would be costly or disruptive for them. But combined, those providers add up to "less than one-tenth of 1 percent" of Change's total volume of claims transmitted, 8/3/22 AM Trial Tr. 147:8–12 (Peresie); FOF ¶ 213, and they both purchase Change's EDI services as a component of Change's revenue-cycle-management ("RCM") software, not on a standalone basis, PX1008 at 143:15–20 (Mincher); 8/8/22 AM Trial Tr. 26:3–15 (Spady); FOF ¶ 215. Nothing in the record establishes that the experience of those two provider witnesses is "representative of the entire universe of [providers]," *see United States v. SunGard Data Sys., Inc.*, 172 F. Supp. 2d 172, 192 (D.D.C. 2001), and the empirical evidence suggests that their experience is not representative. As such, the testimony of the two provider witnesses should carry little weight.

Lacking evidence of changed incentives, Plaintiffs instead try to dress up portions of internal UHG documents as evidence that UHG intends to change its behavior post-merger. *See* PX027; PX054; PX944. But those documents—which discuss potential use cases for Change's data—do not state that the data could be valuable because it could benefit ***UHC exclusively***. Unbroken and unrebutted testimony from UHG's witnesses confirms that any potential uses of Change's EDI data would benefit ***all payers equally***, consistent with Optum's multi-payer business

23

model.  8/5/22 PM Trial Tr. 47:4–50:14 (Dumont); 8/8/22 AM Trial Tr. 49:13–69:7 (Higday); 8/4/22 PM Trial Tr. 81:1–86:9 (Hasslinger); FOF ¶ 337–41.  None of those use cases require Optum to share competitively sensitive information with UHC.  If anything, then, UHG's internal documents reveal that UHG wanted Change's data for procompetitive purposes.

To see just how fundamentally Plaintiffs misunderstand UHG's enterprise incentives, the Court need only review the testimony of Plaintiffs' economist.  In his report and testimony, Dr. Gowrisankaran cites UHG's CEO, Andrew Witty, as saying "that UnitedHealth Group needs to think about United at an enterprise level," 8/9/22 AM Trial Tr. 90:4–18 (Gowrisankaran); PX947 ¶ 25 & n.43; FOF ¶ 395, to create the impression that UHG invariably favors its most profitable business unit, UHC in whole, without regard for the incentives of its other business units or any external constraints.  The trial presentation, however, exposed this reading as at best incomplete, and at worst misleading.  The full picture of Mr. Witty's testimony makes clear that maximizing enterprise value "sometimes . . . would involve [separate business units'] assets being worked together," and "sometimes individually," all subject to "the important caveat of all of the rule sets" that limit UHG's conduct.  *See* DX-0852 at 296:1–297:17 (Witty); FOF ¶ 395.  All of UHG's efforts, then—whether "meeting the needs of the marketplace" or "meeting the needs of physicians and patients"—seek to "mak[e] the best of" the organization's assets, subject to meaningful "constraints," including market incentives, contractual limitations, firewall policies, and business ethics.  *See* DX-0852 at 296:1–297:17 (Witty); FOF ¶ 395.

Plaintiffs' case also fails for the basic reason that they have not marshalled any evidence of harm to competition in the relevant markets.  Under Plaintiffs' theory, what harms competition is not the copying of innovations itself, but the chilling of innovation by other payers and the resulting effect on health plans sold to national accounts and large-group employers.  *See Brown*

24

*Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (stating that Section 7 is "concern[ed] with the protection of competition, not competitors"); COL ¶ 44. Plaintiffs offered next to no evidence about the dynamics of the markets for commercial health insurance sold to national accounts or large-group employers, leaving a host of questions unanswered: Where would UHC deploy innovations it copied from rivals? Would these innovations enable UHC to win bids for national-account and large-group customers? At what threshold would UHC's copying chill rival payers from innovating? Would the absence of rival payers' would-be innovations have any effect on national-account and large-group customers? If so, would the effect be a substantial lessening of competition? And what particular innovations, separately or together, would accomplish this substantial lessening? Each of these questions is an essential link in Plaintiffs' case, and they have answered none of them, providing yet more reasons to reject Plaintiffs' theory.

Plaintiffs' "copying innovation" theory does not just suffer from a failure of proof, it is squarely contradicted by the scant payer testimony that did make it into the record. An Aetna employee testified that he was "not forecasting" Aetna innovating any less as a result of the merger. 8/1/22 PM Trial Tr. 94:23–95:2 (Lautzenhiser); FOF ¶ 399. █████████████████████

███████████████████████████████████████████████

██████████████ ; FOF ¶ 399. A Cigna employee testified that Cigna would not "ever compete less for any reason." PX1005 at 169:14–16, 169:19–170:6 (Dill); FOF ¶ 399. Finally, a former Cigna employee with no authority to testify on Cigna's behalf, Lynn Garbee, stated that Cigna "would still innovate" post-merger, but that "they would be more careful where they put their edits." 8/1/22 PM Trial Tr. 14:17–22 (Garbee); FOF ¶ 399. But Ms. Garbee then explained that she was referring to moving those edits out of ClaimsXten—a concern solved by the divestiture. 8/1/22 PM Trial Tr. 15:22–16:12 (Garbee); FOF ¶ 399. Ms. Garbee's statement is the

closest Plaintiffs came to marshalling third-party support for their theory, and it is still light years away from testimony that any payer will innovate less. In sum, Plaintiffs presented no testimony from any national account or large-group employer about the likely effects of the transaction on competition, and the payer testimony in the record affirmatively refutes Plaintiffs' central, data-misuse theory.

> 2. The record does not support the "improving GRA" version of Plaintiffs' data-misuse theory.

The "improving GRA" version of Plaintiffs' data-misuse theory fares no better. This version of Plaintiffs' theory hinges on the notion that Optum would refuse to sell an improved version of its GRA tool to external payers. 8/9/22 PM Trial Tr. 13:1–6 (Gowrisankaran) ("Q. Doctor, I need you to answer the question yes or no. If Optum did market GRA to all payers, then you don't know what would happen, true? A. I didn't look at what would happen to competition if it were offered on an equal footing to all payers for that particular [product], yes."); FOF ¶ 55. But Optum has never offered a product only to UHC. DX-0850; 8/5/22 AM Trial Tr. 62:23–63:3 (Yurjevich); FOF ¶¶ 53, 73–74. Here too, Plaintiffs have failed to prove that UHG would be incentivized to change its behavior post-merger. Dr. Gowrisankaran did not even attempt to calculate what UHC would purportedly gain by being the only payer with access to an improved version of GRA. Nor did he attempt to calculate what Optum would lose by foregoing sales of an improved version of GRA to external payers. Thus, Dr. Gowrisankaran's prediction that Optum would withhold an improved version of GRA is little more than a guess.

Worse, that guess is predicated on a blatant factual error. At his deposition, Dr. Gowrisankaran testified that Optum sells the current version of GRA only to UHC. 8/9/22 PM Trial Tr. 6:5–8 (Gowrisankaran); FOF ¶ 54. But at trial, he admitted he was wrong about that; GRA is sold to both UHC and external payers. 8/9/22 PM Trial Tr. 6:9–7:6 (Gowrisankaran);

26