# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM, individually
and on behalf of all others similarly
situated,

            Plaintiffs,

v.

UNITEDHEALTH GROUP INC.,
ANDREW WITTY, STEPHEN
HEMSLEY, and BRIAN THOMPSON,

            Defendants.

Case No. 0:24-cv-01743-JMB-JFD

## UNITEDHEALTH GROUP INC.'s, ANDREW WITTY'S, AND STEPHEN HEMSLEY'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED SUPPLEMENTAL CONSOLIDATED COMPLAINT

Peter C. Magnuson
Matthew Kilby
Jeffrey P. Justman
Anderson C. Tuggle
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000
peter.magnuson@faegredrinker.com
matthew.kilby@faegredrinker.com
jeff.justman@faegredrinker.com
anderson.tuggle@faegredrinker.com

Robert J. Giuffra, Jr. (admitted *pro hac vice*)
Jeffrey T. Scott (admitted *pro hac vice*)
Matthew J. Porpora (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
giuffrar@sullcrom.com
scottj@sullcrom.com
porporam@sullcrom.com

Morgan L. Ratner (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

*Attorneys for Defendants UnitedHealth Group Inc.,
Andrew Witty, and Stephen Hemsley*

September 23, 2025

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 8

    A.    The Parties ........................................................................................ 8

    B.    This Action ........................................................................................ 9

        1.    The Challenged Statements ................................................. 12

        2.    The Allegations of Scienter ................................................. 12

        3.    The Alleged Corrective Disclosures ................................... 13

ARGUMENT ...................................................................................................... 15

I.    Plaintiff's Section 10(b) Securities Fraud Claim Should Be Dismissed ............... 16

    A.    The Complaint does not satisfy the PSLRA's requirement to specify why each challenged statement is misleading ............................................. 16

    B.    Plaintiff fails to plead that UnitedHealth made any actionable misstatements ............................................................. 18

        1.    UnitedHealth did not defraud its shareholders by not confessing to supposed misconduct during HouseCalls and Chart Reviews ................................................................... 19

        2.    The challenged statements concerning the Change Healthcare merger are not actionable ............................................... 27

        3.    UnitedHealth's purported "monopolist" conduct did not render false its Code of Conduct ............................................ 29

        4.    The challenged statements about hospitalization rates are not actionable ....................................................................... 31

        5.    UnitedHealth did not misrepresent anything about its portfolio-refinement transactions .......................................... 32

    C.    Plaintiff fails to plead the required strong inference of scienter ................ 34

        1.    Plaintiff fails to plead any motive to defraud UnitedHealth shareholders .................................................................................35

        2.    Plaintiff fails to plead strong circumstantial evidence of conscious misbehavior or extreme recklessness ..............................37

    D.    Plaintiff fails to plead loss causation ..........................................46

II.    Plaintiff's Control-Person Claim Should Be Dismissed .........................................51

III.    Plaintiff's Insider-Trading Claim Should Be Dismissed.........................................51

CONCLUSION ...................................................................................................54

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Anderson* v. *Abbott Lab'ys*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ......................................................... 25

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023).......................................................................... 50

*Bondali* v. *Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ............................................................... 19

*Born* v. *Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)............................................... 28, 29, 47

*Carvelli* v. *Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) .................................................................. 21

*Chill* v. *Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996)........................................................................ 38

*City of Hollywood* v. *Inspire Med. Sys., Inc.*,
2025 WL 1158653 (D. Minn. Mar. 24, 2025) ....................................... 22, 44

*City of Phila.* v. *Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) .................................................................. 44

*City of Plantation* v. *Meredith Corp.*,
16 F.4th 553 (8th Cir. 2021) ...............................................................*passim*

*Cole* v. *Homier Distrib. Co.*,
599 F.3d 856 (8th Cir. 2010) ............................................................... 28, 43

*Cornelia I. Crowell GST Tr.* v. *Possis Med., Inc.*,
519 F.3d 778 (8th Cir. 2008) ............................................................... 34, 40

*Crutchfield* v. *Match Grp., Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021) ....................................................... 26

*Doshi* v. *Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) .................................................................... 44

*Dura Pharms., Inc.* v. *Broudo*,
    544 U.S. 336 (2005) ................................................................................. 46

*ECA* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................ 27, 28

*Elam* v. *Neidorff*,
    544 F.3d 921 (8th Cir. 2008) .............................................................. 22, 38

*Fulton Cnty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) ................................................................. 24

*Gamm* v. *Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ..................................................................... 29

*Gray* v. *Alpha & Omega Semiconductor Ltd.*,
    2021 WL 4429499 (S.D.N.Y. Sept. 27, 2021) ......................................... 20

*Gregory* v. *ProNAi Therapeutics Inc.*,
    757 F. App'x 35 (2d Cir. 2018) ................................................................ 41

*Gross* v. *GFI Grp., Inc.*,
    784 F. App'x 27 (2d Cir. 2019) ................................................................ 30

*Gurary* v. *Winehouse*,
    190 F.3d 37 (2d Cir. 1999) ....................................................................... 43

*Horizon Asset Mgmt. Inc.* v. *H&R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) .............................................................. 34, 40

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
    579 F.3d 878 (8th Cir. 2009) ......................................................... 2, 17, 18

*In re 3M Co. Sec. Litig.*,
    2021 WL 4482987 (D. Minn. Sept. 30, 2021) ......................................... 42

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ................................................................. 37

*In re Ceridian Corp. Sec. Litig.*,
    542 F.3d 240 (8th Cir. 2008) ...................................................... 4, 15, 37, 39

*In re Cerner Corp. Sec. Litig.*,
    425 F.3d 1079 (8th Cir. 2005) ................................................................. 23

*In re Ferrellgas Partners, LP, Sec. Litig.*,
 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ............................................................ 43

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ............................................................ 46

*In re Hertz Glob. Holdings Inc.*,
 905 F.3d 106 (3d Cir. 2018)............................................................................... 41, 45

*In re Hutchinson Tech., Inc. Sec. Litig.*,
 536 F.3d 952 (8th Cir. 2008) ............................................................................ 20, 40

*In re Indivior PLC Sec. Litig.*,
 2025 WL 2242758 (E.D. Va. Aug. 6, 2025) .............................................................. 36

*In re IPO Sec. Litig.*,
 399 F. Supp. 2d 261 (S.D.N.Y. 2005)....................................................................... 48

*In re K-tel Int'l, Inc. Sec. Litig.*,
 300 F.3d 881 (8th Cir. 2002) .................................................................................. 37

*In re Lehman Bros., Inc.*,
 855 F.3d 459 (2d Cir. 2017)................................................................................... 36

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
 939 F. Supp. 2d 360 (S.D.N.Y. 2013)....................................................................... 42

*In re Medtronic Inc., Sec. Litig.*,
 618 F. Supp. 2d 1016 (D. Minn. 2009)........................................................... 21, 32, 38

*In re Nektra Therapeutics Sec. Litig.*,
 34 F.4th 828 (9th Cir. 2022) .................................................................................. 50

*In re Philip Morris Int'l Inc. Sec. Litig.*,
 89 F.4th 408 (2d Cir. 2023) ............................................................................. 31, 32

*In re Plug Power, Inc. Sec. Litig.*,
 2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023) ........................................................... 43

*In re Rocket Cos., Inc. S'holder Derivative Litig.*,
 2025 WL 1554632 (Del. Ch. June 2, 2025)................................................................ 53

*In re Rockwell Med., Inc. Sec. Litig.*,
 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ............................................................ 42

*In re Silver Lake Grp., LLC Sec. Litig.*,
    108 F.4th 1178 (9th Cir. 2024) ........................................................................ 8, 50, 52

*In re Stratasys Ltd. S'holder Sec. Litig.*,
    864 F.3d 879 (8th Cir. 2017) ............................................................................ 19, 20

*In re Target Corp. Sec. Litig.*,
    955 F.3d 738 (8th Cir. 2017) ............................................................................ 15, 34

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ......................................................... 1

*In re UiPath, Inc. Sec. Litig.*,
    2025 WL 2065093 (S.D.N.Y. July 23, 2025) ......................................................... 49

*In re Zagg, Inc. Sec. Litig.*,
    797 F.3d 1194 (10th Cir. 2015) ............................................................................ 40

*Jackson* v. *Abernathy*,
    960 F.3d 94 (2d Cir. 2020) .................................................................................... 38

*Joyce* v. *Amazon.com, Inc.*,
    2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ...................................................... 42

*Julianello* v. *K-V Pharm. Co.*,
    791 F.3d 915 (8th Cir. 2015) ................................................................................ 22

*Kowal* v. *MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994) .............................................................................. 32

*Lian* v. *Tuya Inc.*,
    2025 WL 733253 (S.D.N.Y. Mar. 7, 2025) ............................................................ 31

*Loos* v. *Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ............................................................................ 46, 47

*Lorenzo* v. *SEC*,
    587 U.S. 71 (2019) ................................................................................................ 24

*MacPhee* v. *MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023) .......................................................................... 16, 48

*Mart* v. *Tactile Sys. Tech., Inc.*,
    595 F. Supp. 3d 788 (D. Minn. 2022) ................................................................... 50

*Meitav Dash Provident Funds* v. *Spirit AeroSystems Holdings, Inc.*,
    79 F.4th 1209 (10th Cir. 2023) ................................................................ 42

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ......................................... 32

*Meyer* v. *Greene*,
    710 F.3d 1189 (11th Cir. 2013) ................................................................ 47

*Minneapolis Firefighters' Relief Ass'n* v. *MEMC Elec. Materials, Inc.*,
    641 F.3d 1023 (8th Cir. 2011) .................................................................. 38

*Ok. Firefighters Pension & Ret. Sys.* v. *Capella Educ. Co.*,
    873 F. Supp. 2d 1070 (D. Minn. 2012) .............................................. 25, 31

*Omnicare, Inc.* v. *Laborers Dist. Council*,
    575 U.S. 175 (2015) ............................................................................ 18, 23

*Parnes* v. *Gateway 2000, Inc.*,
    122 F.3d 539 (8th Cir. 1997) .................................................................... 28

*Perez* v. *Target Corp.*,
    2024 WL 4804656 (D. Minn. Nov. 15, 2024) .......................................... 21

*Pittman* v. *Unum Grp.*,
    861 F. App'x 51 (6th Cir. 2021) ............................................................... 42

*Plumber & Steamfitters* v. *Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021)............................................................... *passim*

*Podraza* v. *Whiting*,
    790 F.3d 828 (8th Cir. 2015) .............................................................. 12, 35

*Puchtler* v. *Barclays PLC*,
    2025 WL 887502 (S.D.N.Y. Mar. 21, 2025) ............................................ 44

*Pugh* v. *Trib. Co.*,
    521 F.3d 686 (7th Cir. 2008) .................................................................... 41

*Rand-Heart of N.Y., Inc.* v. *Dolan*,
    812 F.3d 1172 (8th Cir. 2016) ....................................................... 4, 46, 49

*Retail Wholesale* v. *Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) .................................................................... 6

*Rochester Laborers Pension Fund* v. *Monsanto Co.*,
   883 F. Supp. 2d 835 (E.D. Mo. 2012)..............................................................23, 24, 35

*Sailors* v. *N. States Power Co.*,
   4 F.3d 610 (8th Cir. 1993)...........................................................................................25

*Santa Fe Indus. Inc.* v. *Green*,
   430 U.S. 462 (1977)......................................................................................................26

*SEB Inv. Mgmt. AB* v. *Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) .....................................................................52

*Shields* v. *Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)........................................................................................38

*Shoemaker* v. *Cardiovascular Sys., Inc.*,
   300 F. Supp. 3d 1046 (D. Minn. 2018) ...............................................................30, 36

*Singh* v. *Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)..........................................................................................30

*Société Générale Sec. Servs., GbmH* v. *Caterpillar, Inc.*,
   2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ............................................................42

*Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004) .........................................................................................1

*Steamfitters Loc. 449 Pension Plan* v. *AT&T Inc.*,
   2022 WL 17587853 (2d Cir. Dec. 13, 2022) ..........................................................7, 32

*Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*,
   552 U.S. 148 (2008)......................................................................................................26

*Stratte-McClure* v. *Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)..........................................................................................45

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)................................................................................4, 15, 19, 34, 35

*United States* v. *UnitedHealth Grp. Inc.*,
   630 F. Supp. 3d 118 (D.D.C. 2022) .........................................................5, 11, 28, 44

*United States ex rel. Poehling* v. *UnitedHealth Grp. Inc.*,
   2025 WL 682285 (C.D.Cal. Mar. 3, 2025) ................................................................26

*W. Virginia Pipe Trades Health & Welfare Fund* v. *Medtronic, Inc.*,
   845 F.3d 384 (8th Cir. 2016) ............................................................ 26

*Zean* v. *Fairview Health Servs.*,
   858 F.3d 520 (8th Cir. 2017) ............................................................ 12

**Statutes**

15 U.S.C. § 78j(b) ....................................................................... 26, 27

15 U.S.C. § 78u-4(b) ............................................................ 15, 16, 34, 46

15 U.S.C. § 78u-5(c) ........................................................................ 23

15 U.S.C. § 78u-5(i) ......................................................................... 23

## INTRODUCTION

Plaintiff's complaint is a 208-page catalog of virtually every public criticism lodged against UnitedHealth Group Inc. ("UnitedHealth") over the last four years. To compile its tome, Plaintiff has amended or supplemented its complaint five times, each time adding even more scattershot allegations from negative newspaper coverage of UnitedHealth. The operative Complaint now alleges that UnitedHealth has engaged in a wide range of unrelated misconduct, from faulty Medicare billing practices and attempts to reduce hospitalizations to deficient internal corporate firewalls and anticompetitive conduct.

