# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civ. No. 24-cv-1743 (JMB/JFD) |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO |
| vs. | ) ) | DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED |
| UNITEDHEALTH GROUP INC., et al., | ) ) | SUPPLEMENTAL CONSOLIDATED COMPLAINT |
| Defendants. | ) ) | |

4901-4609-9825.v3

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................. 1

II. STATEMENT OF FACTS ........................................................ 4

    A. The Foundation for Defendants' Fraud: Historical Pattern and Structural Advantages .................................................. 4

    B. The Medicare Advantage Scheme: a Systematic Assault on Healthcare Integrity ................................................... 5

        1. The HouseCalls Deception: Mining for Diagnoses, Not Caring for Patients .................................................. 5

        2. The QuantaFlo Fraud: Profiting from False Positives ...... 6

        3. The Coding Factory: Retrospective Reviews and "Buddy Coding" ............................................................. 7

        4. Systematic Pressure on Physicians: Coding over Patient Care .......... 8

        5. The Nursing Home Scheme: Profit over Patient Well-Being ........... 9

        6. The Staggering Financial Impact ..................................... 10

    C. The V28 Deception: Knowingly False Assurances in the Face of Regulatory Reform ................................................... 11

        1. Concealing the Existential Threat ................................... 11

        2. "Masking" V28's Financial Impact Through "Portfolio Refinement" Transactions ......................................... 11

    D. Misleading Investors: Misrepresentations About UnitedHealth's Medicare Advantage Business and the Cover-Up Campaign ............ 13

    E. Insider Trading: Profiting from Concealed Information ............. 14

    F. The Unraveling: Admissions About the Financial Impact, CEO Witty's "Resignation," the DOJ Criminal Investigation, Halting the "Portfolio Refinement" Scheme, and the CFO's Removal ........... 14

    G. The Market Reckoning: Corrective Disclosures and Massive Losses ........ 16

    H. Government Response: Bipartisan Federal Action ................... 16

4901-4609-9825.v3

I.  Leveraging White House Connections to "Resolve" DOJ and Government Troubles ............................................................... 17

III.  LEGAL STANDARD ............................................................................ 18

IV.  THE COMPLAINT SATISFIES THE PLEADING REQUIREMENTS OF THE PSLRA AND THE FEDERAL RULES OF CIVIL PROCEDURE ............. 19

V.  THE COMPLAINT ALLEGES ACTIONABLE FALSE AND MISLEADING STATEMENTS .............................................................. 21

    A.  Defendants' Materially False and Misleading Statements Regarding the Company's Medicare Advantage Business ............................. 22

        1.  Defendants Made False and Misleading Statements About UnitedHealth's Revenue ................................................. 23

        2.  Defendants Made False and Misleading Statements About HouseCalls .................................................................. 28

        3.  Defendants' Emphatic Denials of Government and Media Reports Are Actionable .................................................. 31

        4.  Defendants' False and Misleading Statements Regarding the Lowered Hospitalization Rates ........................................ 33

        5.  Defendants Lied About the Impacts of the Upcoding Scheme and V28 on Company Earnings ...................................... 35

    B.  The Complaint Alleges Materially False and Misleading Statements About Internal Firewalls at UnitedHealth and Its Optum Subsidiary ......... 42

    C.  The Complaint Alleges Materially False and Misleading Statements About the Company's Anti-Competitive Conduct ...................................... 44

VI.  THE COMPLAINT ALLEGES SCHEME LIABILITY ....................................... 46

VII.  PLAINTIFF'S ALLEGATIONS ESTABLISH A STRONG INFERENCE OF SCIENTER .................................................................................. 50

    A.  Plaintiff Sufficiently Plead Defendants' Scienter Regarding the Medicare Advantage Scheme and Related Statements ............................ 51

        1.  The Magnitude and Pervasiveness of the Scheme Create a Strong Inference of Scienter ............................................ 51

**Page**

2.      Defendants Knew About Several Investigations into
        UnitedHealth's Upcoding Practices ................................................. 53

3.      Defendants Discussed HouseCalls in Detail ................................... 55

4.      Temporal Proximity Further Confirms Intent ................................. 56

5.      CEO and CFO "Resignations" Support Scienter ............................ 57

6.      Core Operations Bolsters the Scienter Inference ........................... 58

7.      Government Investigations Reinforce Scienter ............................. 60

8.      Defendants' Competing Theory Is Implausible .............................. 60

B.      Plaintiff Sufficiently Plead Defendants' Scienter Regarding
        UnitedHealth's Lack of Adequate Firewalls ................................. 63

C.      Plaintiff Sufficiently Plead Defendants' Scienter Regarding
        UnitedHealth's Anti-Competitive Activities ................................. 63

D.      Plaintiff Sufficiently Pleads Motive and Opportunity ................. 64

VIII.   THE COMPLAINT ALLEGES LOSS CAUSATION ......................................... 65

A.      Defendants' Admissions and CEO "Resignation" Plead Causation .......... 67

B.      Reports of Government Investigations Plead Causation ............................ 70

C.      Analyst Downgrade and *Guardian* Report Plead Causation ...................... 72

IX.     THE COMPLAINT PLEADS ACTIONABLE SECTION 20A AND 20(a)
        VIOLATIONS ......................................................................... 73

X.      THE COURT SHOULD NOT CONSIDER EXTRANEOUS
        DOCUMENTS OUTSIDE THE COMPLAINT ..................................... 75

XI.     CONCLUSION ........................................................................ 76

4901-4609-9825.v3

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alghazwi v. The Beauty Health Co.*,
2025 WL 2751076 (C.D. Cal. Sep. 23, 2025)............................................................ 75

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ............................................................ 27

*Anderson v. Abbot Lab'ys*,
140 F. Supp. 2d 894 (N.D. Ill. 2001) ...................................................................... 33

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ...................................................................................... 73

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 18

*Bach v. Amedisys, Inc.*,
2016 WL 4443177 (M.D. La. Aug. 19, 2016) ................................................*passim*

*Basile v. Valeant Pharm. Int'l, Inc.*,
2017 WL 3641591 (C.D. Cal. Mar. 15, 2017)......................................................... 73

*Benacquisto v. Am. Express Fin. Corp.*,
44 F.4th 741 (8th Cir. 2022) ................................................................................... 29

*Boca Raton Firefighters & Police Pension Fund v. DeVry Inc.*,
2012 WL 1030474 (N.D. Ill. Mar. 27, 2012)........................................................... 29

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)...................................................................... 43

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)................................................................ 26, 47

*Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*,
775 F. Supp. 3d 1275 (N.D. Ga. 2025).................................................................... 34

*Campbell v. Transgenomic, Inc.*,
916 F.3d 1121 (8th Cir. 2019) ........................................................................... 21, 22

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ............................................................................... 30

*CenturyLink Sales Pracs. & Sec. Litig.*,
   403 F. Supp. 3d 712 (D. Minn. 2019) .................................................*passim*

*Chow v. Archer-Daniels-Midland Co.*,
   2025 WL 790854 (N.D. Ill. Mar. 12, 2025) ......................................... 58, 60

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ................................................................. 31

*City of Plantation Police Officers Pension Fund v. Meredith Corp.*,
   16 F.4th 553 (8th Cir. 2021) ................................................................. 34

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
   29 F.4th 802 (6th Cir. 2022) ..................................................... 19, 20, 64, 65

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
   519 F.3d 778 (8th Cir. 2008) ................................................................. 62

*Crutchfield v. Match Grp., Inc.*,
   529 F. Supp. 3d 570 (N.D. Tex. 2021) .............................................. 32, 33

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................*passim*

*Elam v. Neidorff*,
   544 F.3d 921 (8th Cir. 2008) ................................................................. 40

*Epstein v. World Acceptance Corp.*,
   203 F. Supp. 3d 655 (D.S.C. 2016) .................................................. 60, 68

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ........................................................ 50, 51, 61

*Flynn v. Exelon Corp.*,
   2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) ......................................... 45

*Freedman v. Saint Jude Med., Inc.*,
   4 F. Supp. 3d 1101 (D. Minn. 2014) ................................................. 21, 28

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................. 65

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) .................................................................. 70

**Page**

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ................................................................. *passim*

*Gimpel v. The Hain Celestial Grp., Inc.*,
    2025 WL 2749562 (2d Cir. Sep. 29, 2025)................................................. 37

*Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ........................................................ 43, 52, 53

*Gray v. Alpha & Omega Semiconductor Ltd.*,
    2021 WL 4429499 (S.D.N.Y. Sep. 27, 2021)............................................. 26

*Gregory v. ProNAi Therapeutics Inc.*,
    757 F. App'x 35 (2d Cir. 2018) .................................................................. 58

*Halman Aldubi Provident & Pension Funds Ltd. v.*
    *Teva Pharms. Indus. Ltd.*,
    2022 WL 889158 (E.D. Pa. Mar. 25, 2022)......................................... 25, 46

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
    2013 WL 3147974 (N.D. Ohio June 19, 2013)...................................... 48, 49

*Hedick v. Kraft Heinz Co.*,
    2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ............................................. 20

*Hefler v. Wells Fargo & Co.*,
    2018 WL 1070116 (N.D. Cal. Feb. 7, 2018) .............................................. 29

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .......................................................... 36, 38, 56

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).................................................................................... 49

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ..................................................................... 62

*Hutchins v. NBTY, Inc.*,
    2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)....................................... 64, 65

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
    579 F.3d 878 (8th Cir. 2009) ..................................................................... 20

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
    2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ........................................... 26

- vi -

**Page**

*In re Allstate Corp. Sec. Litig.*,
   2022 WL 2952816 (N.D. Ill. July 26, 2022) ............................................. 66, 67

*In re Ambac Fin. Grp., Inc. Sec Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ........................................................ 34

*In re Ancor Commc'ns, Inc.*,
   22 F. Supp. 2d 999 (D. Minn. 1998) .............................................. 58, 59, 63

*In re Apollo Grp., Inc. Sec. Litig.*,
   2010 WL 5927988 (9th Cir. June 23, 2010) ............................................. 72

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010) ...................................................... 20

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011) ........................................................ 73

*In re Bradley Pharms., Inc. Sec. Litig.*,
   421 F. Supp. 2d 822 (D.N.J. 2006) ............................................................ 70

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ........................................................ 70

*In re Ceridian Corp. Sec. Litig.*,
   542 F.3d 240 (8th Cir. 2008) .................................................................... 62

*In re Cerner Corp. Sec. Litig.*,
   425 F.3d 1079 (8th Cir. 2005) .................................................................. 38

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2017 WL 2599327 (S.D. Tex. June 15, 2017) ........................................... 73

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) .................................................................. 69

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) ................................................... 24, 27

*In re Emergent BioSolutions Inc. Sec. Litig.*,
   2023 WL 5671608 (D. Md. Sep. 1, 2023) ................................................. 20

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................... 48

- vii -

**Page**

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ................................................................ 42, 43

*In re Estée Lauder Co., Inc. Sec. Litig.*,
2025 WL 965686 (S.D.N.Y. Mar. 13, 2025) ........................................................ 25, 28

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018),
*aff'd*, 764 F. App'x 127 (2d Cir. 2019) ....................................................................... 59

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) ............................................................................. 49

*In re Grand Casinos, Sec. Litig.*,
988 F. Supp. 1273 (D. Minn. 1997) .................................................................... *passim*

*In re Herbalife, Ltd. Sec. Litig.*,
2015 WL 12732428 (C.D. Cal. Mar. 27, 2015) ........................................................ 70

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) .......................................................................................... 58

*In re Hutchinson Tech., Inc. Sec. Litig.*,
536 F.3d 952 (8th Cir. 2008) ................................................................................ 26, 62

*In re Indivior PLC Sec. Litig.*,
2025 WL 2242758 (E.D. Va. Aug. 6, 2025) ............................................................... 65

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................................... 52

*In re Medtronic Inc., Sec. Litig.*,
618 F. Supp. 2d 1016 (D. Minn. 2009),
*aff'd sub nom., Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
621 F.3d 800 (8th Cir. 2010) ................................................................................ *passim*

*In re Mylan N.V. Sec. Litig.*,
2025 WL 1874621 (W.D. Pa. July 8, 2025) ............................................................... 47

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ......................................................................................... 73

*In re Novastar Fin. Sec. Litig.*,
2005 WL 1279033 (W.D. Mo. May 12, 2005) ........................................................... 64

4901-4609-9825.v3

Page

*In re Oxford Health Plans, Inc.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................... 65

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ...................................................................... 34

*In re Plug Power, Inc. Sec. Litig.*,
   2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023) ............................................ 59

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) ....................................................... 34

*In re Questcor Sec. Litig.*,
   2013 WL 5486762 (C.D. Cal. 2013) ..................................................... 36, 70

*In re Resideo Techs., Inc., Sec. Litig.*,
   2021 WL 1195740 (D. Minn. Mar. 30, 2021) ....................................... 41, 57

*In re Semtech Corp. Sec. Litig.*,
   2025 WL 2884810 (C.D. Cal. Oct. 7, 2025) ......................................... 40, 41

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ............................................ 45

*In re Silver Lake Grp., LLC Sec. Litig.*,
   108 F.4th 1178 (9th Cir. 2024) .................................................................. 74

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012) ....................................................... 48

*In re St. Jude Med., Inc. Sec. Litig.*,
   836 F. Supp. 2d 878 (D. Minn. 2011) ................................................*passim*

*In re St. Paul Travelers Sec. Litig. II*,
   2006 WL 2735221 (D. Minn. Sep. 25, 2006) ....................................... 24, 26

*In re Stellent, Inc. Sec. Litig.*,
   326 F. Supp. 2d 970 (D. Minn. 2004) ........................................................ 28

*In re Stratasys Ltd. S'holder Sec. Litig.*,
   864 F.3d 879 (8th Cir. 2017) ..................................................................... 30

*In re Target Corp. Sec. Litig.*,
   955 F.3d 738 (8th Cir. 2020) ..................................................................... 65

- ix -

*In re UiPath, Inc. Sec. Litig.*,
  2025 WL 2065093 (S.D.N.Y. July 23, 2025) ............................................................ 73

*In re UnitedHealth Grp. PSLRA Litig.*,
  2007 WL 1621456 (D. Minn. June 4, 2007) ................................................. 18, 19, 52

*In re Virtu Fin., Inc. Sec. Litig.*,
  770 F. Supp. 3d 482 (E.D.N.Y. 2025) ...................................................................... 44

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)....................................................................................... 23

*In re Zagg, Inc. Sec. Litig.*,
  797 F.3d 1194 (10th Cir. 2015) ................................................................................ 58

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ................................................................................. 39

*Institutional Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d. Cir. 2009)......................................................................... 31, 32, 55

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020).......................................................................................... 62

*Joyce v. Amazon.com, Inc.*,
  2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ........................................................ 59

*Julianello v. K-V Pharm. Co.*,
  791 F.3d 915 (8th Cir. 2015) .................................................................................... 41

*Karth v. Keryx Biopharms., Inc.*,
  6 F.4th 123 (1st Cir. 2021)........................................................................................ 42

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)........................................................... 74

*Lian v. Tuya Inc.*,
  2025 WL 733253 (S.D.N.Y. Mar. 7, 2025) ............................................................... 35

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ....................................................................... 67, 71, 72

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) .............................................................................. 69, 71

**Page**

*Lustgraaf v. Behrens*,
    619 F.3d 867 (8th Cir. 2010) ................................................................... 75

*MacPhee v. MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023) ................................................................ 71

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ............................................................. 61, 62

*Mart v. Tactile Sys. Tech., Inc.*,
    595 F. Supp. 3d 788 (D. Minn. 2022) ..............................................*passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ........................................................... 27, 39, 50, 51

*McDonough v. Anoka Cnty.*,
    799 F.3d 931 (8th Cir. 2015) ................................................................... 18

*McMahan & Co. v. Wherehouse Ent., Inc.*,
    900 F.2d 576 (2d Cir. 1990) ................................................................... 28

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021),
    *aff'd sub nom.*, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
    54 F.4th 82 (2d Cir. 2022) ...................................................................... 35

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ............................................................... 71

*MicroCapital Fund LP v. Conn's Inc.*,
    2019 WL 3451153 (S.D. Tex. July 26, 2019) ......................................... 74

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007) .................................................. 73

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) .............................................................*passim*

*Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*,
    2010 WL 11469576 (D. Minn. Feb. 3, 2010) ......................................... 59

*Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*,
    641 F.3d 1023 (8th Cir. 2011) ................................................................ 56

*N. Oil & Gas, Inc. v. EOG Res., Inc.*,
  970 F.3d 889 (8th Cir. 2020) ...................................................................... 75

*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022) ..................................................................... 32, 54

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................... 27, 35, 38, 39

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019) ........................................................ 19

*Perez v. Target Corp.*,
  2024 WL 4804656 (D. Minn. Nov. 15, 2024) ............................................ 31

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) ..................................................................... 26, 27

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
  2019 WL 3336119 (D. Minn. July 25, 2019) ........................... 43, 45, 57, 69

*Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ............................................................ *passim*

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
  2013 WL 1831427 (E.D. Mo. Apr. 30, 2013) ....................................... 60, 61

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
  679 F.3d 972 (8th Cir. 2012) .............................................................. 38, 61

*Rand-Heart of N.Y., Inc. v. Dolan*,
  812 F.3d 1172 (8th Cir. 2016) ........................................................... 41, 70

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ............................................................. 37, 56

*Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015) ............................................ 28, 35, 37

*Ret. Sys. v. Energy Transfer LP*,
  532 F. Supp. 3d 189 (E.D. Pa. 2021) ........................................................ 21

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v.
  Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) .................................................................. 45

Page

*Rochester Laborers Pension Fund v. Monsanto Co.*,
   883 F. Supp. 2d 835 (E.D. Mo. 2012) ............................................................. 41, 42, 53

*Santa Fe Indus. Inc.*, *v. Green*,
   430 U.S. 462 (1977) ............................................................................................ 49

*Sapssov v. Health Mgmt. Assocs., Inc.*,
   22 F. Supp. 3d 1210 (M.D. Fla. 2014),
   *aff'd*, 608 F. App'x 855 (11th Cir. 2015) ................................................... 24, 71

*Schleicher v. Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007) ........................................................... 72

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ........................................................ 74

