**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>UNITEDHEALTH GROUP INC., ANDREW WITTY, STEPHEN HEMSLEY, and BRIAN THOMPSON,<br><br>　　　　　Defendants. | Case No. 0:24-cv-01743-JMB-JFD |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF UNITEDHEALTH GROUP INC.'s, ANDREW WITTY'S, AND STEPHEN HEMSLEY'S MOTION TO DISMISS THE THIRD AMENDED SUPPLEMENTAL CONSOLIDATED COMPLAINT**

Peter C. Magnuson
Matthew Kilby
Jeffrey P. Justman
Anderson C. Tuggle
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000
peter.magnuson@faegredrinker.com
matthew.kilby@faegredrinker.com
jeff.justman@faegredrinker.com
anderson.tuggle@faegredrinker.com

Robert J. Giuffra, Jr. (admitted *pro hac vice*)
Jeffrey T. Scott (admitted *pro hac vice*)
Matthew J. Porpora (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
giuffrar@sullcrom.com
scottj@sullcrom.com
porporam@sullcrom.com

Morgan L. Ratner (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500
ratnerm@sullcrom.com

*Attorneys for Defendants UnitedHealth Group Inc., Andrew Witty, and Stephen Hemsley*

November 17, 2025

# TABLE OF CONTENTS

*Page*

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

I.    **Plaintiff's Opposition Does Not Identify Any Material Misstatements** ........... 3

    A.    Plaintiff challenges inactionable generic statements and accurate data ................................................................................................ 3

        1.    UnitedHealth did not defraud its shareholders by not confessing to a supposed upcoding scheme ................................... 3

        2.    The challenged statements concerning the other alleged schemes are not actionable misrepresentations ............................... 8

    B.    Plaintiff cannot rely on UnitedHealth's denials of wrongdoing ................. 10

    C.    The PSLRA's safe harbor forecloses Plaintiff's reliance on forward-looking projections ................................................................................. 12

    D.    The Complaint fails to identify any deficient disclosures about the portfolio-refinement transactions ............................................................. 14

    E.    Plaintiff cannot reinvent its misstatements claim as a scheme .................. 15

II.    **Plaintiff Comes Nowhere Close to Pleading A Strong Inference Of Scienter** ..................................................................................................... 16

    A.    The Complaint does not plead any motive to commit fraud ....................... 16

    B.    Plaintiff has not pleaded conscious misbehavior or extreme recklessness ............................................................................................. 17

III.   **Plaintiff Fails To Defend Its Loss-Causation Allegations** ............................... 22

IV.   **Plaintiff Has Not Pleaded An Insider-Trading Claim** ..................................... 23

CONCLUSION ................................................................................................. 23

**TABLE OF AUTHORITIES**

*Page(s)*

**Cases**

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023)................................................................................. 4

*Carvelli* v. *Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) ....................................................... 4, 10, 13

*City of Plantation* v. *Meredith Corp.*,
    16 F.4th 553 (8th Cir. 2021) ............................................................ 7, 10, 18

*City of Pontiac* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014)............................................................. 2, 4, 10

*Detroit Gen. Ret. Sys.* v. *Medtronic, Inc.*,
    621 F.3d 800 (8th Cir. 2010) ........................................................................ 19

*Elam* v. *Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ................................................................ 15, 18

*Emp's Ret. Sys.* v. *Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) ........................................................................ 10

*FedEx Ground Package Sys., Inc.* v. *Route Consultant, Inc.*,
    97 F.4th 444 (6th Cir. 2024) .......................................................................... 8

*Glazer Cap. Mgmt., L.P.* v. *Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .............................................................. 9, 18, 22

*Higginbotham* v. *Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) .......................................................................... 6

*In re 3M Co. Sec. Litig.*,
    2021 WL 4482987 (D. Minn. Sept. 30, 2021) ............................................ 16

*In re Canopy Growth Sec. Litig.*,
    2024 WL 3445436 (S.D.N.Y. July 17, 2024) ............................................... 8

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019)...................................................*passim*

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ................................................................................ 2, 17

*In re Dentsply Sirona, Inc. Sec. Litig.*,
665 F. Supp. 3d 255 (E.D.N.Y. 2023) ........................................................................ 6

*In re Facebook, Inc. Sec. Litig.*,
87 F.4th 934 (9th Cir. 2023) ...................................................................................... 19

*In re Fed. Nat'l Mortg. Ass'n Litig.*,
503 F. Supp. 2d 25 (D.D.C. 2007) ............................................................................ 23

*In re Hertz Glob. Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) ...................................................................................... 21

*In re Hutchinson Tech., Inc. Sec. Litig.*,
536 F.3d 952 (8th Cir. 2008) .................................................................................... 20

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) .................................................................................... 17

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................... 21

*In re Resideo Techs., Inc., Sec. Litig.*,
2021 WL 1195740 (D. Minn. Mar. 30, 2021) .......................................................... 12

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011) ................................................................. 18, 22

*In re Stratasys Ltd. S'holder Sec. Litig.*,
864 F.3d 879 (8th Cir. 2017) ...................................................................................... 4

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) .................................................................................... 16

*In re UnitedHealth Grp. PSLRA Litig.*,
2007 WL 1621456 (D. Minn. June 4, 2007) ............................................................ 21

*Institutional Invs. Grp.* v. *Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ...................................................................................... 11

*Julianello* v. *K-V Pharm. Co.*,
791 F.3d 915 (8th Cir. 2015) .................................................................................... 13

*Karth* v. *Keryx Biopharmaceuticals*,
  6 F.4th 123 (1st Cir. 2021).................................................................... 13, 15

