UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

|  |  |  |
|---|---|---|
| California Public Employees' Retirement System, | ) ) ) | Case No. 0:24-cv-01743 (JMB/JFD) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| UnitedHealth Group, Inc., Andrew Witty, Stephen Hemsley, and Brian Thompson, | ) ) ) | St. Paul, Minnesota **December 16, 2025** |
|  | ) | 10:30 a.m. |
| Defendants. | ) |  |
|  | ) |  |

_____

**BEFORE THE HONORABLE JEFFREY M. BRYAN**
**UNITED STATES DISTRICT JUDGE**

**MOTION HEARING**

**APPEARANCES**:

For the Plaintiff:        ROBBINS GELLER RUDMAN & DOWD LLP
                          Roger R. Henssler, Jr.
                          Jack Abbey Gephart
                          Darren J. Robbins
                          Sam S. Sheldon
                          655 West Broadway, Suite 1900
                          San Diego, California 92101

                          TM SULLIVAN PLLC
                          Timothy M. Sullivan
                          200 Southdale Center
                          Edina, Minnesota 55435

For the Defendants:       SULLIVAN & CROMWELL
                          Robert J. Giuffra, Jr.
                          Matthew J. Porpora
                          125 Broad Street
                          New York, New York 10004

(appearances continued on next page)

**APPEARANCES** (continued):

For the Defendants:        SULLIVAN & CROMWELL
                           Rishabh Bhandari
                           1700 New York Avenue, Northwest
                           Washington, D.C. 20006

                           FAEGRE DRINKER BIDDLE & REATH LLP
                           Peter Magnuson
                           90 South Seventh Street, Suite 2200
                           Minneapolis, Minnesota 55402

Court Reporter:            Nancy J. Meyer
                           Registered Diplomate Reporter
                           Certified Realtime Reporter
                           Warren E. Burger Federal Building
                           and United States Courthouse
                           316 North Robert Street
                           St. Paul, Minnesota 55101

Proceedings reported by certified stenographer; transcript produced with computer technology.

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  All right.  Good morning.  We are here today on Case No. 24-1743.

Why don't we begin with appearances, starting with counsel for plaintiffs.

MR. HENSSLER:  Good morning, Your Honor.  Bobby Henssler from Robbins Geller Rudman & Dowd.  I'm joined by my colleagues, Sam Sheldon, Jack Gephart, and Darren Robbins, as well as local counsel Tim Sullivan.

Your Honor, before we start, I just wanted to note one thing for Your Honor.  We noted in your practice pointers that you do encourage young lawyers to take advantage of opportunities to speak.  Mr. Gephart is a recent law grad.  He's actually never gotten a chance to speak in court, and I would like to reserve one minute for him to speak today, if that's okay with the Court.

THE COURT:  Sounds great.  Thank you.

MR. MAGNUSON:  Good morning, Your Honor.  Peter Magnuson from Faegre Drinker on behalf of defendants, and I'm going to turn it over to my co-counsel, Bob Giuffra, who will introduce the rest of the team.

MR. GIUFFRA:  Good morning, Your Honor.  Robert Giuffra with Sullivan & Cromwell for United and Mr. Witty and Mr. Hemsley.

Along with me is Matt Porpora, my partner, and Rishabh Bhandari, another lawyer from Sullivan & Cromwell. Jeff Scott's in the audience, and then also Matt Shors, who is in-house counsel at United.

We're delighted to be here.  Thank you.

THE COURT:  All right.  Good morning.

So I know the parties wanted to have more time for argument this morning.  I don't, unfortunately, have room in the schedule today to accommodate the request so that was denied.

But what I'd like to do is -- maybe if we can tailor some of the -- at least the beginning portions of the argument, and I think we begin with defense counsel, since it's their motion.  I'm thinking about 15 to 20 minutes per side, with brief time for rebuttal.

And if we could at least start with the arguments regarding scienter on the alleged misrepresentations concerning upcoding, as well as concerning the reduction in hospitalization visits.

And then beyond that, you take me wherever you want me to go.

MR. GIUFFRA:  Thank you very much.  Again, Robert Giuffra with Sullivan & Cromwell for Mr. Witty, Mr. Hemsley, and UnitedHealth.

I'll start with the scienter allegations.  As

Your Honor well knows, the Private Securities Litigation Reform Act is a unique federal law that imposed heightened pleadings standards for just one area of law, and that's for the securities laws.  And in order to plead scienter, you've got to come forward with particularized allegations supporting a strong inference of scienter, and that's the plaintiff's burden.  Your Honor acts as the gatekeeper.

With respect to the scienter allegations here, Your Honor, we don't think that they cross the line.  And the reason we don't think they cross the line, Your Honor, is because they are quite summary and nonspecific.  There's no question there was a stock drop here, but the mere fact that there was a stock drop is not sufficient.

Now, in this circuit, in order to plead scienter, you've got to show severe recklessness, and you've got to show that the person who actually made the alleged misstatements had scienter.  It's not sort of a generalized corporate scienter.

And what the plaintiffs do in this case is they rely upon five different categories of allegation to support their scienter allegations, and none of them pass muster.

First of all, they cite a smattering of what we call confidential witnesses.  And as Your Honor pointed out correctly in your *Target* decision back in November, you've got to show that the confidential witnesses had some

interactions with, in this case, the two CEOs, Mr. Witty and Mr. Hemsley.  And there's no connection, allegation that they said anything to either of them about so-called upcoding.

And I've had other cases where courts have denied motions to dismiss but there was a confidential witness who was -- interacted daily with the individual defendants who, again, their scienter is what matters.

Second, this complaint is replete with must-have-known allegations, and the Eighth Circuit in the *Medtronic's* case made it quite clear that must-have-known allegations are not sufficient.  Obviously, the fact that the executives knew about the company's results doesn't mean they knew about improper upcoding.

In addition, the plaintiffs rely upon government investigations --

THE COURT:  If we can pause for a moment there.

The *Medtronic's* case that you're referring to, does it have any discussion about what must have known means in comparison to severe recklessness?

MR. GIUFFRA:  I think what it talks about in that case is you've got to be able to show that the individual defendant had data, information presented to that individual defendant, knowing in this case that there was pervasive upcoding.  And one of the issues in this case, which I think

is important, is to put the alleged upcoding in perspective.

