**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

California Public Employees' Retirement System, *individually and on behalf of all other similarly situated*,

Plaintiff,

v.

UnitedHealth Group Inc., Andrew Witty, Stephen Hemsley, and Brian Thompson,

Defendants.

File No. 24-CV-1743 (JMB/JFD)

**ORDER**

---

Tim Sullivan, TM Sullivan PLLC, Minneapolis, MN; and Darren J. Robbins (*pro hac vice*), Sam S. Sheldon (*pro hac vice*), Robert R. Henssler Jr. (*pro hac vice*), Matthew I. Alpert (*pro hac vice*), Jeffey J. Stein (*pro hac vice*), and Jack Abbey Gephart (*pro hac vice*), Robbins Geller Rudman & Dowd LLP, San Diego, CA, for Putative Class Action Lead Plaintiff California Public Employees' Retirement System.

Peter C. Magnuson, Matthew B. Kilby, and Jeffrey P. Justman, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN; Robert J. Giuffra, Jr. (*pro hac vice*), Jeffrey T. Scott (*pro hac vice*), Matthew J. Porpora (*pro hac vice*), Sullivan & Cromwell LLP, New York, NY, for Defendants UnitedHealth Group Inc., Andrew Witty, and Stephen Hemsley.

---

This matter is before the Court on Defendants UnitedHealth Group Inc.'s (the Company), Andrew Witty's, and Stephen Hemsley's (together, Defendants') motion to dismiss Plaintiff California Public Employees' Retirement System's (CalPERS's) Third Amended Supplemental Consolidated Complaint (TAC). (Doc. No. 171.) CalPERS alleges that the Company and several of its current or former executives violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the Act) and Securities and Exchange Commission (SEC) Rule 10b-5 by engaging in a scheme to deceive investors

and by making materially misleading statements over a four-year period concerning the Company and two of its subsidiaries, Optum and UnitedHealthcare. CalPERS also alleges that the individual defendants, Andrew Witty and Stephen Hemsley (Individual Defendants), engaged in insider trading in violation of Section 20A of the Act. For the reasons below, the Court grants the motion in part and denies it in part.

## BACKGROUND[1]

The Company is a publicly-traded healthcare company headquartered in Minnetonka, Minnesota, and one of the largest corporations in the world by revenue. (Doc. No. 158 [hereinafter, "TAC"] ¶¶ 43, 48.) CalPERS's allegations primarily concern two of the Company's subsidiaries—(1) UnitedHealthcare, the largest health insurer in the United States, and (2) Optum, the Company's medical-services and technology business (*id.* ¶¶ 43, 49, 50)—and the conduct of Witty and Hemsley, both of whom are former or current chief executive officers of the Company and current or former members of the Company's Board of Directors (Board).[2] (*Id.* ¶¶ 44–45.) For its part, CalPERS is the nation's largest public

[1] The Court draws relevant facts from the TAC, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice[,]" such as public SEC filings, stock price history, and industry trends. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

[2] The TAC also implicates the conduct of now-deceased UnitedHealthcare CEO, Brian Thompson. (TAC ¶ 46.) Pursuant to Rule 25(a)(1), if a motion to substitute is not made within 90 days after service of a statement noting the death of a party, "the action . . . against the decedent must be dismissed." The notice of Thompson's death was served in the parties' January 23, 2025 stipulation. (Doc. No. 58 at 1 n.1.) CalPERS did not move to substitute. As a result, the Court dismisses the claims against Thompson pursuant to Federal Rule of Civil Procedure 25(a)(1). (*See also* Doc. No. 175 at 9 n.1.)

pension fund. (*Id.* ¶ 42.) CalPERS purchased the Company's common stock during the putative class period, which spans from September 22, 2021 through July 28, 2025 (Class Period). (*Id.* ¶¶ 1, 42.)

Broadly, and as more specifically set forth below, CalPERS alleges that, during the Class Period, the Company, through UnitedHealthcare and Optum, engaged in widespread, fraudulent, and deceptive schemes in order to maximize revenue and share value, including fraudulently manipulating Medicare Advantage patients' charts in order to extract higher premiums from the government, pressuring nursing homes to minimize hospital transfers, and engaging in anticompetitive activity. CalPERS further alleges that, during this period, the Company made repeated material misstatements to investors about its activities and engineered certain asset sales so that investors would be none the wiser about its schemes. CalPERS alleges that, as the Company's house of cards began to collapse in 2024 and 2025, its stock price nosedived from around $600 per share to less than $300 per share. Finally, CalPERS alleges that, at different times throughout Class Period, the Individual Defendants sold stock based on insider knowledge related to the above-mentioned schemes.

**A. Medicare Advantage Schemes**

Medicare Advantage is a privatized version of traditional Medicare, under which the Centers for Medicare & Medicaid Services (CMS) pays a set fee to private insurers—like, for example, UnitedHealthcare—to provide insurance plans to qualifying senior citizens (Members). (TAC ¶¶ 7, 71.) The government pays a higher set fee to the insurer for Members with certain pre-existing conditions—a so-called "risk-adjustment feature" to

what are otherwise flat-rate or "capitated" payments for each Member. (*Id.* ¶¶ 7, 71–74.) A Member's "risk score" for purposes of setting CMS's annual risk-adjusted flat-rate payment to her insurer is calculated on an annual basis with reference to the diagnosis codes on the Member's previous year's medical chart. (*Id.* ¶ 74.) CMS requires that diagnoses come from either (1) a "chart review"; or (2) a face-to-face visit between the Member and a healthcare provider. (*Id.* ¶¶ 72, 75–76.)

CalPERS alleges that, during the Class Period, the Company made repeated and widespread misstatements in order to conceal the contributions of two Medicare Advantage schemes to UnitedHealthcare's business results: (1) an "upcoding" scheme by which UnitedHealthcare and Optum manufactured or harvested diagnoses from Members to maximize Medicare Advantage revenues; and (2) a scheme designed to reduce nursing home hospitalization transfer rates. CalPERS also alleges that, in late 2024 and into 2025, the Company attempted to cover up the erosive financial impact of later changes to the Medicare Advantage program—which changes were enacted to stave off fraud schemes like the upcoding and transfer-rate schemes—by executing certain "portfolio refinement" transactions. CalPERS's specific allegations regarding these schemes are more fully set forth below.

### *1. Upcoding Scheme*

CalPERS alleges that the Company took advantage of the Medicare Advantage payment structure by pressuring both UnitedHealthcare and Optum employees to engage in "upcoding"—that is, to add more and higher-value diagnosis codes to Members' medical

charts to maximize fees paid to the Company by the government.[3] (*E.g.*, TAC ¶¶ 7–10.) According to this alleged scheme, UnitedHealthcare trained its nurse practitioners in its "HouseCalls" program to visit Members' homes and perform physical assessments—called in-home health risk assessments (HRAs)—geared at finding new diagnoses, "even if they were not medically supported." (*Id.* ¶ 8; *see also id.* ¶¶ 17, 78–81.) The Company required HouseCalls nurse practitioners to use computers with pre-loaded software that was "specifically programmed to recommend lucrative diagnoses" and resulted in unusual diagnoses at rates notably different from UnitedHealthcare's peers. (*Id.* ¶¶ 8, 83–85.) To further increase the number of higher-paying diagnosis codes, the Company also required its HouseCalls nurse practitioners to use unreliable tests and medical devices that were known to regularly result in false positives. (*Id.* ¶¶ 78–81, 83, 92–102, 247–49.) HouseCalls nurse practitioners attended mandatory trainings during which the Company made clear that they were expected to harvest high-value diagnoses from Members; they were incentivized to do so, too, as nurse compensation was linked to the volume and "thoroughness" of their diagnosis coding. (*Id.* ¶¶ 79–80.)

Additionally, Optum managers trained nurses how to add additional diagnosis codes during chart reviews, including relying on "buddy codes" that added more diagnoses based on one diagnosis, and guidance on how to debate with doctors who "challenged medical conditions the Company sought to add to a patient's chart." (*Id.* ¶ 89.) Moreover,

---

[3] The upcoding allegations refer to interviews with seven confidential witnesses who are current or former employees of UnitedHealthcare or Optum. (*Id.* ¶¶ 147–81.)

additional review teams within the Company pressured nurse practitioners to add unnecessary diagnoses to Members' charts during HouseCalls visits, and additional teams of in-house and third-party "risk-adjustment coders" later reviewed the charts to add more or higher-value diagnosis codes, even when "not medically indicated." (*Id.* ¶¶ 103–05; *see also id.* ¶¶ 86–87, 90.) These diagnoses were often wrong. (*E.g.*, *id.* ¶¶ 88, 110–13.)

The Company also pressured and trained Optum physicians to chart more and higher-value diagnoses to "increase payments from Medicare." (*Id.* ¶¶ 8, 16 & n.2, 106–07; *see also id.* ¶ 111.) Optum doctors also had to use charting software that aggressively recommended various diagnoses for Medicare Advantage Members in a manner that was not used for non-flat-fee Medicare Advantage plan patients. (*Id.* ¶ 107.) The Company also incentivized code harvesting by providing lucrative bonuses to physicians who met certain "coding expectations." (*Id.* ¶ 108.)