What the Complaint does *not* allege is securities fraud. Not one of Plaintiff's accusations identifies a single specific, actionable misrepresentation that defrauded UnitedHealth shareholders. It is black-letter law that a decline in a company's stock price following a negative event—including after purported misconduct is revealed—does not alone constitute securities fraud. And it is equally well settled that a complaint does not adequately plead a securities fraud claim merely because it is lengthy. The opposite is true: "such a garrulous style is not an uncommon mask for an absence of detail" on the substantive elements required to plead securities fraud. *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004); *see, e.g.*, *City of Plantation* v. *Meredith Corp.*, 16 F.4th 553, 555-56 (8th Cir. 2021) (affirming dismissal of 125-page securities-fraud complaint); *In re UBS AG Sec. Litig.*, 752 F.3d 173 (2d Cir. 2014) (affirming dismissal of 548-page complaint).

That is all the Complaint offers: parroted bad news coverage and length. To try to capitalize on unrelated stock-price drops over a multi-year period, Plaintiff presses five

disparate and flawed theories of securities fraud based on (i) Medicare Advantage billing, (ii) the alleged absence of firewalls to prevent sharing of competitor data following UnitedHealth's acquisition of Change Healthcare ("Change"), (iii) a grab-bag of alleged anti-competitive conduct, (iv) purported improper efforts to reduce nursing home hospitalizations, and (v) so-called "portfolio refinement" transactions.  But the Complaint fails several times over.  For starters, it violates the fundamental requirement of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) to plead with particularity specific statements that are allegedly false or misleading.  Instead, Plaintiff puffs up the Complaint with 48 different statements, often in lengthy block quotes, without "identify[ing] 'what' statements [are] allegedly false or misleading" and "why each statement [is] misleading." *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009).  The Court should dismiss on this ground alone.

Equally dispositive, Plaintiff does not plead each required element of a securities fraud claim for any of its five unconnected fraud theories.  Plaintiff must establish that *each statement* was (i) both false and materially so, (ii) made with scienter, and (iii) corrected by a disclosure that caused loss.  Not a single statement in the Complaint meets all three requirements.  In fact, most fail on all three.

1.    ***Medicare Advantage.***  Plaintiff's criticisms of UnitedHealth's Medicare Advantage program form the Complaint's core.  Under that program, the government pays insurers a set fee per patient based on each individual's predicted health status, as specified in the Centers for Medicare & Medicaid Services's ("CMS") schedule of diagnostic codes.  Because sicker patients require more medical care, insurance companies receive a higher

-2-

fee for the greater risks of insuring them.  Plaintiff's theory is that UnitedHealth used its "HouseCalls" program to collect higher Medicare Advantage payments because visiting nurses purportedly identified "not medically supported" conditions for an unspecified number of patients out of millions of visits per year.  (Compl. ¶ 8.)  Plaintiff does not contend that these HouseCalls provided no value to seniors or never resulted in legitimate diagnoses.  Instead, Plaintiff relies on cherry-picked allegations from press reports about these visits and a Department of Justice ("DOJ") civil investigation into those allegations. Such thin allegations do not state a claim for securities fraud.

*First*, Plaintiff has not pled a material misrepresentation.  Instead,  Plaintiff claims, in blunderbuss fashion, that numerous public statements UnitedHealth made about its Medicare Advantage program were fraudulent, including (i) generic statements that are not actionable as a matter of law (*e.g.*, "in-home clinical care programs provide significant benefits to seniors" (Compl. ¶ 290)), (ii) factual statements about how Medicare Advantage works (*e.g.*, that "[r]isk adjustment levels [the] playing field and ensures that there's no disincentive to care for the most vulnerable" (¶ 293)), (iii) accurate historical data (*e.g.*, that "nurse practitioners performed more than 2.7 million clinical preventive home care visits in 2023" (¶ 315)), and (iv) honestly held opinions about Medicare Advantage's future performance (*e.g.*, the "2025 outlook [] includes revenues of $450 billion to $455 billion" (¶ 320)).  Plaintiff claims that these statements were false because UnitedHealth did not disclose that it used its HouseCalls program "to generate unsupported diagnoses of serious and chronic medical conditions in order to boost Medicare Advantage payments." (¶ 331(a).)  But it is axiomatic that "companies do not have a duty to disclose uncharged,

unadjudicated wrongdoing." *Plumber & Steamfitters* v. *Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021), and, in any event, Plaintiff does not plead particularized allegations of any pervasive wrongdoing.

*Second*, Plaintiff fails to plead the required "strong inference" of scienter—that is, an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). Plaintiff merely recycles the same sort of generic allegations that courts routinely reject, such as pointing to the Individual Defendants' high-level executive positions at UnitedHealth and their familiarity with the Company's financial results, and the accounts of "confidential witnesses" who are not alleged to have had any interactions with the Individual Defendants. Nor can Plaintiff evade this requirement under the PSLRA's heightened pleading standards by alleging that UnitedHealth's CEO and CFO "should have known" about the company's purported misuse of the HouseCalls program to generate revenue, because negligence—or even "incompetence"—does not constitute securities fraud. *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 249 (8th Cir. 2008).

*Third*, Plaintiff fails to plead loss causation—that is, that a "corrective disclosure" revealed the falsity of the challenged misstatements. *Rand-Heart of N.Y., Inc.* v. *Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016). Instead, Plaintiff cites reports of government investigations into previously publicly known allegations involving the HouseCalls program—which have not resulted in any enforcement action—and UnitedHealth's earnings miss in Q1-2025, which was followed by the CEO's resignation. None of those

disclosures revealed that any of the challenged statements about the HouseCalls program were false.

**2.** ***Change Healthcare Acquisition.***  Plaintiff alleges that UnitedHealth made in-court misrepresentations in conjunction with DOJ's unsuccessful lawsuit to block its 2022 acquisition of Change Healthcare—namely, that UnitedHealth never intended to extend its firewalls to Change to prevent improper sharing of competitor data.  (Compl. ¶¶ 11-13.)  But as Plaintiff acknowledges (¶ 207), the district court concluded after a trial that the evidence "d[id] not reveal" any "intention" on UnitedHealth's part to misuse "competitive intelligence about its rivals."  *United States* v. *UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 123, 144 (D.D.C. 2022).  That ruling dooms this theory of securities fraud.

Plaintiff's hindsight-driven collateral attack on that judgment fails.  *First*, Plaintiff does not plead that UnitedHealth's stated intention to extend its firewalls to Change post-merger was false when made.  *Second*, Plaintiff fails to plead a strong inference of fraudulent intent.  That UnitedHealth's then-CEO (Andrew Witty) and its Board Chairman (Stephen Hemsley) sold 13% and 7% of their stock, respectively, before the Change trial has no bearing on scienter for securities fraud; if anything, that Messrs. Witty and Hemsley sold those shares before the trial undermines any allegation that they intended to profit by improperly using competitor data after acquiring Change.  (Compl. ¶¶ 382-83.)  *Third*, Plaintiff makes no effort to plead loss causation.  None of the purported "corrective disclosures" that Plaintiff cites (¶¶ 232-87) even mentioned firewalls, let alone revealed that UnitedHealth did not intend to implement the relevant firewalls following the Change merger.

**3.    *Purported "Monopolist" Conduct.*** Plaintiff declares that UnitedHealth used its supposed "monopolistic dominance to engage in anti-competitive practices to consolidate its control over healthcare services and eliminate competition," primarily by favoring its subsidiary Optum.  (¶ 6.)  But such conclusory allegations fall short of securities fraud for at least three reasons.  *First*, the only statement Plaintiff challenges is UnitedHealth's aspirational statement in its employee Code of Conduct that "[n]o employee or director should take advantage of anyone through unfair-dealing practices." (¶ 345.)  That kind of generic statement is not legally actionable because "a code of conduct is 'inherently aspirational'" and "expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspiration." *Retail Wholesale* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).  *Second*, the Complaint contains no particularized allegations that UnitedHealth's CEO and CFO intended to defraud shareholders by publishing its Code of Conduct on its website, as virtually every public company does.  *Third*, Plaintiff cannot establish loss causation because the announcement of a DOJ investigation over alleged antitrust violations did not correct any statement in the company's Code of Conduct.

**4.    *Nursing Home Hospitalization.*** Based on allegations in an anonymously sourced article in *The Guardian*, a British newspaper, Plaintiff alleges that UnitedHealth offered "bonus payments" to nursing homes under a "'Premium Dividend' program" if they lowered hospitalization rates for patients on Medicare Advantage.  (Compl. ¶¶ 141-46.).  Based on this allegation, Plaintiff contends that UnitedHealth defrauded its shareholders by making generic statements about Medicare Advantage (*e.g.*, "[c]onsumers

in Medicare Advantage [] experienced better health outcomes" (¶ 314)), and reporting accurate statistics (*e.g.*, Medicare Advantage customers have a "40% lower rate of avoidable hospitalizations and consistently derive much greater value" for shareholders (¶ 309)). Those allegations also fail. *First*, the challenged statements are either "paradigmatic examples of the kind of 'vague' and 'optimistic' rhetoric that constitutes corporate puffery," *Meredith*, 16 F.4th at 557, or "[a]ccurately reported data," which "does not become an actionable misrepresentation merely because underlying misconduct may have contributed to the reported numbers," *Steamfitters Loc. 449 Pension Plan* v. A*T&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022). *Second*, Plaintiff does not even try to plead particularized facts evidencing the Individual Defendants' scienter with respect to these allegations, as they must to state a claim. *Third*, Plaintiff fails to plead loss causation because nothing in *The Guardian* article corrects any of UnitedHealth's challenged statements about the general benefits of Medicare Advantage.

**5.    *Portfolio Refinement Transactions.***    Plaintiff alleges that UnitedHealth "would have missed" its 2024 earnings had it not sold stakes in certain subsidiary businesses to private-equity investors in so-called "portfolio refinement" transactions. (Compl. ¶ 331(f).) These allegations also fail. *First*, UnitedHealth disclosed in its Form 10-K all the details of these transactions, including that the gains "were recorded [as] operating costs ... and contributed about 80 basis points ($3.3 billion) to the operating cost ratio," and that UnitedHealth could be "required to repurchase these interests [for] up to $3.4 billion." (¶ 327.) *Second*, Plaintiff's sole scienter allegation—that UnitedHealth's CFO later announced that he was stepping down—cannot support an inference of scienter.

*Third*, Plaintiff cannot plead loss causation because it does not allege that UnitedHealth's stock price declined either when it reported the details of these transactions or when the media and analysts criticized the transactions.  (¶¶ 267-79.)  Instead, Plaintiff alleges that the stock price declined when UnitedHealth later revised its earnings for 2025, which did not correct any statements about the previously disclosed asset sales.  (¶ 282.)