*Silverman v. Motorola, Inc.*,
   798 F. Supp. 2d 954 (N.D. Ill. 2011) ........................................................... 71

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) .......................................................................... 70

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) ............................................................................. 45

*Société Générale Sec. Servs., GbmH v. Caterpiller, Inc.*,
   2018 WL 4616356 (N.D. Ill. 2018) ............................................................... 54

*Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*,
   2022 WL 17587853 (2d Cir. Dec. 13, 2022) ............................................... 35

*Stone v. Life Partners Holdings, Inc.*,
   26 F. Supp. 3d 575 (W.D. Tex. 2014) ........................................................... 32

*Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*,
   552 U.S. 148 (2008) ..................................................................................... 48, 50

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................... 18, 50, 51

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
   759 F. Supp. 3d 926 (D. Ariz. 2024) ........................................................... 21

*Vanderhoef v. China Auto Logistics Inc.*,
   2020 WL 5105243 (D.N.J. Aug. 31, 2020) ................................................. 52

Page

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic Inc.*,
  57 F. Supp. 3d 950 (D. Minn. 2014) ................................................................*passim*

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  845 F.3d 384 (8th Cir. 2016) .................................................... 46, 47, 48, 49

*Yanek v. Staar Surgical Co.*,
  388 F. Supp. 2d 1110 (C.D. Cal. 2005) ............................................... 53, 63

*Zean v. Fairview Health Servs.*,
  858 F.3d 520 (8th Cir. 2017) ............................................................... 75

*Zola v. TD Ameritrade, Inc.*,
  172 F. Supp. 3d 1055 (D. Neb. 2016),
  *aff'd*, 889 F.3d 920 (8th Cir. 2018) ...................................................... 64

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
  §78u-4(b)(2)(A) ................................................................................... 50

Federal Rules of Civil Procedure
  Rule 8(a) ........................................................................................ 20, 66
  Rule 9(b) ..................................................................................... 3, 4, 20

Federal Rules of Evidence
  Rule 407 .............................................................................................. 57

17 C.F.R.
  §240.10b-5(a) ................................................................................ 46, 49
  §240.10b-5(b) ................................................................................ 25, 32
  §240.10b-5(c) ................................................................................ 46, 49

## LEGISLATIVE HISTORY

Private Securities Litigation Reform Act of 1995
  Pub. L. No. 104-67, 109 Stat. 737 (1995) ("PSLRA") ...................................... 3, 19, 20

# I.    INTRODUCTION

Between late 2021 and July 2025, UnitedHealth orchestrated one of the largest healthcare fraud schemes in American history – a systematic assault on Medicare that generated tens of billions of dollars in fraudulent profits while deceiving investors about the true source of the Company's success.[1]  Two separate Office of Inspector General ("OIG") reports found that UnitedHealth pocketed billions of dollars in payments for diagnoses that were either unsupported or never treated.  ¶¶119-131.  The *WSJ*'s analysis of Medicare data revealed that in 2021 alone, UnitedHealth extracted $8.7 billion for conditions no doctor ever treated – an amount equal to more than 50% of the Company's net income that year.  ¶¶117, 183.  Named sources, including doctors, nurses, and confidential witnesses, describe in granular detail how the Company systematically trained, pressured, and financially incentivized its workforce to manufacture diagnoses divorced from medical necessity.  ¶¶147-189.  When CMS implemented reforms in 2023 to curb rampant upcoding, UnitedHealth's house of cards began to collapse, forcing the Company to engineer billions of dollars in so-called "portfolio refinement" transactions to mask the scheme's unraveling.  ¶¶267-279.

The market reckoning was devastating.  As the truth emerged through corrective disclosures between February 2024 and July 2025, UnitedHealth's stock price collapsed from over $600 per share to less than $300 per share.  ¶¶232-286, 434-501.  The DOJ opened

---

[1]    Capitalized terms not otherwise defined herein have the same meaning as set forth in the Third Amended Supplemental Consolidated Complaint for Violations of the Federal Securities Laws (ECF 158) (the "Complaint"), and unless otherwise noted, all "Ex. __," "¶__," and "¶¶__"citations are to the Complaint.

both civil and criminal fraud investigations into the Company's Medicare practices. ¶¶240-246, 259-260, 280-281. CEO Andrew Witty was forced out one day before the criminal investigation surfaced, but the Company lied to investors, claiming it was his "decision to step down as CEO for personal reasons." ¶¶256-259, 415-420. CFO John Rex was abruptly removed two days after the Company admitted it had planned $3.65 billion in "portfolio refinement" transactions – what analysts recognized as "earnings 'management'" – to manufacture earnings again in 2025. ¶¶282-287, 432-433. Bipartisan U.S. Senate investigations were launched into what Senators explicitly labeled as "fraud." ¶¶405-407, 424-426.

Defendants' challenges fail on every front.[2] *Falsity*: Once a company attributes revenue growth to specific factors, it cannot omit that a significant portion stems from systematic fraud – regardless of formal adjudication. ¶¶297, 331(a)-(d). As the Eighth Circuit succinctly put it, "[m]ost investors would consider it significant … that a company was not earning as much as it was claiming to earn." *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 830 (8th Cir. 2003). When Defendants claimed HouseCalls was providing "'cost-effective, appropriate care'" (¶126) they misled investors – HouseCalls was generating its outsized revenue via a pervasive manufactured-diagnosis scheme. ¶¶288, 298-319, 331(a)-(d). Defendants lied when they assured investors 2025 EPS estimates were achievable while secretly planning $3.65 billion in "portfolio refinement" transactions to conceal the scheme's collapse. ¶¶320, 322, 328, 331(f)-(g), (j).

---

[2] Defendants are UnitedHealth, former CEO Witty, current CEO Hemsley, and former CEO of UnitedHealth's insurance business Brian Thompson. ¶¶43-47.

*Scienter*: The Complaint alleges an industrial-scale fraud generating billions annually through Company-wide policies involving thousands of employees – corroborated by OIG findings, academic studies, named witnesses, and investigative journalism. ¶¶71-189, 347-362, 398-400, 408-412. Executives repeatedly denied wrongdoing in response to damning reports, then watched their false assurances collapse in the weeks or months thereafter. ¶¶317-319, 321-323, 326-330, 413-420, 429-433. Defendants made massive fortuitously timed stock sales that were so suspicious Congress demanded an SEC investigation. ¶¶377-397. The elaborate cover-up – $7 billion in "portfolio refinement" transactions to hide the devastating impact of anti-upcoding reforms while publicly claiming the reforms would have no impact – demonstrates not ignorance, but knowledge, intent, and overwhelming scienter. ¶¶267-279, 284-285, 323, 327, 330, 498.

*Loss Causation*: When UnitedHealth slashed 2025 EPS estimates by 50% over six months, suspended guidance, dumped its CEO amid a criminal fraud investigation, and admitted manufacturing billions in earnings to mask the scheme's collapse, the market understood exactly what happened. ¶¶434-501. Financial analysts explicitly connected each disclosure to the Medicare Advantage fraud and DOJ scrutiny. *Id.*

The Complaint's well-sourced allegations – supported by government reports, academic studies, investigative journalism, insider accounts, and Defendants' own admissions – more than satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b).

- 3 -

## II.    STATEMENT OF FACTS

### A.    The Foundation for Defendants' Fraud: Historical Pattern and Structural Advantages

UnitedHealth's executives recognized they had created the perfect vehicle for fraud. ¶¶408-412.  The Company's two major divisions – UnitedHealthcare (insurance) and Optum (healthcare services) – gave it unprecedented control over both providers submitting diagnosis codes and insurers receiving government payments.  ¶¶48-70.  This vertically integrated super structure became the foundation for systematic exploitation of Medicare Advantage's risk-adjustment system.  ¶¶71-77.

Medicare Advantage is a privatized version of traditional Medicare, under which the government pays private insurers a set fee to provide insurance plans to qualifying seniors. ¶7.  The payments increase with the apparent severity of each patient's condition.  ¶¶71-77. The sicker a patient appears on paper, the more the government pays for that patient.  *Id.* UnitedHealth weaponized this mechanism, deliberately designing programs to manufacture lucrative diagnoses regardless of clinical reality.  ¶¶7-10, 71-189, 408.

The Medicare & Retirement business generated more than half of UnitedHealthcare's revenue and approximately 35% of UnitedHealth's consolidated annual revenues for FY 2021 through FY 2024.  ¶¶399-400.  This business alone generated over $100 billion annually, growing from $100 billion in 2021 to $139.5 billion in 2024 as enrolled members grew by 20% to 7.8 million during that timeframe.  ¶¶77, 398-399.  The Medicare Advantage revenue made the fraud scheme central to UnitedHealth's financial performance and investor appeal.  ¶7.  Financial analysts focused on the Medicare Advantage business and frequently asked specific questions about it during investor calls.  *E.g.*, ¶¶291-292, 294, 310.

- 4 -

B.      **The Medicare Advantage Scheme: a Systematic Assault on Healthcare Integrity**

      1.      **The HouseCalls Deception: Mining for Diagnoses, Not Caring for Patients**

UnitedHealth's HouseCalls program represented a fundamental perversion of healthcare delivery. ¶¶78-102. HouseCalls dispatches nurse practitioners to members' homes for 45-60 minute health risk assessments with the stated goal of identifying "gaps in care." ¶78. But what patients believed were genuine clinical evaluations were actually sophisticated data-mining operations designed to harvest diagnosis codes triggering higher government payments. ¶¶78-102, 163-169. HouseCalls nurses received Company-issued laptops loaded with proprietary software, E-HouseCalls, that auto-populated diagnostic suggestions aimed at inflating CMS risk scores. *Id.* As one HouseCalls nurse practitioner described: "90% of the E-HouseCalls suggested diagnoses [that] were not accurate," yet nurses faced repeated questioning if they refused to accept unsupported recommendations. ¶¶163-169.

The Company deployed HouseCalls on an industrial scale – over 2.9 million times during 2024 alone. ¶82. A *WSJ* analysis of billions of Medicare Advantage records showed the scheme's effectiveness at adding rarely diagnosed conditions even though nurse practitioners were not required to confirm diagnoses with lab tests. ¶¶84-85, 182-189. From 2019 to 2021, UnitedHealth diagnosed secondary hyperaldosteronism 246,000 times after in-home visits, leading to $450 million in payments while all other Medicare Advantage insurers combined generated less than 10% of that amount, or $42 million. *Id.* Medicare

- 5 -

data analysis showed each HouseCalls visit was worth about $2,735 in extra Medicare Advantage payments – nearly three times the average for all other insurers.  ¶91; Ex. 5 at 4.

### 2.    The QuantaFlo Fraud: Profiting from False Positives

UnitedHealth's use of QuantaFlo devices further highlights the lengths to which the Company went to manufacture diagnoses.  ¶¶92-102, 162, 165-166, 247-253.  Despite knowing QuantaFlo was not FDA-approved as a standalone diagnostic tool and produced frequent false positives, UnitedHealth mandated its use and instructed nurses to diagnose peripheral artery disease ("PAD") based solely on QuantaFlo readings.  ¶¶92-94, 165. Multiple witnesses confirmed the device was "bogus" and wrongly diagnosed people, with follow-up testing finding no evidence of disease.  ¶¶93, 98, 162.  Even a healthy athlete-physician was falsely diagnosed – which UnitedHealth later admitted was improper.  ¶94.

The Company ordered QuantaFlo use to "tap into a sea of revenue," and the financial results were as predictable as they were fraudulent.  ¶96.  Between 2019 and 2021, UnitedHealth nurses diagnosed PAD over 568,000 times after in-home visits, generating $1.4 billion in Medicare payments – far exceeding any other insurer.  ¶95; Ex. 5 at 8.

The device's manufacturer, Semler Scientific, has offered to pay nearly $30 million to the DOJ to resolve fraud claims related to its role in fraudulent Medicare billing practices, providing yet another independent validation of UnitedHealth's fraudulent diagnostic practices.  ¶¶247-253.[3]

---

[3]    Tellingly, Semler is no longer a medical device company, having rebranded itself a "'bitcoin-first company.'"  ¶251.

4901-4609-9825.v3

### 3.    The Coding Factory: Retrospective Reviews and "Buddy Coding"

UnitedHealth's fraud extended far beyond in-person encounters. The Company deployed armies of retrospective chart reviewers and offshore coding teams to systematically scour patient records to generate diagnoses – no matter how old, tangential, or unsupported – that could be reactivated to inflate government payments. ¶¶103-105, 153-155. This was data mining for profit. *Id.*

Internal communications reveal the systematic nature. Executives explicitly instructed coders to use "'buddy codes'" – adding waves of lucrative secondary diagnoses tied to single reported conditions. ¶¶89-90. When a senior risk adjustment coding educator reported improper upcoding to the Company's internal fraud hotline, the coding educator was removed and retaliated against, further demonstrating the Company's commitment to maintaining its fraudulent system at all costs. ¶¶153-158.

A former Medicare Advantage informatics director quantified the scheme's scope: UnitedHealth chart reviews resulted in "double the value" compared to competitors, leading to the conclusion that "it was completely obvious that UnitedHealth was upcoding." ¶¶170-174. A contract coder described instructions to commit fraud, quitting because UnitedHealth "guidelines explicitly directed coders to upcode." ¶¶175-178.

Medicare data confirms the systematic improper upcoding. An HIV diagnosis yielded an extra $3,000 annually per member, yet a *WSJ* analysis showed only 11% of UnitedHealth members diagnosed with HIV received routine treatment. ¶114; Ex. 3 at 3. An HIV expert

- 7 -

explained these people did not have HIV, "[i]f they did, that would be substandard care at a pretty severe level."  Ex. 3 at 3.

### 4.    Systematic Pressure on Physicians: Coding over Patient Care

Optum has become the largest employer of physicians in America, having relationships with 90,000 physicians – 10% of all physicians in America.  ¶¶60, 106; Exs. 4, 7, 11.  This unprecedented control amplified UnitedHealth's ability to influence coding practices across its network.  *Id.*

UnitedHealth implemented systematic pressure on physicians to prioritize diagnosis coding over clinical judgment.  ¶¶106-109.  Dr. Emilie Scott, a former UnitedHealth physician, described the Company's approach: "'The system is not primarily about taking care of the patient .… It's, how do you get the money to flow?'"  Ex. 11 at 4; ¶182.  A medical doctor at an Optum clinic confirmed this institutional focus: "The majority of the prompts on the list had nothing to do with why the patient was being seen … Optum management cared more about adding diagnosis codes than addressing the real reason the patients were there."  ¶¶148-152. Dr. Susan Baumgaertel reported "UnitedHealth pressured her and her colleagues to apply codes to Medicare Advantage patients for conditions they didn't think were appropriate."  ¶404.

The pressure created significant impacts across UnitedHealth's physician network. Exs. 4, 7, 11.  Doctors reported feeling "'an insidious pressure'" to document diagnoses unrelated to care, explaining "'[w]e were not truly caring for patients anymore … just micromanaging their care to bring in money.'"  ¶¶8-9, 182; Ex. 11.

- 8 -

Patients discovered alarming diagnoses in their records that doctors had never mentioned or treated.  ¶¶9, 88, 98-99.  Dr. Baumgaertel admitted telling patients: "I don't really think you have that condition, but I'm supposed to code you as having it so that I get paid more."  ¶9.

The *WSJ*'s analysis of Medicare data for 2019-2022 demonstrates that the Company's pressure campaign worked.  ¶109; Ex. 11.  Sickness scores for patients who switched from traditional Medicare to UnitedHealth Medicare Advantage saw a 55% increase in the very first year – an increase equivalent to every patient being diagnosed with HIV and breast cancer.  *Id.* at 2.  A 2022 study by UnitedHealth's own physician researchers reached the same conclusion, showing that UnitedHealth's physicians coded its Medicare Advantage members as having lung disorders, vascular conditions, and kidney disease at a rate 200% higher than individuals in traditional Medicare.  ¶110; Ex. 4 at 10.

### 5. The Nursing Home Scheme: Profit over Patient Well-Being

Perhaps the most morally reprehensible aspect of UnitedHealth's Medicare Advantage scheme was UnitedHealth's secret practice of paying bonuses to nursing homes to reduce hospital transfers for Medicare Advantage members – creating direct financial incentives to deny necessary medical care.  ¶¶141-146.

The human consequences were devastating and predictable.  A *Guardian* investigation documented routine cases where these financial incentives led to denial of necessary care to increase profits, including at least one instance resulting in permanent brain

- 9 -

damage. *Id.* Internal records showed UnitedHealth instructing nursing home employees to meet quotas for reduced hospitalizations, regardless of medical necessity. ¶¶143-146.

A UnitedHealth whistleblower's testimony to Congress captured the institutional callousness: "'No one is truly investigating when a patient suffers harm.… These incidents are hidden, downplayed and minimized.'" ¶142.

### 6.     The Staggering Financial Impact

The numbers tell the story of a healthcare fraud unprecedented in its scope and magnitude. The *WSJ* analysis showed UnitedHealth received $8.7 billion in 2021 for diagnosis codes that no doctor ever treated – more than 50% of the Company's 2021 net income of $17 billion. ¶¶117, 183, 405; Ex. 3 at 5.

An independent academic study confirmed the scope, with UnitedHealth capturing $13 billion of the estimated Medicare Advantage payments generated industry-wide through improper coding in 2021. ¶136. The study's lead author concluded that UnitedHealth was simply "'coding a lot more than the other largest insurers.'" ¶¶137-139.

Government investigators confirmed the scheme's massive scope. ¶¶119-131. The OIG found that in 2023 alone, UnitedHealth received $3.2 billion from in-home health risk assessments and chart reviews without any follow-up care. ¶127. The OIG's conclusions were clear: "[E]ither: (1) the diagnoses are inaccurate and thus the payments are improper or (2) enrollees did not receive needed care for serious conditions." ¶128. As the government watchdog put it, UnitedHealth's practice of profiting off people's diagnoses without providing necessary treatment "'is wrong.'" ¶130.