*Kushner* v. *Beverly Enters., Inc.*,
  317 F.3d 820 (8th Cir. 2003) ......................................................2, 17, 21, 22

*Lim* v. *Hightower*,
  2025 WL 2965692 (6th Cir. Oct. 21, 2025)................................................. 16

*Mart* v. *Tactile Sys. Tech., Inc.*,
  595 F. Supp. 3d 788 (D. Minn. 2022)........................................................ 23

*Noto* v. *22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022)........................................................................ 11

*NYC Pub. Pension Funds* v. *Coupang, Inc.*,
  2025 WL 2613650 (S.D.N.Y. Sept. 10, 2025)...................................... 5, 11, 20

*OFI Asset Mgmt.* v. *Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016)...................................................................... 14

*Okla. Firefighters* v. *Capella Educ. Co.*,
  873 F. Supp. 2d 1070 (D. Minn. 2012)........................................................ 6

*Parnes* v. *Gateway 2000, Inc.*,
  122 F.3d 539 (8th Cir. 1997) ............................................................. 7, 9, 10

*Plumber & Steamfitters* v. *Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021).................................................................... 7, 11

*Pub. Emps. Ret. Sys.* v. *Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .................................................................... 22

*Retail Wholesale* v. *Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ............................................................... 9, 10

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)........................................................................ 19

*Sapssov* v. *Health Mgmt. Assocs., Inc.*,
  22 F. Supp. 3d 1210 (M.D. Fla. 2014)..................................................... 6, 22

*Shoemaker* v. *Cardiovascular Sys., Inc.*,
  300 F. Supp. 3d 1046 (D. Minn. 2018)....................................................... 10

*Singh* v. *Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019).................................................................................. 8

*Steamfitters Loc. 449* v. *AT&T Inc.*,
  2022 WL 17587853 (2d Cir. Dec. 13, 2022) ................................................ 7

*Stone* v. *Life Partners Holdings, Inc.*,
  26 F. Supp. 3d 575 (W.D. Tex. 2014)........................................................... 11

*Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*,
  552 U.S. 148 (2008).......................................................................................... 16

*United States* v. *UnitedHealth Grp. Inc.*,
  630 F. Supp. 3d 118 (D.D.C. 2022) ........................................................ 9, 20

*W. Virginia Pipe Trades* v. *Medtronic, Inc.*,
  845 F.3d 384 (8th Cir. 2016) ................................................................. 15, 16

*Wielgos* v. *Commonwealth Edison Co.*,
  892 F.2d 509 (7th Cir. 1989) ........................................................................ 15

*Wilson* v. *Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011)..................................................................... 14, 16

*Wochos* v. *Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ...................................................................... 12

**Statute**

15 U.S.C. § 78u-5 ................................................................................................... 12

## INTRODUCTION

Plaintiff's Complaint—its sixth attempt—raises five scattershot securities-fraud theories relating to (1) Medicare coding practices, (2) asset sales, (3) the Change merger, (4) purported anticompetitive conduct, and (5) nursing-home hospitalization rates.  In its Opposition, Plaintiff barely defends the last three.  Instead, Plaintiff goes all in on its unsupported allegations that (i) UnitedHealth personnel purposefully and "pervasive[ly]" coded patients in Medicare Advantage for medical conditions they did not have (what Plaintiff calls "upcoding") (Compl. ¶ 10) and (ii) UnitedHealth executed fraudulent asset sales to boost revenue (so-called "portfolio-refinement" transactions).  Both theories fail to meet the basic requirements for securities fraud under the Private Securities Litigation Reform Act ("PSLRA"):  materially false statements, scienter, and loss causation.

*First*, Plaintiff cannot identify a single actionable material misrepresentation.  The bulk of the challenged statements are high-level generic descriptions of UnitedHealth's business (*e.g.*, we "provide cost-effective, appropriate care") that are too general to be material to reasonable investors as a matter of law.  (Opp. 2.)  The others involve either the disclosure of accurate data or prospective statements covered by the PSLRA's safe harbor.

Plaintiff tries to transform these inactionable misrepresentations into securities fraud by claiming that DOJ is investigating UnitedHealth's coding practices, and that UnitedHealth's HouseCalls program drove its bottom line.  Neither tactic works.  As for DOJ's investigation—which UnitedHealth disclosed before the class period even began (*see* Ex. A at 80)—there has been no finding of any misconduct.  And public companies are under no obligation to accuse themselves of "uncharged, unadjudicated wrongdoing."

*City of Pontiac* v. *UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014). As for the impact of UnitedHealth's alleged upcoding, Plaintiff is wrong. In its telling, the supposed upcoding drove 50% of the company's profits. (Opp. 1, 10, 24.) But Plaintiff compares gross revenues to net income. Under an apples-to-apples comparison, *using the Complaint's own speculative estimates*, the upcoding Plaintiff alleges represented just 3% of UnitedHealth's overall revenues in 2021, 0.86% in 2023, and 0.95% over the entire class period. That is not enough to turn inactionable statements about the company's financials into securities fraud.

*Second*, Plaintiff comes nowhere close to pleading scienter. Under the PSLRA, scienter requires particularized facts that each maker of the alleged misstatements "had knowledge of contradictory crucial information." *Kushner* v. *Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003). Plaintiff instead trots out the kind of "should have known" arguments that establish, at most, "negligence, but not … fraud." *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008). None of its allegations from confidential witnesses—who had no alleged contact with the Individual Defendants—media reports, and government investigations establishes that this was a top-down scheme in which UnitedHealth's senior-most executives knew that their statements were false, much less knew of "pervasive" upcoding.

*Third*, Plaintiff's loss causation allegations fail. Although Plaintiff cites negative news about UnitedHealth (Opp. 67-73), none of those reports revealed that any challenged statement was false, or that the market cared about anything other than the negative news itself.