Coding is something that anyone who's providing health services to a patient in 2025 does, whether it's a rural doctor or a big, you know, health provider like Optum. And there's nothing wrong with coding. In fact, we think coding is good because all you're doing is identifying, you know, medical conditions that people have.

And United -- and there's no dispute about this -- follows the coding practices that are approved by the federal government through the CMS. And what coding does is it classifies diseases, symptoms, and the like. And a company like Optum, which is part of United, will do more than a billion codes a year. And we have more than -- in terms of Medicare Advantage, more than 10 million customers.

And so what plaintiffs do in this case -- and I think this is largely the gravamen of the complaint -- is they look to *The Wall Street Journal* articles that have appeared about United. And United, as it's entitled to do, has said we disagree strongly with those articles. And what those articles are premised on is, essentially, you know, a review of -- and a small smattering.

In fact, if you look at the numbers, UnitedHealth Group is literally, by revenue, the third biggest company in the United States, with almost $400 billion a year in revenue.

What the plaintiffs do is they look at the amount of alleged upcoding that's in *The Wall Street Journal* article, which over the four years of the class period is less than 1 percent, .95 percent. And you're talking about allegedly 20 billion in upcoding across 2.1 billion -- excuse me, 2.1 trillion in revenue, and that's at 3 point -- that's paragraph 398 of the complaint.

Now, the -- and then they also cite two OIG audits that were done for purposes of -- OIG is part of the Health and Human Services department. And what the CMS says -- and this is an important point. The complaint, Exhibit 13 at 25, is that the OIG did not conclude, quote, "that the diagnoses were not accurate," close quote. In fact, the OIG itself, in its report, said that home visits, which is a criticism that's being made and leveled at UnitedHealth in short reviews, quote, "are an allowable source for diagnoses." That's Complaint Exhibit 15 at 1.

Now, this whole -- the allegation somehow that there's this pervasive upcoding scheme, there's no evidence and no allegation, no particularized facts that the CEO executives of this company knew about pervasive upcoding, and that's the key linchpin that's missing in this complaint.

THE COURT: The allegations, I think, are that they knew at least about *The Wall Street Journal* articles

and the OIG audit reports.  So what more needs to be said when we're talking about scienter?  And you were explaining why under the *Medtronic's* case there has to be some allegation that the speaker had knowledge or had some -- some data.  So why don't we tie that together here.

You're saying that the complaint fails because the speakers didn't -- there's no allegations that the speakers had what?  Because I think there is an allegation that they had read the articles and then knew about the OIG reports.

MR. GIUFFRA:  No question about that, Your Honor. But, again, if a mere article in the newspaper is sufficient to establish that the executives knew about, you know, pervasive and illegal upcoding, then you'd be, basically, rendering the PSLRA dead letter.  You've got to show evidence.

So mere allegation doesn't mean that something is actually going on.  And it's important to remember that in this case there was a -- a litigation in California, a False Claims Act case, brought by the Department of Justice.  They took it over.  And in that case, the special master -- the District Court has not yet ruled -- but recommended that summary judgment be granted -- and this is the *Poehling* case, P-o -e-h-l-i-n-g, 2025 -- grant summary judgment because there was no evidence that United had used any invalid codes.  And that's at 2025 Westlaw 682285 at *8.

And so -- and there's never been an allegation by the Department of Justice.  There certainly hasn't been a court finding that United is engaging in pervasive upcoding. So what the plaintiffs are essentially left with is *The Wall Street Journal* article.  And *The Wall Street Journal* article -- and this is a criticism that was leveled by the magistrate in the *Poehling* case -- they don't have medical records.  All they have is, basically, the following -- and, again, it's less than 1 percent of all revenue that was earned by United during the class period.  So a small amount.  And normally under the securities laws when people talk about materiality, it's, like, 5 percent.  So we're talking about a very small amount.

And the problem is -- from plaintiff's perspective is United, through the HouseCalls program -- and this is a positive thing, which the company strongly supports -- visits and does a lot of work for underserved communities, lower-income people, rural --

THE COURT:  Right.  But what does the complaint have to say, in your view, that it doesn't say to show the recklessness of the speaker, even though you concede that they had knowledge of *The Wall Street Journal* article and the OIG reports.  And you --

MR. GIUFFRA:  You've got to establish that they knew there actually was pervasive and illegal upcoding.  And

there's no evidence to support that at all.  There's no pleading in that -- in the complaint.  They just say, well, *The Wall Street Journal* asserts there's an issue.  What *The Wall Street Journal* asserts, simply, is if there were less than 1 percent of all the people who were coded, there wasn't follow-up treatment with respect to those people with respect to the conditions.

Well, a lot of people get diagnosed for things and don't get treated for them, particularly when -- you know, if you're in a rural area, you're low income, people don't go and get treated.  But they have a -- 99 percent was fine.  They raised an issue about 99 percent.

So what the plaintiff seems to say is that, well, *The Wall Street Journal* found that .95 percent of your upcodes, there was an issue.  They don't say that there was a problem because *The Wall Street Journal* doesn't have access and didn't have access to the medical records of the patients.

THE COURT:  So I guess that's kind of my question.  If there is -- does the complaint have to say that there were zero people who were diagnosed?  That absent the training or the questionnaires that the computer program prompted the nurses to ask these additional questions or the -- whatever additional pressure there was to make these diagnoses, does the complaint have to say that absent those

there's nobody who would have been diagnosed that otherwise wasn't?  Like, there's no single person?

Or on the flip side, if the defendants are able to point to -- you know, you're using 99 percent.  One percent are wrong.  Ninety-nine percent seem to be okay.  Where is that threshold for purposes of scienter?  Does the complaint say zero?  Like, there's nobody?

MR. GIUFFRA:  Well, we have -- United never said -- and it would be ridiculous to say -- no company would ever say that they had a hundred percent accuracy rate with respect to medical coding.

THE COURT:  Right.  But the motive in this -- in the alleged misrepresentations for having the -- the difference that -- what makes UnitedHealth Group different from other companies in response to, let's say, *The Wall Street Journal* article and whatnot?  Is it a desire to diagnose what otherwise would be undiagnosed diseases?

MR. GIUFFRA:  That's correct.

THE COURT:  Right.  So if that's the allegation that's supposedly false, in your view, to have severe recklessness, how far does the complaint have to go?  Does it have to say that that's never true; that there was not even a single person who otherwise -- who would not have been diagnosed absent these additional procedures that UnitedHealth Group had?