The upcoding scheme succeeded in increasing the Company's revenues. For example, in 2021, the Company made an estimated $13 billion in additional payments from CMS "as a result of these extra diagnoses, or codes, that made their members seem sicker, relative to people in the traditional Medicare program." (*Id.* ¶ 136.) After a while, however, it drew regulatory and media attention. Starting in September 2021, the Department of Health & Human Services Office of Inspector General (OIG) issued a report entitled, "Some Medicare Advantage Companies Leveraged Chart Reviews and Health Risk Assessments to Disproportionately Drive Payments" (OIG Report). (*Id.*¶ 122 & n.9; *see* Doc. No. 158-15.) The OIG Report did not identify the Company by name but reported that one payer "stood out from its peers in its use of chart reviews and [HRAs] to drive

risk-adjusted payments." (TAC ¶ 123 & n.10.) Also in September 2021, *The Wall Street Journal* (*WSJ*) published an article about the OIG Report, in which it opined that UnitedHealthcare was the payer that stood out in the OIG report as having "received approximately 40% of the questionable payments, or $3.7 billion." (*Id.* ¶ 289.) In the article, the Company refuted any insinuation of misconduct related to its HouseCalls program. (*See id.* ¶¶ 288–330.)

In 2023, CMS began working on a comprehensive overhaul of the Medicare risk-adjustment payment system to "combat widespread coding abuses" of the sort discussed in the September 2021 OIG report. (*Id.* ¶ 132.) The potential changes would remove over 2,000 diagnosis codes and fundamentally restructure payments for chronic diseases. (*Id.* ¶ 133.) The incremental changes—referred to in the TAC as "V28"—would be implemented over a three-year period, culminating in a new risk-score system in 2026. (*Id.* ¶¶ 132–33.)

CalPERS alleges that, starting in spring 2024, several sources began to further reveal the Company's "fraudulent upcoding scheme," to which the Company continued to respond by denying wrongdoing. (*Id.* ¶¶ 16–17.) On February 27, 2024, the *WSJ* reported that the Department of Justice (DOJ) had been investigating UnitedHealthcare in a civil antitrust investigation that included "[M]edicare billing issues, including the Company's practices around documenting patients' illnesses." (*Id.* ¶ 15.) In its annual filing the next day, the Company, which had known about the investigation since October 10, 2023[4] (*id.*

[4] On October 17, 2023, Hemsley sold 121,515 shares of Company stock, his "largest single-day transaction at any time during the Class Period or the Control Period." (*Id.* ¶¶ 230,

¶ 14), continued to characterize its HouseCalls program as legitimate (*e.g.*, *id.* ¶ 315 (stating that "through our HouseCalls program, nurse practitioners performed more than 2.7 million clinical preventive home care visits in 2023 to address unmet care opportunities and close gaps in care")).

Additionally, news of regulators' attention to the Company's practices continued to emerge. On October 24, 2024, the OIG issued a report entitled, "Medicare Advantage: Questionable Use of Health Risk Assessments Continues to Drive Up Payments to Plans by Billions," which, among other things, reported that, in 2023, the Company was paid $3.2 billion in "extra" federal payments for diagnoses from in-home HRAs. (*Id.* ¶¶ 17, 127–29.) That same day, the *WSJ* reported on the OIG's latest report and included quotes from OIG officials calling into question the accuracy of diagnoses and the ability of nurse practitioners to accurately diagnose certain conditions during in-home visits without follow-up laboratory work or X-rays. (*Id.* ¶¶ 130–31.) Senate Judiciary Committee members also took notice of the reporting; they demanded information from the Company about its Medicare billing practices. (*Id.* ¶¶ 405–07.) Then, on February 21, 2025, the *WSJ* reported that the DOJ had begun a "new civil fraud investigation" into the Company, which "examin[ed] the company's practices for recording diagnoses that trigger extra payments to its Medicare Advantage plans . . . ." (*Id.* ¶¶ 240–42.) Finally, on May 14, 2025, the

---

385, 526.) He sold another 66,081 shares on December 5, 2023. (*Id.* ¶¶ 386, 526.) On February 16, 2024, Thompson sold nearly 29,000 shares of Company stock, or 31.4% of his holdings. (*Id.* ¶ 388.) All of these sales occurred before the extent of the civil investigation had been publicly disclosed. (*Id.* ¶ 232.)

*WSJ* reported that the DOJ "is investigating UnitedHealth Group for possible *criminal* Medicare fraud related to its Medicare Advantage business."[5] (*Id.* ¶ 259 (emphasis in original).)

In response to various reports and news stories, the Company continued to publicly defend itself and deny wrongdoing. (*E.g.*, *id.* ¶¶ 317 (quoting an unidentified spokesperson responding to *STAT News* on July 25, 2024, stating in part that the Company "provide[s] training and other practice support to providers because it leads to better care management, coordination, and patient follow-up"), 235–37 (describing the Company's August 8, 2024 public statement responding to the *WSJ*, stating, for example, that "[t]he majority of diagnoses made during a home visit do not result in increased Medicare Advantage (MA) risk adjustment payments"), 239 (quoting a [Company] written statement in a December 29, 2024 *WSJ* article, asserting that its Medicare Advantage practices lead to "more accurate diagnoses, greater availability of care and better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management").) For example, in the October 24, 2024 *WSJ* article about the October 2024 OIG report, an unnamed Company spokesperson took issue with the "misleading, narrow, and incomplete view of risk adjustment data is being used to draw inaccurate conclusions about the value of in-home care for America's most vulnerable seniors in Medicare Advantage," and added that HRAs were comprehensive assessments by highly-trained

---

[5] Throughout this time period, negative news reports about the Company's upcoding continued to be published. (*See id.* ¶ 16 & n.2.)

clinicians that help "identify and drive needed follow-on care for the vast majority of the patients with whom we engage." (*Id.* ¶ 319.) The Company also challenged the *WSJ*'s reporting on the DOJ investigations; it denied wrongdoing or fraud and disclaimed knowledge of any "launch" of any "new" DOJ investigatory activity. (*Id.* ¶¶ 326, 413.) Months later, however, the Company confirmed the civil and criminal DOJ investigations into its Medicare Advantage billing practices. (*Id.* ¶¶ 280–81.)

CalPERS alleges that the Company intentionally made at least twenty-eight misstatements that were materially misleading and meant to deceive investors and to cover up its upcoding scheme. (Doc. No. 172-1 [hereinafter, "Chart"] at Nos. 1–28.)[6] CalPERS points to certain statements by the Company over this four-year period in earnings calls, investor conferences, and earnings reports about the legitimacy, value, and business impacts of UnitedHealthcare's Medicare Advantage programs. (*E.g.*, *id.* ¶¶ 10 (telling investors on September 22, 2021 that "UnitedHealthcare's in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings to ensure our members continue to receive cost-effective, appropriate care"), 305 (quoting a UnitedHealthcare Senior Vice President at the November 29, 2022 annual investor conference as stating that "[w]e expect to complete 2.2 million house calls this year, bringing personalized care into the home to address both immediate and preventive medical

[6] In support of their motion to dismiss, Defendants filed a chart on which they set forth all of Defendants' alleged misstatements that CalPERS set forth in the TAC (Chart); CalPERS agrees that the Chart is complete and accurate. (*See* Doc. No. 172-1; Doc. No. 180 at 19.) For ease of reference, the Court has appended the Chart to this Order and refers to the alleged misstatements as identified in Defendants' chart as "Chart Statements."

care needs in addition to social needs, including access to healthy food, safe housing, transportation and medical appointments and more" and that "[w]e have been testing people for underdiagnosed conditions such as diabetes, prediabetes, hep C and colon cancer" and "what we found is nearly 1 out of every 4 people we screened had a condition[] they didn't realize they had . . ."), 312 (quoting Witty during the November 29, 2023 annual investor conference as acknowledging the "material impact" that the announced changes in Medicare Advantage would have on its business but assuring investors that the Company was "committed to the kind of earnings growth rate over the next 12 months that you would expect from us even if there hadn't been a rate notice cut," because "we spent the last 6 months, reconfiguring our plans for the next year and 2 and 3 and 5 years in response to the change in circumstance," including focusing on how "we can take more cost and efficiency into our organization, and we focused on how we can double down on eliminating waste and unnecessary care in the health system more generally"), 325 (quoting an earnings call comment by the Company's then-CFO John Rex that "we will continue to enhance access and care integration through the home, a much-needed area to help people with their health" and that "Medicare Advantage patients with chronic conditions who receive a home care visit have a lower rate of ER visits, fewer inpatient stays, stronger health outcomes, and a better experience, all while saving the health system billions")).

### *2. Nursing Home Hospitalization Rates*

In a related scheme—also meant to increase profits in its Medicare Advantage business at the expense of patients' medical care—the Company allegedly made secret, lucrative bonus payments to nursing homes that reduced the rate of resident hospital

transfers. (*Id.* ¶¶ 141–46.) A May 21, 2025 article in *The Guardian* broke the news of the scheme. (*Id.*)

CalPERS alleges that the Company made five misleading statements (Chart Statements Nos. 39–43) about hospitalization rates and representations that the nursing homes' lower rates of patient hospitalization represent better health outcomes. (*E.g.*, *id.* ¶¶ 313 (stating that Medicare Advantage patients "were 44% less likely to be admitted into a hospital for COPD or asthma and had a 10% lower rate of admission for stroke or heart attack," "had 14% fewer avoidable emergency department visits," and "had lower admissions"), 314 ("Consumers in Medicare Advantage also experienced better health outcomes across a broad range of measures, including more preventative care visits and fewer hospital visits.").)