*    *    *

***Control-Person Liability.***  Because Plaintiff alleges no primary securities violation, its control-person liability claim must be dismissed.

***Insider-Trading Claim.***  Plaintiff also fails to plead an insider-trading claim against Messrs. Hemsley and Witty.  *First*, Plaintiff fails to plead an underlying Section 10(b) claim, as required to plead an insider-trading claim under Section 20A.  *Second*, Plaintiff fails to plead that it made a "contemporaneous" trade (*i.e.*, on the same day) as Messrs. Hemsley's and Witty's stock sales.  *Third*, Plaintiff fails to plead "what [material non-public] information [Messrs. Hemsley and Witty] specifically obtained or 'when and from whom' [they] obtained it."  *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1192 (9th Cir. 2024).

## BACKGROUND

### A.    The Parties

The California Public Employees' Retirement System is the lead plaintiff for this putative class of UnitedHealth shareholders, and it allegedly purchased UnitedHealth common stock during the Class Period.

Headquartered in the Twin Cities, UnitedHealth is a healthcare company that provides health insurance through its "UnitedHealthcare" business and healthcare services through its "Optum" business. (Compl. ¶¶ 2, 4, 43.) Plaintiff names three individuals as Defendants ("Individual Defendants"): Andrew Witty, Stephen Hemsley, and Brian Thompson. Mr. Witty served as UnitedHealth's CEO from February 3, 2021 to May 13, 2025. (Compl. ¶ 44.) Mr. Hemsley served as Chair of UnitedHealth's Board since 2017, and took over as acting CEO after Mr. Witty resigned in May 2025. (¶ 45.) Mr. Thompson served as CEO of UnitedHealth's insurance business from April 7, 2021 until he was murdered on December 4, 2024, in New York City. (¶ 46.)[1]

## B.    This Action

On February 27, 2024, *The Wall Street Journal* reported that DOJ had commenced an "antitrust investigation" of UnitedHealth regarding "acquisitions of doctor groups" and "Medicare billing issues." (Compl. ¶ 232.) When UnitedHealth's stock price declined following that report, Plaintiff immediately filed this stock-drop suit. (*See* ECF 1.) After press reports of additional allegations against UnitedHealth, Plaintiff amended and supplemented its complaint five times to incorporate these reports. The now-operative complaint is a sprawling behemoth, filled with disjointed allegations parroting virtually every negative piece of press that UnitedHealth has had over the last few years. Those allegations fall into five categories.

---

[1]    This motion is filed on behalf of only UnitedHealth, Messrs. Witty and Hemsley, because Mr. Thompson is deceased and a motion to substitute his estate has not been filed.

*First*, Plaintiff alleges that UnitedHealth "exploited the HouseCalls program by using tools designed to find diagnoses that did not exist, including software specifically programmed to recommend lucrative diagnoses and unreliable medical devices." (Compl. ¶ 8.) Plaintiff makes similar allegations about additional diagnoses based on so-called "chart reviews." (¶¶ 76, 89.) Specifically, Plaintiff claims that UnitedHealth committed fraud by not disclosing that its upcoding practices were driving inappropriate government reimbursement payments.

*Second*, Plaintiff piggybacks on DOJ's highly publicized (and ultimately failed) antitrust action in 2022 to block UnitedHealth's Change acquisition. Change is a healthcare technology company that "process[es] health insurance claims," and DOJ alleged that the acquisition would allow UnitedHealth to "access [] critical competitor information." (Compl. ¶ 11.) During that litigation, UnitedHealth testified to the court that it "has maintained robust firewall and data security policies" and "commits" to "extend [] to Change's Healthcare business" post-merger its "existing firewalls … [that] prohibit employees from improperly sharing external-customer" data. (¶¶ 335, 339.) Following a two-week bench trial that "included testimony from over two dozen witnesses," the court rejected DOJ's allegation, credited UnitedHealth's testimony, and held that there was no evidence that UnitedHealth had any "intention" to misuse "competitive intelligence about its rivals." *UnitedHealth*, 630 F. Supp. 3d at 144. Nonetheless, Plaintiff baselessly contends that UnitedHealth's representations during the trial were false.

*Third*, Plaintiff alleges that UnitedHealth engaged in "anti-competitive practices to consolidate control over healthcare services, eliminate competition, and boost revenues"

for the benefit of its shareholders (*i.e.*, Plaintiff).  (Compl. ¶ 221.)  Plaintiff contends that, after a cyberattack targeted Change's systems in 2024, UnitedHealth provided "loans to desperate providers financially frozen by the breach" on terms that Plaintiff thinks were lopsided in favor of UnitedHealth.  (¶ 219.)  Plaintiff similarly complains about Optum's contracts with hospitals and doctors (¶¶ 222-24), and that UnitedHealth allegedly tried to "freez[e] out rival providers" by "favoring Optum providers over non-Optum providers." (¶ 227).  Plaintiff does not plead that any of UnitedHealth's business tactics were illegal. Instead, Plaintiff merely alleges that DOJ commenced an "antitrust investigation" into unspecified matters.  (¶ 229.)

*Fourth*, Plaintiff claims that UnitedHealth offered "bonus payments" to nursing homes if they lowered hospitalization rates for patients on Medicare Advantage.  (Compl. ¶¶ 141-46.)  According to Plaintiff, UnitedHealth did this because it was focused on "profitability [] for the shareholders."  (¶ 145.)

*Fifth*, Plaintiff criticizes so-called "portfolio refinement" transactions, in which UnitedHealth sold certain "businesses and assets" in 2024.  (Compl. ¶ 327.)  According to Plaintiff, UnitedHealth "would have missed" its 2024 earnings were it not for such transactions.  (¶ 331(f).)

Plaintiff asserts three claims based on these allegations:  (i) securities fraud under Section 10(b) against all Defendants (Count I) (Compl. ¶¶ 512-16); (ii) a "control person" claim under Section 20(a) against all Defendants (Count II) (¶¶ 517-22); and (iii) an insider-trading claim under Section 20A against Messrs. Witty and Hemsley (Count III) (¶¶ 523-28).

### 1.    The Challenged Statements

To try to manufacture a securities fraud claim, Plaintiff has picked through nearly four years of UnitedHealth's public statements to find any remarks that touch on the conduct it criticizes.    Plaintiff challenges 48 different statements made between September 22, 2021 and July 15, 2025 in a wide variety of settings, including SEC filings, press releases, earnings calls, investor conferences, responses to media inquiries, court filings, and other public documents and reports.    The statements fall into five broad categories:  (i) generic statements about Medicare Advantage, data security, and efforts to comply with law; (ii) statements of opinions, beliefs, and future intentions; (iii) factually accurate statements of past performance; (iv) earnings projections; and (v) responses to media reports that Plaintiff characterizes as "denials."  The full text of the statements are included in Exhibit 1.[2]

### 2.    The Allegations of Scienter

In trying to plead scienter, Plaintiff points to the Individual Defendants' senior positions and sales of UnitedHealth stock (while ignoring their purchases of stock during the same period), testimony from purported "whistleblowers," and allegations attributed to "confidential witnesses" who supposedly expressed concerns about UnitedHealth's business practices.  (Compl. ¶¶ 347-433.)  Notably, Plaintiff does not allege that any of

---

[2]    On a motion to dismiss, the court "may consider [UnitedHealth's] SEC filings," *Podraza* v. *Whiting*, 790 F.3d 828, 833 (8th Cir. 2015), and "documents necessarily embraced by the complaint," *Zean* v. *Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

these whistleblowers or confidential witnesses raised their concerns with any senior UnitedHealth executive, let alone with any Individual Defendant.

### 3.    The Alleged Corrective Disclosures

Seizing on widespread reports of industry-wide allegations of aggressive coding by Medicare Advantage insurers,[3] coupled with macroeconomic news that caused earnings misses and stock price declines for many insurance companies in Q1-2025,[4] Plaintiff alleges that the purported misstatements were corrected by nine disclosures on eight separate dates:

1.   **February 24, 2024**:  *The Wall Street Journal* reported that DOJ "launched an antitrust investigation" into "the possible effects of the company's doctor-group acquisitions on rivals and consumers," as well as "Medicare billing issues, including the company's practices around documenting patients' illnesses." (Compl. ¶ 232.)

2.   **February 21, 2025**:  *The Wall Street Journal* reported a "civil fraud investigation … examining" previously reported allegations of "recording diagnoses that trigger extra payments to its Medicare Advantage plans." (¶ 240.)

3.   **April 17, 2025**:  UnitedHealth "reported lower-than-expected Q1-2025 results and slashed 2025 earnings guidance 12%" (¶ 254) because (i) customers sought medical treatment "at twice th[e 2024] rate" in Q1-2025

---

[3]    *See, e.g.*, *Beat cancer? Your Medicare Advantage plan might still be billing for it*, WASH. POST (June 5, 2022); *How Insurance Firms Exploited Medicare Advantage for Billions*, N.Y. TIMES (Oct. 8, 2022) ; *Biden's Plan to Cut Billions in Medicare Fraud Ignites a Lobbying Frenzy*, N.Y. TIMES (Mar. 22, 2023).

[4]    *See, e.g.*, *Health Insurers Are Becoming Chronically Uninvestible*, WALL ST. J. (July 10, 2025).

(Ex. 10 at 3 (4/17/2025 Earnings Tr.)); and (ii) its Medicare Advantage business was "more affected" than expected by newly implemented regulatory changes to the "CMS risk model" (*id.* at 4).

4.  **May 13, 2025**:  UnitedHealth announced that Mr. Witty was stepping down as CEO, and that the "the company suspended its 2025 outlook as care activity continued to accelerate … and the medical costs of many Medicare Advantage beneficiaries new to UnitedHealthcare remained higher than expected."  (Compl. ¶ 256.)

5.  **May 14, 2025** (after market close):  *The Wall Street Journal* reported that DOJ is investigating potential "criminal" violations relating to unspecified "Medicare Advantage business practices."    (¶¶ 259-60.)    This story acknowledges that UnitedHealth had already disclosed in its SEC filings that "the company 'has been involved or is currently involved in various governmental investigations,' . . . including [by] the Justice Department." (Ex. 27.)

6.  **May 21, 2025**:  Analysts at HSBC "cut UnitedHealth's rating" because of the previously reported "[l]eadership change, pulled 2025 guidance, [and] alleged Medicare fraud."  (Compl. ¶ 261.)

7.  **May 21, 2025**:  The *Guardian* claimed that UnitedHealth offered "bonuses" to nursing homes that "reduc[ed] hospital transfers for residents covered by UnitedHealth's Medicare Advantage plans."  (¶ 262.)

8.  **July 24, 2025**:  UnitedHealth disclosed that it had "proactively reached out to the Department of Justice after reviewing media reports about investigations into certain aspects of the Company's participation in the Medicare program.  The Company has now begun complying with formal criminal and civil requests from the Department."  (Ex. 12 (7/24/2025 8-K); *see* Compl. ¶ 280.)

9.    **July 29, 2025**:  UnitedHealth reported that it was revising its guidance for 2025, "highlighting rising costs and operational shortfalls across its business."  (¶ 282.)

Plaintiff does not allege that any of these government investigations has led to an enforcement action, let alone an adjudication of any wrongdoing by UnitedHealth.  And as numerous courts have recognized, the mere initiation of a government investigation is "insufficient" to establish securities fraud "because the announcement of an investigation reveals just that—an investigation—and nothing more."  *MacPhee* v. *MiMedx Grp., Inc.*, 73 F.4th 1220, 1247 (11th Cir. 2023) (citation and quotation marks omitted).

## ARGUMENT

This is a textbook case of why Congress enacted the PSLRA in 1995 "to remedy widespread abuses of the Rule 10b-5 class action device."  *Ceridian*, 542 F.3d at 245.  The PSLRA "impose[s] heightened pleading requirements," *Tellabs*, 551 U.S. at 321, which require plaintiffs to plead with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1), as well as "particular[ized] facts giving rise to a strong inference that the defendant acted with" fraudulent intent, *id.* § 78u-4(b)(2)(A).