- 10 -

### C.    The V28 Deception: Knowingly False Assurances in the Face of Regulatory Reform

#### 1.    Concealing the Existential Threat

In 2023, CMS implemented Version 28 ("V28"), which was designed to overhaul the Medicare Advantage risk adjustment payment system to combat upcoding abuses.  ¶132. V28 eliminated thousands of diagnosis codes and fundamentally revised payment weightings – changes Defendants knew would devastate its artificially inflated revenue stream, and ultimately expose UnitedHealth's systemic fraud.  ¶¶132-135, 284, 421-423, 449, 451, 454, 458-460, 477-479, 498-499.

Despite internal analyses of around 900,000 patients showing V28 would significantly reduce the Company's revenue, CEO Witty repeatedly assured investors the changes would have no impact.  ¶¶310, 312, 421, 423.  Witty's assurances concealed both the upcoding scheme and the already apparent sharp reductions in risk scores and revenue.  ¶¶331(a)-(e), 421-423.

#### 2.    "Masking" V28's Financial Impact Through "Portfolio Refinement" Transactions

As V28 devastated UnitedHealth's ability to upcode in 2024, the Company turned to "financial engineering" to conceal declining profits.  ¶¶267-279.  By late 2024, V28's stricter policies had eroded profits and ended the Company's "more than 60 consecutive quarters of earnings that beat Wall Street estimates."  ¶267.

With full knowledge of V28's material adverse impact, Defendants orchestrated "portfolio refinement" transactions with private equity firms, including Warburg Pincus and KKR & Co.  ¶¶268-272.  These asset sales were timed to close before year-end 2024,

- 11 -

allowing UnitedHealth to fill the hole created by V28 and book $3.3 billion in profits. ¶¶270, 274. The terms potentially required UnitedHealth to buy the assets back for $100 million more than it sold them for. ¶¶327, 331(f)-(g).

The transactions' timing and secrecy demonstrated deliberate manipulation designed to meet earnings targets without alerting investors. ¶269. Without these manufactured profits, "the company would have missed estimates for the first time in more than 15 years." ¶273. Witty knew UnitedHealth orchestrated the "portfolio refinement" transactions at year-end. ¶¶276, 327, 431.

In December 2024 and January 2025, as V28's negative impact materialized, UnitedHealth issued false 2025 EPS estimates of $29.50 per share to $30.00 per share. ¶¶320, 322-324, 331(a)-(d), (f)-(g), (j). The 2025 EPS estimates concealed Defendants' upcoding scheme and that UnitedHealth's 2025 estimates secretly included $3.65 billion, $3.00 per share, from "portfolio refinement" transactions designed to mask V28's negative impact. ¶¶285, 331 (a)-(d), (f)-(g), (j), 498. When reporting on these transactions in February 2025, Defendants lied about their purpose and concealed that the Company was using such transactions to cover-up the upcoding scheme's collapse. ¶¶327, 331(f)-(g), 498.

Financial analysts later confirmed that Defendants' statements misled investors, calling the transactions "earnings 'management'" and "financial engineering." ¶¶279, 432, 498.

**D.    Misleading Investors: Misrepresentations About UnitedHealth's Medicare Advantage Business and the Cover-Up Campaign**

Throughout the Class Period, Defendants identified Medicare Advantage as one of the "key elements" of UnitedHealth's growth strategy, attributing revenue growth to serving sicker patients while concealing the true source: fraudulent upcoding. *E.g.*, ¶¶7, 10, 126, 288, 297, 331.

UnitedHealth's response to media investigations demonstrated a consistent pattern of deception designed to maintain investor confidence. ¶¶18, 235-239, 317-319, 321. When *STAT News* and the *WSJ* published data-backed reports detailing improper upcoding practices and misuse of diagnostic tools, UnitedHealth responded by issuing repeated blanket denials, dismissing meticulously researched findings as "flawed," "unsubstantiated," and "'inaccurate.'" *Id.*

When the *WSJ* published its February 21, 2025 article revealing a DOJ civil fraud investigation of the Company's upcoding causing a $36.00 drop in the Company's share price, UnitedHealth responded immediately – just hours after the article was published – labeling it "misinformation." ¶¶240-246, 413-414. This reflexive denial was clearly intended to prop up UnitedHealth's stock price and slow the accelerating market fallout; at the time of the denial, UnitedHealth had already retained outside counsel and contacted former employees about the investigation. *Id.*

Similar deceptive intent pervaded the Company's response to OIG reports. When, in October 2024, government investigators learned UnitedHealth had received billions from unsupported diagnoses, the Company dismissed the findings as "'misleading, narrow, and

incomplete.'" ¶¶238, 319.  UnitedHealth also issued a similar denial at the start of the Class

Period, claiming a 2021 OIG report – which also showed the Company was upcoding – was

"'inaccurate and misleading.'"  ¶¶126, 290, 295-296.

### E.    Insider Trading: Profiting from Concealed Information

After receiving notice of a DOJ antitrust investigation in October 2023, insiders

including Chairman Stephen Hemsley dumped over $117 million in UnitedHealth stock

before the investigation became public.  ¶¶14, 229-231, 377-397.

The timing was no coincidence.  This $117 million payday represents classic insider

trading based on material, non-public information.  ¶231.  As renowned Columbia Law

School Professor John Coffee explained, these stock sales should have been "bar[ed]" in

light of the DOJ probe.  *Id.*  Congressional lawmakers called the trading pattern "disturbing."

¶¶393-397.

### F.    The Unraveling: Admissions About the Financial Impact, CEO Witty's "Resignation," the DOJ Criminal Investigation, Halting the "Portfolio Refinement" Scheme, and the CFO's Removal

On April 17, 2025, the Company shocked investors by slashing its 2025 profit

forecast and admitting to problems in its Medicare Advantage business, including difficulties

adapting to V28 changes.  ¶¶22-24, 254-255, 328, 449-462.  Analysts covering the Company

linked the disclosure to the fraudulent upcoding scheme and DOJ scrutiny.  *Id.*

A month later, UnitedHealth announced CEO Witty's "resignation" for "personal

reasons" and suspended 2025 EPS estimates.  ¶¶256-258.  The next day brought

confirmation of investors' worst fears.  ¶¶26-28, 259-260.  The *WSJ* reported that the DOJ

had launched a criminal investigation into UnitedHealth's Medicare Advantage billing

- 14 -

practices, transforming what had been civil regulatory matters into potential criminal liability. *Id.* The *WSJ* report caused an 11% stock price decline even though the Company immediately refuted the report as "irresponsible." ¶¶26, 34, 259-260.

Media outlets and corporate governance experts saw through the Company's "personal reasons" explanation for Witty's sudden exit. ¶¶27-28, 416, 475. The *Minnesota Star Tribune* reported Witty had committed the "cardinal sin" of missing financial estimates and was effectively forced out. ¶416. Jeffrey Sonnenfeld, founder of the Yale Chief Executive Leadership Institute, agreed: "'It's got to be pretty bad if they moved this fast'…. Witty was forced out." ¶475.

The Company's subsequent actions confirmed the severity. ¶¶419-420. Within weeks of his removal, UnitedHealth rescinded Witty's 2025 performance-based compensation. *Id.* In July 2025, in a surprising about-face, UnitedHealth admitted the existence of both DOJ civil and criminal investigations into its Medicare Advantage billing practices. ¶¶280-281. The Company further stunned investors on July 29 with admissions including that: (i) UnitedHealth now expects adjusted earnings of $16.00 per share in 2025 (38% lower than the $26.00 per share it said it would deliver just three months earlier); (ii) it would halt further use of "portfolio refinement" transactions (revealing that ceasing their use would remove $3.65 billion from 2025 EPS estimates, over 11% of the earnings outlook announced on April 17, 2025); and (iii) V28 changes will actually cost UnitedHealth $11 billion over three years. ¶¶35, 282-285, 328.

Two days after disclosing the truth about V28's financial impact and the end of "portfolio refinement" transactions, UnitedHealth abruptly removed CFO Rex. ¶¶287, 433.

- 15 -

### G.    The Market Reckoning: Corrective Disclosures and Massive Losses

Between February 2024 and July 2025, a series of partial corrective disclosures revealed the truth about UnitedHealth's fraudulent scheme.  ¶¶232-233, 240-243, 254-286, 436-501.  The market reaction was devastating to UnitedHealth investors as UnitedHealth stock fell from over $600 per share to under $300 per share.  *Id.*

Financial analysts directly connected these massive losses to UnitedHealth's systemic fraud, confirming the market declines as corrective disclosures.  Analysts confirmed the fraud stating the Company's Medicare Advantage program "probably was overearning, overcharging, upcoding for a period of time," with reduced profits reflecting "Department of Justice scrutiny."  ¶¶451-452, 458.  Wells Fargo recognized that DOJ scrutiny meant UnitedHealth could no longer "optimize [Medicare Advantage] coding to [the] same degree," while TD Cowen characterized this as "a potentially fundamental impairment of UNH's historical competitive advantage."  ¶¶467, 473, 477.  *Barron's* likewise noted UnitedHealth's "heavy reliance on its Medicare Advantage billing practices."  ¶¶459-460, 478.  Tellingly, Jefferies acknowledged it had "underappreciated the extent of earnings 'management'" until the July 29, 2025 disclosure that UnitedHealth had planned $3.65 billion of "portfolio refinement" transactions for 2025.  ¶498.

### H.    Government Response: Bipartisan Federal Action

The Republican Chair of the Senate Judiciary Committee launched a formal investigation, characterizing UnitedHealth's conduct as "apparent fraud."  ¶¶405-407.  The Senator cited both the 2024 OIG report showing UnitedHealth received $3.2 billion from

- 16 -

unsupported diagnoses in 2023 and the *WSJ*'s analysis revealing $8.7 billion in payments for conditions no doctor treated in 2021.  *Id.*

CMS announced a "significant expansion of its auditing efforts for Medicare Advantage (MA) plans" in May 2025, acknowledging it was several years behind on audits – a tacit admission that UnitedHealth's scheme had operated unchecked for years.  ¶264. Analysts connected the announcement to UnitedHealth's "aggressive" upcoding practices, calling it a "gut punch" that "could result in a $20 billion" clawback.  ¶¶264-265.

In August 2025, Democratic Senators demanded documents relating to UnitedHealth's nursing home scheme.  ¶¶425-426.  The Senators accused the Company of "prioritizing its bottom line at the expense of the health and safety of nursing home residents," while Representatives urged the DOJ to investigate what they labeled "fraud." ¶¶424-426.

## I.    Leveraging White House Connections to "Resolve" DOJ and Government Troubles

The *WSJ* recently revealed that UnitedHealth hired close political allies of the President of the United States, including top fundraiser Brian Ballard, and arranged meetings between: (i) CEO Hemsley and the White House chief of staff where they "discuss[ed] Medicare"; and (ii) Hemsley and the official overseeing Medicare, Chris Klomp, where they "discussed Medicare-plan billing policies."  *See* Josh Dawsey, Christopher Weaver & Anna Wilde Mathews, *UnitedHealth Is Spending Big on Trump Allies to Fix Its Washington Problems*, Wall St. J. (Sept. 14, 2025) (attached as exhibit 1 to concurrently filed Declaration of Tim Sullivan) at 2.  The Company also secured "unusual" meetings with senior Justice

Department officials – including the attorney general's chief of staff, Chad Mizelle – where they discussed the ongoing criminal investigation. *Id.* The *WSJ* also reported that "UnitedHealth also has sought meetings with Trump himself … seeking in particular to resolve the government investigations …." *Id.*

## III.   LEGAL STANDARD

Private securities fraud actions "provide 'a most effective weapon in the enforcement' of securities laws and are 'a necessary supplement to Commission action.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319-20 (2007).

The Court must "accept all factual allegations in the complaint as true" and "construe those facts in the light most favorable to the plaintiffs." *Id.* at 322; *ConAgra*, 335 F.3d at 829. A complaint stating a claim "'plausible on its face'" has sufficient "content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility "'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of'" the violation. *McDonough v. Anoka Cnty.*, 799 F.3d 931, 945 (8th Cir. 2015). Direct evidence is unnecessary; circumstantial allegations "'need only be enough to nudge the claim "across the line from conceivable to plausible."'" *Id.*

Even under the PSLRA's heightened standards, "it remains the law that, in securities litigation as elsewhere, plaintiffs' Complaint should not be dismissed for failure to state a claim where there is a 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support plaintiffs' claims." *In re UnitedHealth Grp. PSLRA Litig.*,

2007 WL 1621456, at *1 (D. Minn. June 4, 2007) (alteration in original). "Although the

PSLRA imposes certain heightened pleading standards, it does not require a securities fraud

plaintiff to prove its case in the Complaint." *In re St. Jude Med., Inc. Sec. Litig.*, 836 F.

Supp. 2d 878, 905 (D. Minn. 2011) ("*St. Jude I*").

## IV.    THE COMPLAINT SATISFIES THE PLEADING REQUIREMENTS OF THE PSLRA AND THE FEDERAL RULES OF CIVIL PROCEDURE

Defendants expend more than 50 pages attacking the Complaint's structure, yet

simultaneously submit a 17-page chart cataloguing every alleged misstatement –

inadvertently proving they understand the allegations perfectly. *See* UnitedHealth's, Andrew

Witty's, and Stephen Hemsley's Motion to Dismiss the Third Amended Supplemental

Consolidated Complaint (ECF 171-172, 174-175) ("Motion" or "MTD"), Ex. 1. As Judge

Rosenbaum put it in connection with a previous UnitedHealth securities-fraud scandal, the

Court "has eyes to see, as well as a mind to perceive, the nature of plaintiffs' claims.

Plaintiffs' claims are nowhere near as complex as defense counsel suggest." *UnitedHealth*,

2007 WL 1621456, at *1. Defendants' own Motion and chart prove "that the [D]efendants

were on notice of the claims against them." *Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm.*

*Indus. Ltd.*, 432 F. Supp. 3d 131, 155 (D. Conn. 2019).

The Complaint's theory is straightforward: Defendants orchestrated a multi-year

Medicare fraud scheme while making false statements about revenue drivers, HouseCalls,

and the "portfolio refinement" transactions cover-up; concealed the Company's improper

sharing of sensitive data across its business units, and engaged in anti-competitive conduct.

"Even though the factual allegations are lengthy, the complaint's theory of liability is clear."

- 19 -

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 812 (6th Cir. 2022). Defendants' reliance on *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878 (8th Cir. 2009) is misplaced (MTD at 16-18). Unlike *Novastar*, this Complaint "plainly enumerates the individual statements that Plaintiffs allege are false" and breaks them into clear categories. *St. Jude I*, 836 F. Supp. 2d at 887. The Complaint organizes misstatements by category and year (*e.g.*, ¶¶288-330, 332-340, 342-345), then explains why each category was false (¶¶331, 341, 343, 346). This structure more than satisfies Federal Rule of Civil Procedure 8(a). *See St. Jude I*, 836 F. Supp. 2d at 887.

Defendants claim the Complaint should detail "reasons why false" after each individual statement. Not so. The PSLRA and Federal Rules of Civil Procedure 8(a) and 9(b) impose no such requirement. *St. Jude I*, 836 F. Supp. 2d at 887. Because Defendants' statements were misleading by omission, the Complaint necessarily details the concealed information supporting each category of falsity. This approach is "sufficient, even if imperfect." *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *12 (D. Md. Sep. 1, 2023). Plaintiff is not "hiding behind … lengthy block quotes to avoid making itself abundantly clear on the issue of falsity …; instead, it uses the block quotes to put its allegations of material omissions in context." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 710 (W.D. Tex. 2010).

The Complaint is lengthy because Defendants' fraud spans nearly four years – not because of deficient pleading. *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *1, *3 (N.D. Ill. Aug. 11, 2021) (denying motion to dismiss 233-page complaint covering four-year period). Courts routinely uphold securities complaints with comparable or greater length and

- 20 -

complexity. *See, e.g.*, *Pub. Emps. Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325-26 (5th Cir. 2014) ("*Amedisys I*") (reversing dismissal where "[t]he Complaint consists of over 200 pages of allegations regarding, among other things, Defendants' fraudulent Medicare billing practices"); *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 759 F. Supp. 3d 926, 949 (D. Ariz. 2024) (while complaint was "a breathtaking 324 pages," defendants were capable "of identifying which statements are alleged to be false or misleading"); *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 205 (E.D. Pa. 2021). Here, the Complaint more than sufficiently links the alleged misstatements to the underlying material facts Defendants misleadingly concealed from investors throughout the Class Period. *St. Jude I*, 836 F. Supp. 2d at 888.[4]

## V.  THE COMPLAINT ALLEGES ACTIONABLE FALSE AND MISLEADING STATEMENTS

A statement is misleading if it "'create[s] an impression of a state of affairs' that 'materially differ[s] from the one that actually existed.'" *Freedman v. Saint Jude Med., Inc.*, 4 F. Supp. 3d 1101, 1114 (D. Minn. 2014) ("*St. Jude II*"). "'[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects.'" *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic Inc.*, 57 F. Supp. 3d 950, 972 (D. Minn. 2014) ("*Medtronic I*") (some alteration in original). Whether "'a public statement is misleading is a mixed question of law and fact

---

[4]    Defendants protest this is the fifth supplemental complaint. MTD at 1. Of course it is – each supplement added facts as Defendants' scheme continued to unravel: OIG findings, *WSJ* investigations revealing the DOJ criminal and civil probes, CEO firing, CFO's removal, reduced 2025 estimates, and admissions about manufactured earnings. ¶¶127-131, 234-286, 445-502.

for the jury'" and can be resolved as a matter of law only "'when reasonable minds could not

differ.'"  *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019).  Context is

key.  *St. Jude I*, 836 F. Supp. 2d at 888.

### A.    Defendants' Materially False and Misleading Statements Regarding the Company's Medicare Advantage Business

Throughout the Class Period, Defendants misled investors about UnitedHealth's

Medicare Advantage business.  They touted HouseCalls' success in "clos[ing] gaps in care"

and identifying "underdiagnosed" conditions – claiming to save "taxpayers" and the

"health[care] system billions."  ¶¶290, 298, 300-301, 305, 307, 311, 315-316, 325.  In SEC

filings, Defendants attributed rising revenues to "growth in the number of individuals served

through Medicare Advantage" and a higher mix of sicker members: those "with higher

acuity needs."  ¶297 & n.32.