-2-

*Lastly*, Plaintiff's separate claim against Witty and Hemsley for insider trading fails as a matter of law because Plaintiff does not identify what material nonpublic information motivated their sales.

## ARGUMENT

## I.    Plaintiff's Opposition Does Not Identify Any Material Misstatements.

Each challenged statement is a generic statement, the disclosure of an accurate fact, a denial of legal wrongdoing, a forward-looking statement covered by the PSLRA's safe harbor, or the accurate description of a transaction. Plaintiff tries to transform these inactionable statements into securities fraud by mischaracterizing upcoding as the lynchpin of UnitedHealth's business. But once the size of UnitedHealth's Medicare Advantage program is properly contextualized, Plaintiff is left with only generic statements that courts routinely find immaterial as a matter of law. Nor can Plaintiff circumvent these fatal deficiencies by repackaging its misrepresentation claim as a scheme-liability claim.

### A.    Plaintiff challenges inactionable generic statements and accurate data.

#### 1.    UnitedHealth did not defraud its shareholders by not confessing to a supposed upcoding scheme.

The heart of Plaintiff's case is that UnitedHealth committed securities fraud by failing to disclose its alleged upcoding scheme. But UnitedHealth had no duty to disclose uncharged, unadjudicated conduct. Plaintiff cannot create such a duty by pointing to immaterial generic statements or accurately disclosed data.

***Generic Statements.*** Plaintiff contends that generic statements such as UnitedHealth's claim that HouseCalls "help seniors in Medicare Advantage programs

-3-

manage their chronic disease" (Opp. 30) are actionable because UnitedHealth knew that some unspecified number of diagnoses were "unsupported." (Opp. 29.) But even if such statements were "verifiably false when made"—itself an unsupported allegation—that would "not cure [the statements'] generality, which is what prevents them from rising to the level of materiality required." *UBS*, 752 F.3d at 183. The proper inquiry turns on "the level of detail in the disclosure," and "whether the disclosure as written is specific enough to evoke investor reliance." *Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 101-02 (2d Cir. 2023). Investors do "not reasonably rely on [generic statements] for any information related to the soundness of the investment." *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017); *see Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019).

Plaintiff insists that UnitedHealth's conduct contradicted its generic statements. Even if that were true, it would not make those statements actionable because no reasonable investor would rely upon them in the first place. Worse, Plaintiff offers no factual support for its conclusory allegations of pervasive upcoding. Instead, Plaintiff engages in sleight of hand. It mischaracterizes HHS Office of Inspector General ("OIG") reports to assert falsely that the OIG concluded UnitedHealth engaged in fraudulent upcoding. (Opp. 1.) While those reports state that the amount of UnitedHealth's coding during home visits and chart reviews raised potential concerns (Compl. ¶¶ 123, 127-28), the OIG reached no conclusion about the coding's propriety and affirmatively acknowledged that "[home visits] and chart reviews are allowable sources of diagnoses." (Compl. Ex.15 at 1.) And the Centers for Medicare & Medicaid Services—the regulator that oversees Medicare

Advantage—later confirmed that the OIG "ha[d] not concluded that the[] diagnoses are not accurate." (Compl. Ex.13 at 10, 25.)

Plaintiff also challenges generic statements that were accompanied by "quantifiable" data, such as that UnitedHealth had "screened 'about 1 million members'" and that "75% of patients received follow-up." (Opp. 31 n.9.) But Plaintiff fails to allege that any of that specific data was false or inaccurate.

***Accurate Statistical Data.*** Plaintiff says UnitedHealth defrauded shareholders by accurately disclosing that its revenue increased in Q3-2021 because of "growth in the number of individuals served through Medicare Advantage." (Opp. 23-24.) Unable to dispute that statement's accuracy, Plaintiff contends that a company's "[s]tatements about the reasons underpinning revenue growth are actionable" if the company conceals uncharged misconduct that is "widespread" and "systemic." (Opp. 24.) That argument fails for two reasons.

*First*, the statement was both truthful and general enough as to not imply perfect legal compliance from every component of the Medicare Advantage program. UnitedHealth's revenue *did* grow because more patients signed up for Medicare Advantage. And "by painting with a broad brush and keeping to generalities, Defendants did not create a 'duty to disclose'" any uncharged wrongdoing. *NYC Pub. Pension Funds* v. *Coupang, Inc.*, 2025 WL 2613650, at *12 (S.D.N.Y. Sept. 10, 2025); *see* Opening Br. 21-22. That is why Judge Nelson rejected the argument that a for-profit college defrauded investors by attributing its success to "strong demand," while omitting "abusive and deceptive recruiting and enrollment practices." *Okla. Firefighters* v. *Capella Educ.*

-5-

*Co.*, 873 F. Supp. 2d 1070, 1079 (D. Minn. 2012). Statements that describe successes at such a high level of generality "are not misleading because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring." *Id.* at 1080.

The statements in Plaintiff's cases bear no resemblance to challenged statements here. In one, the company attributed revenue growth to a specific "business strateg[y]" (bundling) without disclosing the company's *actual* strategy of charging customers for services without authorization. *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 725 (D. Minn. 2019). The other cases involve similarly specific misrepresentations tying results to a particular business strategy. *See Sapssov* v. *Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014) (specified "initiatives"); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 285 (E.D.N.Y. 2023) ("investments in sales and marketing resources").