MR. GIUFFRA:  In terms of what United actually said -- I think you have to sort of meld the scienter and the misstatement allegations.

What the plaintiffs do is they take statements like, for example, that the HouseCall programs, quote, "helps seniors manage chronic disease," close quote, or provides for, quote, "amazing health assessments," quote close.  And that's paragraphs 398 and 2- -- 398 and 303 of the complaint.  Those statements in and of themselves are not actionable.  They're not the kind of statements investors rely upon.

To the extent that there's an issue about the denials that United en- -- did, well, United litigated in California in federal court whether there was an issue with respect to its coding practices, and the magistrate judge recommended summary judgment for United.  So if you're the CEO of the company, you have no reason to believe that there's pervasive upcoding.  And the company never promised 100 percent perfection, and no company does.

And my understanding, Your Honor, is that the CMS, the people who actually pay the bills, they do regular audits with sampling of the codes.  And United has a very high accuracy rate and, in fact, higher than its peers.

So what the plaintiffs, essentially, have done here in this case is, essentially, done the following.  They

said, you must have known, but they have no particularized allegations.

THE COURT:  All right.  I think -- maybe I'll throw out a specific statement --

MR. GIUFFRA:  Okay.

THE COURT:  -- and then we can use that.  Like, for example, there's a statement from November 29th, 2022, at an annual investor conference that, quote, "What we found is nearly one out of every four people we screened had a condition they didn't realize they had, and the hep C positivity rates for dual special needs numbers are nearly double the national average."  Right?

So you have a statement that quantifies this undiagnosed or underdiagnosed, and if that's -- what does the complaint have to say about the speaker there to say that that speaker was acting with severe recklessness? Because it's not enough, I don't think, to just have read *The Wall Street Journal* article and then make that statement.  It's not enough to just be aware of the OIG reports and then make that statement.

So from your perspective, what additional allegation has to be in the complaint that's missing about the speaker of that -- of that statement?

MR. GIUFFRA:  Plaintiffs would have to establish that that -- that that speaker had information that

contradicted the statement that the speaker made about how -- how the processes were working and what results were being obtained by the processes.  They have nothing like that in this complaint.

And so in my experience, in terms of cases that survive motions to dismiss, it will be speaker says X, Y, and Z, and the allegation is that speaker knew that X, Y, and Z was not true or, at least, you know, was severely reckless in making a statement that was not true.  And in this -- in this case, they have no -- they have no particularized facts that are pled indicating that these executives who made those statements, which were factual statements, but that they did not believe them, that they were not true, they had no contradictory evidence or allegation of contradictory evidence that was submitted.

What they have is confidential witnesses who have no contact with them, who were relatively low-level people, who on an isolated basis raised issues about the coding practices.  That's not enough.  It didn't get to the CEOs who made the statements.  Must-have-known allegations don't work.  The mere fact that there's a government investigation, well, United is entitled to say we disagree; there's no basis for the investigation.  We've actually litigated with the Department of Justice, and so far we've prevailed on this very topic.

THE COURT: Do you make any distinction between -- let's look at those comments that were made in part of the litigation -- right? -- that are cited to, like a brief; right? There are some of the alleged misrepresentations that come straight out of a court case.

Do you make any distinction between those statements and the -- the statement that you made a minute ago that United follows coding -- the coding practices of CMS? Do you make any distinction between the lawyer's statement in that case and the statement here today?

MR. GIUFFRA: Well, the mere fact that a lawyer made an assertion in court is not -- is not particularized facts. Again, it's got to be -- the key to the PSLRA with respect to scienter is you've got to show that the speaker, the person who made the statements, made the statements with, in this circuit, severe recklessness.

They have not pled, well, Mr. Witty or Mr. Hemsley were aware that what they were saying wasn't true; that they actually were being told that the coding practices were pervasively wrong. Okay? They -- they don't have a single piece of evidence that -- or single allegation like that. And that's the problem, and that's the missing link in their complaint.

They've got to show that the people who were making the statements were -- were aware of contrary information,

and that's -- that's -- that's black-letter post -- you know, PSLRA law, and they have nothing like that. They're left with they must have known, or they're left with this argument that it was so pervasive. But then what they do is they play a game and they say, well, it's $20 billion, and then they turn it into income. And, obviously, there's a difference between revenue and income.

And we're saying, if you look at their own data from *The Wall Street Journal*, it's .95 percent, which is damn good. You know, 99 percent, no issue. And, actually, the number's lower because people can have -- you know, you have this symptom; you have that symptom. And people don't do follow-up -- they don't get follow-up treatments, and particularly when you're serving -- in the case of United in 2024, we served 575,000 low-income people and 539,000 in rural areas. And those folks are disproportionately not getting the follow-up treatment, and that's part of the .95 percent.

The only way you'd be able to establish that the coding was wrong would be to actually get the medical records for each person individually and go through it. And we're talking about literally, you know, millions and millions of records to look at, you know, more than a billion coding decisions.

So when you look at where the case stands, again,

they have no confidential witness who's interacting with the CEOs. You have must-have-known allegations, which is clearly an indication that they don't have what they really need, because if they had it, they wouldn't say must have known. I think the fact that the government investigation -- which in and of itself, when the government investigation is inconclusive and nothing's happened yet -- and United has been -- the investigations of United with respect to coding practices, literally since the start of the class period -- and we've literally said, yes, there is an investigation. Investors know about them.

But the mere fact that there's an investigation is not enough to establish that the company's executives were acting with scienter, and the company's executives have the right -- and the company has the right -- to dispute that they've done anything wrong. There's been no finding.

And then the other thing they rely upon, other than *The Wall Street Journal* and the government investigations, is executive departures. And the Eighth Circuit has repeatedly said you can't -- you can't -- you can't infer scienter from the fact that an executive left. And in this case, you have missed earnings. There's no question about that. We don't disagree with that.

And there were warnings about why the company might miss earnings, and it missed earnings. But a bad business

result or missing earnings is not securities fraud.  You've got to -- again, this is the one area of federal law where Congress has prescribed what -- how you get to pleading and how you deal with motions to dismiss.

The other thing they rely upon is the so-called core operations doctrine, but in the cases where that's been followed, it's, like, been, you know, an overwhelming part of the business, and it's never been adopted by the Eighth Circuit.  So what they are missing, Your Honor, is they don't have particularized factual allegations indicating that the most senior executives of United, the people who are making the statements, were on notice that there was some pervasive upcoding.