### *3. Business Portfolio Refinement Transactions*

CalPERS alleges that, in late 2024 and into 2025, the Company allegedly engineered several transactions to attempt to hide the weakness in its earnings results caused by V28's limitations on its profitable upcoding scheme. (*Id.* ¶¶ 267–79.) Specifically, CalPERS alleges that, "shortly before the books closed for 2024," the Company made "more profits appear[]" by making "discreet sales of stakes in business units" to certain private equity and investment firms. (*Id.* ¶ 268.) Under the terms of the deals, the Company could be required to buy back the interests at a higher price. (*Id.*) The Company insisted that the deals close by December 31, 2024, and not be publicized afterward. (*Id.* ¶ 269.) These deals allowed the Company to book an additional $3.3 billion in profit, mostly in the fourth quarter of 2024. (*Id.* ¶ 270.) The Company disclosed these transactions in its January and

February 2025 filings and earnings calls; it characterized the transactions as "business portfolio refinements" that improved operating costs. (*Id.*)

According to CalPERS, the true purpose of these transactions—to hide V28's negative impact on the Company's earnings—came to light over the following months. On May 13, 2025, the Company announced that it was suspending its 2025 financial forecast and that Witty was stepping down as CEO for "personal reasons," effective immediately; his role was thereafter filled by Hemsley. (*Id.* ¶¶ 415, 465.) Media sources surmised that Witty had been forced out for missing earnings estimates. (*Id.* ¶ 416.) Within months, *Bloomberg* attributed the "portfolio refinement" transactions to an attempt by the Company to shore up its profit margins given the effect of V28's stricter payment policies, and Deutsche Bank published a report concluding that the transactions "reflect an increasing reliance on financial engineering rather than regular operational executions to meet earnings targets." (*Id.* ¶¶ 267, 279.)

Then, on July 29, 2025 (the day after the end of the putative Class Period), the Company announced lower than expected earnings and disclosed "that the V28 changes will cost Optum Health about $11 billion total over three years and that it mishandled efforts to offset that impact," specifying that $7 billion of that V28 "headwind" would be realized in 2025. (*Id.* ¶ 284.) The Company also disclosed that it would no longer use "portfolio refinement" transactions and that $3.65 billion in its 2025 financial outlook downgrade was tied to halting these "previously planned portfolio actions." (*Id.* ¶ 285.) Two days later, the Company announced the removal of its CFO, Rex. (*Id.* ¶¶ 287, 433.)

CalPERS alleges that the Company made five misstatements to mislead and deceive investors about the portfolio refinement transactions. (*See* Chart Statements 44–48.) These misstatements include characterizations of the transactions as "strategic" and "enhanc[ing] growth opportunities" (TAC ¶¶ 323, 327, 330), statements providing earnings guidance in April 2025 (*id.* ¶ 328), and Witty's April 17, 2025 statement that although the V28 change would put downward pressure on its revenues, "we think that an awful lot of the issue that we're seeing early in [20]25, we can fix in [20]25 and help us deliver stronger performance for [20]26," and that "we expect that to then be a kind of ramp into reacquiring our target growth rate momentum that we aspire to as an organization" (*id.* ¶ 329).

**B. Representations Regarding Optum's Firewalls**

In January 2021, the Company announced that an Optum business unit would acquire a major healthcare technology company, Change Healthcare (Change). (*Id.* ¶¶ 11, 190.) Change's business was processing health insurance claims and payments; as a result, its business data included information about the Company's competitors' pricing structures, claims data, and billing practices. (*Id.* ¶¶ 11, 193–95.) In February 2022, the DOJ sued to block the Company's acquisition of Change on antitrust grounds, arguing that, if the acquisition occurred, the Company would gain access to sensitive data that it could wield against its competitors. (*Id.* ¶¶ 12, 197–99.) In response, in July 2022, the Company assured investors that it possessed "internal firewalls that prevent the sharing of competitively sensitive information across business units," and later made similar representations to the court presiding over the DOJ lawsuit. (*Id.* ¶¶ 205, 207, 212.) The matter went to a bench trial and, on September 19, 2022, the court found for the Company

and Optum. (*Id.* ¶ 207.) Among its findings, the court "specifically credited [the Company]'s purported history of maintaining data firewalls and policies prohibiting anti-competitive behavior." (*Id.*)[7]

CalPERS alleges that, in 2022, the Company made eight misleading statements relating to its data security in connection with the Change acquisition. (*See* Chart Statements 29–36.) The statements include a press release by Optum calling DOJ's lawsuit "completely without merit" and touting Optum's "best-in-class firewalls and compliance programs that maintain the integrity of our customers' data and information, and prevent unauthorized access and misuse" (TAC ¶ 333), and similar statements about the sophistication of its firewalls in Optum's answer to DOJ's complaint and litigation briefs (*id.* ¶¶ 334, 337–39) and other public statements (*e.g.*, *id.* ¶ 340).

CalPERS alleges that the Company's representations were false because Optum businesses are able to share data without any "role-based security systems" or technical firewall, and they are not technologically prohibited from using external customer data to benefit those Optum businesses competing with external customers. (*Id.* ¶¶ 13, 209 & n.25, 211–12.) CalPERS also alleges that certain security issues were internally reported after the 2022 trial, as the acquisition was implemented and the companies were integrated in October 2022. (*Id.* ¶ 213 (referring to the "lack of technical firewalls inside Optum business systems").) CalPERS acknowledges that the Company responded by

---

[7] Prior to the trial, on July 18–19, 2022, Witty sold 15,376 shares of Company stock, and on July 26, 2022, Hemsley sold 99,312 shares. (*Id.* ¶¶ 382–83, 526.)

implementing certain technical security measures in its business system applications over 2023 and 2024. (*Id.* ¶ 214.) Another issue—missing "Line of Business" tags to "ensure proper data separation and to control whether Optum or UnitedHealthcare employees can access or view" certain customer data—was reported, and after investigation by the Company's Privacy Team, Optum fixed the incorrect tags. (*Id.* ¶ 215.) CalPERS also points to a security breach of Change's data in February 2024. (*Id.* ¶¶ 216–18.)

**C. Other Anticompetitive Practices**

CalPERS alleges that the Company also abused its market dominance in several ways. First, as the largest employer of physicians in the United States, Optum "engaged in anti-competitive conduct to exert control over the market for primary care providers in certain geographies where competition was particularly strong." (*Id.* ¶ 222.) For example, Optum threatened to cancel hospitals' contracts unless they agreed to stop maintaining their own primary-care provider practices and instead used Optum physicians. (*Id.* ¶¶ 222–23.) Optum also intimidated its own doctors to ensure that they did not leave and work for competitors. (*Id.* ¶ 224.) Second, the Company used its market dominance to "upend and pressure Optum's competitors" and pay its own healthcare provider groups considerably more than non-Optum providers, thereby driving up consumer costs and the Company's profits. (*Id.* ¶¶ 16, 225, 227.) The Company's tactics included incentivizing its in-network healthcare providers to refer patients to in-network physicians. (*Id.* ¶¶ 225–26.)

CalPERS alleges that the Company made two misleading statements related to its anticompetitive behavior. (Chart Statements 37–38.) First, it alleges that, in June 2023, Witty stated that the Company was attempting to "exploit[] the core synergy between

Optum and UnitedHealthcare as much as we possibly can appropriate, of course, given the firewall requirements that are needed there." (TAC ¶ 342.) Second, CalPERS alleges that the Company's publicly available code of conduct stated that all employees must "deal fairly with the Company's customers, service providers, suppliers, competitors, and employees," should avoid unfair-dealing practices, and should comply with fair competition laws, which ran contrary to its own conduct. (*Id.* ¶ 345.)

**D. Instances of Insider Trading**

CalPERS also alleges that the Individual Defendants made several trades in 2022 and 2023 based on material non-public information and that, within one week of each such trade, CalPERS purchased the Company's stock. (*Id.* ¶ 526.)

**E. This Action**

In May 2024, this action commenced. (Doc. No. 1.) In August 2025, Lead Plaintiff CalPERS filed the three-count TAC on behalf of itself and a putative class consisting of all purchasers of Company stock during the Class Period. (*See generally* TAC; *see also id.* ¶ 506.) Specifically, in Count I, CalPERS alleges that all Defendants artificially inflated the market price of the Company's common stock in order to cause investors like CalPERS to purchase common stock by engaging in schemes to deceive and defraud investors and by making misleading and false statements about the Company's business health in order, in violation of section 10(b) of the Act (15 U.S.C. § 78j(b)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5). (*Id.* ¶¶ 512–16.) In Count II, CalPERS alleges that the Individual Defendants exercised their power and control over the Company in such a way to cause the Company to engage in conduct that runs afoul of the SEA and violated their duty to

disclose accurate and truthful information regarding the Company's financial position, in violation of section 20(a) of the Act, 15 U.S.C. § 78t-1. (*Id.* ¶¶ 517–22.) Finally, in Count III, CalPERS alleges that the Individual Defendants engaged in impermissible insider trading, in violation of section 20A of the Act, 15 U.S.C. § 78t-1. (*Id.* ¶¶ 523–28.)

## DISCUSSION

Defendants move to dismiss all of CalPERS's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and for failure to meet the pleading requirements of the Private Securities Litigation Reform Act (PSLRA). Because some of CalPERS's allegations do not meet the applicable pleading standards, the Court grants the motion as to Count III, and grants it in part and denies it in part as to Counts I and II.

Initially, the Court acknowledges the applicable standards for a motion to dismiss. In general, a complaint must present "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A pleading has facial plausibility when its allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In addition, pursuant to the PSLRA, a heightened pleading standard applies to some of the elements of two of the claims raised in the TAC. *E.g.*, *City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 556 (8th Cir. 2021) (imposing a heightened pleading standard to the

misrepresentation and scienter elements of Rule 10b-5(b) claims); *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 826 (D. Minn. 2022) (imposing a heightened pleading standard applies to section 20A claims). Other portions, as noted below, are subject to the more general heightened fraud pleading standard under Federal Rule of Civil Procedure 9(b)—which requires pleading with "specificity"—does. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 980, 986 (8th Cir. 2012) (citing *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006)). At this stage in the proceedings, courts construe the allegations and draw inferences from them in the light most favorable to the plaintiff. *Park Irmat Drug Corp. v. Express Scripts Hldg. Co.*, 911 F.3d 505, 512 (8th Cir. 2018). In reviewing all of the claims, courts consider the complaint as a whole, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Mart*, 595 F. Supp. 3d at 503.