Plaintiff's latest Complaint falls far short of satisfying those demanding standards.  As a threshold matter, Plaintiff does not explain how or why the challenged statements are false.  And even if Plaintiff could clear that threshold hurdle, it fails to plead three independently required elements of its Section 10(b) claim:    (i) a "material misrepresentation or omission," (ii) "scienter," and (iii) "loss causation."  *In re Target*

-15-

*Corp. Sec. Litig.*, 955 F.3d 738, 742 (8th Cir. 2020). Without a predicate violation of Section 10(b), Plaintiff's control-person claim also must be dismissed. Finally, the insider-trading claim cannot survive because Plaintiff does not allege that it made a "contemporaneous" trade with Messrs. Hemsley and Witty or even that they sold stock based on material nonpublic information.

## I.    Plaintiff's Section 10(b) Securities Fraud Claim Should Be Dismissed.

### A.    The Complaint does not satisfy the PSLRA's requirement to specify why each challenged statement is misleading.

The Complaint does not meet the PSLRA's heightened pleading standard because it fails to explain how or why any of the 48 challenged statements were false or misleading. Rather, the Complaint is impermissibly bulked up with dozens of pages of large block quotes, with portions bolded and italicized, followed by a long catch-all paragraph that purports to identify why the dozens of preceding statements are misleading. For example, with respect to Plaintiff's Medicare Advantage allegations, the Complaint challenges 27 bolded and italicized blocks of statements over a four-year period. (Compl. ¶¶ 289-326.) That is followed by a single paragraph (spanning six pages) that purports to identify 18 different reasons why those 27 blocks of statements are supposedly misleading. (¶ 331.) The Complaint uses this same tactic with respect to the other challenged statements. (¶¶ 332-346.)

As the Eighth Circuit made clear in *Novastar*, this pleading tactic is improper and warrants dismissal. 579 F.3d at 883.

*First*, quoting "lengthy excerpts" from disclosures with large blocks of "highlighted and italicized passage[s] does not satisfy the PSLRA[] … because it does not identify 'what' statements were allegedly false or misleading." *Novastar*, 579 F.3d at 882-83 & n.3. Because nearly all of the blocks of bolded and italicized text in the Complaint include multiple factual assertions, it is impossible to "say what statements [are] alleged to be false or misleading." *Id.* at n.3.

To give one example, Plaintiff bolds and italicizes six full sentences of the quotation in Paragraph 316, but "a court can only speculate," *id.*, about which of the ten separate factual statements that Plaintiff identifies are false:  (i) the reported number of seniors identified as having "emerging health needs," (ii) that such health needs "may otherwise have gone unidentified," (iii) the reported number of seniors connected to "essential resources," (iii) that those resources included "food and security, medication affordability, transportation, and financial support," (iv) the reported number of "gaps in care" that home visits identified, (v) the opinion that home visits "made a real difference in people's lives," (vi) the reported percentage of patients who "received follow-up in a clinical setting" within 90 days of a home visit, (vii) that patients with "chronic conditions" spend "measurably less time than fee-for-service patients in emergency room and other hospital settings," (viii) the opinion that spending less time in the hospital constitutes "better managed and more stable health outcomes," (ix) that home visits "help patients live healthier lives," or (x) that home visits "save taxpayers' money." (Compl. ¶ 316.)  The Complaint is full of other examples of this impermissible pleading tactic. (*See, e.g.*, ¶¶ 294, 298, 305, 313.)

*Second*, beyond not identifying *which* particular statements were allegedly false or misleading, the Complaint "does not provide any link between an alleged misleading statement and specific factual allegations demonstrating the reasons why the statement was false or misleading, as the PSLRA requires." *Novastar*, 579 F.3d at 883. As in *Novastar*, "the complaint merely contains '[a] litany of alleged false statements,'" followed by "a generalized one-paragraph summary" that purports to "boil down the complaint's [100] pages of background material" and allegedly "undisclosed facts." *Id.* at 883-84 & n.4.

Applying the Eighth Circuit's ruling in *Novastar*, this Court should dismiss the Complaint because of this threshold pleading deficiency.

### B.    Plaintiff fails to plead that UnitedHealth made any actionable misstatements.

None of the challenged statements is actionable. In assessing whether the Individual Defendants knowingly made material misrepresentations, the Court should read each statement "in its full context, … in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc.* v. *Laborers Dist. Council*, 575 U.S. 175, 190 (2015). Moreover, the Court should "undertake a statement-by-statement analysis," rather than "analyz[e] the overall impression made by a set of statements." *Bondali* v. *Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015); *see Tellabs*, 551 U.S. at 321. In context, not a single supposed misstatement is both false and material.

-18-

### 1.    UnitedHealth did not defraud its shareholders by not confessing to supposed misconduct during HouseCalls and Chart Reviews.

The centerpiece of the Complaint is Plaintiff's unsupported speculation that UnitedHealth may have committed a False Claims Act ("FCA") violation by "fraudulently obtain[ing] billions of dollars of revenue from the federal government" through miscoding Medicare Advantage customers.  (Compl. ¶ 38.)  The Complaint does not allege that UnitedHealth actually committed any FCA violations in seeking reimbursement from the federal government, much less quantify the number of such violations.  At best, the Complaint alleges that DOJ is investigating alleged FCA violations, but the DOJ has never found that UnitedHealth violated the FCA.  *See MacPhee*, 73 F.4th at 1247 ("[T]he announcement of an investigation reveals just that—an investigation—and nothing more.") (citation and quotation marks omitted).

Specifically, in trying to transform news reports of a DOJ investigation regarding possible FCA violations into a fraud on UnitedHealth's *shareholders*, Plaintiff challenges four categories of statements in which UnitedHealth did not confess that it "fraudulently diagnos[ed] Medicare Advantage plan members with various conditions."  (¶ 7.)  Each challenge "improperly faults [UnitedHealth] for its nondisclosure of 'uncharged, unadjudicated wrongdoing.'"  *Danske Bank*, 11 F.4th at 95.[5]  But the case law is emphatic that defendants do not commit securities fraud simply by failing to disclose wrongdoing

---

[5]    Plaintiff also challenges an October 2021 statement that UnitedHealth "expect[ed]" "in-home clinical visits" to increase as the COVID pandemic winds down.  (Compl. ¶ 291.)  Plaintiff does not explain how or why that statement is false.

even during an ongoing government investigation. *See Gray* v. *Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *9 (S.D.N.Y. Sept. 27, 2021) (courts do not "infer wrongdoing … from the mere existence of an investigation" because "government investigations are just that."); *see also In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an SEC investigation does not suggest that any of the allegedly false statements were actually false … nor does it add an inference of scienter."). The facts in *Danske Bank* are illustrative. There, the plaintiffs sued a Danish bank for securities fraud because the bank had failed to disclose its violation of anti-money laundering laws even as European regulators had launched several public investigations. *Id.* at 97. The plaintiffs argued that the bank's financial statements were misrepresentations in light of those investigations and a subsequent finding of wrongdoing. *Id.* at 98. But the Second Circuit rejected that claim, reasoning that "accurately reported financial statements do not automatically become misleading by virtue of the company's nondisclosure of suspected misconduct that may have contributed to the financial results." *Id.* at 98-99.

**1. Generic Statements.** Plaintiff identifies several generic statements, commonly described as "puffery." "[T]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial, either because it is so exaggerated ('You cannot lose.') or so vague ('This bond is marvelous.') that a reasonable investor would not rely on it in considering the 'total mix of [available] information.'" *Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019). Even if a statement concerns an important topic or is untrue, "[n]o reasonable investor" would base a trading decision on "vague and [] obvious hyperbole" that is "devoid of any substantive information." *In re Stratasys Ltd. S'holder Sec. Litig.*,

864 F.3d 879, 882 (8th Cir. 2017); *see Carvelli*, 934 F.3d at 1321 ("Whether a statement was made in bad faith or without a reasonable basis is irrelevant to the question whether the statement is nonetheless so airy as to be insignificant.").

Here, generic "puffery" statements include advertising that HouseCalls "deliver[] amazing health assessment[s]" (Compl. ¶ 303), and "help seniors … stay healthy" and "looked after properly" (¶¶ 298-99; *see also* ¶¶ 293, 303, 317, 325.)  "[N]o reasonable investor would rely upon" these kinds of generic statements that are "vague and nonverifiable." *Stratasys*, 864 F.3d at 882 (statement that product has "unmatched speed, reliability, quality, and connectivity" is inactionable); *see Perez* v. *Target Corp.*, 2024 WL 4804656, at *12 (D. Minn. Nov. 15, 2024) (statement "describing [company's] inventory as 'healthy' and 'well-positioned'" is inactionable).

**2.  *Accurate Statistical Data.***  It is blackletter law that "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Danske Bank*, 11 F.4th at 99; *see In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009) (disclosure of "accurate historical data [] not actionable").  Here, Plaintiff challenges UnitedHealth's disclosures that "revenue increased [in Q3-2021] due to growth in the number of individuals served through Medicare Advantage" (Compl. ¶ 297), and that "nurse practitioners performed more than 2.7 million clinical preventive home care visits in 2023" (¶ 315; *see also* ¶¶ 297, 300-01, 305, 307-08, 311, 315-16).  But Plaintiff never alleges that such data was wrong—say, that revenue in Q3 in fact decreased, or that nurse practitioners in fact performed only 1 million such visits.  Instead, Plaintiff says that those accurate numbers were misleading because UnitedHealth failed to disclose

supposed regulatory violations in connection with its Medicare Advantage programs. But that is not enough to render historical data false. If it were, any company "whose quarterly financial reports include[d] revenue from transactions" that violated one regulation or another "could be sued for securities fraud." *Danske Bank*, 11 F.4th at 99.

***3. Forward-looking Projections.*** Plaintiff challenges forward-looking projections. Those include the company's projection that the "2025 outlook [] includes revenues of $450 billion to $455 billion." (Compl. ¶ 320; *see* ¶¶ 310, 312, 322, 324.) As an initial matter, "[m]anagement's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct." *City of Hollywood* v. *Inspire Med. Sys., Inc.*, 2025 WL 1158653, at *7 (D. Minn. Mar. 24, 2025). That UnitedHealth later revised its projection (Compl. ¶ 254) is nothing more than an impermissible "fraud by hindsight" allegation that does not establish that a projection was false when made. *Elam* v. *Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008).

Plaintiff says that the projections here are actionable because a purported internal analysis from 2023 showed that the phase-in of Medicare Advantage rule change in 2024 would "cut back sharply" on certain diagnoses. (Compl. ¶ 331(e).) But Plaintiff fails to allege that the projection did not already factor in that analysis. *See In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (8th Cir. 2005) (no allegation that "a material loss of deals necessarily rendered Cerner unable to achieve its projected earnings"); *Rochester Laborers Pension Fund* v. *Monsanto Co.*, 883 F. Supp. 2d 835, 882 (E.D. Mo. 2012) ("Just because these two distributors may have believed that farmers were hesitant to purchase the new seeds is not necessarily inconsistent with Monsanto's predictions about its seeds and traits

business.").  And, in any event, UnitedHealth had no duty to disclose every "fact cutting the other way." *Omnicare*, 575 U.S. at 189.

There is more.  UnitedHealth's projections are protected by the PSLRA's safe harbor for forward-looking statements.  Under this statutory safe harbor, a defendant "shall not be liable" for any "projection[s]" or "statement[s] of future economic performance" if those projections or statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially."  15 U.S.C. § 78u-5(c) & (i)(1).

Here, each of the filings included meaningful, cautionary language warning prospective shareholders of the relevant risks, such as the "Biden administration's 2023 reforms to the CMS risk adjustment model" that would "negatively impact[] UnitedHealth's Medicare Advantage business."  (Compl. ¶ 331(e).)  Indeed, in its quarterly report for Q3-2024, filed on November 4, 2024, and incorporated by reference in the December 3, 2024 earnings guidance that Plaintiff challenges (Ex. 9 at 3), UnitedHealth expressly warned that "ongoing Medicare funding pressures" created "continued pressure in the Medicare Advantage program."  (Ex. 8 at 18.)  UnitedHealth added that "substantial revisions to the risk adjustment model, which serves to adjust rates to reflect a patient's health status and care resource needs, will result in reduced funding."  (*Id.*)  UnitedHealth further cautioned that it "is currently involved in various governmental investigations," and that "[c]ertain of the Company's businesses have been reviewed or are currently under review" for "coding and other requirements under the Medicare risk-adjustment model." (*Id.* at 13.)