Investors thought they understood the connection between UnitedHealth's revenue

growth and the rise in sicker members: HouseCalls' in-home visits were supposedly

uncovering and identifying chronic conditions in seniors, producing higher CMS

reimbursements.  ¶291.  In reality, however, the growth in "sicker" members was a fiction.

UnitedHealth used HouseCalls – and other means – to fabricate diagnoses for conditions

never treated by doctors, inflating revenues by falsely portraying members as sicker than

they actually were.  ¶¶71-189, 331(a)-(d).

When media outlets wrote about these practices, Defendants doubled down, insisting

their "'risk-adjustment program is transparent'" and dismissing a February 2025 *WSJ* report

on a DOJ probe as "misinformation."  ¶¶290, 326.  Defendants repeatedly assured investors

that UnitedHealth was "focused" on "providing better outcomes" and that its Medicare Advantage members "experienced better health outcomes," including lower hospitalization rates. ¶¶294, 304, 309, 313-314. False. The Company prioritized cutting costs at patients' expense, including by pressuring nursing homes to avoid necessary transfers for Medicare Advantage members to hospitals. ¶¶141-146.

When CMS implemented V28 to "cut back sharply" on upcoding, Witty assured investors V28 would have no financial impact. ¶¶310, 312. But when V28 threatened to end the Company's 60-plus consecutive quarterly earnings beats at the end of 2024, Defendants covertly structured $3.3 billion of "portfolio refinement" transactions to conceal the scheme's collapse. ¶¶267-279, 331(f). UnitedHealth then issued false 2025 EPS estimates that secretly depended upon another $3.65 billion of unsustainable "portfolio refinement" transactions. ¶¶279, 320, 322-324, 331(f)-(g), 498.

These misstatements are linked: each conceals a different facet of Medicare Advantage misconduct while creating the false impression of legitimate practices and sustainable performance. "It would be perverse if companies could escape liability for securities fraud simply by disseminating a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016).

## 1. Defendants Made False and Misleading Statements About UnitedHealth's Revenue

UnitedHealth publicly reported revenues in quarterly SEC filings and affirmatively attributed increases to "growth in the number of individuals served through Medicare

- 23 -

Advantage" and "a greater mix of people with higher acuity needs." ¶297 & n.32 (same for May 4, 2022 through May 7, 2025). Those statements were materially misleading because the Company's Medicare Advantage business generated billions in profit through rampant upcoding. ¶331. In 2021 alone, Defendants' scheme harvested $8.7 billion for diagnoses no doctor treated – an amount representing over half the Company's net income. ¶¶117, 331(c). By 2023, upcoding generated $3.2 billion from in-home assessments alone – two-thirds of the entire industry's risk-adjusted payments from such methods. ¶¶127, 331(c).

Statements about the reasons underpinning revenue growth are actionable when they conceal fraudulent sources. *In re St. Paul Travelers Sec. Litig. II*, 2006 WL 2735221, at *3 (D. Minn. Sep. 25, 2006) (statements about increasing growth and revenue actionable for failing to disclose bid-rigging scheme); *Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014) (statements about high hospital admissions false for concealing the fraudulent Medicare patient admissions), *aff'd*, 608 F. App'x 855 (11th Cir. 2015); *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 285-86 (E.D.N.Y. 2023) (statements attributing growth to market factors, while omitting that growth was due to alleged anticompetitive conduct, were actionable); *CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 724-25 (D. Minn. 2019) (statements regarding strategies and policies were false because, fraudulent practices were "widespread, systemic and knowingly encouraged by CenturyLink's impossible-to-meet quota system, that management instructed sales representatives to use deceptive sales tactics, and that Defendants knew CenturyLink's sales were materially dependent on cramming").

***No False Claims Act Violation is Required to Plead Falsity***: The issue is whether Defendants committed deceptive or manipulative acts or made statements that were misleading under the federal securities laws, not whether they violated another law.  MTD at 19; *Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *10 (E.D. Pa. Mar. 25, 2022) (emphasis omitted) (disclosure required "because it is what made [the product] so successful," regardless of whether conduct was illegal); *Sapssov*, 22 F. Supp. 3d at 1226 ("plaintiffs … need not allege a violation of the [False Claims Act (the 'FCA')] … to properly plead their securities fraud"); *Bach v. Amedisys, Inc.*, 2016 WL 4443177, at *11 (M.D. La. Aug. 19, 2016) ("*Amedisys II*") (formal adjudication of Medicare fraud "is of no relevance" because "[d]efendants stand accused of violating sections 10(b) and 20(a) of the Securities Exchange Act of 1934").

When Defendants attributed UnitedHealth's revenue growth to the rise in sicker members, they had a duty to disclose the real driver; upcoding members with conditions that no doctor ever treated.  *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *3 (S.D.N.Y. Mar. 13, 2025) ("[O]mitted sources of revenue don't need to be 'fraudulent or otherwise illegal' for a statement to be misleading under Rule 10b-5(b)…. What matters is that [the company] touted the reasons for its success while leaving out the parts of the truth it found inconvenient.  The telling of half-truths – that's what the securities laws don't tolerate.").

Nor can Defendants escape liability claiming they had no duty to disclose """uncharged, unadjudicated,""" wrongdoing.  MTD at 19-20.  Courts hold that while defendants have no duty to disclose uncharged behavior, once they speak "about what drove

- 25 -

[the company's] financial success, the [d]efendants were required to disclose all material information on that topic." *Bos. Ret. Sys. v. Alexion Pharms., Inc*., 556 F. Supp. 3d 100, 123-24 (D. Conn. 2021); *In re Alibaba Grp. Holding Ltd. Sec. Litig*., 2023 WL 2601472, at *10 (S.D.N.Y. Mar. 22, 2023) (same); *St. Paul Travelers*, 2006 WL 2735221, at *3 ("[d]efendants did not have a duty to accuse themselves of wrongdoing, but they could have disclosed material facts fully indicating how they were accomplishing increases in revenue and market share").

The authorities Defendants rely on for this point do not help them. *See* MTD at 20. Unlike here, those cases involved complaints that relied solely on the existence of a government investigation to infer misconduct. *See Gray v. Alpha & Omega Semiconductor Ltd.*, 2021 WL 4429499, at *9 (S.D.N.Y. Sep. 27, 2021) (no inference of wrongdoing or duty to disclose when an investigation is the only pleaded fact); *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) (post-class-period accounting adjustments and an SEC inquiry – standing alone – were insufficient to plead falsity or scienter). By contrast, the Complaint pleads countless specific facts demonstrating misconduct, in addition to multiple investigations. *See*, *e.g.*, ¶¶71-189.

***Danske Is Also Inapposite***: Defendants' reliance on *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021) fails. MTD at 19-20. *Danske* involved misstated financial results "standing alone," without explanation. 11 F.4th at 99. Here, UnitedHealth did not merely report raw financial data – it explained revenue drivers, repeatedly attributing growth to serving a larger and sicker Medicare Advantage population. ¶297 & n.32. By touting these revenue drivers, Defendants made affirmative, misleading

- 26 -

statements.  *See Dentsply*, 665 F. Supp. 3d at 283 (rejecting *Danske* where "statements attribute[ed] 'sales growth' to 'increased demand'" when actually driven by minimum purchase requirements).  Reasons for revenue growth are "important to a reasonable investor even if the fraud only accounted for a small percentage of … profits," and here the fraud was anything but small, yielding as much as 50% of UnitedHealth's annual net income. *CenturyLink*, 403 F. Supp. 3d at 724-25; ¶¶117, 331(c).  Moreover, courts recognize that such information is material because the fraud exposed the Company to "potential civil and criminal liability."  *Id.*; *see also Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *6 (N.D. Ill. Feb. 10, 2023) (describing marketing strategy success obligated disclosure of improper practices).

**Literal Accuracy Does Not Cure a Misleading Half-Truth**: Defendants wrongly recast these statements as "[a]ccurate [s]tatistical [d]ata."  MTD at 21-22.[5]  A statement is misleading when it omits material facts that would have altered the """total mix""" of information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).  The Supreme Court has emphasized "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v.*

---

[5]    Defendants mischaracterize the holding in *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009) ("*Medtronic II*"), *aff'd sub nom.*, *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800 (8th Cir. 2010).  MTD at 21.  There, the court held that statements about the company's "strong performance" were non-actionable historical data because "[p]laintiffs do not allege that the few hospitals and clinics that discontinued their purchasing of the [company's product] harmed the [product's] overall market performance." *Medtronic II*, 618 F. Supp. 2d at 1031.  That is opposite of the allegations here: an ongoing upcoding scheme propped up UnitedHealth's entire Medicare Advantage program, and when it was discontinued, UnitedHealth's overall market performance collapsed.  ¶¶71-189.

- 27 -

*Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015). As Judge Brasel recently recognized, a duty to disclose can arise "'when a corporation puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices,'" even when the corporation has not been charged with wrongdoing. *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 810-11 (D. Minn. 2022); *see also Estée Lauder*, 2025 WL 965686, at *3 (alterations in original) ("[I]f [a defendant] puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success.").[6]

### 2.    Defendants Made False and Misleading Statements About HouseCalls

Defendants repeatedly touted HouseCalls as improving care for seniors and delivering better health outcomes, claiming it "ensure[s] our members continue to receive cost-effective, appropriate care" (¶290); "helps seniors … manage their chronic disease, close gaps in care and stay healthy and out of the hospital" (¶298); and identifies "underdiagnosed conditions" that "can be better treated" (¶¶301, 305, 311). ¶¶299-300, 302-303, 307-308, 315-316, 325.[7]

---

[6]    *See also Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1051 (D. Minn. 2015) ("Although the statements may have been literally true, the literal truth fails to appraise reasonable investors of the full story."); *St. Jude II*, 4 F. Supp. 3d at 1120-21 (same); *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 985 (D. Minn. 2004) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)) (same).

[7]    Defendants feign confusion about the falsity of Thompson's statement alleged at ¶291. MTD at 19 n.5. This statement is misleading for the same reasons as the other statements in that section. *See* ¶331. Thompson misleadingly reassured analysts that Medicare Advantage risk-adjustments had gained "traction" in 2022 (as compared to 2021) because of legitimate clinical encounters, including "in-home clinical visits." ¶291. Thompson is deceased (*see*

These statements were false and misleading.  ¶¶78-102, 331(a), (c)-(d).  Defendants omitted that UnitedHealth used HouseCalls to inflate risk scores and profits.  Nurses were forced to use questionnaires during visits designed to yield profitable diagnoses (¶¶83-91), software that overrode clinical judgment to suggest lucrative conditions (¶¶81-82), and quality-assurance teams that pressed nurses to link benign symptoms to chronic diseases (¶¶87-91).  HouseCalls nurses were also required to use inaccurate diagnostic tools (QuantaFlo) to capture high-value diagnoses.  ¶¶92-94, 100-102, 165-166, 247-253, 358.  This generated billions in Medicare revenues based on unsupported diagnoses of serious chronic medical conditions.

Concealing HouseCalls' true purpose rendered these statements materially false and misleading.  *See CenturyLink*, 403 F. Supp. 3d at 727-28 (statements about "meeting customer needs" false where company "knowingly encouraged widespread cramming of charges" to inflate revenue); *Amedisys II*, 2016 WL 4443177, at *9 (investors may presume their financial future "does not hinge upon the continuation of a fraud"); *Boca Raton Firefighters & Police Pension Fund v. DeVry Inc.*, 2012 WL 1030474, at *2 (N.D. Ill. Mar. 27, 2012) (statements attributing success to "legitimate business factors" instead of "'predatory' practices" actionable); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *7 (N.D. Cal. Feb. 7, 2018) (statements about "success" and "commitment to providing value" actionable where driven by fraudulent practices).

---

MTD at 9 n.1), but Defendants have yet to provide his estate information or file a formal suggestion of death.  *See Benacquisto v. Am. Express Fin. Corp.*, 44 F.4th 741, 745 (8th Cir. 2022).

- 29 -

Taking snippets out of context, Defendants argue certain HouseCalls' statements were "generic 'puffery.'" MTD at 20-21. This argument mischaracterizes Plaintiffs' allegations in a manner that parallels Defendants' efforts to mislead investors. *Compare* ¶298 ("through [HouseCalls], a true collaboration between Optum and UnitedHealthCare, where our clinicians help seniors in Medicare Advantage programs manage their chronic disease, close gaps in care and stay healthy and out of the hospital. Our teams not only look after our members' medical needs …") *to* MTD at 21 (quoting ¶298) ("HouseCalls … 'help seniors … stay healthy'"). This attempt at distortion is unavailing because "even if some portions of individual statements might be too vague and general to be actionable, particular statements by Defendants must be evaluated not only in their entirety, but also in context." *St. Jude I*, 836 F. Supp. 2d at 888; *see also Tactile*, 595 F. Supp. 3d at 809 n.17 (statements about "'strong growth'" in the company's VA channel were not inactionable puffery because "the alleged fraud is that [d]efendants addressed the revenue from the VA and Medicare channels without disclosing that those sales were impacted by illegal sales practices").[8] So too here: when Defendants touted HouseCalls' healthcare benefits, they concealed that the program's

---

[8] Even the cases Defendants cite recognize the importance of context in puffery analysis. MTD at 20-21. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019) ("A conclusion that a statement constitutes puffery doesn't absolve the reviewing court of the duty to consider the possibility – however remote – that in context and in light of the "total mix" of available information, a reasonable investor might nonetheless attach importance to the statement."); *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882-83 (8th Cir. 2017) (context is relevant to determining whether a statement is puffery).

- 30 -

core purpose and financial impact stemmed from upcoding practices that generated billions in improper Medicare revenue.[9]

### 3. Defendants' Emphatic Denials of Government and Media Reports Are Actionable

The Company repeatedly denied investigative reports that reported on UnitedHealth's use of HouseCalls, chart reviews, and provider incentives to manipulate members' risk scores. ¶¶290, 296, 317-319, 321, 326. Rather than acknowledging these practices, the Company claimed its "'risk-adjustment program is transparent'" (¶290); touted its in-home care program as "'best practice[s]'" (¶296); insisted providers "diagnose and document patient information completely and accurately" (¶317); described HouseCalls as helping to "identify conditions" and "connect patients to necessary specialists and high-quality medical care" (¶318); asserted its practices lead to "'more accurate diagnoses'" (¶321); and flatly denied the *WSJ*'s February 2025 report of another new DOJ investigation (¶326).

Each statement was materially false and misleading. ¶¶71-189, 331(a)-(d). False or misleading denials are actionable. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d. Cir. 2009) (CFO's explicit denials of unusual discounting false and misleading). "Emphatic statements by [d]efendants denying wrongdoing …," coupled with

---

[9] *Perez v. Target Corp.*, 2024 WL 4804656, at *12 (D. Minn. Nov. 15, 2024) is inapposite. MTD at 21. *Perez* involved genuinely vague statements like feeling "good about … inventory levels" and being "'well-positioned.'" 2024 WL 4804656, at *12. Here, Defendants made quantifiable representations: screened "about 1 million members" (¶301); "nearly 1 out of every 4" had undiagnosed conditions (¶305); "identified 300,000 seniors" (¶316); "75% of patients received follow-up" (*id.*). These specific, measurable representations are actionable fraud, not puffery. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671-72 (6th Cir. 2005). A reasonable investor would conclude UnitedHealth to be growing revenue by legitimate patient diagnosing via HouseCalls – not fabricating diagnoses to generate billions in improper revenues.

- 31 -

representations of full transparency, "contribute to a strong inference that Defendants violated the law by at least acting severely recklessly in making denials." *CenturyLink*, 403 F. Supp. 3d at 734-35; *see also Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 596 (W.D. Tex. 2014) ("To blatantly offer assurances of the company's virtuous methods in the face of public criticism … [when] one knows [the company] is in danger is more than misleading – this constitutes direct lying."); *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) (affirmative denial of investigation's existence violated SEC Rule 10b-5(b)).

***Defendants Wrongly Contend These Denials Are Non-Actionable Opinions***: The Complaint alleges detailed, particularized facts showing a stark disparity between Defendants' denial statements and the Company's ongoing upcoding scheme. ¶¶71-189. *Avaya*, 564 F.3d at 269 (denials of improper practices actionable when contradicted by specific allegations). Defendants' reliance on *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 593 (N.D. Tex. 2021) does not help them. MTD at 25. There, the court held that describing a lawsuit as "'without merit'" was non-actionable opinion because such a statement is routine, aspirational, and not a factual assertion. *Crutchfield*, 529 F Supp. 3d at 593-94. Defendants here said much more. For instance, in response to the OIG's findings that UnitedHealth was receiving a disproportionate portion of a $9.2 billion pool of suspicious Medicare payments from CMS based on in-home visits, Defendants declared the Company's "'risk-adjustment program is transparent.'" ¶290. And in response to a *STAT News* report about the Company's risk adjustment practices, it assured investors its "'providers and partners make independent clinical decisions'" about diagnoses, and "we

- 32 -

provide training … to providers because it leads to better care management." ¶317. These are affirmative assurances – well beyond the generalized, aspirational statements in *Crutchfield*.[10]

***Defendants' February 2025 DOJ Investigation Denial Was Especially Deceptive***: *See* MTD at 25 n.6. By February 21, 2025, when UnitedHealth publicly dismissed the *WSJ* report as "misinformation," the Company had already retained outside counsel for the new DOJ probe and commenced contacting former employees about the investigation. ¶245. Within weeks, in-house counsel confirmed "the government has asked us some questions regarding Optum's coding practices," described the inquiry as "in the early stages," and offered representation through the Company's retained counsel. ¶245. These contemporaneous steps confirm UnitedHealth was responding to a new and separate DOJ investigation when it issued its denial.

### 4. Defendants' False and Misleading Statements Regarding the Lowered Hospitalization Rates

Defendants' statements that UnitedHealth cut hospitalization rates by as much as 40% compared to traditional Medicare, because its "value-based care" model delivered "better outcomes," and greater patient engagement, were false and misleading. ¶¶294, 304, 309, 313-314. Defendants concealed that UnitedHealth paid nursing homes hundreds of thousands of dollars annually through various incentive programs to suppress hospital

---

[10] *Anderson v. Abbot Lab'ys*, 140 F. Supp. 2d 894 (N.D. Ill. 2001) is also inapposite. MTD at 25. There, defendants disclosed an ongoing FDA dispute and merely declined to admit liability. *Abbot*, 140 F. Supp. 2d at 906-07. The court found investors could evaluate this sort of "posturing." *Id.* Here, it is the opposite; UnitedHealth affirmatively denied any wrongdoing, or DOJ investigations, and assured investors of full transparency and compliance with CMS rules. ¶290.