*Second*, even if UnitedHealth had made specific statements attributing its revenues to a particular business strategy, the purported upcoding scheme was not "widespread" (Opp. 24) enough to require disclosure any time UnitedHealth spoke about Medicare Advantage. Although the absolute numbers may seem large because UnitedHealth is one of the largest companies in the world, what matters is the *percentage* of the company's revenue flowing from the alleged fraud. *See, e.g.*, *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) (citing 5% "rule-of-thumb approach to what is 'material'"); *Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (alleged misrepresentation pertaining to "2% of Gateway's total assets" was immaterial).

Here, Plaintiff alleges that UnitedHealth's revenues from allegedly fraudulent upcoding averaged less than 1% of the company's annual revenue across the entire class period. *Infra* 8. When alleged uncharged misconduct represents such a small slice of a business's revenue, courts are emphatic that "[a]ccurately reported data does not become an actionable misrepresentation merely because [some alleged] misconduct may have contributed to the reported numbers." *Steamfitters Loc. 449* v. *AT&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022).

Plaintiff makes much of dicta (Opp. 24, 27) in *CenturyLink* that statements about the source of revenue might be actionable "even if the fraud only accounted for a small percentage of" profits. 403 F. Supp. 3d at 724. But that dicta cannot be squared with the general principle that "[n]ot all inaccurate statements constitute material misrepresentations." *City of Plantation* v. *Meredith Corp.*, 16 F.4th 553, 556 (8th Cir. 2021). Any other rule would improperly "bring within the sweep of federal securities laws many routine representations made by [companies]." *Plumber & Steamfitters* v. *Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021).

Much of Plaintiff's argument on this front rests on bad math as much as bad law. In arguing that the alleged upcoding scheme was so central to UnitedHealth's business that its legality was embedded into every statement the company made about Medicare Advantage, Plaintiff repeatedly compares the *revenue* that UnitedHealth purportedly obtained against the company's *net profits*. (Opp. 1, 10, 24.) This apples-to-oranges comparison flouts basic accounting principles. *See FedEx Ground Package Sys., Inc.* v.

*Route Consultant, Inc.*, 97 F.4th 444, 456 (6th Cir. 2024) (rejecting comparison of revenue to net income).

The proper way to measure the contribution of a particular business activity is by comparing the revenues from that activity to the company's overall revenues. *See, e.g.*, *In re Canopy Growth Sec. Litig.*, 2024 WL 3445436, at *15 (S.D.N.Y. July 17, 2024). According to the Complaint's allegations from the Wall Street Journal and OIG, UnitedHealth's allegedly fraudulent upcoding scheme constituted only a small fraction of UnitedHealth's overall revenues:  3% in 2021 ($8.7 billion out of $287.6 billion total revenues); 0.86% in 2023 ($3.2 billion out of $371.6 billion total revenues); and 0.95% between 2018 and 2024 ($20 billion of $2.1 trillion total revenues).  (Compl. ¶ 398; Opp. 10, 17 (citing ¶ 264).)  That does not rise to the level of significance necessary to transform generic statements into actionable ones.

### 2.     The challenged statements concerning the other alleged schemes are not actionable misrepresentations.

Plaintiff challenges various other statements UnitedHealth made regarding the Change Healthcare merger, the company's Code of Conduct, and lower hospitalization rates of its nursing-home patients.  None is an actionable misrepresentation.

***Change Healthcare Merger***.  Generic statements that a company "has 'compliance programs'" designed to "prohibit employees from improperly sharing" information are inactionable as a matter of law.  (Opp. 42.)  Shareholders know that "simple and generic assertions about having 'policies and procedures'" cannot guarantee perfect compliance. *Singh* v. *Cigna Corp.*, 918 F.3d 57, 64 (2d Cir. 2019).  Plaintiff's cases do not counsel

otherwise.  In *Glazer Cap. Mgmt., L.P.* v. *Forescout Techs., Inc*, plaintiffs were challenging a company's *detailed* responses to "specific questions" about certain contracts raised by analysts during earnings calls.  63 F.4th 747, 770-71 (9th Cir. 2023).  And in *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189 (N.D. Ga. 2019), the court incorrectly concluded that a company's characterization of its network as "highly sophisticated" was actionable.  *Id.* at 1231.  The Eighth Circuit has explained that such "lack of specificity … precludes [generic statements] from being deemed material."  *Parnes*, 122 F.3d at 547.

Plaintiff asserts that these generic statements become actionable once considered within the "critical context" of UnitedHealth seeking "regulatory approval."  (Opp. 44).  But context cuts the other way because the court reviewing the Change merger held, after trial, that the same evidence Plaintiff copied and pasted into its Complaint "d[id] not reveal" any "intention" of UnitedHealth to misuse "competitive intelligence about its rivals."  *United States* v. *UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 123, 144 (D.D.C. 2022).

***Code of Conduct***.  Plaintiff claims that UnitedHealth committed fraud by engaging in anti-competitive conduct despite telling employees to "follow" its Code of Conduct's directive to act fairly.  (Opp. 45).  A company's directives to follow aspirational policies are immaterial as a matter of law.  Reasonable investors understand that "a code of conduct is 'inherently aspirational'" and "expresses opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."  *Retail Wholesale* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).  In arguing otherwise, Plaintiff cites outlier, erroneous district court decisions holding that generic

-9-

statements are material if they are "objectively false." (Opp. 45.) Every court of appeals to consider the issue has squarely held that a generic statement is *not* material even if it is "verifiably false." *UBS*, 752 F.3d at 183; *see Carvelli*, 934 F.3d at 1321; *Hewlett-Packard Co.*, 845 F.3d at 1278-79; *Emp's Ret. Sys.* v. *Whole Foods Mkt., Inc.*, 905 F.3d 892, 901-02 (5th Cir. 2018); *Parnes*, 122 F.3d at 547.