At best, they have notice that there were these *Wall Street Journal* articles, which United, as was its right, objects to strongly, has publicly said we think they're wrong.  We think the methodology is wrong.

THE COURT REPORTER:  Hold on.  You have to slow down.

MR. GIUFFRA:  I'm sorry.

THE COURT REPORTER:  "We think the methodology is wrong."

MR. GIUFFRA:  We're entitled to say that the methodology that *The Wall Street Journal* employed was wrong, and the mere fact that *The Wall Street Journal* employed a

methodology, which we think overstates the extent of the so-called upcoding, doesn't mean that if you say we think there's no upcoding, that that's securities fraud.

Now, again, if you look at the statements that they focus on, they've got, you know, very generic statements about the HouseCalls program. Those are not actionable.

They cite statements like -- and this is at paragraph 297 -- that the company's revenue increased in the third quarter of '21 because more individuals are served through Medicare Advantage. Okay. They don't allege that that statement was false. Accurate statements are not false.

Then they spend a lot of time saying, well, you made these -- you made these statements about denials, but a denial is not -- is not actionable. Companies are allowed to contradict and dispute allegations that are made against them.

And in this case, again, there may be investigations, but there's never been a finding by the Department of Justice or any court that United has engaged in any improper upcoding. And, again, the only court finding was in the *Poehling* case where the magistrate has recommended no finding.

The other thing they try to do is they say, well, you know, when you describe the investigations, you describe

them, yes, at the start of the class period, but you didn't describe a change in the investigations.  And that kind of a change in a government investigation -- which, again, we're only sort of receiving -- you know, you get a subpoena or you get a new request; companies don't do updates every day about, like, you know, this is the latest development in the Department of Justice investigation.

And then there are other matters, Your Honor, which I'm happy to talk about, if you would like me to.  You know, I think -- obviously, I think we think that they have these five unconnected theories, which are, basically, every bad act that's been alleged in the press about United over four years, and that's why they amended the complaint five times.

But they've gotten nursing home hospitalization issues.  They don't plead any scienter.  That's out.

They've got the Change merger.  Again, they don't plead scienter and they don't have loss causation.  And in that case, the federal judge who looked at the allegations rejected them.

Then they have this monopolist claim, and what they do there is cite, you know, very generic language from the company's code of conduct.  So I think --

And then on the portfolio refinancing transactions, they don't dispute that they were disclosed to the market.

They just say that they were used to somehow, you know, help the company meet earnings.  Well, this is not a derivative action.  It's not a fiduciary duty claim.  If you fully disclose what a transaction is or is not accomplishing, there's no fraud.

So I think the guts of this case -- and Your Honor hit it directly from the get-go -- is, you know, have they established a material misstatement with respect to the so-called upcoding allegations and have they established scienter?  And we think that they -- they have.  The fact that they are ultimately left with must-have-known allegations demonstrates that that's not enough.

And the other thing that they cite are trading by the executives.  And what they don't really highlight is that Mr. Witty from the start of the class period had 70,000 UnitedHealth shares and ended the class period with 349,000.  So he bought -- increased his ownership.

Mr. Thompson, who is the deceased former executive, he was at 17,000 and went up to 32 by the end of the class period.

Mr. Hemsley did go down from 1.7 to 1.1, selling over time.

Executives sell stocks because that's their compensation.  And like anyone who's smart with, you know, their finances, they want to be diversified.  There's

nothing wrong with that.

And the Sixth Circuit -- excuse me.  The Eighth Circuit in the *Target* case said a sell of up to 32 percent of the executive stock was not inherently suspicious, and there's no allegation here that the sales here are at that level.

So we think, Your Honor, that you should dismiss the allegations of the complaint.  It's long on allegations from the press.  It's very short on the kinds of particularized factual allegations that are necessary in order to pass the PSLRA bar, particularly when one looks at scienter.  And then on the actual statements, they're either -- you know, they're either puffery statements, generic statements, general statements, or denials of government investigations.  And companies are allowed to deny government allegations.

And I would just end with one last point.  There are two cases that we cite in our complaint -- I mean, in our motion papers that I think are important to just give the Court a sense for.

In the *UBS* case, which is a case from the Second Circuit that I worked on, you had a -- more than a hundred-billion-dollar stock drop.  You had a DPA.  You had a 550-page complaint.  The case was dismissed at the District Court level and affirmed on -- by the Second Circuit.

And the *Danske Bank* was a case involving anti-money laundering, and there were $230 billion in anti-money laundering, and the Court dismissed it, and it was affirmed on appeal.

So these cases require certain types of allegations. And the plaintiffs have not made them in this case, and the Court should dismiss.

Thank you very much.

THE COURT:  Thank you.

So that was not 15 to 20.  So I'll make sure you have an equal amount of time.  So as you're trying to figure out how much to split this up with Mr. Gephart, I will conclude your arguments at about 11:25.

MR. HENSSLER:  Thank you, Your Honor.  And, again, Bobby Henssler from Robbins Geller for the plaintiff, CalPERS.

Your Honor, this case is about a pattern defendants can't deny:  fraud, cover-up, collapse.  Three facts confirm that this is, in fact, securities fraud.

The government watchdog's findings, from day one, there's that OIG report.  Second OIG report, the watchdog says they took billions for diagnoses no doctor treated. The OIG said either these diagnoses are false or patients didn't get necessary medical care.  The OIG said this was wrong.  That's Exhibit 8 to our complaint.

Fact 2 that confirms this is securities fraud, Your Honor, the $7-billion cover-up.  When the CMS V28 reforms threatened --

THE COURT:  Why don't we address, kind of -- the focus I have so far, if there's -- the best allegations you can point to in the complaint that shows scienter for the upcoding allegations.  Let's start with that.

MR. HENSSLER:  Happy to, Your Honor, and there's a mountain of evidence.  We heard him stand up and say we need the individual medical records.  Of course, we can't get those; right?  So that's the standard that they want to hold us to.

A mountain of evidence here.  Your Honor, the OIG notice, day one of the class period, the OIG report from October of last year, finding that they committed fraud. Policy and infrastructure that this scheme required, Your Honor.  We're talking about every single aspect of the company, thousands of employees, doctors -- remember, they controlled 90,000 doctors in America, 10 percent of our country's physicians -- describing in granular detail the fact that they were pressured to apply codes.