## I. SECTION 10(b) CLAIM AND RULE 10b-5 CLAIMS

In Count I, CalPERS alleges that Defendants violated section 10(b) of the Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. (TAC ¶¶ 512–16.) Section 10(b) of the Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements section 10(b), prohibits the following conduct:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit

> to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Together, section 10(b) and Rule 10b-5 create two distinct private causes of action for securities fraud—(1) a claim premised on a fraudulent or deceptive scheme under Rule 10b-5(a) and (c); and (2) a claim premised on material misstatements or omissions under Rule 10b-5(b) (the more common of the two Rule 10b-5 claims). *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98, 105–06 (2d Cir. 2021); *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455 (2013) ("We refer to claims under Rule 10b-5(a) and (c) as 'scheme liability claims' because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements.").

All Rule 10b-5 claims require proof of the following: (1) scienter; (2) connection between the allegedly unlawful conduct and the purchase or sale of securities; (3) reliance; (4) economic loss; and (5) loss causation. *Halliburton*, 573 U.S. at 267; *Danske Bank*, 11 F.4th at 98, 105. Additionally, Rule 10b-5(a) and (c) scheme-liability claims require proof on the additional element that "the defendant committed a deceptive or manipulative act [] in furtherance of the alleged scheme to defraud." *Danske Bank*, 11 F.4th at 105 (quotation

omitted). A Rule 10b-5(b) misrepresentation claim requires proof on the additional element of "a material misrepresentation or omission" by the defendant. *Meredith*, 16 F.4th at 556 (providing that a plaintiff prevails under Rule 10b-5 "only if the plaintiff suffered economic loss as a result of relying on a material misrepresentation or omission that the defendant made with the requisite mental state"). The PSLRA imposes a heightened pleading standard to the falsity and scienter elements in claims brought under Rule 10b-5(b). *Id.*; *see also* 15 U.S.C. § 78u-4(b); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002). These heightened pleading requirements are intended to foreclose attempts to plead "fraud by hindsight."[8] *Navarre*, 299 F.3d at 742.

**A. Scheme Liability Under Rule 10b-5(a) and (c)**

Defendants argue that CalPERS fails to state a claim for scheme liability under Rule 10b-5(a) and (c). Because CalPERS does not allege sufficient facts, the Court agrees.

In the Eighth Circuit, "a scheme-liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)." *KV Pharm.*, 679 F.3d at 987. The heightened pleading requirements of the PSLRA do not apply to Rule 10b-5(a) and (c) scheme-liability claims; instead, the heightened fraud pleading standard under Federal Rule of Civil Procedure 9(b) does. *Id.* at 980, 986 (citing *In re Parmalat*, 414 F. Supp. 2d at 432). That being the case, in order for CalPERS's scheme-liability claim to

---

[8] In requiring that both misrepresentation and scienter be pleaded with particularity, the PSLRA's pleading standard supersedes Federal Rule of Civil Procedure 9(b). *Navarre*, 299 F.3d at 742; *see* Fed. R. Civ. P. 9(b) (setting forth that a party alleging fraud must "state with particularity the circumstances constituting fraud" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

survive Defendants' motion, the TAC must "specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *In re Parmalat*, 414 F. Supp. 2d at 432; *see also KV Pharm.*, 679 F.3d at 986 (discussing applicability of Rule 9(b) pleading standard to scheme-liability claim and quoting *In re Parmalat*).

Here, CalPERS argues that Defendants engaged in deceptive conduct by implementing two schemes: (1) an upcoding scheme and hospital-transfer incentive scheme that was meant to inflate the Company's stock price (the so-called Medicare Advantage scheme); and (2) a scheme to deceptively conceal the nature of the so-called "portfolio refinement transactions" at year-end in 2024. (Doc. No. 180 at 63–64.)

The Court first considers whether CalPERS sufficiently pleads its scheme-liability claim with respect to its allegations that the Company bolstered share values through the Medicare Advantage scheme. In the TAC, CalPERS makes general allegations—which mirror the language of Rule 10b-5(a) and (c)—that "Defendants employed devices, schemes, and artifices to defraud" and "engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and the Class in connection with their purchase of the Company's common stock during the Class Period." (TAC ¶ 513.) In support, CalPERS "repeat[ed] and reallege[d] each and every" of the preceding 511 paragraphs of allegations. (*Id.* ¶ 512.) CalPERS also alleges that "UnitedHealth, Witty, Hemsley and Thompson engaged in a scheme and wrongful course of business and disseminated or approved the statements specified above" which were "intended to, and did[] deceive the investing public," among other things. (*Id.* ¶ 515.) Further, CalPERS's

brief in opposition to this motion make its theory of liability related to the alleged Medicare Advantage scheme no less general; with reference to several hundred paragraphs in the TAC, CalPERS explains that "[t]he [TAC] details pervasive deceptive ongoing acts that were designed to, and did, artificially inflate [the Company]'s stock price, and defrauded shareholders." (Doc. No. 180 at 62.) Such general allegations—which do not identify which specific defendant performed which specific act or acts and when the act or acts were performed—cannot support a scheme-liability claim. *See KV Pharm.*, 679 F.3d at 985–87 (affirming district court's dismissal of scheme-liability claim where investors made conclusory and general allegations regarding the nature of the deceptive scheme and did not specify committed which deceptive act and when). Thus, to the extent the scheme-liability claim is premised on the alleged Medicare Advantage scheme, CalPERS fails to state its claim with the required specificity.

The Court next considers whether CalPERS sufficiently pleads its scheme-liability claim with respect to the allegedly deceptive 2024 year-end "portfolio refinement transactions." With respect to this alleged scheme, CalPERS's allegations are more descriptive of Defendants' alleged deceptive acts than the scheme-liability allegations concerning the alleged Medicare Advantage scheme. For example, CalPERS alleges that V28 hampered the Company's ability to continue its upcoding scheme and, in an effort to "mask its declining profits," it engaged in "$3.3 billion of 'portfolio refinement' transactions with private equity firms," which were nothing more than "manufactured earnings" to avoid missing year-end earnings estimates, and which "included terms that could require [the Company] to buy back the interests sold at a higher price." (TAC ¶¶ 33,

270, 273; *see also id.* ¶¶ 270–79, 282–87.) The Company initially reported the $3.3 billion in profits under "operating costs"; which permitted it to "report a decline in its operating cost ratio from 14.7% to 13.2%." (*Id.* ¶ 274.) Despite its claims that it "had valid business reasons for the deals," the Company did not disclose the true nature of the transactions until months afterward. (*Id.* ¶¶ 267, 278, 279.)

However, CalPERS's allegations do not implicate any of the specific Defendants. Instead, CalPERS's allegations implicate "UnitedHealth," "the Company," and "Defendants." (*Id.* ¶¶ 33, 34, 35, 270, 274, 278, 284, 285.) Because CalPERS does not specify the role that any specific Defendant had in the scheme, the Court is compelled to conclude that the scheme-liability claim is insufficiently pleaded under Rule 9(b). *E.g.*, *KV Pharm.*, 679 F.3d at 985–87 (affirming dismissal of scheme-liability claim where investors "d[id] not allege what specific manipulative acts either [Defendant] performed, or when the manipulative acts were performed"). CalPERS does allege that, during a 2025 investor call, Witty "acknowledged his awareness of the Company's reliance on these transactions." (TAC ¶ 431.) Likewise, CalPERS alleges that on February 27, 2025, Witty and Hemsley signed the Company's SEC Form 10-K for the fiscal year ending December 31, 2024, on which they reported on the portfolio refinement transactions as follows:

> As a result of continued portfolio refinement, the Company sold other businesses and assets and entered into strategic transactions. These transactions resulted in total consideration received of $3.0 billion and an addition $1.9 billion of equity method investments related to the valuation of our retained interests in certain transactions. The carrying value for these transactions was $1.0 billion, primarily related to goodwill. The gains from business portfolio refinement, including strategic transactions, were recorded within operating costs in

> the Consolidated Statement of Operations and contributed about 80 basis points ($3.3 billion) to the operating cost ratio, nearly half ($1.4 billion) related to Optum Health with the remainder split between UnitedHealthcare ($1.1 billion) and Optum Insight ($800 million). Certain transactions also included various put and call options, which were valued at $630 million and included in other liabilities on the Consolidated Balance Sheet. As of December 31, 2024 the total estimated future obligation under these arrangements if the Company decided or was required to repurchase these interests was up to $3.4 billion.

(TAC ¶ 327.) At most, however, these allegations show only that Witty and Hemsley made alleged misrepresentations regarding the nature of the transactions. The TAC includes no allegations relating to "conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)," as is required to state a scheme-liability claim and survive Defendants' motion. *See KV Pharm.*, 679 F.3d at 987; *Mart*, 595 F. Supp. 3d at 824 (dismissing scheme-liability allegations against defendants for whom investors made only "thin allegations" regarding their knowledge of or involvement in a deceptive scheme).

Thus, the Court will dismiss the portion of Count I asserting scheme liability under Rule 10b-5(a) and (c).