-23-

This "cautionary language [is] specific and related directly to" the Medicare Advantage risk-adjustment issues that Plaintiff says it did not know. *Julianello* v. *K-V Pharm. Co.*, 791 F.3d 915, 922 (8th Cir. 2015). Even if UnitedHealth "may have underestimated the effect of these risks to its [Medicare Advantage] business, [it] did not mislead investors or falsely deny that these risks existed." *Monsanto*, 883 F. Supp. 2d at 854. "[L]et[ting] investors know about the trouble without painting too gloomy a picture … cannot sensibly be described as fraud." *Fulton Cnty. Emps. Ret. Sys.* v. *MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012).

**4.   *Purported "Denials."***   Plaintiff challenges statements that it categorizes as "denials" of misconduct.  For example, it highlights the vanilla statement UnitedHealth issued in response to *The Wall Street Journal*'s "investigative reports" that "the WSJ presented no credible evidence to support [its] claim" and that HouseCalls "provide[] in-home clinical assessments at no cost to millions of seniors each year" and are "a critical touchpoint in the care continuum."  (Compl. ¶ 318; *see also* ¶¶ 290, 296, 319, 321, 326.) But Plaintiff does not identify any fact that is false in UnitedHealth's purported "denials." Nor could it, because the Complaint never alleges that UnitedHealth failed to comply with any applicable laws, only that it is the subject of ongoing government investigations.  *See Ok. Firefighters Pension & Ret. Sys.* v. *Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1082 (D. Minn. 2012) ("the Complaint itself never alleges that [the company] was ever found to be in noncompliance at any point during the Class Period."); *see also Danske*, 11 F.4th at 99

("When a securities fraud claim is premised on the defendant's predicate violations of law . . . the facts of that underlying violation must be pled with particularity.")[6]

Moreover, UnitedHealth's "maintenance of its innocence is not fraud," because "SEC rules do not create a duty to confess contested charges," and "[i]nvestors can evaluate this sort of posturing for what it is worth." *Anderson* v. *Abbott Lab'ys*, 140 F. Supp. 2d 894, 906-07 (N.D. Ill. 2001); *cf. Sailors* v. *N. States Power Co.*, 4 F.3d 610, 612 (8th Cir. 1993) ("The mere fact that a public utility embarks on a public relation campaign over a rate case" does not mean that the company "should in effect publicize that it was probably not entitled to the rate increase."). Because investors understand that companies typically issue denials when they are attacked in the court of public opinion for alleged violations of the law, "courts have routinely found that a company-issued statement regarding its belief that [allegations are] unfounded or without merit is an opinion that is generally not actionable as a misstatement of fact." *Crutchfield* v. *Match Grp., Inc.*, 529 F. Supp. 3d 570, 593 (N.D. Tex. 2021) (collecting cases). Thus, the federal securities laws permit

---

[6] Plaintiff claims UnitedHealth falsely stated in February 2025 that it was "not aware of the 'launch' of any 'new'" DOJ investigation into Medicare Advantage coding (Compl. ¶ 244) that was different from the 2024 DOJ investigation (¶ 232). Plaintiff relies on the fact that UnitedHealth contacted former employees in March 2025 to inform them that DOJ had begun to "question[]" witnesses. (¶ 245.) That suggests, at most, that the initial investigation had advanced to the witness-interview phase. Regardless, it is immaterial to a reasonable investor whether DOJ was interviewing witnesses as part of an ongoing investigation or a new investigation. The only fact that might have mattered is that there was a DOJ investigation, and UnitedHealth did not deny that DOJ was looking into its business practices. (¶ 326; Ex. 8 at 13.)

companies to defend themselves against thinly sourced public accusations before assertions of misconduct are fully adjudicated.

Lastly, to the extent Plaintiff alleges that UnitedHealth engaged in a "scheme" to defraud the government by seeking Medicare Advantage payments based on miscoded diagnoses, that claim fails. (*See* Compl. ¶¶ 7, 513.) UnitedHealth did not employ any deceptive or manipulative act, like wash sales or matched orders, "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Although "the subsections of Rule 10b-5 … are not hermetically sealed," "misstatements and omissions alone are not enough for scheme liability." *SEC* v. *Rio Tinto plc*, 41 F. 4th 47, 49, 54 (2d Cir. 2022) (citing *Lorenzo* v. *SEC*, 587 U.S. (2019)). At most, Plaintiff alleges a scheme to defraud the government, not a *securities fraud* scheme on which Plaintiff relied. *W. Virginia Pipe Trades Health & Welfare Fund* v. *Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016); *see Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*, 552 U.S. 148, 159-60 (2008) (rejecting "indirect" "scheme" claims).[7]

As courts have explained, plaintiffs seeking to allege an actionable securities fraud scheme under Rule 10b-5(a) and (c) cannot merely rely on alleged misstatements. *See Danske Bank*, 11 F.4th at 105. Instead, plaintiffs must show that the defendants employed deceptive or manipulative acts "in connection with the purchase or sale of any security."

---

[7]    In fact, in the FCA action against UnitedHealth relating to Medicare Advantage coding, the special master recommended that summary judgment be granted in favor of UnitedHealth. *See United States ex rel. Poehling* v. *UnitedHealth Grp., Inc.*, 2025 WL 682285, at *1 (C.D. Cal. Mar. 3, 2025).

15 U.S.C. § 78j(b); *see Santa Fe Indus. Inc.* v. *Green*, 430 U.S. 462, 476 (1977) (explaining that securities "manipulation" meant practices like "wash sales, matched orders or rigged prices, that are intended to mislead investors by artificially affecting [securities] market activity").

2.      **The challenged statements concerning the Change Healthcare merger are not actionable.**

Plaintiff challenges two categories of statements in connection with the Change Healthcare merger litigation: (i) generic statements about UnitedHealth's maintenance of "best-in-class," "robust," and "advanced and sophisticated" firewalls (Compl. ¶¶ 333, 335-39); and (ii) UnitedHealth's "commit[ment]" to "extend [] to Change's business" post-merger its "existing firewalls and data-security policies [that] prohibit employees from improperly sharing external-customer" data (¶¶ 334-35, 339). Neither category of statement is actionable.

Generic statements about "robust," "sophisticated" and "best-in-class" firewalls are "paradigmatic examples of the kind of 'vague' and 'optimistic' rhetoric that constitutes corporate puffery." *Meredith*, 16 F.4th at 557 (statement that company had "industry-leading position" and "proven strategies, standards, and discipline" inactionable); *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (statements that JP Morgan "'set the standard' for 'integrity'" and had "risk management processes [that] are highly disciplined" inactionable). Such statements "contain[] no useful information upon which a reasonable investor would base a decision to invest." *Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997). And because "almost every [] [company] makes these

-27-

statements" about having strong computer controls, such generalized statements cannot affect a reasonable investor's investment calculus. *JP Morgan*, 553 F.3d at 206.

Statements about UnitedHealth's intention to extend its information-sharing barriers to Change post-merger likewise are not actionable. To plead that a statement of future intent is "false or misleading when made," a plaintiff must allege contemporaneous falsity—*i.e.*, that the defendants "did not intend to" comply with their "stated intention" "at the time they announced they would.'" *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 488-89 (S.D.N.Y. 2021); *see Cole* v. *Homier Distrib. Co.*, 599 F.3d 856, 862 (8th Cir. 2010) (same under state law). Plaintiff has not done that.

Instead, Plaintiff merely copies DOJ's brief in the failed Change litigation, which cited pre-merger due-diligence documents in which UnitedHealth personnel identified access to Change's "data" as one of several reasons to pursue the acquisition. (Compl. ¶¶ 364-69.) But as the court in the Change litigation held, such "ordinary course documents in which United[Health] executives expressed interest in Change's 'data' and 'data rights'" do not suggest anything nefarious. *UnitedHealth*, 630 F. Supp. 3d at 144. "[B]oth Optum and Change are companies in the business of dealing with data, so the fact that Optum was discussing Change's data and data rights during due diligence is hardly a surprise." *Id.* Some general access to data does not mean that UnitedHealth expected to forgo data-security measures—which is what Plaintiff needs to adequately plead contemporaneous falsity.

Plaintiff also ignores that those diligence-related documents were prepared *before* DOJ challenged the merger, while the challenged statement occurred *after*. Whatever

-28-

UnitedHealth may have contemplated when considering the Change acquisition, it responded to DOJ's concerns by committing to extend its information-sharing barriers to cover Change. Plaintiff does not allege a single fact to support its contention that "Defendants' stated intention to [implement a firewall] was false or misleading when made." *Born*, 521 F. Supp. 3d at 489. Indeed, Plaintiff's allegation that UnitedHealth "fixed" gaps in the firewall as they were identified during the Change integration confirms that UnitedHealth's stated intention was true. (Compl. ¶ 215.) And the fact that a third-party "ransomware" gang infiltrated Change's servers in 2024 (¶ 216) has nothing to do with *internal* information-sharing barriers, let alone show that UnitedHealth misrepresented its stated intention to implement a firewall two years earlier. All it shows is that Change's protections were not impenetrable to outside hackers, a claim that UnitedHealth never made.

### 3. UnitedHealth's purported "monopolist" conduct did not render false its Code of Conduct.

Plaintiff makes conclusory allegations about "monopolistic" conduct that Plaintiff declares was unfair to UnitedHealth's competitors. (Compl. ¶ 6.) But Plaintiff cannot plead a misrepresentation claim about non-disclosure of allegedly illegal "monopolistic" conduct because Plaintiff fails to plead "with particularity" the "elements of an underlying antitrust [claim]." *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019). "If a § 10(b) claim is predicated on illegal conduct, then the complaint must allege conduct that if true would be illegal." *Shoemaker* v. *Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1053 (D. Minn. 2018); *see also Danske*, 11 F.4th at 99 (plaintiff must plead "the

facts of th[e] underlying violation [of law] with particularity").  Plaintiff has made no such effort here.

Beyond this hurdle, the principal statement that Plaintiff challenges is immaterial as a matter of law, specifically, the aspirational statement in UnitedHealth's Code of Conduct that employees should "deal fairly with the Company's customers, service providers, suppliers, competitors, and employees" and should not "take advantage of anyone through unfair-dealing practices."  (Compl. ¶ 345.)  Such "declarations about the importance of acting lawfully and with integrity" are "too general to cause a reasonable investor to rely upon them" and cannot be construed as guarantees of compliance.  *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019); *see Hewlett-Packard*, 845 F.3d at 1276 (same; code of conduct not actionable).  In short, a "general statement that does no more than state a goal shared by the management of every public company in no way amounts to a specific promise or guarantee."  *Gross* v. *GFI Grp., Inc.*, 784 F. App'x 27, 30 (2d Cir. 2019).  That is especially true here because UnitedHealth's Code of Conduct makes clear that these goals are inherently aspirational.  The Code states on page one that "[a]ll of us must strive to apply this Code every day."  (Ex. 6 at 1.)

Plaintiff also points to a June 1, 2023 statement by former CEO Witty at an investor conference about "exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements that are needed" to prevent improper information sharing.  (Compl. ¶ 342.)  Plaintiff faults Mr. Witty for mentioning information-sharing barriers without confessing unrelated alleged misconduct—that "Defendants were favoring Optum provider groups over non-Optum

competitor groups." (¶ 343.) But Mr. Witty's statement was not "misleading" because "there is no direct connection between Defendants' statements" about computer firewalls "and the omitted information regarding" alleged favoritism of certain doctor groups. *Capella*, 873 F. Supp. 2d at 1080. And, again, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Danske Bank*, 11 F.4th at 98.

### 4. The challenged statements about hospitalization rates are not actionable.

Plaintiff challenges two categories of statements that it alleges were false based on the stories in *The Guardian* that UnitedHealth sought to lower hospitalization rates of nursing home patients on Medicare Advantage: (i) the generic statement that "[c]onsumers in Medicare Advantage [] experienced better health outcomes" (Compl. ¶ 314); and (ii) truthful statistics about Medicare Advantage users, such as that they have a "40% lower rate of avoidable hospitalizations and consistently derive much greater value" for shareholders (¶ 309; *see* ¶¶ 294, 304, 313). Neither is actionable.