- 33 -

"'admits per thousand.'" ¶¶141-146, 331(i). They also hid that the Company stationed its own medical teams in nearly 2,000 nursing homes to enforce aggressive cost-cutting tactics that boosted profits at the expense of patient safety. *Id.* Such undisclosed practices "***directly contradict*** [defendants'] affirmative statements." *In re Ambac Fin. Grp., Inc. Sec Litig.*, 693 F. Supp. 2d 241, 271 & n.32 (S.D.N.Y. 2010).

Defendants claim these statements are puffery because they are not "falsifiable." MTD at 31. Not so. All of these statements expressly claimed that UnitedHealth produced materially lower hospitalization rates than traditional Medicare because of healthier patients. ¶¶294, 304, 309, 313-314. Comparative statements like these are actionable and verifiable. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 735-36 (N.D. Cal. 2022) (statements that products were "either as good as or better than the conventional" equivalent were actionable); *see also Bucks Cnty. Emps. Ret. Sys. v. Norfolk S. Corp.*, 775 F. Supp. 3d 1275, 1288 (N.D. Ga. 2025) (statement that "'[s]afety [is] a core value'" was not "too vague to be verifiable" where defendants were sacrificing safety for profits).

Defendants' puffery cases involve truly vague statements. *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) (alterations in original) ("'hit[ting] the ground running,'" and "'implementing … proven strategies'"); *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (using "'the best science,' and [being] 'very advanced'"). By contrast, Defendants made specific, objective claims about the Company's care model that were directly falsified by the nursing home scheme. By attributing markedly low hospitalization rates to the Company's care, Defendants were "obligated to fully inform investors" as to the true reasons, including that

- 34 -

UnitedHealth actively discouraged hospitalizations regardless of care. *Tile Shop*, 94 F. Supp. 3d at 1051.

Defendants' fallback, that the statements referred to the entire Medicare Advantage population, not just nursing-home members, also fails. MTD at 32. Defendants themselves directly linked the lower hospitalizations to UnitedHealth's Medicare Advantage program and to "better outcomes" (¶¶294, 304, 309, 313-314).[11] *See also* ¶¶294, 304; *Tile Shop*, 94 F. Supp. 3d at 1049 (rejecting defendant's argument where company itself "directly attribut[ed] [its] financial success" to a specific claimed driver, making the statement factual and not mere puffery).

### 5.    Defendants Lied About the Impacts of the Upcoding Scheme and V28 on Company Earnings

***The V28 Lies***: Defendants' 2023 V28 statements were knowingly false. Internal analyses "of around 900,000 patients" showed V28 would "cut back sharply" on profitable diagnoses (¶331(e)); Defendants spent six months "reconfiguring" plans "in response" (¶312); yet Witty publicly assured investors V28 would have no financial impact (¶¶310,

---

[11]    This point makes Defendants' cases distinguishable. *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *18 (S.D.N.Y. Mar. 30, 2021) (finding generalized statements about the company's overall financial performance from a myriad of global revenue streams, were too attenuated from the specific wrongful conduct to be actionable), *aff'd sub nom.*, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022); *Lian v. Tuya Inc.*, 2025 WL 733253, at *9 (S.D.N.Y. Mar. 7, 2025) (finding generalized statements about marketing plans "came nowhere close to placing at issue the subject" of the misconduct). MTD at 32. Also, Defendants' reliance on *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) and *Medtronic II*, 618 F. Supp. 2d at 1031 to claim that accurately reported data is not actionable, is misplaced. MTD at 32. *See Omnicare*, 575 U.S. at 192 ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

312).  That contradiction makes the statements actionable.  *St. Jude I*, 836 F. Supp. 2d at 892-93 (internal data contradicting public statements pleads falsity); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (factor 2, same).

The V28 statements were also misleading because 2023 results were inflated by at least $3.2 billion in improper payments from the upcoding scheme.  ¶¶127-128, 331(a)-(d).  *ConAgra*, 335 F.3d at 830 ("significant" that a company not earning what it claimed); *In re Questcor Sec. Litig.*, 2013 WL 5486762, at *14 (C.D. Cal. 2013) (forecasts "misleading because Defendants concealed the true causes of the … financial success").

**The "Portfolio Refinement" Scheme**: By late 2024, V28's stricter policies had eroded UnitedHealth's margins and ended the Company's 60+ consecutive quarterly earnings beats.  ¶¶267, 331(f).  To mask the erosion in profits, Defendants orchestrated $3.3 billion in year-end "portfolio refinement" transactions with private equity firms.  ¶¶268-272, 331(f).  UnitedHealth insisted these transactions close before year-end 2024 and "not be publicized even after they closed." ¶269.  Witnesses told *Bloomberg* UnitedHealth did these deals to book $3.3 billion in profit and "meet[] earnings targets."  ¶¶269-270, 274, 331(f).

Defendants then misled investors in multiple ways.  *First*, on December 3, 2024 and January 16, 2025, UnitedHealth targeted 2025 EPS estimates of $29.50-$30.00 per share, claiming executives were "highly informed" (¶¶320, 322, 324), while concealing margins had eroded and that $3.3 billion of 2024 profit (over 9% EPS) was derived from "portfolio refinement" transactions (¶¶267-279, 331(f)).  *St. Jude I*, 836 F. Supp. 2d at 892-93.

*Second*, Defendants concealed that the 2025 EPS estimates depended on $3.65 billion in **additional** planned "portfolio refinement" transactions designed to hide V28's continuing

impact on profits, and the estimates could not be achieved without them. ¶¶331(g), 285, 498. Witty knew of these transactions and signed the SEC Form 10-K for FY 2024. ¶¶327, 276; *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (alterations in original) (defendant "bridge[d] the [scienter] gap" by referencing the data).

*Third*, both the inflated FY 2025 estimates and FY 2024 results concealed the upcoding scheme itself, falsely validating Defendants' assertions about revenue growth drivers. ¶¶320, 322, 331(f)-(g), (j). "There is a 'substantial likelihood that the disclosure of [[UnitedHealth's] fraudulent Medicare practices] … would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Amedisys II*, 2016 WL 4443177, at *10; *CenturyLink*, 403 F. Supp. 3d at 724 (information that company's revenue was derived from fraud would be important to investors "because the alleged fraud opened CenturyLink to potential civil and criminal liability").

*Fourth*, Defendants claimed the "portfolio refinement" transactions were "strategic," "had valid business reasons," and "will enhance growth opportunities." ¶¶323, 327, 330. These representations created a materially false impression about the transactions' purpose and earnings sustainability. ¶¶282-285, 331(a)-(d), (f). "'[O]nce a company speaks on an issue or topic,' it must 'tell the whole truth.'" *Gimpel v. The Hain Celestial Grp., Inc.*, __ F.4th __, 2025 WL 2749562, at *10 (2d Cir. Sep. 29, 2025); *Tile Shop*, 94 F. Supp. 3d at 1051 ("Although the statements may have been literally true, the literal truth fails to appraise reasonable investors of the full story.").

Tellingly, just ***two weeks*** after defending $3.3 billion of 2024 transactions as "valid" (¶¶267-278; Ex. 21 at 2), on July 29, 2025, UnitedHealth terminated $3.65 billion of planned "portfolio refinement" 2025 transactions. *Helwig*, 251 F.3d at 552 ("closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" supports fraud). This disclosure admitted V28's $7 billion two-year impact – matching the two years of "portfolio refinement" transactions. ¶¶284-285, 327. The stock price dropped over 7% – additional "'strong evidence that the information was material.'" *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 983 (8th Cir. 2012); ¶500.

Defendants' speculation that their forecasts may have "already factor[ed] in" the 2023 internal analysis showing V28's severe impact, fails. MTD at 22. The timing shows otherwise. UnitedHealth gave EPS estimates in December 2024 and January 2025 – ***after*** it had already: (i) manufactured earnings via $3.3 billion of 2024 "portfolio refinement" transactions to conceal V28's impact; and (ii) planned an additional $3.65 billion of such deals for 2025 to hide the continuing negative impact on profits. ¶¶267-278, 331(f)-(g), (j). If they "factor[ed] in" V28's impact, they would not need $7 billion in "manufactured earnings" to meet estimates. *St. Jude I*, 836 F. Supp. 2d at 893 (factual disputes are "matters for discovery and resolution on the merits").[12]

---

[12] Unlike Defendants' cases (MTD at 22), the Complaint alleges fraud, not hindsight. Defendants knew the 2025 EPS estimates were false when made because V28 had already devastated margins – creating a $3+ billion shortfall they concealed through $3.65 billion in "portfolio refinement" transactions. ¶331(f)-(g), (j). This distinguishes all of Defendants' cited authorities. In *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079 (8th Cir. 2005), there was "no indication" the company couldn't meet projections. *Id.* at 1084. Here, Defendants knew they couldn't achieve estimates without the unsustainable transactions. Unlike *Omnicare*'s

- 38 -

***Market Professionals Recognized the Fraud***: Analysts understood the fraudulent nature of the "portfolio refinement" transactions. Deutsche Bank: the transactions "reflect an increasing reliance on financial engineering rather than regular operational executions to meet earnings targets." ¶279. Jefferies: "we underappreciated the extent of earnings 'management.'" ¶498; *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1262 (10th Cir. 2022) (that analysts criticized "'management's lack of transparency'" supports fraud).

Defendants argue that just because financial analysts recognized that the "portfolio refinement" transactions "manufactur[ed] earnings" and were "financial engineering," and the transactions filled the multi-billion dollar V28 profit gap by adding $3.3 billion to 2024 earnings, does not "amount[] to securities fraud." MTD at 33. But the deception was not just the transactions themselves – it was Defendants' insistence the transactions were "strategic" and would "enhance growth opportunities" (¶¶323, 327, 330) while concealing their true purpose: papering over the upcoding scheme's collapse and V28's devastating impact on UnitedHealth. While hitting earnings targets for "more than 60 consecutive quarters" (¶267), Defendants touted these manufactured gains as strategic growth drivers rather than revealing them as a temporary mask for the upcoding scheme. ¶¶267, 323, 327. Defendants violated their duty to speak fully and truthfully. ¶331(a)-(d), (f); *Matrixx*, 563 U.S. at 44.

---

subjective opinions (575 U.S. at 189), Plaintiff alleges objective facts: the estimates required manufactured earnings. *See* MTD at 22-23.

***The Timeline Proves Knowledge of Falsity***: The temporal proximity between Defendants' statements and the collapse of the 2025 EPS estimates, demonstrates knowledge of falsity:

- **December 3, 2024**: Defendants gave 2025 EPS estimates of $29.50-$30.00 per share.  ¶320.

- **January 16, 2025**: Defendants reaffirmed those estimates, boasted executives were "highly informed," and claimed "portfolio refinement" transactions "will enhance growth."  ¶¶322-324.

- **April 17, 2025**: Three months later – missed earnings, slashed EPS estimates, and Witty admitted knowledge of "the issue" and assured investors "we can fix in '25."  ¶¶254, 328-329.

- **May 13, 2025**: Less than one month later – CEO Witty terminated, 2025 estimates suspended in face of DOJ criminal investigation.  ¶¶256-259.

- **July 15, 2025**: Company reconfirmed it "had valid business reasons for the ['portfolio refinement'] deals."  ¶¶278, 330.

- **July 29, 2025**: Two weeks later – Company gave 2025 EPS estimate of $16.00 per share, terminated the use of "portfolio refinement" transactions (finally admitting 2025 EPS estimate had included $3.65 billion of such deals), and admitted V28 was a $7 billion "headwind" in 2024-2025.  ¶¶282-285.

- **July 31, 2025**: Two days later – UnitedHealth unexpectedly removed long-time CFO Rex.  ¶287.

"The proximity of these events, in light of the absence of an intervening catastrophic occurrence and the enormous discrepancy between defendants' representations and what actually happened, is sufficient to support a strong inference that defendants' statements … were knowingly misleading when made."  *In re Grand Casinos, Sec. Litig.*, 988 F. Supp. 1273, 1284 (D. Minn. 1997) (six month gap); *Elam v. Neidorff*, 544 F.3d 921, 930 (8th Cir. 2008) ("close proximity" between defendants' statements and announcement that resulted in decline in stock value is relevant to fraud); *In re Semtech Corp. Sec. Litig.*, 2025 WL

- 40 -

2884810, at *9 (C.D. Cal. Oct. 7, 2025) (sudden resignation of non-defendant executive adds

to the inference that statements were false when made).

      ***Safe Harbor Fails***: "'[C]autionary language'" must be "***meaningfully*** cautionary"

and "'based on a realistic description of the risks applicable to the particular circumstances.'"

*Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1178-79 (8th Cir. 2016) (emphasis in

original). Defendants' warnings fail on every front, as Defendants:

- Never mentioned the $3.65 billion hole in 2025 EPS estimates concealed by "portfolio refinement" transactions. ¶331(f)-(g), (j), 498; *In re Resideo Techs., Inc., Sec. Litig.*, 2021 WL 1195740, at *5 (D. Minn. Mar. 30, 2021) ("any cautionary language was not meaningful because it contradicted [d]efendants' actual knowledge").

- Never disclosed the upcoding scheme generating billions in improper revenue. ¶331(a)-(d), (j); *St. Jude I*, 836 F. Supp. 2d at 893 ("the purported 'cautionary statements' on which [d]efendants rely do not address the theory of Plaintiffs' case").

- Never retracted Witty's repeated promises that V28 would have no earnings impact. ¶¶310, 312.

- Defendants' warnings actually bolstered the false forecast by stating: "there are adjustments we can make to partially offset these rate pressures." MTD, Ex. 8 at 18.

- Omitted Witty's full April 17 comment, which actually affirmed the 2025 EPS estimate and misled investors by claiming V28 issues "are largely addressable as we go through the rest of this year, and in no way undermine our confidence in the value-based care strategy of the company." MTD, Ex. 10 at 12.

      Generic and misleading warnings about "Medicare funding pressures" do not render

specific lies non-actionable. MTD at 23. Defendants' cases are in accord. *Id.* at 24

(*Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015) (cautionary language must

be "'extensive, specific, and directly related to the alleged misrepresentation'"); *Rochester*

*Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 854 (E.D. Mo. 2012) (cautions not meaningful if they "mislead investors").

In Defendants' case, *Karth v. Keryx Biopharms., Inc.*, 6 F.4th 123, 137 (1st Cir. 2021) (MTD at 41), the court addressed the "'Grand Canyon' metaphor": "one cannot tell a hiker that a mere ditch lies up ahead, if the speaker knows the hiker is actually approaching the precipice of the Grand Canyon." The facts here plead just that: DOJ scrutiny and V28 had ended UnitedHealth's historical competitive advantage (upcoding), but Defendants told investors the V28 canyon was not even a pothole. ¶¶282-285, 331(a)-(d), (g), (j). Given Witty's positive assurances in April 2025, one month later investors and analysts understandably were "stunned" when UnitedHealth pulled 2025 estimates and terminated the CEO; they finally recognized that "*[t]he inability to code at pre-v28 levels … represents a potentially fundamental impairment of UNH's historical competitive advantage*." ¶¶466-467, 477.

### B. The Complaint Alleges Materially False and Misleading Statements About Internal Firewalls at UnitedHealth and Its Optum Subsidiary

Defendants' challenges to their statements about internal firewalls are meritless. MTD at 27-29; ¶¶332-341. *First*, taking words out of context, Defendants claim certain statements are puffery. MTD at 27-28. Not so. Defendants affirmatively stated the Company has "compliance programs that maintain the integrity of our customers' data and information, and prevent unauthorized access and misuse" (¶333) and that its "existing firewalls and data-security policies prohibit employees from improperly sharing" customer information (¶335). Such statements are actionable. *In re Equifax Inc. Sec. Litig.*, 357 F.

- 42 -

Supp. 3d 1189, 1231 (N.D. Ga. 2019) (statements about maintaining "'a highly sophisticated data information network that includes advanced security, protections and redundancies'" were not subjective opinions); *see also Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) ("'general statements of optimism, when taken in context, may form a basis for a securities fraud claim'").

***Second***, Defendants' mischaracterization of the statements to claim they are non-actionable statements of "future intent," also fails. MTD at 28. At the same time Defendants stated they agreed to "maintain" "robust firewall processes" and "extend them to Change," ***they also*** confirmed that the Company "imposes strict limitations" on data sharing. *See* ¶¶334-335. In other words, these purported future statements were inextricably linked to present-tense factual representations about existing systems Defendants claimed were already in place. *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2019 WL 3336119, at \*18 (D. Minn. July 25, 2019) (where statement "indicates present, current action … Defendants cannot paint this as a purely forward-looking statement"). Also, the Complaint alleges Defendants' intention to use Change's competitively sensitive data to UnitedHealthcare's advantage. ¶¶363-376.[13]

---

[13] This point distinguishes Defendants' case *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 488-89 (S.D.N.Y. 2021) (no allegation that defendants did not intend at the time of their statement, to follow through on their stated plan). MTD at 28-29. Also, Defendants argue that the timing of these allegations does not support falsity (*id.*), but that ignores the Complaint's detailed allegations of unauthorized database access and governance failures (¶¶370-376), which are consistent with, and corroborate, the falsity of Defendants' representations about the Company's data firewalls.

- 43 -

*Last*, Defendants evade the critical context: these statements were made to secure regulatory approval for a merger raising serious antitrust concerns. ¶¶205-208, 332-341. Again, context matters. *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 507 (E.D.N.Y. 2025) (finding statements actionable where they "provide assurances" to investors that the company had the necessary procedures in place to protect sensitive data in the context of concerns about a merger).[14]

### C.    The Complaint Alleges Materially False and Misleading Statements About the Company's Anti-Competitive Conduct

During the Class Period, UnitedHealth's Code of Conduct mandated that employees "Comply with Fair Competition Laws and Company Policies," requiring that "[t]o comply with these laws, each employee, [and] director … *must* deal fairly with the Company's customers, service providers, suppliers, competitors, and employees," and ***prohibiting*** taking "advantage of anyone through unfair-dealing practices." ¶345. These statements were false. ¶¶221-228, 346.