Moreover, a statement that employees must comply with the law is actionable only if paired with allegations of related "conduct that if true would be illegal." *Shoemaker* v. *Cardiovascular Sys., Inc.*, 300 F. Supp. 3d 1046, 1053 (D. Minn. 2018). Because Plaintiff challenges UnitedHealth's statement directing its employees not to engage in "[a]nti-[c]ompetitive [c]onduct" (Opp. 44), its inability to show any antitrust violation is fatal.

***Hospitalization Rates***. Plaintiff challenges UnitedHealth's statements that the company cut hospitalization rates because its "value-based care" model delivered "better outcomes" and greater patient engagement as false because UnitedHealth allegedly concealed alleged misconduct that contributed to these rates. (Opp. 33-35.) That challenge fails for two reasons. *First*, accurate data "cannot become actionable simply because companies do not simultaneously disclose some wrongdoing that may have contributed" to the data. *Fogel* v. *Vega*, 759 F. App'x 18, 24 (2d Cir. 2018). "[C]ompanies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Id. Second*, such statements are a paradigmatic example of puffery. *Meredith*, 16 F.4th at 557.

### B.    Plaintiff cannot rely on UnitedHealth's denials of wrongdoing.

In its Opposition, Plaintiff asserts that UnitedHealth committed fraud by denying allegations of wrongdoing. But "the securities laws do not prohibit a company from

publicly taking a litigation position that a tribunal may later reject." *Coupang*, 2025 WL 2613650, at \*18. Any other position would improperly require public companies to treat disclosure requirements as a "rite of confession." *Danske Bank*, 11 F.4th at 98. And here, of course, no judge or jury (or prosecutor) has ever decided that UnitedHealth committed any wrongdoing.

Each of Plaintiff's cases involves misrepresentations of facts rather than the denial of an allegation that the company violated the law. (Opp. 31-32.) *See Institutional Invs. Grp.* v. *Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) (denying that company offered product discounts); *Stone* v. *Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 596 (W.D. Tex. 2014) (false assurances that actuarial assumptions were vetted by "medical doctors and published actuarial data"); *Noto* v. *22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) (denying fact of any SEC investigation).

Plaintiff never explains how the fact that UnitedHealth "retained outside counsel" (Opp. 33) proves it lied in February 2025 when it stated that the company was "not aware of the 'launch' of any 'new'" DOJ investigation into Medicare Advantage coding (Compl. ¶ 244) separate from the DOJ's already disclosed investigation (¶ 232). Nor was any distinction material: what matters is that the public knew DOJ was looking into UnitedHealth's business practices, not whether it was doing so in one or two investigations. And UnitedHealth had disclosed the existence of DOJ investigations of its coding practices *since* 2017—before the class period even began. (MTD Ex. 8 at 13-14.)

-11-

###### C.   The PSLRA's safe harbor forecloses Plaintiff's reliance on forward-looking projections.

Plaintiff also challenges UnitedHealth's forward-looking predictions about the impact of new regulations on its future revenues based on available data.  (Opp. 35-36.) But Plaintiff ignores that these forward-looking predictions were accompanied by meaningful cautionary language that triggers the PSLRA safe-harbor protections.  Even if a company knows that it is "unlikely to meet" its projections, the PSLRA's safe harbor still applies if there is sufficient cautionary language.  *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021).[1]

Plaintiff invokes a district court decision that wrongly assumed that the safe harbor is inapplicable if cautionary language was "contradicted" by defendants' "knowledge" that its prediction was false.  (Opp. 41. (citing *In re Resideo Techs., Inc., Sec. Litig.*, 2021 WL 1195740, at *5 (D. Minn. Mar. 30, 2021).)  But the PSLRA's express "use of the disjunctive term 'or' between subclauses (A) and (B) [of 15 U.S.C. § 78u-5(c)(1)] confirms that 'a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading."  *Wochos*, 985 F.3d at 1190.  Thus, "if a statement is accompanied

---

[1]   Witty did not "assure[] investors" that regulatory changes would have "no financial impact."  (Opp. 35.)  He said UnitedHealth was "committed to the kind of earnings growth rate over the next 12 months that you would expect from us even if there hadn't been a rate notice cut" by making up for the impact in other ways, such as "eliminating waste." (Compl. ¶ 312.)  Those are two different things.

by meaningful cautionary language, the defendants' state of mind is irrelevant." *Carvelli*, 934 F.3d at 1326; *see Julianello* v. *K-V Pharm. Co.*, 791 F.3d 915, 922 (8th Cir. 2015).

Plaintiff concedes that UnitedHealth's risk warnings about regulatory changes to the Medicare Advantage program were meaningful and cautionary. UnitedHealth expressly warned shareholders about the very risks Plaintiff says it did not know: that "substantial revisions to the risk adjustment model, which serves to adjust rates to reflect a patient's health status and care resource needs, *will result in reduced funding*" (MTD Ex. 8 at 18 (emphasis added)), and that UnitedHealth "is currently involved in various governmental investigations" including for "coding and other requirements under the Medicare risk-adjustment model" (*id.* at 13). Plaintiff presses that UnitedHealth failed to accuse itself of wrongdoing (Opp. 41), but that does not undermine the fact that UnitedHealth made "company-specific warnings based on a realistic description of the risks applicable to the particular circumstances." *Julianello*, 791 F.3d at 921.

Plaintiff cites *Karth* v. *Keryx Biopharmaceuticals* for the proposition that "one cannot tell a hiker that a mere ditch lies ahead, if the speaker knows the hiker is actually approaching the precipice of the Grand Canyon." 6 F.4th 123, 137 (1st Cir. 2021). But the issue there was whether a statement describing a "supply interruption" as "hypothetical" was false and misleading when "that disruption was actively occurring." *Id.* at 138. Here, UnitedHealth did not describe the changes to Medicare regulations as merely hypothetical, but warned that "*ongoing* Medicare funding pressures" created "*continued* pressure in the Medicare Advantage program" that "*will result in reduced funding*." (MTD Ex. 8 at 18 (emphasis added).)