Nurses, same thing.  Thousands of times per year going out -- actually, millions of times per year -- on those HouseCalls visits.  Your Honor, that's policy and infrastructure.  That doesn't happen by accident.  The size,

8.7 billion in a single year.

THE COURT: Right. But I think that the thing I'm struggling with here is that you have statements that acknowledge, to some degree -- I don't think they use the word pressure. But they acknowledge the benefit or the value or at least attribute some value to having undiagnosed or underdiagnosed diseases, diagnosed through those -- the training and the nurses and the nurse visits.

So you have, I think, then -- it's not enough to say that -- that nurses felt pressure to follow this -- this -- or were trained to follow a certain practice; right? I think there has to be something beyond that. There has to be some allegations that -- that the speakers of these statements knew what they were saying wasn't true; right?

The severe recklessness standard when you're alleging a cover-up, I think, has a requirement that the complaint be very clear about the cover-up; that the speaker knows this is a cover-up. Right?

And so where are those allegations, or do you disagree that that's what's required when you're alleging a cover-up?

MR. HENSSLER: Well, under *Tellabs*, the Supreme Court -- of course, we've got to consider all the things together holistically, is the word the Supreme Court uses.

But, Your Honor, we have those facts.  The policy -- companywide policy is what's required.  That doesn't happen by accident.  It comes from the top.

THE COURT:  Right.  But if there's a legitimate reason for the company policy -- right?  For example, they have determined that there's underdiagnosed diseases or preventative care, actually, is not just better for the patient, it's also better for the insurance company; right?

So if you have some legitimate basis for a policy and your complaint is alleging that that legitimate basis is purely a cover-up, then I think that has to be the allegation when it comes to scienter; that the speaker knows it's a cover-up.

So which paragraphs say that?

MR. HENSSLER:  Your Honor, there's not a legitimate basis.  That's the allegation.  This -- this HouseCalls is a fraud machine.

THE COURT:  Okay.  That's your point.  So you're saying, then, that there was nobody who benefited from the company policy --

MR. HENSSLER:  Exactly.

THE COURT:  -- to diagnose -- so that statement, "one out of four people otherwise would not have been diagnosed," that statement, your -- the complaint is saying that it wasn't one out of four at all.  In fact, it's zero

out of four.  It's zero out of a million.

MR. HENSSLER:  That's just a cover-up, Your Honor.  The whole purpose of HouseCalls is -- this fraud machine -- is to scoop up diagnoses so they can steal money --

THE COURT:  No, I understand the theory.  What I'm saying is what paragraph in the complaint says that the speaker who said one out of four knew that that was a lie -- knew that was a cover-up; that it's actually zero out of 40 knew it.

MR. HENSSLER:  It's the facts collectively, Your Honor.  It's the facts holistically.  And, Your Honor, I think one of the most powerful facts --

THE COURT:  What's the best paragraph in the complaint for me to look to that says this speaker -- pick one.  I don't care.  Pick one -- and say which is the best paragraph that shows that speaker knew that this was a cover-up and not true?

MR. HENSSLER:  Well, why don't we talk about the cover-up transactions, Your Honor.  So late 2024, internally the company is in crisis; right?

THE COURT:  You're talking about the end-of-year transactions on the portfolio refinement?

MR. HENSSLER:  They're about to miss for the first time in 15 years.  Investors -- Wall Street set their watches to this company making the numbers.  Sixty quarters

straight.  They start having a fire sale on the last days of the year.  They sell off 3.3 billion in assets to hide the impact that V28 is having on their business.

Mr. Witty had assured investors V28 would have no earnings impact.  But, like I said, they're about to miss, and they craft those 3.3 billion in assets sales.  They instruct the private equity firms that they can't discuss those deals even after they're disclosed; right?  Deceptive intent.

The CEOs, Mr. Witty and Mr. Hemsley, signed the 10-K where they misleadingly talked about some aspect of those deals, Your Honor.  They said those were going to enhance growth.  Well, that's a lie.  On the kill, you can't say one thing, hold back another.  That's a half truth.  It was misleading.  It was false.

The purpose of those deals was to conceal the impact that V28 was having and they knew it was having, and they knew it was going to have that impact because they had that internal analysis showing V28 was going to destroy their margins.  And that's just what happened.

So July 29th of this year, they admit V28 actually has an $11-billion impact, and they abandon those transactions altogether, Your Honor.  They walk away from 3.65 billion in profits, Your Honor, on July 29th; abandoning those deals, while they simultaneously disclose

their earnings have collapsed by 50 percent.

Your Honor, that doesn't make any sense; right?  It's economically illogical to walk away from 3.65 billion in profits while you're in the middle of this financial crisis. And, Your Honor, it's not just us saying that was fraud. Financial analysts said it was fraud.  Deutsche Bank said these transactions reflect an increasing reliance on financial engineering.  That's -- that's not a secret code. That phrase, we all know what it means; right?  It's fraud. Other analysts said these were manufactured earnings. Others said earnings management.  That is fraud.

Your Honor, the other evidence on the upcoding, analysts understood what had happened.  When they revealed their declining numbers in April of this year, financial analysts said it confirmed they had been upcoding, overearning, overcharging.  They called it fraud.  So you don't have to take my word for it.  That's what financial professionals, whose job it is to listen to everything this company, said.

And back to the upcoding, Your Honor.  So the QuantaFlo device -- right? -- so it's not even FDA approved. They insist every single --

THE COURT:  Does the complaint allege what percentage of false positives come from the QuantaFlo device?

MR. HENSSLER:  It does not.  But it's not FDA approved.

THE COURT:  Right.  Does the complaint quantify how much it misses by?

MR. HENSSLER:  Well, actually, Your Honor, yes, there's notices talking about that they've never seen it come back positive; that they -- on further testing, these folks do not have peripheral artery disease.  Remember, doctors explaining --

THE COURT:  All right.  So I just want to -- again, I'm focused on what the allegations are in the complaint because I think that's what I'm required to do under the standards that I have to apply.  You may have additional arguments, financial analysts over here.

I'm focused on the paragraphs of the complaint.  So what does the complaint say about how frequently that is a false positive result on that device?

MR. HENSSLER:  Your Honor, so there's allegations from nurses, both named nurses in *The Wall Street Journal* articles, and the STAT News article, as well as confidential witnesses talking about the fact that it was a false positive machine, that on further testing, that nobody was coming back.