### B. Liability for Misstatements Under Rule 10b-5(b)

Defendants argue that the Court should dismiss the Rule 10b-5(b) claims because the alleged misrepresentations listed in the TAC are non-actionable and because the allegations do not sufficiently plead scienter. Because the TAC contains sufficient allegations only with respect to Chart Statements 44–48, the Court denies the motion as to these statements, but the Court grants the motion with respect to Chart Statements 1–43.

### *1. Actionability of the Alleged Misstatements*

As already noted, to plead securities fraud, the plaintiff "must show that the defendant made a statement that was misleading as to a material fact." *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)). With respect to the requirement that the alleged statement be misleading or false, the PSLRA requires that a complaint "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)). In other words, the plaintiff must plead the "who, what, when, where and how of the misleading statements or omissions." *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 882 (8th Cir. 2009) (quotation omitted). "To meet the falsity requirement, a complaint must not only indicate that false statements were made, but must indicate *why* the alleged misstatements were false when made." *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 887 (D. Minn. 2011) (quoting *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010)) (emphasis added). Plaintiffs must "plead the existence of any facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Navarre*, 299 F.3d at 742. "[I]f no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law." *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir 2002). In addition, a complaint must include allegations of materiality. A factual statement is "material" "when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the total mix of information made available." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1992). Immaterial statements include "vague, soft, puffing statements or obvious hyperbole." *In re K-tel Int'l*, 300 F.3d at 897.

Here, the parties place the alleged misrepresentations into the following three groups: (A) statements relating to the Medicare Advantage scheme (including generic statements, historical data, forward-looking projections, denials of wrongdoing, and statements relating to the portfolio refinement transactions); (B) statements relating to Optum's firewalls; and (C) statements relating to the Company's other anticompetitive practices. Defendants first argue that the statements in each group are non-actionable, or not accompanied by the requisite allegations of materiality or falsity, or both. The Court considers each group in turn.

a. <u>Medicare Advantage Schemes</u>

*i. Generic Statements*

Defendants argue that Chart Statements 3, 6, 7, 10, 11, 20, and 27 are non-actionable because they are too generic and comprise forward-looking puffery. The Court agrees.

A statement that is too generic is non-actionable because a "reasonable investor could not have been swayed by the statement." *Meredith Corp.*, 16 F.4th at 556 (quotation omitted). "[V]ague and optimistic rhetoric that constitutes corporate puffery" fall into this category. *Id.* (quotation omitted). So, too, do "promotional phrases used to champion the company but [are] devoid of any substantive information." *Stratasys*, 864 F.3d at 882 (quotation omitted). Examples of such non-actionable statements include claims of

"uncompromising commitment to . . . customer satisfaction," *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 374 (E.D.N.Y. 2022); characterizing a product as having "unmatched speed, reliability, quality and connectivity," *Stratasys,* 864 F.3d at 882; and statements that a company "understands what its customers want and has a connectivity with its consumer," *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y 2019) (quotations omitted).

Chart Statements 3, 6, 7, 10, 11, 20, and 27 fall into this nonactionable category because these promotional statements lack substantive information. For instance, the statements discuss policy reasons for structuring Medicare Advantage using risk-adjusted payments without any specific reference to the Company (TAC ¶ 293), describe the HouseCalls program as a growing one that helps Members stay healthy (*id.* ¶¶ 298, 299, 302, 303) while bringing value to the health care system (*id.* ¶ 302) and "saving the health system billions" through preventative care measures (*id.* ¶ 325). Another statement defends the Company's overall goals in training its healthcare providers (such as pronouncing that its training "leads to better care management, coordination, and patient follow-up") and explains the Company's expectations that its providers and partners "make independent clinical decisions," "diagnose and document patient information completely and accurately in compliance with [federal] guidelines." (*Id.* ¶ 317.) None of these statements is specific enough to be actionable (and many also contain non-actionable puffery). Accordingly, no reasonable shareholder would rely on these statements when making decisions, and these statements cannot support a claim under Rule 10b-5(b).

*ii. Accurate Historical Statements*

Defendants next argue that Chart Statements 5, 8, 9, 12, 13, 14, 16, 18, 19, 39, 40, 41, 42, and 43 disclose accurate historical data (and some include generic puffery), and therefore, they do not amount to actionable statements because the TAC contains no allegations of their falsity. *See Danske Bank*, 11 F.4th at 99; *see also In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1030–31 (D. Minn. 2009) (dismissing for failure to state a securities fraud claim because the complaint made no allegations that the statements at issue, which concerned past sales and economic success, were inaccurate); *In re Marion Merrell Dow Inc., Sec. Litig. II*, No. 93-0251-CV-W-6, 1994 WL 396187, at *3–4 (W.D. Mo. July 18, 1994) (concluding that defendant was not liable for accurate report about past performance, and discussing cases). The Court agrees with Defendants.

Chart Statements 5, 8, 9, 12, 13, 14, 16, 18, and 19 are non-actionable because CalPERS fails to allege with particularity that they are false.[9] For example, the statement that "UnitedHealthcare's revenue increased due to growth in the number of individuals served through Medicare Advantage and Medicaid, including a greater mix of people with

---

[9] At the hearing, CalPERS's counsel characterized the TAC as alleging that "HouseCalls is a fraud machine" and that no patient benefited from it. Even considering all of the allegations together, the Court does not agree because the TAC does not allege that the HouseCalls program was 100% fraudulent or that its *only* function was to manufacture fake health conditions. For example, the 2024 OIG report that forms the basis of many allegations notes that OIG "did not determine whether diagnoses reported only on HRAs or HRA-linked chart reviews were supported by documentation" and acknowledged that CMS did not concur with a recommendation at least in part for that reason. (Doc. No. 158-13 at 10, 12.) Absent allegations that the HouseCalls program had a single, fraudulent purpose, CalPERS cannot now rely on a sweeping characterization to meet the requirement that the TAC contain allegations of each statement's falsity at the time it was made.

higher acuity needs" (TAC ¶ 297) is a relatively generic statement that CalPERS does not plead with particularity was untrue when made. The TAC contains no allegations that, in 2021, UnitedHealthcare had not, in fact, grown its revenue by enrolling additional Medicare Advantage patients "including a greater mix of people with higher acuity needs." (*Id.* ¶ 297.) Similarly, the TAC includes no allegations that the Company did not actually "perform[] more than 2.1 million clinical preventive home care visits in 2021," or that those visits were intended "to address unmet care opportunities and close gaps in care." (*Id.* ¶ 300.) The other statements contain similar statistics or data concerning total number of completed visits, which the TAC does not allege with particularity to be untrue. (*E.g.*, *id.* ¶¶ 301 (listing a historical completion rate of 35% and stating that the Company "reached out over the last year to about 1 million members"); 305 (stating that the Company was on pace to complete 2.2 million house calls and explaining that "nearly 1 out of every 4 people we screened had a condition, they didn't realize they had and the hep C positivity rates for dual special needs members are nearly double the national average."); 307 (stating that the Company "performed nearly 2.3 million clinical preventative home care visits" in a prior year); 308 (stating that the Company was on pace to complete 2.5 million visits); 311 (stating that the Company was on pace to complete 2.5 million visits, 200,000 tests for diabetes and hep C, and 3.8 million screenings).) Therefore, the Court concludes Chart Statements 5, 8, 9, 12, 13, 14, 16, 18, and 19 are non-actionable.

Likewise, Chart Statements 39, 40, 41, 42, and 43 comprise either generic puffery, accurate statistical data concerning nursing home hospitalization rates, or both. For example, Chart Statement 39 includes generic puffery ("[W]e focus relentlessly on the

quadruple aim, including lowering total cost of care, providing better outcomes and outstanding patient experiences, and we are relentless in monitoring specific data points that help deliver . . . those outcomes.") and historical statistical data ("[M]embers that are in fully capitated arrangements overall have about a 30% lower hospitalization rate and about 40% lower skilled nursing facility occupation rate than their counterparts."). (TAC ¶ 294.) The TAC contains no allegations that the data is false as reported in that statement. Each of the other four statements contain much of the same. (*Id.* ¶ 304 ("M[edicare] A[dvantage] patients in value-based arrangements with Optum Care physicians are more engaged in their care, with adherence to wellness checks running 5 points higher than Medicare Fee-for-Service patients, helping to deliver a nearly 20% lower hospitalization rate."); 309 ("Seniors . . . can access a more integrated and comprehensive suite of critical health benefits . . . . They experience better health outcomes, such as an over 40% lower rate of available hospitalizations and consistently derive much greater value."); 313 (proclaiming that "people in our fully accountable M[edicare] A[dvantage] arrangements with Optum experience better complex care management" and listing several examples of lower hospitalization and emergency room admissions); 314 ("Consumers in Medicare Advantage also experienced better health outcomes across a broad range of measures, including more preventative care visits and fewer hospital visits.").) None of the allegations in the TAC assert that any of those historical statistics were factually inaccurate. Thus, CalPERS does not plausibly allege false, material statements relating to the Medicare Advantage nursing-home hospitalization rates in Chart Statements 39–43.

*iii. Forward-Looking Projections*

Defendants assert that Chart Statements 2, 15, 17, 23, 25, and 26 are non-actionable forward-looking statements that are unaccompanied by any allegation that they were false when made. Again, the Court agrees with Defendants.