As a threshold matter, Plaintiff does not allege why this statement is false, for example, by alleging facts that Medicare Advantage users did not experience "better health outcomes." (Compl. ¶ 314). Moreover, a generic puffery that Medicare Advantage users have "better health outcomes" than those on fee-per-service Medicare plans is "'vague' and 'optimistic' rhetoric" that is neither falsifiable nor material as a matter of law. *Meredith*, 16 F.4th at 557; *see In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (statements that medical study was "the best science" and "unique in ... completeness and transparency" inactionable).

-31-

As to the statistics-oriented statements, Plaintiff does not dispute that customers on Medicare Advantage collectively had lower hospitalization rates than those on fee-per-service Medicare plans.  As a matter of law, "[a]ccurately reported data does not become an actionable misrepresentation merely because underlying misconduct may have contributed to the reported numbers."  *AT&T*, 2022 WL 17587853, at *3; *see In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009).  That is especially true here, where the statements referred to the entirety of UnitedHealth's Medicare Advantage population, and not specifically about those in nursing homes.  *See Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *18 (S.D.N.Y. Mar. 30, 2021) ("challenged statements attributing the overall financial performance of Frutarom to factors like organic growth and acquisitions" are "too generalized to require it to disclose bribes affecting only a portion of its operations").  As one court recently explained, "it is usually unreasonable for an investor to take general statements regarding an issuer's business for more than what they are worth, reading into them sweeping denials of discrete instances of misconduct."  *Lian* v. *Tuya Inc.*, 2025 WL 733253, at *8 (S.D.N.Y. Mar. 7, 2025).

### 5.    UnitedHealth did not misrepresent anything about its portfolio-refinement transactions.

In its 2024 earnings release, UnitedHealth fully disclosed its sale of stakes in some of the company's business units to private-equity investors.  These disclosures included that the transactions "contributed about 80 basis points ($3.3 billion) to the operating cost ratio," and that UnitedHealth could be "required to repurchase these interests [for] up to

$3.4 billion." (Compl. ¶ 327; *see also* ¶ 323 (earnings release).)  Plaintiff says that UnitedHealth misleadingly failed to state that (i) its 2024 earnings would have been lower by $3 billion had it not sold those assets for $3 billion in gains, and (ii) those transactions were "manufactur[ed] earnings" and "financial engineering." (¶331(f).)  Neither supposed failure amounts to securities fraud.  *First*, reasonable investors are presumed to possess "mathematical proficiency," including the ability to "perform simple subtraction."  *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 270 (3d Cir. 2005).  *Second*, UnitedHealth need not adopt "pejorative characterizations of disclosed factual matters." *Kowal* v. *MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994).

Plaintiff also points to UnitedHealth's comment to *Bloomberg* that those transactions had "valid business reasons." (Compl. ¶ 330.)  But Plaintiff does not allege a single fact to suggest that UnitedHealth lacked "valid business reasons" for those asset sales.  Nor can it transform its after-the-fact criticisms of UnitedHealth's business judgment into a securities fraud claim.

Lastly, Plaintiff challenges UnitedHealth's revised guidance for 2025 and forward-looking statement on the accompanying earnings call that "we think that an awful lot of the issue that we're seeing early in '25, we can fix in '25." (¶¶ 328-29.)  Plaintiff claims those statements were misleading because UnitedHealth failed to disclose that it planned additional portfolio sales in 2025 to offset the "negative impact" of the government's updated Medicare Advantage pricing model (called "V28"). (¶ 331(g).)  But the PSLRA's safe harbor shields such forward-looking statements.  Far from concealing anything about the pricing model, UnitedHealth expressly disclosed on the earnings call that "we

underestimated the impact of V28" and cautioned that the pricing pressures were unprecedented: "What we're going through like the rest of the industry is a dramatic, really never seen before adjustment in pricing for this marketplace. And what we're seeing this year is two or three areas where the pressure that, that has created across the market is creating new dynamics we haven't seen." (Ex. 10 at 10, 12.) UnitedHealth did not commit securities fraud "simply because it d[id] not disclose [data] at the level of detail plaintiffs request in retrospect." *Karth* v. *Keryx Biopharms., Inc.*, 6 F.4th 123, 136 (1st Cir. 2021).

### C.    Plaintiff fails to plead the required strong inference of scienter.

Under the PSLRA, Plaintiff must allege a "strong inference" of fraudulent intent. *Tellabs*, 551 U.S. at 319-20; *see* 15 U.S.C. § 78u-4(b)(2)(A). Where, as here, the defendant is a corporation, scienter must be alleged as to the "executives actually making the allegedly false or misleading statements." *Cornelia I. Crowell GST Tr.* v. *Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). A complaint "must [] raise a strong inference of scienter for each defendant and with respect to each alleged misrepresentation," all of which must be considered "separately." *Horizon Asset Mgmt. Inc.* v. *H&R Block, Inc.*, 580 F.3d 755, 761 (8th Cir. 2009). To allege a strong inference of scienter, a plaintiff must plead particularized facts showing (i) "motive and opportunity," or (ii) that the defendants "inten[ded] to deceive" or acted with "severe recklessness"—that is, they made "highly unreasonable omissions or misrepresentations" in which the "danger of misleading [investors] is either known to the defendant, or is so obvious that the defendant must have been aware of it." *Podraza*, 790 F.3d at 836 & n.3. Either way, the inference of scienter

"must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Here, instead of pleading any particular defendant's specific state of mind, Plaintiff "merely alleges 'knowledge' as a group without any specific allegations about each defendant and each alleged misrepresentation, such as how and what each defendant allegedly knew that rendered the alleged misstatement actionable," which "is plainly insufficient." *Monsanto*, 883 F. Supp. 2d at 895. The Court should dismiss the Complaint for this reason alone. Regardless, each of Plaintiff's scienter theories fails on its own terms.

### 1. Plaintiff fails to plead any motive to defraud UnitedHealth shareholders.

The Complaint does not allege anything beyond a generalized profit motive, which is "a desire 'universally held among corporations and their executives'" that "does not contribute significantly to an inference of scienter.'" *Podraza*, 790 F.3d at 840. At most, Plaintiff alleges that the Individual Defendants—as corporate executives routinely do—sold some of their stock over the course of the four-year class period. Plaintiff alleges that (i) Mr. Hemsley sold 7% of his stock in October 2021 (Compl. ¶ 379), 7% of his stock before the Change trial in July 2022 (¶ 383), 10% of his stock in October 2023 (¶ 385), and 6% of his stock in December 2023 (¶ 386); (ii) Mr. Witty sold 13% of his stock before the Change trial in July 2022 (¶ 382); and (iii) Mr. Thompson sold 31.4% of his stock in February 2024 (¶ 388). But such stock sales are not indicative of scienter because corporate executives routinely receive most of their compensation through stock grants and options, which they sell when those grants and options vest. *See In re Lehman Bros., Inc.*,

855 F.3d 459, 464 (2d Cir. 2017) (corporate employers often "compensate their high-ranking employees ... with equity in the corporation"). That is why the Eighth Circuit has recognized that "sales of up to 32% of an individual's stock" is "not inherently suspicious." *Target*, 955 F.3d at 743.[8] Plaintiff also ignores that both Messrs. Witty and Thompson "increased their holdings of [UnitedHealth stock] during the Class Period,"—by 5x and 2x, respectively—which is "wholly inconsistent with fraudulent intent." *Shoemaker*, 300 F. Supp. 3d at 1054 n.7.[9]

Messrs. Witty's and Hemsley's stock sales before the Change trial illustrate how short these allegations come of pleading the required strong inference of scienter. (Compl. ¶¶ 382-83.) Those pre-trial stock sales might, at most, support an inference that the executives were concerned that the court might block the merger—not Plaintiff's farfetched speculation that, if the merger were approved, Messrs. Witty and Hemsley secretly intended to profit by flouting the "firewall" and using competitor data. (¶ 381.) Indeed, the sales suggest the opposite: under Plaintiff's theory, it would have made no sense for Messrs. Witty and Hemsley to sell stock *before* profiting from this supposed scheme. Because the timing of the stock sales "deprive[d] them of … the value of their [allegedly] 'false'" statements, those sales do not support an inference of scienter. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989); *see Ceridian*, 542 F.3d

---

8    In particular, Mr. Thompson sold his stock on the same day that his options vested, which negates any inference of bad intent. (Ex. 17 (2/20/2024 Form 4).) *See, e.g.*, *In re Indivior PLC Sec. Litig.*, 2025 WL 2242758, at *18 (E.D. Va. Aug. 6, 2025).

9    *See* (Ex. 15 (9/23/2021 Form 4); Ex. 10 at 83 (2025 Proxy)); (Ex. 14 (9/23/2021 Form 4); Ex. 18 (9/26/2024 Form 4).)

at 247 ("If they intended to 'cook the books' to increase insider trading profits, why would they only sell shares *before* the books were cooked?").

> **2.      Plaintiff fails to plead strong circumstantial evidence of conscious misbehavior or extreme recklessness.**

Where a plaintiff fails to plead motive, as here, "other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA] standard." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002). Plaintiff has not come close to meeting that standard for any of the five categories of alleged conduct.

*1.   Plaintiff fails to plead scienter for the Individual Defendants with respect to the Medicare Advantage statements.* The scienter standard for the Individual Defendants' forward-looking statements about Medicare Advantage—*i.e.*, the statements in Paragraphs 310, 312, 322, and 324 of the Complaint—is higher than even extreme reckless. Under the PSLRA safe harbor, "[l]iability for a forward-looking" statements "requires actual knowledge that the statement is false." *Meredith*, 16 F.4th at 557. Plaintiff does not even try to allege that any of the Individual Defendants had actual knowledge that the challenged projections were false. Plaintiff merely notes that, like other insurance companies (*see supra* p. 14), UnitedHealth "suspend[ed] its 2025 financial forecast" on May 13, 2025. (Compl. ¶ 415.) But a "financial projection could be reasonable on one day, yet considerably less reasonable a few days later." *Stratasys*, 2016 WL 3636992, at *11. That is why the Eighth Circuit has rejected the "hindsight" assumption that a company must have "deliberately … disregarded information it had before it" simply because it "experience[s] financial difficulties within a month of [making] the positive statements" or

-37-

projections. *Elam*, 544 F.3d at 930. Nor has Plaintiff alleged any coherent reason why UnitedHealth would provide inflated guidance in December 2024 only to withdraw that guidance just five months later. "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning." *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). And in all events, none of that amounts to actual knowledge of falsity.

As to the remaining alleged misstatements, Plaintiff offers various scattershot scienter theories. Each misses the mark.

*First*, Plaintiff declares that the Individual Defendants must have known that some unspecified number of the tens of thousands of HouseCalls diagnoses that are made every year were fraudulent because of their hands-on management style and knowledge of UnitedHealth's "day-to-day operations." (Compl. ¶¶ 347-50.) But "general allegations about a 'hands-on' management style and access to data [are] insufficient" to support an inference of scienter. *Medtronic*, 618 F. Supp. 2d at 1034 (quotation omitted); *see Minneapolis Firefighters' Relief Ass'n* v. *MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) (no scienter despite allegations that "Gareeb was actively involved in MEMC's day-to-day operations"). Similarly, the unexceptional fact that UnitedHealth's executives were familiar with bottom-line financial results of one of the largest and most complex companies in the world does not mean they knew that those results were allegedly obtained in part through illegal means. *See, e.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("The fact that GE did not automatically equate record profits with misconduct cannot be said to be reckless.").

*Second*, Plaintiff claims confidential witnesses were aware of supposed misconduct, but Plaintiff does not allege that any of these confidential witnesses ever communicated their purported concerns to the Individual Defendants who made the challenged statements. (Compl. ¶¶ 148-81.)  This is fatal to Plaintiff's reliance on those witnesses because "nothing in the complaint suggests that [they]  had any insight into what, if anything, [the Individual Defendants] knew" about those issues.  *Meredith*, 16 F.4th at 557-58.