Defendants pressured physicians to remain locked within Optum's network through coercive non-compete clauses while employing misleading tactics to dissuade patients from seeking care from competitors. ¶222. UnitedHealthcare leveraged its market power to pressure in-network physicians and facilities to sever ties with out-of-network providers and to steer patients away from Optum's rivals. ¶¶225-226. Defendants manipulated

---

[14]  Defendants' reliance on the outcome of the DOJ anti-trust case regarding the Change merger does not support their challenge. MTD at 29. The issue here is whether Defendants made misstatements about UnitedHealth's firewalls and its ability to maintain the integrity of customer data. The Complaint adequately pleads that these statements were false and misleading when made. ¶¶209-215, 332-341, 363-376.

reimbursement structures to give Optum an artificial advantage – paying its providers as much as double the rates offered to non-Optum competitors for identical services in the same markets.  ¶¶62-70, 172-173, 225-226.

UnitedHealth's Code of Conduct statements were not just misleading, they were objectively false.  *CenturyLink*, 403 F. Supp. 3d at 728 (finding Code of Conduct statements actionable when directly at odds with alleged misconduct); *Patterson*, 2019 WL 3336119, at *15-*16 (finding code-of-ethics statements with specific antitrust-compliance guidelines actionable); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (holding code-of-conduct statements actionable when directly at odds with alleged conduct); *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *9 (N.D. Ill. Apr. 21, 2021) (same).[15]

***Defendants Misstate the Code of Conduct's Mandatory Language***: Defendants misquote the Code of Conduct's wording to dilute its mandatory obligation.  The Code of Conduct said employees and directors "***must***" deal fairly, not that they "should."  MTD at 30.  A requirement to "comply" is directive, not aspirational.  *Flynn*, 2021 WL 1561712, at *9; *Patterson*, 2019 WL 3336119, at *15-*16.

***No Antitrust Violation Required***: Defendants claim Plaintiff must plead a fully developed antitrust violation for code-of-conduct statements to be false.  MTD at 29.  Not so.

---

[15]  The statements at issue in the cases cited by Defendants were merely aspirational compared to those alleged here, making Defendants' cases inapposite.  MTD at 30.  *See Singh v. Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019) (finding code of ethics statements inactionable where the "framing suggests caution … regarding the extent of Cigna's compliance"); *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (finding statements that "emphasize a desire to commit to certain 'shared values'" inactionable).

- 45 -

*See Teva Pharms.*, 2022 WL 889158, at *10 (explaining the issue was not whether the conduct was illegal, but whether the undisclosed scheme made the product appear successful); *Amedisys II*, 2016 WL 4443177, at *11.

**Witty's Statement About "[C]ore [S]ynergy" Is Actionable**: Witty's June 1, 2023 statement (¶342) was not a generic comment about corporate structure. MTD at 30-31. Witty explicitly assured investors that the exploitation of the synergies between UnitedHealth and Optum was occurring only within in the limits of applicable "firewall requirements." ¶342. In reality, UnitedHealth was breaching those safeguards – steering higher reimbursement rates to its own Optum providers while underpaying competitors for identical services, effectively eliminating independent rivals. ¶343. That misconduct directly contradicts the "firewall" assurance and makes Witty's statement misleading.

## VI. THE COMPLAINT ALLEGES SCHEME LIABILITY

To plead scheme liability under SEC Rules 10b-5(a) and (c), a plaintiff must show defendants: "'(1) committed a deceptive or manipulative act (2) with scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and (4) that defendants' actions caused the plaintiffs' injuries.'" *Medtronic I*, 57 F. Supp. 3d at 977. While the scheme must rest on conduct beyond misstatements, the Eighth Circuit holds there is no bar to misrepresentations forming part of it. *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016) ("*Medtronic III*").

Defendants contend that Plaintiff "[a]t most, … alleges a scheme to defraud the government, not a securities fraud scheme." MTD at 26. While it is also true that UnitedHealth perpetrated a scheme to defraud the government, Defendants' contention

- 46 -

misstates both the law and the facts. The Complaint details pervasive deceptive ongoing acts that were designed to, and did, artificially inflate UnitedHealth's stock price, and defrauded shareholders. ¶¶71-189, 297-286. Defendants' conduct generated billions in fraudulent profits that directly inflated UnitedHealth's stock price. ¶¶91-118, 127, 331(c). When the fraud unraveled, shareholders suffered massive losses. ¶¶434-502. *See also In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at *8 (W.D. Pa. July 8, 2025) (same).[16]

This type of conduct by itself supports scheme liability. MTD at 26. In *Tactile*, Judge Brasel found scheme liability where defendants improperly "induce[d] doctors and hospital staff to prescribe" their products and "'[e]xaggerated and distorted … claims data analyses,'" that went beyond liability for their misstatements. 595 F. Supp. 3d at 823. Although the misconduct in *Tactile* pales in scope, it parallels UnitedHealth's payment, pressure, and training of thousands of doctors and nurses to add unnecessary diagnoses. ¶¶86-91, 106-109. *See also Medtronic III*, 845 F.3d at 393 (alterations in original) ("conduct beyond mere misrepresentations" included "'pa[ying] physicians … to induce their complicity in concealing adverse events'"). Similarly, paying medical professionals (in this case nursing homes), to prioritize profits over patient health constitutes a scheme. *See Medtronic I*, 57 F. Supp. 3d at 977 (inducing physicians to "conceal[] adverse side effects" constitutes scheme conduct); *Alexion*, 556 F. Supp. 3d at 132, 142 (scheme allegations upheld where physicians pushed to prescribe products despite "'"good clinical reason"'" not to). Manipulating

---

[16] Defendants' FCA citation (MTD at 26 n.7) is a distraction. Securities fraud does not require an FCA violation – the question is whether their statements misled investors under securities laws, not whether they violated other statutes. *Sapssov*, 22 F. Supp. 3d at 1226.

medical research and journal articles is likewise actionable conduct. *See Medtronic III*, 845 F.3d at 393 (manipulating medical publications is scheme conduct); *Tactile*, 595 F. Supp. 3d at 823 (exaggerating clinical study results is scheme conduct).

The same holds true for UnitedHealth's "portfolio refinement" transactions. Engagement in and concealment of transactions intended to "manufacture" profits is "inherently deceptive" and supports scheme liability. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) (creation of an "in-house transfer agent" to "conceal a scheme designed to channel … savings away from [parties] to which the savings rightfully belonged" was manipulative conduct); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 579 (S.D. Tex. 2002) ("falsifying records to reflect non-existent profits [constitutes] conduct prohibited by [securities laws]"). Defendant Witty discussed these deals and signed the SEC Form 10-K for FY 2024. ¶¶327, 431.

Defendants' reliance on *Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 552 U.S. 148 (2008) misses the mark. MTD at 26. In *Stoneridge*, the plaintiff class purchased securities issued by Charter Communications, but sued Charter's suppliers – third parties who had engaged in manipulative transactions with Charter. 552 U.S. at 152-53. The Supreme Court held those third-party suppliers were "too remote" from the investor-plaintiffs to be liable. *Id.* at 161. The suppliers: (i) "had no duty to disclose[;]" and (ii) their deceptive acts fell "in an indirect chain" because "nothing [they] did made it necessary or inevitable for Charter to record the transactions as it did." *Id.* at 159-61. Here, by contrast, UnitedHealth was the issuer, and Defendants were the direct perpetrators of the scheme, like the defendants in *Medtronic II*, who designed and operated the scheme; precisely the type of defendants typically liable under §10(b). *Haw.*

- 48 -

*Ironworkers Annuity Tr. Fund v. Cole*, 2013 WL 3147974, at \*4 (N.D. Ohio June 19, 2013) (upholding allegations that defendants schemed to "inflate earnings within their business group" and engaged "in fraudulent conduct designed to give an air of legitimacy" to the company's false earnings reports).

Defendants distort *Medtronic II*. MTD at 26. Far from supporting Defendants' position, *Medtronic II* reinforces Plaintiff's claim. There, the court held that the complaint properly alleged scheme liability because it identified the scheme's linchpin: "the act of paying physicians to induce their complicity." *Medtronic III*, 845 F.3d at 393. Here, too, the Complaint identifies the acts of fraud. Defendants did not merely fail to prevent upcoding – they engineered it. The Company trained and pressured nurses and doctors through the HouseCalls program and Optum-owned practices to add medically unnecessary diagnoses; mandated software designed to capture additional codes; and required use of the QuantaFlo device knowing it generated false peripheral artery disease diagnoses. ¶¶79-81, 83-118.[17]

Defendants themselves stressed the importance of the Medicare Advantage business to investors. ¶¶347-353; *see Medtronic III*, 845 F.3d at 394 ("[I]n speaking with potential investors, Medtronic's CEO specifically emphasized that the company's products' strong clinical trial performance undergirded Medtronic's competitiveness and sustainability."). What the market was ***not*** aware of was that UnitedHealth was generating billions in

---

[17]   Also, *Santa Fe Indus. Inc., v. Green*, 430 U.S. 462, 476 (1977), offers Defendants no support. MTD at 27. Manipulative conduct under SEC Rules 10b-5(a) and (c) "includes more than only wash sales, matched orders, or rigged prices." *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1195-96 (D. Or. 2015) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 (1983)).

fraudulent profits from these businesses – creating a "duty to disclose" precisely because the market relied on these profits.  *Stoneridge*, 552 U.S. at 159; *Medtronic I*, 57 F. Supp. 3d at 968 ("'A duty arises, however, if there have been inaccurate, incomplete or misleading disclosures.'").

## VII.    PLAINTIFF'S ALLEGATIONS ESTABLISH A STRONG INFERENCE OF SCIENTER

To allege scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2)(A).  "'Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud, (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity.'"  *St. Jude I*, 836 F. Supp. 2d at 895.

"The strong-inference pleading standard does ***not*** license [courts] to resolve disputed facts at this stage."  *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001).  The scienter inference "need not be irrefutable"; nor "even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  Rather, "whether ***all*** of the facts alleged, taken collectively," give rise to "an inference of scienter ***at least as likely*** as any plausible opposing inference."  *Id.* at 322-23, 328 (emphasis in original).

Assessed "holistically," as *Tellabs* and *Matrixx* require, the Complaint's allegations establish a strong inference of scienter: industrial-scale fraud generating billions annually and central to UnitedHealth's profits; repeated false denials as investigations intensified; $7 billion in "portfolio refinement" transactions to conceal the scheme's collapse; temporal

4901-4609-9825.v3

proximity between false statements and withdrawals; CEO and CFO forced out as the fraud unraveled; multiple criminal and civil investigations; and suspicious insider trading. *Matrixx*, 563 U.S. at 48-49; *Tellabs*, 551 U.S. at 324.  The inference is not just strong – it is overwhelming.

      **A.    Plaintiff Sufficiently Plead Defendants' Scienter Regarding the Medicare Advantage Scheme and Related Statements**

            **1.    The Magnitude and Pervasiveness of the Scheme Create a Strong Inference of Scienter**

"At the motion to dismiss stage, it is reasonable to assume that top management were 'aware of matters central to that business's operation.'"  *CenturyLink*, 403 F. Supp. 3d at 731.  The upcoding scheme itself produced at least $8.7 billion in 2021 alone – an amount equal to more than half the Company's total 2021 net income.  ¶117.  Based on the OIG finding that UnitedHealth received over $3 billion in improper payments in 2023, financial analysts estimated the Company could be required to pay back $20 billion.  ¶¶264-265.  The "sheer size" of the fraud supports the only reasonable inference that "defendants must have been aware."  *Green Tree*, 270 F.3d at 666.

The scale of Defendants' fraud matches the cover-up: $7 billion in planned "portfolio refinement" transactions earnings over two years that executives orchestrated to mask the scheme's collapse – demonstrating both their knowledge of the original fraud and active participation in concealing it.  ¶¶267-279, 282-285.

The scheme's longstanding and pervasive nature further strengthens scienter.  "Common sense dictates that … problems of this type and magnitude likely develop over time, and do not become apparent to management all at once."  *Grand Casinos*, 988 F. Supp.

- 51 -

at 1283.  Courts have found scienter regarding "a scheme to defraud Medicare" based on "the amount and widespread nature of the fraud," far less severe or pervasive than here. *Sapssov*, 22 F. Supp. 3d at 1228.

The Complaint alleges a massive, coordinated fraud requiring top-down directives:

- **Company-wide upcoding-related policies**: UnitedHealth implemented systemic upcoding through training sessions (¶¶106, 148-152, 355); bonuses (¶¶112, 160, 181); retroactive chart reviews (¶¶150-151, 181); mandated use of a QuantaFlo device that produced false PAD diagnoses worth $1.4 billion over three years (¶¶95-96, 358); mandated use of Company-issued laptops for HouseCalls visits, pre-loaded with software designed to prod nurses to add additional diagnoses (¶¶83-84, 95, 115-118).

- **Dedicated upcoding divisions**: Specialized teams maximized upcoding: "quality assurance" reviewers (¶¶87, 356); Optum audit teams (¶153); overseas risk-adjustment coders (¶359); teams that incessantly prodded doctors to add codes (¶¶89, 158, 160, 164).

- **"Portfolio refinement" transactions**: After V28 limited upcoding, UnitedHealth manufactured earnings through asset sales to conceal the upcoding scheme's collapse.  ¶¶267-279, 323, 327, 429-431.  The elaborate efforts to hide the scheme's unravelling provide powerful evidence of scienter. *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *3 (D.N.J. Aug. 31, 2020) ("Attempts to cover up fraud demonstrate a high degree of scienter.")*.*  Here, Defendants did not simply fail to disclose V28's impact – they orchestrated a sophisticated cover-up involving billions in financial engineering and repeatedly mischaracterized the transactions' purpose as "strategic" rather than remedial.  ¶¶269, 323, 327, 330.

OIG reports, reputable investigative reports, and confidential witnesses corroborate these allegations.  ¶¶119-131, 147-189.  These accounts establish scienter when describing "widespread pressure campaign[s]" from management.   *Glazer*, 63 F.4th at 772-73.  Reputable news articles based on independent investigation add to scienter.  ¶¶182-189; *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *UnitedHealth*, 2007 WL 1621456, at *1 (*WSJ* report).

- 52 -

Defendants claim the Court should disregard confidential witnesses unless they interacted directly with apex executives. MTD at 39. But the law does not require such contact. *Glazer*, 63 F.4th at 772-73; *St. Jude I*, 836 F. Supp. 2d at 899-900 ("no such requirement exists"). Moreover, the coordinated, company-wide policies described by the investigative reports and witnesses – mandatory training (¶¶79, 106), modified electronic health records systems (¶¶148-152, 179-181), and financial incentives (¶¶160, 181) – could only have been implemented through top-down directives from senior management. The pervasiveness of these policies pleads a strong inference of knowledge. *CenturyLink*, 403 F. Supp. 3d at 731 (pervasiveness of misconduct supports scienter); ¶¶78-189, 267-278, 354-360, 408-412, 429-433.[18]

### 2.    Defendants Knew About Several Investigations into UnitedHealth's Upcoding Practices

UnitedHealth faced multiple investigations into its Medicare Advantage practices – from the DOJ (¶¶229, 232, 240-242, 259), and OIG (¶¶122-131), as well as the *WSJ*, and other major media (¶¶182-188). Notice of an investigation creates "***actual*** knowledge of potential problems." *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1130 (C.D. Cal. 2005) (emphasis in original).

"Emphatic statements by Defendants denying wrongdoing … contribute to a strong inference that Defendants violated the law by at least acting severely recklessly."

---

[18]  Unlike the conclusory allegations at issue in *Monsanto*, 883 F. Supp. 2d at 895 (MTD at 35), the Complaint alleges Defendants had specific knowledge of both the fraud and the cover-up, as they knew the scheme generated billions annually, orchestrated cover-up transactions, and issued false denials to conceal it.

*CenturyLink*, 403 F. Supp. 3d at 734-35; *Amedisys II*, 2016 WL 4443177, at *13.[19]  Either Defendants knew their denials were false, or they recklessly failed to investigate before making categorical assurances – both establish scienter.

***Denial of OIG Reports***: On the first day of the Class Period, responding to the September 2021 OIG report, UnitedHealth insisted its "'risk-adjustment program is transparent and compliant with CMS rules'" and attacked the report as "'based on old data,'" "'inaccurate,'" and "'misleading.'"  ¶¶289-290, 295-296.  In October 2024, after the OIG found billions in improper payments, the Company again dismissed the findings as a "'misleading, narrow and incomplete view.'"  ¶¶238, 319.  In January 2025, UnitedHealth published its own biased study countering the OIG's findings.  ¶¶427-428.

***Denial of Media Reports***: In August 2024, following *WSJ* reports concerning upcoding, UnitedHealth claimed the *WSJ*'s "core thesis, methodology and conclusions are flawed" and assertions "unsubstantiated." ¶¶318-319.  On February 21, 2025, when the *WSJ* reported a new DOJ fraud investigation, UnitedHealth doubled down, calling it "misinformation."  ¶¶244, 413.  On May 14, 2025, after the *WSJ* reported a criminal investigation, the Company tripled down, calling it "'deeply irresponsible.'"  ¶¶259, 280. Yet, by July 2025, UnitedHealth confirmed both investigations.  ¶280.  These were lies intended to prop up the Company's falling stock price.  ¶¶244-246; *Noto*, 35 F.4th at 106 ("[o]therwise, the Company would not have tried to hide [the investigation]").

---

[19]   Defendants disagree with this precedent, complaining it "makes no sense."  MTD at 42. But Defendants' own confusion about the law is not a defense, and the only case they cite – *Société Générale Sec. Servs., GbmH v. Caterpiller, Inc.*, 2018 WL 4616356 (N.D. Ill. 2018) – did not address, much less discount, the value of emphatic denials.  *Id.* at *5.

***Denial of Impact from V28 Reforms***: In April 2023, when CMS announced anti-upcoding reforms, Witty personally assured investors the changes would have no financial impact. ¶¶421-423. Given the internal analysis showing V28's negative impact (¶421), and his admissions (¶423), Witty either knew or recklessly disregarded that V28 was poised to erase billions in upcoding profits.