**D.    The Complaint fails to identify any deficient disclosures about the portfolio-refinement transactions.**

Plaintiff argues that UnitedHealth "concealed the upcoding scheme" with its portfolio-refinement transactions. (Opp. 37.) But Plaintiff cannot dispute that, in its 2024 earnings release, UnitedHealth fully disclosed that it had sold certain assets to private-equity investors, which "contributed about 80 basis points ($3.3 billion) to the operating cost ratio." (Compl. ¶ 327; *see* ¶ 323 (earnings release).) An accurate disclosure about asset sales cannot be rendered misleading by UnitedHealth's failure to accuse itself of unrelated wrongdoing at the same time. *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("The market is not misled when a transaction's terms are fully disclosed.").

Plaintiff also claims that UnitedHealth's comment to *Bloomberg* that those transactions had "valid business reasons" (Compl. ¶ 330) must have been false because analysts characterized them as "financial engineering" (Opp. 39). But Plaintiff does not point to anything other than speculation to suggest that UnitedHealth lacked "valid business reasons" for those asset sales. (*Id.*) Moreover, UnitedHealth "was under no obligation to use any adjective, let alone a pejorative one, to describe" its transactions. *OFI Asset Mgmt.* v. *Cooper Tire & Rubber*, 834 F.3d 481, 504 (3d Cir. 2016). Again, what matters is that the economic substance of the transactions, and their effect on UnitedHealth's business, were fully disclosed to investors.

Lastly, Plaintiff alleges that UnitedHealth's projection for 2025 earnings-per-share was false because UnitedHealth omitted granular details about how that figure was

-14-

calculated, including that UnitedHealth planned an additional $3.6 billion in asset sales. (Opp. 36-37.) UnitedHealth did not commit securities fraud "simply because it d[id] not disclose [data] at the level of detail [P]laintiffs request in retrospect." *Karth*, 6 F.4th at 136. Courts have rejected the theory that projections are misleading if they do not "reveal all of the data, assumptions, and methodology behind" them. *Wielgos* v. *Commonwealth Edison Co.*, 892 F.2d 509, 514 (7th Cir. 1989).

Nor does Plaintiff allege that UnitedHealth's 2025 earnings-per-share projection was false when made. Instead, Plaintiff simply says that UnitedHealth changed its projection seven months later. (Opp. 40.) Such "fraud by hindsight" pleading does not make out a securities claim. *Elam* v. *Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008).

### E.    Plaintiff cannot reinvent its misstatements claim as a scheme.

To try to circumvent the requirement of pleading an actionable misrepresentation, Plaintiff tries to repackage its misrepresentation claim under Rule 10(b)-5(b) as a "scheme" claim under Rule 10(b)-5(a) & (c). The basis for Plaintiff's scheme claim is indistinguishable from the basis for its misstatements claim. Plaintiff merely alleges that nurses coded "unnecessary diagnoses" and that UnitedHealth sought to lower nursing-home hospitalization rates without disclosing this conduct. (Opp. 47.) Those allegations might amount to a Medicare-fraud scheme, but they are not a *securities-fraud scheme*.

*West Virginia Pipe Trades* v. *Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016), does not suggest otherwise. There, plaintiffs did not "merely repackage allegations of misrepresentation as allegations of a scheme," but instead alleged that the defendants paid third-party physicians to lie in medical journals. *Id.* at 393. By contrast, Plaintiff merely

repeats its upcoding allegations and impermissibly labels them a scheme. Such "repackaged" misstatement claims do not plead a scheme. *Id.*

Plaintiff's upcoding-scheme theory also fails because Plaintiff fails to plead reliance. Stating the obvious, Plaintiff could not have relied on UnitedHealth's alleged overcharging of the government because it did not even know about that "deceptive conduct" at the time. *Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*, 552 U.S. 148, 160 (2008).

Alternatively, Plaintiff claims that UnitedHealth's fully disclosed "portfolio refinement" transactions were a scheme. (Opp. 48.) But "[t]he market is not misled when a transaction's terms are fully disclosed." *Wilson*, 671 F.3d at 130. Unlike the sham transactions featured in *Enron* and *Smith Barney* (Opp. 48), the asset sales here were real sales to third parties that UnitedHealth fully disclosed, as the Complaint acknowledges (¶¶ 323, 327).

## II.    Plaintiff Comes Nowhere Close to Pleading A Strong Inference Of Scienter.

### A.    The Complaint does not plead any motive to commit fraud.

To try to show a motive to defraud, Plaintiff points to stock sales by the Individual Defendants. (Opp. 64-65.)[2] But the Eighth Circuit, in recognition of the fact that executives routinely sell stock, has held that "sales of up to 32% of an individual's stock" are "not inherently suspicious." *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 (8th Cir.

---

[2] Plaintiff is wrong that the Court cannot consider an executive's overall purchases and sales, as reported on Form 4s filed with the SEC. (Opp. 65, 75.) *See Lim* v. *Hightower*, 2025 WL 2965692, at *5 (6th Cir. Oct. 21, 2025); *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *18 (D. Minn. Sept. 30, 2021).

2020).  And Plaintiff cannot avoid *Target*, which controls because the sales here were below that threshold, by citing nonbinding, out-of-circuit cases.  (Opp. 64-65.)  Thus, Plaintiff must raise other "particularly strong" evidence of conscious misbehavior or recklessness to satisfy the PSLRA standard.  *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 894 (8th Cir. 2002).