THE COURT:  So it's always wrong?

MR. HENSSLER:  That's what --

THE COURT:  You're saying that there's allegations either in the complaint or in the attached documents that say that that -- every positive result from that device was incorrect?

MR. HENSSLER:  That's what witnesses have said; so that's the evidence in the complaint, yes, Your Honor.

THE COURT:  All right.  So then doesn't the complaint also have to have some statement tying that to the people making -- the speakers of the statements?

MR. HENSSLER:  No.

THE COURT:  And if so, where's that paragraph?

MR. HENSSLER:  It doesn't, Your Honor. Recklessness under -- even under their case, this *Kushner* case they cite, recklessness is shown --

THE COURT:  Severe recklessness?

MR. HENSSLER:  Yep.  Where they, quote, "ignored obvious signs of fraud."  They ignored obvious signs of fraud here, Your Honor.

THE COURT:  Well, don't you have to allege that they knew about it to allege that they ignored it?  How do you ignore something you didn't know about?

MR. HENSSLER:  Of course they knew about it.

THE COURT:  Okay.  Where's the paragraph that says the speaker of whatever misrepresentation knew that QuantaFlo, in fact, was always wrong or knew of nurses who

believed that?  Where is that statement?  Where is that paragraph?

MR. HENSSLER:  So, Your Honor, you have to consider the facts together and make --

THE COURT:  I'm asking you to tell me the best paragraph you can point to that shows the speaker had knowledge of the rate at which this device returned or yielded a false positive result.

MR. HENSSLER:  So, Your Honor, it's the evidence that they get 1.5 billion from peripheral artery disease.

THE COURT:  Is there any paragraph in the complaint that alleges any speaker knew about the QuantaFlo device?

MR. HENSSLER:  It's the plausible inference, Your Honor.  They had to buy tens of thousands of these devices, order the nurses to use them on every single HouseCalls visit.

THE COURT:  Where in the complaint does it talk about how many QuantaFlo devices were ordered and how many -- how much they pressured nurses to use that specific device?  What are those paragraph numbers?

MR. HENSSLER:  So the facts alleged plead that every single HouseCalls nurse had to use the QuantaFlo device.  That's both *The Wall Street Journal* and the STAT News discussing the QuantaFlo, as well as from some of the

former employees we've described as confidential witnesses saying the same thing; that every single HouseCalls nurse was required to use QuantaFlo on every single visit. As you know, they did millions of HouseCalls visits per year.

So the company had to procure -- had to buy tens of thousands of these devices that are not FDA approved -- and, actually, the FDA says you shouldn't even be using these for PAD testing, for peripheral artery disease testing.

So, Your Honor, the plausible inferences that, yeah, given the OIG notice from day one in the class period, that this is a fraud, and the fact that they're buying tens of thousands of these devices is that, of course, these executives knew. Mr. Witty, he signed the 10-Q where every quarter they talked about how they're making their Medicare Advantage revenue. He said it was because of sicker members. The reality was it was because of this massive upcoding scheme.

And, Your Honor, the -- defense counsel spent a lot of time talking about materiality. So I will address that for the Court. *ConAgra*, from the Eighth Circuit, which we cited a number of times, holds three things that end the materiality analysis, Your Honor. Net income is the proper comparison. Eight percent of net income in *ConAgra* was held to be material. We've alleged 50 percent of net income here. And third, materiality should rarely be granted on a

motion to dismiss.

Your Honor, the way the Medicare Advantage program works confirms what *The Wall Street Journal* said. Remember, it's *The Wall Street Journal* that compared to net income, not us. But under Medicare Advantage, it's higher revenue because the patients are presumably sicker. But here, 8.7 billion under *The Wall Street Journal*'s analysis for medical conditions, no doctor treated. So this is pure profit, extra revenue, no extra care costs. That's why *The Wall Street Journal* compared to net income.

They just dispute the facts alleged, Your Honor. And the total mix standard, of course, under *Matrixx*, the Supreme Court, if investors knew in 2021 that 8.7 billion came from diagnoses no doctor treated, that it was exposing the company of these criminal investigations, of course, investors would have cared.

And the proof is in the pudding, Your Honor. When the truth was revealed through the partial corrective disclosures, the stock collapsed by 50 percent, and that's *KV Pharmaceuticals* from the Eighth Circuit we cite at page 38. The stock drop is strong evidence that the information was material.

Your Honor, other evidence confirming scienter here, the executive departures, they lied. They lied about the reason Mr. Witty was leaving the company. So April 17th of

this year, they missed for the first time in 60 quarters, in 15 years, slash GPS estimates. Mr. Witty says, we can fix this in 2025, this year. Less than a month later, they pull guidance. So they tell investors you can't rely on our numbers at all, and they say Mr. Witty is leaving effective immediately for personal reasons.

Well, we know that's a lie; right? The *Star Tribune* immediately said according to UnitedHealth employees that's a cover story. One day later, *The Wall Street Journal* reveals the criminal investigation into the same exact conduct, and then two weeks after that, they canceled Mr. Witty's compensation package. They canceled his stock grants.

Companies don't do that to CEOs who are retiring or leaving for personal reasons. Why lie if he's leaving for some innocent explanation? The false cover story, Your Honor, it confirms deceptive intent. It's classic evidence of scienter even under their own case, that *Hertz* case that they cite over and over again.

And it's not just Mr. Witty. Just a couple months after he supposedly resigns for personal reasons, they pushed the CFO out as well, just two days after they admitted the truth about V28 and admitted the truth about those cover-up transactions, the fact that they were abandoning 3.6 billion in cover-up transactions that day.

So, Your Honor, it's no coincidence that the CEO and the CFO are pushed out within months of each other at the same time that this criminal probe is revealed. And then the company finally admitted the criminal probe.

And we're not saying that these government investigations are the reason that the Court can infer scienter. Your Honor, it's their response, it's their deceptive response, to these investigations. So when *The Wall Street Journal* reported the fact of the investigation, Your Honor, the company -- it causes stock drop. The stock dropped.

The company ran out and immediately called *The Wall Street Journal* misinformation. They called *The Wall Street Journal* fake news. At the same time, Your Honor, we've included an email in our complaint where one of the top lawyers at the company had already retained Latham & Watkins. He's reaching out to former employees to try to get them to lawyer up with Latham & Watkins.