To plead that a statement of future intent is "false or misleading when made," a plaintiff must allege contemporaneous falsity—that is, that the defendants "did not intend to" comply with their "stated intention" "at the time they announced they would.'" *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 488–89 (S.D.N.Y. 2021). In addition, under the PSLRA's safe-harbor provision, statements that "are identified as forward-looking and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" are non-actionable. *Trs. of Welfare & Pension Funds of Local 464A–Pension Fund v. Medtronic PLC*, 726 F. Supp. 3d 938, 972 (D. Minn. 2024) (quotation omitted); *see also* 15 U.S.C. § 78u-5(c) & (i)(1). A forward-looking statement is a statement for which the truth or falsity "is discernable only after it is made." *Julianello v. KV Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015). Examples of forward-looking statements include "(1) projections of revenues or other financial items, (2) statements of plans and objectives for future operations, and (3) statements of the assumptions underlying the previous two categories." *Id.* (citing 15 U.S.C. § 78u–5(i)(1)). For the safe-harbor provision to apply, cautionary language "must be extensive, specific, and directly related to the alleged misrepresentation." *Id.* (quotation omitted). "Cautionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as

the forward-looking statements." *Id.* (quotation omitted). "The requirement for meaningful cautions calls for substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Id.* at 921–22 (quotation omitted).

CalPERS argues that Defendants made the challenged statements about the Company's business performance knowing they were false because the Company did not disclose the existence and nature of its upcoding scheme. (Doc. No. 180 at 38–39.) CalPERS specifically challenges the Company's 2025 revenue projections as false because Defendants "concealed the upcoding scheme" and points to the portfolio refinement transactions as demonstrating the Company's recognition at the time that V28 would have a significant impact on its revenues. (Doc. No. 180 at 52–53.) CalPERS points to the Company's suspended and then revised 2025 forecast, plus Witty's and the then-CFO Rex's removals, as further confirmation that the Company knew that its 2025 estimates were false. (Doc. No. 180 at 55.)

The Court concludes that Chart Statements 2, 15, 17, 23, 25, and 26 are non-actionable because they are forward-looking and fall under the safe-harbor provision. For example, Chart Statement 15 is a comment that the Company is "firmly of the view that the 13% to 16% long-term growth rate of adjusted earnings per share is very much the zone we're in" and that they "believe" and "expect" to stay in that zone. (TAC ¶ 310.) This projection is purely prospective and, other than the 2025 revision to the Company's earnings projections, CalPERS does not allege with particularity that this projection was false. Similarly, in Chart Statement 17, on November 29, 2023, Witty acknowledged the

"significant change" and "material impact" of V28 but opined that the Company was still "committed to the kind of earnings growth rate over the next 12 months that you would expect from us," citing changes the Company was making to improve efficiencies. (*Id.* ¶ 312.) CalPERS asserts that this projection must have been false because, much earlier, even before V28 took effect, the Company conducted an analysis indicating that V28 would be impactful. (Doc. No. 180 at 40 (citing TAC ¶ 312(e).) But Chart Statement 17 itself acknowledged the V28 impact and the work the Company had done to try to offset it; whether those efforts would prove successful was a forward-looking statement, the veracity of which only time would tell. *See Julianello*, 791 F.3d at 921. Moreover, the Company issued meaningful cautionary language related to this issue, so the safe harbor applies. (*See* Doc. No. 172-8 at 18 (acknowledging the V28 rate changes and the related "continued pressure in the Medicare Advantage program").) Chart Statements 2, 23, 25, and 26 all pertain to future outlook and projections by UnitedHealth. (TAC ¶¶ 291 (answering a question about the future impact of "COVID headwinds" in an earnings call in 2021 by stating that "we are encouraged by the encounters with the physicians, the primary care visits and annual wellness visits as well as in-home clinical visits," and predicting "less of a headwind in 2022 due to those encounters"); 320 (noting that at some point in the future the Company "will introduce its 2025 outlook" including projections for revenue, earnings, and adjusted net earnings); 322 (reiterating Chart Statement 23); 324 (reiterating Chart Statement 23 and describing why that "outlook" "incorporates a view of care activity commensurate with what we saw in '24" and noting an expectation that "we start the year with highly informed insights in the care and needs of the people we will be

serving").) The TAC does not include any allegations that these forward-looking predictive statements were false.[10]

Thus, CalPERS does not plausibly allege that Defendants made false, material statements relating to the Medicare Advantage nursing-home hospitalization rates in Chart Statements 2, 15, 17, 23, 25, and 26.

*iv. Denials of wrongdoing.*

Defendants characterize Chart Statements 1, 4, 21, 22, 24, and 28 as purported denials of misconduct, which CalPERS has not alleged to be materially false. Once again, the Court agrees.

Statements denying "uncharged, unadjudicated wrongdoing," are non-actionable predicate statements for a claim of securities fraud. *E.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("Disclosure is not a rite of confession and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." (quotation omitted)); *see also Danske Bank*, 11 F.4th at 99–100. Here, each of these statements was made by the Company in response to articles published in the media on the nature of the HouseCalls program or are statements by the Company in the journalism pieces themselves, in which it discredits the methodology or data on which the journalists relied in their reporting on the Medicare Advantage program and touts the value

[10] To the extent that CalPERS argues that events in late spring and summer 2025 establish the falsity of these statements as a matter of law (Doc. No. 180 at 55), the Court is not convinced by this argument. The cases cited do not support this proposition of law, and assuming falsity based on these events amounts to fraud by hindsight, which cannot support a Rule 10b-5(b) claim. *See Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008).

of the program to Members. (TAC ¶¶ 290 (stating to the *WSJ* that its "in-home clinical care programs provide significant benefits to seniors and for years have been valuable offerings" and claiming general compliance with CMS rules); 296 (criticizing the OIG report as based on old date, inaccurate and misleading); 318 (criticizing the *WSJ* for flawed methodology and unsubstantiated assertions); 319 (criticizing the conclusions of the 2024 OIG report as inaccurate and incomplete); 321 (defending the HouseCalls program as a practice that leads to "better health outcomes and prevention, including less hospitalization, more cancer screenings and better chronic disease management" as well as a practice that helps "achieve Medicare Advantage's goals of improving quality and reducing costs"); 326 (criticizing the *WSJ* as engaging "in a year-long campaign to defend a legacy system that regards volume over keeping patients healthy" and generally stating that suggestions that the HouseCalls program is fraudulent "is outrageous and false").) The allegations in the TAC do not identify any specific factual falsity in any of these denials.[11]

*v. Portfolio Refinement Transactions*

Defendants argue that the alleged misstatements relating to its portfolio refinement transactions in Chart Statements 44, 45, 46, 47, and 48 cannot provide a basis for an actionable Rule 10b-5(b) claim because information about the transactions was fully and publicly disclosed and because the statements comprise non-actionable truthful statements of historical performance and forward-looking projections. For its part, CalPERS argues

[11] As noted above, to the extent that CalPERS argued at the hearing that these denials were false because the HouseCalls program was a "fraud machine," the Court cannot agree because the TAC does not allege that the HouseCalls program was 100% fraudulent.

that Defendants made strategic omissions and misleading statements to investors regarding the reason for and nature of the transactions. The Court agrees with CalPERS.

Chart Statements 44–48, when viewed in light of the TAC as a whole, sufficiently and particularly plead the misrepresentation element. CalPERS alleges that because of V28, the Company was unable to meet its 2024 Q4 earnings estimates, something that had not happened for the previous sixty consecutive quarters. (*Id.* ¶¶ 33, 270, 273, 331(f), 429, 430.) The TAC also includes allegations that, instead of being forthright about the reason for the transactions, the Company misleadingly reported the $3.3 billion earnings from the transactions under "operating costs" and omitted any mention of V28. (*Id.* ¶¶ 270, 274, 278, 330, 327.) One analyst labelled the sales "unusual" (*id.* ¶ 275), and another believed that the gains from the private equity transactions were "really including the equivalent of multiple years of earnings in one year," something that "probably should not have been included" (*id.* ¶ 277). Chart Statements 44–48 are also material because a reasonable investor would rely on them. That is, there is "a substantial likelihood that the disclosure of the omitted fact"—that the Company had to shore up its earnings with engineered transactions (*id.* ¶ 232)—"would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 805 (8th Cir. 2010).

Thus, the Court concludes that CalPERS adequately pleaded materiality and falsity with respect to Chart Statements 44, 45, 46, 47, and 48, and Defendants' motion is denied as to these statements.

b. Optum's Firewalls

CalPERS identifies a second group of statements, Chart Statements 29–36 regarding Optum's security firewalls, that could form the basis of a Rule 10b-5(b) claim. Defendants seek to dismiss any claim based on these statements, arguing that the statements are too generic or a statement of future intent. The Court agrees.

Chart Statements 29, 32, 33, 34, 35, and 36 are non-actionable "vague or optimistic rhetoric," or "puffery." For example, Chart Statement 29 comprises a portion of a February 2022 press release in which the Company makes generic statements about its commitment to safeguarding information security. (TAC ¶ 333.) Similarly, Chart Statement 32 comes from a June 2022 sustainability report to investors, in which the Company stated its commitment to data security and makes generic representations about how its "robust" information management systems meet industry standards. (*Id.* ¶ 336.) Chart Statements 33, 34, and 35 are culled from representations made by the Company in legal briefing to the Court hearing the DOJ's lawsuit to block the Change acquisition—they comprise puffing statements regarding the Company's "advanced and sophisticated technology architecture and infrastructure" that "prevent[s] the sharing of competitively sensitive information across business units" (*id.* ¶ 337), the robustness of its firewalls and investigations undertaken to test them (*id.* ¶ 338), and how the Company was committed to its historical data security policies to protect its customers' data (*id.* ¶ 339). Chart Statement 36 comprises a statement in materials created by the Company for a November 2022 investor conference, in which it touted its "long-established firewalls" and integrity of its claims-data security. (*Id.* ¶ 340.) These statements are the kinds of aspirational

rhetoric that is too vague and lacking in substance so as to actually sway a reasonable investor. *See, e.g.*, *Meredith*, 16 F.4th at 557 (concluding references to "proven strategies" were non-actionable corporate puffery); *Kusnier*, 639 F. Supp. 3d at 374 (concluding that defendant's statement of "uncompromising commitment to safety and customer satisfaction" was "pure puffery"). These statements do not include any "guarantees" or allegations "supported by specific statements of fact." *Kusnier*, 639 F. Supp. 3d at 373 (quotation omitted).