*Third*, Plaintiff suggests that UnitedHealth's senior most executives should have known about supposed improper diagnoses of an unspecified fraction of the company's tens of thousands of Medicare Advantage customers because other personnel at UnitedHealth "trained its providers," "pressured providers," "issued laptops" to nurses that suggested diagnoses, "purchased and distributed equipment to providers," and managed a "team of risk-adjustment coders in India."  (Compl. ¶¶ 354-60.)  But the allegation that "the controlling officer defendants *should have known* about [issues] affecting many areas of the corporation" is, at most, a "claim of negligence, but not of fraud."  *Ceridian*, 542 F.3d at 249.

Notably, Plaintiff does not allege that the Individual Defendants were involved in, or had knowledge of, the "training sessions" that Plaintiff complains about (Compl. ¶¶ 79, 89, 92, 106); the "pre-loaded software" on laptops that "suggested potential diagnoses" (¶ 83); "internal reviews" of the HouseCalls program (¶ 87); the instructions given to "risk-adjustment coders" (¶105); any supposedly "flawed methods" underlying a study published by Optum about "UnitedHealth's Medicare Advantage Model" (¶ 427); or the supposed unreliability of the QuantaFlo device to diagnose "peripheral artery disease" (¶ 92).

-39-

Consequently, there is no "connective tissue" between these allegations and the senior executives who made the challenged statements. *Jackson* v. *Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020); *see Cornelia I.*, 519 F.3d at 783 ("[T]he importance of the study to [the company] does little to establish scienter," because "[n]o facts have been alleged related to the executives' involvement in either its design or ongoing administration"); *Horizon*, 580 F.3d at 762 (the complaint "fails to allege, however, that [the speaker] even knew about these issues").

Plaintiff also claims that "high-level executives dismissed internal reports of improper coding," but the sole support for that sweeping claim is the allegation that one employee was allegedly "chastised" by her direct supervisor, which she then reported to the "compliance hotline." (Compl. ¶¶ 361-62.) This anecdote does not suggest that the Individual Defendants even knew of this incident, let alone dismissed widespread "improper coding." *See Hutchinson*, 536 F.3d at 960 ("Events at one specific plant or with one individual customer are not enough to meet the PSLRA's heightened standard.").

*Fourth*, Plaintiff highlights lobbying efforts by the then-CEO of UnitedHealth's healthcare subsidiary (Steven Nelson) in 2014 against certain changes to Medicare Advantage regulations. (Compl. ¶¶ 408-12.) Plaintiff does not explain how lobbying efforts *seven years* before the start of the class period supports a strong inference that *the Individual Defendants* made false statements with scienter in 2021 and later. This allegation "tells [the court] nothing about [the speaker's] state of mind." *Horizon*, 580 F.3d at 762.

*Fifth*, Plaintiff points to CEO Witty's resignation in May 2025, but a resignation is not an admission of scienter. As Plaintiff puts it, Mr. Witty was "forced out" because the company "fell short of financial guidance," not because the Board allegedly learned that he had committed fraud. (Compl. ¶¶ 415-17.) "For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than 'the reasonable assumption that the resignation occurred as a result of the release of bad news." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) (collecting cases); *see Gregory* v. *ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 n.4 (2d Cir. 2018) ("executive resignations" do not support scienter because "the complaint includes no allegations that the executives resigned because the company was behaving fraudulently"); *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) (CEO's "forced resignation" was "not an indicator that fraudulent intent existed at the time the alleged omissions occurred").

*Sixth*, Plaintiff suggests that UnitedHealth's "initiative[]" in June 2025 to undertake a "'comprehensive review' of the [Company's] . . . processes and performance measures for risk assessment coding" is tantamount to an admission that the company engaged in fraudulent coding years earlier. (Compl. ¶ 419.) "[D]rawing an inference" of scienter based on "subsequent remedial measures" does "not comport with Federal Rule of Evidence 407, … much less [show] that any individual defendant knew of or was recklessly indifferent" to purported misconduct when the challenged statements were made. *Pugh* v. *Trib. Co.*, 521 F.3d 686, 695 (7th Cir. 2008); *see In re Longtop Fin. Techs. Ltd. Sec. Litig.*,

939 F. Supp. 2d 360, 388 n.213 (S.D.N.Y. 2013) (rejecting "adverse inference [of scienter] from [company's] attempts to strengthen … controls"); *Zagg*, 797 F.3d at 1205 (same).

*Seventh*, Plaintiff says that denying wrongdoing somehow gives rise to an inference of knowledge of wrongdoing. (Compl. ¶¶ 413-414.) But that makes no sense. "What [Plaintiff] is really asking is that [UnitedHealth] be required to admit liability for uncharged, unadjudicated claims while the [government] investigation … [is] ongoing," but "[t]hat sort of confession of guilt is not required." *Société Générale Sec. Servs., GbmH* v. *Caterpillar, Inc.*, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018).

*Lastly*, Plaintiff says the Court should assume that UnitedHealth's most senior executives knew that particular diagnostic codes for some unspecified number of Medicare Advantage users were unsupported because the Medicare Advantage business was a "[c]ore [c]omponent of UnitedHealth's [b]usiness." (Compl. ¶ 398.) To start, the Eighth Circuit has never endorsed "the core operations theory to plead scienter." *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *21 (D. Minn. Sept. 30, 2021). Indeed, it is "question[able] whether the core operation doctrine has survived the enactment of the PSLRA." *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018); *see Pittman* v. *Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021) ("[T]he fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent."); *Meitav Dash Provident Funds* v. *Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1224 (10th Cir. 2023) (same). The Court should not adopt that doctrine for the first time here.

Regardless, even in jurisdictions where the core-operations doctrine still applies, courts have imposed further limitations that preclude its application here.  For starters, recognizing the doctrine's shaky foundations, courts treat it only as "additional support for an inference of scienter" rather than an independent basis for establishing scienter.  *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *22 (S.D.N.Y. Aug. 29, 2023).  Courts also require that the "affected operations" must "truly constitute[] nearly all of the company's business," such as where "revelation caused company to declare bankruptcy." *Id.*; *accord Joyce* v. *Amazon.com, Inc.*, 2023 WL 8370101, at *14 (W.D. Wash. Dec. 4, 2023).  Here, Plaintiff alleges that UnitedHealth's *entire* "Medicare & Retirement business"—of which the Medicare Advantage business is merely a part—contributes "approximately 35% of UnitedHealth's total revenues." (Compl. ¶ 400.)  That unidentified part (somewhere well south of 35%) is insufficient to trigger the core-operations doctrine. *See, e.g.*, *In re Ferrellgas Partners, LP, Sec. Litig.*, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (core-operations doctrine inapplicable where segment comprised 30% of overall business).

**2. *Plaintiff fails to plead scienter with respect to statements about intended firewalls at Change Healthcare.***  To plead scienter with respect to a statement of future intention, Plaintiff must allege with particularity that Defendants "secretly intended not to perform or knew that [they] could not perform."  *Gurary* v. *Winehouse*, 190 F.3d 37, 44 (2d Cir. 1999); *see Cole*, 599 F.3d at 862 (same).  The Complaint contains no such allegations.

Plaintiff points to the pre-merger ordinary-course due diligence documents (Compl. ¶¶ 363-69), which do not establish scienter for the same reason they do not establish falsity, as discussed above (at pp. 26-27). Plaintiff also argues—based on allegations lifted word-for-word from DOJ's proposed findings of fact (*compare* Compl. ¶¶ 370-76; *with* Ex. 23 ¶¶ 217-23)—that UnitedHealth's stated intention not to misuse competitor data must have been a lie because certain competitor data could theoretically be accessed by someone without permission under the company's then-existing firewalls. This theoretical access theory fails because Plaintiff (like DOJ before it) "does not [cite] a single instance in which these firewalls have been breached." *UnitedHealth*, 630 F. Supp. 3d at 146. In any event, any suggestion that UnitedHealth's stated intention was untrue is refuted by Plaintiff's acknowledgement that the company's integration team promptly closed gaps in the firewall upon identifying them. (Compl. ¶¶ 213-15.) "Such remedial efforts weaken the inference of scienter." *Puchtler* v. *Barclays PLC*, 2025 WL 887502, at *18 (S.D.N.Y. Mar. 21, 2025); *see Doshi* v. *Gen. Cable Corp.*, 823 F.3d 1032, 1044 (6th Cir. 2016) (same).

**3. Plaintiff fails to plead scienter based on the Code of Conduct.** The key question for scienter is "not merely whether [the defendant] had knowledge of the undisclosed facts," but whether "the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *City of Phila.* v. *Fleming Cos.*, 264 F.3d 1245, 1260-61 (10th Cir. 2001); *see Inspire*, 2025 WL 1158653, at *13 (similar). Plaintiff fails to allege that UnitedHealth's senior executives knew, or were extremely reckless to the risk, that (i) the company had engaged in purportedly "monopolist" conduct, and (ii) the aspirational statement in the company's employee code of conduct would mislead UnitedHealth's

shareholders without confessing those supposed antitrust violations. No corporate executive would think that an aspirational code of conduct is a promise that the company is free of individual violations, or that affirming such a code would mislead shareholders. *See supra* pp. 28-29. Because the "complaint 'does not present facts indicating a clear duty to disclose' it does not establish 'strong evidence of conscious misbehavior or recklessness.'" *Stratte-McClure* v. *Morgan Stanley*, 776 F.3d 94, 107 (2d Cir. 2015).

   ***4. Plaintiff makes no effort to plead scienter with respect to the nursing-home allegations.*** Plaintiff does not even try to allege scienter about the allegations lifted from a *Guardian* article that UnitedHealth sought to lower the rate at which Medicare Advantage patients in nursing homes went to the hospital. (*See* Compl. ¶¶ 347-433.) As a result, the claims based on statements in Paragraphs 294, 304, 309, 313, and 413 of the Complaint should be dismissed.

   ***5. Plaintiff fails to plead scienter regarding the portfolio refinement transactions.*** In an effort to allege fraud about the fully disclosed asset sales, Plaintiff points to the decision by UnitedHealth's CFO to step down on July 31, 2025, following weaker financial performance. (Compl. ¶ 433.) But that allegation supports only the "the reasonable assumption that the resignation occurred as a result of the release of bad news." *Hertz*, 905 F.3d at 118. Nor can Plaintiff plead scienter merely because UnitedHealth disclosed on July 29, 2025, that it was changing its business strategy to "pursue more the performance of the business portfolio that we have," rather than continue with its "previously planned portfolio" sales. (Ex. 13 at 10, 17 (7/19/2025 Earnings Tr.); Compl. ¶ 432.) "[A] change

in business strategy does not itself show that the old approach was plagued by fraud." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *14 (S.D.N.Y. Mar. 30, 2021).

**D.    Plaintiff fails to plead loss causation.**

Finally, Plaintiff fails to plead loss causation—the pleading requirement that a plaintiff show that the defendant's alleged misstatements "caused the loss for which [it] seeks to recover damages."    15 U.S.C.  § 78u-4(b)(4).    The loss-causation requirement ensures that the securities laws protect investors only "against those economic losses that misrepresentations actually cause," rather than serve as "broad insurance against market losses." *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005).  A stock drop alone does not establish loss causation because a reduced stock price may reflect other factors, such as "changed economic circumstances" or "new industry-specific or firm-specific facts," rather than the correction of "the earlier misrepresentation." *Id.* at 342-343.  Thus,  that a company's stock price declined in response to "bad news" is insufficient. *Rand-Heart*, 812 F.3d at 1180.  Instead, Plaintiff must identify a "corrective disclosure" that revealed the falsity of the alleged misstatements and "'relate[s] back to the [earlier] misrepresentation and not to some other negative information about the company.'" *Id.*  Plaintiff has not done so for any of the corrective disclosures here.

**1.    *Reports of Government Investigations (Corrective Disclosures 1, 2, 5, and 8).*** Plaintiff cites three media reports disclosing government investigations into UnitedHealth's Medicare Advantage business and potential antitrust violations, and UnitedHealth's disclosure that it was "complying with formal criminal and civil requests from the [DOJ]."  (Compl. ¶¶ 232, 240, 258-59, 280.)  These reports cannot constitute

corrective disclosures because they merely announce investigations, and thus do not reveal the falsity of any challenged statements. At most, the articles reveal that the government was examining UnitedHealth's practices—not that those practices necessarily run afoul of any law, much less are inconsistent with UnitedHealth's prior public representations. *See Born*, 521 F. Supp. 3d at 494 (a disclosure is not a "'corrective disclosure[] for purposes of alleging loss causation" if it "contained no information" revealing that "Defendants' prior statements … were false or misleading"). Moreover, as shown by the Complaint itself, the market had known for years of allegations of purported aggressive coding of some Medicare Advantage members across the entire industry. (See *supra* p. 14.) The government's investigation into these allegations, without more, did not reveal anything new.