***Denial of Reasons for "Portfolio Refinement" Transactions***: On July 15, 2025, after *Bloomberg* revealed UnitedHealth used the "portfolio refinement" transactions to "'mask[] a weakness in the operations,'" the Company claimed it "had valid business reasons for the deals." ¶¶267-278. UnitedHealth could not responsibly cite "business reasons" for $3.3 billion of "portfolio refinement" transaction profits without first investigating – which would have revealed the upcoding scheme's collapse.

These detailed responses demonstrate Defendants either knowingly made false denials or recklessly issued statements without investigation. *CenturyLink*, 403 F. Supp. 3d at 734-35.

### 3.    Defendants Discussed HouseCalls in Detail

"[T]he most powerful evidence of scienter is the content and context of [defendants'] statements themselves." *Avaya*, 564 F.3d at 269. Witty frequently discussed HouseCalls in great detail, demonstrating knowledge. He claimed to be "super impressed with the development" of the program, cited specific metrics ("300,000 seniors" received new diagnoses, Company "close[d]" "three million gaps in care"), and purported to understand the financial impact, claiming it "save[s] taxpayers' money." ¶¶299, 349-352.

- 55 -

Defendants now attempt to reframe these specific statements as generic allegations of a "hands-on management style."  MTD at 38 (citing *Medtronic II*, 618 F. Supp. 2d at 1034 and *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011)).  But unlike *Medtronic* and *MEMC*, where plaintiffs generally alleged only involvement in "day-to-day operations," here Witty demonstrated granular knowledge of HouseCalls' specific mechanisms, metrics, and fraudulent revenue generation.  ¶299, 349-352.

### 4.    Temporal Proximity Further Confirms Intent

"Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter."  *Reese*, 747 F.3d at 574-75; *Helwig*, 251 F.3d at 552 ("closeness in time" is relevant to scienter); *Grand Casinos*, 988 F. Supp. at 1283 (seven months is "short time frame").  An "enormous discrepancy between defendants' representations and what actually happened" amplifies the inference.  *Grand Casinos*, 988 F. Supp. at 1284.

Defendants made denials mere weeks before contradictory admissions:

*DOJ Investigations*: After publicly dismissing the February 2025 *WSJ* report of a new DOJ fraud investigation as "misinformation" (¶¶244, 413), weeks later UnitedHealth's lawyers admitted (internally) "the government has asked us some questions regarding Optum's coding practices" (¶¶245-246), in April analysts linked the 12% earnings cut to DOJ investigations (¶254), and within five months Defendants confirmed both investigations (¶¶280-281).  *Helwig*, 251 F.3d at 552.

***2025 EPS Estimates***: On January 16, 2025, UnitedHealth estimated 2025 EPS of $29.50-$30.00 per share.  ¶322.  Three months later, UnitedHealth dropped 2025 EPS estimates by 12%.  ¶449.  One month later, estimates were suspended and Witty "resigned." ¶415.  Two and a half months later, UnitedHealth reduced 2025 EPS estimates by another 38%, to $16.00 per share.  ¶282.  In six months, UnitedHealth revised 2025 EPS estimates three times, slashing estimates nearly in half – creating a strong inference of scienter.

***CEO "Resignation," Criminal Probe, and "Comprehensive Review"***: CEO Witty "resigned" for "personal reasons" on May 13, a criminal fraud investigation was revealed the next day, and on June 2 the Company announced a "comprehensive review" of its coding practices.  ¶¶256, 259, 415-420.  Defendants invoke FRE 407 (MTD at 41-42), but scienter arises from this sequence: "resignation," exposure, damage control.  This pattern proves consciousness of fraud, not remediation.

## 5.    CEO and CFO "Resignations" Support Scienter

Witty's May 13, 2025 "resignation" – for "personal reasons" – shocked investors. ¶¶256-258, 463-470.  That day, UnitedHealth also withdrew 2025 EPS estimates and the stock declined 18%.  ¶¶415, 469.  The next day, the *WSJ* reported the criminal investigation, causing another 11% decline.  ¶¶418, 480.  New CEO Hemsley immediately announced a comprehensive review of coding practices and cancelled Witty's performance-based stock units.  ¶¶419-420.  These actions and the timing of Witty's "resignation" strongly suggest Witty's involvement in wrongdoing.  *Patterson*, 2019 WL 3336119, at *20; *Resideo*, 2021 WL 1195740, at *6 ("rapid discovery of undisclosed problems by the new chief financial officer" supports scienter).

- 57 -

On July 31, 2025, just two months after UnitedHealth ended its relationship with its CEO, UnitedHealth abruptly removed CFO Rex – **two days** after UnitedHealth admitted 2025 EPS estimates had included $3.65 billion in "portfolio refinement" transactions, that it would discontinue use of such transactions, and that V28 would cost UnitedHealth $11 billion over three years. ¶¶282-285, 432-433; *CenturyLink*, 403 F. Supp. 3d at 734 ("unexpected" resignations, "coupled with evidence of timing" adds to scienter); *Chow v. Archer-Daniels-Midland Co.*, 2025 WL 790854, at *4 (N.D. Ill. Mar. 12, 2025) (same).

At the time of Witty's departure, UnitedHealth claimed the CEO "stepp[ed] down" for "personal reasons" (the day before a criminal investigation surfaced). ¶¶256, 259. Defendants now shift gears and suggest UnitedHealth fired Witty because the Company "'fell short of financial guidance.'" MTD at 41, 49. Defendants cannot have it both ways: either the "personal reasons" story was a lie, or their current "bad performance" defense is. And when a CFO is removed days after admitting billions in planned earnings manipulation, the inference of scienter is inescapable.[20]

### 6.    Core Operations Bolsters the Scienter Inference

"'[F]acts critical to a business's **core operations or an important transaction** generally are so apparent that their knowledge may be attributed to the company and its key

---

[20]  Defendants' authorities are in accord. MTD at 41 (quoting *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018) ("'Various courts have recognized that an executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation.'"); *Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 38 n.4, 39 (2d Cir. 2018) (unlike here, the complaint included "no allegations that the executives resigned because the company was behaving fraudulently"); *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) (unlike here, no "resignation" coinciding with revelation of criminal investigation).

officers.'" *In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) (some emphasis in original); *St. Jude I*, 836 F. Supp. 2d at 903; *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 2010 WL 11469576, at *7-*8 (D. Minn. Feb. 3, 2010) (6% of sales sufficient).

Here, the business unit that was impacted by the fraud constituted 35% of the Company's revenue. ¶¶398-400. Defendants cannot credibly claim the fraud here was too small or irrelevant to reach senior management, as it generated at least $8.7 billion in 2021, over $3 billion in 2023, and the OIG expressly called the Company's conduct "wrong." ¶¶117, 119-131, 331(c), 398-400.

And when V28 forced UnitedHealth to curtail the fraud, its financial condition collapsed confirming the scheme's centrality to operations. ¶¶267-279. The numbers tell the story: UnitedHealth executed $3.3 billion in "portfolio refinement" transactions in 2024 and planned another $3.65 billion for 2025 to mask the scheme's collapse. ¶¶267-279, 285, 429-433. Hemsley cancelled these deals just two weeks after defending them to *Bloomberg* – and admitted V28 cost UnitedHealth $7 billion over two years, matching the value of "portfolio refinement" transactions exactly. ¶¶284-285, 327. This damning admission destroys any effort to construct a competing inference of innocence.[21]

---

[21] Defendants suggest the fraud needed to be even larger to trigger a core operations inference, but they cite only cases with a tiny fraction of the fraud described here. MTD at 42-43 (*In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *3 (S.D.N.Y. Aug. 29, 2023) (fraud concerned $400 million revenue charge); *Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *14 (W.D. Wash. Dec. 4, 2023) (impacted segment accounted for "16% of net sales"); *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *3, *19 (S.D.N.Y. Mar. 30, 2018) (segment accounted for $30 million in annual earnings), *aff'd*, 764 F. App'x 127 (2d Cir. 2019)).

- 59 -

### 7.    Government Investigations Reinforce Scienter

Government investigations support scienter. *Chow*, 2025 WL 790854, at *4 ("'[g]overnment investigations can help to reinforce allegations of scienter'"); *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 676 (D.S.C. 2016) (same); *Sapssov*, 22 F. Supp. 3d at 1228 (OIG investigation supports scienter). UnitedHealth faced civil and criminal DOJ fraud investigations (¶¶240-243, 256-260, 280-281), bipartisan Senate investigations calling the conduct "fraud" (¶¶404-407, 424-426), and two OIG reports finding UnitedHealth received billions in improper Medicare payments and labeling the conduct "wrong" (¶¶119-131). This unprecedented civil, criminal, and legislative scrutiny powerfully supports scienter.

Defendants claim the "ongoing" investigations are meaningless (MTD at 42), yet UnitedHealth has hired President Donald Trump's top fundraiser and secured what former prosecutors called "unusual" meetings with White House and DOJ leadership to end those same investigations. *See supra* §II.I. This unprecedented influence campaign proves the investigations threaten Defendants – that is consciousness of wrongdoing, not innocence.

### 8.    Defendants' Competing Theory Is Implausible

Defendants claim "other personnel" executed the scheme, so they remained ignorant. MTD at 39. Implausible. Given the OIG findings from day one of the Class Period, the scheme's magnitude and pervasiveness, and the core importance of Medicare Advantage to UnitedHealth's profits, Defendants' professed ignorance is severe recklessness. "[T]he ongoing fraudulent scheme could not have been perpetrated over a substantial period of time without the knowledge, participation, and complicity of the executives at the highest level of

the company." *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 2013 WL 1831427, at \*2 (E.D. Mo. Apr. 30, 2013). The OIG findings threatened the foundation of the Company's most profitable business – ignorance was not an option.

This institutional fraud wasn't new – it was embedded in UnitedHealth's culture. Defendants claim pre-Class Period executive conduct is irrelevant. MTD at 40-41. Not so. Former CEO's explicit instructions to subordinates to exploit upcoding and intimidate regulators establish UnitedHealth's institutional knowledge and culture of fraud – directly relevant to scienter at the Class Period's start. ¶¶408-412; *KV Pharm.*, 679 F.3d at 981 (pre-class period evidence is relevant to scienter).

Moreover, Defendants *did* personally participate: Thompson and Witty assured the market that HouseCalls increased health and "save[d] taxpayers' money" rather than artificially inflated reported profits (¶¶316, 352); Witty and Hemsley signed SEC filings misrepresenting revenue drivers and "portfolio refinement" transactions (¶¶297 & n.32, 327); Witty denied V28's earnings impact (¶¶310, 312); and Hemsley, Thompson, and Witty sold millions of dollars of UnitedHealth stock based on inside information (¶¶378-392).

Defendants claim there is no "coherent reason" for providing "inflated guidance … only to withdraw [it] five months later." MTD at 38. The reason is obvious: Defendants gambled they could manufacture enough earnings through "portfolio refinement" transactions to conceal the upcoding scheme's collapse. ¶¶267-279, 331(f)-(g), (j). When that gamble failed, the day of reckoning arrived. *See Green Tree*, 270 F.3d at 662 (cannot "infer innocence by hindsight because the alleged misdeeds did not pay off"); *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble –

- 61 -

concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."). The scheme's collapse does not negate scienter – it proves it.

Defendants dismiss a fraud hotline report as an "anecdote" that never reached Defendants. MTD at 40. Wrong. CW2, a senior coding educator, reported systematic upcoding fraud to the fraud hotline, was retaliated against, and the Senior General Counsel contacted CW2 about it in March 2025. ¶¶153-158, 244-246, 361-362. Unlike *Hutchinson*'s isolated "one specific plant" incident (536 F.3d at 960), CW2 reported company-wide practices ***corroborated by OIG findings***. ¶¶119-131. Management learned of systematic fraud through their own compliance mechanism and chose retaliation over investigation – that is not ignorance, it is scienter. *CenturyLink*, 403 F. Supp. 3d at 733 (retaliation and management's "indifference" to whistleblower adds to scienter).

Defendants' cases, *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240 (8th Cir. 2008) and *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755 (8th Cir. 2009), involved alleged schemes divorced from defendants, concerning random accounting errors or isolated departmental fraud (*see* MTD at 39-40). *Ceridian*, 542 F.3d at 249; *Horizon*, 580 F.3d at 762.[22] Here, the scheme was a coordinated, company-wide scheme critical to financial performance, publicly defended, and personally enriching to Defendants via stock sales.

---

[22] Defendants' other two cases, *Jackson v. Abernathy*, 960 F.3d 94 (2d Cir. 2020) and *Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778 (8th Cir. 2008), also did not involve company-wide schemes, but isolated problems outside the view of defendants (*see* MTD at 40). *Abernathy*, 960 F.3d at 99 (only "three employees knew of problems"); *Possis*, 519 F.3d at 783 (alleged fraud concerned "independent clinical study conducted at several off-site locations").

- 62 -

B.    **Plaintiff Sufficiently Plead Defendants' Scienter Regarding UnitedHealth's Lack of Adequate Firewalls**

*First*, executives internally referenced plans to share information despite firewalls. The Company hired consultants to assess Change data value to other segments and circulated a memo telling executives to "stop thinking" firewall requirements "means we can't … harness the capabilities of [UnitedHealthCare and Optum] together." ¶367. Witty received an email recommending he "require" employees to "share [information] between companies." ¶368.

*Second*, Defendants had actual knowledge through the formal DOJ investigation, a subsequent trial where Witty testified, and repeated public assurances about their "commitment[]" to "maintain robust firewall[s]." ¶¶333-340, 403; *Yanek*, 388 F. Supp. 2d at 1130.

*Third*, Defendants knew about deficient firewalls through an internal audit showing Optum has a "'heightened risk of data being mismanaged'" and "'no effective means of enforcement'" upon discovering breaches. ¶375.

*Fourth*, the $13 billion Change acquisition – the largest in Company history – concerned core operations and immediately made UnitedHealth the largest healthcare clearinghouse. ¶68; *Ancor*, 22 F. Supp. 2d at 1005.

C.    **Plaintiff Sufficiently Plead Defendants' Scienter Regarding UnitedHealth's Anti-Competitive Activities**

*First*, UnitedHealth's antitrust conduct was investigated by the DOJ, leading to Congressional hearings and heavy media coverage Defendants could not ignore. ¶¶59-69, 196-204, 220, 234, 393-397; *Yanek*, 388 F. Supp. 2d at 1130.

- 63 -

*Second*, the antitrust activity was widespread and pervasive, spanning over a decade of major acquisitions to achieve market dominance and capitalize on monopolistic power. ¶¶57-70, 221-228; *Grand Casinos*, 988 F. Supp. at 1283.

### D.     Plaintiff Sufficiently Pleads Motive and Opportunity

Although pleading motive is unnecessary, "'personal financial gain may weigh heavily in favor of a scienter interference.'" *Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, 1069 (D. Neb. 2016), *aff'd*, 889 F.3d 920 (8th Cir. 2018). Insider trades create scienter inference when "unusual either in the amount of profit made, the amount of stock traded, the portion of stocks sold, or the number of insiders involved." *In re Novastar Fin. Sec. Litig.*, 2005 WL 1279033, at *6 (W.D. Mo. May 12, 2005).

Defendants' insider trading was unusual in all four factors. One month into the Class Period, after the OIG started to shine a light on UnitedHealth's misconduct, Hemsley sold $56 million worth of shares – his second largest sale during the Class Period. ¶379. After receiving a DOJ antitrust investigation notice, but before that information was public, Hemsley sold another $65 million (his largest Class Period trade) and Thompson dumped 31.4% of his holdings for over $15 million – trades so suspicious Congress demanded an SEC investigation. ¶¶229-231, 384-397. Before the Change trial, Witty sold $6 million (his largest sale) and Hemsley sold $53 million (third largest). ¶¶380-383.

These trades readily clear the scienter threshold. *Astec Indus.*, 29 F.4th at 814 ($3.1 million sale); *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *2, *6 (E.D.N.Y. Mar. 30,

- 64 -

2012) (9.4%); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (11%).[23]

Defendants' SEC Form 4 arguments fail. First, they lack proper incorporation. *See infra* §X. Second, Witty and Thompson acquired shares for "$0" (MTD, Exs. 14-15, 18), which "does not demonstrate lack of scienter." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010). Third, Thompson disposed of significantly more shares than he acquired, reducing holdings from 38,162 to 25,542 shares of UnitedHealth stock. MTD, Ex. 17.[24] That Witty and Thompson retained some performance awards while simultaneously making massive, suspicious sales of vested shares demonstrates selective trading on inside information, not confidence.

With OIG investigations and DOJ probes escalating, Defendants knew the fraud's exposure was inevitable – and sold before the reckoning. "Had [they] held this stock a little longer, its value would have been cut almost in half." *Astec Indus.*, 29 F.4th at 814; ¶¶38, 389-392, 500. They did not – that is scienter.

## VIII.  THE COMPLAINT ALLEGES LOSS CAUSATION

The pleading requirement with regard to causation "is not very stringent." *ConAgra*, 335 F.3d at 831. Plaintiff need only provide "'a short and plain statement'" indicating "the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47

---

[23]  Defendants cite *In re Target Corp. Sec. Litig.*, 955 F.3d 738 (8th Cir. 2020) (MTD at 36), but that opinion is not instructive because the sales there were far less suspicious. *Id.* at 743 (sold 10%-20% of shares at unsuspicious times throughout the class period).

[24]  This fact differentiates this case from *In re Indivior PLC Sec. Litig.*, 2025 WL 2242758, at *18 (E.D. Va. Aug. 6, 2025) where defendants sold only the newly vested stock. MTD at 8 n.8.

(2005). This "simple test" under Federal Rule of Civil Procedure 8(a) requires alleging "'a causal connection between the material misrepresentation and the loss,'" and that the "'share price fell significantly after the truth became known.'" *See CenturyLink*, 403 F. Supp. 3d at 735; *St. Jude I*, 836 F. Supp. 2d at 908.