### B.    Plaintiff has not pleaded conscious misbehavior or extreme recklessness.

Plaintiff must establish that the "executives actually making the allegedly false or misleading statements" acted with scienter.  *Cornelia I. Crowell GST Tr.* v. *Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008).  More specifically, Plaintiff must "show[]" that the maker of the alleged misstatements, here, the Individual Defendants, "had knowledge of contradictory crucial information."  *Kushner*, 317 F.3d at 829; *see Ceridian*, 542 F.3d at 247-48 (same).  Plaintiff's various "should have known" theories establish, at most, "negligence, but not [] fraud." *Ceridian*, 542 F.3d at 249.  That fatal defect is not cured by Plaintiff's confidential-witness allegations, speculative must-have-known theories, or reference to government investigations, news reports, executive departures, or the largely repudiated core operations doctrine.  Nor can Plaintiff save its deficient scienter allegations by pointing to the "[t]emporal proximity" between alleged misstatements and their

correction (Opp. 56), because the Eighth Circuit has explained that any effort to "infer[] scienter from temporal proximity" amounts to pure "speculation." *Elam*, 544 F.3d at 929.[3]

*Confidential Witnesses.*   Plaintiff says that its confidential-witness allegations support scienter, even though those confidential witnesses had no interaction with the makers of the alleged misstatements. (Opp. 53.) But the Eighth Circuit is clear that the PSLRA requires exactly that.   "[N]othing in the complaint suggests that either the confidential former employee or his sources had any insight into what, if anything, [the defendant] knew about" the issue.  *Meredith*, 16 F.4th at 557-58.  Plaintiff cannot avoid *Meredith* by pointing to an earlier, errant district-court decision.  (Opp. 53 (citing *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 899 (D. Minn. 2011)).)  Plaintiff's other cases involve allegations of direct interactions absent here.  *See Glazer*, 63 F.4th at 772 (confidential witnesses alleged CEO "participated in the alleged pressure campaign"); *CenturyLink*, 403 F. Supp. 3d at 732 (confidential witnesses had "personal interactions" with executives).  Thus, none of the confidential-witnesses allegations here suggest that any Individual Defendant knew his statements were false, much less that pervasive upcoding was occurring.

*"Must-Have-Known" Theories.*   Plaintiff speculates that the upcoding scheme "could only have been implemented through top-down directives from senior management." (Opp. 53.) Such "must have known" allegations cannot support scienter.

---

[3]   As explained in UnitedHealth's opening brief (at 37-38), the scienter standard for forward-looking statements requires "actual knowledge" of falsity.  Plaintiff has not tried to meet that standard.

*Detroit Gen. Ret. Sys.* v. *Medtronic, Inc.*, 621 F.3d 800, 808 (8th Cir. 2010).  Plaintiff's sole support for that proposition is *CenturyLink* where, unlike here, the plaintiff alleged that the CEO "received reports about extensive cramming."  403 F. Supp. 3d at 731.

Plaintiff also contends that UnitedHealth's senior-most executives must have known about the allegedly illegal upcoding scheme because they were familiar with the bottom-line results of the Medicare Advantage business during earnings calls.  (Opp. 55.) Plaintiff does not explain why Witty's statement that "our clinicians identified 300,000 seniors with emerging health needs" (Compl. ¶ 316) suggests he had "granular knowledge" of "fraudulent revenue recognition." (Opp. 56).  Recognizing as much, Plaintiff speculates that, if Defendants had "investigated" certain issues, they "would have" discovered the "upcoding scheme's collapse." (Opp. 55.)  But the allegation that, "'if' [a defendant] had asked various questions earlier, it would have" learned the truth fails to plead recklessness as a matter of law.  *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 112-13 (2d Cir. 2009).

Plaintiff's other scienter allegations rest on the same kind of speculation.  For the portfolio-refinement transactions, Plaintiff jumps from its speculation that UnitedHealth did not have "valid business reasons" for the transactions to its further speculation that UnitedHealth must have "recklessly issued statements without investigation." (Opp. 55.) No allegations support Plaintiff's double-layered speculation.  "Simply raising an inference that a company's executive 'should have' discovered misconduct, not that the executive actually knew of misconduct, is insufficient." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 952 (9th Cir. 2023).  For the code-of-conduct statements, the fact that UnitedHealth

gained "market dominance" through a decade of "major acquisitions" (Opp. 64) says nothing about senior executives' knowledge of specific alleged antitrust violations, much less their knowledge that aspirational statements in the company's Code of Conduct somehow would mislead shareholders.  For the Change merger statements, Plaintiff offers no reason for this Court to find scienter based on the same allegations that a court already held "d[id] not reveal" any "intention" on UnitedHealth's part to misuse "competitive intelligence about its rivals."  *UnitedHealth*, 630 F. Supp. 3d at 123, 144.  And Plaintiff does not even try to argue scienter with respect to its nursing-home allegations.

*Government Investigations and Media Reports.*  Plaintiff says that the fact of a government investigation "creates 'actual knowledge of *potential* problems."  (Opp. 53, 60, 63-64 (emphasis added).)  Plaintiff's out-of-circuit support is irrelevant because the Eighth Circuit has rejected this exact argument:  "The mere existence of [a government] investigation does not … add an inference of scienter."  *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008).

Plaintiff similarly contends, again quoting *CenturyLink*, that a defendant's standalone denial of wrongdoing gives rise to a strong inference that defendants "act[ed] severely recklessly in making denials."  (Opp. 53-54.)  Not true.  "Finding scienter based on a denial itself would read out the scienter requirement from the Exchange Act."  *Coupang*, 2025 WL 2613650, at \*30.  That is why the Eighth Circuit held that, "[a]bsent a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law," a complaint fails to plead scienter.  *Kushner*, 317 F.3d at 831.