That's a lie. Why are they lying about the fact that there's an investigation? It's deceptive intent. They're doing it to try to prop up the stock price -- right? -- to try to get investors to stop selling the stock. And then timing, just months later they admit the fact of the investigations. Why lie to investors if they're innocent.

Your Honor, the insider trading, this is a slam-dunk

smoking gun.  Okay.  So paragraph 230 -- a picture is worth a thousand words.  If Your Honor doesn't have the complaint, that's okay.  I'm going walk through it for you.

THE COURT:  I have it here.

MR. HENSSLER:  So paragraph 230, please do take a look at that picture.  Timing is everything; right?

So October 10th they're on DOJ notice.  Seven days later, what does Mr. Hemsley do?  He dumps 65 million bucks of his own stock.  Over the next four months, he sells over a hundred million of his own stock while he's keeping that information secret from investors.  No trading plans.  No blackout periods.  Your Honor, that's classic insider trading on material nonpublic information.

Again, you don't have to take my word for it. Professor Coffee at --

THE COURT REPORTER:  Hold on.  You need to slow down.  "Professor Coffee" --

MR. HENSSLER:  Thank you.  I apologize.

Professor Coffee at Columbia, defense expert, corporate governance expert, he said those trades should have been barred.  He sort of, ironically, said apparently this didn't happen.

Congress referred them to the SEC, said that trading pattern was disturbing.  That chart in paragraph 230, a picture is worth a thousand words.  That's scienter,

Your Honor.  That's classic scienter.  Insider trading.  That's securities fraud.  Look at what they did.  If you're looking at the chart, they knew, they traded, they concealed.  And when *The Wall Street Journal* revealed the fact of that DOJ investigation, the stock crashed, so they cashed in.  They made money while investors, our clients, CalPERS, were buying on the other side of those trades.

Your Honor, the -- it's not just HouseCalls.  So back to the doctors that are employed by UnitedHealth, 90,000 doctors.  This doesn't happen by accident.  Dr. Baumgaertel, for example, she blew the whistle.  She put her name to these allegations.  She explained that her and her colleagues were pressured by UnitedHealth to add codes that were inappropriate, that shouldn't have been applied.  Other doctors said the same thing, said they -- claimed that the -- or stated and testified that this conduct was completely improper.

You think about what those doctors are doing, Your Honor.  They're, essentially, putting their medical license at risk by explaining what UnitedHealth required of them, and they also described the real human consequence of the UnitedHealth policies.  There were seniors calling in to physicians saying, "What is this?  I've got peripheral artery disease?  You never told me about this."  How terrifying that had to be for these seniors.

And Dr. Baumgaertel, to her credit, would say to those seniors, "Look" --

THE COURT:  So the false positives you were saying, it's a hundred percent of the time?

MR. HENSSLER:  There's testimony from witnesses both in the --

THE COURT:  That's what you recollect of the complaint?

MR. HENSSLER:  Yes, sir.

THE COURT:  Okay.  Well, I want to make sure you have time to address everything you wanted to address.  But I am concerned a little bit about if we move to the acquisition of Change Health, one or more of these statements are from briefs written by attorneys.  Is there some argument that an attorney in a brief to the Court is -- that a company or -- I guess the attorney, who's the speaker in this situation, even though they're not a party to the lawsuit here, so -- but assuming that the main party is the same person who said the thing, the attorney is now a party, are you saying that that can be securities fraud?

MR. HENSSLER:  That's correct, Your Honor.  And --

THE COURT:  So the statement in Mr. Giuffra's opening argument, that United follows coding practices of CMS -- I understand it's a different issue.  One is about upcoding, and one's about the -- in the briefs that you cite

as misrepresentations are regarding the acquisition of Change. But it's the same in the sense that it's an attorney making a representation to a court. Are you saying that Mr. Giuffra committed securities fraud?

MR. GIUFFRA: I -- well, for the securities fraud, as the Court knows from the briefs, we need a false statement, we need intent, and we need causation. So --

THE COURT: I guess I'm just concerned. Is there a case where you can point to a court concluding either at the motion to dismiss stage, summary judgment stage, trial stage, that a statement in a brief, a legal brief to a court, that constitutes security fraud? Is there any case you can point to where that's happened?

MR. HENSSLER: Your Honor, I don't have that case off the top of my head, but what I can tell you from the complaint, there's a footnote that we pleaded where we describe that -- you know, this is a $13-billion acquisition, the biggest acquisition UnitedHealth has ever made. Analysts and the investing community are hyperfocused on whether this acquisition is going to be completed.

And they're following the DOJ litigation very closely. Market commentators are writing about it on an almost daily basis and reporting on all of the comments that UnitedHealth is making, both in press releases and 8-Ks about the acquisition, as well as in the litigation. So,

yes, this -- that shows that investors were concerned about it, that it mattered to investors. So that's proof of materiality, Your Honor, at this stage.

And then the other -- what makes it securities fraud is when *The Wall Street Journal* reported the fact of the investigation into the firewalls in February of 2024 and we had that big stock drop, significant stock drop, that's causation. Analysts linked it back to the fact of whether other -- are there other firewalls here, and that is what we're alleging with regard to the statements about the firewalls.

And one other point, Your Honor, the -- the -- you know, they -- they say in their briefs and you heard counsel say again today, oh, you know, the judge looked at this, nothing to see here. We specifically allege in the complaint that we plead facts that were not presented to the court in the Change trial. Your Honor, it's paragraph 209. And it's 209 to 215.

Quote, "These facts were not presented to the Court," close quote, at the Change trial. So that's what differentiates. And, you know, I'm sure that judge would have liked to see those facts.

THE COURT: All right. Mr. Gephart's turn.

MR. HENSSLER: Thank you so much, Your Honor.

THE COURT: Okay.

MR. GEPHART:  Good morning, Your Honor.  I'll try to be brief.  I'd just like to take a moment to discuss certain materials that were attached to defendants' briefings; namely, plaintiff's objection to the proxy statement and the three forms for -- that were attached to defendants' motion to dismiss at page 36, Footnote No. 9.

There were four articles that were cited by but not attached to defendants' motion to dismiss at page 13 and Exhibit A, which was a surprise exhibit that was attached for the first time on reply.

Your Honor, plaintiffs have not incorporated any of these materials into their pleadings, and defendants never formally requested additional notice.  But, more importantly, defendants are using all of these materials for the truth of the matter asserted.  And the Eighth Circuit is clear in *EOG Resources* and other cases, the Eighth Circuit has held that judicial notice is inappropriate when documents are offered for the truth of their content and where that content is in dispute.