Further, the Court agrees that Chart Statements 30 and 31 are non-actionable statements of future intent—Chart Statement 30 comprises a forward-looking statement in the Company's March 2022 answer to the DOJ Change lawsuit, in which the Company represented that it "agreed to make binding commitments to its customers and the Government" to maintain and extend its "robust firewall processes" (TAC ¶ 334), and Chart Statement 31 comprises a statement in a March 2022 press release that represents the same[12] (*Id.* ¶ 335). Although the TAC includes allegations identifying a potential motive for acquiring Change's data (i.e., competitively utilizing claims data in UnitedHealthcare) and that the firewall protections did not prevent Optum from using external customer data as an unfair competitive advantage (TAC ¶¶ 13, 205–24), such allegations do not establish falsity; at best they might, if true, support an inference that the March 2022 representations

[12] Aside from its representation of an intention to maintain and expand its firewall protections, Chart Statement 31 also comprises rosy rhetoric about the resources expended by Optum to wall off its data from UnitedHealthcare. (TAC ¶ 335.) This portion of Chart Statement 31 is pure corporate puffery.

about expanding firewalls was false. However, the PSLRA requires that allegations of falsity be pleaded with particularity so as to "give rise to a strong inference," not with inference alone. *Novastar*, 579 F.3d at 882 (quotation omitted); *see also* 15 U.S.C. § 78u-4(b)(1). Nowhere does the TAC includes allegations that, in March 2022, the Company had no intention to actually maintain or expand its firewall protections after the merger, as it represented in Chart Statements 30 and 31. *E.g.*, *Born*, 521 F. Supp. 3d at 488–89 (S.D.N.Y. 2021) (concluding alleged misstatement related to company's representation that it would maintain stock listing on public exchange was non-actionable where plaintiff failed to allege contemporaneous falsity). Absent particularized allegations about the Company's intentions regarding Optum's firewall protections in March 2022, the Court cannot conclude that Chart Statements 30 and 31 were false when made.

c. Other Anticompetitive Practices

CalPERS identifies a third set of statements, Chart Statements 37 and 38 regarding the Company's alleged anticompetitive practices, establish a Rule 10b-5(b) claim. Again, the Court agrees with Defendants that these statements are also non-actionable.

Chart Statement 37 comprises a statement made by Witty at a June 2023 investor conference, in which Witty stated that the Company's performance-improving focus has been "making sure that we're exploiting the core synergy between Optum and UnitedHealthcare as much as we possibly can appropriately, of course, given the firewall requirements that are needed there." (TAC ¶ 342.) This, too, is puffery; it is vague and grandiose post-acquisition rhetoric that is too vague and lacking in substance so as to actually sway a reasonable investor. The Court disagrees with CalPERS's assertion that

Witty's statement was misleading because Witty did not inform investors of Optum's alleged practice of favoring Optum providers over non-Optum providers. (*See id.* ¶ 343.) But, as discussed above, the Company is under no obligation to confess to "uncharged, unadjudicated wrongdoing." *Danske Bank*, 11 F.4th at 98.

Chart Statement 38, for its part, comprises a snippet of the Company's Code of Conduct, which describes the Company's policy that, to comply with laws governing business competition, "each employee, director, and contractor must deal fairly with the Company's customers, service providers, suppliers, competitors, and employees. No employee or director should take advantage of anyone through unfair-dealing practices." (*Id.* ¶ 345.) Case law is clear that this statement—which describes the Company's aspiration to follow applicable law—is non-actionable. *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (concluding that aspirational statements about the importance of acting within the bounds of the law are "too general to cause a reasonable investor to rely upon them" and do not comprise a guarantee); *Retail Wholesale & Dep't Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (concluding statements in codes of conduct, which are "inherently aspirational," are non-actionable as material misrepresentation (quotation omitted)).

In summary, the Court concludes that Chart Statements 1–43 are non-actionable under Rule 10b-5(b) as material misrepresentations. CalPERS adequately pleads the falsity element only as to Statements 44–48, which relate to the portfolio refinement transactions.

**2. *Scienter***

The Court next considers Defendants' argument that CalPERS inadequately pleads

the scienter element as to Chart Statements 44–48, which relate to the portfolio refinement transactions.[13] For the reasons discussed below, the Court disagrees with Defendants.

The scienter requirement "refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To meet the heightened PSLRA standard, a plaintiff must "state with particularity . . . the facts evidencing scienter." *Okla. Firefighters Pension & Retirement Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1076 (D. Minn. 2012) (quoting *Tellabs*, 551 U.S. at 313). The complaint must, for "each act or omission alleged to [give rise to liability], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Meredith*, 16 F.4th at 556 (quoting 15 U.S.C. § 78u-4(b)(2)(A)). A "strong inference" is one that is "cogent and compelling" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Capella*, 873 F. Supp. 2d at

[13] The Court is concerned that the TAC does not sufficiently allege scienter as to Chart Statements 1–43. For one thing, an asserted motive of corporate greed and profit maximization alone does not evidence the requisite state of mind required to support he scienter element of a Rule 10b-5(b) claim. *Podraza v. Whiting*, 790 F.3d 828, 840 (8th Cir. 2015) (observing that "greed is a ubiquitous motive" and that desires "universally held among corporations and their executives does not contribute significantly to an inference of scienter" (quotations omitted)). Further, CalPERS has not alleged that any of the Individual Defendants, both of whom were senior executives, orchestrated, much less knew of, fraud below in the Medicare Advantage business or in representations regarding firewalls made by counsel in legal briefing. *Accord Elam*, 544 F.3d at 929 (8th Cir. 2008) ("This court has not expressly addressed the core operations method of pleading scienter, and we note the Fifth and Ninth Circuits have rejected it."); *In re 3M Co. Sec. Litig.*, No. 20-CV-2488 (NEB/KMM), 2021 WL 4482987, at *21 (D. Minn. Sept. 30, 2021) (noting the non-viability of the core-operations method of pleading scienter in the Eighth Circuit). Nevertheless, because the Court has concluded that Chart Statements 1–43 are non-actionable, it need not consider Defendants' argument that the TAC fails to plead scienter for these statements.

1083–84 (quoting *Tellabs*, 551 U.S. at 324). A section 10(b) securities-fraud case will not survive a motion to dismiss absent allegations that "point to contemporaneous reports, witness statements, or any [other] information that had actually been provided to defendants at the time they were alleged to have misrepresented material facts." *Id.* at 1076 (quoting *Tellabs*, 551 U.S. at 313).

A plaintiff may show scienter in at least one of three ways: "(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." *Podraza*, 790 F.3d at 836 (quotation omitted). When evaluating the sufficiency of the allegations of scienter, "courts must consider the complaint in its entirety," asking "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Capella*, 873 F. Supp. 2d at 1083 (quoting *Tellabs*, 551 U.S. at 322–23) (emphasis in original).

Here, Defendants argue that the refinement transactions were "fully disclosed asset sales," that CalPERS fails to allege any motive beyond the desire to maximize profits (which is insufficient to survive the motion), and the allegations concerning mental state are too speculative to give rise to scienter. (*See* Doc. No. 715 at 45 (citing *Podraza*, 790 F.3d at 840.) The Court concludes, however, that Defendants' arguments mischaracterize the allegations in the TAC. While Defendants correctly note that allegations of corporate greed alone are insufficient to give rise to scienter, *e.g.*, *Podraza*, 790 F.3d at 840 (observing that "greed is a ubiquitous motive" and that desires "universally held among

corporations and their executives does not contribute significantly to an inference of scienter" (quotations omitted)), the TAC alleges that Defendants were motivated by more than mere corporate greed when they made misleading statements to investors about the nature of the portfolio refinement transactions in late 2024 and early 2025. Rather, CalPERS alleges, with particularity, that Defendants wanted to prevent investors from learning that V28—which they referred to as "funding cuts" (TAC ¶ 133)—threatened its Medicare Advantage business revenue. This is "an unusual or heightened motive" that "give[s] rise to a strong inference of scienter." *Id.* at 840 (quotation omitted).

Further, CalPERS alleges that Defendants concealed the nature of the portfolio refinement transactions (TAC ¶¶ 269-70, 274–77) and discontinued its reliance on portfolio refinement transactions only after the impact of V28 on the Company's business became known. (*Id.* ¶¶ 282–85.) The allegations, if true, establish a sufficient mental state: the Company's then-CFO and Witty had knowledge that the statements made about the nature of the portfolio refinement transactions were not complete or accurate, and that they did so to avoid missing earning targets for the first time in fifteen years as well as to avoid explaining why that occurred. Thus, the Court concludes that CalPERS has sufficiently alleged scienter for Chart Statements 44–48.

### *3. Loss Causation*

Defendants next argue that CalPERS does not sufficiently allege the element of loss causation. (Doc. No. 175 at 56.) The Court concludes that the allegations in the TAC are sufficient for the Rule 10b-5(b) claim to proceed with respect to Chart Statements 44–48.