The Eleventh Circuit's decision in *Meyer* v. *Greene*, 710 F.3d 1189 (11th Cir. 2013), is on point. There, the plaintiff alleged that the defendant, a real estate developer, committed fraud by failing to depreciate the value of its real-estate holdings after the real-estate market plunged from 2008 to 2010. *Id.* at 1192-1193. Although the defendant's stock price dropped after the defendant announced that the SEC had initiated an investigation into the company's valuation practices, the Eleventh Circuit rejected that report as corrective of any of the defendant's prior statements because "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Id.* at 1201. Other courts have likewise recognized that the drop in a company's stock price following the announcement of an investigation "can only be attributed to market speculation about

whether fraud has occurred." *Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).

These principles doom Plaintiff's loss causation allegations.

**2.     *Revised Guidance and CEO Witty's resignation (Corrective Disclosures 3, 4, and 9).*** UnitedHealth's disclosures that its Q1-2025 results were lower than expected, that it was revising its 2025 guidance, and that CEO Witty was stepping down are not corrective disclosures. (Compl. ¶¶ 254, 256, 282.) An "earnings miss, standing alone, is insufficient to establish loss causation" because it merely indicates lower financial performance, and "do[es] not tend to suggest that the company had engaged in fraud[]." *Loos*, 762 F.3d at 887-88. As courts have routinely recognized, although "a failure to meet earnings forecasts has a negative effect on stock prices," it does "not disclose" a purported fraud. *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005).

Moreover, there is a perfectly rational and nonfraudulent explanation for the downward revisions: CMS's "sweeping" regulatory changes. Plaintiff acknowledges that these CMS changes, which were introduced in 2024 and accelerated in 2025 (Compl. ¶¶ 132-34), resulted in lower margins for treating Medicare Advantage members (¶ 256). Nothing about those regulatory changes suggests that UnitedHealth had defrauded its shareholders, especially because many other insurance companies also reported earnings misses and revised their Q1-2025 guidance for those same reasons. (See *supra* p. 14.) Indeed, Plaintiff admits that market observers downgraded UnitedHealth's stock in no small part because of changes in the CMS coding system, which resulted in "higher than expected medical costs for Medicare Advantage members." (*See, e.g.*, Compl. ¶ 450.)

The July 29, 2025 disclosure that UnitedHealth was further revising its 2025 guidance is especially off point. (¶ 282.) Nothing about that disclosure revealed any supposedly new fact that corrected any prior statements about portfolio-refinement transactions. Indeed, UnitedHealth disclosed the details of those sales in February 2025 (¶ 327), and the press criticized those transactions weeks before the July 29 adjustment (*i*¶¶ 267-79). "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price." *Rand-Heart*, 812 F.3d at 1180; *see In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428, at *8 (C.D. Cal. Mar. 27, 2015) (complaint's "inclusion of additional events that purportedly revealed Herbalife's fraudulent practices … reinforces the Court's conclusion that Plaintiffs have not established loss causation").

Nor can Plaintiff rescue these statements by noting that CEO Witty resigned around the same time. The Complaint itself makes clear that the timing of Mr. Witty's resignation has a perfectly rational and nonfraudulent explanation: "[t]he company under his leadership fell short of financial guidance to shareholders." (Compl. ¶ 416.) Stripped of the Complaint's hyperbole, the CEO's resignation at a time when the company was missing its financial goals is entirely unsurprising. It does not "correct" the various alleged misstatements.

**3.   *Analyst Downgrade (Corrective Disclosure 6).*** Plaintiff also offers as a corrective disclosure HSBC's announcement on May 21, 2025, that it was cutting its rating of UnitedHealth. (Compl. ¶ 261.) But HSBC made that decision based on previously reported negative news about the company, including the recent "[l]eadership change,

-49-

pulled 2025 guidance, [and] alleged Medicare fraud." (*Id.*) HSBC's announced *opinion* about UnitedHealth, based on information previously provided to the market, cannot constitute a corrective disclosure. That is because "the only thing actually disclosed to the market when the opinion [wa]s released [wa]s the opinion itself." *MacPhee* v. *MiMedx Grp., Inc.*, 73 F.4th 1220, 1246 (11th Cir. 2023).

4. **Guardian Article (Corrective Disclosure 7).** The remaining alleged corrective disclosure is a May 2025 *Guardian* article that reported, based mostly on anonymized anecdotes, that UnitedHealth made payments to nursing homes to lower hospitalization rates for some unspecified number of Medicare Advantage members. (Compl. ¶ 262.) But Plaintiff cannot "trace[] [its] losses back to the very facts about which the defendant [allegedly] lied." *In re Nektra Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022). The specific anecdotes raised in the *Guardian* article cannot render false UnitedHealth's generic statement that "[c]onsumers in Medicare Advantage [] experience[] better health outcomes." (Compl. ¶ 314.) "This disparity in specificity" is fatal to Plaintiff's claim. *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *19 (S.D.N.Y. July 23, 2025) (putative corrective disclosure failed because "it reflected no contradiction, no correction, and no concession of past inaccuracy"); *Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 (2d Cir. 2023) ("a gap in genericness between misrepresentation and corrective disclosure reduces the likelihood that investors would understand the 'specific disclosure [to have] actually corrected the generic misrepresentation.'"). Likewise, the *Guardian* article did not cast doubt on the accurate statement that Medicare Advantage users have a "40% lower rate of avoidable

hospitalizations and consistently derive much greater value" for shareholders. (Compl. ¶ 309; *see* ¶¶ 294, 304, 309, 313.)

## II.    Plaintiff's Control-Person Claim Should Be Dismissed.

Because Plaintiff fails to allege any primary violation of the securities laws, its "derivative" claim for "controlling-person" liability also fails. *Meredith*, 16 F.4th at 558.

## III.    Plaintiff's Insider-Trading Claim Should Be Dismissed.

Plaintiff fails to plead an insider-trading claim under Section 20A of the Exchange Act. "Under Section 20A, a person who (1) violates any provision of the Exchange Act or its rules or regulations (2) by purchasing or selling securities 'while in possession of material, nonpublic information' will be liable to (3) 'any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased ... or sold' the same class of securities." *Mart* v. *Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 825 (D. Minn. 2022).

Plaintiff alleges that it purchased UnitedHealth shares "contemporaneously" with five sales made by Messrs. Witty or Hemsley (Compl. ¶ 526):

| Defendants' Sales | Plaintiff's Alleged "Contemporaneous" Purchase |
|---|---|
| July 18, 2022 (Witty) | July 19, 2022 |
| July 26, 2022 (Hemsley) | July 28, 2022 |
| July 19, 2023 (Witty) | July 26, 2023 |
| **October 17, 2023 (Hemsley)** | **October 17, 2023** |
| December 5, 2023 (Hemsley) | December 11, 2023 |

The insider-trading claim fails for several reasons. *First*, for all the reasons above, Plaintiff has failed to plead an underlying "violat[ion] [of] Section 10(b) of the Exchange Act." *Mart*, 595 F. Supp. 3d. at 828.

*Second*, only one of Plaintiff's five transactions (the October 17, 2023 purchase bolded above) was "contemporaneous" with an alleged insider sale. Numerous courts have held that a plaintiff's stock purchase is "contemporaneous" only if made on the "same day" as the insider sale. *In re Fed. Nat'l Mortg. Ass'n Litig.*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007) (collecting cases). Indeed, the Ninth Circuit recently emphasized that "the contemporaneous trading rule is 'a proxy for contractual privity'" with the defendant, and therefore should be construed narrowly to "weed[] out individuals who could not have possibly traded with the sellers." *Silver Lake*, 108 F.4th at 1190.

Here, the only "contemporaneous" stock trade that occurred on the same day that Plaintiff purchased was Mr. Hemsley's October 17, 2023 sale. But that transaction cannot ground a Section 20A claim for a different reason: Plaintiff purchased at a price lower than the price at which Mr. Hemsley sold.[10] "[C]ourts have consistently held that shares purchased below the defendant's sale price cannot satisfy the contemporaneity requirement, because it is impossible that those trades occurred with defendant at an unfair advantage." *SEB Inv. Mgmt. AB* v. *Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020) (collecting cases).

*Third*, even if Plaintiff had identified a contemporaneous transaction, Plaintiff does not allege with particularity that Messrs. Hemsley or Witty traded on the basis of material non-public information when the five trades occurred. The two July 2022 trades occurred

---

[10]    Mr. Hemsley sold "in multiple trades ranging from $538.00 to $542.33" (Ex. 16 n.1 (10/19/2023 Form 4)), and Plaintiff bought shares at $536.65 (ECF 131-14).

before the Change trial and at most support an inference that Messrs. Hemsley and Witty sold based on fear that the Court might block the deal, causing the stock price to decline. But any such speculation about the outcome of a public trial cannot be material non-public information. *See, e.g., In re Rocket Cos., Inc. S'holder Derivative Litig.*, 2025 WL 1554632, at *10 (Del. Ch. June 2, 2025) (rejecting that defendant's "reaction to information he heard on Squawk Box" is "non-public information" that can support insider-trading claim). Nor does the Complaint identify any material nonpublic information that supposedly motivated Mr. Witty's July 2023 stock sale. Lastly, although the October and December 2023 trades occurred after UnitedHealth had been notified of DOJ's antitrust investigation, Plaintiff alleges no facts suggesting that Mr. Hemsley knew of the investigation, let alone that he had any reason to believe the investigation would be made public (which did not occur for months) or would result in any finding of wrongdoing (which there has never been). *See Silver Lake*, 108 F.4th at 1192 (affirming dismissal of insider trading claim because the complaint "do[es] not allege what information [defendant] specifically obtained or 'when and from whom' [it] obtained it"). In fact, with respect to the October 2023 sale—the only one that was contemporaneous with Plaintiff's purchase—Plaintiff alleges that Mr. Hemsley sold stock one week before "high-ranking" personnel were notified of the DOJ subpoena. (Compl. ¶¶ 229-30.)

## CONCLUSION

Because, even on its sixth attempt, Plaintiff fails to plead a cognizable claim of securities fraud, the Court should dismiss the Complaint with prejudice.[11]

Dated:  September 23, 2025

Respectfully Submitted,

/s/ *Peter C. Magnuson*

| | |
|---|---|
| Robert J. Giuffra, Jr. (admitted *pro hac vice*) | Peter C. Magnuson |
| Jeffrey T. Scott (admitted *pro hac vice*) | Matthew Kilby |
| Matthew J. Porpora (admitted *pro hac vice*) | Jeffrey P. Justman |
| SULLIVAN & CROMWELL LLP | Anderson C. Tuggle |
| 125 Broad Street | FAEGRE DRINKER BIDDLE & REATH LLP |
| New York, New York 10004 | 2200 Wells Fargo Center |
| Tel:  (212) 558-4000 | 90 South Seventh Street |
| Fax:  (212) 558-3588 | Minneapolis, MN 55402 |
| giuffrar@sullcrom.com | Tel:  (612) 766-7000 |
| scottj@sullcrom.com | Fax:  (612) 766-1600 |
| porporam@sullcrom.com | peter.magnuson@faegredrinker.com |
| | matthew.kilby@faegredrinker.com |
| Morgan L. Ratner (admitted *pro hac vice*) | jeff.justman@faegredrinker.com |
| SULLIVAN & CROMWELL LLP | anderson.tuggle@faegredrinker.com |
| 1700 New York Avenue, N.W. | |
| Washington, D.C. 20006 | |
| Tel:  (202) 956-7500 | |
| Fax:  (202) 956-7676 | |
| ratnerm@sullcrom.com | |

*Attorneys for UnitedHealth Group Inc., Andrew Witty, and Stephen Hemsley*

---

[11] In granting Plaintiffs' most recent motion to amend and supplement its complaint, the Court agreed with Defendants' "concerns regarding the number of amendments and supplementations to the complaint and the delays those changes have caused in this case." (ECF 156.)