The Complaint easily satisfies this standard. It alleges "UnitedHealth's common stock traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about UnitedHealth and Defendants' fraudulent scheme," and that when the truth emerged the artificial inflation was removed and UnitedHealth's stock price dropped. ¶¶434-435. The relevant truth was revealed by partial disclosures on eight dates. ¶¶232-233, 240-243, 254-263, 280-286, 436-501.

Each disclosure caused "statistically significant stock price declines." ¶502. *See ConAgra*, 335 F.3d at 831 (decline "related to" relevant issues "demonstrated loss causation"); *CenturyLink*, 403 F. Supp. 3d at 735. And, financial analysts explicitly linked these declines to the newly revealed corrective information. ¶¶435-502. For instance, after April 17, 2025, analysts connected the deteriorating financial condition to UnitedHealth having been "overearning, overcharging, upcoding," and "pulling back" under DOJ scrutiny. ¶¶451-452, 458. Such commentary not only supports the causal connection but reinforces that the market understood and responded to the corrective nature of each disclosure. *See CenturyLink*, 403 F. Supp. 3d at 735-36 (analyst attribution of decline supports loss causation); *In re Allstate Corp. Sec. Litig.*, 2022 WL 2952816, at *7 (N.D. Ill. July 26, 2022)

- 66 -

(same).  These well-pleaded facts provide precisely the notice *Dura* and *ConAgra* require.  Defendants' scatter-shot challenges miss the mark.

### A.    Defendants' Admissions and CEO "Resignation" Plead Causation

Defendants incorrectly argue that their April, May, and July 2025 admissions about poor earnings and the pulling of 2025 EPS estimates due to Medicare Advantage, and Witty's "resignation," "are not corrective disclosures."  MTD at 48.  But Defendants not only misapprehend the law, they improperly dispute the facts alleged.

No requirement exists that corrective disclosures admit falsity or "'mirror the earlier misrepresentation.'"  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).  "'Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'"  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018).  As the court held in *St. Jude I*, "'a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity.'"  836 F. Supp. 2d at 910 (there is no "'mirror-image'" requirement); *see also CenturyLink*, 403 F. Supp. 3d at 736 ("'such admissions can be hard to come by'").

***The April 2025 earnings miss and 2025 EPS reduction plead loss causation***: *See* ¶¶254-255, 449-462; *St. Jude I*, 836 F. Supp. 2d at 908-911 (earnings miss and guidance reduction satisfied *Dura*).  Analysts immediately connected the declining profits to the Medicare Advantage scheme and stock price drop.  ¶¶254, 450-460.  Bernstein explained the "financial reset involved pulling back on improper upcoding – which had been 'overearning'

- 67 -

– which would flow through to anticipated financial results." ¶452; *see also* ¶458 (rising medical costs also relates to the DOJ investigations and upcoding scheme). Other analysts linked Witty's V28 admissions to the upcoding scheme: "[T]hose changes have been years in coming, but still seem to have taken UnitedHealth by surprise, ***an indication of the company's heavy reliance on its Medicare Advantage billing practices***." ¶460. This contradicted Witty's assurances V28 would have no financial impact. ¶¶310, 312, 423. Analysts clarified that "the problems UnitedHealth is having appear to be more company specific, and not a warning for the health-insurer industry." ¶456.[25] The stock "sank by about $130 in its worst one-day performance in over 25 years, ending the day down over 22%." ¶¶457, 461.

***Witty's May 2025 "Resignation" and Pulled 2025 Estimates Plead Causation***: *See* ¶¶256-258, 463-470; *Amedisys I*, 769 F.3d at 318-26 (executive resignations plead causation); *Epstein*, 203 F. Supp. 3d at 674-75 (same). Analysts were "stunned" by the disclosure given the "large guide down … only a month ago." ¶466. Analysts again noted that UnitedHealth's claim of increased medical costs in Medicare Advantage was Company-specific. ¶¶467-468. Wells Fargo linked it to the scheme: "UNH felt it could no longer optimize [Medicare Advantage] coding to [the] same degree." ¶467. Defendants now claim Witty left because "the company was missing its financial goals" (MTD at 49), but UnitedHealth told investors he resigned for "personal reasons." ¶¶256-257. Defendants'

---

[25] Defendants vaguely argue that "other insurance companies also reported earnings misses and revised their Q1-2025 guidance" around this time. MTD at 48 (citing "*supra* p. 14"). But on page 14, Defendants purport to describe the partial disclosures from May through July 24, 2025. There is no reference to other insurance companies on page 14.

shifting explanations only strengthen causation: whether Witty left due to the criminal probe or financial failures caused by the scheme's collapse, the resignation revealed the fraud's impact. Market analysts understood this connection. ¶¶472, 475-478.

**The July 29, 2025 Admissions Plead Causation**: *See* ¶¶282-286, 494-501. UnitedHealth revealed further reduced 2025 estimates, ending planned "portfolio refinement" transactions, and disclosed V28 would cost $11 billion over three years. *Id.* Bernstein linked the "deteriorating financial condition with the DOJ investigations" and their impact on Medicare Advantage margins. ¶497. Jefferies highlighted the new "V28 impact," that 2025 estimates had included $3.65 billion from "portfolio refinement" transactions, and the halt of this "earnings 'management.'" ¶498. Even Defendants' own authority (MTD at 48) confirms earnings misses constitute corrective disclosures. *Loos v. Immersion Corp.*, 762 F.3d 880, 888 (9th Cir. 2014) (the "announcement of 'dismal' financial results" can serve as corrective disclosure); *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005) (same); *First Solar*, 881 F.3d at 754 (same); *Amedisys I*, 769 F.3d at 323-25.

**Defendants' "Truth-on-the-Market" Defense Fails**: *See* MTD at 49. This fact-intensive defense "is rarely appropriate … at the motion to dismiss stage." *Patterson*, 2019 WL 3336119, at *21; *see also Medtronic I*, 57 F. Supp. 3d at 983 (same). Moreover, the July 29 disclosure revealed new facts (¶¶282-286, 494-501), and Defendants continued making specific false statements. *E.g.*, ¶¶290, 296, 317-319, 326-327, 330. *See Amedisys I*, 769 F.3d at 324 (contemporaneous misstatements "prevented the full truth from being revealed");

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  This defense should await trial.[26]

> **B.      Reports of Government Investigations Plead Causation**

Defendants wrongly argue the *WSJ*'s DOJ investigation disclosures (concerning precisely the same subject matter as the alleged fraud), and the Company's later admission "cannot constitute corrective disclosures because they merely announce investigations." MTD at 46-47.

Courts routinely hold investigation disclosures satisfy loss causation.  *See, e.g.*, *Amedisys I*, 769 F.3d at 323-25 (investigations into company's "suspected gaming of the Medicare reimbursement system" constitute corrective disclosures); *Singer v. Reali*, 883 F.3d 425, 446-47 (4th Cir. 2018) (government investigation satisfied causation); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 164 (S.D.N.Y. 2008) (same); *Questcor*, 2013 WL 5486762, at *23 (investigation plead loss causation even though announcement said "little about the nature of the investigation"); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006) (same).

---

[26]   *Rand-Heart* is inapposite.  MTD at 49.  There, the court found the plaintiff had not alleged causation because the defendant had previously "fully disclosed" the fraud.  *Rand-Heart*, 812 F.3d at 1179-80.  Here, the disclosure revealed new information.  ¶¶449-470, 494-501.  In addition, Defendants continue to issue unhedged denials of any wrongdoing. *E.g.*, ¶¶290, 296, 317-319, 326-327, 330.  And, the fact of the reduced 2025 estimates, V28 impact, and abandonment of "portfolio refinement" transactions were obviously being "'publicly revealed for the first time'" (MTD at 49) and were thus new information.  ¶¶282-286, 494-501.  Importantly, analysts recognized the facts were new, and the Company's stock price declined.  ¶¶450-461, 496-500.  *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428 (C.D. Cal. Mar. 27, 2015) is equally misplaced.  MTD at 49 (citing *Herbalife*, 2015 WL 12732428, at *8 (unlike the significant price declines here, the disclosures "were not followed by a significant – or perhaps any – decline")).

- 70 -

Courts have warned that excluding such disclosures "would effectively reward defendants who are able to successfully conceal their fraudulent activities." *Amedisys I*, 769 F.3d at 324-25; *see also Lloyd*, 811 F.3d at 1210 (same). The Eight Circuit has never adopted Defendants' rigid rule. *E.g.*, *CenturyLink*, 403 F. Supp. 3d at 736 (news reports about lawsuits satisfy *Dura*).

Defendants cite cases holding that an investigation announcement may not always plead causation. MTD at 47-48. Yet both decisions acknowledge investigations can be corrective. *See Loos*, 762 F.3d at 890 n.3; *Meyer v. Greene*, 710 F.3d 1189, 1200-01 & n.13 (11th Cir. 2013); *see also Lloyd*, 811 F.3d at 1210-11 (same).[27] Here, Plaintiff does not rely solely on investigation announcements. The *WSJ* reports revealed new corrective information about investigation details, scope, and the criminal probe – all relating directly to the Medicare Advantage scheme. ¶¶232-233, 240-243, 259-260, 436-448, 471-481.[28] Share price declines were statistically-significant. ¶¶443, 447, 480; *cf. Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 983 (N.D. Ill. 2011) (statistically significant decline "is evidence of new information"). Analysts connected the disclosures, and specifically the criminal probe, to the stock price declines and to the Medicare Advantage scheme. ¶¶437-442, 446, 472-479.

---

[27] After *Meyer*, Circuit Judge Martin wrote a concurring opinion acknowledging *Meyer* was wrongly decided and in conflict with *Dura*. *Sapssov*, 608 F. App'x at 864-68. Defendants' other Eleventh Circuit case is similarly at odds with *Dura*. MTD at 15, 19, 50 (quoting *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1247 (11th Cir. 2023)).

[28] The February 27, 2024 *WSJ* report also disclosed the DOJ antitrust probe related to various anti-competitive practices and the Company's firewalls. ¶¶232-233, 436-444. This was the only partial corrective disclosure relating to these misstatements. *Id.*

Critically, the Company repeatedly called the *WSJ* reports "misinformation" and "'deeply irresponsible.'" ¶¶244-246, 280, 491; *see also Amedisys I*, 769 F.3d at 324 ("contemporaneous misstatements" prevent revelation of "full truth"). The Company's July 24, 2025 about-face admission of DOJ investigations revealed new corrective information. ¶¶280-281, 490-493. The statistically-significant stock price decline and market reaction confirm causation. ¶¶491-492. Additionally, Plaintiff relies on earnings admissions, EPS estimate changes, "portfolio refinement" transactions abandonment, and Witty's "resignation," among other partial disclosures. ¶¶254-258, 282-286; *see also Amedisys I*, 769 F.3d at 324 (other disclosure relevant when assessing loss causation allegations); *Lloyd*, 811 F.3d at 1210-11 (same).[29]

## C.    Analyst Downgrade and *Guardian* Report Plead Causation

Defendants argue the HSBC downgrade did not reveal new information and the *Guardian* exposé didn't provide a "'concession of past inaccuracy.'" MTD at 49-51. Both arguments fail.

Analyst reports can constitute corrective disclosures. *CenturyLink*, 403 F. Supp. 3d at 736; *see also In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (analyst downgrade constituted a corrective disclosure); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 974 n.6 (S.D. Ind. 2007). The HSBC downgrade from $490.00 per share to

---

[29]    Defendants again argue truth on the market and assert that allegations of "aggressive" coding across the industry and its generic risk disclosure defeat causation. MTD at 47 (citing "*supra* p. 14"); *id.* at 23 (citing MTD, Ex. 8 at 18). As detailed above, this is a fact-specific defense that should be rejected at this time – particularly given the disclosures revealed new information, the stock price drops, and Defendants' repeated denials. ¶¶232, 240-242, 259-260, 280-281, 244-246, 280; *supra* §VIII.A. Also, on page 14 of the MTD there is no reference to the industry.

$270.00 per share "highlighted that '[l]eadership change, pulled 2025 guidance, [and] alleged **Medicare fraud** have resulted in market cap halving.'" ¶261.  Market commentators linked the "slashed" downgrade to the stock price decline.  ¶¶483-484.

Regarding the *Guardian* exposé, courts have rejected requiring "'mirror-image'" disclosures admitting "inaccuracy."  *See supra* §VIII.A.; *St. Jude I*, 836 F. Supp. 2d at 910. The revelations that UnitedHealth secretly paid nursing homes to reduce hospitalizations – caused the share price to decline.  ¶¶141-146, 262-263.  Analysts connected the scheme disclosure to the stock price drop.  ¶¶485-487.[30]

## IX.    THE COMPLAINT PLEADS ACTIONABLE SECTION 20A AND 20(a) VIOLATIONS

Courts recognize trades within four to eight days satisfy contemporaneity.  *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2599327, at *4-*5 (S.D. Tex. June 15, 2017) (six days); *Basile v. Valeant Pharm. Int'l, Inc.*, 2017 WL 3641591, at *9 (C.D. Cal. Mar. 15, 2017) (week or more); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 508-09 (S.D.N.Y. 2011) (five days).  All of Plaintiff's trades occurred the same day or within seven days of the Individual Defendants' sales.  ¶526.  This satisfies contemporaneity.  *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1196 (C.D. Cal. 2007) (eight days).

---

[30]  Defendants' cases do not help them.  MTD at 50.  *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74 (2d Cir. 2023) addressed defendants' efforts to rebut the presumption of reliance at class certification.  *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093 (S.D.N.Y. July 23, 2025) assessed whether causation may be pleaded where "'no specific corrective disclosure ever exposed the precise extent of [the company's] alleged fraud.'"  *Id.* at *20.  *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022) noted causation requires "'tracing the loss back to the very facts about which the defendant lied,'" as Plaintiff did here.  *Id.* at 838.

Defendants cite no controlling Eighth Circuit authority requiring same-day trading and courts reject such a rule. *See MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *24 (S.D. Tex. July 26, 2019). Even their Ninth Circuit case holds §20A "merely requires that the seller and buyer engaged in transactions close in time, not with each other." *In re Silver Lake Grp., LLC Sec. Litig.*, 108 F.4th 1178, 1190 (9th Cir. 2024). Moreover, "a strict same-day rule means that 'insiders could trade near the close … and greatly reduce the universe of potential successful plaintiffs.'" *MicroCapital*, 2019 WL 3451153, at *24.

Defendants argue purchases at prices lower than Hemsley's stock sales cannot satisfy §20A. MTD at 52. That is not the law. First, they cite no Eighth Circuit authority. Second, the Complaint alleges Plaintiff purchased while unaware of material information Defendants concealed. *See supra* §§V.-VII. Courts reject Defendants' restrictive approach. *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *18-*19 (N.D. Cal. Mar. 31, 2023) (rejecting reliance on Defendants' case (*SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113 (N.D. Cal. 2020)).

Finally, Defendants claim the Complaint fails to plead Hemsley and Witty traded on material, nonpublic information. The strong inference of scienter establishes the predicate §10(b) violation. *Tactile*, 595 F. Supp. 3d at 828. Moreover, Defendants' cases involve stand-alone insider trading without underlying securities fraud. *Silver Lake*, 108 F.4th at 1184-85 (*see* MTD at 52-53). Here, Witty and Hemsley were C-suite executives with direct access to material information – unlike *Silver Lake*'s outside shareholder. ¶¶44-45, 300, 306, 315, 327.

- 74 -

Defendants concede control-person liability by arguing only that Plaintiff fails to plead a primary violation.  MTD at 51.  Because §10(b) violations are adequately pled, §20(a) liability follows.

## X.    THE COURT SHOULD NOT CONSIDER EXTRANEOUS DOCUMENTS OUTSIDE THE COMPLAINT

Defendants assert the Court can consider SEC filings and "'documents necessarily embraced by the complaint'" without formal request.  MTD at 12 n.2.  Wrong.  Only documents "'whose contents are alleged in a complaint and whose authenticity no party questions'" may be considered.  *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).  Even then, documents cannot be used "for the truth of the matters [asserted]" when the opposing party disputes those matters.  *N. Oil & Gas, Inc. v. EOG Res., Inc.*, 970 F.3d 889, 895 n.6 (8th Cir. 2020).

Here, Defendants improperly seek to use extraneous documents for their truth.  First, they cite four articles absent from the Complaint to bolster their "truth-on-the-market" defense – an abuse of discretion.  *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).  Second, they use SEC Forms 4 to negate scienter by arguing Defendants' stock purchases show lack of fraudulent intent.  MTD at 36.  Courts reject this.  *Alghazwi v. The Beauty Health Co.*, __ F. Supp. 3d __, 2025 WL 2751076, at *10 (C.D. Cal. Sep. 23, 2025) (denying request to "notice the truth of the stock sales disclosed in the SEC Forms 4 for purposes of negating scienter").

- 75 -

## XI.    CONCLUSION

For the reasons stated herein, the Court should deny Defendants' Motion.

DATED:  October 30, 2025            TM SULLIVAN PLLC
                                    TIM SULLIVAN, MN 391528


                                         s/ Tim Sullivan
                                    ————————————————————
                                         TIM SULLIVAN

                                    225 South Sixth Street, Suite 3900
                                    Minneapolis, MN  55402
                                    Telephone:  773/919-8667
                                    tim@tmsull.com

                                    Local Counsel for Lead Plaintiff

                                    ROBBINS GELLER RUDMAN & DOWD LLP
                                    DARREN J. ROBBINS (admitted *pro hac vice*)
                                    SAM S. SHELDON (admitted *pro hac vice*)
                                    LAURIE L. LARGENT (admitted *pro hac vice*)
                                    ROBERT R. HENSSLER JR. (admitted *pro hac vice*)
                                    MATTHEW I. ALPERT (admitted *pro hac vice*)
                                    JEFFREY J. STEIN (admitted *pro hac vice*)
                                    JACK ABBEY GEPHART (admitted *pro hac vice*)
                                    655 West Broadway, Suite 1900
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058
                                    darrenr@rgrdlaw.com
                                    ssheldon@rgrdlaw.com
                                    llargent@rgrdlaw.com
                                    bhenssler@rgrdlaw.com
                                    malpert@rgrdlaw.com
                                    jstein@rgrdlaw.com
                                    jgephart@rgrdlaw.com

                                    Lead Counsel for Lead Plaintiff

4901-4609-9825.v3