-20-

Plaintiff also claims that the existence of negative "news articles" about UnitedHealth proves the Individual Defendants acted with scienter. (Opp. 52.) None of Plaintiff's cases supports the illogical inference that a negative media report provides evidence that an executive made a false statement with scienter. Those cases merely state that "factual particulars" in news articles can be "credited [] to the extent that other factual allegations would be"—*i.e.*, if they allege facts that "raise a strong inference" that the makers of the statements acted with scienter. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000); *In re UnitedHealth Grp. PSLRA Litig.*, 2007 WL 1621456, at \*1-2 (D. Minn. June 4, 2007) (same). The mere say-so of the press is not enough to plead scienter with the particularity required by the PSLRA.

***Executive Departures.*** Plaintiff relies on the departures of UnitedHealth's CEO and CFO, but those facts can support scienter only where a plaintiff links the departure to fraud. In *CenturyLink*, for example, the court held that resignations "weeks after CenturyLink announced the results of its investigation … marginally assists Plaintiffs in alleging scienter." 403 F. Supp. 3d at 734; Opp. 57-58. Plaintiff do not allege that here. Instead, Plaintiff alleges that Witty departed UnitedHealth because he "committed the 'cardinal sin' of missing financial estimates" (Opp. 15)—not because he committed fraud—which cannot support an inference of scienter. *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 118 (3d Cir. 2018).

***Core Operations.*** Plaintiff invokes the "core operations" doctrine by pointing to the "magnitude" of the allegedly improper upcoding. (Opp. 51-52, 58.) That doctrine is flawed and should not be adopted. (Opening Br. 42-43.) The Eighth Circuit has rejected

the proposition that executives must have known of a "scheme given its sheer size and its effect on the company's core business." *Kushner*, 317 F.3d at 828. At most, size can lend support only to corroborate other well-pled allegations of scienter, which are missing here. *See St. Jude*, 836 F. Supp. 2d at 903. Indeed, in Plaintiff's cases, unlike this one, plaintiffs pleaded with particularity that the individual defendants knew about or directed the alleged misconduct. *See Sapssov*, 22 F. Supp. 3d at 1228 (misconduct "initiated by [the CEO]"); *Glazer*, 63 F.4th at 772 ("Individual Defendants themselves participated in the widespread pressure campaign"); *CenturyLink*, 403 F. Supp. 3d at 731 (CEO "received reports about extensive cramming"). Plaintiff's own allegations establish that fraudulent upcoding was not a core operation. *Supra* 8.

## III.    Plaintiff Fails To Defend Its Loss-Causation Allegations.

Because Plaintiff makes no effort to plead loss causation for the Change merger statements, those claims must be dismissed.

As to its other fraud theories, Plaintiff repeats its mantra that a corrective disclosure need not be a "mirror image" of the statement. (Opp. 67, 73.) But even Plaintiff's cited cases state that a corrective disclosure must "'reveal[] to the market the falsity' of the prior misstatements." *Pub. Emps. Ret. Sys.* v. *Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014). Plaintiff does not explain how any of the disclosures it identifies—reports of government investigations into previously publicly known allegations, and UnitedHealth's earnings miss in Q1-2025, which was followed by its CEO's departure—revealed the falsity of any challenged statement.

## IV.    Plaintiff Has Not Pleaded An Insider-Trading Claim.

Plaintiff says that some courts have recognized that a trade "within four to eight days" after the defendant sells can "satisfy contemporaneity. (Opp. 73.) But where, as alleged here (Compl. ¶ 503), "a large volume of securities are sold on a daily basis on a national exchange, plaintiffs could not have realistically traded with a given defendant unless they traded on the same day." *In re Fed. Nat'l Mortg. Ass'n Litig.*, 503 F. Supp. 2d 25, 47 (D.D.C. 2007). Plaintiff alternatively contends that a two-day window might be appropriate if a defendant sells "near the close" of the trading day (Opp. 74), but a two-day window would mean, at most, that the July 18, 2022 and October 17, 2023 sales could be considered contemporaneous.

Plaintiff is wrong (Opp. 74) that it need not identify what "material, nonpublic information" motivated the trade, which it failed to do. *Mart* v. *Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 827 (D. Minn. 2022). Even under Plaintiff's own theory, Hemsley's October 17 sale occurred one week *before* he allegedly learned of material, nonpublic information—the DOJ subpoena. (Compl. ¶¶ 229-30.)

### CONCLUSION

The Court should dismiss the Complaint—Plaintiff's sixth effort (*see* ECF 156)—with prejudice.

-24-

Dated:  November 17, 2025

Respectfully Submitted,

/s/ Peter C. Magnuson

Robert J. Giuffra, Jr. (admitted *pro hac vice*)
Jeffrey T. Scott (admitted *pro hac vice*)
Matthew J. Porpora (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588
giuffrar@sullcrom.com
scottj@sullcrom.com
porporam@sullcrom.com

Morgan L. Ratner (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
Tel:  (202) 956-7500
Fax:  (202) 956-7676
ratnerm@sullcrom.com

Peter C. Magnuson
Matthew Kilby
Jeffrey P. Justman
Anderson C. Tuggle
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel:  (612) 766-7000
Fax:  (612) 766-1600
peter.magnuson@faegredrinker.com
matthew.kilby@faegredrinker.com
jeff.justman@faegredrinker.com
anderson.tuggle@faegredrinker.com

*Attorneys for UnitedHealth Group Inc., Andrew Witty, and Stephen Hemsley*