Exhibit A, as I said, appeared for the first time on reply.  We never had a chance to object to its inclusion or to the arguments that defendants used to advance, and the arguments are also appropriate, Your Honor.  They use it to advance a truth-on-the-market defense, which courts nationwide have determined is inappropriate to consider at

the motion to dismiss stage.

And I'll just end briefly, Your Honor, on a 12(b)(6) motion, defendants are required to accept our allegations as true and not substitute their own facts using documents that plaintiffs have never incorporated.

So we respectfully request that the Court disregard these materials.

Thank you very much.

THE COURT: Just a minute. Just a minute.

Okay. Thanks.

MR. GEPHART: Thank you.

MR. GIUFFRA: Thank you, Your Honor.

Let me just start with, I think, the key point here. The Sixth -- the Eighth Circuit has made it quite clear that plaintiffs have to show that the defendant had, quote, "contradictory information when making the statement," and that's the *Kushner* case from 2003.

Your Honor repeatedly asked plaintiff to identify a paragraph in the complaint showing the contradictory information was provided to the two CEO defendants, and he was unable to do so.

With respect to the CMS and the OIG reports, again, the CMS said, quote, "OIG did not conclude," quote, "'the diagnoses are not accurate.'" And that's Complaint Exhibit 13 at 23.

With respect to policy and sort of assuming things from policy and a smattering of confidential witnesses, again, that's not contradictory evidence presented to the CEOs.

With respect to the undiagnosed conditions, it's United's position that the company's processes and coding processes actually do promote good outcomes. We have a 99 percent success rate. We serve a lot of low-income and rural communities.

The company's policy and -- you know, somehow to say that we think coding is good, that in and of itself does not state securities fraud. There's a legitimate basis that's been put forward why it works, and we think the HouseCall program works.

The claim about how one in four people are not diagnosed, well, there's no -- you know, that aren't diagnosed, maybe they wouldn't have been diagnosed without the HouseCall program, there's no allegation that that statement was false and certainly no allegation that the people who made the statement thought it was false.

With respect to the portfolio refinement transactions, again, those were fully disclosed to the market. It's possible an analyst called them financial maneuvering, but that doesn't make it fraud. What matters is it was disclosed to the market, and there's no question

about that.

With respect to changes in CMS policy, the company -- and this is at the Magnuson Exhibit 8 at 18 -- warned investors, quote, "substantial revisions to CMS risk adjustment model could result in reducing funding."  And that's what happened, and it was fully disclosed again to the market.

With respect to the QuantaFlo device, again, nothing in the complaint quantifying the use of that and certainly no allegation that the CEOs knew about it.

THE COURT:  Well, I think there is at least one that I found; a reference in paragraph 97; studies showed that the device gave false positives 10 percent of the time. There's a reference to five doctors who say, quote, "Some of the QuantaFlo diagnoses were nearly useless."  But that's different than what I think Mr. Henssler was saying in his argument.

The question -- the reason I'm asking you this is I'm trying to understand if -- what percentage of false positives is enough to render false this representation, alleged misrepresentation, and then also where in the complaint does it allege that the speaker had knowledge of that?  It's a very specific point in the middle of a haystack of facts, but I'm wondering if you have anything to shed -- any light to shed on that.

MR. GIUFFRA:  I think I make two points.  One, 10 percent is pretty good if you're right 90 percent of the time.

Second, critically, they don't have any allegation that the people who made the statements knew it was even 10 percent false positives.  So false positive on a new medical device would be a -- 10 percent would be pretty good.

On the insider trading allegation, with respect to Mr. Hemsley, I would urge the Court to look at paragraphs 229 to 230 because they say, well, he sold the stock before -- one week before high-ranking personnel were notified of the DOJ subpoena.  So after the DOJ subpoena they would maybe be closer to having something, but he sold before.

THE COURT:  What do you make of that chart that a picture's worth a thousand words in paragraph 230?  It does show, you know, the drop in -- relative to the timing of -- of certain sales by at least those two individuals.

MR. GIUFFRA:  I don't think it really tells you anything because they're not able to show that the executives had knowledge or information that was contrary to what the market knew when they sold the stock.  They point to things that happened afterward, and they are not able to show how there was knowledge in the heads of the CEO at the

time they sold the stock that -- that indicated insider trading.

The Hemsley one is a perfect example. They said, well, he sold before the subpoena arrived. Obviously, if nobody at the company knew about the subpoena until a week later, there's no inside information that he was in the possession of.

With respect to the revenue, we've talked about this; .95 is not, you know -- $20 million over four years is a lot. But when you're dealing with $2 trillion, it's not a lot. And, again, a stock drop is not enough.

So, ultimately, just to sort of wrap it up, they don't have anything on scienter, which I think is the easy way for this Court to dismiss this complaint. They don't have a single confidential witness who can point to the two CEOs. They rely upon must-have-known allegations. That's not enough.

The mere fact of a DOJ investigation doesn't get them over the line, particularly when United won the *Poehling* case, which was a highly contested case against the Department of Justice on this very issue within the last year.

The mere fact that there's executive departures is not enough. And the fact that someone said, you know, I think I can fix it or, you know, we can get it done, you

know, paragraph 16 of the complaint, they say the reason that Mr. Witty was -- left the company was because he, quote, "committed the cardinal sin," quote close, of missing targets.  That doesn't mean that he was aware of fraud.  He left the company because the company had missed targets.  And that's what they allege in the complaint so we accept that as true, but it doesn't mean he was aware of fraud.

So, Your Honor, we strongly urge the Court to dismiss the case.  They don't have the kinds of pleading of particularized facts necessary to show a strong inference of scienter.

Unless the Court has any further questions, I'm going to sit down.

Thank you very much.

THE COURT:  All right.  Thank you very much.

The matter is now under advisement, and we'll issue an order in due course.

Hope everyone has a good day.  Thank you.

Court stands in recess.

(Proceedings were concluded at 11:35 a.m.)

CERTIFICATE OF COURT REPORTER


I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.


                    Dated this 17th day of December, 2025.


                    /s/ Nancy J. Meyer
                    Nancy J. Meyer
                    Official Court Reporter
                    Registered Diplomate Reporter
                    Certified Realtime Reporter