The loss-causation element requires a plaintiff to show that a defendant's misstatements "caused the loss for which [it] seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). This element is meant to limit a Rule 10b-5(b) claim to "those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). The heightened PSLRA pleading standard does not apply to the loss-causation element; instead, the pleading standard on this element is "not very stringent," *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003), and is satisfied by "a short and plain statement" indicating "the loss and the causal connection." *St. Jude*, 836 F. Supp. 2d at 908, 911 (quotations omitted). In short, at this stage, the loss-causation element is satisfied "by allegations that the plaintiff bought securities at a price artificially inflated by defendant's misrepresentations, and that the price dropped once the truth was revealed." *In re St. Jude Med.*, 836 F. Supp. 2d at 910 (quotation omitted). Plaintiff need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of loss causation." *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 701 (D. Minn. 2005) (quotation omitted).

Here, CalPERS sufficiently put Defendants on notice of what the relevant loss may be and the causal connection of that loss to the misrepresentations at Chart Statements 44–48. *See In re St. Jude*, 836 F. Supp. 2d at 910–11. CalPERS generally alleges that "[the Company]'s common stock traded at artificially inflated prices as a direct result of Defendants' materially false and misleading statements, and concealment of the relevant truth about the Company and Defendants' fraudulent scheme," and that the stock price dropped once the truth became known through several partial disclosures. (TAC ¶¶ 240–

43, 254–63, 280–86, 434–35, 445–01.) CalPERS further alleges that each partial disclosure corresponded with a subsequent decline in the price of Company stock. (*See, e.g.*, *id.* ¶¶ 20, 24, 25, 29, 35, 243, 255, 258, 260, 261, 502.) Therefore, CalPERS's claim is supported by sufficient allegations regarding loss causation.

## II. SECTION 20(a) "CONTROL PERSON" LIABILITY

Count II is for "control person" liability under section 20(a) of the Act. Both CalPERS and Defendants treat this claim as derivative; that it rises or falls on whether Count I survives. (Doc. No. 180 at 90.) Because a portion of Count I survives Defendants' motion, so, too, does Count II. *E.g.*, *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).

## III. SECTION 20A INSIDER TRADING

In Count III, CalPERS asserts a violation of section 20A of the Act against Hemsley and Witty, the Individual Defendants. Specifically, the TAC includes allegations that the Individual Defendants traded Company stock on several occasions during the putative Class Period to obtain dozens of millions of dollars in insider-trading proceeds. (TAC ¶¶ 523–28.) Defendants also seek dismissal of Count III, arguing that it fails for two reasons: (1) CalPERS does not allege with particularity that the Individual Defendants traded based on material non-public information; and (2) all but one of the allegedly violative transactions did not occur "contemporaneously" with CalPERS's purchase of stock. (Doc. No. 175 at 62–63.) The Court concludes that the allegations of the Individual Defendants' use of material non-public information are not sufficient to state a section 20A claim.

Section 20A provides for insider-trading liability as follows:

> Any person who . . . purchas[es] or sell[s] a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). The PSLRA's heightened pleading standard applies to insider-trading claims under section 20A. *Mart*, 595 F. Supp. 3d at 826.

CalPERS alleges that Witty and/or Hemsley sold stock on the basis on material non-public information on five occasions—specifically, July 18, 2022, July 26, 2022, July 19, 2023, October 17, 2023, and December 5, 2023. (TAC ¶¶ 389, 526.) For their part, Defendants argue that CalPERS's allegations are based on impermissible speculation. The Court considers the circumstances around each alleged sale, in turn.

First, CalPERS alleges that Witty's July 18, 2022 and Hemsley's July 26, 2022 sales were undertaken mere days before trial in the DOJ's lawsuit against the Company to block its acquisition of Change. (*Id.* ¶¶ 382, 383.) However, at the time of Hemsley's and Witty's sales, the case had been pending on a public docket for nearly five months. *United States v. UnitedHealth Grp. Inc., et al.*, No. 1:22-CV-0481 (CJN), Doc. No. 1 (D.D.C. Feb. 24, 2022). Further, as alleged in the TAC, the sales occurred *before* the bench trial in that matter began. (*Id.*) Finally, CalPERS appears to allege, at most, that Hemsley's and Witty's sales may have been informed by their own speculation about the outcome of a public judicial proceeding; that is, CalPERS does not allege that Hemsley and Witty acted on material non-public information. The July 18 and 26, 2022 sales, as pleaded, cannot form the basis of a section 20A claim.

Next, CalPERS alleges nothing about Witty's July 19, 2023 sale other than that it occurred and that it occurred seven days before CalPERS purchased common stock. (TAC ¶ 526.) Absent allegations regarding the information that informed Witty's decision to sell, the July 19, 2023 sale, as pleaded, cannot form the basis of section 20A claim.

Regarding Hemsley's October 17, 2023 sale, CalPERS alleges that Hemsley—who, at the time, was the Chair of the Company's Board of Directors (*id.* ¶ 45)—"sold 121,515 shares of [Company] stock for proceeds of over $65 million" just "one week after [the Company] was notified of the DOJ antitrust investigation but before it was publicly disclosed." (*Id.* ¶ 385.) One week before the sale, "[the Company] received notice that the DOJ had launched a "non-public antitrust investigation into the company." (*Id.* ¶ 229.) CalPERS further alleges that, one week *after* the sale, "at least 16 high-ranking" individuals within the Company received an email from Company senior counsel and executive vice president of governance, compliance, and security regarding the investigation. (*Id.*) However, these allegations—even if true—would not be sufficient to establish that Hemsley traded with any inside information even under the *Iqbal/Twombly* standard, much less the heightened PSLRA standard. At most, it speculates that Hemsley *may* have been among the sixteen "high-ranking colleagues" who received notice of the DOJ suit on October 24, 2023—seven days after he had sold his stock. Therefore, as pleaded, the October 17, 2023 sale cannot form the basis of a section 20A claim.

Lastly, CalPERS alleges that Hemsley's December 5, 2023 sale was a continued reaction to the DOJ antitrust investigation, which, at the time, was not publicly known. (*Id.* ¶¶ 230, 386.) CalPERS alleges that Hemsely sold "over 66,081 [Company] shares for

additional proceeds of more than $36 million." (*Id.* ¶ 386.) However, CalPERS does not allege that Hemsley actually had knowledge of the DOJ investigation. Allegations based on mere speculation are insufficient to meet the requisite pleading standard and survive Defendants' motion. As a result, the December 5, 2023 sale, which CalPERS merely speculates occurred on insider information, cannot form the basis of a section 20A claim.

Thus, because CalPERS has not alleged an actionable transaction to form the basis of a section 20A claim, the Court dismisses Count III,[14] without prejudice.

[14] Because CalPERS does not sufficiently allege that the Individual Defendants' sales were undertaken pursuant to material non-public information, the Court need not rule on Defendant's second argument: that the trades meet the "contemporaneous[]" requirement in section 20A. *See* 15 U.S.C. § 78t-1(a). The Court notes the parties' disagreement about the breadth of the term "contemporaneous[]" as it appears in section 78t-1(a) (which statute does not define). The Court need not resolve the dispute at this time, but observes that the weight of authority favors a definition of "contemporaneous[]" that is longer than Defendants' urged definition as "traded on the same day" (Doc. No. 175 at 62–63), but shorter than one week. *Mart*, 595 F. Supp. 3d at 826–28 (discussing cases); *see also, e.g.*, *Lamartina v. VMware, Inc.*, No. 20-CV-2182 (EJD), 2023 WL 2763541, at *19 (N.D. Cal. Mar. 31, 2023) (finding "ample precedent" that a four-day trading gap may be considered contemporaneous); *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1136 (N.D. Cal. 2020) (concluding that purchases more than two weeks after defendant's sale were too distant to satisfy the contemporaneity requirement); *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 560 F. Supp. 2d 1221, 1246 (M.D. Fla. 2008) (concluding that a purchase nearly one month after an insider's sale was too distant to be contemporaneous); *In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823-H (RBB), 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006) (finding a seven- or eight-day gap "on the border of an acceptable time period"); *In re Eng'g Animation Sec. Litig.*, 110 F. Supp. 2d 1183, 1196 (S.D. Iowa 2000) (concluding that plaintiff's purchase three days after defendants' sales was contemporaneous for purposes of Section 20A); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 144 (S.D.N.Y. 1999) (holding that purchases within five trading days of insider sales were "contemporaneous"). CalPERS's allegations appear to meet the "contemporaneous[]" requirement under section 20A. (*See* TAC ¶¶ 389, 526.)

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants UnitedHealth Group Inc.'s, Andrew Witty's, and Stephen Hemsley's motion to dismiss (Doc. No. 171) is GRANTED IN PART[15] and DENIED IN PART as follows:

   a. The portion of Count I alleging a violation of Rule 10b-5(a) and (c) is DISMISSED WITH PREJUDICE.

   b. The portion of Count I alleging a violation of Rule 10b-5(b) premised on Chart Statements 1–43 is DISMISSED WITH PREJUDICE.

   c. The motion is DENIED with respect to the portions of Counts I and II premised on Chart Statements 44–48.

   d. Count III is DISMISSED WITHOUT PREJUDICE.

2. All claims against Defendant Brian Thompson will be DISMISSED pursuant to Federal Rule of Civil Procedure 25(a)(1).

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 30, 2026

/s/ *Jeffrey M. Bryan*
Judge Jeffrey M. Bryan
United States District Court

---

[15] The TAC is the eighth pleading filed in this matter (Doc. Nos. 1, 45, 54, 79, 97, 110, 131, 158) and Defendants' motion to dismiss is their second. (Doc. Nos. 90, 171.) The Court reiterates and shares the Magistrate Judge's "concerns regarding the number of amendments and supplementations to the complaint and the delays those changes have caused in this case." (Doc. No. 156.) Therefore, the dismissed portion of Count I is dismissed with prejudice.